1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)

2
Yeremey O. Krivoshey (SBN 295032)
1990 North California Blvd., Suite 940

3
Walnut Creek, CA 94596
Telephone: (925) 300-4455

4
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com

5
         ykrivoshey@bursor.com

6
**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)

7
888 Seventh Avenue
New York, NY  10019

8
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163

9
E-Mail:  scott@bursor.com

10
*Class Counsel*

11

12
UNITED STATES DISTRICT COURT

13
NORTHERN DISTRICT OF CALIFORNIA

14

15
SANDRA MCMILLION, JESSICA
ADEKOYA, and IGNACIO PEREZ, on

16
Behalf of Themselves and all Others
Similarly Situated,

17

18
                          Plaintiffs,

         v.

19
RASH CURTIS & ASSOCIATES,

20
                          Defendant.

21

22

23

24

25

26

27

28

| | |
|---|---|
| | Case No. 4:16-cv-03396-YGR |
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| | Date: January 30, 2017 |
| | Time: 2:00 p.m. |
| | Courtroom: 1 |
| | Judge:  Hon. Yvonne Gonzalez Rogers |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on January 30, 2018 at 2:00 p.m. or as soon thereafter as counsel may be heard by the above-captioned Court, located at 1301 Clay Street, Oakland, CA 94612, Courtroom 1, 4th Floor in the Courtroom of Judge Yvonne Gonzalez Rogers, Plaintiffs Jessica Adekoya and Ignacio Perez ("Plaintiffs") will and hereby do move the Court for an order granting their motion for summary judgment.

This motion is made on the grounds that (1) the Global Connect, VIC, and TCN dialers constitute automatic telephone dialing systems within the meaning of the Telephone Consumer Protection Act, (2) Defendant never had prior express consent to call Plaintiff Perez, (3) Defendant did not have prior express consent to call Plaintiff Adekoya regarding her mother's account, (4) Plaintiff Adekoya revoked consent, (5) and Plaintiff McMillion revoked consent.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, Plaintiffs' Supporting Separate Statement, the Declarations of Yeremey Krivoshey and Randall A. Snyder, and exhibits thereto, filed herewith, the pleadings and papers on file herein, and upon such matters as may be presented to the Court at the time of the hearing.

### CIVIL LOCAL RULE 7-4(a)(3) STATEMENT OF ISSUE TO BE DECIDED

Whether (1) Global Connect, VIC, and TCN dialers constitute automatic telephone dialing systems within the meaning of the Telephone Consumer Protection Act, (2) Defendant had prior express consent to call Plaintiff Perez, (3) Defendant had prior express consent to call Plaintiff Adekoya regarding her mother's account, (4) whether Plaintiff Adekoya revoked consent, and (5) whether Plaintiff McMillion revoked consent.

Dated:  December 11, 2017                     Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Yeremey Krivoshey*
             Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No.295032)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email:  ltfisher@bursor.com
            ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**PAGE(S)**

I.      INTRODUCTION................................................................................................1

II.     BACKGROUND REGARDING DEFENDANT'S AUTODIALERS.................................2

III.    SUMMARY JUDGMENT STANDARD ........................................................5

IV.     DEFENDANT'S GLOBAL CONNECT, VIC, AND TCN DIALERS ARE
        AUTOMATIC TELEPHONE DIALING SYSTEMS PURSUANT TO THE
        TCPA..................................................................................................................5

        A.     Legal Standard for Automatic Telephone Dialing Systems ......................5

        B.     Each of Defendant's Dialers Are Automatic Telephone Dialing
               Systems....................................................................................................7

V.      DEFENDANT DID NOT HAVE PRIOR CONSENT TO CALL THE
        NAMED PLAINTIFFS .....................................................................................11

        A.     Defendant Never Had Consent to Call Perez ........................................12

        B.     Defendant Did Not Have Consent to Call Adekoya Regarding Her
               Mother's Account...................................................................................14

        C.     Defendant Called Adekoya After She Revoked Consent.........................15

        D.     Defendant Called McMillion After She Revoked Consent ....................15

VI.     CONCLUSION ...............................................................................................16

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 5

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................ 5

*Griffith v. Consumer Portfolio Serv., Inc.*,
838 F. Supp. 2d 723 (N.D. Ill. 2011) ................................................................. 6, 7

*Hernandez v. Collection Bureau of Am., Ltd.*,
2014 WL 4922379 (C.D. Cal. Apr. 16, 2014) ............................................... passim

*In re Applications of Booth Radio & Television Stations, Inc.*,
43 F.C.C. 2003, 1953 WL 83579 ("2003 FCC Order") ........................................ 6

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*,
30 F.C.C. Rcd. 7961 (July 10, 2015) ............................................................. 11, 14

*In Re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
18 F.C.C.R. 14014 (July 3, 2003) ......................................................................... 1

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG*,
Dkt. No. 92-90, 23 FCC Rcd. 559 (2008) ............................................................. 7

*Meyer v. Portfolio Recovery Associates, LLC*,
707 F.3d 1036 (9th Cir. 2012) ............................................................... 1, 7, 11, 14

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ............................................................................... 11

*Soppet v. Enhanced Recovery Co., LLC*,
679 F.3d 637 (7th Cir. 2012) ............................................................................... 11

*Thornhill Publ'g Co., Inc. v. Gen. Tel. Elecs. Corp.*,
594 F.2d 730 (9th Cir. 1979) ................................................................................. 5

*Van Patten v. Vertical Fitness Group, LLC*,
847 F.3d 1037 (9th Cir. 2017) ............................................................................. 11

*Warnick v. Dish Network LLC*,
2014 WL 12537066 (D. Col. Sept. 30, 2014) ................................................. 1, 6, 7

**STATUTES**

47 U.S.C. § 227(b)(1)(A) ........................................................................................... 6

1

**RULES**

2

Fed. R. Civ. P. 56(a) ................................................................................................................................. 5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.  INTRODUCTION

Plaintiffs' motion for summary judgment seeks to ensure a stream-lined trial that does not get bogged down in the technical details of automatic dialing systems that are not actually disputed by any party to this action.  The central element of Plaintiffs' Telephone Consumer Protection Act ("TCPA") claim is whether Defendant's dialers – VIC, Global Connect, and TCN – constitute Automatic Telephone Dialing Systems ("ATDS") within the meaning of the TCPA.  The Federal Communications Commission, which Congress vested with authority to prescribe regulations implementing the TCPA's requirements, has interpreted an ATDS as "cover[ing] any equipment that has the specified capacity to generate numbers and dial them without human intervention, *regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.*" *In Re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C.R. 14014, 14092 (July 3, 2003) ("2003 FCC Order") (emphasis added).  Since the 2003 FCC Order, "almost every court that has looked at the issue" has adopted the FCC's expanded definition of an ATDS.  *Warnick v. Dish Network LLC*, 2014 WL 12537066, at *12 (D. Col. Sept. 30, 2014) (citing, *inter alia*, *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)).  In the same 2003 Order, the FCC found that predictive dialers fell within the ATDS definition because "predictive dialers had the capacity to dial numbers without human intervention."  *Hernandez v. Collection Bureau of Am., Ltd.*, 2014 WL 4922379, at *2 (C.D. Cal. Apr. 16, 2014) (citing 2003 FCC Order, at 14091-93).  Here, as discussed in detail below, Defendant admits that its VIC and TCN dialers are predictive dialers, and admits that its Global Connect dialer operates without human intervention.  Indeed, the company that makes Global Connect advertises that Global Connect offers "predictive" dialing.  Instead, the dialers automatically call lists of numbers uploaded by Defendant's employees, automatically screen the calls, determine when (and what kind of) connections are made, and reroute answered calls to available representatives, when, and if, any representatives are available.  There is no reason to burden a jury with the technical specifications of complicated autodialing systems when there is no

genuine dispute that VIC, Global Connect and TCN constitute ATDS within the meaning of the TCPA.

Plaintiffs also move for summary judgment as to the issue of prior express consent on their individual TCPA claims.  This Court has already found that Defendant did not have prior express consent to call Plaintiff Perez.  Order Granting Plaintiffs' Motion for Class Certification., ECF Doc. No. 81, at 10.  Further, there can be no dispute that Plaintiffs Adekoya and McMillion revoked any purported consent Defendant may have had to call their cellphone numbers with its autodialers.  As a stark example, Defendant called Plaintiff McMillion using its TCN autodialer in January of 2017, six months after this case started.

## II.  BACKGROUND REGARDING DEFENDANT'S AUTODIALERS

Each of Defendant's three dialers (VIC, Global Connect, and TCN) used within the class period work essentially the same way.  In what Mr. Steven Kizer, Defendant's former Compliance Director, described as a "perfect-chain," new accounts are loaded into Defendant's debt collection software and telephone numbers are "immediately loaded to the dialer and phone calls begin." Krivoshey Decl., Ex. 3 Kizer Dep. 48:14-50:8; 50:7-12 ("Q. And so for a large file that comes in from a client, that is loaded typically automatically into the dialer and the dialer starts making calls; is that correct? A. Normally that would be the normal course of business.").  Depending on Defendant's preferences and priorities at any given time, Defendant's collections managers upload lists of accounts (with phone numbers) for the dialers to call, called "campaigns."  *Id*., at 51:18-52:18.  *See also* Plaintiffs' Supporting Separate Statement ("SSS"), at Facts 3, 13, 18; Correa Dep., at 17:6-12 (referring to TCN, testifying that TCN works by calling numbers uploaded into the dialer by Defendant's employees); *id*., at 21:10-18 (Global Connect works the same way); *id*., at 23:10-13 (referring to VIC, testifying that Defendant would load "numbers that our client had given us consent to call. Agents would log in; it would start calling").  Defendant's dialers can call multiple lists of phone numbers simultaneously.  *See* NK Dep., at 30:19-31:1.

Defendant admits that the VIC and TCN dialers are "predictive" dialers.  SSS, at Facts 12, 17; Correa Dep., at 23:10-13 (VIC was predictive); *id*., at 30:9-21 (testifying that TCN has the

capabilities of both VIC and GC in one, as it is able to be a predictive dialer and do messaging campaigns); NK Dep., at 26:22-27:11 ("Q. Does Rash Curtis use a predictive dialing system? A. Yes. … Q. …you think VIC is a predictive dialer? A. VIC is.").  Defendant's advertising materials extoll the "benefits" of using its predictive dialers as opposed to manually dialing telephone numbers:

> With a manual or basic dialer system, Account Representatives average only twelve to eighteen (12-18) minutes of each hour talking to contacts.  They spend the remaining forty-two to forty-eight (42-48) minutes dialing, listening for calls to connect, receiving busy signals, and waiting through numerous rings only to receive several "non-answers."
>
> **Our predictive dialer increases our productivity by automatically handling all mundane dialing tasks.  Our system dials out on four to five (4-5) lines per workstation, automatically sorting each call outcome into appropriate queues.**  This enhances our self-pay Account Representatives' effectiveness by increasing our contact time.
>
> Our system accomplishes this by passing only those calls that have been answered by a "live voice" to our Account Representatives.  Within milliseconds, the connection is passed to an Account Representative as the account simultaneously appears on our Account Representative's screen…
>
> **Busy signals and no-answers are automatically placed in separate queues to be recalled on demand.**  Answering machines can be retried later or passed to an operator who will leave a message.  By connecting our Account Representatives to only those calls that have been answered, the predictive dialer gives our Account Representatives more time to produce results…

Krivoshey Decl. Ex. 12 (Exhibit 24 to DC Dep.), at 18 (emphasis added).  *See also* Krivoshey Decl. Ex. 9 (Exhibit 4 to NK Dep.) at 8 (stating that Defendant's predictive dialer uses "Automatic dialing algorithms to optimize outbound call volumes based on the ratio of current contacts versus Account Representatives available to receive a call").  VIC could call a minimum of at least three numbers per available agent, while TCN can call up to ten numbers simultaneously per available agent.  SSS, at Facts 14, 19; DC Dep., at 20:14-20; 25:11-20.  If there was no available agent when a person answered a call made by TCN or VIC, the call would either automatically be dropped or the person would be placed on silent hold.  DC Dep., at 19:1-5 (testifying that when a person does not answer a call, a "majority of the time it will drop the call and go on to the next number"); 19:22-20:1; 25:21-27:15.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Up until the end of 2016 or the beginning of 2017, Defendant used the VIC and Global Connect dialers simultaneously, then transitioned to TCN as its sole dialer likely at the beginning of 2017.  *See* SSS, at Facts 1, 11, 16.  Defendant used Global Connect for its capability to perform messaging campaigns, whereby the recipients of calls made by Global Connect would hear prerecorded messages.  *Id.*, at Fact 5.  Defendant transitioned to TCN because, like VIC, it is a predictive dialer, and, like Global Connect, it can perform messaging campaigns.

Aside from its messaging capabilities, the main difference between Global Connect and VIC is that, for VIC, certain accounts are linked with specific account representatives, whereas Global Connect calls are routed to Defendant's entire collections office to be answered on a first-come first-serve basis.  *See id.*, at Facts 2, 7, 11, 16; Kizer Dep., at 55:13-16 ("meaning whoever grabs the phone first gets the call"); Snyder Decl. ¶¶ 17, 19-22, 24-26, 48-50 (comparing functionalities of predictive and progressive dialers).  Indeed, the company that makes Global Connect advertises that, like TCN and VIC, Global Connect offers "**predictive**, preview, and manual dial modes."  Snyder Decl., at ¶ 45, Ex. D (emphasis added).  As discussed above, Global Connect automatically dials numbers from lists uploaded by Defendant's collections managers, according to specific criteria set by Defendant.  SSS, at Fact 3.  Global Connect could make 10 simultaneous calls per available agent.  SSS, at Fact 4; DC Dep., at 21:19-23.  *See also* Krivoshey Decl. Ex. 9 (Exhibit 4 to NK Dep.), at 8 (stating the Global Connect "increases normal contact rates by as much as 500% and enables" Rash Curtis to "[r]each thousands of contacts within minutes").  Defendant's call logs show that Global Connect actually made about **59 calls per minute for roughly 12.5 hours per day**.  Snyder Decl. ¶ 67.  *See also* SSS, at Facts 8, 9.  Like VIC, Global Connect's software had the ability to route only those calls to agents that were answered by a live person.  Snyder Decl., at ¶¶ 19, 48-49.  When a person picked up a call made by Global Connect, they would hear a prerecorded message asking for the intended recipient.  SSS, at Fact 5; DC Dep., at 22:20-23:2.  Call recipients would then get a prerecorded menu of option of numbers they could press, such as "if you are John Doe, please press 1; if you are not John Doe, press 2."  DC Dep., at 23:14-24:17.  If there were no available agents when call recipients

completed the automated prompts, call recipients would hear a pause before another agent became available and connected.  *Id.*, at 22:6-12; SSS, at Fact 6.  For a brief period of time within the class period, Defendant decided to refrain from calling cellphone numbers using Global Connect because it believed that Global Connect was a "robo call" that did not have "human interaction."  *See* BK Dep., at 16:20-17:13; Krivoshey Decl., Ex. 19 (Exhibit 37 to BK Dep.) at 1.  *See also* SSS, Fact 10.

### III.  SUMMARY JUDGMENT STANDARD

"Summary judgment is proper where the pleadings, discovery and disclosure materials on file, as well as any affidavits, show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Hernandez*, 2014 WL 4922379, at *1 (quoting Fed. R. Civ. P. 56(a)).  "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact."  *Id.*, (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "A factual issue is 'genuine' when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor."  *Id.*, (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

"In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor."  *Id.*, 2014 WL 4922379, at *2.  "But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issue of fact and defeat summary judgment."  *Id.*, (citing *Thornhill Publ'g Co., Inc. v. Gen. Tel. Elecs. Corp*., 594 F.2d 730, 738 (9th Cir. 1979)).

### IV.  DEFENDANT'S GLOBAL CONNECT, VIC, AND TCN DIALERS ARE AUTOMATIC TELEPHONE DIALING SYSTEMS PURSUANT TO THE TCPA

#### A.  Legal Standard for Automatic Telephone Dialing Systems

"Congress enacted the TCPA in 1991 in response to consumer complaints about the growing number of telemarketing calls and use of telemarketing practices that were found to be an invasion of consumer privacy."  *Id*.  The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system … to any telephone number assigned to a … cellular

telephone service." 47 U.S.C. § 227(b)(1)(A).  The TCPA defines "automatic telephone dialing system" ("ATDS") as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  *Id.*, § 227(a)(1).

"In 2003, the Federal Communications Commission ('FCC') was asked for guidance as to whether predictive dialers fell within the scope of the TCPA's definition of automatic telephone dialing system."  *Hernandez*, 2014 WL 4922379, at *2 (citing *In re Applications of Booth Radio & Television Stations, Inc.*, 43 F.C.C. 2003, 1953 WL 83579 ("2003 FCC Order")).  "The Commission noted that unlike prior versions of automated dialing technology, which created and dialed 10-digit phone numbers arbitrarily, predictive dialers relied on a stored database of numbers which could then be dialed at a rate to ensure that when a consumer answered the phone, a sales person would be available to take the call."  *Id.*  "The Commission also noted that while such technology was a clear advance in the nature of automated dialing equipment, to exclude it from coverage under the TCPA simply because it relied on phone numbers being pre-programmed into the system rather than arbitrarily producing random or sequential numbers to call, would lead to an unintended result."  *Id.*  "The Commission recognized that technological advances aside, 'the basic function of such equipment … has not changed-the capacity to dial numbers without human intervention.'"  *Id.* (quoting 2003 FCC Order, at 14092).  "Therefore, because predictive dialers had the capacity to dial numbers without human intervention, the Commission concluded that they fell within the statutory definition of automatic telephone dialing system and the intent of Congress."  *Id.*  *See also Warnick v. Dish Network LLC*, 2014 WL 12537066, at *12 (D. Col. Sept. 30, 2014) (noting that pursuant to the FCC, the definition of ATDS covers "any equipment that has the specified capacity to generate numbers and dial them without human intervention, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.") (quoting 2003 FCC Order, at 14092)); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011) (noting that the FCC interprets ATDS as including "equipment that utilizes **lists or databases of known, nonrandom telephone** numbers") (emphasis added).

In 2008, the FCC issued a declaratory ruling affirming the 2003 Order.  *Id.* (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Dkt. No. 92-90, 23 FCC Rcd. 559 (2008)) ("2008 FCC Order").[1]  "Indeed, this expanded definition of an ATDS per the FCC rulings has been adopted by almost every court that has looked at the issue."  *Warnick v. Dish Network LLC*, 2014 WL 12537066, at *12 (citing, *inter alia*, *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)).

### B.  Each of Defendant's Dialers Are Automatic Telephone Dialing Systems

Court's evaluating debt-collectors' dialing systems almost identical to those used by Defendant have found such dialing systems constitute ATDS *as a matter of law*.  For instance, in *Griffith*, Judge Grady found the following dialer to constitute ATDS as a matter of law on summary judgment:

> The night before a dialing campaign begins, a computer program reviews account information for every CPS [(the defendant)] customer listed in the Customer Information File and identifies customers eligible for the dialing campaign using criteria selected by CSP.  Gallagher Decl. ¶ 8 (stating that as a first cut CPS might, for example, use the program to identify all customers who are less than 60 days in arrears).)  This same program then copies the account and telephone numbers of each eligible customer into a new temporary computer file called the "Dialer File."  On the day of the campaign, a supervisor in CPS's collections department inputs additional criteria for the dialing campaign into CPS's Collections System, effectively telling the CPS collection System which numbers the dialer should call … Clewel Decl. ¶ 7 ("The supervisor might decide, for example, that Illinois customers who owe $500 or more and are 21 to 30 days behind should be called during the campaign.").)  The program then reviews the Dialer File for accounts that satisfy the criteria and copies those accounts and associated telephone numbers into a new file called the "Logical View File."  At the same time, the supervisor assigns certain CPS employees ("collectors") to the campaign, who then use the program to "sign on" to the campaign so that they can 'answer' the calls made by the Castel dialer that actually connect to consumers."  Once the dialing campaign begins, the Castel dialer "reads" the telephone numbers set at the "predictive dialing rate" set by the supervisor.  The dialer determines whether a call is answered by a customer, and if so, routes the call back to CPS's computer system, which forwards the call to an available collector.

*Griffith*, 838, F. Supp. 2d, at 724, 728 (quotations and citations omitted).  Judge Grady held that even though the dialer at issue "cannot generate and dial random or sequential numbers, it is still an 'automatic telephone dialing system,'" as the dialer "automatically dials numbers stored in the Logical View File and routes answered calls to available collectors."  *Id.*, at 727.

---

[1] District courts lack jurisdiction to challenge the validity of the 2003 FCC Order.  *Hernandez*, 2014 WL 4922379, at *3.

In *Hernandez*, 2014 WL 4922379, at *1, *3–4, Judge Wright similarly found that a debt collector's dialing system constituted ATDS as a matter of law, even though the dialer "does not have any computer code that allows it to generate either random or sequential telephone numbers, nor does it have the capacity to store or produce and call numbers from a number generator:"

> Rather, the CT Center operates by interfacing with a database of debtor accounts – including phone numbers – provided to it by its user, CBA.  The list of particular accounts to be contacted on any given day is created the prior evening by CBA's President, Shawn DeLuna.  Once the CT Center is provided a list of accounts – and therefore, telephone numbers – to contact, it is able to place calls to those account holders using certain pre-defined calling criteria.  If desired by CBA, these calls can be made using the CT Center's predictive dialing capability.  Using that capability, the system can calculate the anticipated time when an agent on a call will be available to take another call, based on factors like that agent's average talk time, and place calls accordingly.  In doing so, the system is able to minimize each agent's idle time, waiting for the call recipient to answer the call.

*Id.*, at *1 (citations omitted).

VIC, Global Connect, and TCN share all the relevant characteristics with the dialers at issue in *Hernandez* and *Griffith* that led Judge Wright and Judge Grady to find those dialers met the definition of ATDS as a matter of law.  As in *Hernandez* and *Griffith*, Defendant's dialers call numbers from a list uploaded by Defendant's employees.  SSS, at Facts 3, 13, 18.  As in *Hernandez* and *Griffith*, Defendant's dialers automatically call multiple numbers (between 3 to 10) per available agent, monitor answer rates, and then transfer live calls to available agents, when and if agents become available.  *Id.*, at Facts 2, 4, 6, 12, 14, 17, 19.  Defendant's autodialers are precisely the types of dialers the FCC sought to categorize as ATDS pursuant to its 2003 and 2008 Orders discussed above.  They are dialers the FCC determined operate without "human intervention," as made obvious by the fact that Defendant's dialers are able to dial multiples of numbers simultaneously from predetermined lists, even when no available agents are available to answer the thousands of calls made.  *Id.*, at Facts 9, 10, 15, 20.  The dialers, not Defendant's employees, determine when a call has been answered, whether a call has been answered by a live person or an answering machine, and whether there is a busy tone.  *Id.*  Defendant's autodialers are able to make "thousands of contacts within minutes," event though Defendant only has roughly 30 available call representatives at any given time to answer calls made by the dialers.  *See* NK Dep., at 34:6-11; SSS, at Fact 9.  No "human interaction" is involved between the time that Defendant

uploads lists of numbers for its dialers to call and the time that its dialers reroute answered calls to available representatives.  SSS, at Facts 10, 15, 20.

Further, Defendant knows that its dialers constitute ATDS pursuant to the TCPA, and, because they are ATDS, that Defendant needed express prior consent to call cell phones with its dialers.  For this reason, Defendant would episodically ensure that no cell phones were dialed with the dialers after getting sued for TCPA violations, but would resume calling cellphones after a few days *in order to cut costs and generate more revenue*.  Kizer Dep., at 73:19-81:2.  Decisions to call cellphones through the dialers in violation of the TCPA were made consciously by the upper echelons of Rash Curtis' management.  *Id.*, at 74:23-75:11.  Mr. Kizer testified:

> Q.  Do you know why Rash Curtis made the decision at the times that it decided to place cell phone numbers into the dialers[?]…
>
> …
>
> A ... There was a time when it was made completely crystal clear to management that calling cell phones was violation of statute.  It was illegal.  You're not supposed to do that without consent.
>
> Q.  The TCPA, is that what you're referring to?
>
> A.  Correct.
>
> Q.  And who made that clear?
>
> A  The first indication that it was made clear was made [by] Bob Keith, Robert Keith, VP of the legal department.  I agreed with him and Chris Paff overrode us, overrode that decision in the initial beginning, and we're talking a period probably covering a couple of years.
>
> ...
>
> Q. So when you first started for those first couple of years, the decision was made to include cell phone numbers being inputted into the dialer?
>
> A. That is correct, knowing that it was not supposed to be happening.
>
> ...
>
> Q. Okay. So at some point did they stop then?
>
> A. When it was apparent it could potentially be too expensive.  So it's a cost factor...So we're calling them knowing we're not supposed to.  We are getting hit maybe with some very minor lawsuit, [$]1500, [$]3000.  Bob, Robert Keith, would come out of his office, vice president of the legal department, be all upset, because he's complaining he's having to cut checks for $3,000...So he would could out and say, he, we've been sued.  I want to stop

making announcements to the entire floor.  Don't call cell phone numbers.  Make sure they're not in the header, and then that would go for about two or three days.

...[Y[ou know, it basically was cost.  After a couple days, they'd go right back to the same thing.

Q.  ...[S]o when you left Rash Curtis ... was Rash Curtis still loading cell phones into the dialer?

A.  Yes, sure.

Q.  Did management ever explain their decision to restart loading cell phones into the dialers?

A.  Not the staff, but in meeting they did.

Q.  Were you a part of those meetings?

A.  I was present at them.

Q.  So what were the reason given?

A.  We need money.

Q.  ...So they figured by calling --- by loading cell phones into the dialer, they could make more money from their accounts[?]

A.  That is correct, and unfortunately it's true ... [Y]ou have to understand the economics of things.

... So if I could on call a landline ... I'm probably going to eliminate 99 percent of all the phones in the entire system very quickly.  My dialer is no longer something I should pay for.

So at some point what they're doing is they're saying, we're short [$]175,000 this month.  We've got to make up some ground.  We have ten days left.  They'd hit it.  They'd hit every phone number...

Q.  When you say they hit every phone number, what do you mean?

A.  Every number of Phone Fields 1 through 10.

Q.  All accounts across the board in Rash Curtis' system?

A.  That's correct...

*Id.*, 74:11-81:10.  In other words, there is no genuine dispute whether Defendant's dialers are

ATDS.  Accordingly, the Court should find that the VIC, Global Connect, and TCN dialers are

ATDS as a matter of law.  The only class issues that need to be determined at trial are the number

of times Defendant called class members using its autodialers (damages), lack of prior consent on a

class basis (it is Defendant's burden to prove at trial that it had prior express consent), and willfulness of Defendant's TCPA violations (treble damages).

## V.  DEFENDANT DID NOT HAVE PRIOR CONSENT TO CALL THE NAMED PLAINTIFFS

"Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which defendant bears the burden of proof." *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).  The Ninth Circuit has defined "express consent" to mean "clearly and unmistakably stated." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).  In the debt collection context, the Ninth Circuit has clarified that "prior express consent is consent to call *a particular telephone number in connection with a particular debt* that is given before the call in question is placed."  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012)*.  See also Van Patten*, 847 F.3d at 1045 ("giving a contact phone number is not prior express consent for any contact, instead prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, *and that such number was provided during the transaction resulted in the debt owed*") (emphasis added and quotations omitted).  In the debt collection context, a debt collector is not deemed to have prior consent to call a person even where the real debtor provides the creditor with someone else's phone number, such as by mistake, through a typographical error, or on purpose so that someone other than the actual debtor would receive debt-collection calls.  *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 641 (7th Cir. 2012) (holding that a debt collector does not have consent even where a debtor had "given 'consent' to call someone else's number – perhaps Customer put down his own number with a typo, or the number of a person against whom Customer held a grudge").

Although the TCPA does not explicitly give consumers a right to revoke consent to receive autodialed calls, a 2015 FCC Order has clarified that consumers "have the right to revoke consent, using any reasonable method including *orally or in writing*."  *Van Patten*, 847 F.3d at 1047 (quoting *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C. Rcd. 7961 (July 10, 2015) (the "2015 FCC Order") (emphasis added)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.       Defendant Never Had Consent to Call Perez

Defendant has admitted that "Defendant was attempting to reach a different individual when it called Mr. Perez's cell phone number."  Defendant Rash Curtis & Associates' Supplemental Opposition to Plaintiffs' Motion for Class Certification ("Class Cert. Surreply"), ECF Doc. No. 71, at 3.  Indeed, Defendant has never challenged Plaintiffs' assertion that Defendant has never had an account in Plaintiff Perez's name, and has never produced any documents showing that it has an account in Plaintiff Perez's name.  SSS, at Facts 21, 25.  Instead, in its Class Cert. Surreply, Defendant claimed that it purportedly had consent through "coincidence or divine providence" on the basis that Plaintiff Perez is a personal care-taker who provided his cellphone number to Sutter General Hospital in connection with a client *who is not the debtor Defendant was calling about*.  *See* Class Cert Surreply., at 3.  *See also* Krivoshey Decl., Ex. 14 ("Perez Dep.") at 9:21-10:23, 20:12-21, 45:24-46:18 (Perez describing his occupation as a "caregiver" for adults through In Home Support Services).  Exhibit 6 to Mr. Keith's declaration in support of Defendant's Class Cert Surreply shows that Defendant was calling Plaintiff Perez regarding an account belonging to someone named Daniel Reynoso, who also provided the name Darlene Lopez as a "primary contact."  ECF Doc. No. 71-2, Ex. 6; SSS, at Fact 21.  At Mr. Perez's deposition, Defendant repeatedly asked if Daniel Reynoso or Darlene had ever been Mr. Perez's clients, and whether he has even ever heard their name.  Mr. Perez unequivocally stated that he had never heard of either of these people, and that they have never been his clients.  Perez Dep. at 30:13-16 ("Q. Do you know a Darlene Lopez? A. No. Q. Do you know a Dan Renozo? A. No."); *id*. at 45:13-23 ("Q. ... Did you ever have a patient by the name of Dan Renozo? A. No. A. Someone that lived in the house? A. No. ... Q. What about Darlene Lopez? No."); *id*. at 46:19-25 (same); *id*. at 48:18-49:6 (same).

As part of his job as a caregiver, Plaintiff at times took his patients to Sutter General Hospital because it is "the best facility in Sacramento."  *Id*. at 46:5-8.  Plaintiff Perez testified that he provided his phone number to Sutter "when [he] checked" in his patients, and did so "on behalf of [his] patients."  *See id*. at 47:1-48:2.  Plaintiff Perez also testified that he once gave his number to Sutter when his uncle was sick at the hospital and ultimately passed away there in 2014.  *Id*. at

49:17-24.  In addition, when Plaintiff Perez was personally sick and "blacked out" while visiting his sick uncle, he may have given his phone number to Sutter to be contacted regarding his own health issues.  *Id*. at 50:19-51:7.  In sum, Defendant has not presented a shred of evidence that Plaintiff Perez provided his telephone number to Sutter with regards to any anyone other than his personal clients, his dying uncle, and with regards to his own illness.  *See* SSS at Fact 24.

Defendant has previously argued that the "coincidence or divine providence" of Plaintiff Perez providing his number to Sutter in connection with completely unrelated accounts shows that Sutter, and by extension, Defendant, had "prior express consent" to call his cellular telephone number with an autodialer.  Class Cert. Surreply, at 3.  Fortunately, the standard for "prior express consent" is not "divine providence."  Indeed, this Court has already found that the above factual scenario does not evidence consent to call Plaintiff Perez:

> Perez's deposition does, indeed, indicate that Perez gave his phone number to Sutter General Hospital, which is the entity on whose behalf defendant called Perez.  However, according to a declaration submitted by defendant, Perez's provision of his phone number was not in connection with any particular debt owed by Perez.  Rather, Sutter General Hospital referred a debt account associated with another individual.  (Dkt. No. 71-2, Keith Decl. ¶ 4; *see also* Exhibit 6 thereto).  Sutter General Hospital then allegedly forwarded to defendant that individual's patient information sheet at some point, which included a cell phone number that belonged to Perez.  That sequence of events does not constitute prior express consent.

Order Granting Plaintiffs' Motion for Class Certification, ECF Doc. No. 81, at 10.  Defendant has not produced any evidence since the Court's September 6, 2017 Order suggesting that it has any evidence of prior express consent.  In fact, Defendant has since produced emails strongly suggesting that Defendant obtained the patient information sheet attached as Exhibit 6 to Bob Keith's Surreply declaration *months after this litigation began*, and not, as Mr. Keith previously declared, on May 7, 2015.  *See* Krivoshey Decl., Ex. 13 (Nick Keith asking one of Defendant's employees to call a Sutter employee to obtain "Prior Express Consent Documents" (the facesheet) regarding Plaintiff Perez's[2] account on November 21, 2016); SSS, at Fact 22.  Rather, as this Court

---

[2] Plaintiffs infer that Nick Keith was asking for Plaintiff Perez's facesheet from the fact that the subject of the email is "McMillion v. Rash Curtis – Prior Express Consent Documents" and Plaintiff Perez is the sole Plaintiff in this litigation whose phone number was called regarding a debt account opened by Sutter.  *See* Krivoshey Decl., Ex. 13.  The facesheet attached as Exhibit 6 to Bob Keith's Surreply declaration is also the only document Defendant has ever claimed evidences consent to call Plaintiff Perez's telephone number.

has already found, Defendant obtained Plaintiff Perez's telephone number through skip tracing, and not from Plaintiff Perez directly or through any facesheet purportedly provided to Defendant by Sutter.  Order Granting Plaintiffs' Motion for Class Certification, ECF Doc. No. 81, at 10-11; Kizer Dep. at 45:19-46:13; 46:4-5 ("Majority of our clients do not initially send proof of debt."); *Id.* at 47:23-48:1 ("Q. Some accounts come in with a phone number from the debtor and other accounts come in without a phone number for the debtor?  A. Yes, sir."); 45:25-46:5 (specifying that "**Sutter does not**" provide proof of debt (credit application) when it opens a debt collection account with Defendant) (emphasis added).  Accordingly, there is no genuine issue of material fact as to the issue of whether Defendant had express prior consent prior to calling Plaintiff Perez with an autodialer.

### B.   Defendant Did Not Have Consent to Call Adekoya Regarding Her Mother's Account

Geraldine Caldwell, Plaintiff Adekoya's mother, did not provide Plaintiff Adekoya's cellphone number to Doctors Medical Center, the creditor on whose behalf Defendant called Plaintiff Adekoya's cellphone.  Krivoshey Decl., Ex. 16 (RCA000281 facehsheet); SSS, at Fact 30. Rather, the facesheet regarding Ms. Caldwell's account shows that she only provided her personal phone number to her creditor, and did not provide Plaintiff Adekoya's phone number despite listing her as an "emergency contact."  *See id.* (Plaintiff Adekoya's phone number ends with 5496). However, Defendant's call records show that Defendant called Plaintiff Adekoya six times between January 8 and January 11, 2014 using Global Connect prior to connecting with Plaintiff Adekoya, at which point Plaintiff Adekoya purportedly gave Defendant consent to call her regarding her mother's account.  *See* Krivoshey Decl., Ex. 16 (RCA000258); SSS, at Fact 31. Defendant has produced no evidence that it had any consent to call Plaintiff Adekoya's cellphone regarding Ms. Caldwell's account prior to the January 13, 2014 call transcribed at RCA00258.  *Id.* It is immaterial whether Defendant purportedly had consent to call Plaintiff Adekoya regarding accounts other than Ms. Caldwell's, such as Plaintiff Adekoya's personal account and an account belonging to her son.  *Meyer*, 707 F.3d at 1042 ("prior express consent is consent to call *a particular telephone number in connection with a particular debt* that is given before the call in

question is placed").  Accordingly, there is no genuine dispute of material fact as to whether Defendant had consent to call Plaintiff Adekoya six times between January 8-11, 2014 using Global Connect.

### C.     Defendant Called Adekoya After She Revoked Consent

On October 26, 2017, the day after the discovery cut-off (after representing for over a year that no call recordings exist), Defendant produced a call recording of a call made to Plaintiff Adekoya dated April 18, 2016.  Krivoshey Decl., Ex. 15.  On the call, Plaintiff Adekoya can be heard unequivocally telling Defendant's representative that she revoked any consent to call her cellphone:

> **Adekoya**: ... **I told you guys to stop calling me, but you guys keep calling me**, and then the one before, she almost had me fired from my job, so I'm having something filed against you guys, **because I asked you nicely to stop calling ... but you guys are not supposed to be contact me**.
>
> **Defendant**: I'm sorry I don't see where we got down not to call you.
>
> **Adekoya**: **[Y]eah I've been saying that for a long time**.

*Id*., starting around minute 6:13 of the audio file; SSS, at Fact 28.  After this revocation of consent, Defendant's records show that Defendant called Plaintiff Adekoya's cellphone on the following dates on April 27, 2016 and April 28, 2016 using Global Connect.  Krivoshey Decl., ¶ 21; SSS, at Fact 29.  Accordingly, there is no genuine dispute as to the material fact that Defendant called Plaintiff Adekoya two times using Global Connect after she revoked consent.

### D.     Defendant Called McMillion After She Revoked Consent

Defendant's account notes for February 2, 2016 state that Plaintiff McMillion "ASKED FOR NO MORE CALLS AT ALL SHE HAS A ATTY SO I ASKED FOR HIS INFO SHE SAID DNC ME AGAIN UH AND REMOVE ALL NUMBER."  Krivoshey Decl., Ex. 18, at RCA000227; SSS, at Fact 32.  Reviewing the above account notes, Dan Correa testified that it "[l]ooks like she said don't call us anymore, she has an attorney."  DC Dep. 85:23-86:8.  Despite Plaintiff McMillion's revocation of consent, Defendant's call logs show that her cellphone was called by Global Connect on February 16, 2016 and February 17, 2016.  Krivoshey Decl., Ex. 18 (RCA000227); SSS, at Fact 33.

1

2

On June 17, 2016, Plaintiff McMillion filed the Class Action Complaint in the present

action, *McMillion, et al., v. Rash Curtis & Associates*, Case No. 4:16-cv-03396-YGR in the

3

Northern District of California, and thereby revoked any purported consent Defendant may have

4

had in calling her cellphone. *See* Class Action Complaint, ECF Doc. No. 1, at ¶¶ 2, 23; SSS, at

5

Fact 34.  Defendant called Plaintiff McMillion's cellphone two times on January 25, 2017 through

6

its TCN dialer.  Krivoshey Decl., at ¶ 22; SSS, at Fact 35.  Accordingly, there is no genuine dispute

7

as to the material facts that Defendant called Plaintiff McMillion two times using Global Connect

8

after she revoked consent, and two more times using TCN after she revoked consent.

9

## VI.  CONCLUSION

10

For the foregoing reasons, Plaintiffs ask that the Court grant partial-summary judgment and

11

hold that the Global Connect, TCN, and VIC dialers are ATDS as a matter of law, and that

12

Defendant called each of the three named Plaintiffs using an autodialer without their express prior

13

consent.

14

15

Dated:  December 11, 2017                          Respectfully submitted,

16

**BURSOR & FISHER, P.A.**

17

18

By:    */s/ Yeremey Krivoshey*
                    Yeremey Krivoshey

19

20

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No.295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email:  ltfisher@bursor.com
             ykrivoshey@bursor.com

21

22

23

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

24

25

26

27

*Attorneys for Plaintiffs*

28