**EXHIBIT 17**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

SANDRA MCMILLION, JESSICA            )
ADEKOYA, and IGANCIO PEREZ, on       )
Behalf of Themselves and all         )
others Similarly Situated,           )
            Plaintiffs,              )
        vs.                          ) NO.
RASH CURTIS & ASSOCIATES,            )
            Defendant.               )
_____  )

**THURSDAY, JULY 13, 2017**

--oOo--

**Deposition of**

**IGNACIO B. PEREZ**

Reported By:    SUZY S. BAKER, CSR No. 9361

**SACRAMENTO, CALIFORNIA**

**THURSDAY, JULY 13, 2017**

---o0o---

BE IT REMEMBERED that on Tuesday,
July 13, 2017, commencing at the hour of 10:00
A.M., of said day, at the Ellis Law Group, 740
University Avenue, Suite 100, Sacramento,
California, before me, SUZY BAKER, CSR No. 9361,
a Notary Public in and for the County of
Sacramento, State of California, personally
appeared

**IGNACIO B. PEREZ,**

called as a witness herein, and after being
first duly sworn by me to tell the truth, the
whole truth, and nothing but the truth, was
examined and testified as follows:

---o0o---

EXAMINATION BY MR. ELLIS

Q     Good morning.  Can you state your full
name and spell your last name for the record,
please.

A     Ignacio B. Perez.  Last name Perez,
P-E-R-E-Z.

Q     Good morning, Mr. Perez, my name is Mark
Ellis as I told you before we got started.  To

1     my right is Anthony Valenti, he is an attorney
      2     that works with me on this case.  To your right
      3     is Suzy Baker who is the court reporter who is
      4     taking down everything you and I will be saying
10:04:28 AM 5     today.  Okay?
      6         Okay.  So you are nodding your head so the
      7     very first thing I am going to tell you are that
      8     head nods and head shakes don't translate well
      9     on the record.  You have to verbally answer my
      10    questions.
      11        Do you --
      12    A    Yes.
      13    Q    Do you understand that?
      14    A    Yes.
      15    Q    Second admonition I am going to give you
      16    is that we can't talk at the same time.  So you
      17    have to wait for me to finish asking my question
      18    before you answer and I'll try to wait for you,
      19    for you to finish answering before I ask my next
10:05:00 AM 20    question.
      21        Fair enough?
      22    A    Yes.
      23    Q    Okay.  So here is the most important thing
      24    I have to say to you at this point.  Is that
      25    even though we are in a conference room in my

law firm in an informal situation, you have been

         sworn under oath subject to penalty of perjury

         just as if we were sitting in a court of law in

         front of a judge and/or a jury.

                  Do you understand that?

         A       Yes.

         Q       Okay.  So Mr. Perez, because of that, it's

         really important that you give your best

         testimony today.  That is, you attempt to answer

         as accurately as you possibly can.  And let me

         explain a little further.

                  As I indicated a second ago, Miss Baker is

         taking down my questions verbatim and your

         answers verbatim.  Ultimately, they will be

         transcribed into a little booklet called a

         deposition transcript.  Okay?  It will be put

         down in writing.  If we get to trial and you

         change some of your answers in some sort of

         substantive way; you change a no to a yes, a yes

         to a no on important issues, I'll use your

         testimony here today against you.  I will

         impeach -- what we call impeachment.

                  Have you ever watched a legal TV show

         where attorneys cross-examine somebody?

         A       Yes.

slow and I have kind of weird pauses in my
questions and I know it makes it hard to know if
I am finished or not, but if you just wait, just
count to yourself a thousand one.

And again, you are doing pretty well, but
it's hard when you jump on the end of my
question and my last word's coming out and then
you answer for Miss Baker to take that down.

Are you with me on that?

A    Yes.

Q    Okay.  So what is your, what is your
current phone number?

A    Area code ████████5193.

Q    And how long have you had that telephone?

A    I don't know.

Q    More than a year?

A    Yeah.

Q    More than two years?

A    No.  No.

Q    Okay.  Listen --

A    I don't keep records of my phone number, I
just have a number and I have used it and I
don't keep track of how long I had it.  All I
know is I had it when I was with Metro PCS and
now I am with Cricket.

1    Q      Okay. So I appreciate that you say that

2    you don't keep records of that. I am still

3    going to ask questions.

4    A      That's okay.

5    Q      Are you with me on that?

6    A      That's okay.

7    Q      Okay. And I am entitled to your best

8    estimate. And I am going to go through a series

9    of questions to narrow down your answers and it

10   will be much more pleasant, Mr. Perez, if you

11   just follow my questions because all I am doing

12  is trying to get some information. I am not

13   trying to harass you or beat you up. Okay?

14       Are you with me?

15   A      Yeah.

16   Q      All right. So did you have the, did you

17   have the 5193 number five years ago?

18   A      Yeah, I believe I did, yeah.

19   Q      Okay. So when did --

20       MR. KRIVOSHEY: Speak up. I am right next

21   to you and I almost didn't hear that.

22      THE WITNESS: I believe I did, yeah.

23   BY MR. ELLIS:

24   Q      And that's a cell phone?

25   A      Yes.

1   Q       Do you have a land line --

2   A       No.

3   Q       -- at that --

4           MR. KRIVOSHEY:  Just, just let him, let

5   him finish.

6           THE WITNESS:  Excuse me.  I, I can't get

7   this because what is this guy doing with the

8   case with Rash and, and -- what is it, Rash --

9           MR. KRIVOSHEY:  Okay.  So he is their

10  lawyer.

11          THE WITNESS:  Okay.

12          MR. KRIVOSHEY:  He has the right to ask --

13          THE WITNESS:  There are a lot of questions

14  about my home address and Social Security

15  number, and where are we going with this?  I

16  have a right to ask.

17          MR. ELLIS:  So I'll -- it's okay, Yeremey,

10:14:28 AM18  I'll answer.

19          THE WITNESS:  I have a right to ask.

20  What's they guy have to do with Rash and --

21          MR. ELLIS:  Okay.  So, so -- do you want

22  me to answer?

23          THE WITNESS:  Yeah.

24          MR. ELLIS:  Or do you just want to get

25  upset?

responsibilities come with filing a lawsuit, and
that is to sit down and answer questions about
the basis to see if you are -- you properly have
a lawsuit.  And I have a right on behalf of my
client that you have hauled into court, not me,
you have hauled us into court.

Do you understand that?  You have filed a
lawsuit.  This is the lawsuit, it's got your
name on it, and you have hauled us into court,
my clients.

Do you understand that?

A    Yes.

Q    All right.  Do you understand that you are
asking for tens of thousands of dollars from my
clients?

MR. KRIVOSHEY:  Objection; calls for a
legal conclusion.

MR. ELLIS:  You can answer unless he
instructs you not to answer.

THE WITNESS:  I need to talk to you in
private.

MR. ELLIS:  Okay.  We can take a break.

(Whereupon a break was taken.)

MR. ELLIS:  All right.  Back on the
record.

1    through it was continuously.

2    Q    All right.  Did you ever have any, any

3    live conversations with anyone from Rash Curtis?

10:29:28 AM 4    A    When I picked up the phone it would be a

5    robo call and then a space for about a few

6    seconds and then a live person comes on.  And I

7    will ask them who are you, they would refuse to

8    identify their names so I hang up.  And that's

9    happened more than one time.  In fact, it

10    happens at dinner hour, early in the morning

11    when I am still sleeping, and most of the day.

12    And here is the thing, my phone is used

10:29:58 AM 13    for emergency phone calls only; to the doctors,

14    to the department of hospitals and emergency

15    room.  I take care of adults.  So when they call

16    me and interfere with my phone and some

17    situation was happening at home or anywhere, or

18    on the road, I have to stop and deal with that

19    call and then I have to call, get on the phone

20    and call 911.  I don't like that.  I don't like

21    to be bothered by phone calls like that.

22    Q    Okay.  Are you, are you saying that a

23    phone call ever came in from a number that you

10:30:29 AM 24    identify with Rash Curtis when you were in an

25    emergency situation?

```
 1    A       It was an emergency situation.  They were
 2    calling me.  It would be a life and death
 3    situation.
 4    Q       Okay.  Listen to my question.
 5    A       I am.
 6    Q       Focus on my question.  You clearly want to
 7    give me some information, I appreciate that.
 8    A       Yeah.
 9    Q       My question is very specific.
10    A       Okay.
11    Q       Do you recall ever receiving a phone call
12    on your cell phone from a number that you have
13    identified as a Rash Curtis telephone number
14    when you were in the process of making an
15    emergency phone call.  Yes or no?
16    A       I don't know.
17    Q       How many phone calls -- withdraw that.
18            As I understand your testimony you
19    switched from Metro PCS to your current phone
20    carrier about, about two years ago?
21    A       No.  Last year.
22    Q       Okay.  So that's why I am clarifying.  So
23    you need to let me finish before you talk.
24            When did you switch from Metro PCS to your
25    current carrier?
```

BY MR. ELLIS:

Q     Mr. Perez, I have put in front of you what we have marked as Exhibit 1.  This is the class action complaint that's been filed by your attorneys on your behalf and on behalf of certain other individuals including Sandra McMillion and Jessica Adekoya.

10:33:59 AM      Have you ever seen this document before?

A     Yes.

Q     Okay.  At some point in time did you review this document?

A     Yes.

Q     Did you review it in preparation for today's deposition?

A     Yes.

Q     Okay.  Did you see it sometime in the summer of 2016?

A     No.

Q     Okay.  Was -- in preparation for today's deposition, was that the first time you ever saw this document?

A     Yes.

10:34:31 AM      Q     Okay.  And in preparation for today's deposition did you review this document?

A     Yes.

1  that Rash Curtis used an autodialer.  Let me

2  just stop you right there.  Do you know what an

3  autodialer is?

4  A      Yes, I do.

5  Q      What is it?

6  A      It's a machine that has a pre-recorded

7  message that's set to call numbers and -- that's

8  the global call.  It's the message that comes

9  across the phone, you listen to it, you can

10:36:29 AM 10  either hang up or continue with it.  In this

11  case it will call me several times with the same

12  message then there is a space in between and

13  then a live person will come on.

14  Q      Okay.  When was the first time that you

15  were, you were called?

16  A      Excuse me.

17  Q      When is the first time that you were

18  called by Rash Curtis?

10:37:02 AM 19  A      Last year beginning of 20, 2016,

20  beginning.

21  Q      When you say the beginning, in January?

22         MR. KRIVOSHEY:  Objection; calls for

23  speculation.

24         MR. ELLIS:  You can answer.  I am entitled

25  to your best estimate.

THE WITNESS:  I can't remember.

2  BY MR. ELLIS:

3  Q       Okay.  Well, first quarter of 2016?   That

4  is, the first three months of the year?

5          MR. KRIVOSHEY:  Same objection.

THE WITNESS:  I don't know.

7  BY MR. ELLIS:

8  Q       Well, again, you have told me that you

9  believe the phone calls began beginning of 2016?

10  A      Yes.  That, I do remember.

11  Q      Okay.  So I am just trying to figure out.

12  So you think it was the first half of 2016?

13  A      Yes.

14  Q      Okay.  Do you believe it is the first

15  quarter of 2016?

16         MR. KRIVOSHEY:  Objection; asked and

17  Answered.

18         MR. ELLIS:  You can answer.

19         THE WITNESS:  No.  No.

20  BY MR. ELLIS:

Q      Okay.  When is the first time you ever

22  spoke with someone from Rash Curtis?

23  A      I don't know.

24  Q      Was that in the first half of 2000 --

25  A      I don't know.

```
 1   Q     Okay.  Sir.  Mr. Perez, please look at me
 2   for a second.  Do you agree that I have been
 3   courteous with you today?
 4   A     Yes.
 5   Q     All right.  I would like to have the same
 6   courtesy back.
 7         Can we agree to that?
 8   A     Okay.
 9   Q     All right.  So again, if you can let me
10   finish my questions.  Okay?  I have got a job to
11   do here.  Right?  I represent someone that you
12   are suing.  So I need to get some, some
13   background information.
14         You agree that that's how the court
15   process works?
16   A     Yes.
17   Q     Okay.  So again, you are telling me that
18   you don't know when you had the first phone
19   call, live phone call with someone with Rash
20   Curtis that you actually spoke with them.  Is
21   that what you're telling me, you just don't
22   recall?
23   A     I don't recall.
24   Q     Okay.  But at some point in time did you
25   have a live conversation with someone from Rash
```

10:38:58 AM (line 5)
10:39:28 AM (line 17)

```
1    Q      So the answer is yes?

2    A      Yes.

3    Q      Okay.  Other than these four phone calls

4    that are identified in your lawsuit, do you know

5    other dates?  Were other phone calls on other

6    dates captured in your phone?

7           MR. KRIVOSHEY:  Objection; calls for

8    speculation.

9           MR. ELLIS:  If you know.

10          THE WITNESS:  I don't know.

11   BY MR. ELLIS:

12   Q      Do you know whether the phone calls, any

13   of these four phone calls that were made to you

14   were manually dialed as opposed to robo called?

15   A      Robo call.

16   Q      How do you know that?

17   A      When I answer it that's the first thing

18   that comes up.

19   Q      Again, I understand that's what you hear

20   but my question for you is:  Do you know whether

21   or not a collector pressed the buttons to make

22   these phone calls to you as opposed to a machine

23   making the calls?

24          MR. KRIVOSHEY:  Objection; calls for

25   speculation, asked and answered.
```

10:45:30 AM

10:45:56 AM

           THE WITNESS:  Don't know.

BY MR. ELLIS:

Q       Again, this, this question is not to, not

going to involve you giving me attorney/client

privileged communications, but at some point in

time did you go on a web site to, for the Bursor

& Fisher law firm?

A       Only through the Metro app.

Q       Okay.  Well, let me just ask you this.

Did you contact the law firm or did the law firm

contact you?

A       I contacted them.

Q       Okay.  And you got that name off of the

Metro PCS application.  True?

A       Yes.

Q       Okay.  And did you call them on the

telephone?

A       Yes.

Q       And again, you believe that was sometime

in 2016?

A       Yes.

Q       All right.  So if you go back to the front

page of this lawsuit you'll see at the top, you

see that up at the top there are some, some

lettering, some words, it says document one

1     Q      So the answer is yes?

2     A      Yes.

3     Q      Do you know how many?

4     A      I don't know.

10:50:57 AM 5     Q      Were there phone calls made to you by Rash

6     Curtis or what you attribute to Rash Curtis

7     after June 7, 2016?

8     A      Yes.

9     Q      How many?

10    A      I don't know.

10:51:33 AM 11    Q      Your Metro PCS plan, is that, is that a

12    plan where you have an unlimited number of phone

13    calls either out or in for any given number

14    month for a flat fee?

15    A      Unlimited, yes.

16    Q      So no matter how many phone calls come in

17    you are charged the same amount every month?

10:52:05 AM 18    A      Going out there was a limit, but coming

19    in, no.

20    Q      Okay.  So if you made phone calls out on

21    the plan, if you went over a certain number or a

22    certain number of minutes you would be charged.

23    Is that correct?

24    A      I don't recall ever going out that much.

25    I don't recall.

1    Q       Okay.  But in terms of the number of phone

2    calls coming in, you were charged a flat fee?

3    A       Yes.

10:52:41 AM 4    Q       Okay.

5    A       Excuse me.

6    Q       Surely.  So Mr. Perez, I am going to, I am

10:52:57 AM 7    going to represent to you and you don't have to

8    agree with this, but Rash Curtis's business

9    records record the communications and attempted

10    communications with any particular person and

11    they indicate that there was only one phone call

12    where there's actually a conversation with you.

13    And their records indicate that that occurred on

10:53:28 AM 14    June 7, 2016.  That is the date of this last

15    phone call as alleged in the little box.

16    A       The last one?

17    Q       Yes, sir.

18    A       Area code 707?

19    Q       Yes, sir.  And that -- I will also further

20    tell you that the records indicate that you told

21    them on that date that you were not the person

22    that they were attempting to contact.

10:54:00 AM 23    A       Yes.

24    Q       And that you asked them to quit calling

25    you?

1   A       Yes.

2   Q       Okay.  Do you remember, do you remember

3   that conversation now?  I know it was over a

4   year ago, but does that sound like a

5   conversation that you had?

6   A       Yes.

7   Q       Okay.  And I will tell you that the

8   records indicate that they were, they were

10:54:25 AM 9   removing your number or this number out of their

10  records so it would not be called again.

11  A       That, I do know.

12  Q       Okay.  And so again, my question is, do

13  you recall after that conversation on or about

14  June 7, 2016, do you actually have a memory of

15  being called again by Rash Curtis or do you

16  know?

17          MR. KRIVOSHEY:  Objection; asked and

18  answered.

10:54:59 AM 19          THE WITNESS:  Don't know.

20          MR. ELLIS:  Okay.

21  Q       Now, the lawsuit asks my client to pay you

10:55:27 AM 22  some amount of damage or damages for what it

23  claims is the harassment.  Let me, and let me

24  just ask you this.

25          To your knowledge have you ever owed a

1  debt that Rash Curtis was collecting on?

2  A    No.

3  Q    Okay.  Can you tell me as you sit here

4  today what, what you are asking for in terms of

5  a damage?

6      MR. KRIVOSHEY:  Objection; calls for a

7  legal conclusion.

8      MR. ELLIS:  Okay.  You can answer.  In

9  your own words if you know.

10     THE WITNESS:  I need a break.

11     MR. ELLIS:  No.  Again, we are at one of

12  these points where I have asked you a question

13  and so you have to answer to the best of your

14  ability and then you can take a break.

15     MR. KRIVOSHEY:  Say it if you know.

16     THE WITNESS:  I don't know.

17     MR. ELLIS:  Okay.

18  Q    Are you claiming that you suffered some

19  sort of distress because of the phone calls?

20  A    Irritating.

21  Q    Okay.  So the phone calls were irritating?

22  A    And harassment.

23  Q    And you thought that they were harassing?

24  A    Yes, they are.

25  Q    Anything else?

1   A      Irritating harassment, that's it.

2   Q      Okay.  You haven't visited any sort of

3 doctor or psychologist or psychiatrist for any

4 stress or distress that -- from these phone

5 calls, have you?

6   A      No.

7   Q      Okay.  Haven't lost any sleep over it,

8 have you?

9   A      Some sleep.

10   Q      Okay.  So why, why have you -- you lost

11 sleep?

12   A      When you get called late in the evening,

13 early in the morning in all hours like this it

14 tends to get on your nerve.  And when you

15 repeatedly tell them stop calling you, after a

16 while you get tired.

17   Q      So how many times do you think you told

18 them to stop calling?

19   A      Numerous times.

20   Q      More than five?

21   A      More than five.

22   Q      More than 10?

23   A      I believe more than five.

24   Q      More than 10?

25   A      I just keep saying, don't call me no more.

| | | |
|---|---|---|
| 1 | Q | More than 10? |
| 2 | A | No. |
| 3 | Q | So somewhere between five and 10 times? |
| 4 | A | I would say about that. Because after I |
| 5 | | see the number come up I just ignored it. |
| 6 | Q | You just stopped picking it up? |
| 7 | A | Exactly. |
| 8 | Q | Okay. And -- well, you see in the phone |

1       Q       More than 10?

2       A       No.

3       Q       So somewhere between five and 10 times?

4       A       I would say about that.  Because after I

5   see the number come up I just ignored it.

10:58:00 AM  6       Q       You just stopped picking it up?

7       A       Exactly.

8       Q       Okay.  And -- well, you see in the phone

9   calls that are listed in the complaint, Mr.

10   Perez, these phone calls seem to come in

11   somewhere between 3:30 and five o'clock in the

12   afternoon.

13               Do you see that?

14       A       On these?

15       Q       Yes, sir.  Was that typically when the

10:58:28 AM 16   phone calls would come in?

17       A       I don't know.  I wish I kept a record of

18   it, but I don't know.

19       Q       Well, let me just ask you:  Why did you

20   not keep a record of that?

21       A       That's a good question.  Because I should

22   have went to Metro and have ordered a phone

23   record which they can let me know and I didn't

24   do it.

25       Q       Uh-huh.  Why did you change from Metro to

1    Because it's not attached to a wall outlet.  If

2    I am in a room, if I am outside in the back

3    yard, or if I am in the store and I am needed,

4    see, I have another caregiver that comes in and

5    she is there to take over when I am not there;

6    and she will call me and I get there; I say

7    okay, take care of business and I'll be there as

8    soon as I can.  If it's a 911 threat, call 911

9    and let them know first on-hand and then call

10    me.  That's what I like about the cell phone

11    otherwise I wouldn't want it, I would rather

12    have a wall phone, you know, and that's it.

13    Q    So it's necessary for your business?

14    A    Yes.

15    Q    And you use it in your business?

16    A    Yes.

17    Q    And do you -- when the bill comes in -- I

18    take it you pay taxes every year?

19    A    I pay.

20    Q    And do you write the phone bill off as a

21    business expense then?

22    A    No.

23    Q    Are you sure about that?

24    A    Positive.

25    Q    Okay.  In terms of the usage on the phone,

```
 1   is it -- would you say that 80 percent of the
 2   use, to pick up an approximation, is for
 3   business?
 4        MR. KRIVOSHEY:  Objection; calls for
 5   speculation.
 6        MR. ELLIS:  You can answer.
 7        THE WITNESS:  I would say 50/50.
 8   BY MR. ELLIS:
 9   Q    50/50?
10   A    Uh-huh.
11   Q    Is that a "yes"?
12   A    Yes.
13   Q    Okay.  Now, let me just ask you.  Did you
14   ever have a patient by the name of Dan Renozo?
15   A    No.
16   Q    Someone that lived in the house?
17   A    No.
18   Q    And how about -- what was his mother's
19   name?
20        MR. CASTRO:  Darlene Lopez.
21   BY MR. ELLIS:
22   Q    What about Darlene Lopez?
23   A    No.
24   Q    Has it ever been that you've had to, to
25   take one of your patients to, to Sutter?
```

11:06:28 AM (line 13)

11:06:56 AM (line 25)

```
1    A      Yes.
2    Q      Is Sutter the approved facility through
3    the county?
4    A      No.
5    Q      How do you decide where you are going to
6    take them to if there's an emergency?
7    A      Sutter General, the best facility in
8    Sacramento.
9    Q      And then who pays?  Is it their insurance
10   that will pay?
11   A      Yes.
12   Q      Okay.  And when -- are you responsible for
13   checking the patients in under your contract
14   with the county?
15   A      It's my responsibility to ensure that they
16   are okay going to see their doctors, getting
17   their prescription, and emergency room visit, if
18   necessary.
19   Q      Okay.  And do you know whether or not Dan
20   Renozo had a friend or relative in one of your
21   care facilities?
22   A      Don't know.
23   Q      Okay.  And how about Darlene Renozo, have
24   you ever heard of her?
25   A      Darlene Renozo, no.
```

11:07:30 AM13

11:08:00 AM21

1  Q    Okay. And when, when you checked these
2  patients in through your contract with, with the
3  county, do you give them, do you give Sutter
4  General your phone number to be contacted at?
5  A    Yes. Sutter General and their doctors and
6  the pharmacy.
7  Q    And so, so you voluntarily provide that to
8  them as a contact?
9  A    Yes.
10  Q    As a contact number. Right?
11  A    Yes.
12  Q    All right. Do you recall when you have
13  done that, when you have given your contact's
14  number to Sutter General. --
15  A    Uh-huh.
16  Q    -- whether you have ever put any
17  restrictions on it when you give it to them?
18  A    No.
19  Q    Okay. Just want to make sure my questions
20  and answers are clear.
21  A    Yes.
22  Q    When you give Sutter General your
23  telephone number on behalf of your patients, you
24  don't recall or you don't put any restrictions
25  on when they can call you back. Is that

```
 1   correct?
 2   A      Yes.
 3   Q      Okay.
 4          THE WITNESS:  May I take another break?
 5          MR. KRIVOSHEY:  Are we almost done?
 6          MR. ELLIS:  We are almost done.
 7          THE WITNESS:  This question is really
 8   important.  Can we go in this conference room?
 9          MR. ELLIS:  You can.
10          MR. KRIVOSHEY:  Okay.
11             (Whereupon a break was taken.)
12          MR. ELLIS:  Back on the record.
13   Q      So you said yourself something was
14   important, was there anything you wanted to add
15   to any of your answers?
16   A      No.
17   Q      You are pretty definite about that.
18          Okay.  I just want to be clear one more
19   time.  So no one in your facility, to the best
20   of your knowledge as you sit here today, in 2014
21   was named Dan Renozo?
22   A      No.
23   Q      You don't know that or that's true?
24   A      True, don't know.
25   Q      And Darlene Lopez, to the best of your
```

Timestamps in left margin:
11:09:51 AM — line 3
11:09:58 AM — line 7
11:11:58 AM — line 11
11:12:01 AM — line 12
11:12:31 AM — line 23

1 knowledge, no one was in your facility with that
2 name in 2014?

3 A No.

4 Q Were either one of those people ever in
5 your facility?

6 A No.

7 Q Okay. Do you know either one of those
8 individuals?

9 A The only one I know is my uncle and he
10 passed away in 2014.

11:12:58 AM11 Q What was your uncle's name?

12 A Carmello Breone Aristud, A-R-I-S-T-U-D.
13 He died May 4, 2014.

14 Q Now, what is it about these names that you
15 somehow think could be linked with your uncle?

16 A Don't know.

11:13:27 AM17 Q Did your uncle die at Sutter?

18 A Yes.

19 Q Okay. Do you think that you gave your
20 telephone number to Sutter in terms of helping
21 your uncle out?

22 A Yes, sir. Admitting office at Sutter and
23 the doctors, that's the only people I gave the
24 number to.

25 Q Okay. And who was, who was the doctor or

```
 1   doctors, do you remember their names?
 2   A       His primary doctor is doctor -- wow, I
 3   don't even remember that doctor's name.  He's in
 4   the Sutter Group, Sutter Group at 1201 Alhambra,
 5   and I don't remember that doctor's name anymore.
 6   Q       Any doctors that treated your uncle that
 7   you do remember their names?
 8   A       Hayah Hussein, but he was a pulmonary
 9   doctor.  And, of course, the emergency room
10   doctors, anybody that is on staff; nurses and
11   technicians and, you know, what goes on at that
12   hospital.  They have got numerous, numerous
13   doctors and departments and all of that.  So --
14   but my number, the 271-5193 is listed on the, on
15   their directory in the main hospital and the
16   clinics.  So they can get ahold of me anywhere.
17   Q       How about you, have you been personally
18   treated at Sutter?
19   A       I had a downfall at Sutter, I blacked out
20   when I was visiting my uncle.  They took me down
21   to the emergency room, yes.
22   Q       That would have been 2014?
23   A       No.  I would say that was 2013 or '12.  I
24   can't remember, but it happened at Sutter
25   Memorial Hospital which is no longer there no
```

1      more, they have been cleaned out.

2      Q      Okay.  Right.  And you would have given

3      them your cell phone number at that point in

4      time too?

5      A      At that point, yes.

6      Q      Which is the same number you have today?

7      A      I believe the same number.  Yes.

8             MR. ELLIS:  Okay.  That's all I have got.

9      Thank you very much, I appreciate your time.

10            THE WITNESS:  Thank you.

11            MR. KRIVOSHEY:  Before we go off the

12     record I am going to say that I think there were

13     parts of information that disclosed confidential

14     information.  So we are going -- once we see the

15     record we're going to designate some of them,

16     but for the time being I would like to designate

17     the whole transcript as confidential and we also

18     reserve our right to make any corrections that

19     we may find pursuant to Rule 30.

20         (Record marked as confidential as requested.)

21            MR. ELLIS:  So, you know, I'll tell you

22     what I told your partner two days ago, which is

23     that, you know, I am not going to agree to

24     designate the entire transcript as confidential.

25     I mean you can get the transcript and then you

**CERTIFICATE OF REPORTER**

2

3          I, SUZY BAKER, CSR No. 9361 a Certified

4     Shorthand Reporter in and for the State of

5     California, hereby certify that the witness in the

6     foregoing deposition,

7                     IGNACIO B. PEREZ,

8     was by me duly sworn to testify the truth, the

9     whole truth, in the within-entitled cause; that

10    said deposition was taken by me, a duly certified

11    shorthand reporter and a disinterested person, at

12    the time and place herein stated, and was

13    thereafter transcribed into typewriting, by

14    computer, under my direction and supervision.

15         I further certify that I am not of counsel

16    or attorney for either or any of the parties to

17    said deposition, nor in any way interested in the

18    outcome of the cause, and that I am not related to

19    any of the parties thereto.

20         IN WITNESS WHEREOF, I have hereunto set my

21    hand of July 27, 2017.

22                   _____

23                   SUZY BAKER, CSR No. 9361

24

25

**EXHIBIT 18**

Available Reports:  BCA Advanced Trade, Assets, Bankruptcy, Score - Bankcard w

BANKRUPTCY HISTORY
Received from Experian: 01-08-2013 09:10
BCA Advanced Trade, Assets, Bankruptcy, Score - Bankcard

SSN
Last Name
First Name
Address
City
State and Zip

*** RET MAIL ***

Model Score Information
Model Code          ** - UNKNOWN???
Model Score         :9999

RCA 000279

**EXHIBIT 19**

Edit Tracking

| Field | Date/Time | Emp # | Old Value | New Value | Debtor |
|---|---|---|---|---|---|
| PHONE6 | 5/9/2012 11:46 AM | 67 | 2096275108 | | 1443416 |
| PHONE | 6/7/2016 3:27 PM | 157 | 9162715193 | | 1443416 |
| SPOUSEEMPPHONE | 6/15/2016 2:41 PM | 42 | 9164243071 | | 1443416 |

OK

RCA 000280

**EXHIBIT 20**



## ABBREVIATIONS

| 01. | AKA | Also Known As | 18. | NATA | Not at that Address |
|-----|------|---------------|-----|-------|---------------------|
| 02. | ATTY | Attorney | 19. | NL | No Listing |
| 03. | BAL | Balance | 20. | 411NL | 411 No Listing |
| 04. | BFR | Boyfriend | 21. | NRBY | Nearby |
| 05. | BIF | Balance in Full | 22. | NG | No Good |
| 06. | BK | Bankruptcy | 23. | NLE | No Longer Employed |
| 07. | BPA | Best Possible Arrangement | 24. | NSP | No Such Person |
| 08. | BRO | Brother | 25. | OOT | Out of Town |
| 09. | CB | Call Back | 26. | OOW | Out of Work |
| 10. | CI | Call in | 27. | PH | Phone |
| 11. | CK | Check | 28. | PD | Past Due |
| 12. | CNF | Confirmed | 29. | PIF | Paid In Full |
| 13. | DBA | Doing Business As | 30. | PPWK | Paperwork |
| 14. | DGHTR | Daughter | 31. | PMT | Payment |
| 15. | DISC | Disconnected | 32. | POE | Place of Employment |
| 16. | DTR | Debtor | 33. | PPA | Partial Payment Arrangement |
| 17. | EOM | End of Month | 34. | PT | Patient |

RCA 000192

| 35. | FTR | Father | | 51. | RES | Residence |
|-----|-----|--------|---|-----|-----|-----------|
| 36. | FWD | Forward | | 52. | RMMT | Roommate |
| 37. | GFR | Girlfriend | | 53. | SD | Said |
| 38. | HM | Home | | 54. | SIF | Settled in Full |
| 39. | HUP | Hung-up | | 55. | SIS | Sister |
| 40. | INS | Insurance | | 56. | SSI | Social Security Income |
| 41. | I/S | Itemized Statement | | 57. | TBR | To Be Received |
| 42. | LMOM | Left Message on Machine | | 58. | TBS | To Be Sent |
| 43. | LMTC | Left Message to Call | | 59. | TO | Talk Off |
| 44. | LMW | Left Message With | | 60. | TT | Talk To |
| 45. | MCAL | Medical | | 61. | UH | Updated Header |
| 46. | MO | Money Order | | 62. | VH | Verified Header |
| 47. | MR | Mister | | 63. | WCB | Will Call Back |
| 48. | MRS | Misses | | 64. | WI | Walk In |
| 49. | MTR | Mother | | 65. | # | Number |
| 50. | NA | No Answer | | 66. | PD | Predictive Dialer |
| | | | | 67. | IB | Inbound |
| | | | | 68. | OB | Outbound |
| | | | | 69. | ALT | Alternate |

RCA 000193

# EXHIBIT 21

# BURSOR & FISHER

P.A.

1990 NORTH CALIFORNIA BLVD.
SUITE 940
WALNUT CREEK, CA 94596-7351
www.bursor.com

JULIA A. LUSTER
Tel: 925.300.4455
Fax: 925.407.2700
jluster@bursor.com

March 4, 2016

<u>*Via Certified Mail - Return Receipt Requested*</u>



Rash Curtis & Associates
190 S Orchard Ave
Ste A205
Vacaville, CA 95688

Re:    *Demand Letter*

To Whom It May Concern,

This letter serves as a notice and demand for corrective action on behalf of my client, Sandra McMillion, and all other persons similarly situated, arising from your violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (hereinafter referred to as the "TCPA"). This letter serves to give you notice that you have been making calls using an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1) without my client's prior express written consent within the meaning of the TCPA.

Between December 23, 2015 and February 17, 2016, you and/or your agents called Ms. McMillion's cellular telephone using an automatic telephone dialing system without her prior express written consent on at least 35 occasions. Ms. McMillion has requested on several occasions that you stop calling her on her cellular telephone, but the calls persist. These calls were placed from your telephone numbers, including (707) 454-2010 and (866) 729-2722, to Ms. McMillion at (415) 632-0589)

This letter serves as a demand that you immediately stop making any further calls to my client in violation of the TCPA and that you immediately place Ms. McMillion on your internal Do Not Call list.

Due to the harassing and unrelenting nature of these automated calls, my client intends to file a federal class action lawsuit on behalf of herself and all others similarly situated for your violations of the TCPA seeking damages of $1,500 per unlawful call.

We are willing to negotiate to attempt to resolve the demands asserted in this letter. If you wish to enter into such discussions, please contact me immediately. If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation. If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Very truly yours,

Julia A. Luster

**EXHIBIT 22**

```
--------------------------------------------------------------------------------
        ACCOUNT #:  2763532   CLIENT DEBTOR #:    4001082448-0001
```

TYPE OF ACCOUNT:   1
CLIENT NAME: MARIN GENERAL HOSPITAL SP        FORWARDED (BY/TO):
        FOR: MCMILLION,SANDRA KA               FORWARDED FOR:
        REM:                                   COLLECTOR CODE:55
CLIENT NO. : 3655
LAST LETTER: 000   DOCUMENT CODE (1-9): 0    INTEREST FM(R/S/J): S  INTEREST %: 10
  LABEL/CARD: N          NEW BUSINESS: Y      DATE OF REFERRAL: 121316
  CREDIT FLAG: D       BULLETIN CODE: 00      DATE OF SERVICE: 062716
  CLERK CODE: NK         STATUS CODE: ATY   DATE OF LAST PAYMENT:  0
        RATE: 14.5       S/L NUMBER: 00            JACK DATE: 112217

  AMOUNT REFERRED:        $      56.13
  PRINCIPAL BALANCE:      $      56.13
  ACCUMULATED INTEREST:   $       0.00
  OTHER CHARGES:          $       0.00
  COURT COSTS:            $       0.00
  ATTORNEY FEES:          $       0.00
  OTHER:                  $       0.00
  INTEREST:               $       8.23

  ACC'T BAL:              $      64.36
```

| TYPE | DATE | PAYMENT AMOUNT | PAID ON PRINCIPAL | PAID ON INTEREST | PAID ON OTHER CHGS | PAID ON COURT COST | PAID ON ATTY FEES | PAID ON OTHER |
|------|------|----------------|-------------------|------------------|--------------------|--------------------|-------------------|---------------|

PAYMENT TRANSACTION HISTORY

NO PAYMENTS THIS ACCOUNT

# EXHIBIT 23



MARIN
GENERAL
HOSPITAL

250 BON AIR ROAD
GREENBRAE, CA 94904

# Admission/Registration Record



| | VISIT ID | PAT TYPE | SERVICE | NURSES STATION | ROOM | MED. REC. NO. |
|---|---|---|---|---|---|---|
| **P** | 4001082448 | EMERGENCY | ERD | RME - Nursing Station | Waiting Room-06 | 02191817 |

| | FC | ARRIVED BY | SOURCE | PREFERRED LANGUAGE | ADMIT DATE / TIME |
|---|---|---|---|---|---|
| | 200 | WALK IN | NON-HEALTH CARE FACILITY POINT OF ORIGIN | English | 06/27/2016 10:42 |

| | OPT CEN | OPT REL | BIRTHDATE | AGE | SEX | MARITAL | RACE | RELIGION | PRIOR ADM DT | DISCH DATE/TIME |
|---|---|---|---|---|---|---|---|---|---|---|
| | NO | NO | | 51Y | F | S | BLACK | BAP | 11/16/2015 18:04 | |

| PATIENT NAME AND ADDRESS | PRIMARY PHONE COUNTY | PATIENT EMPLOYER NAME AND ADDRESS | CELL PHONE |
|---|---|---|---|
| MCMILLION, SANDRA KACEE GENERAL DELIVERY, SAN RAFAEL, CA 94901 | 0589 | DISABLED , | |

| GUARANTOR NAME AND ADDRESS | PHONE/DOB | GUARANTOR EMPLOYER NAME AND ADDRESS | WORK PHONE |
|---|---|---|---|
| MCMILLION, SANDRA K GENERAL DELIVERY SAN RAFAEL, CA 94901 | 0589 05/07/1965 | DISABLED , | ()- |

| PRIMARY CONTACT NAME AND ADDRESS | PHONE/REL | PRIMARY EMPLOYER NAME & ADDRESS | PHONE |
|---|---|---|---|
| MCMILLION, SKYLER UNKNOWN OLIVE BRANCH, MS 00000 | 0372 Son | , | ()- |

| SECONDARY CONTACT NAME AND ADDRESS | PHONE / RELATION | HIPAA NOTICE | OUTPATIENT LOCATION | ACCOMMODATION | ACCIDENT DATE / TIME |
|---|---|---|---|---|---|
| , , | ()- | 11/16/2015 | EMERGENCY ROOM | | 06/27/2016 00:00 |

| INSURANCE 1 INFO | | INSURANCE 2 INFO | | INSURANCE 3 INFO | |
|---|---|---|---|---|---|
| NAME/ADDRESS | SUB REL / POLI# / GRP# / AUTH# | NAME/ADDRESS | SUB REL / POLI# / GRP# / AUTH# | NAME/ADDRESS | SUB REL / POLI# / GRP# / AUTH# |
| MEDICARE PART A & B PO BOX 971 AUGUSTA, GA 309030971 | SELF 429310077A | | | | |

| | ADMITTING COMPLAINT | ADMITTED BY |
|---|---|---|
| **D X** | Cough | haromg |
| | COMMMENTS | ASSEMBLY |

PRINTED: 06/27/2016 11:35:02 AM
VISIT NO:

MED REC NO:

Page 1 of 1

Form#:

## CONSENT TO MEDICAL AND SURGICAL PROCEDURES

I consent to the procedures that may be performed during this hospitalization or while I am an outpatient. These may include, but are not limited to emergency treatment or services, laboratory procedures, X-ray examinations, medical or surgical treatment or procedures, anesthesia, or hospital services provided to me under the general and special instructions of my physician or surgeon. I understand that the practice of medicine and surgery is not an exact science and that diagnosis and treatment may involve risks of injury or even death. I acknowledge that no guarantees have been made to me regarding the result of examination or treatment in this hospital.

## NURSING CARE

This hospital provides only general nursing care and care ordered by the physician(s). If I want a private duty nurse, I agree to make such arrangements. The hospital is not responsible for failure to provide a private duty nurse and is hereby released from any and all liability arising from the fact that the hospital does not provide this additional care.

## PRIVACY PRACTICES AND OTHER INFORMATION

Our Notice of Privacy Practices provides information about how we may use or disclose your protected health information. We are also providing you with information offering tips to raise patient safety awareness. Your Right to make Decisions about Medical Treatment pamphlet provides information on the Advance Healthcare Directive. We encourage you to read these pamphlets in full.

I (or the patient) have an Advance Healthcare Directive ☐ Yes ☑ No

I (or the patient) am interested in receiving information regarding the Advance Healthcare Directive ☐ Yes ☑ No

In the event of an emergent situation and you are no longer able to speak for yourself, who would you like to make decisions for you?

Print Designee Name: _Skyler McMillion_ Designee Phone #: _____ 0372_

I (or the patient) have a Physician Order for Life Sustaining Treatment (POLST) ☐ Yes ☑ No

I (or the patient) have received the Patient Information Guide, which includes information on the Advance Healthcare Directive, the Notice of Privacy Practices at Marin General Hospital, healthcare safety tips and other important information that should be reviewed before or during your stay in the hospital. ☑ Yes ☐ No



**MARIN GENERAL HOSPITAL**
250 BON AIR ROAD  GREENBRAE, CA 94904

**CONDITIONS OF ADMISSION**

Form COA-E
Rev. 09/05/14
Page 1 of 4

4001082448
MCMILLION, SANDRA KACEE
DOB:            F    51Y
ADM: KATZMAN, ARAM

02191817
EMERGENCY
06/27/2016
ERD

## LEGAL RELATIONSHIP BETWEEN HOSPITAL AND PHYSICIANS

All physicians and surgeons providing services to me, including the radiologist, pathologist, emergency physician, anesthesiologist and others, are not employees or agents of the hospital. They have been granted the privilege of using the hospital for the care and treatment of their patients, but they are not employees or agents of the hospital.

I understand that I am under the care and supervision of my attending physician. The hospital and its nursing staff are responsible for carrying out my physician's instructions. My physician or surgeon is responsible for obtaining my informed consent, when required, to medical or surgical treatment, special diagnostic or therapeutic procedures, or hospital services provided to me under my physician's general and special instructions.

## MATERNITY PATIENTS

If I deliver an infant(s) while a patient of this hospital, I agree that these same Conditions of Admission apply to the infant(s).

## PERSONAL BELONGINGS

As a patient, I am encouraged to leave personal items at home. The hospital maintains a fireproof safe from the safekeeping of money and valuables. The hospital is not liable for the loss or damage to any money, jewelry, documents, or other articles that are not placed in the safe. Hospital liability for loss of any personal property deposited with the hospital for safekeeping is limited by law to five hundred dollars ($500) unless I receive a written receipt for a greater amount from the hospital.

## FINANCIAL AGREEMENT

In case of an emergency, no one will be refused care on the basis of ability to pay. Those who receive emergency services and are able to pay will be responsible for the medical bills incurred.

For non-emergent care, as well as emergent care with ability to pay - I agree to promptly pay all hospital bills in accordance with the reimbursement rates listed in the hospital's charge description master and, if applicable, the hospital's charity care and discount payment policies and state and federal law. I understand that I may review the hospital's charge description master before (or after) I receive services from the hospital. I understand that all physicians and surgeons, including the radiologist, pathologist, emergency physician, anesthesiologist, and others, will bill separately for their services. If any account is referred to an attorney or collection agency for collection, I will pay actual attorney's fees and collection expenses. All delinquent accounts shall bear interest at the legal rate, unless prohibited by law.

## ASSIGNMENT OF INSURANCE BENEFITS

I assign and authorize direct payment to the hospital of all insurance and health plan benefits payable for this hospitalization or for these outpatient services. I agree that the insurer on plan's payment to the hospital pursuant to this authorization shall discharge its obligations to the extent of such payment. I understand that I am financially responsible for charges not paid according to this assignment, to the extent permitted by state and federal law.



MARIN GENERAL HOSPITAL
250 BON AIR ROAD  GREENBRAE, CA 94904

**CONDITIONS OF ADMISSION**

Form COA-E
Rev. 09/05/14
Page 2 of 4

*COA*

4001082448
MCMILLION, SANDRA KACEE
DOB:          F     51Y
ADM: KATZMAN, ARAM

02191817
EMERGENCY
06/27/2016
ERD

+                                                                                          +

## CONSENT TO PHOTOGRAPH

I hereby consent to be photographed while receiving treatment at the hospital.

I understand that the images from such photography may be used for my treatment or for hospital health care operations such as peer review or medical education, as the hospital or my treating physician(s) deem appropriate.

Note: Photography for other purposes (e.g., research, publication, outside education, marketing, public relations, news or documentary) requires use of the form "Consent to Photograph and Authorization for Use and Disclosure".

The term "photograph" as used herein includes video or still photography, in digital or any other format, and any other means of recording or reproducing images.

## NOTIFICATION OF FAMILY MEMBER / REPRESENTATIVE (Applies to ED and Inpatients Only)

☒ A family member or representative is already aware of my admission to the hospital

☐ I will call my family member

☐ I do not wish to have a family member or representative notified of my admission to the hospital

☐ Please notify the following family member or representative of my admission to the hospital

Name: _____ Phone Number: _____ Date Notified: _____

## NOTIFICATION OF PERSONAL PHYSICIAN (Applies to ED and Inpatients Only)

☐ Please notify my personal physician of my admission to the hospital

Physician Name: _____ Phone Number: _____

City: _____ Date Office Notified: _____

☒ Yes, my personal physician is aware of my admission to the hospital

Physician Name: ___ *V. Gordon* ___ Phone Number: _____

☐ I do not have a personal physician

☐ I do not wish to have my personal physician notified of my admission to the hospital

---

 MARIN GENERAL HOSPITAL
250 BON AIR ROAD   GREENBRAE, CA 94904

**CONDITIONS OF
ADMISSION**

Form COA-E
Rev. 09/05/14
Page 3 of 4

*COA*

4001082448
MCMILLION, SANDRA KACEE
DOB: ████████   F   51Y
ADM: KATZMAN, ARAM

02191817
EMERGENCY
06/27/2016

ERD

+                                                                              +

## HEALTH PLAN OBLIGATION

This hospital maintains a list of health plans with which it contracts. A list of such plans is available upon request from the financial office. The hospital has no contract, express or implied, with any plan that does not appear on the list. I agree to pay the reimbursement rates listed in the hospital's charge description master (in accordance with the hospital's charity care and discount payment policies, if applicable, and state and federal law) for all services rendered to me by the hospital if I belong to a plan that does not appear on the above mentioned list. All physicians and surgeons, including the radiologist, pathologist, emergency physician, anesthesiologist, and others, will bill separately for their services. It is my responsibility to determine if physicians providing services to me contract with my health plan, if any.

I certify that I have read the foregoing and received a copy thereof. I am the patient, the patient's legal representative, or am otherwise duly authorized by the patient to sign the above and accept its terms on his/her behalf.

Date: ___6/27/16___ Time: ___1136___ AM / PM

Signature: _____
             *(patient / legal representative)*

If signed by someone other than patient, indicate relationship: _____

Print name: _____
             *(legal representative)*

Signature: _____
             *(witness)*

Print Name: _____
             *(witness)*

### A COPY OF THIS DOCUMENT SHOULD BE GIVEN TO THE PATIENT AND ANY OTHER PERSON WHO SIGNS THIS DOCUMENT.

MARIN GENERAL HOSPITAL
250 BON AIR ROAD  GREENBRAE, CA 94904

**CONDITIONS OF ADMISSION**

Form COA-E
Rev. 09/05/14
Page 4 of 4

4001082448
MCMILLION, SANDRA KACEE
DOB: ███████  F    51Y
ADM: KATZMAN, ARAM

02191817
EMERGENCY
06/27/2016
ERD

*COA*

## CONSENT TO MEDICAL AND SURGICAL PROCEDURES

I consent to the procedures that may be performed during this hospitalization or while I am an outpatient. These may include, but are not limited to emergency treatment or services, laboratory procedures, X-ray examinations, medical or surgical treatment or procedures, anesthesia, or hospital services provided to me under the general and special instructions of my physician or surgeon. I understand that the practice of medicine and surgery is not an exact science and that diagnosis and treatment may involve risks of injury or even death. I acknowledge that no guarantees have been made to me regarding the result of examination or treatment in this hospital.

## NURSING CARE

This hospital provides only general nursing care and care ordered by the physician(s). If I want a private duty nurse, I agree to make such arrangements. The hospital is not responsible for failure to provide a private duty nurse and is hereby released from any and all liability arising from the fact that the hospital does not provide this additional care.

## PRIVACY PRACTICES AND OTHER INFORMATION

Our Notice of Privacy Practices provides information about how we may use or disclose your protected health information. We are also providing you with information offering tips to raise patient safety awareness. Your Right to make Decisions about Medical Treatment pamphlet provides information on the Advance Healthcare Directive. We encourage you to read these pamphlets in full.

I (or the patient) have an Advance Healthcare Directive      ☐ Yes   ☒ No

I (or the patient) am interested in receiving information regarding the Advance Healthcare Directive      ☒ Yes   ☐ No

In the event of an emergent situation and you are no longer able to speak for yourself, who would you like to make decisions for you?

Print Designee Name: _SANDRA-C, McMill_ Designee Phone #: _____

I (or the patient) have received the Patient Information Guide, which includes information on the Advance Healthcare Directive, the Notice of Privacy Practices at Marin General Hospital, healthcare safety tips and other important information that should be reviewed before or during your stay in the hospital.      ☒ Yes   ☐ No



**MARIN GENERAL HOSPITAL**
250 BON AIR ROAD  GREENBRAE, CA 94904

*COA*

**CONDITIONS OF ADMISSION**

Form COA-E
Rev. 06/02/2016
Page 1 of 3

4001153532
MCMILLION, SANDRA
DOB: ██/██/19██   51Y   Female
ADM: SUTHERLAND, ERICA

02191817
OP SINGLE VISIT
11/15/2016
XR2

Patient: MCMILLION, SANDRA KACEE    MRN: 02191817    Encounter: 4001153532    Page 1 of 3

## LEGAL RELATIONSHIP BETWEEN HOSPITAL AND PHYSICIANS

All physicians and surgeons providing services to me, including the radiologist, pathologist, emergency physician, anesthesiologist and others, are not employees or agents of the hospital. They have been granted the privilege of using the hospital for the care and treatment of their patients, but they are not employees or agents of the hospital.

I understand that I am under the care and supervision of my attending physician. The hospital and its nursing staff are responsible for carrying out my physician's instructions. My physician or surgeon is responsible for obtaining my informed consent, when required, to medical or surgical treatment, special diagnostic or therapeutic procedures, or hospital services provided to me under my physician's general and special instructions.

## MATERNITY PATIENT

If I deliver an infant(s) while a patient of this hospital, I agree that these same Conditions of Admission apply to the infant(s).

## PERSONAL BELONGINGS

As a patient, I am encouraged to leave personal items at home. The hospital maintains a fireproof safe from the safekeeping of money and valuables. The hospital is not liable for the loss or damage to any money, jewelry, documents, or other articles that are not placed in the safe. Hospital liability for loss of any personal property deposited with the hospital for safekeeping is limited by law to five hundred dollars ($500) unless I receive a written receipt for a greater amount from the hospital.

## FINANCIAL AGREEMENT

In case of an emergency, no one will be refused care on the basis of ability to pay. Those who receive emergency services and are able to pay will be responsible for the medical bills incurred.

For non-emergent care, as well as emergent care with ability to pay - I agree to promptly pay all hospital bills in accordance with the reimbursement rates listed in the hospital's charge description master and, if applicable, the hospital's charity care and discount payment policies and state and federal law. I understand that I may review the hospital's charge description master before (or after) I receive services from the hospital. I understand that the physicians who will care for me are members of Marin General Hospital's independent medical staff. These physicians have privileges to care for their patients at Marin General Hospital but they are not employees of the hospital. This structure, designed by California law, requires physicians to independently contract with insurance companies for their services. That means I may have separate bills for physician services and they may or may not contract directly with my insurance company.

## ASSIGNMENT OF INSURANCE BENEFITS

I assign and authorize direct payment to the hospital of all insurance and health plan benefits payable for this hospitalization or for these outpatient services. I agree that the insurer on plan's payment to the hospital pursuant to this authorization shall discharge its obligations to the extent of such payment. I understand that I am financially responsible for charges not paid according to this assignment, to the extent permitted by state and federal law.



| MARIN GENERAL HOSPITAL<br>250 BON AIR ROAD  GREENBRAE, CA 94904 | **CONDITIONS OF ADMISSION**<br><br>Form COA-E<br>Rev. 06/02/2016<br>Page 2 of 3 | 4001153532<br>MCMILLION, SANDRA<br>DOB: ██████ 51Y Female<br>ADM: SUTHERLAND, ERICA | 02191817<br>OP SINGLE VISIT<br>11/15/2016<br>XR2 |
|---|---|---|---|
| *COA* | | | |

## CONSENT TO PHOTOGRAPH

I hereby consent to be photographed while receiving treatment at the hospital.

I understand that the images from such photography may be used for my treatment or for hospital health care operations such as peer review or medical education, as the hospital or my treating physician(s) deem appropriate.

Note: Photography for other purposes (e.g., research, publication, outside education, marketing, public relations, news or documentary) requires use of the form "Consent to Photograph and Authorization for Use and Disclosure".

The term "photograph" as used herein includes video or still photography, in digital or any other format, and any other means of recording or reproducing images.

## HEALTH PLAN OBLIGATION

This hospital maintains a list of health plans with which it contracts. A list of such plans is available upon request from the financial office. The hospital has no contract, express or implied, with any plan that does not appear on the list. I agree to pay the reimbursement rates listed in the hospital's charge description master (in accordance with the hospital's charity care and discount payment policies, if applicable, and state and federal law) for all services rendered to me by the hospital if I belong to a plan that does not appear on the above mentioned list. All physicians and surgeons, including the radiologist, pathologist, emergency physician, anesthesiologist, and others, will bill separately for their services. It is my responsibility to determine if physicians providing services to me contract with my health plan, if any.

I certify that I have read the foregoing and received a copy thereof. I am the patient, the patient's legal representative, or am otherwise duly authorized by the patient to sign the above and accept its terms on his/her behalf.

Date: NOV 1 5 2016          Time: 10:03A          AM / PM

Signature: _____
           (patient / legal representative)

If signed by someone other than patient, indicate relationship: _____

Print name: _____
            ( legal representative)

Signature: _____
           ( Witness)

Print name: _____ ule Giambra
            ( Witness)

### A COPY OF THIS DOCUMENT SHOULD BE GIVEN TO THE PATIENT AND ANY OTHER PERSON WHO SIGNS THIS DOCUMENT

MARIN GENERAL HOSPITAL
250 BON AIR ROAD   GREENBRAE, CA 94904

**CONDITIONS OF ADMISSION**

Form COA-E
Rev. 06/02/2016
Page 3 of 3

*COA*

4001153532
MCMILLION, SANDRA
DOB: ████████  51Y  Female
ADM: SUTHERLAND, ERICA

02191817
OP SINGLE VISIT
11/15/2016
XR2

Patient: MCMILLION, SANDRA KACEE     MRN: 02191817     Encounter: 4001153532     Page 3 of 3

# EXHIBIT 24

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DEC 14 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JORDAN MARKS, individually and on behalf of all others similarly situated,<br><br>           Plaintiff-Appellant,<br><br>  v.<br><br>CRUNCH SAN DIEGO, LLC,<br><br>           Defendant-Appellee. | No.   14-56834<br><br>D.C. No.<br>3:14-cv-00348-BAS-BLM<br>Southern District of California,<br>San Diego<br><br><br>ORDER |

Before:  CALLAHAN, BEA, and IKUTA, Circuit Judges.

Submission is vacated and deferred pending the D.C. Circuit decision in

*ACA International v. Federal Communications Commission, et al.*, No. 15-1211

(argued on October 19, 2016).

# EXHIBIT 25

2016 WL 8982232 (C.A.9) (Oral Argument)
This is an unofficial transcript derived from video/audio recordings
United States Court of Appeals, Ninth Circuit.

Jordan Marks, Plaintiff-Appellant,

v.

Crunch San Diego, L.L.C., Defendant-Appellee.

No. 14-56834.
December 6, 2016.

## Oral Argument

Appearances:

Seyed Abbas Kazerounian, Kazerouni Law Group, APC, Costa Mesa, CA, for petitioner.

Ian Charles Ballon, Greenberg Traurig LLP, Los Angeles, CA, for respondent.

Before:

Consuelo M. Callahan, Carlos T. Bea, Sandra S. Ikuta, Circuit Judges.

## CONTENTS
ORAL ARGUMENT OF SEYED ABBAS KAZEROUNIAN ON BEHALF OF THE PETITIONER
ORAL ARGUMENT OF IAN CHARLES BALLON ON BEHALF OF THE RESPONDENT
REBUTTAL ARGUMENT OF SEYED ABBAS KAZEROUNIAN ON BEHALF OF THE PETITIONER

JUDGE CALLAHAN: Good morning.


**ORAL ARGUMENT OF SEYED ABBAS KAZEROUNIAN ON BEHALF OF THE PETITIONER**

MR. KAZEROUNIAN: Good morning, your Honors.

And may it please the Court.

There are two --

JUDGE CALLAHAN: And your name?

MR. KAZEROUNIAN: Oh, my name is Abbas Kazerounian representing the petitioner Jordan Marks.

JUDGE CALLAHAN: Okay. And will you be the only person arguing?

MR. KAZEROUNIAN: For the petitioner, yes, your Honor.

JUDGE CALLAHAN: Okay. Thank you.

MR. KAZEROUNIAN: Your Honors, there are two questions presented before this Court today. The first question is, did the district court err in invalidating binding FCC final declaratory rulings on the TCPA in violation of the Hobbs Act?

The second question presented today is, did the district court err in finding that the text communication system used by Crunch is not an automated telephone dialing system when that system stored a list of numbers and on last in an automated fashion sent marketing text messages to those numbers.

I believe that the first question presented I think can be put to rest and look quickly on the second one because I think that every circuit court that has dealt with that issue has found that there is a jurisdictional bar when presented with this issue which is that the district court is bound by final declaratory rulings of the FCC, and actually that was dealt with by this very Court in the US West Communications case v. Hamilton.

And in fact the Ninth Circuit, interestingly in that case, agreed with the district court which conflicted with the FCC opinion, but still found that they're bound by that jurisdictional bar.

JUDGE IKUTA: What do we do about the -- the case ACA International, I guess it is, that's currently pending? So if the -- the D.C. Circuit decides that the FCC was wrong in the way it explained potential or capacity as being the sort of inchoate potential capacity, how does that affect our decision?

MR. KAZEROUNIAN: I think the -- the D.C. Circuit could potentially reverse your opinion if they conflict and if it comes up subsequent to your opinion, but if it's purely on the capacity issue, I don't think the capacity issue will -- will change the outcome because on -- on the petitioner's interpretation of an automated telephone dialing system, we believe that the mechanism used by text communications had the present capacity to be defines as an ATDS, but technically there is a conflict -- potential conflict, your Honor.

JUDGE IKUTA: Do we understand the difference between present capacity and potential capacity? And can you tell me what you mean by those terms?

MR. KAZEROUNIAN: Yes, your Honor. Present capacity is when the mechanism in question has the actual ability at the time in question when the allegations are brought to being able to do what we define as an automated telephone dialing system.

JUDGE IKUTA: So my iPhone can store numbers, can store a list of numbers -- but if right now can't call all those numbers unless I download an app to do so. Does my iPhone have the present capacity to call listed numbers? Or just the potential capacity?

MR. KAZEROUNIAN: It would have the potential capacity, but I -- I would also -- I would also ask the Court to take that hypothetical as an extreme example. And the FCC has actually commented on that and said that's never been presented before. And if Crunch says, well, that's a ludicrous, you know, outcome of the interpretation of Mr. Marks, well, there is actually an easy way to resolve that issue. If ever that be -- anyone sues under that premise that somebody's cell phone could be an ATDS, I think, you know, that case could be stayed under primary jurisdiction and petition to the FCC. And the FCC will be able to deal without petition because that's not --

JUDGE IKUTA: But I'm trying to understand your definition, I mean, so let's say I downloaded the app 'cause there is an app that I can download that will allow me to call every number in my stored contacts list --

MR. KAZEROUNIAN: Yes, your Honor.

JUDGE IKUTA: -- immediately. Assuming I had downloaded that app, is my -- does my phone meet the definition of -- of an ATDS under your interpretation?

MR. KAZEROUNIAN: You mean, does the app have the ability to have a list of numbers and dial them on this?

JUDGE CALLAHAN: Now, that's not the question.

JUDGE IKUTA: My iPhone has all the contacts or has all the contacts presumably I could store a list that was randomly generated even in my iPhone. If I download the app, I just punch a button and then it will call all those -- all the numbers in my contact list.

MR. KAZEROUNIAN: Then on a technical level, yes.

JUDGE IKUTA: Okay. So -- so can you walk me through the definition and explain how it works? So the -- the -- in 227 it says that the -- the automatic telephone dialing system means equipment which has the capacity, and -- and you're arguing potential capacity as I understand your brief. Is that right?

To store or produce telephone numbers to be called, and then what does the -- the last clause, using a random or sequential number generator modify?

MR. KAZEROUNIAN: I think that modifies the word "produce," your Honor. It --

JUDGE IKUTA: So -- so you're saying that, it has the capacity to store telephone numbers or it has a capacity to produce numbers using a random or sequential number generator. Is that your --

MR. KAZEROUNIAN: That -- that's precisely the distinction.

JUDGE IKUTA: So you're saying now what -- what Congress intended was that, any phone or any piece of equipment that had the capacity to store telephone numbers and to dial such numbers would be an ATDS. Is that what you're saying?

MR. KAZEROUNIAN: Exactly. And that's what the FCC has said in 2003, in 2008, 2015 and, in fact, two, three weeks ago --

JUDGE IKUTA: But there -- there -- it's little bit ambiguous what -- what the FCC is saying. I mean, they -- they say, a range of things. They -- they do say what you're saying, but then they also say some other things as well so I'm not sure that it's completely clear what their proposed -- what their -- their rule is.

MR. KAZEROUNIAN: I -- I think the fact that the ability to dial a list or from a database of numbers in an automated fashion has been a -- has been a consistency in FCC opinions in 2003, 2008, 2015 and most recently in the enforcement advisory that came out on November 18th.

JUDGE IKUTA: But doesn't the -- doesn't that just read -- I think the other side argues that it reads the -- using a random or sequential number generator basically out of the -- out of the -- the statute. So that's no longer a limiting factor because if it can store telephone numbers -- I mean, I don't even need to -- to download the app. I just need to have one number. So I -- the capacity to store telephone number and dial it.

MR. KAZEROUNIAN: Absolutely.

JUDGE IKUTA: So -- so that's every -- everybody's phone, not even my iPhone, any flip phone has the capacity to store a number and dial it.

MR. KAZEROUNIAN: Potentially, I think, there's two points to be made to that.

JUDGE IKUTA: Okay.

MR. KAZEROUNIAN: I think, first of all, I'd like to point to the 2008 opinion -- an FCC opinion, which says, equipment that dials a list of numbers such as a business's list of customers rather than dial random or sequential numbers because the basic function of such dialing equipment is the same -- the capacity to dial numbers without human intervention.

When -- when the statute was created in 1991, at that point, in that society companies used random or sequentially generated numbers to market -- market people, but that has changed.

In 2016, that's almost non-existent. And if we were to hold Crunch's interpretation of the fact that it requires numbers to be randomly or sequentially produced to store them and to dial them, that would eviscerate the TCPA because nobody uses that technology anymore.

So in 2003 --

JUDGE IKUTA: Doesn't that just mean that Congress enacted a statute, addresses a specific problem, now that problem has gone away? I -- I don't see why that gives -- getting to the court license to reinterpret the statute to address a different problem.

MR. KAZEROUNIAN: Well, I think, the courts are bound by the final declaratory rulings of the FCC absent a Hobbs Act appeal. And, furthermore, in 2015, the Congress -- the creator of the statute actually created an exemption for federally backed student -- student loans. Those are not randomly or sequentially generated numbers. Those are targeted numbers.

So the question for me to the court would be is, why would Congress go out of its way and spend taxpayer money creating an exemption when under Crunch's interpretation, they wouldn't be violations anyway?

JUDGE IKUTA: So could the -- the -- the 2015 case, the ACA International case that's currently pending could limit the FCC's interpretation. Is that correct?

MR. KAZEROUNIAN: On its face, at least, as to the -- as to the capacity portion, but in this particular case under our interpretation of ATDS we believe that the -- the text communication system actually had the current capacity because it's undisputed in the record that text communication system could store a list of numbers and send en masse --

JUDGE IKUTA: But isn't ACA also arguing that the -- that ATDS must have the generation capacity? It's not enough merely to store? I mean, now that would certainly require us to say that the text communication system was not a ATDS if -- if the D.C. Circuit agreed with them?

MR. KAZEROUNIAN: Yes. But that also opens up a Pandora's box in the -- in the respect that it's also challenging 2003 and 2008 opinions which were not challenged within the 60-day period which is required under the Hobbs Act. So what -- the effect of that is I don't know and I think we'd have to have subsequent litigation to see if that challenges that [inaudible].

JUDGE IKUTA: Is there any case, I -- I was curious about that because 2015 quotes and relies on 2003 and 2012, I think.

MR. KAZEROUNIAN: Yes.

JUDGE IKUTA: And if the D.C. Circuit finds that the 2015 interpretation is invalid, how does that affect --

MR. KAZEROUNIAN: I -- I don't think that's --

JUDGE IKUTA: -- does anyone know that --

MR. KAZEROUNIAN: I don't think there's any authority on that.

JUDGE IKUTA: -- [inaudible] question. Okay.

MR. KAZEROUNIAN: I -- I think one argument would be that's incorporated by reference and it would have a -- it would have an effect, but of course the other side is that those -- those are closed doors.

And -- and I think the -- that the second issue was the analysis of the automated telephone dialing system is the -- without human intervention portion of that. I think what's important to understand from the district court opinion is on the one hand the district court stated, we're not -- I'm not bound by the FCC opinion which obviously we disagree with.

But on the other hand, the courts relies heavily on without human intervention, which is not in the statute, and it's actually a creation of the FCC in analyzing ATDS.

JUDGE IKUTA: Doesn't the word "automatic" infer that or imply that it's without human intervention? I mean, it's called the automatic telephone dialing system, and --

MR. KAZEROUNIAN: Yes.

JUDGE IKUTA: -- what does automatic mean if not --

MR. KAZEROUNIAN: I would agree with that. The point I was just making is that -- that standard is created by the FCC, but the district court's analysis on -- without human intervention was not one that I agree with because the FCC -- and in fact, this very Court, in the Meyer opinion, the emphasis has always been on the dialing portion of it because the -- the district court was talking about the gathering of numbers and the uploading of the numbers and, you know, the creation of the 180 character text messages and being sent. But that's not part of the analysis because, otherwise, a predictive dialogue which the Meyer court and this -- this very Court decided a predictive dialogue is per se in ATDS and so has the -- the --

JUDGE IKUTA: Didn't -- didn't the parties there concede everything? I -- I thought we -- we never really ruled on anything in Meyer, we just said, oh, they've conceded it.

MR. KAZEROUNIAN: In Meyer, your Honor, the -- the holding was, if I may --

JUDGE IKUTA: We said, PRA does not dispute that its predictive dialers have the capacity as described in the TCPA.

MR. KAZEROUNIAN: But -- but the Meyer opinion also relies firmly on the 2003 opinion that a predictive dialer is an ATDS.

JUDGE IKUTA: But apparently they didn't dispute it.

MR. KAZEROUNIAN: Right. But the 2003 opinion --

JUDGE IKUTA: So I am not sure how precedential that is.

MR. KAZEROUNIAN: I would argue that the 2003, at least, and the 2008 opinions are -- are precedential in -- in that regard. And -- yes --

JUDGE CALLAHAN: So you're not asking us to hold this for the D.C. Circuit?

MR. KAZEROUNIAN: Holding what, your Honor?

JUDGE CALLAHAN: Hold this case -- wait to see what they say.

MR. KAZEROUNIAN: Well, I -- I actually had to submit something and I said maybe that would be the prudent thing to do in case to see it because obviously, you know, you would go to the effort and it could have the --

JUDGE IKUTA: So you would be willing for us to hold it? I think we -- we denied your motion initially because it was so close to oral argument that we could still decide to -- to hold this pending that decision. Do we know when there -- have they heard oral argument or what's the status?

MR. KAZEROUNIAN: Yes. They've heard oral argument but we're waiting for the written opinion. I -- I mean, the -- the one thing I would like to emphasize and even in the advisory opinion -- the enforcement advisory opinion, which is not binding on this Court, but it should be given the Skidmore deference and given significant weight.

And in -- and that -- in that particular definition, most recently November 18th, the FCC said, the term "automatic telephone dialing system or auto dial" covers any equipment that has the capacity to store or produce numbers to be dialed and dial and dial them without human intervention.

JUDGE IKUTA: And that was aggressive interpretation like -- like it had everything you wanted, right?

MR. KAZEROUNIAN: Exactly right. So I would like to reserve two minutes for my rebuttal if I may.

JUDGE CALLAHAN: Thank you.

MR. KAZEROUNIAN: Thank you so much.


### ORAL ARGUMENT OF IAN CHARLES BALLON ON BEHALF OF THE RESPONDENT

MR. BALLON: Good morning, your Honor.

Ian Ballon for the appellee Crunch San Diego.

Your Honors, this case actually may be decided on much simpler grounds. There are three facts -- three ways that -- that a system can dial in this case, and we believe that actually it is the appellant's interpretation that would violate Hobbs Act if there's any question of Hobbs Act violation.

The -- the FCC has made very clear in the 2015 order in paragraph 10 of that order that they were not contrary to what the appellants are arguing. They were not purporting to change the definition of an ATDS.

JUDGE IKUTA: But that -- where they just quote the language of the statute? I mean, I -- I saw in your briefs you say they quote the language of the statutes like, yeah, they quote the language of the statute, but then they go on and they give all these other language about a -- a very expansive interpretation of -- of the statutory language.

MR. BALLON: There is -- there is a lot of stray language in the 2003 order. The 2003 order held that -- that a predictive dialer was an ATDS. In paragraph 10 of the 2015 order, the FCC makes very clear that it held that a predictive dialer was an ATDS because it had the capacity to -- to generate numbers randomly and sequentially. It met the statutory definition.

And -- and that's the critical point. There's a lot of district court case law which is what the appellant relies on. Pre-2015, looking at the stray loose 2003 language arguing that the FCC interpret it, brought -- expanded the -- the statutory definition.

JUDGE IKUTA: Well, I have in my notes just -- I just picked it random -- something from the 2015 which said, well, in 2003 we said the equipment need only have the capacity to store or produce telephone numbers. The commission says that even when dialing a fixed set of numbers, equipment may nevertheless meet the auto dialer definition.

And -- and there's lots of language particularly in the 2012 and the 2015 order saying even if it's from a set list of numbers, as long as it has the capacity -- and they say, oh and the dissent says, we're using the term "capacity" as if it's a 8,000-seat stadium. It could be. It has the capacity to be a 20,000-seat stadium. We agree. That's what we're doing.

I mean, so -- so they have a very -- I -- I don't think you can call it stray language because the whole thrust of their -- their order is to expand the definition and in -- in a very aggressive way.

MR. BALLON: Well, I -- I think that there is stray language. They -- they spend a lot of time talking about the characteristics of a predictive dialer. A predictive dialer dials from a list, but that doesn't mean dialing from a list changes the statutory definition.

JUDGE IKUTA: Doesn't have to have random generation it says, that's -- that's not -- no longer necessary.

MR. BALLON: Well, I -- I don't think that's what the FCC says in the 2015 order. The only court to ever look at that issue was the Third Circuit in the Yahoo! v. Dominguez case which -- which said that although the 2015 order is not a model of clarity, the FCC made very clear that it was not purporting to change the statutory definition.

JUDGE IKUTA: Let me just go for a minute to the -- the statutory language itself, and you heard the statutory interpretation of opposing counsel. I was struggling with what using a random or sequential number generator modifies. He says it -- it modifies produce which makes and reads well produce using a random or sequential number generator, but I didn't see how you could say to store using a random or sequential number generator. That -- that didn't make sense grammatically. So how do you interpret the statutory language?

MR. BALLON: Well, I -- I think -- I think to -- to agree with the appellant's definition, you have to move the comma.

JUDGE IKUTA: But tell me how you think it should be interpreted? What does using a random or sequential number generator modify?

MR. BALLON: It -- it means that the numbers that are produced or stored themselves have to be generated randomly or sequentially.

JUDGE IKUTA: So -- so then you would say telephone numbers using a random or sequential number generator, but it doesn't say telephone numbers produced using a random or sequential numbered generator so the telephone numbers aren't using anything. So how does that work grammatically?

MR. BALLON: The -- the telephone numbers would have to be -- the numbers would have to be generated. Number generation is a requirement of the statute.

JUDGE IKUTA: So you want us to read in the word telephone numbers generated using a random or sequential number generator. So you want us to put in the word "generated" in there. Is that right?

MR. BALLON: No. I -- I wouldn't -- I wouldn't change the statutory definition at all.

JUDGE IKUTA: Well, then how do I read telephone numbers using a random or sequential number generator isn't grammatical. So -- so explain to me how I -- I read that sentence.

MR. BALLON: The -- the telephone numbers have to be either stored or produced telephone numbers to be called using a random or sequential number generator.

JUDGE IKUTA: Right, and that's what the statute says and what is using modify? That clause -- that gerund clause, if I remember my high school grammar.

MR. BALLON: I -- I think it is the numbers to be called. The numbers to be called --

JUDGE IKUTA: But the numbers to be called aren't using anything so something else. I mean, you would have to put in the word "generated." Telephone numbers generated using a random or sequential number generator or some other word because the telephone numbers themselves aren't using anything.

MR. BALLON: Yeah. I mean, I agree that Congress could have drafted this more carefully. I think the --

JUDGE IKUTA: I agree with that.

MR. BALLON: I -- I think the definition that makes the most sense is the FCC's definition and the Third Circuit's definition. The FCC in the 2012 -- 2015 order in paragraph 10 as well as in paragraph 12 in note 46 refers to -- to the capacity to generate numbers randomly or sequentially. The Third Circuit construed that there is the requirement for number generation.

And I think this case can be resolved very simply. The facts are undisputed, it's also undisputed between the parties that -- that the plaintiffs do -- do not meet the statutory definition so if you apply the statute -- all parties agree that -- that summary judgment was properly granted. The --

JUDGE IKUTA: I don't -- I -- I was having trouble with that. I mean, here we have this -- this piece of equipment which apparently has the capacity to store telephone numbers and there's testimony from Mr. Aesefi that it could -- you

could import a list of numbers so presumably you can import a list of numbers that were created by a random number generator.

And then there's testimony from Mr. Aesefi that a message could go out to all of the numbers in the database. So why doesn't that meet the plain language of the statute?

MR. BALLON: Because dialing from a database is -- is not enough, and that's the critical thing as -- as the --

JUDGE IKUTA: Why is that if the database consists of numbers that were randomly generated, doesn't that meet the plain language of those statutes?

MR. BALLON: Well, if -- if you delete from the statute, the requirement for an automatic telephone dialing system then dialing from a list would make perfect sense.

JUDGE IKUTA: It's automatic, right, 'cause it can dial all the numbers with one punch of the button.

MR. BALLON: But -- but then Congress would have said automatic. They said automatic telephone dialing system and there's the requirement of number generation. That -- that's the --

JUDGE IKUTA: You're saying that the equipment has to be able to generate numbers? Because then they -- they point to the disjunctive store or produce.

MR. BALLON: There's no court that's ever accepted that. The Ninth Circuit would be -- would --

JUDGE IKUTA: The -- the language of that statute say store or produced as disjunctive?

MR. BALLON: Well -- I mean, again, it -- it renders superfluous the automatic telephone dialing system. It renders superfluous number generation. Congress could have just X'd everything out and just said produced 'cause any system that dials would have to produce. So again --

JUDGE IKUTA: So you want us to read it as store and produce?

MR. BALLON: Store or produce.

JUDGE IKUTA: Well, but if it's store or produce and the whole produced telephone numbers using a random sequential number generator would go away that'd be one type of equipment and another type of equipment is one that stores telephone numbers to be called and dial such numbers, I guess, automatically. I mean, that's a possible reading. It's -- it's consistent with the language.

MR. BALLON: Right. I -- I, again, I think the -- you know, the only court that's looked at this is the Third Circuit. I think the Third Circuit and the FCC in the 2015 order in paragraph 10 were very clear that predictive dialers, even though a characteristic of the predictive dialer is to dial from a list, the predictive dialer is an ATDS because it had the capacity to generate numbers randomly or sequentially even if that capacity was not used.

JUDGE IKUTA: So I'm looking at paragraph 10 and it says, we read from our previous statements that dialing equipment generally has the capacity to store or produce and dial random or sequential numbers. So they seemed to be moving -- I thought as I was reading the FCC order, they seemed to be moving from producing random or sequential numbers to dialing random or sequential numbers.

And then by 2015, they sure gave that up. You know, there's language in the 2015 that just goes, well, we don't have even have to dial them randomly or sequentially. They can do it from a set database. It says even if not presently used for that purpose including when the caller is calling a set list of consumers. So they seem to be migrating into -- as long as the piece of equipment can dial a bunch of numbers, even if it's set list, that meets the definition that's good enough for us.

MR. BALLON: I -- I don't think so. I -- I think the FCC has -- has made clear that they -- that -- that there is this requirement for number generation even if --

JUDGE IKUTA: What's the best language in the 2015 order that isn't quoting just the language of the statute?

MR. BALLON: Well, I -- I think it is paragraph 10. I think it's also paragraph -- let me see.

JUDGE IKUTA: What -- what's the best language in paragraph 10? I mean, I think I just read paragraph 10 and it's -- it's pretty ambiguous.

MR. BALLON: It's the store and produce and dial random or sequential numbers that --

JUDGE IKUTA: Store or produce, comma, and dial random or sequential numbers. I mean, so it certainly could store random or sequential numbers, and then says, even if not presently used for that purpose including in the callers calling a set list of consumers. And I say that's good enough.

MR. BALLON: Right. Paragraph 10 is addressing the question of capacity. And there's no question that the language is a little bit sloppy, but in referring to random or to -- to random or sequential numbers, it does encompass that concept of number generation, which is --

JUDGE IKUTA: Well, it doesn't say it. It says dial random or sequential numbers. It doesn't say anything about generating them. Is that your best language from 2015?

MR. BALLON: Well, I -- I think it is that language. I think it's also paragraph 12 and note 46. Note 46 includes the -- the CFR section. I do think it's significant that in the 2003 order, which the appellant says, the FCC broadened the definition. The FCC in 2003 expressly adopted a CFR provision that tracks the statutory language and does not include this concept of dialing from a list.

It's very clear from the 2015 order that dialing from a list is a characteristic of -- of predictive dialer. But a predictive dialer is only an ATDS because it is -- because it is the capacity to generate random or sequential numbers.

JUDGE IKUTA: Where's the word -- where does it say that to generate -- it has to have the capacity to generate random numbers.

MR. BALLON: Well, there's the reference to random or sequential numbers.

JUDGE IKUTA: Where does it say to generate?

MR. BALLON: You're -- you're certainly right that in paragraph 10 it doesn't say generate.

JUDGE IKUTA: So where does it say that?

MR. BALLON: The -- the Third Circuit in the Dominguez case construing the --

JUDGE IKUTA: That's an unpublished opinion, right?

MR. BALLON: It is an unpublished opinion.

JUDGE IKUTA: Okay. So that -- that doesn't help us too much.

MR. BALLON: Okay. Well, looking at the -- at the various provisions which include paragraph 10, which include paragraph 12 and note 46, which include paragraph 111, which talk about capacity that -- that cumulatively that court had concluded there was the requirement of number generation. There's certainly the requirement of -- of random or sequential numbers.

It's not enough that -- that the numbers just be on a list. There is some requirement of random or sequential. And as -- as the district court noted, the -- the statute doesn't grant the FCC the -- the power to change the definition. Now, that's not a Hobbs Act issue as the appellant says. It's evidence that -- that the appellant's interpretation doesn't make sense.

The appellant is wrong in saying that the FCC broadened the definition of the statute when the FCC itself in the CFR section tracks the statute, and when the FCC itself claims that it's not doing it, and when Congress didn't tell delegate to the FCC this definition.

JUDGE IKUTA: So -- so let me ask you this. So -- so we have a statute which is pretty unclear. And a CFR section which basically just tracks the language of the statute. And then we have these orders that have a very expansive [inaudible] of interpretation. And as I understand appellant's argument, they say, we're bound by it because of the Hobbs Act -- didn't like unless the 2015 case before the D.C. Circuit changes it.

Why aren't we -- I -- I was trying to see if there was -- there were any cases that have said, well, when -- when the agency takes such interpretation that's so far appealed from the statute, a court doesn't have to comply with that? And I didn't see any case holding that.

MR. BALLON: Well, I mean, the -- the Ninth Circuit in -- in the Satterfield case says that under Chevron the deference is due only to formal rulemaking. There are cases that talk about that. But -- but, again, I -- I think it's very clear that -- that the appellant's argument, for a more expansive definition, to give meaning to -- to loose language -- loose language in the FCC orders that goes beyond the statute, that goes beyond what the FCC itself is purporting to do.

I think that's where you run into Hobbs Act problems. I think the -- the court has to -- has to apply the statute. There -- the -- the facts are undisputed and the plaintiff doesn't dispute that -- that it doesn't meet the statutory definition.

Thank you, your Honor.

JUDGE CALLAHAN: All right. Thank you for your argument.


### REBUTTAL ARGUMENT OF SEYED ABBAS KAZEROUNIAN ON BEHALF OF THE PETITIONER

MR. KAZEROUNIAN: Your Honors, in -- in response to Mr. Ballon's argument, I mean, looking at paragraph 10 of the 2015 FCC opinion. As your Honor read out, it states within that statement -- including when the caller is calling a set of list of -- a list of consumers, which is exactly what the text communication system has.

Now, in this -- in this particular -- as it pertains to the TCPA, Congress gave expressed grant of authority to the FCC to interpret and to regulate the TCPA. And the -- the FCC --

JUDGE CALLAHAN: Why aren't you -- why aren't they expanding the statutory language and do they have authority to do that?

MR. KAZEROUNIAN: Yes, they do, your Honor. They -- they do have that authority, and Congress has never objected to their interpretation. And in 2003, the FCC said confirming that the ATDS requirement was to be interpreted broadly to apply to a wide spectrum of evolving technologies, then understood that technology is changing, and therefore they have to broaden that interpretation, otherwise, it would moot the TCPA as I discussed earlier.

As far as the automated telephone --

JUDGE CALLAHAN: At -- at some point doesn't it require a rewrite of the statute if it gets too broad, and in that case aren't they overstepping?

MR. KAZEROUNIAN: I think -- I -- I think the -- the overstepping only becomes when the -- when the statute is ambiguous and then it -- I think at that point a court would have -- would have the ability to use the Chevron deference, but if it's -- if it doesn't create capricious or -- or a nonsensical reasoning or interpretation of the -- the statute, the Chevron cannot be applied.

Even if it's one that the courts don't agree with as was the case in US West Communications v. Hamilton. I think -- I think the emphasis here is on the human intervention portion of it, and I think the facts on the record show that there's multiple ways that this mechanism, a text communication system sent it in -- sent messages in an automated way specifically in the list of numbers that existed.

So in conclusion, your Honors, I respectfully request the Court to reverse the district court's opinion because the overwhelming evidence and looked upon most favorably in -- in favor of Mr. Marks shows that this -- this is an ATDS because it stores numbers and it calls them in an automated fashion.

JUDGE CALLAHAN: All right. Thank you both for your argument in this matter. It was very helpful. Difficult case, and we appreciate you're both so prepared.

MR. KAZEROUNIAN: Thank you, your Honor.

JUDGE CALLAHAN: This matter will stand submitted.

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 26**

No. 15-1211 (and consolidated cases)

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

ACA INTERNATIONAL ET AL.,
*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES
OF AMERICA,
*Respondents.*

_____

CAVALRY PORTFOLIO SERVICES, LLC ET AL.,
*Intervenors for Petitioners.*

_____

ON PETITIONS FOR REVIEW OF AN ORDER
OF THE FEDERAL COMMUNICATIONS COMMISSION

_____

JOINT BRIEF FOR PETITIONERS ACA INTERNATIONAL, SIRIUS XM,
PACE, SALESFORCE.COM, EXACTTARGET, CONSUMER BANKERS
ASSOCIATION, U.S. CHAMBER OF COMMERCE, VIBES MEDIA, AND
PORTFOLIO RECOVERY ASSOCIATES

_____

Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500

*Counsel for Petitioner the Chamber
    of Commerce of the United States
    of America*

Shay Dvoretzky
Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone:  (202) 879-3939

*Counsel for Petitioners Sirius XM Radio
    Inc. and Professional Association for
    Customer Engagement, Inc.*

*Additional Counsel Listed on Inside Cover*

Brian Melendez
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Telephone: (612) 486-1589

*Counsel for Petitioner ACA International*

Tonia Ouellette Klausner
Keith E. Eggleton
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7706

*Counsel for Petitioners salesforce.com, inc.
and ExactTarget, Inc.*

Kate Comerford Todd
Steven P. Lehotsky
Warren Postman
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Petitioner Chamber of
Commerce of the United States of
America*

Michele Shuster
MAC MURRAY, PETERSEN & SHUSTER LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054
Telephone: (614) 939-9955

*Counsel for Petitioner Professional
Association for Customer Engagement, Inc.*

Monica S. Desai
Amy L. Brown
Jonathan Jacob Nadler
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000

*Counsel for Petitioner Consumer Bankers
Association*

Christopher J. Wright
Jennifer P. Bagg
Elizabeth Austin Bonner
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300

*Counsel for Petitioner Vibes Media, LLC*

Robert A. Long
Yaron Dori
Michael Beder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Petitioner Portfolio Recovery
Associates, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    Parties and Amici

1.    There were no district court proceedings.  Petitioners are ACA International (No. 15-1211); Sirius XM Radio Inc. (Nos. 15-1218 and 15-1441); Professional Association for Customer Engagement, Inc. (Nos. 15-1244 and 15-1440); salesforce.com, inc. and ExactTarget, Inc. (No. 15-1290); Consumer Bankers Association (No. 15-1304); Chamber of Commerce of the United States of America (No. 15-1306); Vibes Media, LLC (No. 15-1311); Rite Aid Hdqtrs. Corp. (No. 15-1313); and Portfolio Recovery Associates, LLC (No. 15-1314).

2.    Respondents are the Federal Communications Commission and the United States of America.

3.    The following entities are intervenors:

Intervenors for Petitioners:  Cavalry Portfolio Services, LLC; Conifer Revenue Cycle Solutions, LLC; Council of American Survey Research Organizations; Diversified Consultants, Inc.; Gerzhom, Inc.; Marketing Research Association; Mercantile Adjustment Bureau, LLC; MRS BPO LLC; and National Association of Federal Credit Unions.

Intervenors for Respondents:  None.

4.    The following entities are *amici curiae*:

In support of Petitioners:  American Bankers Association; American Financial Services Association; American Gas Association; Charles R. Messer; Communication Innovators; Consumer Mortgage Coalition; Credit Union National Association; CTIA—The Wireless Association; Edison Electric Institute; Independent Community Bankers of America; Mortgage Bankers Association; National Association of Chain Drug Stores; National Association of Water Companies; National Restaurant Association; National Retail Federation; National Rural Electric Cooperative Association; Retail Litigation Center, Inc.; and The Internet Association.

In support of Respondents:  Consumers Union; Electronic Information Center (EPIC); National Association of Consumer Advocates; National Consumer Law Center.

In support of neither party:  None known.

B.    Ruling Under Review

The ruling under review was released on July 10, 2015 by the Federal Communications Commission. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1144-1224).  The Order is an omnibus declaratory ruling and order that addressed 21 separate requests for TCPA-related action from the Commission.

C.    Related Cases

All petitions for review of the Commission's Order were consolidated in this Court under the lottery procedures set forth in 28 U.S.C. § 2112(a). Petitioners are not aware of any other related case.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

1.    ACA International, the Association of Credit and Collection Professionals, is a Minnesota nonprofit corporation with offices in Washington, DC, and Minneapolis, Minnesota. Founded in 1939, ACA represents nearly 3,700 members, including credit grantors, collection agencies, attorneys, asset buyers, and vendor affiliates. ACA produces a wide variety of products, services, and publications, including educational and compliance-related information; and articulates the value of the credit-and-collection industry to businesses, policymakers, and consumers. ACA has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

2.    Sirius XM Radio Inc. (Sirius XM) is the nation's largest satellite radio provider. Sirius XM Holdings Inc. owns all of the outstanding capital stock of Sirius XM Radio Inc. Liberty Media Corporation beneficially owns more than 50 percent of the outstanding capital stock of Sirius XM Holdings Inc.

3.    Professional Association for Customer Engagement, Inc. (PACE) is a non-profit trade organization dedicated to the advancement of companies that use contact centers as an integral channel of operations. It has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

4.     salesforce.com, inc. is a leading provider of enterprise cloud computing solutions.  ExactTarget, Inc. is a provider of on-demand software solutions.  salesforce.com, inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.  ExactTarget, Inc. is wholly owned by salesforce.com, inc.

5.     Consumer Bankers Association is a non-profit corporation and trade association representing the retail banking industry—banking services geared toward consumers and small businesses.  It has no parent corporation, and no publicly held corporation owns a 10 percent or greater interest in it.

6.     The Chamber of Commerce of the United States of America (the Chamber) is the world's largest business federation.  It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  The Chamber is a non-profit, tax-exempt organization incorporated in the District of Columbia.  It has no parent corporation and no publicly held corporation owns a 10 percent or greater interest in it.

7.     Vibes Media, LLC is a leading provider of mobile marketing technology and services.  It has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

8.      Portfolio Recovery Associates, LLC, is a Delaware limited liability

company.  It is a subsidiary of PRA Group, Inc., a publicly traded company.  PRA

Group provides a broad range of revenue and recovery services, returning millions

of dollars annually to business and government clients.  No publicly held

corporation owns 10 percent or more of PRA Group, Inc. stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO THE PARTIES, RULINGS, AND RELATED CASES ........................................................................................i

CORPORATE DISCLOSURE STATEMENT .......................................iv

TABLE OF AUTHORITIES .................................................................ix

GLOSSARY............................................................................... xvii

INTRODUCTION ...................................................................................1

JURISDICTION.....................................................................................3

ISSUES .................................................................................................4

STATUTES AND REGULATIONS........................................................4

STATEMENT OF THE CASE................................................................5

    A.   Congress Enacts the TCPA To Restrict Particular Practices ...............5

    B.   The Commission's Subsequent Orders Generate Significant Confusion as Wireless Communications Increase Dramatically .........7

        1.   The Commission's Orders Concerning Predictive Dialers Create Significant Confusion.......................................7

        2.   Wireless Communications Become Commonplace...................8

    C.   TCPA Litigation Explodes .................................................10

    D.   The Commission's Order .................................................11

STANDARD OF REVIEW .................................................................14

SUMMARY OF ARGUMENT .............................................................14

STANDING .........................................................................................18

ARGUMENT .......................................................................................21

I.    THE COMMISSION'S INTERPRETATION OF ATDS IS UNLAWFUL...................................................................................21

    A.   An ATDS Must Have the Present Ability To Generate Random or Sequential Numbers and To Dial Such Numbers Automatically ...................................................................21

# TABLE OF CONTENTS
## (continued)

Page

    1.    "Capacity" refers to equipment's present abilities ..................21

    2.    An ATDS must be able to automatically generate and dial random or sequential numbers ..........................................31

  B.  The Commission's Vague, Self-Contradictory Interpretation Violates the APA and Due Process .....................................34

    1.    The Commission must interpret the TCPA coherently............34

    2.    The Commission's interpretation of "capacity" lacks a meaningful limiting principle ....................................35

    3.    The Commission contradicted itself in describing the functions of an ATDS ..............................................37

II.   THE ORDER'S PROVISIONS REGARDING REASSIGNED NUMBERS ARE UNLAWFUL ...................................................39

  A.  The Commission Misinterpreted "Called Party" ...............................41

    1.    The TCPA makes sense only if "called party" means "expected recipient".....................................................41

    2.    The Commission's interpretation of "called party" violates the First Amendment ..................................46

    3.    The Commission did not justify its interpretation of "called party" ............................................................47

  B.  The Commission's One-Call Rule Exacerbates the Problems Created by Its Definition of "Called Party" .........................................51

    1.    The one-call rule does not solve the problems created by the Commission's interpretation of "called party" ..................51

    2.    The Commission offered no plausible explanation of how its purported safe harbor solves the problem that it identified ...............................................................53

III.  THE COMMISSION'S TREATMENT OF REVOCATION OF CONSENT IS UNLAWFUL....................................................................55

  A.  The Commission's Unworkable Revocation-of-Consent Regime Is Arbitrary and Capricious ..................................................55

# TABLE OF CONTENTS
## (continued)

                                                                **Page**

    B.    The Commission Improperly Prevented Callers and Recipients
          from Agreeing to Reasonable Means of Revocation ........................61

CONCLUSION ................................................................................................64

CIRCUIT RULE 32(a)(2) ATTESTATION

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Almay, Inc. v. Califano,*
    569 F.2d 674 (D.C. Cir. 1977)...................................................................55

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn,*
    418 F.3d 600 (6th Cir. 2005) ...............................................................46

*Am. Gas. Ass'n v. FERC,*
    593 F.3d 14 (D.C. Cir. 2010)...............................................................58

*Am. Library Ass'n v. FCC,*
    401 F.3d 489 (D.C. Cir. 2005)...............................................................19

*Ark. Dairy Co-op. Ass'n v. USDA,*
    573 F.3d 815 (D.C. Cir. 2009)...............................................................25

*Bell Atl. Tel. Cos. v. FCC,*
    24 F.3d 1441 (D.C. Cir. 1994)...............................................................47

*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
    467 U.S. 837 (1984)...............................................................14, 25

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984)...............................................................26

*Cmty. for Creative Non-Violence v. Turner,*
    893 F.2d 1387 (D.C. Cir. 1990)...............................................................34, 36, 37

*Community-Service Broad. of Mid-Am., Inc. v. FCC,*
    593 F.2d 1102 (D.C. Cir. 1978)...............................................................27

*Competitive Telecommc'ns Ass'n v. FCC,*
    309 F.3d 8 (D.C. Cir. 2002)...............................................................54

\* Authorities upon which we chiefly rely are marked with an asterisk.

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Cramer v. United States,*
325 U.S. 1 (1945)...............................................................49

*Credit Alliance Corp. v. Campbell,*
845 F.2d 725 (7th Cir. 1988) ...........................................61

*De Los Santos v. Millward Brown, Inc.,*
No. 13-80670-CV, 2014 WL 2938605 (S.D. Fla. June 30, 2014)...............25, 28

*Dominguez v. Yahoo, Inc.,*
No. 14-1751, 2015 WL 6405811 (3d Cir. Oct. 23, 2015) ...............5, 6, 7, 31, 39

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568 (1988)...........................................................25

*FCC v. AT&T, Inc.,*
131 S. Ct. 1177 (2011)........................................................22

*FCC v. Fox Television Stations, Inc.,*
132 S. Ct. 2307 (2012)........................................................34

*Gager v. Dell Fin. Servs., LLC,*
727 F.3d 265 (3d Cir. 2013) ..............................................61

*Gaza v. LTD Fin. Servs.,*
No. 8:14-cv-1012, 2015 WL 5009741 (M.D. Fla. Aug. 24, 2015) ...................39

*Gensel v. Performant Techs., Inc.,*
No. 13-C-1196, 2015 WL 402840 (E.D. Wis. Jan. 28, 2015)......................11, 44

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323 (1974)...........................................................46

*Gragg v. Orange Cab Co., Inc.,*
995 F. Supp. 2d 1189 (W.D. Wash. 2014) ......................................25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
   134 S. Ct. 604 (2013)..................................................................63

*Hunt v. 21st Mortg. Corp.*,
   No. 2:12-CV-2697, 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013) .................25

*Illinois v. Rodriguez*,
   497 U.S. 177 (1990).................................................................49

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
   847 F. Supp. 2d 1253 (S.D. Cal. 2012) ............................................28

*Initiative & Referendum Institute v. U.S. Postal Service*,
   417 F.3d 1299 (D.C. Cir. 2005).........................................26, 27, 28

*Johnson v. United States*,
   135 S. Ct. 2551 (2015)..........................................................34, 38

*Judulang v. Holder*,
   132 S. Ct. 476 (2011).............................................................54

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004)................................................................32

*Marks v. Crunch San Diego, LLC*,
   55 F. Supp. 3d 1288 (S.D. Cal. 2014).............................................25

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)..............................................................18

*Mfrs. Ry. Co. v. Surface Transp. Bd.*,
   676 F.3d 1094 (D.C. Cir. 2012)...................................................34

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015).......................................................60, 62

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Morissette v. United States,*
    342 U.S. 246 (1952)..............................................................61

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983)...........................................................14, 59

*N.Y. State Elec. & Gas Corp. v. Sec'y of Labor,*
    88 F.3d 98 (2d Cir. 1996) ....................................................55

*NLRB v. Rockaway News Supply Co.,*
    345 U.S. 71 (1953)..............................................................63

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) (per curiam)..................51, 53

*Osorio v. State Farm Bank, F.S.B.,*
    746 F.3d 1242 (11th Cir. 2014) ...................47, 48, 61, 62

*Reno v. ACLU,*
    521 U.S. 844 (1997)............................................................46

*Sable Commc'ns v. FCC,*
    492 U.S. 115 (1989)............................................................28

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) ................................................31

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002).............................................18

*Smith v. California,*
    361 U.S. 147 (1959).............................................................46

*Soppet v. Enhanced Recovery Co., LLC,*
    679 F.3d 637 (7th Cir. 2012) .........................................47, 48

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Specialty Equip. Mkt. Ass'n v. Ruckelshaus,*
720 F.2d 124 (D.C. Cir. 1983)................................................................58

*Susan B. Anthony List v. Driehaus,*
134 S. Ct. 2334 (2014)...........................................................................46

*Tripoli Rocketry Ass'n v. BATF,*
437 F.3d 75 (D.C. Cir. 2006)..................................................34, 36, 37

*TRW Inc. v. Andrews,*
534 U.S. 19 (2001)..................................................................................24

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994)................................................................................25

*United States v. Mezzanatto,*
513 U.S. 196 (1995)................................................................................63

*United States v. Stevens,*
559 U.S. 460 (2010)................................................................................31

*United States v. Wilson,*
503 U.S. 329 (1992)................................................................................23

* *USPS v. Postal Regulatory Comm'n,*
785 F.3d 740 (D.C. Cir. 2015)........................................34, 35, 36, 37, 38

* *Util. Air Regulatory Grp. v. EPA,*
134 S. Ct. 2427 (2014)......................................................30, 41, 45, 50

*Video Software Dealers Ass'n v. Webster,*
968 F.2d 684 (8th Cir. 1992) ...............................................................46

*Walter O. Boswell Mem. Hosp. v. Heckler,*
749 F.2d 788 (D.C. Cir. 1984)...............................................................30

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)....................................................................26

*Wedgewood Village Pharmacy v. DEA,*
    509 F.3d 541 (D.C. Cir. 2007)..................................................55

**STATUTES**

5 U.S.C. § 706.......................................................................3, 14

12 U.S.C. § 1715z-13a(j).............................................................23

12 U.S.C. § 2605(e)....................................................................60

15 U.S.C. § 1666(a)....................................................................60

15 U.S.C. § 1681s-2(a)...............................................................60

15 U.S.C. § 1692c(c)...................................................................60

28 U.S.C. § 2342.........................................................................3

28 U.S.C. § 2343.........................................................................3

28 U.S.C. § 2344......................................................................3, 4

42 U.S.C. § 300x-27(b)...............................................................23

47 U.S.C. § 151...........................................................................3

47 U.S.C. § 152...........................................................................3

47 U.S.C. § 153...........................................................................3

47 U.S.C. § 154...........................................................................3

47 U.S.C. § 201...........................................................................3

47 U.S.C. § 227...........................................................................3

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

\* 47 U.S.C. § 227(a) .......................................................... 2, 5, 14, 21, 23, 24, 31, 32

47 U.S.C. § 227(b) ............................................ 1, 5, 8, 14, 16, 20, 39, 41, 42, 50, 59

47 U.S.C. § 227(c) .............................................................................................23

47 U.S.C. § 227(d) .............................................................................................50

47 U.S.C. § 227 note ......................................................................................42, 45

47 U.S.C. § 402(a) ...........................................................................................3, 4

47 U.S.C. § 403 .....................................................................................................3

47 U.S.C. § 405(a) ................................................................................................4

47 U.S.C. § 503(b) ..............................................................................................20

Bipartisan Budget Act of 2015, Public Law No. 114-74, 129 Stat. 584,
   § 301.....................................................................................................................5

## OTHER AUTHORITIES

47 C.F.R. § 1.4(b) ................................................................................................4

*Black's Law Dictionary* 1004 (10th ed. 2014)..........................................................53

H.R. Rep. No. 102-317 (1991).........................................................................6, 27

*Hearing Before the Subcomm. on Commc'ns of the S. Comm. on
Commerce, Science, and Transp.*, 102d Cong. 45 (1991) ....................................8

MacMillan Dictionary (2015) ..............................................................................22

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)....................................22

New Oxford American Dictionary (1st ed. 2001) ..................................................32

Restatement (Second) of Contracts § 211 cmt. a (1981) ........................................57

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Restatement (Third) of Agency § 5.01, cmt. (c) (2006) .........................................61

S. Rep. No. 102-178 (1991) .....................................................................................6

**ADMINISTRATIVE MATERIALS**

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    7 FCC Rcd. 8752 (1992) ....................................................................................6

*Implementation of Section 6002(B) of the Omnibus Budget*
    *Reconciliation Act of 1993,*
    10 FCC Rcd. 8844 (1995) ..................................................................................9

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    10 FCC Rcd. 12391 (1995) ................................................................................6

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    18 FCC Rcd. 14014 (2003) ....................................................................7, 8, 32

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    23 FCC Rcd. 559 (2008) ....................................................................................8

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    27 FCC Rcd. 15391 (2012) ................................................................................8

*Westfax, Inc. Petition for Consideration and Clarification,*
    30 FCC Rcd. 8620 (Consumer & Governmental Affairs Bur. 2015) .................41

## **GLOSSARY**

2003 Order

Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003)

APA

Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

ATDS

Automatic Telephone Dialing System, defined in 47 U.S.C. § 227(a)(1)

Order

Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1144-1224)

O'Rielly Dissent

Statement of Commissioner Michael O'Rielly Dissenting in Part and Approving in Part, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1267-81)

Pai Dissent

Dissenting Statement of Commissioner Ajit Pai, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1255-66)

TCPA

Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394, codified at 47 U.S.C. § 227

## **INTRODUCTION**

Every organization—schools, charities, political parties, small businesses, major corporations—must be able to reach people efficiently.  Organizations must be able to issue safety alerts, solicit political or charitable support, notify consumers of new products and services, make individuals aware of problems with their accounts, or just tell people their pizza is coming.  Those communications, which often occur by telephone or text message, are vital to contemporary society.

Congress has always recognized the importance of these communications. In the 1980s, however, a particular problem arose:  telemarketers began to use specialized dialing equipment that automatically generated and dialed thousands of random or sequential numbers, often to deliver unwanted prerecorded messages. That practice became especially troublesome when those aimless calls reached cellular phones, tying up entire wireless networks in a given area and forcing recipients to pay pricey per-minute charges.

In response, Congress in 1991 enacted the Telephone Consumer Protection Act (TCPA) to prohibit calls to cellular and certain specialized telephone lines made using an "automatic telephone dialing system" (ATDS) without the "prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A).  Congress defined an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator;

- 1 -

and (B) to dial such numbers." *Id.* § 227(a)(1).  Congress thus restricted calls from particularly defined equipment.  It did not ban unsolicited calls generally, nor did it prohibit all computer-assisted dialing.

The Commission rewrote the TCPA in the Order under review.  *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1144-1224).  *First*, the Order embraces an atextual and self-contradictory definition of ATDS that severely curtails a wide range of legitimate communications that Congress never sought to restrict.  It asks whether equipment *could be modified* to have the ability to store or produce random or sequential numbers, or perhaps the ability to dial numbers randomly or sequentially, or perhaps the ability to dial telephone numbers without human intervention—rather than focusing on the *present ability* of equipment to perform *all* of the statutorily defined tasks.  Contrary to the First Amendment and common sense, the Order threatens to turn even an ordinary smartphone into an ATDS.

*Second*, the Order imposes liability on callers who call or text numbers that were assigned to consenting customers but that, unbeknownst to the caller, were later reassigned to different users.  This approach prevents callers from reasonably relying on their customers' consent.  It makes an empty promise of Congress's assurance that callers may lawfully contact willing recipients, and it chills constitutionally protected expression.

- 2 -

*Third*, the Order authorizes individuals to revoke consent by "any reasonable means" of their choosing. This degree of customization of revocation methods makes it all but impossible for callers to track and process revocations, leaving everyone (including consumers) worse off. Just as impermissibly, the Order prohibits callers and recipients from *agreeing* on a specific means of revocation by contract.

The Order jeopardizes desirable communications that Congress never intended to ban. And it will further encourage massive TCPA class actions seeking crippling statutory damages. Its unlawful provisions should be vacated.

## JURISDICTION

These are petitions for review of a final order of the Federal Communications Commission. The Commission had jurisdiction under 47 U.S.C. §§ 151-154, 201, 227, and 403. This Court has jurisdiction under 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342-2344, and 5 U.S.C. § 706. The Order was released on July 10, 2015, and the petitions—filed on July 10 (No. 15-1211), July 14 (Nos. 15-1218 and 15-1244), August 26 (No. 15-1290), September 1 (No. 15-1304); September 2 (No. 15-1306), September 4 (No. 15-1311), and September 8 (No. 15-

1314) of 2015—were timely filed within 60 days. *See* 47 U.S.C. §§ 402(a), 405(a);

28 U.S.C. § 2344; 47 C.F.R. § 1.4(b).[1]

## ISSUES

1.     Whether the Commission interpreted ATDS in a way that unlawfully

turns on the equipment's potential rather than present abilities,

nullifies the statutory random-or-sequential-number-generation

requirement, and provides inadequate guidance to regulated parties.

2.     Whether the Commission unlawfully prevented callers from

reasonably relying on the "prior express consent of the called party"

by imposing liability for innocent calls to reassigned numbers.

3.     Whether the Commission unlawfully imposed an unworkable regime

for handling revocation of consent.

## STATUTES AND REGULATIONS

The Addendum contains all applicable provisions.

---

[1] The Commission also published the Order in the *Federal Register* on October 9, 2015.  Out of abundance of caution, Petitioners Sirius XM and PACE filed protective petitions on November 23, 2015, as did Petitioners ExactTarget.com, salesforce.com, and ACA International on November 24, 2015.

## STATEMENT OF THE CASE

**A.    Congress Enacts the TCPA To Restrict Particular Practices**

In the TCPA, Congress imposed two basic restrictions on calls to emergency-service numbers, hospital rooms, wireless numbers, and other specialized lines. *First*, Congress banned calls to such numbers "using … an artificial or prerecorded voice" without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A); *see id.* § 227(b)(1)(B) (same for "residential telephone line[s]"). *Second*, Congress banned calls to specialized numbers using an ATDS—"equipment which has the capacity … (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers"—without such consent. *Id.* § 227(a)(1), (b)(1)(A). Congress created a private right of action with statutory damages of $500 per violation and $1,500 per willful or knowing violation. *Id.* § 227(b)(3).[2]

The ATDS provision targeted harmful practices that emerged in the 1980s. Then, "telemarketers typically used autodialing equipment that either called numbers in large sequential blocks or dialed random 10-digit strings." *Dominguez*

---

[2] The restrictions on ATDS and prerecorded calls do not apply to calls made "for emergency purposes" or (since November 2, 2015) to certain calls "made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(a)(1), (b)(1); Bipartisan Budget Act of 2015, Public Law No. 114-74, 129 Stat. 584, § 301.

*v. Yahoo, Inc.*, No. 14-1751, 2015 WL 6405811, at *2 (3d Cir. Oct. 23, 2015).

Random dialing allowed callers to reach and tie up unlisted and specialized

numbers. *See* S. Rep. No. 102-178, at 2 (1991). And sequential dialing allowed

callers to reach all such numbers in an area, creating a "potentially dangerous"

situation in which no outbound calls (including emergency calls) could be placed.

H.R. Rep. No. 102-317, at 10 (1991).

Accordingly, the Commission "initially interpreted the [TCPA] as

specifically targeting equipment that placed a high volume of calls by randomly or

sequentially generating the numbers to be dialed." *Dominguez*, 2015 WL

6405811, at *2. In its first TCPA-related order, the Commission declared that

equipment with "speed dialing," "call forwarding," and "delayed message"

functions are not ATDSs, "because the numbers called are not generated in a

random or sequential fashion." *In re Rules and Regulations Implementing the

Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, ¶47 (1992). It

later explained that the TCPA's ATDS provisions do not apply to calls "directed to

[a] specifically programmed contact number[]" rather than "to randomly or

sequentially generated numbers." *In re Rules and Regulations Implementing the

Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, ¶19 (1995). For

fifteen years, the scope of the ATDS restriction remained settled.

### B. The Commission's Subsequent Orders Generate Significant Confusion as Wireless Communications Increase Dramatically

Two developments—the Commission's further interpretation of the TCPA and the explosion of wireless communications—transformed the TCPA's narrow restriction of specific equipment into a high-stakes assault on legitimate, beneficial communications that Congress never meant to restrict.

#### 1. The Commission's Orders Concerning Predictive Dialers Create Significant Confusion

By the mid-2000s, the TCPA had largely achieved its goal of eliminating the use of random or sequential number generators. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶132 (2003) (2003 Order). Computer-assisted dialing, however, remained useful for calling targeted lists of numbers. *Id.* Those lists were often fed into "predictive dialers," which use "algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and [an agent] will be available to take the call." *Id.* ¶8 n.31. Some predictive dialers could call only from lists; others could generate and dial random or sequential numbers. *Id.* ¶131.

Starting in 2003, the Commission concluded that some predictive dialers qualify as ATDSs, *id.* ¶133, but its orders were "hardly a model of clarity," *Dominguez*, 2015 WL 6405811, at *2. The Commission quoted the random-or-

sequential-number-generator requirement, 2003 Order ¶129, and suggested that equipment does not lose the capacity to satisfy that requirement simply because it is "paired with predictive dialing software and a database of numbers," *id.* ¶133. But the Commission also suggested varied tests for liability: whether the equipment can *dial* "at random, in sequential order, or from a database of numbers," *id.* ¶131; whether it can "store or produce telephone numbers," *id.* ¶¶132-33; and whether it can "dial numbers without human intervention," *id.* at ¶132; *see also In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, ¶¶12-14 (2008); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 15391, ¶2 n.5 (2012). The Commission further concluded that text messages qualify as "call[s]" under § 227(b)(1)(A). 2003 Order ¶165.

### 2.    Wireless Communications Become Commonplace

The rise of wireless communications magnified the impact of these confusing statements. The number of wireless subscribers had increased from only six million in 1991 to 326 million in 2012. *See* Order ¶7 (JA1153); *Hearing Before the Subcomm. on Commc'ns of the S. Comm. on Commerce, Science, and Transp.*, 102d Cong. 45 (1991) (statement of Thomas Stroup). Moreover, although "fewer than three percent of adults" "were wireless-only" in 2003, "39 percent" were by 2013. Order ¶7 (JA1153).

- 8 -

The uses of wireless devices also changed significantly. In the early 1990s, cell phones were used almost exclusively for calls—and, given the price of sending and receiving calls, not too many. *See Implementation of Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, 10 FCC Rcd. 8844 (1995), tbls. 3-4 (60-minutes-per-month plan cost $63 in 1991). Today, by contrast, many plans allow subscribers to make and receive unlimited calls and text messages.

Businesses and other organizations contact people through wireless calls and text messages to provide many useful services. Schools reduce truancy by alerting parents when children are absent. Fairfax Cty. Pub. Schs. Comments 2 (JA938).[3] Non-profit organizations provide safety alerts, appointment reminders, and schedule-change notifications. Nat'l Council of Nonprofits Comments (JA787). Utilities notify customers that payments are due. Nat'l Rural Elec. Coop. Ass'n Comments 2-3 (JA806-07). And businesses engage in targeted outreach that looks nothing like random or sequential dialing. Sirius XM, for instance, calls car owners who have satellite-radio subscriptions to explain the service and ask whether they wish to extend it. *See* Sirius XM Radio Inc. Ex Parte 4 (JA989).

---

[3] Unless otherwise indicated, all cited agency record materials come from CG Docket No. 02-278.

## C.    TCPA Litigation Explodes

Litigants seized on the confusion created by the Commission's orders—and the significant statutory penalties for violations—and filed numerous class-action lawsuits challenging communications that bear no resemblance to the practices that troubled Congress.  Between 2010 and 2014, TCPA lawsuits increased by more than 560 percent, *see* U.S. Chamber of Commerce *et al.* Letter 2 (JA910), with more than 2,000 filed in 2014 alone.  O'Rielly Dissent 124 (JA1267).  These lawsuits target companies in almost every sector of the economy, threatening billions in statutory penalties.[4]  One law firm even created an app that lets plaintiffs and the firm "laugh all the way to the bank" by matching incoming calls to a database of callers and forwarding the information to the firm so it can file a class action.  http://www.blockcallsgetcash.com; O'Rielly Dissent 131 n.36 (JA1274).

The prevalence of number reassignment also has increased litigation.  About 37 million wireless numbers are reassigned every year.  Pai Dissent 117 (JA1260).  Yet consenting subscribers do not always inform callers of the change.  Callers may dial a number that they have every reason to believe belongs to a consenting recipient, but that has been transferred to someone else.

---

[4] *See, e.g.*, *In re Capital One TCPA Litig.*, Dkt. No. 329 in MDL No. 2416, 1:12-cv-10064 (N.D. Ill.) (approving class settlement involving "approximately 1.9 billion phone calls" and *minimum* statutory damages of "$950 billion dollars").

As the Order recognizes, callers cannot avoid this problem. The largest database of reassigned numbers includes only "80 percent of wireless … numbers," Order ¶86 n.301 (JA1190), so companies that take elaborate precautions may still accidentally reach reassigned numbers, *see* DIRECTV, LLC Comments 6-10 (JA521-25); Twitter, Inc. Comments 9 (JA957). Some plaintiffs have even refused to tell the caller about the reassignment—letting the call roll into an uninformative voicemail or answering without identifying themselves—and then sued over "unwanted" calls. *See* Pai Dissent 120 (JA1263); Rubio's Rest., Inc. Petition (JA728-29); *Gensel v. Performant Techs., Inc.*, No. 13-C-1196, 2015 WL 402840, at *2 (E.D. Wis. Jan. 28, 2015).

### D.    The Commission's Order

Against this backdrop, 21 parties asked the Commission to clarify or revise its view of the TCPA. A divided Commission issued an Order addressing the statutory definition of ATDS, the handling of reassigned numbers, and the revocation of consent.

The Commission concluded that "the capacity of an [ATDS] is not limited" to what the equipment is capable of doing in its "current configuration[,] but also includes its potential functionalities," Order ¶16 (JA1157)—that is, what it *could* do if modified, at least if those possible modifications are not too "theoretical" or "attenuated," *id.* ¶18 (JA1158). At one point, the Commission suggested that an

ATDS must be able to "store or produce, and dial random or sequential numbers," but elsewhere it "reaffirm[ed]" its earlier orders and offered several different tests for the functions an ATDS must have the capacity to perform. *Id.* ¶10 (JA1154); *see also id.* ¶¶12-14 (JA1155-56).

The Order also addresses reassigned numbers. The Commission concluded that "called party" in the consent exception means the "current subscriber (or non-subscriber customary user of the phone)," not the "intended recipient of a call." *Id.* ¶72 (JA1182-83). A caller therefore faces liability if it tries to call a consenting customer but inadvertently reaches someone to whom the number has been reassigned. The Commission recognized "callers lack guaranteed methods to discover all reassignments immediately after they occur." *Id.* ¶85 (JA1189-90). To mitigate this "severe" result, *id.* ¶90 n.312 (JA1192-93), the Commission allowed callers unaware of reassignment to make one liability-free call, *id.* ¶85 (1189-90). But regardless whether that call is answered or the caller otherwise has *any* reason to suspect a reassignment, callers (and their affiliates and subsidiaries) are strictly liable for all subsequent calls if, in fact, the number has been reassigned. *Id.* ¶¶85, 88, 95 (JA1189-90, 1192, 1194-95).

Finally, the Commission concluded that customers may revoke consent through any individualized means they choose, so long as that method is "reasonable" under the "totality of the facts and circumstances." *Id.* ¶¶55, 64 n.233

(JA1176, 1179). It also prohibited a caller from "limit[ing] the manner in which revocation may occur." *Id.* ¶47 (JA1172-73).

Commissioners Pai and O'Rielly dissented. Both recognized that every ATDS must be able "to store or produce telephone numbers to be called, using a random or sequential number generator." Pai Dissent 114 (JA1257); O'Rielly Dissent 129 (JA1272). They also explained that interpreting "capacity" to include "potential functionalities" both "dramatically depart[ed] from the ordinary use of the term," Pai Dissent 115 (JA1258), and could transform "every smartphone, tablet, [and] VoIP phone" into an ATDS, *id.*; *accord* O'Rielly Dissent 128 (JA1271).

As to reassigned numbers, the dissenting Commissioners concluded that interpreting "called party" to mean "expected recipient" is "by far the best reading of the statute," Pai Dissent 118 (JA1261), and the only way to avoid unconstitutionally chilling "communications that consumers have expressly consented to receiv[e]," *id.* at 120 (JA1263); *accord* O'Rielly Dissent 134 (JA1277). They also explained that the Commission's one-call rule "demand[s] the impossible," Pai Dissent 121 (JA1264), because it is "absolutely ludicrous" to presume that one (perhaps unanswered) call or text makes the caller aware of the reassignment, O'Rielly Dissent 131 (JA1274).

- 13 -

Finally, the dissenters explained that the Commission's position on revocation inflicts unworkable burdens on callers. For instance, consumers could tell any retail salesperson that they want to revoke their consent, disregarding any centralized system established by the retailer for the orderly and effective intake and processing of such requests. Pai Dissent 123 (JA1266).

## STANDARD OF REVIEW

Agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory … authority." 5 U.S.C. § 706(2). Under this standard, agency action is unlawful if it contradicts the governing statute, resolves statutory ambiguities unreasonably, fails to consider important aspects of the problem at hand, or adopts a solution contrary to the evidence. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## SUMMARY OF ARGUMENT

**I.** Anyone who calls wireless lines with an "automatic telephone dialing system" must have the consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii). An ATDS is "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such calls." *Id.* § 227(a)(1). Two questions follow: what does it

mean for equipment to have the "capacity" to perform the functions of an ATDS, and what are those functions? The Commission's substantively mistaken and hopelessly vague answers must be set aside.

A.     "Capacity" refers to present ability—what equipment can do now, in its current configuration—not potential functionalities if modified. The Commission's interpretation contradicts the ordinary meaning, structure, and purposes of the TCPA. The Commission's interpretation also leads to absurd and unconstitutional results because virtually every kind of modern phone, including every smartphone and office phone, could be modified to generate random or sequential numbers.

The TCPA also addresses what functions any ATDS must be capable of performing. An ATDS must be able to (1) generate random or sequential numbers; (2) use the generator to store or produce numbers to be called; and (3) dial those numbers. Moreover, the ATDS must be able to perform these tasks automatically. The Order misinterprets the statute by suggesting that the mere ability to dial from any list of numbers suffices and that the equipment need not be able to work automatically.

B.     The Commission's interpretations are also impermissibly vague and internally inconsistent. The Commission concluded that "capacity" includes "potential functionalities" that could be created by modifying the equipment, at

- 15 -

least where those potential functionalities are not too "attenuated" or "theoretical." The Commission did not explain what that means other than to say that rotary phones are not ATDSs. Callers remain in the dark about what modifications are *too* theoretical or attenuated to turn a modern-day phone into an ATDS. Similarly, the Commission put forth self-contradictory descriptions of the functions that an ATDS must be able to perform—including suggesting that the ability to dial from any list of numbers (whether random or sequential or not) is, by itself, enough. It is arbitrary and capricious for the Commission to force regulated parties to guess about the scope of its speech-restrictive regime.

II.    The Commission also made it impossible for callers to rely on consent they have received. The TCPA protects automated and prerecorded calls made "with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). The Commission interpreted "called party" to mean "the current subscriber" or "non-subscriber customary user of the phone," Order ¶72 (JA1182-83), rather than the call's expected recipient. But this makes consent meaningless: how is a caller to know, *before* placing a call to the number associated with a consenting consumer, that the number has changed or that somebody else will answer?

A. In the context of the TCPA's consent exception, "called party" must mean the call's expected recipient. Callers that try to reach consenting individuals face a practical problem: as the Order recognizes, 100,000 wireless numbers are

reassigned *daily*, but callers have no reliable means of tracking all of these reassignments. Interpreting "called party" to mean "expected recipient" is therefore necessary to give effect to the TCPA's protection of consensual calls. By contrast, interpreting "called party" to mean the phone's current subscriber or customary user renders this protection meaningless, and violates the First Amendment, by threatening strict liability for callers who unexpectedly reach someone other than the consenting consumer.

**B.** The Commission's "solution" of exempting the first call to a reassigned number does not fix the Order's defects. Calls often go unanswered, and texts unreturned. Imposing strict liability for all subsequent calls, *regardless* whether the first call gives the caller any reason to believe that the number has been reassigned, is arbitrary and capricious.

**III.** Finally, the Commission created an unworkable, unreasonable regime governing revocation of consent.

**A.** To ensure adequate recording and processing of revocations of consent, callers must be able to rely on uniform revocation procedures. The Commission could have allowed consumers to revoke consent without sabotaging the need for uniformity by, for example, prescribing standard revocation procedures. It instead allowed each consumer to use any means of revoking consent that is "reasonable" under the "totality of the facts and circumstances," and

it prevented callers from relying on any sort of centralized process for handling such requests. This case-by-case approach is arbitrary and capricious because it ignores callers' needs for uniformity and undermines consumers' ability to have their requests processed.

**B.** At a minimum, the Commission unlawfully concluded that callers and consumers may not voluntarily agree on means of revocation. Under the TCPA's common-law backdrop, parties may agree upon means of notice, including for revocations of consent. And even if the TCPA allows consumers to revoke consent however they wish, nothing in the statute overcomes the strong presumption that statutory rights are waivable by contract.

## STANDING

"Only one of the petitioners needs to have standing to permit [this Court] to consider the petition for review." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). If a petitioner is "an object of the [agency] action (or forgone action) at issue—as is the case usually in review of a rulemaking and nearly always in review of an adjudication—there should be little question that the action or inaction has caused [it] injury, and that a judgment preventing or requiring the action will redress it." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Moreover, an association has standing if there is a "substantial probability that the FCC's order will harm the

- 18 -

concrete and particularized interests of at least one of [its] members." *Am. Library Ass'n v. FCC*, 401 F.3d 489, 493 (D.C. Cir. 2005).

Each Petitioner has standing. Petitioner Sirius XM, and members of Petitioners ACA International, PACE, the Chamber, and the Consumer Bankers Association, communicate with customers by telephone calls or text messages, relying on equipment that the Order arguably treats as ATDSs. *See* Moore Declaration ¶4, Add. 8 (Sirius XM); Sailors Declaration, Add. 9-10 (PACE member CSG International); Brubaker Declaration, Add. 6 (PACE member InfoCision, Inc.); ACA Int'l Ex Parte 2-5 (JA592-95); U.S. Chamber of Commerce and U.S. Chamber Institute for Legal Reform Ex Parte 2, 6 (JA1139, 1143); U.S. Chamber of Commerce, Am. Bankers Ass'n, *et al.* Ex Parte 1 (JA486); Consumer Bankers Ass'n Petition 8-9 (JA776-77); *see also* Sundgaard Declaration, Add. 11 (explaining that Petitioner Portfolio Recovery Associates owns and wishes to use computerized dialers). For example, PACE members InfoCision, Inc. and CSG International, and ACA International member AllianceOne Receivables Management, Inc., call customers using computerized dialers. Brubaker Declaration, Add. 6; Sailors Declaration, Add. 9-10; ACA Int'l Ex Parte 3 (JA593).

For their part, Petitioners salesforce.com, ExactTarget, and Vibes Media provide their customers with technologies that the Order arguably treats as ATDSs.

*See* ExactTarget, Inc. Comments 2 (JA719); salesforce.com, inc. and ExactTarget, Inc. Ex Parte 1 (JA1053); Vibes Media, LLC Ex Parte 1 (JA1060).

Because the Order took effect upon release, *see* Order ¶188 (JA1224), Petitioners or their members must either change their business practices or face the threat of liability for the use of this equipment, in either administrative enforcement actions, *see* 47 U.S.C. § 503(b)(1)(B), or private litigation, *see id.* § 227(b)(3). Indeed, Petitioners or their members already face lawsuits in which plaintiffs rely on the Order. *See In re Portfolio Recovery Assocs., LLC Telephone Consumer Protection Act (TCPA) Litig.*, No. 11-md-2295 (S.D. Cal.); *Hooker v. Sirius XM Radio Inc.*, No. 13-cv-00003 (E.D. Va.); *see also* Chamber Ex Parte 3 (JA1140).

Separately, Petitioners or their members or customers also obtain and rely on consent to make calls arguably covered by the Commission's new interpretations. *See* Sailors Declaration ¶4, Add. 9 (PACE member CSG International); Brubaker Declaration ¶4, Add. 6 (PACE member InfoCision); *see also* salesforce.com & ExactTarget Ex Parte 1 (JA1053); U.S. Chamber of Commerce and U.S. Chamber Institute for Legal Reform Comments 3 (JA932); Consumer Bankers Petition 8 (JA776); Vibes Ex Parte 2-4 (JA1061-63); Moore Declaration ¶4, Add. 8 (Sirius XM). The Order's provisions on reassigned numbers and revocation of consent prevent Petitioners or their members or customers from relying on that consent.

- 20 -

Again, Petitioners or their members or customers must choose between making calls and facing the threat of liability under the Order.

Petitioners also participated in the proceedings below. *See* Order Appendices B, D, F, G, K, L, N, R, U, & V (JA1226-48); Sirius XM Ex Parte 1 (JA986); salesforce.com & ExactTarget Ex Parte 1 (JA1053).

## ARGUMENT

## I. THE COMMISSION'S INTERPRETATION OF ATDS IS UNLAWFUL

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). This definition prompts two questions: what does it mean for equipment to have the "capacity" to perform the functions of an ATDS, and what are those functions? The Commission's answers misinterpret the TCPA, violate the Constitution, provide no guidance to regulated parties, and contradict themselves. They must be set aside.

### A. An ATDS Must Have the Present Ability To Generate Random or Sequential Numbers and To Dial Such Numbers Automatically

#### 1. "Capacity" refers to equipment's present abilities

Every relevant principle of statutory interpretation confirms that "capacity" refers to what equipment can do as is, not what it might be able to do if changed.

**(a)     Text and context confirm that "capacity" refers to what equipment can do in its unmodified state**

Congress did not define "capacity," so its "ordinary meaning" controls. *FCC v. AT&T, Inc.*, 131 S. Ct. 1177, 1182 (2011). In ordinary usage, "capacity" refers to present ability. Consider this sentence: "Lambeau Field has the capacity to seat 80,735 people." That means Lambeau can hold 80,735 people *now*—not that, although it actually seats only 75,735, it could be remodeled to accommodate 5,000 more. *See* Pai Dissent 115 & n.574 (JA1258). Similarly, one might say: "That program does not have the capacity to display pdfs, but it will after I install this update." If "capacity" included what the software might be rewritten to do, this sentence would make no sense. Although the program obviously *could have been* reprogrammed to open pdfs, it still lacked the capacity to do so when the speaker made the statement. Likewise, no one would say that a factory has the capacity to produce 1,000 widgets a day just because the company could add another 100-widget-per-day machine to its existing nine.

Dictionaries confirm this definition. "Capacity" is "the facility or power to produce, perform, or deploy," as in "a plan to double the factory's capacity." Merriam-Webster's Collegiate Dictionary 182 (11th ed. 2003); *see also* MacMillan Dictionary (2015) ("the ability to do something," as in "Her poor health limits her earning capacity."). These definitions refer to *present* ability. If "capacity"

- 22 -

accounted for hypothetical modifications, it would make no sense to speak of "a plan to double the factory's capacity."

Congress's other references to "capacity" confirm this understanding. Congress has authorized certain housing loans, provided the house "contain[s] a heating system that ... has the capacity to maintain a minimum temperature ... of 65 degrees Fahrenheit ...." 12 U.S.C. § 1715z-13a(j)(3)(A). Residents would be left cold by the argument that, although the system could not currently warm the house, it might be reconfigured to do so. Congress has also required certain substance-abuse programs to preferentially refer qualifying pregnant women "to a treatment facility that has the capacity to provide treatment" to them. 42 U.S.C. § 300x-27(b)(2)(A)-(B). That obligation would not be discharged by sending a woman to a hospital that could acquire the bed needed to care for her but has not.

Moreover, "Congress' use of a verb tense is significant," *United States v. Wilson*, 503 U.S. 329, 333 (1992), and here Congress said that an ATDS "is" equipment that "has" the requisite capacity. 47 U.S.C. § 227(a)(1). "Had Congress wanted to define [ATDS] more broadly it could have done so by adding tenses and moods, defining it as 'equipment which has ... or could have the capacity.'" Pai Dissent 115 (JA1258); *cf.* 47 U.S.C. § 227(c)(1)(A), (B) (requiring the Commission to "evaluate the categories of ... entities that *would have the capacity*" to administer procedures for protecting residential subscribers' privacy

rights (emphasis added)).  That Congress chose not to do so confirms that the definition encompasses only *present* ability.

Finally, a "potential functionalities" test would sweep in "pretty much any calling device or software-enabled feature" because "[i]t's trivial to download an app, update software, or write a few lines of code that would modify" the device's software "to dial random or sequential numbers."  Pai Dissent 115 (JA1258).  As a result, a potential functionalities test would cover "every smartphone, tablet, [and] VoIP phone."  *Id.*  Indeed, that test "is so expansive that the [Commission] ha[d] to use a *rotary phone* as an example of a technology that would not be covered." O'Rielly Dissent 128 (JA1271) (emphasis added); *see* Order ¶18 (JA1158).

That cannot be right.  *First*, it would nullify Congress's carefully worded requirement that an ATDS have the capacity "to store or produce telephone numbers to be called, *using a random or sequential number generator*."  47 U.S.C. § 227(a)(1)(A) (emphasis added).  If every software-enabled telephone were an ATDS, that requirement would have no real limiting effect.  Congress could not have meant for the lone word "capacity" to "do the bulk of th[e] provision's work" while the phrase "using a random or sequential number generator," which accounts for "half of [the provision's] text," "lie[s] dormant in all but the most unlikely situations."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

- 24 -

*Second*, the results of a "potential functionalities" test would be absurd. *See Ark. Dairy Co-op. Ass'n v. USDA*, 573 F.3d 815, 829 (D.C. Cir. 2009) (absurdity canon applies at *Chevron* step one). Congress could not have intended for its restrictions on ATDSs to require consent for text messages from a smartphone to arrange lunch with a friend, invite an acquaintance to a fundraiser, or remind a customer of a cable-installation appointment. In fact, before the Order, many federal courts interpreted "capacity" to mean "present ability" to avoid precisely this absurdity.[5]

> **(b)    The TCPA would violate the First Amendment if "capacity" included "potential functionalities"**

A "potential functionalities" test sweeps in so much speech that it violates the First Amendment. At the very least, it raises "serious constitutional questions" that warrant rejecting the Commission's interpretation. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 588 (1988).

Regulations that target a particular medium of communication "often present serious First Amendment concerns," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622,

---

[5] *See Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1291-92 (S.D. Cal. 2014); *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1192-93 (W.D. Wash. 2014); *De Los Santos v. Millward Brown, Inc.*, No. 13-80670-CV, 2014 WL 2938605, at *6 (S.D. Fla. June 30, 2014); *Hunt v. 21st Mortg. Corp.*, No. 2:12-CV-2697, 2013 WL 5230061, at *4 (N.D. Ala. Sept. 17, 2013).

659 (1994), "and so are always subject to at least some degree of heightened First Amendment scrutiny," *id.* at 640-41. Time, place, and manner restrictions on speech are also subject to heightened scrutiny. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). They must, among other things, be "narrowly tailored to serve a significant governmental interest." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

In keeping with these principles, a restriction must be limited to speech that *actually* causes the problem the Government seeks to solve, rather than include speech that *might* do so. For example, in *Initiative & Referendum Institute v. U.S. Postal Service*, 417 F.3d 1299 (D.C. Cir. 2005), this Court held that "the *potential*" for harassment by those collecting petition signatures outside post offices could not justify a categorical ban; the Government must "targe[t] and eliminat[e] no more than the exact source of the 'evil' it seeks to remedy." *Id.* at 1307.

Although the Commission never acknowledged the sweeping effects of its "potential functionalities" approach on speech or explained what interests it believes that approach serves, it claimed elsewhere in the Order that the ATDS restriction prevents the "nuisance, invasion of privacy, cost, and inconvenience that autodialed ... calls generate." Order ¶29 (JA1162-63). Those interests cannot justify the Commission's approach.

- 26 -

As an initial matter, courts scrutinizing speech restrictions must focus on the law's "actual purposes," "disallow[ing] after-the-fact rationalizations" that "were not actually considered by [Congress]." *Community-Service Broad. of Mid-Am., Inc. v. FCC*, 593 F.2d 1102, 1146 n.51 (D.C. Cir. 1978). The ATDS restriction's "actual purpose" was to prevent automated dialers from reaching unlisted specialized numbers by dialing *randomly* and from knocking specialized lines out of service by dialing *sequential* blocks of numbers. *See, e.g.*, H.R. Rep. No. 102-317, at 10 (1991). Had Congress's purpose been to prohibit all unsolicited, computer-assisted calls, Congress would have prohibited all unsolicited, computer-assisted calls. Instead, it restricted a particular kind of equipment. And had Congress been troubled by unwanted ATDS calls in general, it would have restricted them when made to residential landlines as well as specialized numbers.

Moreover, whatever the TCPA's actual purpose, the statute already brushes up against the First Amendment. Rather than prohibiting calls that are *in fact* autodialed, it restricts devices that have the present ability to autodial. This prophylaxis does not target the "exact source" of any problem. *Initiative & Referendum Inst.*, 417 F.3d at 1307.

Regardless whether the TCPA as written violates the First Amendment, the Commission's prophylaxis-upon-prophylaxis certainly does. Its interpretation restricts the use of equipment that could be modified in such a way that it could

- 27 -

have the ability to autodial. This interpretation is even further removed than the statute from any possible harm. If call recipients neither know nor care whether the caller's phone could have been used to autodial, they certainly neither know nor care whether the phone *could be modified* so that it could be used to autodial.

Finally, beyond being divorced from any legitimate interest, the Commission's test covers more speech than the Constitution allows. Threatening crushing liability for millions of everyday calls simply because they came from devices that *could* be modified so that they *might* be able to generate random or sequential numbers "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Id.* The Commission may not "burn the house to roast the pig." *Sable Commc'ns v. FCC*, 492 U.S. 115, 127 (1989).

Unsurprisingly, the United States and a number of federal courts have read "capacity" to refer to "present ability" to stave off these constitutional concerns. *See, e.g.*, *Millward Brown, Inc.*, 2014 WL 2938605, at *64 (agreeing with the United States, in response to defendant's argument that the TCPA is unconstitutionally broad, that "'capacity' refers to 'present, not potential, capacity'"); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262 (S.D. Cal. 2012) (adopting the Government's position that "capacity" does

not capture "smartphones" or "personal computers"). This Court should do the same.

### (c)    The Commission provided no plausible response to these deficiencies

The Commission provided little support for its contrary interpretation. Regarding the text, it stated only that interpreting "capacity" "to include 'potential ability' is consistent with formal definitions of 'capacity,' one of which defines 'capacity' as 'the potential or suitability for holding, storing, or accommodating.'" Order ¶19 (JA1158-59) (citation omitted). That definition, however, supports Petitioners. To be sure, "capacity" includes a sense of potentiality: a one-gallon bucket has the "capacity" to hold one gallon even when empty. But that does not mean it "ha[s] the capacity to hold two gallons of water" just because it could be *modified* to do so. Pai Dissent 114 (JA1257).

The Commission also asserted that a "present capacity test could render the TCPA's protections largely meaningless by ensuring that little or no modern dialing equipment"—which is generally programmed to call from lists but lacks the ability to generate random or sequential numbers—"would fit the statutory definition of an autodialer." Order ¶20 (JA1159); *see also id.* ¶19 (JA1158-59) (claiming the interpretation is needed to "ensure that the restriction on autodialed calls [is not] circumvented"). This assertion only highlights the TCPA's *success* in restricting designated dialing equipment; "[i]f callers have abandoned that

equipment, then the TCPA has accomplished the precise goal Congress set out for it." Pai Dissent 116 (JA1259). The Commission may not "update" the TCPA to cover different equipment: "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014). Moreover, the First Amendment does not tolerate prophylaxis-upon-prophylaxis under the guise of preventing circumvention. *See supra* 25-29.

Finally, the Commission stated that individual consumers "have [not] been sued based on typical use" of smartphones, and it suggested that such suits were unlikely because "friends, relatives, and companies with which consumers do business [do not] find those calls unwanted …." Order ¶21 (JA1159-60). But the Commission cannot fend off charges of absurdity by swapping in a "typical use" test for smartphones; agencies may not "bring varying interpretations of the statute to bear, depending on whether" they like the result. *Walter O. Boswell Mem. Hosp. v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984). Moreover, the Commission's view ignores reality. Lawyers and (other) profit-seekers have proven eager to exploit the Commission's overreaching before, *see supra* 10-11, and will likely do so again. Regardless, courts reject erroneous statutory interpretations even if no one seeks to exploit them, and the First Amendment does

- 30 -

not leave people at the "mercy" of the Government's or a private litigant's *"noblesse oblige." United States v. Stevens*, 559 U.S. 460, 480 (2010).

### 2. An ATDS must be able to automatically generate and dial random or sequential numbers

The Commission's conflicting answers to the second question of statutory interpretation—what functions ATDS equipment must be able to perform—are also unlawful.

### (a) Subsection 227(a)(1) demands that ATDS equipment be able to automatically perform three key tasks

Subsection 227(a)(1) defines ATDS to mean equipment that "has the capacity … to store or produce telephone numbers, using a random or sequential number generator; and … to dial such numbers." 47 U.S.C. § 227(a)(1). This provision requires that an ATDS be able to do three things. *First*, the equipment must be able to generate random or sequential numbers. Otherwise, it cannot do anything "using a random or sequential number generator." *Id.* § 227(a)(1)(A). *Second*, the equipment must be able either to store or to produce numbers to be called by using that random or sequential number generator. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950-51 (9th Cir. 2009); *Dominguez*, 2015 WL 6405811, at *3 n.1. *Third*, the equipment must be able to dial the numbers that it stores or produces with a random or sequential number generator. The statutory text—"dial *such* numbers," 47 U.S.C. § 227(a)(1)(B) (emphasis added)—

- 31 -

refers back to the stored or produced "telephone numbers to be called, using a random or sequential number generator," *id.* § 227(a)(1)(A).

The statute also requires that the equipment be capable of performing these functions *automatically*—without human intervention—as the Commission itself previously recognized. *See* 2003 Order ¶132. Subsection 227(a)(1) defines "*automatic* telephone dialing system," and the Court "cannot forget that [it] ultimately [is] determining the meaning of [that] term" when parsing subsections 227(a)(1)(A) and 227(a)(1)(B). *Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004). Because something "automatic" can "work[] by itself with little or no direct human control," The New Oxford American Dictionary (1st ed. 2001), an "automatic" telephone dialing system must be able to perform the requisite functions without human assistance.

**(b)    The Commission erred by suggesting that the ability to call from any list suffices**

These statutory requirements make clear that an ATDS must be able to do more than dial numbers from a prepared list; it must be able to automatically generate and then dial *random* or *sequential* numbers. The Order blurs that line. It states, for example, that equipment need only be able "to store or produce telephone numbers," not just random or sequential ones. Order ¶12 (JA1155-56). Elsewhere, it states that what matters is whether the equipment "has the capacity to store or produce numbers and dial those numbers at random, in sequential order, *or*

*from a database of numbers.*" *Id.* ¶16 (JA1157) (emphasis added). Still elsewhere, it states that "the basic function" of an ATDS is "to dial numbers without human intervention," without clarifying whether those numbers must be random or sequential. *Id.* ¶17 (JA1157-58).

All of these alternatives are wrong. Reading the statute to cover equipment with the simple ability "to store or produce telephone numbers" erases the phrase "using a random or sequential number generator." Reading the statute to bar equipment that can dial "at random, in sequential order, or from a database" transforms the definition's number-*generation* requirement into a method-of-dialing requirement. That result is doubly wrong: the definition's only reference to dialing ("dial such numbers") says nothing about the manner of dialing, and adding "from a database" to this imaginary method-of-dialing requirement supplants the definition's number-generation provision.

Finally, subjecting callers to liability whenever their equipment operates without human intervention, *id.*, is even further off the mark. If the Commission meant to suggest that the absence of human intervention *suffices* to make equipment an ATDS, it again removed the phrase "using a random or sequential number generator" from the statute. And if the Commission concluded that the absence of human intervention is not a *necessary* feature of an ATDS, it wrote "automatic" out of "automatic telephone dialing system."

- 33 -

**B.    The Commission's Vague, Self-Contradictory Interpretation Violates the APA and Due Process**

The Commission's vague explanation of its "potential functionalities" test and internally inconsistent account of the functions an ATDS must be able to perform violate the APA and the Due Process Clause.

**1.    The Commission must interpret the TCPA coherently**

"[A]n agency's exercise of its statutory authority [must] be reasonable and reasonably explained." *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012). "[C]ryptic" explanations that "ha[ve] no content" or "offer[] no meaningful guidance" must be set aside. *USPS v. Postal Regulatory Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015); *see also, e.g., Tripoli Rocketry Ass'n v. BATF*, 437 F.3d 75, 81 (D.C. Cir. 2006).

Similarly, the Due Process Clause requires that the statute or regulatory scheme "give fair notice of conduct that is forbidden" and establish adequate standards to prevent "seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *see also Johnson v. United States*, 135 S. Ct. 2551, 2560 (2015) (while "[e]ach of [a provision's] uncertainties … may [have] be[en] tolerable in isolation, … their sum ma[de] a task … which at best could be only guesswork"). This requirement "applies with particular force in review of laws dealing with speech." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1395 (D.C. Cir. 1990).

- 34 -

## 2. The Commission's interpretation of "capacity" lacks a meaningful limiting principle

The Commission violated these requirements by adopting an impermissibly vague interpretation of "capacity" that "includes [equipment's] potential functionalities." Order ¶16 (JA1157). Recognizing that virtually anything can be turned into something else with enough effort, the Commission added that "there must be more than a theoretical potential that the equipment could be modified to satisfy the 'autodialer' definition." *Id.* ¶18 (JA1158); *see also id.* (not "too attenuated"). The Commission's test, therefore, is this: equipment is an ATDS because of its "potential functionalities," unless that potential is merely "theoretical" or "attenuated."

This sheds zero light on the critical question callers face: how "theoretical" a modification is too theoretical, how "attenuated" a possibility is too attenuated? Indeed, the Commission admitted the limits of its "test," disclaiming any attempt to provide a standard "administrable industry-wide." *Id.* ¶17 (JA1157-58).

Applying the APA, this Court has regularly set aside similarly uninformative agency positions. For example, over an agency's assertion of deference, the court invalidated a test that turned on whether a change in mail-preparation requirements would "require mailers to alter a basic characteristic of a mailing in order … to qualify" for the same rate they did before. *USPS*, 785 F.3d at 748. Like the Commission here, the agency indicated that one change (requiring more

- 35 -

informative barcodes and electronic scheduling) was a "basic alteration," while another (requiring stacking of certain flat boxes) was not, but otherwise provided no guidance on the "basic alteration" standard's meaning. *Id.* This "d[id] not come close to satisfying the requirement of reasoned decisionmaking" because the standard "ha[d] no content" and "offer[ed] no meaningful guidance to the Postal Service or its customers on how to treat future changes to mail preparation requirements." *Id.* at 754; *see also Tripoli Rocketry Ass'n*, 437 F.3d at 81 (setting aside "much faster" standard under the APA because the agency "sa[id] nothing about what *kind* of differential makes one [rate] 'much faster' than another"). This Court has similarly held that the Due Process Clause prohibits speech restrictions that turn on ill-defined matters of degree, such as one requiring that speakers use "a conversational tone." *Turner*, 893 F.2d at 1394-95.

The Commission's sparse, contradictory examples make things worse. It said a "rotary-dial phone" does not qualify as an ATDS because the possibility of modification is "too attenuated." But predictive dialers qualify because they only "lack[] the necessary software" to perform the requisite functions. Order ¶16 (JA1157); *see also id.* ¶16 n.63 (JA1157) ("[S]oftware-controlled equipment is designed to be flexible, both in terms of features that can be activated or de-activated and in terms of features that can be added to the equipment's overall functionality").

- 36 -

By contrast, smartphones—which can be programmed to generate random or sequential numbers "through the use of an app or other software," *id.* ¶21 (JA 1159-60)—fall within a twilight zone. As software-controlled equipment, they would seem to be covered by the Commission's test. But the Commission equivocated, noting that no one "*ha[d] been sued* based on *typical use* of smartphone technology," and that it would "continue to monitor … private litigation[]" and "provide additional clarification as necessary." *Id.* (emphasis added).

These ambiguities reflect the emptiness of the Commission's test. They exonerate callers who dig up an antique rotary phone and dial by hand. But for real-world callers, who almost always use equipment that runs some piece of software, the Commission could not make up its mind about whether the hypothetical ability to modify that software renders the equipment an ATDS. Regulated parties cannot follow, so agencies cannot lawfully promulgate, such mush. *See USPS*, 785 F.3d at 756; *Tripoli Rocketry Ass'n*, 437 F.3d at 84; *Turner*, 893 F.2d at 1394-95.

### 3.    The Commission contradicted itself in describing the functions of an ATDS

The Order also offers a contradictory account of the functions that an ATDS must be able to perform. As noted, the Commission suggested that an ATDS need only be able to dial from a list: it reiterated that equipment need only be able "to

store or produce telephone numbers," Order ¶12 (JA1155-56), and it said that a predictive dialer qualifies because, "when paired with certain software, [it] has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database." *Id.* ¶13 (JA1156). Neither definition comports with the statute, *see supra* 31-33, and in any event they are not the same.

The Commission's discussion of human intervention puts the confusion on full display. The Commission said that an ATDS's "basic functions" are "to dial numbers without human intervention and to dial thousands of numbers in a short period of time." *Id.* ¶17 (JA1157-58). It added that "[h]ow the human intervention element" applies "is specific to each individual piece of equipment" and therefore requires "a case-by-case determination." *Id.* Three paragraphs later, however, the Commission "reject[ed] PACE's argument that the Commission should adopt a 'human intervention' test"—that is, make it an "element" for "case-by-case" consideration—as inconsistent with the Commission's understanding of "capacity." *Id.* ¶20 (JA1159).

These "incoherent" positions provide no "meaningful guidance" to callers. *USPS*, 785 F.3d at 744, 754. Particularly when combined with the vagueness of the potential-functionalities test, these contradictions make application of the TCPA pure "guesswork." *Johnson*, 135 S. Ct. at 2560. Modern callers therefore must secure consent (itself now an illusory defense, *see infra* 39-54), use a rotary

- 38 -

phone, or not call at all. Both the APA and the Due Process Clause forbid the Commission from putting callers to that impossible choice.[6]

*    *    *

For these reasons, the parts of the Order interpreting ATDS should be set aside.

## II.    THE ORDER'S PROVISIONS REGARDING REASSIGNED NUMBERS ARE UNLAWFUL

The TCPA protects otherwise-prohibited calls if they are invited by the recipient—that is, made "with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). The Commission misinterpreted this critical defense and violated the First Amendment by interpreting "called party" to mean the called phone number's "current subscriber or customary user," Order ¶73 (JA1183-84), rather than the call's expected recipient. Thanks to the Commission, a caller now faces liability if it tries to reach a consenting customer but inadvertently reaches someone else to whom the customer's number has been reassigned.

---

[6] The Third Circuit has noted that the Order is "hardly a model of clarity," *Dominguez*, 2015 WL 6405811, at *2, and district courts have struggled to apply it, *see, e.g.*, *Gaza v. LTD Fin. Servs.*, No. 8:14-cv-1012, 2015 WL 5009741, at *4 (M.D. Fla. Aug. 24, 2015) (reading the Order to cover equipment that can randomly or sequentially generate numbers, predictive dialers, and perhaps all "dialing equipment").

Every day, 100,000 cell phone numbers are reassigned to new users, and callers lack any reliable means of identifying every number that has been reassigned. If the "called party" is the reassigned number's new subscriber or customary user—rather than the previous one who consented to be called and whom the caller expects to reach—the threat of unpredictable and unavoidable TCPA liability will deter calls even to people who expressly consented to be contacted. The Commission's interpretation of "called party" would therefore nullify Congress's decision to *permit* consensual calls. That interpretation also violates the First Amendment by imposing strict liability for calls to reassigned numbers and thereby chilling calls to consenting recipients.

The Commission tried to cure these flaws by allowing callers a single call to a reassigned number before they (and their affiliates and subsidiaries) incur liability. But that call may not even hint that the number has been reassigned; a call may go unanswered, or a text message unreturned. The "solution" thus does not come close to solving the serious problem that the Commission identified with its interpretation of "called party." In fact, it only made the Order's approach to reassigned numbers *more* arbitrary by deeming callers to have "constructive knowledge" that a number has been reassigned *no matter what happens* as a result of the first call.

## A.    The Commission Misinterpreted "Called Party"

The natural meaning of "called party" is the expected recipient of the call. Suppose "[y]our uncle writes down his telephone number for you and asks you to give him a call," and then "you dial that number." Pai Dissent 118 (JA1261).  It would make perfect sense to "say you are calling ... [y]our uncle," and to refer to your uncle, the person "you expect to answer," as the "called party." *Id.*  That would remain true even if "your uncle wrote down the wrong number," "he lost his phone and someone else answered it," someone else "actually pays for the service," or his number was reassigned. *Id.*; *see also Westfax, Inc. Petition for Consideration and Clarification*, 30 FCC Rcd. 8620, 8624 (Consumer & Governmental Affairs Bur. 2015) (interpreting "recipient" in § 227(b)(1)(C) to mean "the consumer for whom the fax's content is intended").  In fact, the statutory context demonstrates that "expected recipient" is the only plausible reading of the statute.

### 1.    The TCPA makes sense only if "called party" means "expected recipient"

Statutory provisions must be interpreted to fit with "the broader context of the statute":  an agency's interpretation is unreasonable if it "produces a substantive effect" that is incompatible "with the design and structure of the statute as a whole." *Util. Air*, 134 S. Ct. at 2442.  Here, Congress sought to balance "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of

speech and trade … in a way that protects the privacy of individuals and permits legitimate telemarketing practices." 47 U.S.C. § 227 note. That is why every kind of communication restricted by the TCPA is permissible with consent. *See* 47 U.S.C. § 227(b)(1)(A), (b)(1)(B), (b)(1)(C). And people consent to all kinds of calls or text messages—for example, instant updates when Amazon announces a sale, a school faces a snow delay, a credit card registers a high-dollar purchase, or Bryce Harper hits a home run.

The Commission's interpretation would gut Congress's protection of such consensual communications, thereby upending the balance Congress struck between protecting consumers and safeguarding beneficial calling practices. Each year, around 37 million wireless telephone numbers are reassigned from one subscriber to another—around 100,000 a day. Pai Dissent 117 (JA1260); O'Rielly Dissent 130 (JA1273). Those reassignments pose unavoidable problems for callers who want to contact consenting consumers. There is no reliable way to ascertain whether a given cell phone number has been reassigned, because no available database tracks all reassignments. As the Commission acknowledged, although there are "tools [that] help callers determine whether a number has been reassigned," they "will not in every case identify numbers that have been reassigned." Order ¶85 (JA1189-90). Even the database extolled by the Commission claims to include only "80 percent of wireless and hard-to-find phone

- 42 -

numbers." *Id.* ¶86 n.301 (JA1190). The consequences of liability for "only" the remaining 20 percent of reassignments—$500 or $1,500 a call—could still prove catastrophic.

No matter what a caller does, then, it cannot escape the probability that it will call reassigned numbers. DIRECTV, for instance, has gone to great lengths to avoid calling reassigned numbers. It requires customers to "maintain and promptly update" their contact information, and it provides a 24/7 toll-free number for them to do so. When handling changes to a customer's account, DIRECTV's representatives verify the customer's phone number, and automated programs carry any changes throughout DIRECTV's systems. And if a customer calls from an unrecognized number, DIRECTV's representative asks if the customer's number has changed. DIRECTV Comments 6-10 (JA521-25). Despite these steps, DIRECTV faces multiple class-action lawsuits from individuals holding reassigned numbers, some of whom never even answered DIRECTV's call. *Id.* at 10-12 (JA525-27). DIRECTV is not alone. *See, e.g.*, Abercrombie & Fitch Co. and Hollister Co. Ex Parte 2 (JA982).

Some TCPA plaintiffs even *exploit* the reassignment of phone numbers. Rubio's Restaurant sent automated texts to consenting employees to alert them to potential food safety problems, but one employee lost his phone and his number was reassigned. The new holder never asked Rubio's to stop texting him and

instead waited to receive hundreds of food safety alerts before suing Rubio's for $500,000. *See* Rubio's Petition 2-3 (JA728-29); Pai Dissent 120 (JA1263). In another case, "[i]nstead of simply answering the phone and telling [the defendant] that she wasn't the person they were trying to reach," the plaintiff, "on the advice of counsel," "documented all the calls she received for a lengthy period of time" in a "transparent attempt to accumulate damages." *Gensel*, 2015 WL 402840, at *2. The Order tolerates and indeed encourages this abuse, because it expressly rules that even consumers who act in bad faith are entitled to collect penalties. Order ¶95 (JA1194-95).

Callers face an additional problem under the Order. Because it interprets "called party" to mean not just the "current subscriber" but also the "non-subscriber customary user" of a number, Order ¶73 (JA1183-84), a caller may call a number provided by the consenting subscriber, only to reach the phone's different customary user. Again, the caller has no way of discovering this information beforehand—how could it know if someone else primarily uses the number provided by a consenting customer? And what if there is more than one customary user of a number—whose choice controls? The Commission indicated that the consent of a customary user binds the subscriber if the caller accidentally reaches the subscriber, *see id.* ¶78 (JA1185-86), and the logic underlying that statement is that the subscriber's consent should bind the customary user as well,

- 44 -

but the Order fails to make that clear.  The Commission's approach is thus arbitrary and capricious, because it still potentially exposes good-faith callers to unfair liability when they reach the customary user rather than the consenting subscriber, or when they reach a different customary user than the one who provided consent.

Interpreting "called party" to mean the new subscriber or customary user thus eviscerates the statute's consent exception.  If every call risks triggering strict liability, callers will refrain from calling consenting consumers in the first place. *See, e.g.*, Nat'l Rural Elec. Coop. Ass'n Comments 6 (JA810) (some rural utilities have shut down programs that involve contacting consenting customers "because of the risk of litigation" over reassigned numbers); Abercrombie and Hollister Co. Ex Parte 4 (JA984) (Abercrombie has curtailed texting to avoid reassigned-number liability).  Suppressing these calls would defeat Congress's stated objective of "permit[ting] legitimate [calling] practices."  47 U.S.C. § 227 note.

By contrast, interpreting "called party" to mean "expected recipient" avoids these problems and "produces a substantive effect ... compatible with" the statutory scheme. *Util. Air*, 134 S. Ct. at 2442.  Under this interpretation, a caller who expects to reach a consenting person, but through no fault of its own reaches someone else, would still have made the call with the "prior express consent of the called party."  This reading therefore protects the right of callers to make and

- 45 -

consumers to receive consensual calls.  Moreover, it adequately protects those who do *not* wish to be called.  They need only "inform[] [the] caller that he has the wrong number"—by, for example, sending a STOP message or speaking to the operator—and any subsequent call will trigger TCPA liability.  Pai Dissent 119 (JA1262).

### 2.    The Commission's interpretation of "called party" violates the First Amendment

The First Amendment forbids not only laws that directly prohibit protected speech, but also laws that chill it.  *E.g.*, *Reno v. ACLU*, 521 U.S. 844, 872 (1997).  Laws that hold speakers strictly liable for the consequences of their speech transgress this limitation:  they "have the collateral effect of inhibiting the freedom of expression, by making the individual … more reluctant to exercise it."  *Smith v. California*, 361 U.S. 147, 151 (1959); *see, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (no strict defamation liability for speech on matters of public concern); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) (unwittingly participating in a permitless march); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690-91 (8th Cir. 1992) (selling violent videos to children).  These principles are all the more significant when private parties as well as government officials may sue to enforce speech restrictions.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014).

The Commission's interpretation of "called party" violates the First Amendment. If callers cannot reliably discover reassignments, any caller that uses an ATDS or prerecorded message—pretty much everyone under the Commission's view, *see supra* 24-25—risks at least $500 in damages per call. These communications are often the only means for delivering desired, time-sensitive information to many people. Deterring these communications through strict liability violates the First Amendment, just as chilling news reports, video rentals, or protest marches does. At a minimum, interpreting "called party" to mean "current subscriber or customary user" raises "substantial constitutional questions," and the term should be interpreted to avoid them, *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445 (D.C. Cir. 1994).

### 3.     The Commission did not justify its interpretation of "called party"

The Commission's rationales for its interpretation of "called party" do not withstand scrutiny.

*First*, the Commission cited decisions stating that "caller intent" is not "relevant" to the consent exception. Order ¶78 (JA1185-86) (citing *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014)). These decisions predated the Commission's record-based determination that, even using best practices, callers "will not in every case identify numbers that have been reassigned." Order ¶85

- 47 -

(JA1189-90).  Indeed, they assumed that "[o]ther options remain" for callers to identify reassigned numbers.  *Soppet*, 679 F.3d at 642.  They also did not consider the First Amendment implications of interpreting "called party" to ignore the caller's good-faith expectations.

Moreover, the Commission itself parted ways with *Soppet* and *Osorio*, recognizing the relevance of a caller's expectation under a proper reading of the statute.  It defined "called party" to include not just the current subscriber—that is, the person who pays the bills—but also "customary users," on the grounds that "it is reasonable for callers to rely on customary users" and "the caller ... cannot reasonably be expected to divine that the consenting person is not the subscriber."  Order ¶75 (JA1184-85).  It also justified its one-call rule on the ground that after one call, the caller will have "actual" or "constructive" knowledge of the reassignment.  *Id.* ¶¶90-91 & n.312 (JA1192-93).  By accepting that liability should attach only if the caller knows of the reassignment, either in reality or by presumption, the Commission recognized that the caller's expectations matter.

*Second*, the Commission claimed that proving TCPA violations might be too difficult under an "expected recipient" approach because evidence for that "subjective standard" may lie in the "control of the caller."  *Id.* ¶78 (JA1185-86).  But the Commission could easily have avoided this problem by using an *objective* "expected recipient" approach, asking what a caller would reasonably expect rather

- 48 -

than what the caller in fact expected.  That approach would also protect consumers by forcing businesses to take reasonable steps to keep customer information up to date; otherwise, callers cannot "reasonably expect" to reach a particular person when calling.  Even under a *subjective* "expected recipient" approach, moreover, the Commission's concerns are overstated.  Because courts routinely infer subjective states of mind from objective circumstances, *see, e.g.*, *Cramer v. United States*, 325 U.S. 1, 33 (1945), courts would have little trouble determining caller intent from business records, consumer testimony, and common sense.  *See* Wells Fargo Ex Parte, Exhibit 7 (JA888) (detailing ways intent can be determined objectively).

*Third*, the Commission stated that "the consent of one party cannot be binding on another."  Order ¶78 (JA1185-86).  But that principle is hardly absolute. *Cf., e.g.*, *Illinois v. Rodriguez*, 497 U.S. 177 (1990) (police may conduct a search after receiving consent from a person who reasonably appears to, but does not in fact, have authority over the premises).  Even the Commission agrees in some contexts,  acknowledging that "the consent of a customary user … *may* bind the subscriber."  Order ¶78 (JA1185-86) (emphasis added).  Similarly, the Commission's one-call rule allows the previous subscriber's consent to bind the new subscriber for that call.  *Id.* ¶90 n.312 (JA1192-93).

*Fourth*, the Commission claimed that the TCPA elsewhere uses "called party" to mean "subscriber." Order ¶74 (JA1184). Yet "the presumption of consistent usage readily yields to context, and a statutory term … may take on distinct characters from association with distinct statutory objects." *Util. Air*, 134 S. Ct. at 2441-42. The TCPA uses "called party" differently in different provisions. For example, "called party" in subsection 227(d)(3)(B) must refer to the person who picks up the phone; it discusses what happens when "the called party has hung up." Elsewhere, "called party" must refer to the subscriber because only the subscriber is potentially "charged" for the call. 47 U.S.C. § 227(b)(2)(C). There is no obstacle, then, to interpreting "called party" to mean "expected recipient" in the TCPA's consent provision. Otherwise, callers cannot meaningfully use the consent exception the statute establishes, nor can they exercise their constitutionally protected right to contact those who wish to hear from them.

*Finally*, the Commission suggested that callers deal with its new approach to reassigned numbers by making *more* calls: they could "remove doubt" through "a single call … to confirm identity." Order ¶84 (JA1189). Of course, because so many phones qualify as ATDSs under the Order's logic, *see supra* 24-25, it may be impossible to make even that call without risking liability. Moreover, it would be perverse to read a consumer protection statute to "require companies to repeatedly

and frequently contact consumers" just to ask if their numbers have been reassigned. United Healthcare Servs., Inc. Petition 5 (JA398).

### B.    The Commission's One-Call Rule Exacerbates the Problems Created by Its Definition of "Called Party"

The Commission acknowledged that reading "called party" to mean "current subscriber or customary user" creates the many problems discussed above: "no one perfect solution exists to inform callers of reassignment," Order ¶88 (JA1192), so callers will be liable under the Order for innocent calls to reassigned numbers. Purporting to mitigate the impossible demands imposed by its interpretation, the Commission gave callers one liability-free call. Order ¶89 (JA1192). But that approach does not solve the problem, because it would arbitrarily impose liability for later calls *regardless* whether the first call provides any reason to believe that the number has been reassigned or that the caller has reached the wrong person.

### 1.    The one-call rule does not solve the problems created by the Commission's interpretation of "called party"

An agency that acknowledges a problem and sets out to address it must go some meaningful distance toward solving it. *See North Carolina v. EPA*, 531 F.3d 896, 907 (D.C. Cir. 2008) (per curiam) (setting aside an EPA rule purportedly designed to ensure that emissions from upwind states would not impede downwind states' ability to comply with environmental standards because it did not "achiev[e] something measurable toward [that] goal").

According to the Commission, the safe harbor "strikes the appropriate balance" between caller and recipient by giving "the caller [the] opportunity to take reasonable steps to discover reassignments and cease ... calling before liability attaches" without subjecting those holding reassigned numbers to numerous mistaken calls. Order ¶89 (JA1192); *see also id.* ¶¶91-92 (JA1193). But the one-call rule does no such thing, and thus cannot salvage the Commission's interpretation of "called party." That one call may reveal nothing about reassignment—the call may go unanswered, ring busy, roll into an uninformative voicemail message, or otherwise shed no light on the identity of the current subscriber. *See* Wells Fargo Ex Parte 4 (JA872). This is particularly true for text messages, whose senders have no opportunity to speak with a person or listen to a voicemail message, and often receive no response at all. O'Rielly Dissent 131 (JA1274). Even so, the Commission concluded that the caller, its affiliates, and its subsidiaries are deemed to have "constructive knowledge" that the number has been reassigned. Order ¶72 & n.261 (JA1182-83).

This leaves callers in an impossible situation. They cannot discover that the subscriber has changed *before* the first call because even those who deploy all of the "tools" the Commission discussed "may nevertheless not learn of reassignment." *Id.* ¶88 (JA1192). And they might not learn of reassignment *during* that call because, as the Commission again recognized, "a single call to a reassigned

- 52 -

number will [not] always be sufficient for callers to gain actual knowledge of the reassignment." *Id.* ¶90 n.312 (JA1192-93). Nor is there any way for callers to determine who the "non-subscriber customary user" of a number is, since all available information relates to the actual subscriber.

The Commission's one-call-and-you're-out approach therefore does not "achiev[e] something measurable toward" the "goal" of solving the problem that the Commission identified. *North Carolina*, 531 F.3d at 907. Instead, it simply takes $500 off the potentially enormous bill that will result from the arbitrary and capricious liability the Order otherwise imposes.

> **2.    The Commission offered no plausible explanation of how its purported safe harbor solves the problem that it identified**

The Commission tried a number of tactics to get around the fundamental practical problems created by its misinterpretation of "called party." For example, it deemed callers to have "constructive knowledge" of reassignment after just one call. Order ¶91 (JA1193). But that "is absolutely ludicrous." O'Rielly Dissent 131 (JA1274). "Constructive knowledge" is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Black's Law Dictionary* 1004 (10th ed. 2014). Imputing constructive knowledge—even though the Commission acknowledged that no amount of "reasonable care or diligence" can ensure that the caller is aware of a reassignment—makes the Order all the more arbitrary.

- 53 -

The Commission also attempted to justify its one-call rule by disclaiming, despite its earlier acknowledgments to the contrary, any obligation to make compliance with the TCPA possible. In the Commission's view, it could have adopted a "traditional strict-liability" or "zero call" approach, so callers cannot complain about the uselessness of its one-call rule. Order ¶90 & n.312 (JA1192-93).

But callers are not stuck with the Commission's we-could-have-hurt-you-worse approach. The Commission cannot impose strict liability on innocent callers without violating the First Amendment. *See supra* 46-47. Moreover, even where an agency has discretion to "limit" the relief it provides, it "must do so in some rational way," not by "flipping a coin." *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011); *see also, e.g., Competitive Telecommc'ns Ass'n v. FCC*, 309 F.3d 8, 16-17 (D.C. Cir. 2002) (applying arbitrary and capricious review to the scope of a safe harbor). The Commission cannot limit its "solution" to the acknowledged problem of reassigned numbers to a useless one-call "safe harbor" any more than it could "solve" that problem by creating a "no TCPA liability on Thursdays" rule.

<center>*    *    *</center>

The Commission misinterpreted the term "called party" and set forth an arbitrary solution to the problem of reassigned numbers. This Court should therefore vacate these parts of the Order.

<center>- 54 -</center>

## III.   THE COMMISSION'S TREATMENT OF REVOCATION OF CONSENT IS UNLAWFUL

The Commission concluded that consumers who consent to prerecorded or ATDS-assisted calls may revoke that consent. Order ¶56 (JA1176-77). The Commission refused, however, to establish any standardized and workable method of revoking consent, instead allowing individuals to use whichever methods they prefer, so long as the Commission or a jury later concludes it was "reasonable" under "the totality of the facts and circumstances." *Id.* ¶64 & n.233 (JA1179). This every-individual-is-a-law-unto-himself approach is arbitrary and capricious. Making matters worse, the Commission evidently prohibited callers and called parties from *agreeing* upon a means of revocation. *Id.* ¶70 (JA1181-82). That rejection of private agreements has no statutory basis.

### A.   The Commission's Unworkable Revocation-of-Consent Regime Is Arbitrary and Capricious

An agency's regulation is arbitrary and capricious if "compliance" with it "would be unworkable." *Almay, Inc. v. Califano*, 569 F.2d 674, 682 (D.C. Cir. 1977); *see also Wedgewood Village Pharmacy v. DEA*, 509 F.3d 541, 552 (D.C. Cir. 2007) (rejecting agency ruling as "unworkable for veterinary practice"); *N.Y. State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 109 (2d Cir. 1996) (setting aside safety standard because it imposed a "patently unworkable burden on employers").

The Commission's revocation-of-consent regime violates this principle. The Commission could have prescribed uniform revocation procedures, or allowed parties to agree to reasonable standard processes for revocation. Instead, it allowed each customer to revoke consent by any "reasonable" method as determined by the "totality of the circumstances." That degree of individualization is impracticable and deprives callers of the ability to craft efficient and reliable mechanisms for receiving and processing revocations.

Consider, for example, the problems the Commission's approach poses for those who send automated text messages to willing recipients. Before the Commission's Order, industry norms required marketers to inform customers that they can stop future text messages by replying with a keyword from a standardized list: "STOP, CANCEL, UNSUBSCRIBE, QUIT, END, and STOPALL." Vibes Ex Parte 3 (JA1062). Per the Commission, however, a customer could claim freedom to use any nonstandard term, such as "no" or "halt" or "do not call." Because "technological barriers" preclude programming a system to recognize every way in which individuals might express their desire to revoke consent, *id.*, mobile marketers could determine which responses amount to revocations only through manual review, an utterly infeasible method that would eliminate every benefit of sending text messages *en masse*.

- 56 -

Other organizations face similar problems. Customers theoretically could tell the pizza-delivery guy that they no longer wish to receive promotional text messages. Or they could tell their cable installer that they no longer want to receive informational calls about outages. But organizations typically train only particular customer-service agents to deal with revocations of consent. Under the Commission's Order, just about every employee who might interact with a customer would have to receive training in "the nuances of customer consent for TCPA purposes." Pai Dissent 123 (JA1266). An organization cannot tell in advance whether a customer's interaction with a particular employee will later be deemed a "reasonable" medium for revoking consent, so the only way to ward off liability will be to take exorbitant precautions.

Finally, consider more broadly the problems the Order poses for most callers that use dialing technology. Callers use these technologies rather than manual dialing because they wish to reach large numbers of consumers efficiently. Organizations must standardize such exchanges to keep interactions manageable and lawful. *Cf.* Restatement (Second) of Contracts § 211 cmt. a (1981) (describing "standardization" as "essential" to any "system of mass ... distribution"). By disregarding this imperative for uniformity, the Commission imposed on callers the impracticable task of forecasting every possible scenario under which a means of revoking consent could be deemed "reasonable" under the "totality of the

- 57 -

circumstances," putting procedures in place to handle each scenario, and training personnel on all of these procedures. The open-endedness of the Order's "reasonableness" standard only compounds these problems. *Cf. Specialty Equip. Mkt. Ass'n v. Ruckelshaus*, 720 F.2d 124, 139-40 (D.C. Cir. 1983) (a regulation requiring parts manufacturers to reimburse vehicle manufacturers for certain "reasonable expenses" was arbitrary and capricious, because the agency's failure to "flesh out these terms" threatened to "lead to costly, protracted disputes").

The Commission did not have to regulate this way. It overlooked proposals from a variety of commenters offering reasonable alternatives to its unworkable approach, such as requiring callers to designate a standard phone number or email address to which revocation requests should be addressed. *See* Santander Consumer USA, Inc. Comments 3 (JA816). Or it could have required automated text-messaging systems to recognize certain customer responses (such as "STOP") as revocations of consent. Or it could have required callers' customer-service lines to include an option (say, "press 7") for revoking consent. Rules like these would have allowed businesses to know what is required of them and to standardize their interactions with customers who want to revoke consent, while still protecting the rights of customers. It was arbitrary and capricious for the Commission not to address or adopt these reasonable proffered alternatives. *See Am. Gas. Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) ("[W]here parties raise reasonable

alternatives, "reasoned decisionmaking requires considering those alternatives."); *see also State Farm*, 463 U.S. at 48.

In fact, the Commission adopted just such an approach elsewhere in its Order. It ruled that, when a financial institution or healthcare provider sends an automated text about certain types of financial or healthcare information, "the exclusive means by which consumers may opt out of such messages" is "replying 'STOP.'" Order ¶¶138, 147 (JA1210-11, 1214-15). If standardized revocation procedures suffice to protect people who get messages from banks and hospitals, why not from school districts and small businesses?

Congress has adopted similar standardized notification procedures. Under the TCPA itself, for example, a fax user must make a "request not to send future unsolicited advertisements to a telephone facsimile machine" "to the telephone or facsimile number of the sender" or through another method of communication identified by the Commission. 47 U.S.C. § 227(b)(2)(E). Other statutes that operate alongside the TCPA and likewise govern business communications with consumers commonly provide standard notification provisions. The Fair Debt Collection Practices Act, for example, establishes a comprehensive regulatory scheme regarding consumer consent for collections calls—including by specifying the manner in which consent must be obtained and requiring that any individual who wishes to revoke such consent must do so in writing. *See* 15 U.S.C.

§ 1692c(c); *see also, e.g.*, 12 U.S.C. § 2605(e) (homebuyers must submit complaints about mortgages to addresses that mortgage servicers designate); 15 U.S.C. § 1666(a) (consumers seeking correction of credit billing mistakes must submit written notice to addresses that creditors designate); *id.* § 1681s-2(a)(8)(D) (consumers must submit disputes about credit reports to addresses that credit bureaus designate).

Although commenters raised these standardized revocation statutes with the Commission, *see, e.g.*, Santander Consumer USA Ex Parte 2-5 (JA740-43), the Commission failed to squarely address the issue. If the Commission decides to regulate permissible modes of revocation, notwithstanding the absence of any statutory requirement that it do so, it should at least act "consistent with other statutes that expressly address this issue." O'Reilly Dissent 136 & n.60 (JA1279).

The Commission's refusal to allow standardization imposes unworkable burdens on callers and ultimately harms consumers by depriving them of an effective method of revoking consent. Whatever benefits the Commission's approach might provide some consumers in the short run, that small benefit cannot outweigh the many harms the Order inflicts on callers and consumers themselves in the long run. *Cf. Michigan v. EPA*, 135 S. Ct. 2699, 2709 (2015) (regulations are not "appropriate" where their "costs are … disproportionate to the benefits").

### B. The Commission Improperly Prevented Callers and Recipients from Agreeing to Reasonable Means of Revocation

The Commission's approach to revocation is also improper insofar as it precludes callers and consumers from agreeing to "an exclusive means to revoke." Order ¶63 (JA1179).

The Commission's interpretation contradicts the common-law backdrop against which the TCPA was enacted. When Congress borrows a concept from the common law, it "presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952). In this case, "the TCPA's silence regarding the means of providing or revoking consent [indicates] that Congress sought to incorporate 'the common law concept of consent.'" *Osorio v. State Farm Bank, FSB*, 746 F.3d 1242, 1255 (11th Cir. 2014) (quoting *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013)). At common law, "[a]n explicit agreement among parties … may prescribe a particular form that a [notification] must have to be effective." Restatement (Third) of Agency § 5.01, cmt. c (2006). For example, in *Credit Alliance Corp. v. Campbell*, 845 F.2d 725 (7th Cir. 1988), the Seventh Circuit held that a guarantor had not revoked consent to a guaranty because the method of revocation she used differed from the method she agreed to use. "Where the parties agree to a method for revoking," the Court explained, "that method should be followed." *Id.* at 729.

Because the TCPA "incorporate[s] 'the common law concept of consent,'" *Osorio*, 746 F.3d at 1255, and because that concept allows parties to agree on the means of revoking consent, the TCPA does too.  That is why the Eleventh Circuit has already "conclude[d] that [consumers], *in the absence of any contractual restriction to the contrary*, [are] free to ... revoke any consent [under the TCPA]." *Id.* (emphasis added).  Indeed, the Commission itself elsewhere recognized the parties' common-law right to bargain about TCPA-related details.  In response to the problem of reassigned numbers, it suggested that callers should contractually require consumers to update their contact information and then sue them for breach if they fail to do so. *See* Order ¶¶47, 86 (JA1172-73, 1190-91).

The Commission's disregard of the common law is particularly unreasonable because the Commission expressly relied on the common law in concluding that consent is revocable in the first place. *See* Order ¶58 (JA1177) ("Congress intended for broad common law concepts of consent and revocation of consent to apply.").  It is unprincipled and unreasonable for an agency to insist that the common law provides important context when deciding whether revocation of consent is permissible at all, but that the common law does not matter when deciding which methods of revocation parties must use. *Cf. Michigan*, 135 S. Ct. at 2708 (an agency interpreting a statutory provision may not simultaneously treat

neighboring statutory provisions as relevant context for some purposes, but as irrelevant for others).

In any event, even assuming that the TCPA protects consumers' right to revoke consent in any way they like, consumers may—and often do—waive that right by contract. In the absence of "affirmative indication of Congress's intent to preclude waiver," courts "presum[e] that statutory provisions are subject to waiver by voluntary agreement of the parties." *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995); *accord, e.g.*, *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 134 S. Ct. 604, 611 (2013) (upholding contractual waiver of rights under ERISA); *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 80 (1953) (same under the Labor Management Relations Act). The TCPA includes no such "affirmative indication" regarding revocation of consent. So even if the statute grants consumers a right to use "any reasonable method" to revoke consent, they may still give up that right in voluntary agreements with callers. It was unreasonable for the Commission to conclude otherwise.

<p style="text-align:center">*    *    *    *    *</p>

The Order misinterprets "ATDS" to consider potential rather than present ability, erases the random-or-sequential-number-generation requirement from the statute, and ensnarls regulated parties in uncertain and contradictory tests. It eviscerates the statutory consent defense and discourages protected speech by

holding callers strictly liable for calls to reassigned numbers. And it encumbers callers with an unworkable system for processing revocations of consent, while preventing callers and consumers from overcoming this problem by private agreement. In short, the Commission's interpretation of the TCPA leads to a $500 pricetag on almost every routine call or text, transforming the statute's focused ban on random or sequential calling into an expansive source of crippling class-action liability.

## CONCLUSION

The petitions for review should be granted, and the challenged provisions of the Order vacated.

Dated: February 24, 2016

Respectfully submitted,

/s/ Shay Dvoretzky

Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500

Kate Comerford Todd
Steven P. Lehotsky
Warren Postman
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Petitioner the Chamber
of Commerce of the United States
of America*

Shay Dvoretzky
Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Email: sdvoretzky@jonesday.com

*Counsel for Petitioners Sirius XM Radio
Inc. and Professional Association for
Customer Engagement, Inc.*

Michele Shuster
MAC MURRAY, PETERSEN & SHUSTER
LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054
Telephone: (614) 939-9955

*Counsel for Petitioner Professional
Association for Customer
Engagement, Inc.*

Brian Melendez
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Telephone: (612) 486-1589

*Counsel for Petitioner ACA
International*

Tonia Ouellette Klausner
Keith E. Eggleton
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7706

*Counsel for Petitioners salesforce.com,
inc. and ExactTarget, Inc.*

Monica S. Desai
Amy L. Brown
Jonathan Jacob Nadler
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000

*Counsel for Petitioner Consumer
  Bankers Association*

Christopher J. Wright
Jennifer P. Bagg
Elizabeth Austin Bonner
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300

*Counsel for Petitioner Vibes Media,
  LLC*

Robert A. Long
Yaron Dori
Michael Beder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Petitioner Portfolio
  Recovery Associates, LLC*

## <u>CIRCUIT RULE 32(a)(2) ATTESTATION</u>

In accordance with D.C. Circuit Rule 32(a)(2), I hereby attest that all other

parties on whose behalf this brief is filed consent to its filing.


Dated:  February 24, 2016                    /s/ Shay Dvoretzky
                                             Shay Dvoretzky

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's Order of October 13, 2015, because it contains 13,936 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1), as determined by the word-counting feature of Microsoft Word.

Dated: February 24, 2016            /s/ Shay Dvoretzky
                                    Shay Dvoretzky

**ADDENDUM**

No. 15-1211

### ACA INTERNATIONAL ET AL.,
*Petitioners,*

v.

### FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,
*Respondents*

---

### CAVALRY PORTFOLIO SERVICES, LLC ET AL.,
*Intervenors for Petitioners*

---

### PETITIONERS' ADDENDUM
### TABLE OF CONTENTS

Reproduction of Relevant Authorities:

47 U.S.C. § 227(a)(1) ...............................................................Add. 1

47 U.S.C. § 227(b) (2012) .......................................................Add. 1

42 U.S.C. § 227(d)(3)(B)..........................................................Add. 3

26 U.S.C. § 227 note................................................................Add. 3

Bipartisan Budget Act of 2015, § 301(a)................................Add. 4

47 U.S.C. § 227(b) (as amended) ............................................Add. 5

Materials Related to Standing:

Declaration of Steven Brubaker .............................................Add. 6

Declaration of Michael Moore ................................................Add. 7

Declaration of Brandon Sailors ..............................................Add. 9

Declaration of Tara Sundgaard...............................................Add. 11

## 47 U.S.C. § 227(a)(1)

**(a) Definitions**

As used in this section—

**(1)** The term "automatic telephone dialing system" means equipment which has the capacity—

**(A)** to store or produce telephone numbers to be called, using a random or sequential number generator; and

**(B)** to dial such numbers.

## 47 U.S.C. § 227(b) (2012)

**(b) Restrictions on use of automated telephone equipment**

**(1) Prohibitions**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

**(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

**(i)** to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

**(ii)** to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

**(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

Add. 1

**(B)** to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);

\*    \*    \*

**(D)** to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

## (2) Regulations; exemptions and other provisions

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

\*    \*    \*

**(C)** may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

\*    \*    \*

## (3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

**(A)** an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

**(B)** an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

**(C)** both such actions.

Add. 2

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

## 47 U.S.C. § 227(d)(3)(B)

**(d) Technical and procedural standards**

\*       \*       \*

### (3) Artificial or prerecorded voice systems

The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

\*       \*       \*

**(B)** any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

## 47 U.S.C. § 227 note

Pub. L. 102–243, § 2, Dec. 20, 1991, 105 Stat. 2394 , provided that: "The Congress finds that:

\*       \*       \*

**(4)** Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

**(5)** Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

\*       \*       \*

Add. 3

**(9)** Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

\*     \*     \*

### Bipartisan Budget Act of 2015, § 301(a)

## SEC. 301. DEBT COLLECTION IMPROVEMENTS.

(a) IN GENERAL.—Section 227(b) of the Communications Act of 1934 (47 U.S.C. 227(b)) is amended—

**(1)** in paragraph (1)—

**(A)** in subparagraph (A)(iii), by inserting '', unless such call is made solely to collect a debt owed to or guaranteed by the United States'' after ''charged for the call''; and

**(B)** in subparagraph (B), by inserting '', is made solely pursuant to the collection of a debt owed to or guaranteed by the United States,'' after ''purposes''; and

**(2)** in paragraph (2)—

**(A)** in subparagraph (F), by striking ''and'' at the end;

**(B)** in subparagraph (G), by striking the period at the end and inserting ''; and''; and

**(C)** by adding at the end the following: ''(H) may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States.''.

Add. 4

## **47 U.S.C. § 227(b) (as amended)**

**(b) Restrictions on use of automated telephone equipment**

**(1) Prohibitions**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States-

**(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice-

*     *     *

**(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

**(B)** to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

*     *     *

Add. 5

PROFESSIONAL ASSOCIATION
FOR CUSTOMER ENGAGEMENT,
INC.,

          Petitioner,

    v.

FEDERAL COMMUNICATIONS
COMMISSION,

          Respondent.

Case No. 15-01244

## DECLARATION OF Steven Brubaker

I, Steven Brubaker, hereby state and declare as follows:

1. My name is Steven Brubaker, and I currently serve as the Chief of Staff with InfoCision, Inc., and, as such, I am familiar with InfoCision, Inc.'s business operations.

2. InfoCision, Inc. is a member of the Professional Association for Customer Engagement, Inc.

3. As a part of its business, InfoCision, Inc. uses, and intends to continue to use, predictive dialers and other computerized dialers when placing calls to customers and potential customers.

4. InfoCision, Inc. in many cases obtains, and intend to continue to obtain, express consent from the recipients of these calls.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2015.

*Steven Brubaker*

Steven Brubaker, Chief of Staff

Add. 6

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIRIUS XM RADIO INC.,

               Petitioner,

   v.

FEDERAL COMMUNICATIONS
COMMISSION,

               Respondent.

Case No. 15-01218

## DECLARATION OF MICHAEL MOORE

I, Michael Moore, hereby state and declare as follows:

1. My name is Michael Moore, and I currently serve as the Vice President and General Manager, Care Operations, with Sirius XM Radio Inc. ("Sirius XM"), and, as such, I am familiar with Sirius XM's business operations.

2. As a part of its business, Sirius XM contracts with vendors to call customers with trial subscriptions to Sirius XM's satellite radio service, a service that begins with no charge as a feature of the vehicles they bought or leased. The calls discuss the service and its features and ask customers whether they wish to extend their subscriptions.

3. My understanding of the equipment used by vendors to call cell phones on Sirius XM's behalf rests on my long-term interactions (by phone and in person)

with the vendors' representatives, on site visits, and on the expert reports of Ken Sponsler dated February 13, 2015 and March 27, 2015, in *Hooker v. Sirius XM Radio, Inc.*, No. 13-cv-00003 (E.D. Va.).

4. Although Sirius XM's vendors do not all use identical equipment, they have always used, and have advised us that they intend to continue to use, computer-assisted dialing systems when making calls to cellular phones. For example, they have used preview-dialing systems, which present information about a single consumer to an agent, who may then choose to dial the consumer's number by manually clicking the number (or the word "dial") on the screen. The phone line is opened, the number is dialed, and the agent remains on the line for the duration of the call. Once the agent ends the call, the preview-dialing system presents information about another consumer to the agent, who then repeats these manual steps to call that consumer. Sirius XM in many cases obtains, and intends to continue to obtain, consumers' express consent to be called using automated telephone dialing systems.

5. Sirius XM is now defending four putative class-action lawsuits from consumers whom Sirius XM's vendors called using preview-dialing technology. *See Knutson v. Sirius XM Radio, Inc.*, No. 12-cv-00418 (S.D. Cal.); *Trenz v. Sirius XM Radio, Inc.*, No. 15-cv-00044 (S.D. Cal.); *Elikman v. Sirius XM Radio, Inc.*, No. 15-cv-02093 (N.D. Ill.); *Hooker v. Sirius XM Radio, Inc.*, No. 13-cv-00003 (E.D. Va.).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on November 23, 2015.

Michael Moore

2

Add. 8

# EXHIBIT 27

ORAL ARGUMENT NOT YET SCHEDULED

## No. 15-1211 (and consolidated cases)

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

#### ACA INTERNATIONAL ET AL.,

*Petitioners,*

v.

#### FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES
#### OF AMERICA,

*Respondents.*

---

#### CAVALRY PORTFOLIO SERVICES, LLC ET AL.,

*Intervenors for Petitioners.*

---

### ON PETITIONS FOR REVIEW OF AN ORDER
### OF THE FEDERAL COMMUNICATIONS COMMISSION

---

### JOINT REPLY BRIEF FOR PETITIONERS ACA INTERNATIONAL,
### SIRIUS XM, PACE, SALESFORCE.COM, EXACTTARGET, CONSUMER
### BANKERS ASSOCIATION, U.S. CHAMBER OF COMMERCE, VIBES
### MEDIA, AND PORTFOLIO RECOVERY ASSOCIATES

---

Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500

*Counsel for Petitioner the Chamber
of Commerce of the United States
of America*

Shay Dvoretzky
Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939

*Counsel for Petitioners Sirius XM Radio
Inc. and Professional Association for
Customer Engagement, Inc.*

*Additional Counsel Listed on Inside Cover*

Brian Melendez
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Telephone: (612) 486-1589

*Counsel for Petitioner ACA International*

Tonia Ouellette Klausner
Keith E. Eggleton
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7706

*Counsel for Petitioners salesforce.com, inc.
   and ExactTarget, Inc.*

Kate Comerford Todd
Steven P. Lehotsky
Warren Postman
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Petitioner Chamber of
   Commerce of the United States of
   America*

Michele Shuster
MAC MURRAY, PETERSEN & SHUSTER LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054
Telephone: (614) 939-9955

*Counsel for Petitioner Professional
   Association for Customer Engagement, Inc.*

Monica S. Desai
Amy L. Brown
Jonathan Jacob Nadler
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000

*Counsel for Petitioner Consumer Bankers
   Association*

Christopher J. Wright
Jennifer P. Bagg
Elizabeth Austin Bonner
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300

*Counsel for Petitioner Vibes Media, LLC*

Robert A. Long
Yaron Dori
Michael Beder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Petitioner Portfolio Recovery
   Associates, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

GLOSSARY ..................................................................................................... vi

INTRODUCTION ............................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 2

ARGUMENT ...................................................................................................... 5

I.   THE COMMISSION'S INTERPRETATION OF ATDS IS
     UNLAWFUL ............................................................................................. 5

     A.   The Commission's Entire Interpretation Is Before The Court ........... 5

     B.   ATDS Equipment Must Have The Present Ability To Store Or
          To Produce Telephone Numbers To Be Called, Using A
          Random Or Sequential Number Generator ....................................... 7

          1.   "Capacity" means "present ability" .......................................... 7

          2.   ATDSs must be able to do more than dial from a list ............. 13

     C.   The Commission's Interpretation Is Unlawfully Vague .................... 19

II.  THE ORDER'S PROVISIONS REGARDING REASSIGNED
     NUMBERS ARE UNLAWFUL ................................................................. 22

     A.   The Commission Misinterpreted "Called Party" ............................. 22

     B.   The One-Call Rule Cannot Salvage The Order's Interpretation
          Of "Called Party" .......................................................................... 27

III. THE COMMISSION'S TREATMENT OF REVOCATION OF
     CONSENT IS UNLAWFUL .................................................................... 29

CONCLUSION ................................................................................................. 31

CIRCUIT RULE 32(a)(2) ATTESTATION

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

CASES

*Addison v. Holly Hill Fruit Prods.,*
    322 U.S. 607 (1944)...................................................................29

*Almay, Inc. v. Califano,*
    569 F.2d 674 (D.C. Cir. 1977)..................................................29

*Ashton v. Pierce,*
    716 F.2d 56 (D.C. Cir. 1983)....................................................18

*Bell Atl. Tel. Cos. v. FCC,*
    24 F.3d 1441 (D.C. Cir. 1994)..................................................29

*Biggerstaff v. FCC,*
    511 F.3d 178 (D.C. Cir. 2007)....................................................5

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994)..................................................................17

*Citizens United v. FEC,*
    558 U.S. 310 (2010)..................................................................11

*De Los Santos v. Millward Brown, Inc.,*
    2014 WL 2938605 (S.D. Fla. June 30, 2014)...........................12

*Dominguez v. Yahoo, Inc.,*
    2015 WL 6405811 (3d Cir. Oct. 23, 2015) .........................6, 14

*FCC v. Fox Television Stations, Inc.,*
    132 S. Ct. 2307 (2012).............................................................19

*Frisby v. Schultz,*
    487 U.S. 474 (1988)..................................................................12

*Geller v. FCC,*
    610 F.2d 973 (D.C. Cir. 1979)....................................................5

\* Authorities upon which we chiefly rely are marked with an asterisk.

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)..................................................................26

*Hunt v. 21st Mortgage Corp.*,
    2013 WL 5230061 (N.D. Ala. Sept. 17, 2013)........................12

*Johnson v. United States*,
    135 S. Ct. 2551 (2015)...........................................................20

*Knox v. SEIU*,
    132 S. Ct. 2277 (2012)...........................................................26

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)...........................................................29

*Moser v. FCC*,
    46 F.3d 970 (9th Cir. 1995) ...................................................12

*Nat'l Min. Ass'n v. U.S. Dep't of Interior*,
    70 F.3d 1345 (D.C. Cir. 1995)...................................................7

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
    503 U.S. 407 (1992)...................................................................8

*Riley v. California*,
    134 S. Ct. 2473 (2014)...........................................................11

*Ruggiero v. FCC*,
    317 F.3d 239 (D.C. Cir. 2003) (en banc)...............................13

*SWANCC v. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)...............................................................18

*Tripoli Rocketry Ass'n v. BATF*,
    437 F.3d 75 (D.C. Cir. 2006)..................................................19

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*TRT Telecomms. Corp. v. FCC,*
     876 F.2d 134 (D.C. Cir. 1989)..............................................................5

*United States v. Mendoza-Lopez,*
     481 U.S. 828 (1987).............................................................................17

*United States v. Papagno,*
     639 F.3d 1093 (D.C. Cir. 2011)..........................................................17

*United States v. Pritchett,*
     470 F.2d 455 (D.C. Cir. 1972)............................................................15

*\*USPS v. Postal Regulatory Comm'n,*
     785 F.3d 740 (D.C. Cir. 2015)............................................................19

*\*Util. Air Regulatory Grp. v. EPA,*
     134 S. Ct. 2427 (2014)........................................................................23

*Virginia v. Hicks,*
     539 U.S. 113 (2003).............................................................................21

**STATUTES**

5 U.S.C. § 554(e) ........................................................................................5

*47 U.S.C. § 227(a) ............................................................................1, 9, 13

47 U.S.C. § 227(b) ...............................................................................17, 19

47 U.S.C. § 227(c) .....................................................................................17

**ADMINISTRATIVE MATERIALS**

47 C.F.R. § 1.2(a).........................................................................................5

Declaratory Ruling and Order, *In re Rules and Regulations*
     *Implementing the Telephone Consumer Protection Act of 1991,* 18
     FCC Rcd. 14014 (2003)....................................................................6, 17

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559 (2008)................................................................6

Report and Order, *Establishment of a Public Safety Answering Point Do-Not-Call Registry*, 27 FCC Rcd. 13615 (2012).............................................18

Report and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752 (1992).................................................................17

*Telemarketing/Privacy Issues: Hearing Before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce on H.R. 1304 & H.R. 1305*, 102d Cong. (1991).................................................................16

*Unsolicited Telephone Calls*, 77 FCC 2d 1023 (1980) ................................................................16

## OTHER AUTHORITIES

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012)........................................14

H.R. 3035 (112th Cong. 2011)................................................................18

H.R. Rep. No. 102-317 (1991)................................................................16

S. Rep. No. 102-178 (1991) ................................................................16

## GLOSSARY
(continued)

| | |
|---|---|
| 1992 Order | Report and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752 (1992) |
| 2003 Order | Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003) |
| *ACA Declaratory Ruling* | Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559 (2008) |
| APA | Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* |
| ATDS | Automatic Telephone Dialing System, defined in 47 U.S.C. § 227(a)(1) |
| Br. | Brief for Respondents Federal Communications Commission and the United States of America |
| FDCPA | Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* |
| Middle Class Tax Relief and Job Creation Act of 2012 | Pub. L. No. 112-96, 126 Stat. 156 |
| Order | Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1144-1224) |
| Pai Dissent | Dissenting Statement of Commissioner Ajit Pai, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1255-66) |

## **GLOSSARY**
### (continued)

| | |
|---|---|
| Pet. Br. | Joint Brief for Petitioners ACA Int'l *et al.* |
| *Public Safety Answering Point Registry* | Report and Order, *Establishment of a Public Safety Answering Point Do-Not-Call Registry*, 27 FCC Rcd. 13615 (2012) |
| TCPA | Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394, codified at 47 U.S.C. § 227 |
| *Telemarketing/Privacy Issues* | *Telemarketing/Privacy Issues: Hearing Before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce on H.R. 1304 & H.R. 1305*, 102d Cong. (1991) |

## **INTRODUCTION**

Under the Commission's Order, any phone that has the capacity to store and dial numbers from a list is apparently an "autodialer," and any phone that could hypothetically be *altered* to do so has the requisite capacity. That test likely subjects every uninvited call or text to a wireless number from almost any modern phone—including smartphones—to a $500 penalty. Respondents cannot bring themselves to disagree, saying only that smartphones are not "necessarily" covered (Br. 34-35).

The purported authority for this newfound ban? The TCPA's prohibition against uninvited calls to police stations, hospital rooms, and wireless phones made with an "automatic telephone dialing system"—"equipment which has the capacity ... to store or produce telephone numbers to be called, using a random or sequential number generator; and ... to dial such numbers." 47 U.S.C. § 227(a)(1). In other words, the Commission transformed a narrow provision targeting automated, random-and-sequential dialers—a particularly troubling kind of dialing equipment that had clogged emergency lines, harassed hospital patients, and overwhelmed cellular networks—into a universal ban on far more calls, from devices that cannot even currently function that way.

The Order also makes it impossible for callers to *comply* with that ban by securing consent. Callers are strictly liable for calls unknowingly placed to

reassigned numbers. But given the sheer number of reassignments and the near-impossibility of sussing them out, such calls are admittedly unavoidable. And even if callers reach the right person, they still cannot trust the consent they have obtained. The Commission concluded that recipients may revoke consent through *any* "reasonable" means, not just designated channels. That choose-your-own-method-of-revocation regime prevents callers from efficiently tracking and honoring revocations. All told, the Order ensures that callers cannot avoid liability when making legitimate calls that Congress allowed: ones made without an ATDS or with prior consent.

Respondents counter by rewriting the statute, revising the Order, and ignoring Petitioners' arguments. But the TCPA is clear, and it clearly prohibits the Commission's boundless interpretation.

## SUMMARY OF ARGUMENT

I.    A.    While Respondents accept that the Court has jurisdiction to review the Commission's interpretation of "capacity," they assert that the Court may not review its interpretations of the functions of an ATDS because earlier orders settled that issue. But those orders were ambiguous, which is why Petitioners asked for a declaratory ruling. Even if the earlier orders had been clear, this issue would still be before the Court because parties asked the Commission to initiate a rulemaking to revisit them, and the Order denied those requests.

**B.** The tools of statutory interpretation—and Respondents' own counterexamples—demonstrate that "capacity" refers to what equipment can do now, not what it might do if modified. Respondents fret over the administrability of the statute's test, but the distinction between using equipment and modifying it is far clearer than the Commission's "not-too-attenuated" alternative. Furthermore, Respondents' weak disclaimer that its test does not "necessarily" cover smartphones—like the logic of the Order—reveals the absurd, unconstitutional breadth of the Commission's interpretation.

Additionally, to fall within the TCPA, equipment must do more than dial from a list; it must have the capacity to store or to produce telephone numbers *using a random or sequential number generator*. Respondents disagree, but they cannot even settle on an interpretation of that phrase. Their suggestions also contravene basic rules of grammar and again threaten to sweep in every smartphone.

**C.** The Order's speech restrictions are impermissibly vague. Respondents cannot explain what makes a hypothetical modification too "attenuated" or why some kinds of software-controlled equipment (predictive dialers) qualify as ATDSs while others (smartphones) might not. Respondents do not even try to explain the Order's contradictory statements about the functions an ATDS must be able to perform.

**II.    A.**    The Order's interpretation of "called party" makes matters worse.
The Commission concedes that diligent callers are liable for calls unintentionally
placed to reassigned numbers under its interpretation.  Although Respondents seek
support for that result in the TCPA's text, they admit that "called party" is at best
ambiguous.  The Commission may not resolve ambiguities in profoundly
unworkable (and thus unreasonable) ways, nor may it ignore the First
Amendment's prohibition against strict liability for speech.

**B.**    The Commission tried to cure its admittedly unworkable interpretation
by giving callers one liability-free call.  Respondents erroneously maintain that this
arbitrary rule simply allocated risks between callers and call recipients.  In fact, the
Commission created the rule to give callers a reasonable opportunity to discover
reassignments—an end it plainly fails to achieve.  Moreover, contrary to
Respondents' argument, the one-call rule is integral to the Commission's
interpretation of "called party" and cannot be severed from it.

**III.**    The Commission's revocation-of-consent rules are impracticable and
unjustified.  Recipients request automated calls and texts because they want
information fast.  Organizations cannot provide it if they must scour every channel
through which someone might have "reasonably" revoked consent.  Moreover,
these burdens serve no purpose.  The Commission essentially admitted that

consumers can handle standardized methods when it *required* consumers to use those methods to opt out of healthcare and banking messages.

## ARGUMENT

### I.   THE COMMISSION'S INTERPRETATION OF ATDS IS UNLAWFUL

#### A.   The Commission's Entire Interpretation Is Before The Court

Respondents assert (Br. 36-38) that, while the Commission's interpretation of "capacity" is reviewable, its related pronouncements about the functions that an ATDS must be able to perform are not. Respondents are wrong.

In addition to challenging a rule when promulgated, parties may secure judicial review in two ways. If the rule is unclear, parties may seek a clarifying declaratory ruling, *see* 5 U.S.C. § 554(e); 47 C.F.R. § 1.2(a), and then seek judicial review, *see, e.g.*, *TRT Telecomms. Corp. v. FCC*, 876 F.2d 134 (D.C. Cir. 1989). If the rule is clear, parties may "petition for a rulemaking to modify" it and seek review of the denial. *Biggerstaff v. FCC*, 511 F.3d 178, 184-85 (D.C. Cir. 2007); *Geller v. FCC*, 610 F.2d 973, 977-78 (D.C. Cir. 1979).

Petitioners did both. Some asked the Commission to clarify its earlier, ambiguous statements about the meaning of "capacity" and the functions that an ATDS must be able to perform. *E.g.*, TextMe, Inc. Pet. 7-13 (JA546-52); Glide Talk Ltd. Pet. 9-13 (JA255-59); PACE Pet. 7-8 (JA236-37). Others asked it to "initiate a rulemaking." ACA Int'l Pet. 1 (JA410); PACE Pet. 3 (JA232). In

response, the Order purportedly "clarif[ied]" the "meaning of 'capacity'" and "the definition of 'autodialer,'" while denying the requests for rulemaking.  Order ¶¶165 & n.552, 167-87 (JA1222-24).

Respondents insist Petitioners could not seek a declaratory ruling on an ATDS's functions because the Commission's earlier orders settled that issue.  But those orders were "hardly a model of clarity." *Dominguez v. Yahoo, Inc.*, 2015 WL 6405811, at *2 (3d Cir. Oct. 23, 2015) (unpub.).  The 2003 Order, for example, set out at least three different accounts of an ATDS's functions:  one mirroring the statute, one turning on the capacity "to dial [stored] numbers at random, in sequential order, or from a database," and one targeting "the capacity to dial without human intervention." 2003 Order ¶¶129, 131, 132.  The *ACA Declaratory Ruling* parroted (but did not reconcile) these conflicting tests.  ¶¶2 & n.6, 7 & n.23, 12-14.  This mess explains why so many sought clarification and why one circuit has already read the Commission's old orders differently than Respondents do now. *See Dominguez*, 2015 WL 6405811, at *2.  And it explains why, contrary to Respondents' revisionist account, the Order spent fifteen paragraphs "clarif[ying]" the definition of "autodialer."  Order ¶165 n.552 (JA1222) (citing *id.* ¶¶10-24 (JA1154-61)).

Even if the Commission's earlier orders were clear, Petitioners secured review because ACA International and PACE expressly (but unsuccessfully) asked

for a rulemaking on this topic. *Id.* ¶¶164-65 & n.552 (JA1222). This Court has "repeatedly recognized" that parties may challenge rules "beyond the statutory period" this way. *Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1350 (D.C. Cir. 1995).

### B.    ATDS Equipment Must Have The Present Ability To Store Or To Produce Telephone Numbers To Be Called, Using A Random Or Sequential Number Generator

#### 1.    "Capacity" means "present ability"

Respondents argue (Br. 29) that "capacity" includes "potential abilities"— what something might be able to do if modified or reprogrammed. But "capacity" refers to what something *can* do, not what it *could* do if altered. No one would advertise a laptop as having the capacity to store 500 GB because its 150 GB hard drive could be supplemented with a 350 GB external one. That remains true regardless of whether the modification is easy or hard, likely or unlikely. A pig lacks the capacity to fly because it doesn't have wings, not because the prospect of adding them is too "attenuated."

Respondents answer (Br. 27) that a "present ability" interpretation "add[s] a word" to the TCPA. Speaking of "present" capacity no more "adds a word" than clarifying that "spouse" means "current spouse"; it simply explains what "capacity" *means*.

- 7 -

Respondents next cherry-pick definitions (Br. 28). But agencies cannot look out over a crowd of definitions and pick their friend; the definition must "mak[e] … sense under the statute." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 418 (1992). Some of Respondents' definitions do not. For example, no one's phone has the "potential for growth, development, or accomplishment." Respondents' other definitions support Petitioners. "Capacity" does mean "potential or suitability for holding, storing, or accommodating," but a teaspoon cannot hold a tablespoon of sugar, even if it could be recast. "Capacity" also means "potentiality for production or use," but a standard printer lacks the potential to produce photocopies, even if it could be hooked up to a scanner.

Respondents' counterexamples (Br. 29-30) prove Petitioners' point. Take the question whether a browser has the capacity to play Flash videos even though it lacks the necessary plug-in. On Respondents' own account, the answer cannot be "yes," but rather, "[y]es, *if* you download the flash plug-in." That telltale "if" gives the game away: the browser lacks that capacity now, and would gain it only if modified. Next, Petitioners agree "a stadium's seating capacity [does not] rise[] and fall[] every time a person in a wheelchair enters and exits." Entering a stadium in a wheelchair does not *modify* the stadium; it *uses* it. So too for Respondents' factory. Producing more with additional workers does not alter the factory; it fully deploys it.

- 8 -

Finally, Respondents contend (Br. 30) Congress could have covered only existing abilities (rather than ones that arise upon modification) by banning equipment "which stores or produces numbers." But that hypothetical statute only covers equipment actually *used* to perform the specified functions, not equipment that *could* perform them (even if it has never done so). In any event, even if Respondents' hypothetical statute were coextensive with the TCPA, that would prove only that Congress could have said the same thing in two different ways. That does not mean the term Congress actually chose—here, "capacity"—should be given something other than its plain meaning.

Other interpretive tools compel the same conclusion. Congress provided that ATDS equipment must have the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator." 47 U.S.C. § 227(a)(1)(A). If "capacity" included abilities that result only from modification, this limit would serve virtually no purpose because "[i]t's trivial to download an app, update software, or write a few lines of code that would modify a phone to dial random or sequential numbers." Pai Dissent 115 (JA1258). Similarly, the Commission's reading ignores the ATDS provision's targeted purpose, and absurdly and unconstitutionally covers every modern phone. Pet. Br. 25-29; *infra* 10-12.

Respondents claim (Br. 31) a "present ability" approach would lead to line-drawing problems because "activating the autodialer functionality will always require some degree of 'modification'" (such as "pressing a button" or "replacing the manufacturer's software"). But pressing a button does not "modify" equipment (it uses it), and replacing software does not "use" equipment (it modifies it). And even if there are hard cases, they pale in comparison to those augured by the Commission's test. How many lines of code before a reprogramming becomes "too theoretical"? How many new screws before adding a part is "too attenuated"?

Respondents similarly worry (Br. 32) consumers cannot easily determine which functionalities existed at the time of the call, making it difficult to plead violations. But consumers often cannot tell anything by ear about the telephone that called them: how it actually operated, how it could have been operated, or how it might have been reprogrammed to operate. This pleading difficulty comes from the *statute*; Respondents cannot lawfully "solve" it by covering every modern phone.

When Respondents finally address the limits of their "potential functionalities" approach (Br. 34-35), they cannot deny that it covers hundreds of millions of smartphones. Respondents instead claim that the test does not "necessarily" cover them, and anyone sued would not be "preclude[d] … from arguing" that smartphones do not qualify. These concessions are remarkable. The

First Amendment protects against the "inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable." *Citizens United v. FEC*, 558 U.S. 310, 327 (2010). Yet Respondents would condemn every modern telephone user to such a process. It is absurd to think that Congress intended to subject hundreds of millions of people to the prospect of $500-a-call litigation, even if they would not "necessarily" lose.[1]

Respondents' half-hearted disclaimers also defy the Order's logic. The Commission might as well have been talking about smartphones when it said (of predictive dialers) that "software-controlled equipment is designed to be flexible, both in terms of features that can be activated or de-activated and in terms of features that can be added … through software changes or updates." Order ¶16 n.63 (JA1157). The Order did not doubt that smartphones have the same capacity.

---

[1] Respondents justify their hesitance (Br. 34) by claiming that there was "no factual record … describing the capabilities and limitations of smartphones." But everyone knows that smartphones are "minicomputers that also happen to have the capacity to be used as a telephone," *Riley v. California*, 134 S. Ct. 2473, 2489 (2014), and it is "trivial" to modify one to autodial or group text, Pai Dissent 115; *see also, e.g.*, GroupMe, Inc. Pet. 10 & n.21 (JA175) (describing an app that lets "someone else maintain your phone lists of important calls to make," syncs when you get in the car, and "start[s] dialing without [you] ever touching the phone again"). Respondents also assert (Br. 34) that no one has yet been *sued* for using a smartphone atypically, but the Commission's test would reach even "typical" uses.

*Id.* ¶21 (JA1159-60).  That is why courts—and until now the United States—have rejected a "potential functionalities" approach.  Pet. Br. 25 n.5 (collecting cases).[2]

Finally, even if Respondents could devise a "potential functionalities" test that might spare some modern phones, it would still violate the First Amendment.  Time-place-and-manner restrictions must target "no more than the exact source of the 'evil' [they] seek to remedy."  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Even assuming the ATDS provision protects against *all* unrequested automated calls—its talk of random-or-sequential-number generators notwithstanding—the Order goes far beyond that "evil."  It targets not just automated calls or even calls from equipment capable of making automated calls, but equipment that, if modified, *would be* capable of making them.  Respondents proudly counter (Br. 74) that "[e]very court to consider" the constitutionality of the TCPA's restrictions has upheld them.  But some of these cases involved other parts of the statute.  *See Moser v. FCC*, 46 F.3d 970 (9th Cir. 1995) (prerecorded messages to residential

---

[2] Respondents claim (Br. 36) the United States never took a position on "capacity."  That is incorrect.  *See* Br. of United States 11 n.7, *De Los Santos v. Millward Brown, Inc.*, 2014 WL 2938605 (S.D. Fla. June 30, 2014).  There, the United States supported its claim that smartphones do not qualify by approvingly citing *Hunt v. 21st Mortgage Corp.*, 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013).  It described *Hunt* as "concluding that [the] device … had to have [the] present capacity … to store or produce and call numbers from a number generator."

lines).  And none addressed the Commission's limitless, what-could-it-be-*modified*-to-do interpretation of "capacity."[3]

### 2.    ATDSs must be able to do more than dial from a list

An ATDS must "ha[ve] the capacity … to store or produce telephone numbers to be called, using a random or sequential number generator; and … to dial such numbers." 47 U.S.C. § 227(a)(1).  Pursuant to the rules of grammar, the phrase "using a random or sequential number generator" modifies the verbs "store" and "produce."  An *automatic* dialer, therefore, must be able to generate random or sequential numbers, to use that random or sequential number generator to store or to produce numbers to be called, and to dial those numbers, all without human intervention.

Respondents contend (Br. 36) that the ability to dial from a prepared list of numbers—indeed, the ability to be *reprogrammed* to dial from a list—suffices.  To explain why, they claim (Br. 40) the phrase "using a random or sequential number generator" "cannot modify '*store*.'"  But if a dialer automatically stored every

---

[3] Respondents assert (Br. 72) that Petitioners "do not directly challenge the TCPA's constitutionality," but raise only avoidance arguments.  Petitioners repeatedly claimed (and still claim) that the TCPA is unconstitutional if it means what the Commission says.  *E.g.*, Pet. Br. 25, 40.  If the Court upholds the Commission's interpretation, it must invalidate the statute.  *See Ruggiero v. FCC*, 317 F.3d 239, 241 (D.C. Cir. 2003) (en banc) (entertaining constitutional challenge to statute on petition for review).

telephone number that its random or sequential number generator spit out, it *would* have the capacity to "store telephone numbers ... using a random or sequential number generator." And even if this reading may be somewhat awkward, it is the only one the statute will bear. "[T]he statutory definition is explicit" that equipment must have the capacity "to store *or* to produce the randomly or sequentially generated numbers," even though it may be "unclear how a number can be *stored*" in that way. *Dominguez*, 2015 WL 6405811, at *3 n.1.

More importantly, Respondents' proposed alternatives—none of which Respondents endorse, even though the Commission supposedly settled this issue a decade ago—are indefensible. Respondents first suggest that the number-generator requirement modifies only "produce," not "store." That reading is a crime against grammar. Where a modifier follows a series of parallel verbs ("store or produce") and a shared object ("telephone numbers"), the modifier applies to each verb in the list, not just one of them. Antonin Scalia & Bryan A. Garner, *Reading Law* 147 (2012) (series-qualifier canon). That reading also produces absurd results. If the capacity to "store telephone numbers" were enough, every phone with a contact list would be an ATDS.[4]

---

[4] Respondents also suggest (Br. 38) that any telephone with the capacity to store a list necessarily has the capacity to store numbers using a random or sequential number generator, because the caller could always put randomly or

Respondents alternatively suggest (Br. 40-41) that the number-generator requirement modifies the verb "called," not the verbs "store or produce." That reading overlooks the comma in the phrase "store or produce telephone numbers to be called, using a random or sequential number generator." The point of such a comma is to indicate that the modifier applies to an earlier portion of the sentence ("store or produce"), not the verb immediately preceding the comma ("called"). *See United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972). That reading also ignores the ATDS definition's structure, which includes one subsection about "stor[ing]" and "produc[ing]" telephone numbers and another about "dial[ing] such numbers." If Congress had intended the number-generator requirement to apply to the method of calling rather than the method of storage or production, it would have placed the requirement in the latter subsection, not the former.

Moving past the text, Respondents contend (Br. 44) that Congress had "no sensible reason" to restrict equipment that has the capacity to generate random or sequential numbers but not equipment that dials from a list. Not true. The lawmakers who enacted the TCPA understood that random and sequential dialers cause unique problems. These inherently indiscriminate machines often reached

---

(continued...)

sequentially generated phone numbers on its calling list. This theory, too, would cover any phone with a contact list.

"lines reserved for [specialized] purposes," including hospitals, police stations, and fire departments. S. Rep. No. 102-178, at 2 (1991); *see Telemarketing/Privacy Issues* 28 (statement of Rep. Unsoeld) (recounting "horror stor[y]" involving a "man in the hospital bed in the intensive care ward" who received an automated call "offering him a trip to Hawaii"); *id.* at 111 (statement of Michael Frawley) (calls to doctors' pagers and organ-transplant waitlist participants). Indiscriminate dialing also saddled cell phone and pager users with hefty charges, all for calls placed without any reason to believe that recipients would be interested. *See id.* at 28.

Sequential dialing caused additional problems. It overwhelmed *all* of the telephone lines in a hospital, police station, or fire department. H.R. Rep. No. 102-317, at 10 (1991). And because cellular carriers "obtain[ed] large blocks of consecutive phone numbers," sequential dialers "saturate[d] mobile facilities, thereby blocking the provision of service to the public." *Telemarketing/Privacy Issues* 113 (statement of Michael Frawley).

Dialing from a prepared list poses none of these problems. Those who prepare lists "ha[ve] an incentive to direct calls to those likely to be interested," *Unsolicited Telephone Calls*, 77 FCC 2d 1023, 1037 (1980); nobody deliberately calls police stations to sell time-shares or sends texts to random strangers to say the cable guy is coming. And dialers that rely on handpicked lists do not knock out

- 16 -

blocks of consecutive numbers or saturate entire networks. These differences explain why Congress wrote the targeted statute it wrote and why the Commission previously believed that the ATDS restrictions "clearly do not apply" where "the numbers called are not generated in a random or sequential fashion." 1992 Order ¶47; Br. 14 n.5 (conceding its flip-flop).

Respondents further worry (Br. 45-49) that consumers will face a flood of unwanted calls to wireless numbers unless the TCPA covers equipment that can dial from a list. But it is Congress's job to "update the statute" if necessary, not the Commission's. *United States v. Papagno*, 639 F.3d 1093, 1101 (D.C. Cir. 2011). Anyway, wireless subscribers can always sign up for the Do-Not-Call Registry. *See* 2003 Order ¶33. That is the same protection Congress offered to residential subscribers who do not wish to receive ATDS calls (as well as live-operator calls dialed from a list). *See* 47 U.S.C. § 227(b)(1)(B), (c).

Finally, Respondents claim (Br. 49) that Congress has implicitly ratified the Commission's interpretation. Such arguments generally "deserve little weight in the interpretive process." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994). They deserve even less here. To be ratified, an agency's interpretation must have been "unequivocally established." *United States v. Mendoza-Lopez*, 481 U.S. 828, 836 (1987). But Respondents *still* cannot say what "using a random or sequential number generator" means. Even if

- 17 -

the Commission's dial-from-a-list interpretation had been settled, Congress "cannot by its silence ratify an administrative interpretation … contrary to the plain meaning of the Act." *Ashton v. Pierce*, 716 F.2d 56, 63 (D.C. Cir. 1983).

In any event, Respondents cannot identify (as they must) "overwhelming evidence" that Congress approved the agency's position on this "precise issue." *SWANCC v. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001). Respondents cite Congress's rejection of proposed amendments in 2011, but that proposal redefined "ATDS" to cover only *actual use* rather than *capacity*, exempted calls "made for a commercial purpose," and preempted most state regulation. H.R. 3035 (112th Cong. 2011). Members of Congress could have opposed the amendments for any of these reasons; that is why "[f]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation." *SWANCC*, 531 U.S. at 169-70.

Even less persuasive is Respondents' observation (Br. 50) that Congress enacted restrictions on "automatic dialing or 'robocall' equipment" in a rider attached to the Middle Class Tax Relief and Job Creation Act of 2012. Respondents provide no evidence that *Congress* intended "automatic dialing … equipment" to mean the same thing as "ATDS"; *the Commission* interpreted both terms in tandem "to provide regulatory consistency in complying with" the two statutes. *Public Safety Answering Point Registry* ¶29. And there is no reason to

believe that Congress incorporated the *Commission*'s definition of ATDS rather than the *TCPA*'s.

Congress also did not ratify the Commission's interpretation when it exempted calls to collect government debts from section 227(b)(1)(A)'s restrictions.  Respondents claim (Br. 51) this exemption achieves nothing on Petitioners' view, because no one calls random or sequential numbers to collect debts.  Not quite.  Equipment qualifies as an ATDS if it has the *capacity* to perform the requisite functions.  So even if the Government's debt collectors do not make random or sequential calls, their equipment might have the capacity to do so.  In addition, section 227(b)(1)(A) restricts the use of "an artificial or prerecorded voice," which debt collectors regularly use.  In all events, the most plausible explanation for this exemption is not that Congress agreed with the Commission's uncertain position, but rather that, regardless of how the uncertainty got resolved, the Government could collect its debts as it wished.

### C.    The Commission's Interpretation Is Unlawfully Vague

Both due process and the Administrative Procedure Act forbid agency interpretations that offer no meaningful guidance, particularly where speech is concerned.  *See FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *USPS v. Postal Regulatory Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015) (setting aside "alter a basic characteristic" standard); *Tripoli Rocketry Ass'n v.*

*BATF*, 437 F.3d 75 (D.C. Cir. 2006) ("much faster" standard). Despite this requirement, the Commission tersely stated that "capacity" includes what equipment could do if modified in non-"theoretical," non-"attenuated" ways.

Rather than explain the factors used to apply this "test," Respondents insist (Br. 33-35) that the Commission need not "comprehensively map" the devices that fall on each side of its line. Perhaps, but the Commission must explain *what the line is*—what makes a potential modification too "theoretical" or "attenuated"? The Order does not even attempt to answer that question, and its examples—rotary phones out, predictive dialers in, smartphones in limbo—only make things murkier. By treating predictive dialers and smartphones differently, the Commission contradicted itself on the central question raised by its interpretation: how to determine the "potential functionalities" of software-controlled devices. Neither the Order nor Respondents' brief sheds any light on that key issue.

Respondents insist (Br. 52) that the Order survives unless it is "vague in all of its applications." Not so. Even where speech is *not* at stake, the Supreme Court has squarely held that a provision cannot survive a vagueness challenge "merely because there is some conduct that clearly falls within [its] grasp." *Johnson v. United States*, 135 S. Ct. 2551, 2560-61 (2015). And where speech *is* at stake, courts routinely "invalidate *all* enforcement" of a law that "punishes a substantial

amount of protected free speech," even if it has some clear, "plainly legitimate" applications. *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003).

In any event, Respondents exaggerate (Br. 52-53) the number of clear applications. For example, out of an abundance of caution, many callers have abandoned predictive dialers and instead use other computerized systems to assist in calling cellular numbers. This equipment stores numbers from lists; an agent previews each number on the screen and initiates each call (by clicking a button or typing each number on a keypad). Petitioners cannot tell whether such "professional dialing equipment" (Resp. Br. 32) has the requisite "capacity" in the Commission's view. Petitioners also don't know whether it matters that these devices are not configured to do anything "using a random or sequential number generator." Respondents tellingly omit that phrase from their account of what the Order supposedly makes clear because, in four paragraphs, the Order put forth four distinct tests for the functions that an ATDS must be able to perform. Order ¶¶12-15 (JA1155-57). One even has its own sub-contradiction: the absence of human intervention is an "element" to be considered "case-by-case," *id.* ¶17 (JA1157-58), but is apparently not a requirement for TCPA liability, *id.* ¶20 (JA1159).

Respondents ignore these contradictions. For example, while the Order mentioned both the ability to *store* numbers and to *dial* numbers randomly, in sequence, or from a list, Respondents now refuse (Br. 40-43) to say which test

- 21 -

applies. Similarly, while the Order expressly *rejected* a request to "clarify that a dialer is not an autodialer unless it has the capacity to dial without human intervention," Order ¶20 (JA1159), Respondents revive that test (Br. 43, 53) in an attempt to save their dial-from-a-list reading from absurdity.[5] The Commission's lawyers cannot cure the Order's incoherence by rewriting it here.

## II.  THE ORDER'S PROVISIONS REGARDING REASSIGNED NUMBERS ARE UNLAWFUL

### A.  The Commission Misinterpreted "Called Party"

Despite securing consent and taking precaution after precaution, callers often unwittingly reach one of the 37 million wireless numbers that are reassigned annually. The Commission would hold those callers liable. Congress did not intend that result, and to avoid it, "called party" must refer to a call's expected recipient, not the number's current subscriber or customary user. This interpretation tracks the natural meaning of "called party," protects the consent defense, guarantees that those who wish to receive messages may do so, and avoids unconstitutionally punishing innocent callers. Pet. Br. 41-47.

---

[5] Respondents paper over this problem by contending that the Commission merely rejected "one party's request to adopt *a test* for human intervention" (Br. 43 n.9 (emphasis added)). Not true. PACE sought clarification that the absence of human intervention is a prerequisite to liability. Order ¶20 (JA1159); PACE Pet. 12-13 (JA241-42).

Respondents contend (Br. 55) that an expected-recipient understanding of "called party" clashes with the TCPA's text and context. But if someone calls his uncle and reaches a stranger to whom the number has been reassigned, it would be perfectly natural to say that he called his uncle but inadvertently reached somebody else—in other words, the uncle remains the "called party." Respondents also rely (Br. 54-55) on cases reading "called party" to mean "current subscriber" and the variable use of "called party" elsewhere in the TCPA. Those courts did not consider the First Amendment, nor did they benefit from the Commission's finding that callers cannot avoid reaching reassigned numbers. Indeed, the Commission's interpretation of "called party" as "current subscriber *or customary user*," Order ¶73 (JA1183-84), belies its insistence that the Order simply tracks past, consistent usage: no circuit court has adopted that interpretation, and no other TCPA provision suggests it.

Ultimately, this linguistic sparring is beside the point. Even if "expected recipient" were not the only possible meaning of "called party," the Commission acknowledged that the term is at least "ambiguous." *Id.* ¶74 (JA1184). The Commission therefore had a duty—"[e]ven under *Chevron*'s deferential framework"—to interpret it in a way that "produces a substantive effect that is compatible with the rest of the law." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014). Only Petitioners' reading does so; the Commission's renders

the statute's explicit protection for invited calls worthless by holding innocent callers liable for calls to reassigned numbers.

Respondents downplay the burdens imposed by this regime (Br. 18, 58), claiming that callers have ways to learn of many (though not all) reassignments and so to "limit their liability." Respondents dramatically exaggerate the effectiveness of such tools. For example, Respondents urge callers (Br. 58) to use "simple steps" such as "interactive opt-out mechanisms" and "training customer service agents to update records during … calls." But many of these steps are irrelevant to texting technologies, and callers who take them frequently reach reassigned numbers anyway—and face class-action lawsuits for doing so. *See* DIRECTV, LLC Comments 6-10 (JA521-25); Abercrombie & Fitch Co. and Hollister Co. Ex Parte 2 (JA982).

Similarly, Respondents trumpet (Br. 58) "commercial databases … that claim to detect more than 80 percent of all reassignments." A compliance-oriented caller cannot bank on 80 percent, and the Commission never endorses the accuracy of that claim anyway. Indeed, the service itself claims only to "mitigate" the risk: it does not include all numbers and, in light of holes in the underlying data, it can only estimate the likelihood that a given number is "associated with" a consumer. Neustar Ex Parte 1-2 (JA914-15); Wells Fargo Ex Parte 7-8 (JA663-64).

Respondents likewise speculate (Br. 58) that the Order might prompt the development of new tools to discover reassignments. Agencies cannot foist unworkable regimes upon regulated parties on the theory that somebody might come along and clean up their mess. Respondents provide no reason to believe that such solutions are likely anyway; companies have faced reassigned-number lawsuits for years, and no one has yet devised one. Respondents further insist (Br. 60) that callers can simply "employ[] live operators and mak[e] calls manually" to avoid liability. But the Commission's test for "capacity" turns on the equipment's "potential functionalities," not its actual use. Because so many modern phones qualify as ATDSs under that test, even manual calls or texts risk liability. In any event, given our vast, fast-paced economy, callers who need to reach millions of people cannot manually dial before each and every call, nor can those who send time-sensitive text alerts wait around for confirmation.

By holding callers strictly liable for their speech, the Order also violates callers' constitutional rights. *See* Pet. Br. 46-47. Respondents do not bother to address this concern. Instead, they appear to claim (Br. 59, 76) that callers will rarely reach reassigned numbers and that, even if they do, strict liability will not deter anyone from speaking. These unsupported claims are false. *See* Pet. Br. 44-45. More importantly, they are irrelevant. Holding callers strictly liable would violate the First Amendment even if they would be affected only infrequently.

- 25 -

Finally, Respondents insist (Br. 57) that callers must bear these burdens because, without strict liability, consumers might otherwise face a "barrage of telemarketing [calls]" from callers who "[do] not honor requests of new subscribers ... to cease calls to the [reassigned] number." Such callers, however, would remain liable under an expected-recipient interpretation of "called party," because once a consumer informs the caller of the reassignment, the caller necessarily expects to reach the new subscriber. Respondents' argument that "*someone* must bear[] the risk" of reassigned-number calls (Br. 60) fares no better. Callers cannot eliminate the risk of reaching reassigned numbers; indeed, they remain liable even where a recipient acts *deliberately* to increase the number of mistaken calls. Order ¶95 (JA1194-95). Recipients, by contrast, need only identify themselves to stop the calls. In any event, the First Amendment is clear: where one of two sides must shoulder a risk, "obvious[ly]" "the side whose constitutional rights are not at stake" must carry it. *Knox v. SEIU*, 132 S. Ct. 2277, 2295 (2012). The First Amendment protects speakers from strict liability even when they destroy reputations. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974). It surely protects them when they unintentionally make someone's phone ring.

### B.    The One-Call Rule Cannot Salvage The Order's Interpretation Of "Called Party"

In the end, the Commission *agreed* that its interpretation of "called party" would, standing alone, conflict with the statute and impose unfair liability on callers. "[T]he term 'prior express consent' requires that the caller have either [actual or constructive knowledge]" of the reassignment, Order ¶82 n.290 (JA1187), and it would be "unworkable" to hold callers "liable for every call made after reassignment," *id.* ¶88 (JA1192). Accordingly, the Commission gave callers one free call to a reassigned number "as an opportunity for the caller to obtain constructive or actual knowledge of the reassignment." *Id.* ¶82 (JA1187-88). Whatever happens on that call, callers are liable for subsequent calls to reassigned numbers because they are deemed to have "constructive knowledge" of the reassignment. *Id.* ¶91 (JA1193).

But calls frequently go unanswered, texts unreturned—generally for reasons that have nothing to do with reassignment. No doubt a free call will occasionally unearth a reassignment. (Broken clocks and all that.) But that hardly means the Commission has provided what it promised: a "*reasonable* opportunity ... to learn of the reassignment." *Id.* ¶90 (JA1192) (emphasis added); *see id.* ¶82 (JA1187-88) (an opportunity "to obtain constructive or actual knowledge of the reassignment").

Respondents appear to concede as much. They admit (Br. 18) that the one free call does not guarantee "actual notice," and they refuse to defend (or even

- 27 -

mention) the Commission's absurd conclusion that one call provides constructive knowledge to the caller, its subsidiaries, and its affiliates. Instead, Respondents claim (Br. 61) that the Commission never had the goal of "protect[ing] callers from all risk of liability." That, however, is not what the Order says. To be sure, the Commission purported to "balance" the interests of callers and those they mistakenly reach, and it refused to require "actual knowledge" before holding a caller liable. Order ¶88 (JA1192). But it stated—over and again—that callers must "have an opportunity to take *reasonable* steps to discover reassignments and cease ... calling *before liability attaches.*" *Id.* ¶89 (JA1192) (emphasis added); *see also id.* ¶¶82 n.290, 88, 90-92 (JA1187, 1192-93). That is what the one-call rule concededly fails to provide. Indeed, the rule's "constructive knowledge" framework *might* even harm *consumers* if callers, in an attempt to truly mitigate liability, stop making any future calls—even to consenting consumers whose numbers have not in fact been reassigned—once one call goes unanswered.

Perhaps realizing the capriciousness of the rule, Respondents further suggest (Br. 60) that "[n]othing in the Commission's interpretation of 'called party' depends" on it. But the Order expressly tied the one-call rule to the "key statutory term 'called party.'" Order ¶92 (JA1193). It even admitted that its interpretation would be "unworkable" without the exception, *id.* ¶88 (JA1192), because callers "need ... a *reasonable* opportunity to discover a reassignment," *id.* ¶92 (JA1193)

(emphasis added). Since one part of the agency's interpretation of these terms is invalid, "the entire definition ... must fall." *Addison v. Holly Hill Fruit Prods.*, 322 U.S. 607, 618 (1944). At the least, there is "substantial doubt" that the Commission would have adopted its interpretation of "called party" standing alone, making severance inappropriate. *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1447 (D.C. Cir. 1994).

## III.  THE COMMISSION'S TREATMENT OF REVOCATION OF CONSENT IS UNLAWFUL

An agency's position is arbitrary and capricious if it makes compliance impracticable, *see Almay, Inc. v. Califano*, 569 F.2d 674, 682 (D.C. Cir. 1977), or imposes disproportionate burdens, *see Michigan v. EPA*, 135 S. Ct. 2699, 2709 (2015). The Commission's revocation-of-consent regime does both. By refusing to establish (or allow callers to establish) standardized revocation procedures, the Commission made it all but impossible for callers to process revocations—thereby encouraging them to stop calls altogether, even to those who continue to consent—while offering no additional protection to consumers.[6]

---

[6] Petitioners argued (Pet. Br. 55, 61) that the Commission apparently prohibited parties from agreeing upon a means of revocation. The Court should take Respondents at their word (Br. 64 n.16) that the Order "d[oes] not address" that issue and hold that private contracts governing revocation remain intact.

The Commission again downplays these burdens. It insists (Br. 66) that callers can have "live operators" sift through all the communications that they receive in order to sniff out attempted revocations. But speakers—schools, utilities, charities, and businesses—cannot hire "live operators" to review every response. The point of these communications, after all, is to provide quick information to those who request it.

Respondents further contend (Br. 66) that callers will be able to comply because they need only honor "reasonable" requests, a "familiar concept in the law." Respondents miss the point. The *cumulative* burden of devising means to honor one recipient's use of one procedure (say, speaking to a third-party vendor working with the caller), a second recipient's use of another, and a third recipient's use of yet another quickly becomes unmanageable, even if each might be deemed reasonable in isolation. Respondents' related, unsupported contention (Br. 67) that recipients are unlikely to use unusual revocation methods is false. *Cf.* Br. of *Amicus* Commc'ns Innovators 17-20 (describing the lengths to which plaintiffs' lawyers go in TCPA litigation). Indeed, if the Commission truly believed it, it would not have required callers to accept non-standard revocations in the first place.

Tellingly, the Commission never claims that these burdens translate into significant consumer benefits. Quite the contrary. The Commission *itself* dictated

the "exclusive means by which consumers may opt out" of banking and healthcare calls. Order ¶¶138, 147 (JA1210-11, 1214-15). Would it do that if consumers benefit—enough to justify the significant costs and threat of liability to callers—from the ability to use other, unspecified-but-"reasonable" means?

Unable to point to any material harm to consumers from standardized procedures, Respondents assert (Br. 67) that consumers must be free to revoke in any reasonable way because the Commission could not foresee "the infinite variety of conditions which [consumers] must face." Again, that inability did not stop the Commission from establishing standardized revocation procedures for banking and healthcare calls, nor Congress from prescribing specific revocation procedures in the FDCPA. And even if the Commission lacks such foresight, callers do not: they regularly interact with those whom they contact and know well what their members, customers, and clients need.

### CONCLUSION

The petitions for review should be granted, and the challenged provisions of the Order vacated.

Dated:  February 24, 2016

Respectfully submitted,

/s/ Shay Dvoretzky
Shay Dvoretzky
Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone:  (202) 879-3939
Email: sdvoretzky@jonesday.com

Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500

*Counsel for Petitioners Sirius XM Radio
Inc. and Professional Association for
Customer Engagement, Inc.*

Kate Comerford Todd
Steven P. Lehotsky
Warren Postman
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

Michele Shuster
MAC MURRAY, PETERSEN & SHUSTER
LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054
Telephone: (614) 939-9955

*Counsel for Petitioner the Chamber
of Commerce of the United States
of America*

*Counsel for Petitioner Professional
Association for Customer
Engagement, Inc.*

Brian Melendez
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Telephone: (612) 486-1589

Tonia Ouellette Klausner
Keith E. Eggleton
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7706

*Counsel for Petitioner ACA
International*

*Counsel for Petitioners salesforce.com,
inc. and ExactTarget, Inc.*

Monica S. Desai
Amy L. Brown
Jonathan Jacob Nadler
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000

*Counsel for Petitioner Consumer
Bankers Association*

Christopher J. Wright
Jennifer P. Bagg
Elizabeth Austin Bonner
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300

*Counsel for Petitioner Vibes Media,
LLC*

Robert A. Long
Yaron Dori
Michael Beder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Petitioner Portfolio
Recovery Associates, LLC*

## <u>CIRCUIT RULE 32(a)(2) ATTESTATION</u>

In accordance with D.C. Circuit Rule 32(a)(2), I hereby attest that all other parties on whose behalf this brief is filed consent to its filing.


Dated:  February 24, 2016                    /s/ Shay Dvoretzky
                                              Shay Dvoretzky

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's Order of October 13, 2015, because it contains 6,948 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1), as determined by the word-counting feature of Microsoft Word.

Dated:  February 24, 2016                     /s/ Shay Dvoretzky
                                                                    Shay Dvoretzky

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2016, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will send notification of the filing to all parties or their counsel of record.

/s/ Shay Dvoretzky
Shay Dvoretzky