1   Mark E. Ellis - 127159
    Anthony P. J. Valenti - 284542
2   ELLIS LAW GROUP LLP
    1425 River Park Drive, Suite 400
3   Sacramento, CA  95815
    Tel: (916) 283-8820
4   Fax: (916) 283-8821
    mellis@ellislawgrp.com
5   avalenti@ellislawgrp.com

6   Attorneys for Defendant RASH CURTIS & ASSOCIATES

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  SANDRA McMILLION, JESSICA ADEKOYA,          Case No.:  4:16-cv-03396-YGR JSC
    AND IGNACIO PEREZ, on Behalf of
12  Themselves and all Others Similarly Situated,   **DEFENDANT RASH CURTIS &
                                                    ASSOCIATES' MOTION FOR
13           Plaintiffs,                            RECONSIDERATION OF MOTION FOR
                                                    SUMMARY JUDGMENT IN LIGHT OF** *ACA
14  v.                                              INTERNATIONAL V. FEDERAL
                                                    COMMUNICATIONS COMMISSION*
15  RASH CURTIS & ASSOCIATES,
                                                    Date:   May 8, 2018
16           Defendant.                             Time:   2:00 P.M.
                                                    Dept:   Courtroom 1
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

NOTICE OF MOTION ..................................................................................................... 1

REQUEST FOR RELIEF .................................................................................................. 1

I.    AUTHORITY ............................................................................................................ 2

II.   THE COURT'S SUMMARY JUDGMENT ORDER ................................................ 2

    A.  Plaintiffs' Argued, And The Court Found, Rash Curtis' Dialers Constituted ATDSs Because They Are Predictive Dialers. .................................................. 3

    B.  The Court Found Rash Curtis is Liable for Four Phone Calls to Ms. McMillion. .................. 5

    C.  The Court Found Rash Curtis is Liable for Two Phone Calls to Ms. Adekoya. ...................... 5

    D.  The Court Found Rash Curtis Never Possessed Prior Express Consent to Call Mr. Perez. .... 5

    E.  The Court Found Rash Curtis Had No Liability under the FDCPA. .......................... 6

    F.  The Court Found Rash Curtis Had No Liability to Mr. Perez Under the Rosenthal Act........ 6

III.  ARGUMENT ............................................................................................................ 6

    A.  Rash Curtis Has No TCPA Liability to Any Plaintiff Because It Did Not Use an ATDS and Did Not Leave Any Pre-Recorded or Artificial Messages. ............................... 6

        1.  Rash Curtis' Dialers Do Not Constitute ATDSs Because They Do Not Have the Capacity to Store or Produce Phone Numbers Using a Random or Sequential Number Generator. ......................................................................... 6

            a.  *ACA International* Set Aside the FCC's Rulings Establishing Predictive Dialers as ATDSs. ............................................................................... 6

            b.  The Plain Language of the TCPA Requires an ATDS Have the Capacity to Store or Produce Phone Numbers Using a Random or Sequential Number Generator. ................................................................................... 11

            c.  Rash Curtis' Dialers Do Not Have the Capacity to Store or Produce Telephone Numbers Using a Random or Sequential Number Generator. ............... 12

        2.  Rash Curtis Did Not Leave Pre-Recorded or Artificial Voice Messages on Any of the Plaintiffs' Cell Phones. ........................................................... 13

            a.  Rash Curtis Did Not Use an Artificial or Prerecorded Voice During Any of the Calls Made Without the Plaintiffs' Prior Express Consent. ..................... 14

               i.  The Four Remaining Phone Calls to Ms. McMillion. ...................... 14

                    (1)  The February 16, 2016 Call: ........................................ 14

                    (2)  The February 17, 2016 Call: ........................................ 14

                    (3)  The First February 25, 2017 Call: .................................. 15

                    (4)  The Second February 25, 2017 Call: .............................. 15

                ii.  The Two Remaining Calls to Ms. Adekoya: ................................. 15

- i -

(1)   The April 27, 2016 Call: ............................................................... 16

(2)   The April 28, 2016 Call: ............................................................... 16

iii.  The Calls to Mr. Perez. .................................................................. 17

B.   Rash Curtis Separately Has No TCPA Liability for Any Calls to Mr. Perez Because It Immediately Stopped Calling Upon First Learning the Number Had Been Ported to Mr. Perez. 17

1.   *ACA International* Set Aside the FCC's Rulings Regarding Reassigned Numbers. ............ 17

2.   Rash Curtis Reasonably Relied Upon Mr. Reynoso's Prior Express Consent. ..................... 21

IV.   CONCLUSION .................................................................................. 23

- ii -

# TABLE OF AUTHORITIES

PAGE

## Cases

*ACA International v. Federal Communications Commission,* 2018 WL 1352922
   (D.C. Cir. March 16, 2018)..........................................1, 2, 6, 7, 8, 9, 10, 11, 13, 17, 18, 19, 20, 21, 22

*All Hawaii Tours, Corp. v. Polynesian Cultural Center,* 116 F.R.D. 645 (D. Haw. 1987).....................2

*American Civil Liberties Union of Kentucky v. McCreary County, Ky.,* 607 F.3d 439
   (6th Cir. 2010).............................................................................................................................2

*Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837 (1984) ................................7

*Chyba v. First Financial Asset Management, Inc.,* 2014 WL 1744136
   (S.D. Cal. April 30, 2014)...............................................................................................22, 23

*Marks v. Crunch San Diego, LLC,* Case No. 14-56834 (9th Cir. December 14, 2016) .........................25

*Meyer v. Portfolio Recovery Associates, LLC,* 707 F.3d 1036 (9th Cir. 2012) ......................................11

*School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.,* 5 F.3d 1255 (9th Cir. 1993) ...................2

*Watanabe v. Home Depot USA, Inc.,* 2003 WL 24272634 (C.D. Cal. August 26, 2003) .......................2

## Statutes

47 U.S.C. § 227(a)(1)...................................................................................................................3, 13

47 U.S.C. § 227(b)(1)(A)...................................................................................................................13

47 U.S.C. § 227(b)(1)(A)(iii)............................................................................................................11

## Other Authorities

O'Connell, *Cal. Prac. Guide: Civ. Proc. Before Trial* § 14:361.1 (Rutter Group 2018) .......................2

**NOTICE OF MOTION**

TO THE PLAINTIFFS AND THEIR COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN that on May 8, 2018 at 2:00 p.m., or as soon thereafter as counsel may be heard, in Department 1, 4th Floor, of the above-entitled Court, located at 1301 Clay Street, Oakland, California, Defendant Rash Curtis & Associates will, and hereby does, move the Court to reconsider its January 30, 2018 order regarding the parties' cross-motions for summary judgment in light of the recent outcome of *ACA International v. Federal Communications Commission*, 2018 WL 1352922 (D.C. Cir. March 16, 2018).

This motion is based upon this Notice of Motion and Memorandum of Points and Authorities, the Declarations of Bob Keith and Mark E. Ellis (and the exhibits attached thereto), all pleadings and papers on file in this action (including the parties' previous cross-motions for summary judgment and all supporting documentation), and upon such other matters or evidence as may be presented to the Court at the time of the hearing.

**REQUEST FOR RELIEF**

Rash Curtis hereby requests that this Court issue an order:

1.      Denying Plaintiffs' Motion for Partial Summary Judgment on the issue of whether Rash Curtis' three dialers (Global Connect, TCN, and DAKCS/VIC) constitute ATDSs;

2.      Granting Partial Summary Judgment to Rash Curtis on the issue of whether Rash Curtis' three dialers do not constitute ATDSs because, although they are "predictive dialers," they do not have the capacity to store or produce telephone numbers using a random or sequential number generator, and to dial such numbers (without human intervention);

3.      Granting Partial Summary Judgment to Rash Curtis on the issue of TCPA liability based on the fact that none of the calls which were placed without prior express consent were done so using an ATDS or a pre-recorded or artificial voice; and

4.      Granting Rash Curtis' Motion for Partial Summary Judgment as to Mr. Perez's TCPA claim on the basis that, in the absence of actual knowledge that the cell phone number ending in 5193 had been reassigned to Mr. Perez, Rash Curtis was acting in "reasonable reliance" on the prior express consent provided by the cell phone number's previous owner, Mr. Reynoso.

- 1 -

## I.     AUTHORITY

A district court may reconsider its grant or denial of summary judgment under either Federal Rule of Civil Procedure 59(e) (motion to alter or amend a judgment) or Rule 60(b) (relief from judgment). *School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993); *American Civil Liberties Union of Kentucky v. McCreary County, Ky.,* 607 F.3d 439, 450 (6th Cir. 2010) and O'Connell, *Cal. Prac. Guide: Civ. Proc. Before Trial* § 14:361.1 (Rutter Group 2018).

Reconsideration is appropriate when, as here, there is an intervening change in controlling law. *Watanabe v. Home Depot USA, Inc.*, 2003 WL 24272634, at *1 (C.D. Cal. August 26, 2003) (*citing School Dist. No. 1J, supra,* 5 F.3d at 1263); *American Civil Liberties Union, supra,* 607 F.3d at 450; *All Hawaii Tours, Corp. v. Polynesian Cultural Center,* 116 F.R.D. 645, 648 (D. Haw. 1987); O'Connell, *supra,* at § 14:362; Civil L. R. 7-9(b).

Here, the intervening change in controlling law occurred on March 16, 2018, when the United States Court of Appeals, District of Columbia Circuit, issued its highly-anticipated decision in *ACA International v. Federal Communications Commission,* ____ F.3d ____, 2018 WL 1352922 (D.C. Cir. March 16, 2018).

The Court of Appeals "set aside the Commission's explanation of which devices qualify as an ATDS, as well as its understanding of when a caller violates the Act by calling a wireless number held by a consenting party but reassigned to a person who has not given consent." *Id.* at * 4.

Rash Curtis submits any possible TCPA liability here was eliminated by the holdings in *ACA International.* Reconsideration of the Court's February 2, 2018, order regarding the parties' cross-motions for summary judgment is thus warranted (Dkt. No. 167) ("MSJ Order").

## II.     THE COURT'S SUMMARY JUDGMENT ORDER

The parties filed their cross-motions for summary judgment on December 11, 2017. (*See* Dkt. Nos. 139-140.) Oppositions to the cross-motions were filed on January 8, 2018 (*see* Dkt. Nos. 151-152), and replies were filed on January 15, 2018. (*See* Dkt. Nos. 157-158.) The cross- motions came on for regular hearing on January 30, 2018. (*See* Civil Minutes, Dkt. No. 164.) On February 2, 2018, this Court issued its Order Re: Cross Motions For Summary Judgment. (*See* Dkt. No. 167.)

**A.    Plaintiffs' Argued, And The Court Found, Rash Curtis' Dialers Constituted ATDSs Because They Are Predictive Dialers.**

Plaintiffs sought partial summary judgment on the issue of whether Rash Curtis' Global Connect, TCN, and DAKCS/VIC dialers constituted "automatic telephone dialing systems", or "ATDSs" within the meaning of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227(a)(1). (*See* MSJ Order, Dkt. No. 167, p. 2:2-5.)

Notably, Plaintiffs did <u>not</u> argue that the dialers were ATDSs because they were able to "store or produce telephone numbers to be called, <u>using a random or sequential number generator</u>, and to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added). Instead, Plaintiffs proffered the argument that the dialers were ATDSs simply because they possessed "predictive dialing" capabilities which allowed them to operate without human intervention. (*See, e.g.,* Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 139, pp. 6:7-11:2; Plaintiffs' Supporting Separate Statement, Dkt. No. 139-1, Issue Nos. 1-3.)

Conceding that its dialers had "predictive dialing" capabilities, Rash Curtis nevertheless argued that its dialers were ***not*** ATDSs because they could ***not*** operate without human intervention and, more importantly, they did ***not*** possess "the capacity store or produce telephone numbers using a random or sequential number generator," - a clear and unambiguous requirement imposed by the plain language of the TCPA. 47 U.S.C. § 227(a)(1); *see, e.g.,* Rash Curtis' Opposition to Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 152, pp. 1:3-18, 16:25-20:7, 23:23-25; Rash Curtis' Response to Plaintiffs' Supporting Separate Statement, Dkt. No. 152-7, Issue Nos. 1-3; p, Dkt. No. 152-3, ¶¶ 32-33; Declaration of Chris Paff, Dkt. No. 152-4, ¶ 2; Declaration of Dan Correa, Dkt. No. 152-5, ¶ 2; Declaration of Nick Keith, Dkt. No. 152-6, ¶ 2.)

Relying heavily upon the FCC's various declaratory rulings and orders, this Court granted Plaintiffs' motion on this point, finding that Rash Curtis' dialers were ATDSs within the meaning of the TCPA, <u>solely because of their "predictive dialing" capabilities</u>. (MSJ Order, Dkt. No. 167, p. 2:16-17.) The Court explained its reasoning:

> **The TCPA defines ATDSs as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, <u>using a random or sequential number generator</u>; and (B) to dial such**

- 3 -

numbers." 47 U.S.C. § 227(a)(1). **Predictive Dialers, "unlike prior versions of automated dialing technology [that] created and dialed 10-digit phone numbers arbitrarily . . . [employ] a stored database of numbers** which could then be dialed at a rate to ensure that when a consumer answered the phone, a sales person would be available to take the call."** *Hernandez v. Collection Bureau of Am., Ltd.*, 2014 WL 4922379, at *2 (C.D. Cal. 2014) (quoting 43 F.C.C. 2003, 1953 WL 83579, at 14092 ("2003 Federal Communication Commission ('FCC') Order")). The FCC and several district courts have "recognized that[,] technological advances aside, 'the basic function of such equipment . . . has not changed – the capacity to dial numbers without human intervention.'" *Id.*; *see Warnick v. Dish Network LLC*, 2014 WL 12537066, at *12 (D. Col. 2014); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011) (finding that even though the dialer at issue "cannot generate and dial random or sequential numbers, it is still an 'automatic telephone dialing system,'" because the dialer "automatically dials numbers stored in [a database of numbers] routes answered calls to available collectors"). **"Therefore, because predictive dialers had the capacity to dial numbers without human intervention, the Commission concluded that they fell within the statutory definition of automatic telephone dialing system and the intent of Congress."** *Id.*; *see also Warnick*, 2014 WL 12537066, at *12; *Griffith*, 838 F. Supp. 2d at 727. In 2008, the FCC issued a declaratory ruling affirming the 2003 FCC Order. *See id.* (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Dkt. No. 92-90, 23 FCC Rcd. 559 (2008) ("2008 FCC Ruling")). **Interpreting the 2008 FCC Ruling, the Ninth Circuit held in *Meyer* that "predictive dialers fall squarely within the FCC's definition of 'automatic telephone dialing system.'"** *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

MSJ Order, Dkt. No. 167, at pp. 6:8-7:3 (emphasis added).

This Court concluded:

> The record reflects that defendants used three dialers during the class period, namely (i) DAKCS/VIC, (ii) Global Connect, and (iii) TCN. **Plaintiffs offer the testimony of Rash Curtis executives who state DAKCS/VIC and TCN are predictive dialers.** (Dkt. No. 139-2, Declaration of Yeremy Krivoshey ("Krivoshey Decl."), Ex. 1, Deposition of Daniel Correa ("Correa Dep.") at 23:10-13 (DAKCS/VIC dialer), 30:9-21 (TCN dialer); Ex. 2, Deposition of Nick Keith ("Keith Dep.") at 26:22-27:11 (DAKCS/VIC dialer).) **With regard to Global Connect, plaintiffs proffer that Global Connect offers "predictive" functionality and enables defendant to make ten simultaneous calls per agent to reach "thousands of contacts within minutes."** (Dkt. No. 46-4, Declaration of Randall A. Snyder ¶ 39, Ex. C; Krivoshey Decl., Ex. 9.) **Further, defendant's advertising materials highlight that**

- 4 -

> **Rash Curtis uses "predictive dialers" to increase productivity.** (Krivoshey Decl. Ex. 9 at 8; Ex. 12 at 18.) <u>**Accordingly, defendant's Dialers "fall squarely within the FCC's definition of 'automatic telephone dialing system.'"**</u> *Meyer*, 707 F.3d at 1043.

MSJ Order, Dkt. No. 167, at p.7:4-15 (emphasis added).

**B.    The Court Found Rash Curtis is Liable for Four Phone Calls to Ms. McMillion.**

The parties also cross-moved for partial summary judgment on whether Rash Curtis possessed the Plaintiffs' prior express consent to call her cell phone.  (MSJ Order, Dkt. No. 167, p. 2:5.)  The Court found Rash Curtis did not possess Ms. McMillion's prior express consent for any calls placed ***after*** February 2, 2016, the date on which she first revoked her consent.  (*Id.* at pp. 2:18-19; 8:26-10:9.)

A total of four phone calls were made to Ms. McMillion ***after*** February 2, 2016.  The first two calls were made on February 16, 2016, and February 17, 2016.  The last two calls were both made on January 25, 2017.  (*See, e.g.,* Plaintiffs' Supporting Separate Statement, Dkt. No. 139-1, Issue No. 7, Fact Nos. 33-35; *see also*, MSJ Order, Dkt. No. 167, p. 9:9-10.)

**C.    The Court Found Rash Curtis is Liable for Two Phone Calls to Ms. Adekoya.**

The Court likewise found Rash Curtis did <u>not</u> possess Ms. Adekoya's prior express consent for any calls placed ***after*** April 18, 2016, the date on which she first revoked her consent.  (MSJ Order Dkt. No. 167, pp. 2:20-22; 10:10-11:13.)

Two phone calls were made to Ms. Adekoya ***after*** April 18, 2016: the first was made on April 27, 2016, and the second was made on April 28, 2016.  (*See, e.g.,* Plaintiffs' Supporting Separate Statement, Dkt. No. 139-1, Issue No. 5, Fact No. 29; *see also* MSJ Order, Dkt. No. 167, p. 11:2-3.)

**D.    The Court Found Rash Curtis Never Possessed Prior Express Consent to Call Mr. Perez.**

The Court held that Rash Curtis did not possess ***Mr. Perez's*** prior express consent for any of the calls placed to his cell phone number ending in 5193.  (MSJ Order, Dkt. No. 167, pp. 3:1; 11:14-12:13.)  The Court found that although non-party Daniel Reynoso voluntarily provided his cell phone number ending in 5193 to Sutter General Hospital, which, in turn, provided that number to Rash Curtis when it referred Mr. Reynoso's account for collection, that consent did not follow the reassignment of the cell phone number to Mr. Perez.  (MSJ Order, Dkt. No. 167, p. 11:16-19.)

Plaintiffs' Complaint identified just four phone calls made to Mr. Perez, the last of which

1   occurred on June 7, 2016.  (Rash Curtis' **Exhibit 1** in Opposition to Plaintiffs' Motion for Partial

2   Summary Judgment, Dkt. No. 152-9, p. 4, ¶ 7.)  It was during this June 7, 2016 phone call that Rash

3   Curtis first spoke with Mr. Perez and learned that he now possessed the cell phone number ending in

4   5193.  (Rash Curtis' **Exhibit 15** in Opposition to Plaintiffs' Motion for Partial Summary Judgment,

5   Dkt. No. 152-9, p. RCA 000271 (June 7, 2016 entry); Declaration of Bob Keith, Dkt. No. 152-3, ¶ 26;

6   Rash Curtis' **Exhibit 17** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No.

7   152-10, Excerpts from Deposition of Ignacio Perez, at pp. 38:6-39:19.)

8   **E.      The Court Found Rash Curtis Had No Liability under the FDCPA.**

9           The Court granted Rash Curtis' motion for partial summary judgment on each of the Plaintiffs'

10  individual claims under the Fair Debt Collection Practices Act. (MSJ Order, Dkt. No. 167, pp. 3:2,

11  13:1-15:17.)  In short, there are no FDCPA claims left in this case.

12  **F.      The Court Found Rash Curtis Had No Liability to Mr. Perez Under the Rosenthal Act.**

13          The Court also granted Rash Curtis' motion for partial summary judgment on Mr. Perez's

14  claims under California's Rosenthal Fair Debt Collection Practices Act, finding that Mr. Perez failed to

15  make a sufficient showing that Rash Curtis' "actual contact" occurred "with such frequency as to be

16  unreasonable and to constitute harassment to the debtor under the circumstances."  (MSJ Order, Dkt.

17  No. 167, pp. 3:3-4; 16:1-5.)

18          The Court denied Rash Curtis' motion as to Ms. McMillion's and Ms. Adekoya's Rosenthal

19  Act claims, finding that triable issues of fact existed.  (*Id.* at pp. 3:4-5; 16:6-17:8.)

20                                        **III.     ARGUMENT**

21  **A.      Rash Curtis Has No TCPA Liability to Any Plaintiff Because It Did Not Use an ATDS
            and Did Not Leave Any Pre-Recorded or Artificial Messages.**

22

23          **1.      Rash Curtis' Dialers Do Not Constitute ATDSs Because They Do Not Have the
                    Capacity to Store or Produce Phone Numbers Using a Random or Sequential
                    Number Generator.**

24

25                  **a.      *ACA International* Set Aside the FCC's Rulings Establishing Predictive
                            Dialers as ATDSs.**

26

27          In *ACA International, supra,* the D.C. Circuit Court of Appeals began by addressing "the

28  Commission's effort to clarify which sorts of calling equipment qualify as an ATDS so as to fall

- 6 -

1   subject to the general prohibition against making calls using such a device without consent." *ACA*

2   *Int'l, supra,* 2018 WL 1352922, at *4.

3       The court explained the scope of its review included more than just the FCC's 2015 order:

4           **As a threshold matter, the Commission maintains that the court**
            **lacks jurisdiction to entertain petitioners' challenge concerning the**
5           **functions a device must be able to perform. The agency reasons that**
            **the issue was resolved in prior agency orders—specifically,**
6           **declaratory rulings in 2003 and 2008 concluding that the statutory**
            **definition of an ATDS includes "predictive dialers," dialing**
7           **equipment that can make use of algorithms to "assist[ ]**
            **telemarketers in predicting when a sales agent will be available to**
8           **take calls." 2015 Declaratory Ruling, 30 FCC Rcd. at 7972 ¶ 10 n.39;**
            *see also* In re Rules and Regulations Implementing the Telephone
9           Consumer Protection Act of 1991 (2008 Declaratory Ruling), 23 FCC
            Rcd. 559 (2008); 2003 Order, 18 FCC Rcd. 14,014. **According to the**
10          **Commission, because there was no timely appeal from those**
            **previous orders, it is too late now to raise a challenge by seeking**
11          **review of a more recent declaratory ruling that essentially ratifies**
            **the previous ones. We disagree.**
12

13          **While the Commission's latest ruling purports to reaffirm the prior**
            **orders, that does not shield the agency's pertinent pronouncements**
14          **from review.** <u>**The agency's prior rulings left significant uncertainty**</u>
            <u>**about the precise functions an autodialer must have the capacity to**</u>
15          <u>**perform.**</u> **Petitioners covered their bases by filing petitions for both a**
            **declaratory ruling and a rulemaking concerning that issue and**
16          **related ones.** *See, e.g.,* Prof'l Ass'n for Customer Engagement, Inc. Pet.
            3-4; ACA Int'l Pet. 6; GroupMe, Inc. Pet. 3; Glide Talk, Ltd. Pet. 13. **In**
17          **response, the Commission issued a declaratory ruling that**
            **purported to "provid[e] clarification on the definition of**
18          **'autodialer,'" and denied the petitions for rulemaking on the issue.**
            2015 Declaratory Ruling, 30 FCC Rcd. at 8039 ¶ 165 & n.552. **The**
19          **ruling is thus reviewable on both grounds.** *See* 5 U.S.C. § 554(e);
            *Biggerstaff v. FCC,* 511 F.3d 178, 184-85 (D.C. Cir. 2007).
20

21

22

23   *ACA Int'l, supra,* 2018 WL 1352922, at *10 (emphasis added).

24       Under the Administrative Procedures Act, the Court of Appeals reviewed the Commission's

25   challenged orders to determine whether they were "arbitrary, capricious, an abuse of discretion, or

26   otherwise not in accordance with law." *ACA Int'l, supra,* 2018 WL 1352992, at *4 (*quoting* 5 U.S.C. §

27   706(2) *and citing Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 842-843 (1984)).

28       With this standard of review in mind, the court shifted its focus to the statute's plain language:

- 7 -

The statutory definition says that a device constitutes an ATDS if it has the capacity to perform both of two enumerated functions: "to store or produce telephone numbers to be called, <u>using a random or sequential number generator</u>"; and "to dial such numbers." 47 U.S.C. § 227(a)(1)(A)-(B). The role of the phrase, "using a random or sequential number generator," has generated substantial questions over the years. The Commission has sought to address those questions in previous orders and did so again in the 2015 Declaratory Ruling we consider here.

<u>The Commission's most recent effort falls short of reasoned decisionmaking in "offer[ing] no meaningful guidance" to affected parties in material respects on whether their equipment is subject to the statute's autodialer restrictions.</u> *Postal Regulatory Comm'n*, 785 F.3d at 754. A basic question raised by the statutory definition is whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed. Or is it enough if the device can call from a database of telephone numbers generated elsewhere? The Commission's ruling appears to be of two minds on the issue.

<u>In certain respects, the order conveys that equipment needs to have the ability to generate random or sequential numbers that it can then dial. The order twice states that, to "meet[ ] the TCPA's definition of 'autodialer,'" the equipment in question must have the capacity to "dial random or sequential numbers."</u> 2015 Declaratory Ruling, 30 FCC Rcd. at 7972 ¶ 10; *see also id.* at 7974 ¶ 15. **And it is clear from context that the order treats the ability to "dial random or sequential numbers" as the ability to *generate* and then dial "random or sequential numbers."**

*ACA Int'l, supra,* 2018 WL 1352922, at \*10-11 (emphasis added).

The court went on to distinguish dialing equipment which actually generated numbers using a random or sequential number generator from that which simply dialed numbers from a calling list:

To see why, it is helpful to understand that the ruling distinguishes between use of equipment to "dial random or sequential numbers" and use of equipment to "call[ ] a set list of consumers." *Id.* at 7972 ¶ 10. Anytime phone numbers are dialed from a set list, the database of numbers must be called in *some* order—either in a random or some other sequence. As a result, the ruling's reference to "dialing random or sequential numbers" cannot simply mean dialing from a set list of numbers in random or other sequential order: if that were so, there would be no difference between "dialing random or sequential numbers" and "dialing a set list of numbers," even though the ruling draws a

-8-

divide between the two. *See id.* at 7973 ¶¶ 13, 14. **It follows that the ruling's reference to "dialing random or sequential numbers" means generating those numbers and then dialing them.**

The Commission's prior declaratory rulings reinforce that understanding. **In its 2003 ruling addressing predictive dialers, the Commission observed that, "[i]n the past, telemarketers may have used dialing equipment to *create and dial* 10-digit telephone numbers arbitrarily."** 2003 Order, 18 FCC Rcd. at 14,092 ¶ 132 (emphasis added). **But the industry had "progressed to the point where" it had become "far more cost effective" instead to "us[e] lists of numbers."** *Id.* <u>**Again, the Commission suggested it saw a difference between calling from a list of numbers, on one hand, and "creating and dialing" a random or arbitrary list of numbers, on the other hand. Or as the Commission has elsewhere said, numbers that are "randomly or sequentially generated" differ from numbers that "come from a calling list."**</u>

*ACA Int'l, supra,* 2018 WL 1352922, at \*10-11 (emphasis added).

The court then addressed the FCC's inclusion of "predictive dialers" as ATDSs:

**While the 2015 ruling indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a competing view: that equipment can meet the statutory definition even if it lacks that capacity[... ]   By reaffirming that conclusion in its 2015 ruling, <u>the Commission supported the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set</u> of numbers). The 2015 ruling correspondingly expresses that "predictive dialers" can differ from other "dialers that utilize random or sequential numbers instead of a list of numbers."** 2015 Declaratory Ruling, 30 FCC Rcd. at 7973 ¶ 14.

So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? **The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). It might be permissible for the Commission to adopt either interpretation. <u>But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.</u>**

The choice between the interpretations is not without practical significance. Petitioners and various amici describe calling equipment that they wish to use to call set lists of cellular numbers without any

- 9 -

generation of random or sequential numbers. *See* ACA Int'l Reply Br. 21; Am. Bankers Ass'n Amicus Br. 29-30. **And at least some predictive dialers, as explained, <u>have no capacity to generate random or sequential numbers.</u>**

*ACA Int'l, supra,* 2018 WL 1352922, at *11-12 (emphasis added).

Finally, the court set aside the FCC's ruling on the grounds that it failed to satisfy the requirement of reasoned decisionmaking:

> The uncertainty in the 2015 ruling, moreover, does not stop with the question of whether a device must be able to generate random or sequential numbers to meet the statutory definition. **The ruling is also unclear about whether certain other referenced capabilities are necessary for a dialer to qualify as an ATDS.**
>
> [...]
>
> But the Commission nevertheless declined a request to "clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention." 2015 Declaratory Ruling, 30 FCC Rcd. at 7976 ¶ 20. **According to the Commission, then, the "basic function" of an autodialer is to dial numbers without human intervention, <u>but a device might still qualify as an autodialer even if it cannot dial numbers without human intervention.</u> Those side-by-side propositions are difficult to square.**
>
> **The Commission further said that another "basic function[ ]" of an ATDS is to "dial thousands of numbers in a short period of time."** *Id.* at 7975 ¶ 17. **But the ruling imparts no additional guidance concerning whether that is a necessary condition, a sufficient condition, a relevant condition even if neither necessary nor sufficient, or something else. Nor does it indicate what would qualify as a "short period of time." <u>Again, affected parties are left in a significant fog of uncertainty about how to determine if a device is an ATDS so as to bring into play the restrictions on unconsented calls.</u>**
>
> **In short, the Commission's ruling, in describing the functions <u>a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking</u>. The order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the "capacity" to perform the necessary functions. <u>We must therefore set aside the Commission's treatment of those matters.</u>**

1 | *ACA Int'l, supra,* 2018 WL 1352922, at *11-12 (emphasis added).

2 | In sum, by setting aside the Commission's rulings, the United States Court of Appeals removed

3 | "predictive dialers," as well as dialers which "operate without human intervention," from the list of

4 | telephone dialing equipment which constitute ATDSs.   (*See, e.g.,* MSJ Order, p. 7:20-22 ("*ACA*

5 | *International* concerns a related issue, namely whether the 2003 FCC Order and 2008 FCC Ruling

6 | which indicate that predictive dialers constitute ATDSs are unlawful on due process grounds and under

7 | the Administrative Procedure Act.").)

8 | As noted *ante*, however, this Court's finding that Rash Curtis' dialers were ATDSs was <u>based</u>

9 | <u>solely on their capability to "predictively" dial phone numbers "without human intervention."</u>  (MSJ

10 | Order, Dkt. No. 167, p. 2:16-17.)   Accordingly, reconsideration of this issue is appropriate.

11 | b.    **The Plain Language of the TCPA Requires an ATDS Have the Capacity to Store or Produce Phone Numbers Using a Random or Sequential Number Generator.**

12 |

13 | Parsing the language of the TCPA, the statute provides: "It shall be unlawful ... to make any

14 | call *(other than a call ... made with the prior express consent of the party called) using any*

15 | *automatic telephone dialing system or an artificial or prerecorded voice* ... to any telephone number

16 | assigned to a ... cellular telephone service, ... or any service for which the called party is charged for

17 | the call."  47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).

18 | In other words, "[t]he three elements of a TCPA claims are: (1) the defendant called a cellular

19 | telephone number; (2) *using an automatic telephone dialing system*; (3) without the called party's

20 | prior express consent."  *Meyer v. Portfolio Recovery Associates, LLC,* 707 F.3d 1036, 1043 (9th Cir.

21 | 2012) ("the clear language of the TCPA 'mandates that the focus must be on whether the equipment

22 | has the *capacity* 'to store or produce telephone numbers to be called, *using a random or sequential*

23 | *number generator.*'") (emphasis added).

24 | In the aftermath of *ACA International*, Plaintiffs now have the burden of establishing the *prima*

25 | *facie* element of the use of an ATDS without the luxury of relying on the "predictive dialing"

26 | capabilities of Rash Curtis' dialers.  *ACA Int'l, supra,* 2018 WL 1352992, at *10-12 (setting aside

27 | FCC's rulings on which functions qualify a device as an ATDS as unreasonable).  In other words, they

28 |

1    *must* show that each of Rash Curtis' dialers produces, that is, creates or generates, the telephone

2    numbers it calls *using a random or sequential number generator*.

    c.    **Rash Curtis' Dialers Do Not Have the Capacity to Store or Produce Telephone Numbers Using a Random or Sequential Number Generator.**

5        In opposition to Plaintiffs' motion, both of Rash Curtis' Executive Vice Presidents, Bob Keith

6    and Chris Paff, testified that:

> During the relevant time periods of the class, including during the collection communications made by Rash Curtis to Plaintiffs, Rash Curtis employed three different telephone dialing systems: (1) VIC; (2) Global Connect; and (3) TCN. **None of Rash Curtis' telephone dialing systems contain an active random or sequential number generator which can dial numbers.** Rather, these platforms only dial phone numbers from a pre-generated list compiled by an individual.

12    (Declaration of Bob Keith, Dkt. No. 152-3, ¶ 32 (emphasis added); Declaration of Chris Paff, Dkt. No.

13    152-4, ¶ 2 (emphasis added).)

14        The Plaintiffs' "star witness," Mr. Steven Kizer, admitted under oath that Rash Curtis' dialers

15    cannot store or produce telephone numbers, using a random of sequential number generator, and then

16    dial them:

> Q:    And with Global Connect do you know whether or not either the hardware or the software had an automated dialing system that either generated sequentially or randomly a number?  Do you know one way or the other.
>
> A:    I am going to tell you that my understanding of that system, **it did not generate a number.  Numbers had to be fed to it.**
>
> Q:    Right.  So your understanding –
>
> A:    Uh-huh.
>
> Q:    -- because I have read your deposition, and this is exactly what you testified, is that someone in management had to load a series of numbers from various accounts into the system and then it would dial.  The system itself would not generate the number, would it?
>
> A:    **No.  That is correct.  Management had to load the numbers in.**
>
> Q:    And, and, in fact, management would come up with how it was going to

- 12 -

1    fit a particular campaign on a particular day and that was all done by a
2    manager, it was not done by the computer system using an algorithm,
     was it?

3    A:    Correct.

4    (**Exhibit A**, Excerpts from Deposition Transcript of Steven Kizer, p. 91:2-92:1; *see also* **Exhibit B**,

5    Excerpts from Deposition Transcript of Steven Kizer, p. 270:12-19 (Rash Curtis' VIC dialer also had

6    to be "loaded with phone numbers").)

7         In light of the foregoing, Rash Curtis respectfully requests this Court deny Plaintiffs' motion

8    for partial summary judgment on the issue of whether Rash Curtis' dialers constitute ATDSs on the

9    basis that they do not possess the "capacity to store or produce telephone numbers to be called, using a

10   random or sequential number generator," as required by the plain language of the statute.  47 U.S.C. §

11   227(a)(1).[1]

12        **2.    Rash Curtis Did Not Leave Pre-Recorded or Artificial Voice Messages on Any of
               the Plaintiffs' Cell Phones.**

13

14        As this Court correctly noted, "even if the FCC's Orders are overturned, defendant could still

15   face liability if plaintiffs show that defendant made calls using prerecorded messages or artificial

16   voices which are not at issue in *ACA International*."  (MSJ Order, Dkt. No. 167, pp. 7:27-8:1.)

17        Indeed, the TCPA makes its unlawful to "make any call (other than a call made for emergency

18   purposes or made with the prior express consent of the called party) using any automatic telephone

19   dialing system *or an artificial or prerecorded voice*..." 47 U.S.C. § 227(b)(1)(A) (emphasis added).

20        Therefore, although Rash Curtis cannot be held liable for using a "predictive dialer" (*ACA Int'l*,

21   *supra*, 2018 WL 1352922, at *10-12), it may still be liable if it left an artificial or prerecorded voice

22   message during any of the calls for which it did not possess the called party's prior express consent.

23   47 U.S.C. § 227(b)(1)(A).  Rash Curtis' collection notes and call logs demonstrate it did not leave any

24   messages using an "artificial or pre-recorded voice." (Supplemental Declaration of Bob Keith, ¶¶ 3-9.)

---

25   [1] Rash Curtis notes it did not move for summary judgment on this issue.  However, at the time the
26   motions were filed, predictive dialers were still considered to be ATDSs under the FCC's relevant
     orders.  Now that predictive dialing technology is not, without more, enough to render dialing
27   equipment an ATDS, Rash Curtis submits this Court should either: (1) grant Rash Curtis partial
     summary judgment on this issue, or (2) grant Rash Curtis leave to file a second motion for summary
28   judgment on this issue.

1

       **a.**      **Rash Curtis Did Not Use an Artificial or Prerecorded Voice During Any of the Calls Made Without the Plaintiffs' Prior Express Consent**.

2

       **i.**      **The Four Remaining Phone Calls to Ms. McMillion.**

3

As noted, this Court previously held that Rash Curtis possessed Ms. McMillion's prior express

4

consent for all calls placed on or before February 2, 2016. (MSJ Order, pp. 2:18-19; 8:26-10:9.)  Thus,

5

the only remaining calls for which Rash Curtis faces potential liability occurred on February 16, 2016,

6

February 17, 2016, and January 25, 2017 (two calls).   (*See, e.g.,* Plaintiffs' Supporting Separate

7

Statement, Dkt. No. 139-1, Issue No. 7, Fact Nos. 33-35; *see also* MSJ Order, p. 9:9-10.)

8

Rash Curtis' collection notes and call logs conclusively demonstrate that no artificial or

9

prerecorded voice messages were left during any of these four calls.

10

       **(1)**      **The February 16, 2016 Call:**

11

Rash Curtis' collection notes for this entry provide:

12

       **"GC021616:09:25 4156320589-PHONE ANSWERD [SIC] NO LINKBACK"**

13

(Rash Curtis' **Exhibit 3** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No.

14

152-9, p. RCA 000227 (February 16, 2016 entry).)

15

The first two letters, "GC," mean the call was placed using Global Connect.  (Supplemental

16

Declaration of Bob Keith, ¶ 3.)  The next ten digits, "021616:09:25," mean the call was placed on

17

February 16, 2016 at 09:25 hours, or 9:25 a.m.  (*Id.*)  The next ten digits, "4156320589," mean the call

18

was placed to phone number (415) 632-0589.  (*Id.*)  The phrase "Phone Answered No Linkback"

19

means that either Ms. McMillion or her voicemail answered the call, but the Global Connect dialer did

20

not detect any live person on the other end, and therefore terminated the call **without** leaving a pre-

21

recorded or artificial voice message on her voicemail. (*Id.*)

22

       **(2)**      **The February 17, 2016 Call:**

23

Rash Curtis' collection notes for this entry read:

24

       **"GC021716:16:13 4156320589-PHONE ANSWERD [SIC] NO LINKBACK"**

25

(Rash Curtis' **Exhibit 3** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No.

26

152-9, p. RCA 000227 (February 17, 2016 entry).)

27

The first two letters, "GC," mean the call was placed using Global Connect.  (Supplemental

28

- 14 -

Declaration of Bob Keith, ¶ 4.)   The next ten digits, "021716:16:13," mean the call was placed on February 16, 2016 at 16:13 hours, or 4:13 p.m.   (*Id.*)   The next ten digits, "4156320589," mean the call was placed to phone number (415) 632-0589.   (*Id.*)   The phrase "Phone Answered No Linkback" means that either Ms. McMillion or her voicemail answered the call, but the Global Connect dialer did not detect any live person on the other end, and therefore terminated the call **without** leaving a pre-recorded or artificial voice message on her voicemail.   (*Id.*)

### (3)      The First February 25, 2017 Call:

Rash Curtis' collection notes do not show calls made to Ms. McMillion on February 25, 2017. (Supplemental Declaration of Bob Keith, ¶ 5.)   However, Rash Curtis' TCN call logs show that a call was made on February 25, 2017 at approximately 11:42 a.m.   (*Id.*)   The call result was a "machine hang-up."   (*Id.*)   This means that the TCN dialer detected that Ms. McMillion's voicemail answered the call, and it terminated the call **without** leaving a pre-recorded artificial or message on her voicemail.   (*Id.*)

### (4)      The Second February 25, 2017 Call:

Rash Curtis' TCN call logs show that the second February 25, 2017 call was made at approximately 12:49 a.m.   (Supplemental Declaration of Bob Keith, ¶ 6.)   The call result was a "machine hang-up."   (*Id.*)   This means that the TCN dialer detected that Ms. McMillion's voicemail answered the call, and it terminated the call **without** leaving a pre-recorded or artificial message on her voicemail.   (*Id.*)

In sum, Rash Curtis did not leave any pre-recorded or artificial messages on Ms. McMillion's cell phone without her prior express consent.   (*Id.* at ¶¶ 3-6.)

### ii.      The Two Remaining Calls to Ms. Adekoya:

This Court found Rash Curtis possessed Ms. Adekoya's prior express consent for all calls placed on or before April 18, 2016, but it did <u>not</u> possess her prior express consent for any calls placed after that date.   (MSJ Order, pp. 2:20-22; 10:10-11:13.)   Just two phone calls were made to Ms. Adekoya's cell phone number after April 18, 2016; the first was made on April 27, 2016, and the second was made on April 28, 2016.   (*See, e.g.,* Plaintiffs' Supporting Separate Statement, Dkt. No.

139-1, Issue No. 5, Fact No. 29; *see also* MSJ Order, p. 11:2-3.)

### (1)   The April 27, 2016 Call:

Rash Curtis' collection notes for this entry show:

### "GC042716:16:32 5106925496-PHONE ANSWERD [SIC] NO LINKBACK"

(Rash Curtis' **Exhibit 7** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 152-9, p. RCA 000263 (April 27, 2016 entry).)

The first two letters, "GC," mean the call was placed by Global Connect. (Supplemental Declaration of Bob Keith, ¶ 7.) The next ten digits, "042716:16:32," mean the call was placed on April 27, 2016 at 16:32 hours, or 4:32 p.m. (*Id.*) The next ten digits, "5106925496," mean the call was placed to phone number (510) 692-5496. (*Id.*) The phrase "Phone Answered No Linkback" means that either Ms. Adekoya or her voicemail answered the call, but the Global Connect dialer did not detect any live person on the other end, and therefore terminated the call **without** leaving a pre-recorded or artificial voice message on her voicemail. (*Id.*)

### (2)   The April 28, 2016 Call:

Rash Curtis' collection notes for this entry indicate:

### "GC042816:18:18 5106925496-PHONE ANSWERD NO LINKBACK"

(Rash Curtis' **Exhibit 7** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 152-9, p. RCA 000263 (April 28, 2016 entry).)

The first two letters, "GC," mean the call was placed using Global Connect. (Supplemental Declaration of Bob Keith, ¶ 8.) The next ten digits, "042816:18:18," mean the call was placed on April 28, 2016 at 18:18 hours, or 6:18 p.m. (*Id.*) The next ten digits, "5106925496," mean the call was placed to phone number (510) 692-5496. (*Id.*) The phrase "Phone Answered No Linkback" means that either Ms. Adekoya or her voicemail answered the call, but the Global Connect dialer did not detect any live person on the other end, and therefore terminated the call **without** leaving a pre-recorded or artificial voice message on her voicemail. (*Id.*)

In sum, Rash Curtis did not leave any pre-recorded or artificial messages on Ms. Adekoya's cell phone without her prior express consent. (*Id.* at ¶¶ 7-8.)

### iii.    The Calls to Mr. Perez.

None of Rash Curtis' records indicate that any pre-recorded or artificial voice messages were ever left on Mr. Perez's voicemail. (Supplemental Declaration of Bob Keith, ¶ 9; Rash Curtis' **Exhibit 15** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 152-9, pp. RCA 000270-271.) To the contrary, several entries list the following call result: "NML – MACHINE." "No Message Left" means the Global Connect dialer detected an answering machine or voicemail and terminated the call **without** leaving a pre-recorded or artificial voice message on his voicemail. (Supplemental Declaration of Bob Keith, ¶ 9.) Other call results indicate several calls were "skipped," meaning not made, the number dialed was "busy," or "invalid," or the call was answered but there was no "linkback," meaning the Global Connect dialer did not detect a live person on the other end, and therefore terminated the call *__without leaving any pre-recorded or artificial voice message on Mr. Perez's voicemail__*. (*Id.*)

**B.     Rash Curtis Separately Has No TCPA Liability for Any Calls to Mr. Perez Because It Immediately Stopped Calling Upon First Learning the Number Had Been Ported to Mr. Perez.**

**1.     *ACA International* Set Aside the FCC's Rulings Regarding Reassigned Numbers.**

In *ACA International, supra*, the United States Court of Appeals, D.C. Circuit also examined the Commission's rulings regarding when a caller violates the TCPA by calling a wireless number previously held by a consenting party but reassigned ("ported") to a person who has not given consent:

> **We now turn to the Commission's treatment of circumstances in which a consenting party's cell number has been reassigned to another person.** While there is no consensus about the exact numbers of reassignments, **there is no dispute that millions of wireless numbers are reassigned each year**. In the event of a reassignment, the caller might initiate a phone call (or send a text message) based on a mistaken belief that the owner of the receiving number has given consent, when in fact the number has been reassigned to someone else from whom consent has not been obtained. **Does a call or message in that situation violate the statutory bar against making autodialer calls without prior consent? The Commission's answer is yes, apart from a one-call, post-reassignment safe harbor. We set aside the Commission's interpretation on the ground that the one-call safe harbor is arbitrary and capricious.**

1  *ACA Int'l, supra,* 2018 WL 1352992, at *13 (emphasis added).

2       As the court explained:

3          The pertinent statutory language generally renders it unlawful "to make
4          any call (other than a call made for emergency purposes or made with
           the *prior express consent of the called party*) using any automatic
5          telephone dialing equipment or prerecorded voice." 47 U.S.C. §
           227(b)(1)(A) (emphasis added). **The Commission, in its ruling,**
6          **initially addressed who is properly considered the "called party"**
7          **when a consenting party's number is reassigned to another person:**
           **does "called party" refer to the person the caller expected to reach**
8          **(whose consent had previously been obtained), or does it refer to the**
           **person actually reached, the wireless number's present-day**
9          **subscriber after reassignment (whose consent has not been**
           **obtained)?**
10

11         **The Commission adopted the latter interpretation.** 30 FCC Rcd. at
           7999-8001 ¶¶ 72-73. **The result is that the reassignment of a wireless**
12         **number extinguishes any consent given by the number's previous**
           **holder and exposes the caller to liability for reaching a party who**
13         **has not given consent.** An alternative approach, the Commission
           reasoned, would "effectively require consumers to opt out of such calls
14         when the TCPA clearly requires the opposite—that consumers opt in
15         before they can be contacted." *Id.* at 8004 ¶ 80.

16         The agency also refused to "place any affirmative obligation" on new
           subscribers to inform callers that a wireless number now belongs to
17         someone else. *Id.* at 8011 ¶ 95. **The ruling thus expressly**
           **contemplates that a new subscriber could "purposefully and**
18         **unreasonably" refrain from informing a good-faith caller about a**
           **number's reassignment "in order to accrue statutory penalties."** *Id.*
19         (formatting modified). **In that regard, the Commission described a**
           **reported case in which the new, post-reassignment subscriber**
20         **waited to initiate a lawsuit until after having received almost 900**
21         **text alerts** that were intended for the previous subscriber. *Id.* at 8011
           ¶ 94 & n.324.
22

23              […]

24  *ACA Int'l, supra,* 2018 WL 1352992, at *14 (emphasis added).

25       The court continued:

26         **Petitioners next argue that the Commission's one-call safe harbor is**
           **arbitrary. On this score, we agree with petitioners.** When a caller is
27         **unaware that a consenting party's wireless number has been**
28         **reassigned, the Commission chose to allow the caller to make one**

                                  - 18 -

**(and only one) post-reassignment call without incurring liability. For that one call, the Commission understood the statutory term "prior express consent" to refer to the consent given by the previous subscriber.** 30 FCC Rcd. at 8001 ¶ 73 & n.265; *id.* at 8003 ¶ 78.

**The Commission allowed for that one liability-free call, rather than impose "a traditional strict liability standard," because it interpreted a caller's ability under the statute to rely on a recipient's "prior express consent" to "mean reasonable reliance."** *Id.* at 8009 ¶ 90 n.312. <u>**And when a caller has no knowledge of a reassignment, the Commission understandably viewed the caller's continued reliance on the prior subscriber's consent to be "reasonable."**</u>

Elsewhere in the Declaratory Ruling, the Commission echoed the same "reasonable reliance" understanding of the statute's approval of calls based on "prior express consent." The ruling accepts that a caller can rely on consent given by a wireless number's "customary user" ("such as a close relative on a subscriber's family calling plan"), rather than by the subscriber herself. *Id.* at 8001 ¶ 75. That is because the "caller in this situation cannot reasonably be expected to divine that the consenting person is not the subscriber." *Id.* at 8001-02 ¶ 75. **The Commission reiterated in that regard that, in "construing the term 'prior express consent' in section 227(b)(1)(A), we consider the caller's reasonableness in relying on consent."** *Id.* at 8001 ¶ 75.

*ACA Int'l, supra,* 2018 WL 1352992, at *15 (emphasis added).

The court also noted:

**The Commission thus consistently adopted a "reasonable reliance" approach when interpreting the TCPA's approval of calls based on "prior express consent," including as the justification for allowing a one-call safe harbor when a consenting party's number is reassigned.** <u>**The Commission, though, gave no explanation of why reasonable-reliance considerations would support limiting the safe harbor to just one call or message. That is, why does a caller's reasonable reliance on a previous subscriber's consent necessarily cease to be reasonable once there has been a single, post-reassignment call?**</u> **The first call or text message, after all, might give the caller no indication whatsoever of a possible reassignment (if, for instance, there is no response to a text message, as would often be the case with or without a reassignment).**

**[...]**

**The Commission acknowledged that callers "may nevertheless not learn of reassignment before placing a call to a new subscriber," and that the first post-reassignment call likewise might give no reason to suspect a reassignment.** *Id.* at 8009 ¶¶ 88, 90 n.312. <u>**In that event, a**</u>

- 19 -

1

**caller's reasonable reliance on the previous subscriber's consent would be just as reasonable for a second call.**

2

[...]

3

4

**In that light, no cognizable conception of "reasonable reliance" supports the Commission's blanket, one-call-only allowance.**

5

6

*ACA Int'l, supra,* 2018 WL 1352992, at *15-16 (emphasis added).

7

On this issue, the court concluded:

8

**[T]he Commission's one-call-only approach cannot be salvaged by its suggestion that callers rather than new subscribers should bear the risk when calls are made (or messages are sent) to a reassigned number.** *Id.* at 8009-10 ¶ 90 n.312. **That consideration would equally support a zero-call, strict-liability rule. But the Commission specifically declined to adopt "a result that severe."** *Id.* **Having instead embraced an interpretation of the statutory phrase "prior express consent" grounded in conceptions of reasonable reliance, the Commission needed to give some reasoned (and reasonable) explanation of why its safe harbor stopped at the seemingly arbitrary point of a single call or message. The Commission did not do so.**

9

10

11

12

13

14

15

**Finally, the Commission's failure in that regard requires setting aside not only its allowance of a one-call safe harbor, but also its treatment of reassigned numbers more generally.** When we invalidate a specific aspect of an agency's action, we leave related components of the agency's action standing only if "we can say without any 'substantial doubt' that the agency would have adopted the severed portion on its own." *Am. Petroleum Inst. v. EPA,* 862 F.3d 50, 71 (D.C. Cir. 2017) (per curiam) (internal quotation marks omitted).

16

17

18

19

20

21

Here, we have no such assurance. **If we were to excise the Commission's one-call safe harbor alone, that would leave in place the Commission's interpretation that "called party" refers to the new subscriber. And that in turn would mean that a caller is strictly liable for** *all* **calls made to the reassigned number, even if she has no knowledge of the reassignment.**

22

23

24

25

We cannot be certain that the agency would have adopted that rule in the first instance. **Significantly, the Commission said that it "could have interpreted the TCPA to impose a traditional strict liability standard," i.e., "a 'zero call' approach."** 30 FCC Rcd. at 8009 ¶ 90 n.312. **But the agency declined to "require a result that severe," opting instead for a one-call safe harbor.** *Id.* We cannot say without any substantial doubt that the agency would have embraced the

26

27

28

- 20 -

**"severe" implications of a pure, strict-liability regime even in the absence of any safe harbor. <u>As a result, we must set aside the Commission's treatment of reassigned numbers as a whole.</u>**

*ACA Int'l, supra,* 2018 WL 1352992, at *16-17 (emphasis added).

In sum, the D.C. Circuit set aside the Commission's treatment of reassigned numbers <u>as a whole</u>, finding that it could not do away with the arbitrary, one-call safe harbor without imposing absolute, strict liability for *every* call made to a reassigned number, an outcome expressly rejected by the Commission itself. (*Id.*)

It remains unclear exactly what effect this ruling may have in the long run, but the key point to take from this is that the United States Court of Appeals confirmed the Commission's embraces of "an interpretation of the statutory phrase 'prior express consent' grounded in conceptions of <u>reasonable reliance</u>." *ACA Int'l, supra,* 2018 WL 1352992, at *16 (emphasis added).

The United States Court of Appeals found that the one-call safe harbor was not reasonably grounded in such principles of "reasonable reliance" because a caller could not reasonably expect to learn that a number had been reassigned where, as Mr. Perez did here, the new subscriber fails to answer the first, liability-free call and inform the caller of the reassignment.

Here, Rash Curtis submits that it *might* be reasonable to expect a caller (such as Rash Curtis) to learn that a cell phone number had been reassigned during the first ***actual*** conversation with the new subscriber or customary user of the recently-reassigned cell phone number, assuming of course that he or she actually informed the caller of the reassignment during that first conversation (again, just as Mr. Perez did here). At that point, a caller's reliance on the previous subscriber's prior express consent could no longer be considered "reasonable." *ACA Int'l, supra,* 2018 WL 1352922, at *14.

**2.     Rash Curtis Reasonably Relied Upon Mr. Reynoso's Prior Express Consent.**

Rash Curtis received Mr. Reynoso's account for collection from Sutter General Hospital on May 7, 2015. (Declaration of Bob Keith, Dkt. No. 152-3, ¶ 25.) With the account, Sutter General Hospital provided Rash Curtis with his cell phone number it had been given, ending in 5193. (*Id.*)

As explained above, Rash Curtis was finally able to reach someone at the 5193 number on June 7, 2016. (Declaration of Bob Keith, Dkt. No. 152-3, ¶ 26.) That person was Mr. Perez. (*Id.*) Mr.

- 21 -

Perez informed Rash Curtis that he was not the debtor (Mr. Reynoso) and asked Rash Curtis to stop calling him. (*Id.*) And it did; that same day Rash Curtis removed the 5193 number from its collection software and never called Mr. Perez again. (*Id.*)

At all times, Rash Curtis was reasonably relying upon the "prior express consent" provided by Mr. Reynoso when he supplied the cell phone number ending in 5193 to Sutter General Hospital. (Supplemental Declaration of Bob Keith, ¶ 10; *see ACA Int'l, supra,* 2018 WL 1352992, at *15.)  As soon as Rash Curtis became aware that the number had been reassigned to Mr. Perez, it immediately took action to ensure that the number was removed from its database, and it was never called again. (*Id.*)

Consistent with the foregoing, and with Commission's embrace of an interpretation of the statutory phrase "prior express consent" grounded in conceptions of "reasonable reliance," Rash Curtis submits it has no TCPA liability to Mr. Perez because it was at all times acting with a good-faith belief that it possessed valid prior express consent to call the cell phone number ending in 5193. *See, e.g., Chyba v. First Financial Asset Management, Inc.*, 2014 WL 1744136, at *11-12 (S.D. Cal. April 30, 2014), *aff'd.,* 671 Fed.Appx. 989 (9th Cir. 2016).

In *Chyba*, the District Court in and for the Southern District of California stated:

> In the context of FDCPA, the Ninth Circuit has found that debt collectors have a limited obligation to verify the underlying debt. **In Clark v. Capital Credit & Collection Services, 460 F.3d 1162, 1174 (9th Cir.2005), the Ninth Circuit found that a debt collector was entitled to rely on the creditor statement's to verify the debt. The Ninth Circuit cited to case law suggesting that a collector could reasonably rely upon information provided by a creditor who had been accurate in the past.** *Id.* It also held that the FDCPA did not impose any duty on the debt collector to independently investigate the claims. *Id.* (citations omitted). **It would be incongruous with the larger statutory and regulatory scheme to interpret [the] TCPA to require that a debt collector be liable for acting where it had a good-faith basis for doing so.**
>
> **Here, the documents provided gave Defendant a good-faith basis to believe that it had consent to contact Plaintiff at that number.** The Court notes that the cell number listed as her "home" number. **There appears to have been little that the Defendant could have done to further ascertain whether there was consent, except to call Plaintiff at her home number…**

- 22 -

Thus, although Plaintiff did not give consent directly to Defendant to call her cell phone number, ***it is sufficient that Defendant had a good-faith basis to believe that Plaintiff had provided consent to the creditor on whose behalf Defendant sought to collect a debt. <u>Even if Plaintiff is correct in stating that she never gave Defendant or Enterprise consent to call, and there was no actual prior consent from Plaintiff, Defendant is not liable for acting in good faith upon the information provided to it.</u>***

*Chyba, supra,* 2014 WL 1744136, at \*11-12 (emphasis added).

And so it is here.

Under *Chyba*, Rash Curtis possessed a good faith belief that it had prior express consent to contact Mr. Reynoso at the cell phone number ending in 5193.   (Supplemental Declaration of Bob Keith, ¶ 10.)   The fact that the number had been reassigned to Mr. Perez was unknown to Rash Curtis until June 7, 2016, when it was finally able to first speak with Mr. Perez.   (Declaration of Bob Keith, Dkt. No. 152-3, ¶ 26.)   Following that conversation, Rash Curtis no longer had a good faith belief that it had prior express consent to reach Mr. Reynoso at the cell phone number ending in 5193, so it stopped calling.   (*Id.*; Rash Curtis' **Exhibit 17** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 152-10, Excerpts from Deposition of Ignacio Perez, at pp. 38:6-39:19.)

Under the reasoning of *Chyba,* and the new *ACA International* decision confirming the Commission's embrace of principles of "reasonable reliance" when it comes to "prior express consent," Rash Curtis submits it cannot be held liable for mistakenly calling Mr. Perez while trying in good faith to reach Mr. Reynoso at a cell phone number which he provided but which was later reassigned without notice to Rash Curtis.

## IV.   CONCLUSION

Rash Curtis is not a telemarketing business; it does <u>not</u> want to talk to random people.   To the contrary, it <u>only</u> wants to contact the specific debtors for whom it has been referred collection accounts.   Rash Curtis simply has no use for an automatic telephone dialing system which uses a random or sequential number generator to produce, store and dial telephone numbers for random

- 23 -

individuals.[2]  Rash Curtis' collection system is not set up to function that way, and it does not have the capacity to do so, even if Rash Curtis wanted to (which it does not).

In truth, Rash Curtis has a hard-enough time trying to reach the people it actually wants to contact; the same people who refuse to pay their medical bills and then dodge the bill collector's calls for weeks, months, or, in some cases, even years.  Rash Curtis' job is only further complicated by the fact that millions of cell phone numbers are reassigned every year.

The TCPA's strict liability standard coupled with its "adding-machine" remedy has created a niche market for consumer attorneys looking to "hit it big" in California's next "gold rush."  Law firms are working with software and telecommunications companies to develop cell phone applications (like the ones used here) to allow consumers to track, save, and report telemarketing and debt collection calls.  Consumer attorneys, like Mr. Krivoshey, post videos to YouTube explaining how to "cash in" on unwanted telemarketing calls.[3]  Plaintiffs file complaints (like the one here) alleging they ___never___ gave prior express consent to be called, even though we now know those allegations were false as to both Ms. McMillion and Ms. Adekoya.

Based on the foregoing, Rash Curtis hereby respectfully requests this Court reconsider its order on the parties' cross-motions for summary judgment.  In particular, Rash Curtis asks this Court to:

5.  Deny Plaintiffs' Motion for Partial Summary Judgment on the issue of whether Rash Curtis' three dialers (Global Connect, TCN, and DAKCS/VIC) constitute ATDSs;

6.  Grant Partial Summary Judgment to Rash Curtis on the issue of whether Rash Curtis' three dialers do not constitute ATDSs because, although they are "predictive dialers," they do not have the capacity to store or produce telephone numbers using a random or sequential number generator, and to dial such numbers (without human intervention);

7.  Grant Partial Summary Judgment to Rash Curtis on the issue of TCPA liability based on the fact that none of the calls which were placed without prior express consent were done so using an ATDS or a pre-recorded or artificial voice; and

---

[2] Visit https://youtu.be/zb1r_uKOew4 for an example of an automatic telephone dialing system which actually uses a sequential number generator.

[3] https://youtu.be/AbzFEpTy0os

- 24 -

8.    Grant Rash Curtis' Motion for Partial Summary Judgment as to Mr. Perez's TCPA claim on the basis that, in the absence of actual knowledge that the cell phone number ending in 5193 had been reassigned to Mr. Perez, Rash Curtis was acting in "reasonable reliance" on the prior express consent provided by the cell phone number's previous owner, Mr. Reynoso.

In the alternative, if this Court is not persuaded by the *ACA International* decision, Rash Curtis hereby respectfully requests this Court reconsider Rash Curtis' Motion to Stay this action pending the outcome of *Marks v. Crunch San Diego, LLC,* Case No. 14-56834 (9th Cir. December 14, 2016).  As previously explained in Defendant's Motion to Stay (Dkt. No. 156), the Ninth Circuit *sua sponte* stayed the *Marks* case, pending the outcome of *ACA International.* (*See* Rash Curtis' **Exhibit 24** in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 152-9.)   Now that *ACA International* has been decided, Rash Curtis expects the Ninth Circuit will lift the stay in *Marks* and render a similar decision, which would not only clarify the Ninth Circuit's position on these issues but would also be binding precedent on this Court.

Respectfully submitted.

Dated: March 30, 2018

ELLIS LAW GROUP LLP


By  /s/ *Anthony P. J. Valenti*
Anthony P. J. Valenti
Attorney for Defendant
RASH CURTIS & ASSOCIATES

- 25 -