Mark E. Ellis – 127159
Anthony P. J. Valenti – 284542
Lawrence K. Iglesias – 303700
ELLIS LAW GROUP LLP
1425 River Park Drive, Suite 400
Sacramento, CA  95815
Tel: (916) 283-8820
Fax: (916) 283-8821
mellis@ellislawgrp.com
avalenti@ellislawgrp.com

Attorneys for Defendant RASH CURTIS & ASSOCIATES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SANDRA McMILLION, JESSICA ADEKOYA, AND IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>     Defendant. | Case No.:  4:16-cv-03396-YGR JSC<br><br>**DECLARATION OF MARK E. ELLIS IN SUPPORT OF DEFENDANT RASH CURTIS & ASSOCIATES' MOTION TO AMEND THE COURT'S JUNE 18, 2018 ORDER DENYING MOTION FOR RECONSIDERATION [FRCP 59(e)]**<br><br>**Date:  August 21, 2018**<br>**Time:  2:00 p.m.**<br>**Ctrm:  1**<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

    I, Mark E. Ellis, declare:

    1.    I am an attorney at law duly licensed to practice before this Court, and I am the managing partner in the law firm of Ellis Law Group LLP, attorneys of records for Defendant RASH CURTIS & ASSOCIATES in the above matter.  This declaration is based upon my own personal knowledge except as to those matters stated upon information and belief, and as to those things I believe them to be true.  If called as a witness to testify to the matters asserted herein I would do so competently.

1

DECLARATION OF MARK E. ELLIS IN SUPPORT OF DEFENDANT RASH CURTIS & ASSOCIATES' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [FRCP 56(c)]

2.      I have reviewed the Court's docket and hereby certify that the Court issued its Order Re: Cross Motions for Summary Judgment; Denying Motion to Stay (ECF Doc. No. 167) on February 2, 2018.

3.      I have reviewed the Court's docket and hereby certify that Rash Curtis filed its Motion for Reconsideration of the Court's MSJ Order on March 30, 2018 (ECF Doc. No. 189), which was based on the D.C. Circuit Court's decision in *ACA Int'l v. FCC,* 855 F.3d 687 (D.C. Cir. Mar. 16 2018).

4.      I have reviewed the Court's docket and hereby certify that on June 18, 2018, this Court issued its Order Denying Defendant's Motion to Reconsider (ECF Doc. No. 199), in which the Court, among other things, denied to stay this case until the outcome of *Marks v. Crunch San Diego, LLC,* Case No. 14-56834 (9th Cir. December 2016).

5.      I personally confirmed on the day that this motion was filed that the only two United States Court of Appeals decisions which have opined on the D.C. Circuit Court's decision *ACA Int'l* are *Dominguez v. Yahoo, Inc.,* 2018 WL 3118056 (3d Cir. June 26, 2018) and *King v. Time Warner Cable Inc.,* 2018 WL 3188716 (2d Cir. June 29, 2018).

6.      Attached hereto as **Exhibit A** is a true and correct copy of the United States Circuit Court of Appeals, Third Circuit decision in *Dominguez v. Yahoo, Inc.,* 2018 WL 3118056 (3d Cir. June 26, 2018).

7.      Attached hereto as **Exhibit B** is a true and correct copy of the United States Circuit Court of Appeals, Second Circuit decision in *King v. Time Warner Cable Inc.,* 2018 WL 3188716 (2d Cir. June 29, 2018).

8.      Attached hereto is a true and correct copy of Defendant's [Proposed] Order Granting Defendant Rash Curtis & Associates' Motion to Amend the Court's June 18, 2018 Order Denying Motion for Reconsideration [FRCP 59(e)].

\\\

\\\

\\\

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on July 16, 2018 in Sacramento, California.

_____
Mark E. Ellis

DECLARATION OF MARK E. ELLIS IN SUPPORT OF DEFENDANT RASH CURTIS & ASSOCIATES' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [FRCP 56(c)]

# EXHIBIT A

2018 WL 3118056
Only the Westlaw citation
is currently available.
United States Court of
Appeals, Third Circuit.

Bill H. DOMINGUEZ, ON BEHALF
OF HIMSELF and All Others
Similarly Situated, Appellant
v.
YAHOO, INC.

No. 17-1243
|
Submitted under Third Circuit
LAR 34.1(a) on October 2, 2017
|
Opinion filed: June 26, 2018

**Synopsis**
**Background:** Consumer brought putative
class action against Internet company,
alleging violations of Telephone Consumer
Protection Act (TCPA). The United States
District Court for the Eastern District of
Pennsylvania, Michael M. Baylson, J., 8
F.Supp.3d 637, entered summary judgment
for company. Consumer appealed. The
Court of Appeals, Ambro, Circuit Judge,
629 Fed.Appx. 369, vacated and remanded.
On remand, the United States District Court
for the Eastern District of Pennsylvania,
No. 2-13-cv-01887, Baylson, J., 2017 WL
390267, again entered summary judgment
for company, and also excluded consumer's
expert reports. Consumer appealed.

**Holdings:** The Court of Appeals, Roth,
Circuit Judge, held that:

[1] District Court did not abuse its discretion
by excluding consumer's expert reports, and

[2] consumer failed to establish
that company's text messaging system
was "automatic telephone dialing
system" (ATDS) within meaning of TCPA.

Affirmed.

West Headnotes (2)

[1]  **Evidence**
  ⟜ Matters involving scientific or
  other special knowledge in general

  District Court did not abuse its
  discretion by excluding consumer's
  expert reports in his putative class
  action against Internet company,
  alleging violations of Telephone
  Consumer Protection Act (TCPA),
  as reports were irrelevant to
  inquiry as to whether company's
  text message system had capacity
  to randomly or sequentially
  generate telephone numbers as
  an "autodialer"; reports focused
  on latent or potential capacity
  to "autodial" numbers, and
  all reports were founded on
  generalized hypotheticals that did
  not help in resolution of inquiry.
  Communications Act of 1934 §

227, 47 U.S.C.A. § 227; Fed. R. Evid. 702.

Cases that cite this headnote

[2] **Telecommunications**

☜ Illegal or improper purposes

Consumer failed to establish that Internet company's text messaging system was "automatic telephone dialing system" (ATDS) within meaning of Telephone Consumer Protection Act (TCPA), absent any evidence that the system had capacity to generate random or sequential telephone numbers and dial those numbers, as opposed to sending messages only to numbers individually and manually inputted into its system by a user. Telephone Consumer Protection Act of 1991, § 3(a), 47 U.S.C.A. § 227(a)(1), (b)(1)(A).

1 Cases that cite this headnote

On Appeal from the United States District Court for the Eastern District of Pennsylvania, District Judge: Honorable Michael M. Baylson (D. C. Civil Action No. 2-13-cv-01887)

**Attorneys and Law Firms**

Gerald E. Arth, Esq., Abraham C. Reich, Esq., Robert S. Tintner, Esq., Fox Rothschild, 2000 Market Street, 20th Floor, Philadelphia, PA 19103, James A. Francis, Esq., David A. Searles, Esq., John Soumilas, Esq., Francis & Mailman, 100 South Broad Street, Land Title Building, 19th Floor, Philadelphia, PA 19110, Counsel for Appellant

Ian C. Ballon, Esq., Lori Chang, Esq., Justin Barton, Esq., Greenberg Traurig, 1840 Century Park East, Suite 2100, Los Angeles, CA 90067, Brian T. Feeney, Esq., Greenberg Traurig, 2001 Market Street, 2700 Two Commerce Square, Philadelphia, PA 19103, Counsel for Appellee

Before: SHWARTZ and ROTH[*], Circuit Judges and PAPPERT, District Judge

[*]    Honorable Gerald J. Pappert, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION

ROTH, Circuit Judge

**\*1** Appellant Bill Dominguez sued Yahoo!, Inc., alleging that Yahoo violated the Telephone Consumer Protection Act (TCPA)[1] by sending him thousands of unsolicited text messages. Dominguez now returns to this Court for the second time appealing the District Court's grant of summary judgment in favor of Yahoo. For the reasons stated below, we will affirm.

1    47 U.S.C. § 227.

I.

Dominguez v. Yahoo, Inc., Slip Copy (2018)
2018 WL 3118056

The facts underlying this case are set forth at length in our prior opinion,[2] and we provide only a brief recapitulation here. Dominguez purchased a cell phone with a reassigned telephone number. The prior owner of the number had subscribed to Yahoo's Email SMS Service, through which a user would receive a text message each time an email was sent to the user's Yahoo email account. Because the prior owner of the number never canceled the subscription, Dominguez received a text message from Yahoo every time the prior owner received an email. In an attempt to turn off the notifications, Dominguez pursued various courses of action, all of which proved unsuccessful. Ultimately, Dominguez received approximately 27,800 text messages from Yahoo over the course of 17 months.

[2]  *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369 (3d Cir. 2015).

Dominguez then filed a putative class action alleging that Yahoo had violated the TCPA. Under the TCPA, it is unlawful to make or send a non-emergency call or text message "using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service."[3] Thus, Dominguez's lawsuit has always depended upon his assertion that Yahoo's Email SMS Service was an "automatic telephone dialing system," *i.e.*, an autodialer. The TCPA defines an autodialer as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[4]

[3]  47 U.S.C. § 227(b)(1)(A)(iii). Although the text of the statute refers only to "calls," we have held that, under the TCPA, that term encompasses text messages. *See, e.g., Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013).

[4]  47 U.S.C. § 227(a)(1).

The District Court first granted summary judgment in favor of Yahoo in 2014 after concluding that the undisputed evidence demonstrated that the Email SMS Service did not have the capacity to store or produce telephone numbers using a random or sequential number generator.[5] In 2015, while Dominguez's appeal of that decision was pending, the FCC issued a declaratory ruling and order (the 2015 Declaratory Ruling), which concluded that "the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities."[6] In other words, a device could qualify as an autodialer under the TCPA if it had the *latent or potential capacity* to store or produce telephone numbers using a random or sequential number generator, and to dial those numbers. In light of this intervening ruling from the FCC, we vacated the District Court's judgment and remanded the case for further consideration.[7] On remand, Dominguez amended his complaint to allege that the Email SMS Service "ha[d] the potential capacity to place autodialed calls."[8] Yahoo again moved for summary judgment, and both parties submitted expert reports addressing the Email SMS Service's latent or potential capacity.

[5]  *Dominguez v. Yahoo!, Inc.*, 8 F.Supp.3d 637, 643-44 (E.D. Pa. 2014).

[6]  In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2015

Dominguez ex rel. Himself v. Yahoo, Inc., Not Reported in Fed. Appx. (2018)
2018 WL 3118056

Case 1:16-cv-03396-YGR   Document 206-1   Filed 07/16/18   Page 8 of 24

7    *Dominguez*, 629 F. App'x at 373.

8    App. at 116 (Am. Compl.).

**\*2** The District Court granted Yahoo's motion to exclude Dominguez's expert reports and once again granted summary judgment in favor of Yahoo.[9] As relevant to the present appeal, the court concluded that (1) the 2015 Declaratory Ruling should not apply in this case under principles of retroactivity, (2) under the applicable "present capacity" standard, the Email SMS Service did not qualify as an autodialer, (3) in the alternative, even if the 2015 Declaratory Ruling were applicable in this case, Dominguez had not presented any evidence that the Email SMS Service had the latent or potential capacity to generate random numbers because Dominguez's expert reports did not satisfy the standard for admissibility under *Daubert*, and (4) even if Dominguez's expert reports were admissible, Dominguez had failed to provide evidence that the Email SMS Service was capable of both generating random and sequential numbers and dialing those numbers. Dominguez appealed.

9    *Dominguez v. Yahoo!, Inc.*, No. 13-1887, 2017 WL 390267, at \*1 (E.D. Pa. Jan. 27, 2017).

While this appeal was pending, the United States Court of Appeals for the District of Columbia Circuit issued its opinion in *ACA International v. FCC*,[10] a case involving consolidated challenges to the FCC's 2015 Declaratory Ruling. The D.C. Circuit held that the FCC had exceeded its authority by interpreting the term "capacity" to include any latent or potential capacity and described the FCC's approach as "utterly unreasonable in the breadth of its regulatory [in]clusion."[11] In particular, the D.C. Circuit took issue with the fact that "a straightforward reading of the [FCC's] ruling invites the conclusion that all smartphones are autodialers."[12] This was so because, as the FCC had conceded, any ordinary smartphone could achieve autodialer functionality by simply downloading a random-number-generating app.[13] The D.C. Circuit therefore set aside the FCC's 2015 Declaratory Ruling.[14]

10   885 F.3d 687 (D.C. Cir. 2018).

11   *Id.* at 699 (internal quotation marks omitted) (alteration in original).

12   *Id.*

13   *Id.* at 696-97.

14   *Id.* at 692.

## II.[15]

15   The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment, and make all inferences in favor of the nonmoving party. *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 62 (3d Cir. 2013). We review a District Court's decision to exclude expert testimony for an abuse of discretion. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). This means that "[w]e will not interfere with the district court's decision 'unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' " *Id.* (quoting *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999) ).

*Declaratory Ruling), 30 FCC Rcd. 7991, 7974 ¶ 16 (2015).*

The decision in *ACA International* has narrowed the scope of this appeal. [16] In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling. Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer. The only remaining question, then, is whether Dominguez provided evidence to show that the Email SMS Service had the present capacity to function as autodialer.

[16]   Dominguez and Yahoo have both submitted letters under Rule 28(j) explaining their understanding of the impact of *ACA International* on this appeal.

Three of Dominguez's expert reports offer nothing to help resolve the present capacity question. Both the Krishnamurthy Report and the Christensen Report focus on latent or potential capacity. The Krishnamurthy Report proposes five possible ways in which the Email SMS Service could be modified to generate random or sequential numbers. [17] All of these proposed modifications would require several months of work to implement. [18] The Christensen Report is similarly speculative. Christensen opines that "[i]t *would have been* quite easy for one of normal skill in software programming to configure an application to cause mobile messages to be sent based on integration of off-the-shelf, commonly available random number generator programs," and concludes that "the equipment and systems that Yahoo relied upon ... *had the latent capacity* to generate random and/or sequential ten digit numbers." [19] A third report, by Jeffrey Hansen, does not use the term "latent

capacity" but presents similar analysis. The Hansen Report begins with the generalized assertion that "all computers can generate random or sequential numbers." [20] The report then proposes six computer code commands, which, Hansen asserts, could be written into Yahoo's operating system in order to generate wireless numbers randomly or sequentially. [21]

[17]   *See* App. at 306 (Krishnamurthy Report).

[18]   *See* App. at 304, 321 (Krishnamurthy Report).

[19]   App. at 1163, 1165 (Christensen Report) (emphasis added).

[20]   App. at 372 (Hansen Report).

[21]   App. at 373 (Hansen Report).

**\*3** **[1]** In his supplemental filings, Dominguez argues that, under *ACA International*, certain limited modifications may nevertheless fall within the scope of present capacity. He emphasizes the D.C. Circuit's comment that "[v]irtually any understanding of 'capacity' thus contemplates some future functioning state, along with some modifying act to bring that state about." [22] Though that may be true, it does not follow that the Krishnamurthy, Christensen, or Hansen Reports create a triable factual issue regarding the present capacity of the Email SMS Service. The reports are founded upon the exact type of hypothesizing that is foreclosed by *ACA International*. [23] The District Court was therefore correct to exclude the Krishnamurthy, Christensen, and Hansen Reports, as they are irrelevant to the present capacity inquiry. [24]

22  Rule 28(j) Letter from James A. Francis, Appellant's Counsel, to Patricia Dodszuweit, Clerk of Court, 3d Cir. (Mar. 28, 2018) (quoting *ACA Int'l*, 885 F.3d at 696).

23  *ACA Int'l*, 885 F.3d at 696. The D.C. Circuit noted that a correct understanding of "capacity" focuses "on considerations such as how much is required to enable the device to function as an autodialer: does it require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment?" *Id.* The types of modifications discussed by the Krishnamurthy and Christensen Reports—involving several months of work and the integration of unnamed external programs or applications—can hardly be characterized as the "simple flipping of a switch" and are far closer to a full reconstruction of the Email SMS System. Although the modification proposed in the Hansen Report appears simpler in comparison, the addition of a short sequence of code to *any computer operating system* bears a striking similarity to the downloading of an app onto *any smartphone*—the modification that was at issue in *ACA International. See id.* at 696-98.

24  *Cf., e.g., Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue. ... Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Although the District Court, not having the guidance of *ACA International*, focused its analysis primarily on reliability, we may affirm on any basis supported in the record. *See, e.g., Fairview Twp. v. EPA*, 773 F.2d 517, 525 n.15 (3d Cir. 1985).

Dominguez's final expert report, the supplemental declaration of Randall Snyder, also falls short of the admissibility standard. Snyder purports to address present, not just latent, capacity, repeatedly opining that "Yahoo's Email SMS Service system had the ability to generate random numbers and, in fact, did generate random numbers." [25] This opinion, however, is supported by little more than the same type of overbroad, generalized assertions found in the Hansen Report. Specifically, Snyder opines that "[t]he ability to generate random numbers is a fundamental function inherent in information technology computer systems employing the most common operating systems, security protocols and encryption." [26] Snyder goes on to explain the role that random number generators play in various commonly available computer operating systems, such as Microsoft Windows, Apple Mac OS, and UNIX, and posits that "it is a straightforward and very basic algorithm to use the available random number generation functions to generate ten-digit telephone numbers." [27] Notably absent, however, is any explanation of how the Email SMS System actually did or could generate random telephone numbers to dial. In that regard, the Snyder Supplemental Declaration is hardly less speculative than the expert reports of Krishnamurthy, Christensen, or Hansen—and raises the same concerns about the TCPA's breadth that the D.C. Circuit addressed in *ACA International*. Because it does not shed light on the key factual question actually at issue in this case—whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers—the Snyder Supplemental Declaration, like the other expert reports, lacks fit or relevance and was therefore properly excluded. [28]

25  App. at 977 (Snyder Supp. Decl.); *see also id.* at 978.

26  App. at 974 (Snyder Supp. Decl.).

27  App. at 976 (Snyder Supp. Decl.).

28  *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) ("[A]dmissibility

Case 4:16-cv-03396-YGR Document 206-1 Filed 07/16/18 Page 11 of 24

depends in part on the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." (internal quotation marks omitted) ); *see also supra* note 24.

**\*4 [2]** Ultimately, Dominguez cannot point to any evidence that creates a genuine dispute of fact as to whether the Email SMS Service had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers. On the contrary, the record indicates that the Email SMS Service sent messages only to numbers that had been individually and manually inputted into its system by a user.[29] There can be little doubt that Dominguez suffered great annoyance as a result of the unwanted text messages. But those messages were sent precisely because the prior owner of Dominguez's telephone number had affirmatively opted to receive them, not because of random number generation. The TCPA's prohibition on autodialers is therefore not the proper means of redress.

[29]    *See* App. at 248-49 (Decl. of Gareth Shue).

### III.

For the above reasons, we will affirm the District Court's orders excluding Dominguez's expert reports and granting summary judgment in favor of Yahoo.

**All Citations**

--- F.3d ----, 2018 WL 3118056

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2018 WL 3188716
Only the Westlaw citation
is currently available.
United States Court of
Appeals, Second Circuit.

Araceli KING, Plaintiff-Appellee,
v.
TIME WARNER CABLE
INC., Defendant-Appellant.

Docket No. 15-2474-cv
|
August Term, 2016
|
Argued: January 25, 2017
|
Decided: June 29, 2018

**Synopsis**
**Background:** Customer brought action against national cable telecommunications company, alleging that company placed automated or prerecorded calls to her cellular telephone without her consent, in violation of the Telephone Consumer Protection Act (TCPA). The United States District Court for the Southern District of New York, Alvin K. Hellerstein, J., 113 F.Supp.3d 718, entered partial summary judgment for customer. Company appealed.

**[Holding:]** The Court of Appeals, Gerald E. Lynch, Circuit Judge, held that term "capacity," in TCPA definition of a qualifying automatic telephone dialing system (ATDS), referred to a device's current ability to randomly or sequentially generate telephone numbers, absent any modifications to the device's hardware or software.

Vacated and remanded.

West Headnotes (5)

**[1]** **Federal Courts**
⟜ Summary judgment
The district court's order granting a motion for summary judgment in part is reviewed de novo by the Court of Appeals. Fed. R. Civ. P. 56.

Cases that cite this headnote

**[2]** **Statutes**
⟜ Language
Every exercise in statutory construction must begin with the words of the text.

Cases that cite this headnote

**[3]** **Statutes**
⟜ Design, structure, or scheme
**Statutes**
⟜ Context
When engaged in statutory construction, words to be interpreted are not considered in isolation; rather, the court looks to the statutory scheme as a whole

and place the particular provision within the context of that statute.

Cases that cite this headnote

**[4]    Statutes**
⊶ Purpose and intent; determination thereof

**Statutes**
⊶ Design, structure, or scheme

**Statutes**
⊶ History of statute

When engaging in statutory construction, if resorting to the plain text alone fails to resolve the question of construction, the court tests the competing interpretations against both the statutory structure and the legislative purpose and history of the statute.

Cases that cite this headnote

**[5]    Telecommunications**
⊶ Advertising, canvassing and soliciting; telemarketing

Term "capacity," in Telephone Consumer Protection Act's (TCPA) definition of a qualifying automatic telephone dialing system (ATDS), referred to a device's current ability to randomly or sequentially generate telephone numbers, absent any modifications to the device's hardware or software; definition did not include every phone or computer that could be

turned into an ATDS if properly reprogrammed, but did include devices whose "autodialing" features could be activated by the equivalent of the simple flipping of a switch. Telephone Consumer Protection Act of 1991, § 3(a), 47 U.S.C.A. § 227(a)(1), (b)(1)(A).

Cases that cite this headnote

**Attorneys and Law Firms**

Stephen Taylor (Sergei Lemberg, on the brief), Lemberg Law LLC, Wilton, CT, for Plaintiff-Appellee.

Matthew A. Brill (Matthew T. Murchison and Alexandra P. Shechtel, on the brief), Latham & Watkins LLP, Washington, DC, for Defendant-Appellant.

Before: Winter, Cabranes, and Lynch, Circuit Judges.

**Opinion**

Gerard E. Lynch, Circuit Judge:

**\*1** Defendant-appellant Time Warner Cable Inc. ("Time Warner") appeals a decision by the district court (Alvin K. Hellerstein, *J.*) granting partial summary judgment in favor of the plaintiff-appellee Araceli King on her claim that Time Warner knowingly or willfully violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, by using an "automatic telephone dialing system" to call King's cell phone 153 times without her

consent. The district court's interpretation of the statute relied primarily on a Declaratory Ruling and Order issued by the Federal Communications Commission ("FCC") in 2015 that has since been invalidated by the D.C. Circuit. *See ACA Int'l v. FCC*, 885 F.3d 687, 699 (D.C. Cir. 2018). We now conclude that the district court's analysis was based on an incorrect interpretation of the statutory text. Accordingly, the district court's ruling in favor of King is VACATED and the matter is REMANDED for further proceedings consistent with this opinion.

## BACKGROUND

### I. The Telephone Consumer Protection Act

In the interest of reducing the volume of unwanted telemarketing calls, the Telephone Consumer Protection Act, in relevant part, makes it "unlawful ... to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service, ... unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A) (iii); *see also ACA Int'l*, 885 F.3d at 692–93. The statute defines an "automatic telephone dialing system" ("ATDS" or "autodialer") as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 42 U.S.C. § 227(a)(1). Aggrieved parties may bring suit to recover a minimum of $500 per violation, which sum can be trebled at the

court's discretion "[i]f the court finds that the defendant willfully or knowingly violated" the statute. *Id.* § 227(b)(3).

The FCC has the authority to promulgate regulations implementing the TCPA. *Id.* § 227(b)(2); *see also id.* § 201(b) (authorizing the FCC to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter"). In 2015, the FCC issued a Declaratory Ruling and Order that, among other things, attempted to clarify the TCPA's requirement that, to qualify as an autodialer under the statute, a device must have the "capacity" to dial random and sequential numbers. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7973–74 (2015) [hereinafter "2015 Order"]. The Commission asserted that an expansive interpretation of the term "capacity" was consistent with both Congress's intent that the TCPA have a broad protective reach, and with the Commission's previous orders. *Id.* Accordingly, the FCC "declined to define a device's 'capacity' in a manner confined to its 'present capacity.' Instead, the agency construed a device's 'capacity' to encompass its 'potential functionalities' with modifications such as software changes." *ACA Int'l*, 885 F.3d at 693–94, quoting 2015 Order at 7974, 7976.

### II. Factual Background for King's TCPA Claims

**\*2** King contends that Time Warner violated the TCPA by making numerous calls to her cell phone using an autodialer

after she had withdrawn her consent for it to do so.[1] During the period at issue in this lawsuit, King was a Time Warner customer. When signing up to receive services from Time Warner, King was required to agree to the company's terms of service, which included, in relevant part, granting the company permission to "call any number you provide to us (or that we issue to you) for any purpose," provided, however, that a customer could request to be placed on a "do not call" list so as not to receive any further calls "for marketing purposes," and that request would be honored. App. at 243. The terms of service agreement also specified that Time Warner "may use automated dialing systems or artificial or recorded voices to call" its customers. *Id.*

[1] Because the district court granted summary judgment in King's favor on the issue raised in this appeal, we must consider whether, drawing all reasonable inferences in Time Warner's favor, the record shows that there is no genuine dispute as to any material fact and that King is entitled to judgment as a matter of law. *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017), as amended Aug. 21, 2017; Fed. R. Civ. P. 56(a). Accordingly, we state the facts here in the light most favorable to Time Warner.

Time Warner uses an "interactive voice response" calling system to, among other things, contact customers with overdue accounts. The system automatically references Time Warner's billing records to determine which customers are more than 30 days late on their payments, and then dials the number associated with those accounts. If a person answers the call, the system is programmed not to call that number again until the following day (and it will stop altogether if the customer's account becomes current). If the call is not answered, the

system is programmed to leave a voicemail and attempt to call back two more times that day. Time Warner admits that its system has "the capacity to store numbers" and dial them, App. at 222, but asserts that it "does not have the capacity to make random or sequentially generated calls," *id.* at 221.

Beginning on July 3, 2013, Time Warner's system began making calls to a cell phone number belonging to King in an effort to collect on an overdue account. Unfortunately, King was not the customer Time Warner was seeking; instead, her phone number had erroneously been associated with the account of another, apparently delinquent, customer. King claims that, on October 3, 2013, after she had received ten calls from the system, she asked Time Warner to stop calling her number regarding the other customer's account. But the calls continued unabated through January 7, 2014, when King again called Time Warner in another unsuccessful attempt to stop the calls, and beyond.[2] In total, Time Warner's system called King 163 times between July 2013 and August 2014.

[2] When opposing King's motion for summary judgment below, Time Warner disputed that King had made the October 3 and January 7 calls because it had no record of either exchange in its files. The district court determined that the absence of a record in Time Warner's files was insufficient to create a question of fact and therefore concluded that there was no material dispute that King had effectively withdrawn her consent to receive automated calls from Time Warner on October 3. Time Warner does not challenge that holding on appeal.

In March 2014, King filed the instant suit, claiming that Time Warner's calls violated the TCPA. The parties cross-

moved for summary judgment. Time Warner interpreted the term "capacity" in the TCPA's definition of an autodialer to mean that a device was "capable at the time of use" of performing the functions of an autodialer. App. at 265; *see also id.* at 266 (referring to a system's "present capacity"). Accordingly, it argued that, in the absence of any evidence that its system had the present ability to perform the requisite functions, its system could not qualify as an autodialer under the statute. The district court disagreed, because it adopted a broader understanding of the term "capacity." Relying on a press release announcing the FCC's 2015 Order, which was not formally issued until a few days after the court's ruling, the district court determined that the TCPA's definition of an autodialer included "any technology with the *capacity* to dial random or sequential numbers," such as "robo-callers," and concluded that Time Warner's system met that "low bar." *Id.* at 282 (emphasis in original). The court thus rejected as irrelevant Time Warner's contention that there was no evidence that its system "*actually* dialed King's number randomly or from a list," and did not investigate whether Time Warner's system had the current ability to perform the functions of an autodialer. *Id.* (emphasis in original).

**\*3** The court also concluded that although King's assent to the company's terms of service constituted blanket consent to receive calls from an autodialer, she effectively withdrew that consent on October 3, 2013. Accordingly, the court granted summary judgment to Time Warner as to the ten calls made before King withdrew her consent,

and granted summary judgment to King as to the 153 calls made thereafter. The court further held that, because Time Warner had knowingly violated the statute, treble damages were warranted for each of the violating calls.

Time Warner filed the instant appeal.

### III. *The D.C. Circuit's Invalidation of the FCC's 2015 Order*

While Time Warner's appeal was being briefed to this court, the United States Court of Appeals for the District of Columbia Circuit heard a challenge to the FCC's 2015 Order.[3] In *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), that court decided in relevant part that the FCC's definition of "capacity" in the 2015 Order, which included a device's "potential functionalities" after modification, *id.* at 693–94, would allow the statute to extend well past what Congress intended, and that the 2015 Order therefore failed "the requirement of reasoned decisionmaking," *id.* at 703.

3   Under the Hobbs Act, the courts of appeals "ha[ve] exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ... all final orders" of the FCC that are reviewable under 47 U.S.C. § 402(a). 28 U.S.C. § 2342(1). When agency regulations are challenged in more than one court of appeals, as they were in the present case, 28 U.S.C. § 2112 requires that the multidistrict litigation panel consolidate the petitions and assign them to a single circuit. Challenges to the 2015 Order were assigned to the D.C. Circuit, which thereby became "the sole forum for addressing ... the validity of the FCC's" order. *GTE S., Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999); *see also MCI Telecomms. Corp. v. U.S. W. Commc'ns*, 204 F.3d 1262, 1267 (9th Cir. 2000). After hearing argument in this case, we held the appeal in

abeyance pending resolution of the challenges to the validity of the FCC's 2015 Order.

## DISCUSSION

**[1]** The district court's order granting in part King's motion for summary judgment is reviewed *de novo. See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017), as amended Aug. 21, 2017. As noted above, in concluding that Time Warner's calls to King violated the TCPA, the district court relied on the FCC's 2015 Order, which broadly construed the term "capacity" and thus extended the TCPA to reach any device that could be modified by software changes to perform the functions of an autodialer. In the wake of *ACA International*, which invalidated that Order and thereby removed any deference we might owe to the views the FCC expressed in it, we must decide independently whether the district court's broad understanding of the "capacity" a device must have in order to qualify as an ATDS under the TCPA is a supportable interpretation of the statute. We conclude that it is not. Although we are not bound by the D.C. Circuit's interpretation of the statute, we are persuaded by its demonstration that interpreting "capacity" to include a device's "potential functionalities" after some modifications extends the statute too far. Instead, we agree with the D.C. Circuit that the term "capacity" is best understood to refer to the functions a device is currently able to perform, whether or not those functions were actually in use for the offending call, rather than to devices that would have that ability only after modifications.

## I. "Capacity"

***4** As discussed above, to qualify as an ATDS under the TCPA, a device must have the "capacity" to perform the functions of an autodialer. 47 U.S.C. § 227(a)(1)(A). Time Warner contends that "capacity" should be interpreted to mean a device's "present ability," rather than its potential capabilities after some unspecified software modifications. Appellant's Br. at 30 (emphasis omitted). King endorses the 2015 Order's determination that any device that could, if appropriately modified, perform autodialer functions should be construed to have that capacity. *See* Appellee's Br. at 22–23.

**[2]** **[3]** **[4]** "Every exercise in statutory construction must begin with the words of the text." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003). The words to be interpreted are not considered in isolation; rather, we "look[ ] to the statutory scheme as a whole and plac[e] the particular provision within the context of that statute." *Id.* "If resorting to the plain text alone fails to resolve the question, we test the competing interpretations against both the statutory structure of the [TCPA] and the legislative purpose and history of [§ 227(a)(1) ]." *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 6 (2d Cir. 2017).

### A. *The "Plain Meaning" of "Capacity"*

Definitions of the word "capacity" from dictionaries contemporaneous with the passage of the TCPA do little to definitively rule in or rule out Time Warner's proposed interpretation.[4] Some of those definitions invoke an abstract sense of potential—i.e., the capacity of mankind to make world-changing inventions, or the capacity of one person for "greatness." Others aim at something more concrete and immediate—for instance, when one is looking to hire an employee with the capacity to perform certain engineering tasks, qualified applicants presumably will not include people who don't yet have an engineering degree (even those who may get one eventually), but may include degreed engineers who require additional instruction to get up to speed.

[4]   The 1993 edition of *Webster's New World Dictionary* offers "the ability to contain, absorb, or receive and hold" (first definition), and "the ability or qualifications (*for*, or *to* do, something)" (fourth definition, emphasis in original), both of which seem to refer to a *present* ability to do those things; however, it also includes a definition more consistent with the FCC's proposed interpretation: "the quality of being adapted (*for* something) ...; capability; potentiality" (sixth definition, emphasis in original). The 1991 edition of the *Oxford English Dictionary* offers a similarly ambiguous selection, including the "[a]bility to receive or contain" (first definition); "[t]he power, ability, or faculty for anything in particular" (sixth definition); and "[t]he quality or condition of admitting or being open to action ...; capability; possibility" (seventh definition).

Common sense suggests that legislation, which typically targets present social problems, would be aimed at devices that have the "capacity," in that narrower sense, to cause the problem that is the subject of legislative concern, rather than addressing itself to the hazily defined universe of things that have only a theoretical potential to do so. That is so not least because a broader sweep is unnecessary to effect the legislators' protective purpose: in the context of the TCPA, for instance, devices with only the theoretical potential to perform the functions of an autodialer must necessarily obtain that actual ability before they pose a concrete risk of causing the problems which the statute was enacted to prevent. Based on the plain meaning of the statutory text, therefore, we are inclined to adopt a narrower definition of "capacity" than the one the FCC endorsed in its 2015 Order.

### B. *The D.C. Circuit's Opinion*

**\*5** In *ACA International*, the D.C. Circuit rejected the FCC's broad interpretation of "capacity" as inconsistent with the legislative purposes behind the TCPA, and concluded, as do we, that a narrower definition would be appropriate. It first determined that Congress did not intend the statute to reach as far as the FCC's interpretation would permit. Defining "capacity" to include "features that can be added ... through software changes or updates," as the FCC's 2015 Order did, 2015 Order at 7974 n.63, would extend the TCPA to reach to every smartphone that could be programmed to make automatic calls through a simple app download, with the result that every unwanted call to a cell phone from such a device could subject the caller to a $500 minimum statutory penalty—regardless of whether an autodialer feature was ever actually downloaded, let alone used, *ACA Int'l*, 885 F.3d at 697. As the D.C. Circuit pointed out, that outcome "would extend a law originally aimed to deal with

hundreds of thousands of telemarketers into one constraining hundreds of millions of everyday callers." *Id.* at 698. It therefore rejected the FCC's interpretation as an impermissible expansion of the statute's intended reach. *Id.* at 699. We agree that the consequences of the FCC's (and, by extension, King's) interpretation effectively disqualify it as a plausible reading of the statutory language.

In reaching that conclusion, however, the D.C. Circuit did not unequivocally adopt the view of the petitioners in that case (and of Time Warner here) that the term "capacity" was clearly limited to a device's "present ability." It observed that "[v]irtually any understanding of 'capacity' ... contemplates some future functioning state, along with some modifying act to bring that state about." *Id.* at 696. That analysis seems consistent with Congress's decision not to define a qualifying autodialer in terms of whether its autodialing functions were, in fact, in use during the offending call. But rejecting a narrow focus on the present "use" of the device is not an invitation to expand the statute's reach to the limits of a device's technological potential. Instead, the D.C. Circuit proposed:

> whether equipment has the 'capacity' to perform the functions of an ATDS ultimately turns less on labels such as 'present' and 'potential' and more on considerations such as how much is required to enable the device to function as an autodialer: does it require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment?

*Id.*

Although the D.C. Circuit was deciding only whether the FCC's specific interpretation was a reasonable one, rather than announcing what that court itself deemed to be the *best* interpretation of the statute, its analysis informs our understanding of the statutory text. We view the D.C. Circuit's discussion as correctly drawing a distinction between a device that currently has features that enable it to perform the functions of an autodialer—whether or not those features are actually in use during the offending call—and a device that can perform those functions only if additional features are added. We find that distinction persuasive; accordingly, we would conclude that the former category of devices falls within the definition of an ATDS, and the latter does not.[5] *See Herrick v. GoDaddy.com LLC*, No. CV-16-00254-PHX-DJH, 2018 WL 2229131, at *6 (D. Ariz. May 14, 2018) (concluding that *ACA International*'s reasoning directs courts to determine " 'how much' would be required to enable such capacity"); *Gragg v. Orange Cab Co.*, 995 F.Supp.2d 1189, 1196 (W.D. Wash. 2014) (in a case predating the 2015 Order, rejecting the argument that "a system that has to be reprogrammed or have new software installed in order to perform the functions of an ATDS [is] an ATDS").

Case 4:16-cv-03396-YGR   Document 206-1   Filed 07/16/18   Page 21 of 24

5    The Third Circuit recently reached essentially the same conclusion in *Dominguez v. Yahoo, Inc.*, ---- F.3d ----, 2018 WL 3118056 (3d Cir. June 26, 2018), holding that, following the D.C. Circuit's ruling in *ACA International*, in order for his TCPA claim to survive, the plaintiff in that case had to demonstrate that the defendant's equipment "had the present capacity to function as an autodialer." Slip op. at ----; *see also id.* at 9 n.23.

#### C. *Legislative History of "Capacity"*

Finally, the TCPA's ambiguous legislative history regarding the use of the term "capacity" does not cast doubt on the interpretation of the term we derive from the statute's text and purpose. Admittedly, that history does not unequivocally support our narrower interpretation, but neither does it clearly foreclose it. Indeed, it is somewhat supportive of our reading to the extent that Congress expressed concerns about the statute's potential for overreach if a broader definition was used.

**\*6** The House Committee on Energy and Commerce, which was responsible for reviewing and presenting in the first instance the bill that would become the TCPA, certainly recognized that the term "capacity" had some potential for expansiveness, and, indeed, seems to have selected the word partially on that basis. During the Committee's hearings, industry representatives expressed concern that the term "capacity" would allow the statute to reach too broadly and specifically advocated for the definition of an ATDS to focus instead on the actual "use" of a device. *See Telemarketing Practices: Hearing before the Subcomm. on Telecomms. & Finance of the H. Comm. on Energy & Commerce on H.R. 628, H.R. 2131, & H.R. 2184*, 101st Cong. 110–

11 (1989) (letter from Tracy Mullin, Senior Vice President of Gov't Affairs, Nat'l Retail Merchs. Ass'n); *see also Telemarketing/ Privacy Issues: Hearing Before the Subcomm. on Telecomms. & Finance of the H. Comm. on Energy & Commerce on H.R. 1304 & H.R. 1305*, 102d Cong. 107 (1991) (statement of Richard A. Barton, Senior Vice President for Gov't Affairs, Direct Mktg. Ass'n.). The Committee's report rejected that option, observing that the proposed definition of an ATDS included both "equipment which is designed or intended to be used to deliver automatically dialed prerecorded messages" and "equipment which has the 'capability' to be used in such manner."[6] H. Rep. No. 101-633, at 6 (1990).

6    The House version of the bill under consideration in the Report, like the statute ultimately enacted, used the word "capacity" rather than "capability." H. Rep. No. 101-633, at 11. It appears that the Committee used the latter word inadvertently in the passage quoted in the text.

The legislative history thus confirms what the language of the statute makes clear in any event: that the TCPA applies to calls from a device that *can* perform the functions of an autodialer, regardless of whether it has actually done so in a particular case.[7] The history is less clear, however, about the issue here: whether a device should be regarded as having the capacity to perform such functions only if it has the present ability to do so, or should be so regarded if the device *could* gain that ability if it were modified, such as by changes to its software.

7    In the same vein, in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009), the Ninth Circuit recognized that the definition of an ATDS

in the enacted version of the TCPA swept more broadly than a device's present use precisely because the statute used the term "capacity": to be a qualifying ATDS, that court explained, "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it." *Id.* at 951; *see also In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F.Supp.2d 1253, 1261 (S.D. Cal. 2012) (describing *Satterfield* as "confirm[ing] that the statute creates liability based solely on a machine's capacity rather than on whether the capacity is utilized").

The House Committee's Report acknowledged concerns that the definition of an ATDS could potentially be read broadly to "cover the mere ownership of office computers which are capable, perhaps when used in conjunction with other equipment, of delivering automated messages." H. Rep. No. 101-633, at 6. But instead of responding to those concerns by explicitly narrowing the definition, the Committee asserted that, even if such a broad reading prevailed, the statute would not regulate an unduly expansive category of equipment in any event, because the bill placed restrictions only on the "active 'use' [of an ATDS] to deliver automatically dialed *prerecorded* telephone solicitations without live operator intervention." *Id.* at 6–7 (emphasis added).

The Committee's proposed solution was incomplete. The Committee apparently failed to consider that even the version of the bill then under consideration also prohibited the use of an ATDS "to make unsolicited calls ... to any number assigned to a paging or cellular telephone service," apparently regardless of whether the call involved the use of a prerecorded voice. *Id.* at 11–12. The enacted version of the statute exacerbated that problem: it retains largely the same definition of an ATDS,[8] but now restricts

—as separate categories—calls made to cell phones without prior consent using *either* "any automatic telephone dialing system *or* an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added). Nevertheless, the Committee's effort to suggest that the statute's reach would be limited in response to concerns of overbreadth, rather than endorsing the broader view, suggests that Congress was troubled by the possibility that the TCPA could be read to restrict calls from every device that could somehow be converted into an autodialer.

8    In addition to having the capacity to store or produce certain numbers and dial them, the House bill also required a qualifying ATDS to have the capacity "to deliver, without initial live operator intervention, a prerecorded voice message to the number dialed, with or without manual assistance." H. Rep. No. 101-633, at 11. The third requirement was omitted from the enacted version of the statute. *See* 47 U.S.C. § 227(a)(1).

**\*7** The legislative history thus provides no definitive assistance in resolving the issue before us, and it certainly tells us nothing that would foreclose what we view as the best interpretation of the term "capacity" in the context of this statute, which we believe is a narrower one focusing on a device's current functions.

\* \* \*

**[5]** In sum, we conclude that the term "capacity" in the TCPA's definition of a qualifying autodialer should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software. That definition does not include every smartphone or computer

that might be turned into an autodialer if properly reprogrammed, but does include devices whose autodialing features can be activated, as the D.C. Circuit suggested, by the equivalent of "the simple flipping of a switch." *ACA Int'l*, 885 F.3d at 696. Within those bounds, however, courts may need to investigate, on a case-by-case basis, how much is needed to activate a device's autodialing potential in order to determine whether it violates the TCPA.

Applying those principles in the present case, we conclude that the district court's grant of partial summary judgment relied on an incorrect interpretation of the statute that was in turn premised on deference to an FCC Order that is no longer valid. The record does not permit us to conclude, as a matter of law, that Time Warner's system has the requisite "capacity," as we understand it, to meet the definition of an autodialer regulated by the TCPA. Nor does it permit us to conclude the opposite. On the present record, we do not know whether Time Warner's system had the ability to perform the functions of an ATDS when it made the calls to King, nor what kinds of modifications might be required to permit it to do so. Accordingly, the matter is remanded to the district court to take up those questions in the first instance.

## II. Other Issues

The parties have raised several additional arguments that were not resolved by the prior district court order and that the court may need to consider on remand. First, Time Warner argues that the district court's reading of the statute

would render its "random or sequential number generator" clause superfluous. The district court's ruling does not address that question. To the contrary, the district court stated that "[w]hether [Time Warner] *actually* dialed King's number randomly or from a list is irrelevant" because its system had the "*capacity* to dial random or sequential numbers," under the FCC's expanded definition of that term. App. at 304 (emphasis in original, internal quotation marks omitted). In *ACA International*, the D.C. Circuit noted that "the role of the phrase, 'using a random or sequential number generator,' has generated substantial questions over the years," which the FCC's 2015 Order failed to conclusively resolve. 885 F.3d at 701. To the extent that applying the narrower definition of "capacity" that we adopt today necessitates that those complicated questions be answered in the present case, we leave it to the district court to address them in the first instance.

Second, Time Warner argues that the district court improperly relied on a "human involvement" standard that is not reflected in the statute. Appellant's Br. at 27. We note that the FCC expressly declined to adopt such a standard in its 2015 Order. *See* 2015 Order at 7976. And it is unclear whether the district court intended to present the lack of human involvement in Time Warner's calls to King as an alternative basis for its ruling because it cites no authority for reading that standard into the statute. Given those uncertainties, we venture no opinion on whether that lack of human involvement is a consideration relevant to King's claims.

**\*8** In light of the technological complexities inherent in the application of the statute to different types of devices, software programs, and "systems," and the lack of clarity in the record as to the precise mechanisms constituting the Time Warner system that produced the calls to King, it seems prudent to limit our pronouncements in this case. Accordingly, we hold only that the district court decision was in error because (1) that decision was, understandably, based on deference to an administrative interpretation of the statute that has now been invalidated, and (2) when we consider the meaning of the statute independently, without an administrative interpretation to defer to, the best interpretation of the statutory language is the one suggested by the D.C. Circuit's discussion in *ACA International*:

in the TCPA's definition of an autodialer, a device's "capacity" refers to its current functions absent additional modifications, regardless of whether those functions were in use during the offending call. We leave it to the district court in the first instance to develop the factual record in this case and to apply the appropriate standard to the facts that emerge.

## CONCLUSION

For the reasons stated above, the judgment of the district court is VACATED, and the matter is REMANDED for further proceedings consistent with this opinion.

**All Citations**

--- F.3d ----, 2018 WL 3188716

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.