# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SANDRA MCMILLION, ET AL.,**<br>Plaintiffs,<br>vs.<br>**RASH CURTIS & ASSOCIATES,**<br>Defendant. | CASE NO. 16-cv-03396-YGR<br><br>**ORDER DENYING MOTION FOR SANCTIONS**<br>Re: Dkt. Nos. 211, 212, 241, 247 |

Plaintiffs Sandra McMillion, Jessica Adekoya, and Ignacio Perez bring this class action against defendant Rash Curtis & Associates ("Rash Curtis") alleging that defendant called plaintiffs and class members without consent.[1] On September 6, 2017, the Court certified four classes with Perez as the class representative, both for injunctive relief pursuant to Rule 23(b)(2) and damages pursuant to Rule 23(b)(3).[2] (Dkt. No. 81, ("Cert. Order").) On February 2, 2018, the Court ruled on parties cross-motions for summary judgment. (Dkt. No. 167 ("SJ Order").) In that order, the Court granted plaintiffs' motion for partial summary judgment regarding the dialer systems defendant used to make the alleged phone calls and held that those dialers constitute Automatic Telephone Dialing Systems ("ATDSs") within the meaning of the TCPA. (*Id.* at 2.) The Court also granted plaintiffs' motion for partial summary judgment on the issue of prior express consent regarding Perez and held that Rash Curtis never possessed prior express consent

---

[1] More specifically, plaintiffs allege violations of the (i) Telephone Consumer Protection Act, 47 U.S.C. Sections 227, *et seq.* (the "TCPA"); (ii) Fair Debt Collection Practices Act, 15 U.S.C. section 1692, *et seq.* (the "FDCA"); and (iii) the California Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code section 1788, *et seq.*, (the "Rosenthal Act"). (Dkt. No. 1 ("Compl.").)

[2] Plaintiffs moved for class certification with respect to their TCPA claims only and intend to pursue their FDCPA and Rosenthal Act claims on individual bases. (Dkt. No. 66 at 2.)

to call Perez. (*Id.* at 3, 11, 12.) On June 18, 2018, the Court denied Rash Curtis's motion to reconsider that summary judgment order. (Dkt. No. 199 ("Reconsideration Order").)

Now before the Court plaintiffs bring a motion for terminating sanctions based on the allegation that Rash Curtis "presented coordinated false and perjured testimony on the central issue in this case from [each of] three witnesses: Dan Correa, Robert Keith, and Nick Keith."[3] (Dkt. No. 212, ("Sanctions Mtn.") at i.) Having carefully reviewed the pleadings and the papers submitted, and for the reasons set forth more fully below, the Court **DENIES** plaintiffs' motion for sanctions.

## I. BACKGROUND

The background giving rise to this action is well-known and the Court will not repeat it here.[4] (*See, e.g.*, SJ Order at 3-5.) Relevant to the instant motions, plaintiffs allege that defendant's witnesses, whom plaintiffs deposed in October of 2017, lied under oath regarding defendant's conduct in calling phone numbers related to debt-accounts that were obtained via skip tracing. In support of this motion, plaintiffs point to a statistical analysis which reflects approximately 14 million matches between defendant's call logs and phone numbers supposedly obtained by skip tracing.

Defendant concedes that it did not have consent to call phone numbers obtained via skip tracing alone but argues that these "matches" can be explained by the fact that the phone numbers

---

[3] In conjunction with plaintiffs' motion for sanctions, they have filed an administrative motion to seal certain information that is the subject of a February 24, 2017 protective order (Dkt. No. 29) on the grounds that "[p]ublic disclosure of the Confidential Information could harm the Defendant's legitimate business interests." (Dkt. No. 211 at 2.) Plaintiffs also note that Exhibit 9 to the Declaration of Yeremy Krivoshey in Support of Plaintiffs' Motion for Sanctions "contains a phone number being dialed on the debt account in the emails' subject line[,]" disclosure of which could be used by third parties for the purposes of identity theft and fraud. (*Id.*) As defendant failed to file a declaration as required by Local Civil Rule 79-5(d)(1)(A), the Court finds that cause to seal exists *only* as to the telephone number found in the subject line of Exhibit 9 and accordingly **GRANTS IN PART AND DENIES IN PART** plaintiffs' motion to seal. (Dkt. No. 211.)

[4] Plaintiffs allege that defendant repeatedly called them on their telephones using an ATDS and/or an artificial or prerecorded voice. (Compl. ¶¶ 2, 4, 6.) Plaintiffs offer evidence that to make these calls, defendant employs three dialers, namely, the (i) DAKCS/VIC Software System ("DAKCS/VIC"), (ii) Global Connect system ("Global Connect"), and (iii) TCN (collectively, "Dialers"). Parties have extensively litigated defendant's use and the function of these Dialers. (*See* SJ Order, Reconsideration Order.)

2

responsible for the matches, although obtained by skip tracing, were separately acquired via another method or the subject of prior express consent of the called party.

### A. Skip Tracing

Defendant generally receives debt-accounts from creditors. (SJ Order at 4.) While some of these accounts include debtors' phone numbers,[5] defendant receives many accounts without any telephone numbers. (*Id.*) For these accounts, defendant uses a process referred to as "skip tracing" to obtain phone numbers associated with the names on the accounts. (*Id.*) "Skip tracing" is a method or process for locating individuals' phone numbers for the purpose of contacting them, using data analysis of personal information obtained from various public and private databases. (*Id.* (internal citations omitted).) According to plaintiffs, accounts for which defendant obtained phone numbers through skip tracing are marked with a unique status code and are, therefore, readily identifiable. (*Id.*)

### B. Purview of Defendant's Witnesses

In October 2017, prior to the parties cross-motions for summary judgment, plaintiffs took the depositions of Nick Keith and Robert Keith, as well as defendant's Rule 30(b)(6) witness, Dan Correa, all of whom addressed the issue of skip tracing. (*See* Dkt. No. 212-1, Ex. 2 ("N. Keith Dep."); *id.*, Ex. 3 ("R. Keith Dep."); *id.*, Ex. 1 ("Correa Dep.").) Nick Keith began working at Rash Curtis in 2008. (N. Keith Dep., 8:13-15.) Over the course of his employment, he had worked as a transfer agent, a collector, an IT analyst, and, most recently (since 2014), an IT manager. (*Id.* at 8:16-11:16.) In his role as an IT manager, he is largely responsible for overseeing and assisting with "on-boarding clients," which involves transferring data provided by creditors (telephone numbers, demographic information, etc.) and loading it onto Rash Curtis's servers. (*Id.* at 12:4-14:10.) Nick Keith also assures that incoming accounts with phone numbers are properly stored, including making sure that the phone numbers are input into their correct fields in defendant's account database. (*Id.* at 14:1-15:2.)

---

[5] These individuals are excluded from the classes certified in this case. (*See* Cert. Order at 7 (noting that "the classes are limited to those whose phone numbers defendant obtained through skip tracing rather than from a third-party debt owner or the individuals themselves").)

3

Robert Keith began working at Rash Curtis in 2006. (R. Keith Dep. at 9:14-18.) He started as a collection manager, which involved the responsibility of determining which numbers were called by the Dialers. (*See id.* at 9:21-24.) In 2010, Robert Keith became Vice President of Operations. (*Id.* at 10:5-11.) In this role, his responsibilities included overseeing the legal department. (*Id.* at 10:17-13:3.)

Correa began working at Rash Curtis in 2010, where he served as a collections manager from 2010 through 2015, after which he became a senior director of operations. (*See* Correa Dep., at 11:5-14, 11:15-24, 15:17-20.) In his capacity as a collections manager, he was "responsible for determining what numbers were called by" defendant's Dialers. (*Id.* at 12:10-17.) As senior director of operations, Correa oversaw and supervised other collections managers as well as personnel in the client services and legal departments. (*Id.* at 15:21-16:20.)

### C. Storage of Account Information

Defendant's account database supports storage of up to ten telephone number fields for each account. (Sanctions Mtn. at 3.) Phone fields 1 through 4 are reserved for phone numbers that defendant purportedly receives from its creditor-clients, whereas phone numbers obtained via skip tracing are loaded into phone fields 5 through 10, a policy which defendant instituted sometime in 2013. (*See* N. Keith Dep. at 14:11-15:7, 15:14-16) ("[P]hone field 1 through 4 are what comes in from the client, whatever phone number comes in from the client."); Correa Dep. at 51:20-52:19, 69:5-9, 70:19-71:14.)

Defendant's collection managers chose which telephone number fields, and therefore which numbers contained therein, are loaded into the Dialers according to criteria set for any given call campaign. (*See* N. Keith Dep. at 64:24-66:14, 77:23-78:12; *id.* Ex. 9 at 2 ("I was talking to Chris and Bob and Chris's Theory is that if we have all ECA and Accurint skip tracing phone numbers placed in fields 5-10 we can make the dialer and global not call these phone numbers and only the first four fields which are ALWAYS reserved for client given phone numbers or approved phone numbers by the debtor.")

//

//

## D. Testimony Subject to Perjury Charge

During their October 2017 depositions, Nick Keith, Robert Keith, and Dan Correa were each asked about Rash Curtis's calling of the telephone numbers stored in phone fields 5 through 10. (*See* N. Keith Dep. at 81:18-83:7, R. Keith Dep. at 18:16-20:10, Correa Dep. at 63:25-68-25.) Specifically, the deponents had the following exchanges. Nick Keith was asked:

> Q. So as of May 16, 2016, was it still possible to call telephone numbers in phone fields 5 through 10 using Global Connect?
>
> A. I don't believe so[.] No.
>
> Q. Why do you not believe so[?]
>
> A. There is something in Global Connect that will not allow certain phone number fields to be called.
>
> Q. Okay. And so that's – that was initiated on May 16, 2016; is that right?
>
> . . .
>
> A. Incorrect.
>
> Q. So when was it no longer possible to call phones in phone fields 5 through 10 on Global Connect?
>
> …
>
> A. I don't have a for sure date.
>
> Q. Was it possible to call those phone numbers in 2015?
>
> A. I don't know.
>
> Q. Okay. So it looks like in these e-mails you talk to a Dakcs employee to make sure that it was no longer possible to call phone numbers in phone fields 5 through 10; is that accurate?
>
> A. I made sure the export file to Global Connect would not contain those phone numbers.
>
> Q. Is that because if the export file did not contain those phone numbers, Global Connect could call those phone numbers?
>
> A. Incorrect.

5

| | |
|---|---|
| Q. | So why did you care about making sure that the export file you sent to Global Connect did not have those phone numbers? |
| A. | My job was all about redundancy, just in case. |

(N. Keith Dep. at 81:18-83:7.)

Robert Keith was asked:

| | |
|---|---|
| Q. | So you're saying that [Global Connect] never – Rash Curtis never put any numbers in phone fields 5 through 10 into [Global Connect]? |
| A. | To my knowledge, no, we never did. |
| Q. | You remember you're under oath, correct? |
| A. | I do. |
| Q. | Okay. and you're sticking with that answer? |
| A. | I am. |

(R. Keith Dep. at 18:16-20:10.)

Finally, Dan Correa was asked:

| | |
|---|---|
| Q. | Do you know if Rash Curtis ever dialed a cell phone in phone fields 5 through 10 using Vic? |
| A. | No. We dialed 1 through 3. |
| Q. | Why? |
| A. | 1 through 3, sorry. |
| Q. | You don't believe – do you know of a single instance when Rash Curtis called a cell phone in phone fields 5 through 10 using Vic? |
| A. | I do not recall an instance. |
| Q. | You don't know of a single instance that ever happened? |
| A. | I don't know. |
| Q. | Do you know – do you recall a single instance when Rash Curtis called a cell in phone fields 5 through 10 using Global Connect? |

| | |
|---|---|
| A. | I do not recall. |
| Q. | And you understand that you're under oath, correct? |
| A. | Yes. |
| Q. | And don't recall a single time that that ever happened? |
| A. | 2013's a long time ago. |
| Q. | No, I'm talking about any time that you worked there. |
| A. | A cell phone, I really can't comment. I – no, I can't say anything specific to cell phone call in that field. |
| Q. | Okay. So not – do you recall a single instance of Rash Curtis calling any phone in phone fields 5 through 10 at any time that you worked there? |

. . . [Objection]

| | |
|---|---|
| A. | I'm – yeah, I mean I – I would think so when a collector is – no, that would be TCN – no, not that I recall. |
| Q. | So you can't recall Rash Curtis ever calling a single phone number in phone fields 5 through 10 using Global Connect. |
| A. | On Global Connect, I think there was a time where we had an issue making sure that it wasn't calling those numbers; so at that time when we had system updates, some may have been called in error, but we fixed and corrected. |
| Q. | And when – when did this happen? |
| A. | I don't have an exact date. |

. . .

| | |
|---|---|
| Q. | 2015? |
| A. | That's starting to get a little recent, so I would say if 2015, probably earlier but more than likely later. |
| Q. | What was the issue that came up where you think that Rash Curtis may have called numbers in phone fields 5 through 10 using Global Connect? |

. . . [Objection]

7

|   |   |   |   |
|---|---|---|---|
| 1 | A. | I don't know – I don't remember enough to really comment on that. It was so long ago. |
| 2 |   |   |
| 3 | . . . |   |
| 4 | Q. | Do you remember a single time that Rash Curtis called any numbers in phone fields 5 through 10 using the Vic dialer? |
| 5 | . . . |   |
| 6 |   |   |
| 7 | A. | Fields 5 through 10, we may have. We may have called land lines at that time. |
| 8 | Q. | Okay. When was that? |
| 9 | A. | It's been so long. We don't really use Vic anymore. If I had to guess, maybe 2014-ish. |
| 10 |   |   |
| 11 | Q. | Okay. Do you remember a single time where Rash Curtis called a cell phone in phone fields 5 through 10 with the Vic dialer? |
| 12 |   |   |
| 13 | A. | Isn't that what you just asked me? |
| 14 | Q. | I said – I asked – I first asked any phone number. |
| 15 | A. | Okay. |
| 16 | Q. | And you clarified by land lines. |
| 17 |   |   |
| 18 | A. | Okay. Cell phone specific, no, I don't – I can't – I don't remember that, if we did or not. |

(Correa Dep. at 63:25-68:25.)

### E. Motion for Sanctions and Related Motions

On August 10, 2018, plaintiffs filed the instant motion for terminating sanctions based upon the allegation that Nick Keith, Robert Keith, and Dan Correa, through their testimony regarding calls placed to phone numbers found in fields 5 through 10 described above, committed "coordinated perjury on the most central issue in this case[.]" (Sanctions Mtn. at 2.) Plaintiffs filed their motion along with the testimony of Colin B. Weir, which contained his statistical analysis of the call logs produced by Rash Curtis[6] that plaintiffs claim reflect over 14 million

---

[6] Following a discovery dispute regarding production of "usable" call logs by Rash Curtis,

8

1  "matches" between phone calls made by Rash Curtis and phone numbers listed in phone fields 5
through 10 of defendant's account database. (Dkt. No. 212-2 ("Weir Decl.") ¶ 10.)

Defendant opposes the instant motion for sanctions on the grounds that Weir's methodology is "flawed because he *did not* disqualify from what was considered a 'match' calls that were placed to phone numbers not only stored in fields 5-10 but *also stored in phone fields 1-4*, or calls placed where Rash Curtis separately got the number not from skip tracing or otherwise obtained the 'prior express consent' of the called party (for example, directly.) (Dkt. No. 220 ("Sanctions Opp.") at 6 (emphasis in original).) However, at the time of their opposition, defendant had not produced, in full, the phone data held in fields 1 through 4.[7]

A discovery dispute ensued in which plaintiffs averred that they "had no reason to suspect that there were any potential matches between phone numbers in phone fields 5-10 and phone fields 1-4" and did not raise the issue when the account storage data was originally produced because they had "assumed that the data [for phone fields 1 through 4] was either non-existent or irrelevant." (Dkt. No. 221 at 2, 5.) Defendant countered that plaintiffs' counsel never requested the data in fields 1 through 4 and had confirmed to the Court on several occasions that plaintiffs were only requesting fields 5 through 10, as well as the associated account number and debtor name. (*See* Dkt. No. 222 at 2.) On September 27, 2018, after hearing oral argument, Magistrate Judge Jaqueline Scott Corley found that "[t]o allow Defendant to withhold documents central to its defense under these circumstances would be contrary to the purpose of the Federal Rules of Civil Procedure 'to secure the just. . . determination of every action and proceeding'" and ordered the records produced at plaintiffs' expense. (Dkt. No. 228.) On October 11, 2018, defendant moved for relief from Judge Corley's non-dispositive pretrial order. (Dkt. No. 241 ("Relief Mtn.").) Plaintiffs did not file any response or opposition thereto.

Parties subsequently filed several discovery letter briefs, two from defendant on October 3,

---

on March 16, 2018, the Court found that Rash Curtis had complied in good faith in securing and producing "usable" call logs. (*See* Dkt. No. 184.)

[7] Defendant had produced a sample of approximately 90,000 accounts that included data from phone fields 5 through 10 as well as 1 through 4. (*See* Dkt. No. 221 at 2.)

9

2018 and October 10, 2018 and one from plaintiffs on October 11, 2018, regarding a dispute among the parties as to precisely what defendant needed to produce in light of Judge Corley's September 27, 2018 order.[8] (*See* Dkt. Nos. 236, 238, 239.) Specifically, the dispute concerned whether defendant needed to produce "historical" records of account files as they existed in November 2017 (the date of defendant's initial production) or defendant's account records for all previously produced accounts as they are kept today ("present" records). (*See, e.g.*, Dkt. No. 239 at 2.) Despite the dispute, defendant agreed to produce both sets of records and completed its production on October 19, 2018.[9] (*See* Dkt. No. 243 at 1 ("Defendant made its production on a rolling basis and, on October 19, 2018, Defendant informed Plaintiff that it had substantially completed its supplemental production.").) On November 6, 2018, plaintiffs filed a motion for leave to enter into the record in support of their motion for sanctions a supplemental declaration from Weir regarding his analysis of the newly produced data.[10] (Dkt. No. 247.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 37 "[a]uthorizes a full range of sanctions – from fee awards to 'terminating' sanctions – against parties or attorneys for violation of discovery orders or abuse conduct in the course of discovery proceedings." Jones, Rosen, Wegner, and Jones, *Rutter Group Practice Guide: Federal Civil Trials & Evidence* ¶ 13:214 (The Rutter Group 2018); Fed. R. Civ. P. 37. "A district court's use of sanctions is limited by two standards. First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery. Sanctions interfering with the litigant's claim or defenses violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." *Wyle v. R.J. Reynolds Indus., Inc.*, 709

---

[8] Judge Corley struck defendant's discovery letter brief filed at Docket Number 238 for violating the Court's Civil Standing Order. (Dkt. No. 240.)

[9] Accordingly, the Court **DENIES AS MOOT** defendant's motion for relief from non-dispositive pretrial order of Magistrate Judge Corley. (Dkt. No. 241.)

[10] Weir's supplemental analysis found that "99% of the telephone numbers in Fields Five through Ten are not also contained in Fields One through Four – a total of 1,484,646 unique account telephone numbers. (Dkt. No. 247 at 3.)

F.2d 585, 591 (9th Cir. 1983) (internal citations omitted).

Before imposing *terminating* sanctions, "[a] district court must determine [A] the existence of certain extraordinary circumstances, [B] the presence of willfulness, bad faith, or fault by the offending party, [C] the efficacy of lesser sanctions, [D] the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case, and finally, as optional considerations where appropriate, [E] the prejudice to the party victim of the misconduct, and [F] the government interests at stake." *Halaco Engineering Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988).

### III. ANALYSIS

#### A. Extraordinary Circumstances

"Dismissal under a court's inherent powers is justified in extreme circumstances, in response to abusive litigation practices, and to insure the orderly administration of justice and the integrity of the court's orders." *Halaco*, 843 F.2d at 380 (internal citations omitted). In the Ninth Circuit, "extraordinary circumstances exist where there is a pattern of disregard for Court orders and deceptive litigation tactics that threaten to interfere with the rightful decision of a case." *Valley Engineers, Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

Compare the facts of this case to those of *Englebrick v. Worthington Indus., Inc.*, in which the district court granted defendant's motion for terminating sanctions and upon which plaintiffs heavily rely. 944 F.Supp.2d. 899 (C.D. Cal. 2013). In *Englebrick*, the plaintiffs filed a products liability action against defendant asserting design flaws in a glass cylinder after plaintiffs suffered burns while using the glass cylinder. *Id.* at 901-02. Defendant countered that the fire was not caused by a design defect, but by plaintiffs' misuse use of the cylinder, specifically that the plaintiffs were using the cylinder to smoke methamphetamine. *Id.* at 902-03. Plaintiffs continuously lied, including before the court during pretrial proceedings, about their methamphetamine usage, until, after four years of litigation, they admitted to perjury while testifying during the second week of trial. *Englebrick v. Worthington Indus., Inc.*, 620 F.App'x 564, 566-67 (9th Cir. 2015) (upholding district court's decision to dismiss plaintiffs' complaint "as a sanction for their repeated lies under oath during pretrial proceedings about a topic essential to"

11

1 the defendant's defense).

2 Here, the depositions containing the allegedly false statements were submitted to the Court for the first time not by defendant, but by plaintiffs in support of the instant motion. Plaintiffs do not, and cannot, aver that these statements "threaten to interfere with the rightful decision of a case." *Valley Engineers, Inc.*, 158 F.3d at 1057. Rather, at most, plaintiffs can assert that defendant's witnesses provided plaintiff with incomplete information in their depositions. Accordingly, plaintiffs have failed to show that extraordinary circumstances warranting terminating sanctions exist.

### B. Presence of Willfulness, Bad Faith, or Fault

A court must find willfulness, fault, or bad faith in order for terminating sanctions to be proper. *Anheuser-Busch v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995). In *Halaco*, the Ninth Circuit held that the "fault at issue was insufficient to support a dismissal[,]" noting that "[i]f EPA had sought to introduce the report at trial, Halaco might have a colorable claim that the method of preparation constituted an abusive litigation tactic." 843 F.2d at 381.

Here, defendant has not sought to introduce as exhibits or rely upon in support of any substantive motions any of the allegedly false statements as exhibits. Notably, defendant did not use any of the testimony in support of its motion for summary judgment or in opposition to plaintiffs' analogous motion. (*See, generally*, Dkt. Nos. 140, 152.) While the witnesses equivocated, the record does not contain evidence of willfulness, bad faith, or fault.[11]

### C. Efficacy of Lesser Sanctions

Plaintiffs focus primarily on terminating sanctions. Such sanctions "violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." *Wyle*, 709 F.2d at 591 (internal citation omitted). As discussed above, here defendant has not attempted to "use" the allegedly false statements during summary judgement, or at any other juncture. (*See, supra* III.A, B.) Accordingly, plaintiffs have failed to show how the allegedly false statements could have interfered with the disposition of this case.

---

[11] At most, it may be surmised.

12

### D. Relationship or Nexus Between Misconduct and Matters in Controversy

"The most critical criterion for the imposition of a dismissal sanction is that the misconduct penalized must relate to matters in controversy such a way as to interfere with the rightful decision of the case . . . . There must be a nexus between the party's actionable conduct and the merits of his case." *Halaco*, 843 F.2d 381 (internal citations omitted). Moreover, the nexus between the alleged misrepresentations and the actionable conduct must be specific and not general. *Tripati v. Corizon Incorporated*, 713 Fed.Appx. 710 (9th Cir. 2018) (reversing termination sanctions because "the district court defined the nexus at too high a level of generality," where plaintiff lied about being blind and where the district court had imposed terminating sanctions upon a finding that plaintiff's "misrepresentations concern[ed] [plaintiff's] medical condition, which is directly at issue in [the] lawsuit").

Although the Court does not agree with plaintiffs that the issue of whether defendant called numbers in phone fields 5 through 10 is the *only* issue left to be proved at trial, it is certainly central to determining whether Rash Curtis violated the TCPA as to a member of the class by autodialing a cellular phone number which it obtained via skip tracing and did not either separately acquire via another method or receive prior express consent of the called party. (*See* Dkt. No. 225 ("Sanctions Reply") at 10.)

Accordingly, although there is a nexus between the alleged misconduct and the matters in controversy for the reasons stated herein, plaintiffs have not established that the alleged misstatements constituted an extraordinary circumstance resulting from willfulness, bad faith, or fault, which could not be addressed by lesser sanctions, as required to support terminating sanctions.[12] Therefore, to impose terminating sanctions "would constitute an unnecessary and drastic substitute for the adversary process of litigation."[13] *Halaco*, 843 F.2d 382.

---

[12] Because the Court has found that three of the four initial factors to be considered when contemplating whether to impose terminating sanctions weigh against so imposing, the Court need not address the optional factors of the prejudice to the party victim of the misconduct, and the government interests at stake. *See United States v. National Medical Enterprises, Inc.*, 792 F.2d 906, 913 (9th Cir. 1986) (noting that although a showing of prejudice is not required, it is a relevant factor the court should consider prior to ordering a dismissal).

[13] Moreover, the same can be said of plaintiffs' request for lesser sanctions, namely

13

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** plaintiffs' motion for sanctions.[14]

This Order terminates Docket Numbers 211, 212, 241, and 247.

**IT IS SO ORDERED.**

Dated: January 23, 2019

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

exclusion of evidence and direct adverse inference instructions, as well as monetary sanctions. (Sanctions Mtn. at 24-25.) Weir's statistical analysis does not, alone, support an accusation of false testimony, let alone willful perjury, by defendant's witnesses. *United States v. Dunnigan*, 113 S. Ct. 1111, 1116 (1993) (holding that a witness commits perjury only "if she gives false testimony concerning a material matter with the *willful intent* to provide false testimony, rather than as a result of confusion, mistake, or faulty memory") (emphasis supplied).

Robert Keith's testimony addressed only whether the numbers in fields 5 through were *loaded* into Global Connect, not whether those numbers were subsequently called. (R. Keith Dep. at 18:16-20:10.) Nick Keith's testimony similarly addressed whether the Global Connect export files would contain those numbers from fields 5 through 10 and whether Global Connect itself would be allowed to call those numbers. (R. Keith Dep. at 81:18-83:7.) Finally, Correa's testimony, although as a Rule 30(b)(6) witness, addressed only his recollection. (Correa Dep. at 63:25-68:25. Therefore, the Court denies plaintiffs' request for lesser sanctions.

[14] Accordingly, the Court **DENIES AS MOOT** plaintiffs' motion for leave to file newly discovered evidence in support of their motion for sanctions. (Dkt. No. 247.)

14