**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey O. Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
        ykrivoshey@bursor.com
        breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail:  scott@bursor.com

*Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA MCMILLION, JESSICA ADEKOYA, and IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>      Plaintiffs,<br><br> v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>      Defendant. | Case No. 4:16-cv-03396-YGR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION TO STRIKE OR EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT RANDALL A. SNYDER**<br><br>Date:  March 19, 2019<br>Time: 2:00 p.m.<br>Courtroom: 1<br><br>Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**PAGE(S)**

I.      INTRODUCTION ...................................................................................................1

II.     OBJECTIONS TO EVIDENCE .............................................................................2

    A.     The Court Has Already Stricken The "ECA Advanced Trace Report"
        and "Edit Tracking Report" Pursuant To Fed. R. Civ. P. 37(c)(1)............................2

    B.     The Court Should Strike Arguments Concerning Evidence That
        Defendant Claimed Did Not Exist In Discovery .........................................................4

III.    PLAINTIFF PROPOSED A RELIABLE METHOD FOR IDENTIFYING
    CALLS TO CLASS MEMBERS ........................................................................8

IV.     LEGAL STANDARDS .......................................................................................16

V.      THE COURT SHOULD DENY DEFENDANT'S MOTION TO STRIKE
    OR EXCLUDE MR. SNYDER'S TESTIMONY ...............................................17

    A.     Mr. Snyder's Opinions Regarding Class Membership Easily Pass
        *Daubert's* Admissibility Test ..............................................................................17

    B.     Mr. Snyder's Opinions Regarding Rash Curtis' Autodialers Are
        Admissible As Background Information Helpful To The Jury ...............................22

    C.     Defendant's Other Objections Are Meritless ........................................................22

VI.     CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
  2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) ........................................................... 16, 18, 23, 25

*AngioScore, Inc. v. TriReme Med., Inc.*,
  2015 WL 5258786 (N.D. Cal. Sept. 8, 2015) .......................................................................... 16, 18

*Bergen v. F/V St. Patrick*,
  816 F.2d 1345 (9th Cir. 1987) ......................................................................................... 17, 18, 24

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ...................................................................................................... 21

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................................................................ 16, 17

*Elsayed Mukhtar v. Cal State. Univ.*,
  299 F.3d 1053 (9th Cir. 2002) ...................................................................................................... 16

*Fair Hous. of Marin v. Combs*,
  285 F.3d 899 (9th Cir. 2002) ......................................................................................................... 7

*Haiping Su v. Nat'l Aeronautics & Space Admin.*,
  2011 WL 7293396 (N.D. Cal. Apr. 7, 2011) ........................................................................... 17, 18

*Krakauer v. Dish Network L.L.C.*,
  311 F.R.D. 384 (M.D.N.C. 2015) ................................................................................................. 19

*Krakauer v. Dish Network L.L.C.*,
  2017 WL 2455095 (M.D.N.C. June 6, 2017) ............................................................................... 19

*Krakauer v. Dish Network, L.L.C.*,
  2015 WL 5227693 (M.D.N.C. Sept. 8, 2015) ......................................................................... 18, 19

*Legg v. Voice Media Grp., Inc.*,
  2014 WL 1767097 (S.D. Fla. May 2, 2014) ................................................................................. 25

*McClellan v. I-Flow Corp.*,
  710 F. Supp. 2d 1092 (D. Or. 2010) ............................................................................................ 17

*Primiano v. Cook*,
  598 F. 3d 558 (9th Cir. 2010) ................................................................................................. 17, 21

*R & R Sails Inc. v. Ins. Co. of State of PA*,
  251 F.R.D. 520 (S.D. Cal. 2008) ............................................................................................... 8, 9

*Reyes v. BCA Fin. Servs., Inc.*,
  2018 WL 3145807 (S.D. Fla. June 26, 2018) .............................................................................. 20

*Romero v. S. Schwab Co., Inc.*,
  2017 WL 5885543 (S.D. Cal. Nov. 29, 2017) ........................................................... 16, 18

*Sterk v. Path, Inc.*,
  46 F. Supp. 3d 813 (N.D. Ill. 2014) ..................................................................... 24, 25

*Van Patten v. Vertical Fitness Grp., LLC*,
  847 F.3d 1037 (9th Cir. 2017) ...................................................................... 1, 3, 4, 15

*Wendell v. GlaxoSmithKline LLC*,
  858 F. 3d 1227 (9th Cir. 2017) ............................................................................. 17

*Yokoyama v. Midland Nat. Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) ..................................................................... 21, 22, 23

**RULES**

Fed. R. Civ. P. 30(b)(6) .................................................................... 8, 10, 11, 12

Fed. R. Civ. P. 37(c)(1) .......................................................................... passim

Fed. R. Evid. 702 ............................................................................................... 17

Fed. R. Evid. 704 ............................................................................................... 24

# I.  INTRODUCTION

Plaintiff's expert Randall A. Snyder is expected to testify, *inter alia*, about the methodology for identifying calls made to class members.  *See gen*, Krivoshey Decl., Ex. 1, Nov. 12, 2018 Supplemental Declaration of Randall A. Snyder ("Snyder Decl.").  Plaintiff has been able to identify a total of 534,698 autodialed calls made to 40,420 class-member telephone numbers.  *See* Krivoshey Decl., Ex. 2, Class Member Data Tabulation Report of Anya Verkhovskaya ("Verkhovskaya Report"), at ¶ 26; *id*., Krivoshey Decl., Ex. 3, Nov. 12, 2018 Declaration of Colin B. Weir ("Weir Decl."), at ¶ 15.  Each of these numbers was 1) assigned to cellular telephones at the time of the calls, 2) does not belong to a debtor on Defendant's account for which the calls were being placed, 3) was in phone fields 5-10 of Defendant's account database (where all skip-traced phone numbers were placed), 4) was never contained in phone fields 1-4 (where phone numbers from creditors were placed), and 5) was actually called by one of Defendant's autodialers.

Defendant has raised *one* issue concerning Plaintiff's proposed methodology for identifying class members.  According to Defendant, the methodology may be overinclusive because some of the numbers identified by Plaintiff's experts may not have been obtained through skip tracing.[1]  However, Defendant has not introduced a shred of evidence in support of its criticism.  It has not introduced a single document showing that it did not obtain any of the 40,420 class member numbers through skip tracing.  Defendant did not designate any rebuttal witnesses, or produce any rebuttal reports, showing that *any* of the 40,420 numbers were not obtained through skip tracing.  Defendant's deadline to do so passed on November 26, 2018.  *See* Case Management and Pretrial Scheduling Order No. 2, ECF No. 246.  Expert discovery closed on December 21, 2018.  Defendant also did not disclose or produce a single document as an exhibit to be used at trial showing that it did not obtain any of the 40,420 numbers through skip tracing.  Defendant's deadline to exchange exhibits to be used at trial passed on January 11, 2019.  *Id*.  Indeed, at trial, *Defendant bears the burden* to prove that it had consent to call these numbers, *i.e*., that it obtained these numbers from its creditor-clients.  *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d

---

[1] The certified classes require that class members' telephone numbers were obtained through skip tracing.  *See* Order Granting Plaintiffs' Motion for Class Certification, ECF No. 81, at 15-16.

1037, 1044 (9th Cir. 2017).  But, as discussed above, Defendant has not produced or disclosed a single document showing that it obtained any of the 40,420 numbers from its creditor-clients.

Defendant's attacks on the sources of data used by Mr. Snyder go to the weight the jury should give to his testimony, not the admissibility of Mr. Snyder's opinions.  At trial, Plaintiff will only need to prove that it is "more likely than not" that the 40,420 numbers belonged to class members, not the apparent 100 percent certainty standard that Defendant suggests.  As discussed below, the circumstantial and direct evidence overwhelmingly show that the 40,420 identified numbers were, in fact, obtained through skip-tracing.  Further, considering that Defendant has not presented any rebuttal evidence or witnesses and has not disclosed a single document or exhibit to be used at trial to show that any of the 40,420 numbers were not obtained through skip tracing, Plaintiff's case will essentially be unrebutted at trial.  Defendant's utter lack of a defense is glaring. The Court should deny Defendant's motion to strike Mr. Snyder.

## II.  OBJECTIONS TO EVIDENCE

### A.  The Court Has Already Stricken The "ECA Advanced Trace Report" and "Edit Tracking Report" Pursuant To Fed. R. Civ. P. 37(c)(1)

In the Court's Order Granting Plaintiffs' Motion for Class Certification, the Court warned Defendant against sandbagging and delay tactics.  *See* ECF No. 81, at 9 n. 9 ("While the Court does not condone defendant's blatant delaying and sandbagging tactics, for the purposes of judicial efficiency, the Court will consider the additional evidence at this time.  Defendant is warned, however, that the use of such tactics in the future may result in evidentiary or monetary sanctions.").  Defendant did not heed the Court's warning.  In the Court's summary judgment order, the Court struck several of Defendant's proffered exhibits pursuant to Fed. R. Civ. P. 37(c)(1) for untimely disclosure and for misleading Plaintiff's counsel about the existence of certain documents and evidence.  ECF No. 167, at 12 n. 9.  Now, without moving for reconsideration of the Court's order striking these exhibits, and without any other justification, Defendant again cites the same stricken exhibits in its present motion.

Specifically, at least *five times* in its brief, Defendant cites a purported "ECA Advanced Trace Report" from the account for which Plaintiff Perez received calls.  *See* Def's Br. at 3:1-2

(citing "ECA Advanced Trace Report, Dkt. No. 140-7, p. 135"); *id.*, at 15:12-14 (citing a "skip-tracing report" that was "Bates-stamped as RCA 000279"); *id.*, at 15:19-20 (citing "ECA Advanced Trace Report, Dkt. No. 140-7, p. 135" and Bob Keith's declaration discussing the same exhibit); *id.*, at 19:17 (citing "ECA Advanced Trace Report, Dkt. No. 140-7, p. 135"); *id.*, at 21:22-24 (referring to the "ECA Advanced Trace report" on the account for which Perez received calls). Indeed, Defendant even asks that the Court strike parts of Mr. Snyder's testimony because he never saw the ECA Advanced Trace Report, failing to mention that the report was stricken because of Defendant's discovery abuse and cannot be used at trial. *See id.*, at 21:22-24. Further, Defendant cites at least three times to an "Edit Tracking report" regarding the account for which Perez received calls. *See id.*, at 19:7-10 (citing "Edit Tracking Report, Dkt. No. 140-7, p. 137" and Keith's declaration discussing the same exhibit); *id.*, at 19:15-17 (citing "Edit Tracking report"); *id.*, at 19:18 (citing "Edit Tracking report" and Keith's declaration discussing the same exhibit).

The "ECA Advanced Trace Report" was attached as Exhibit 18 to Defendant's Master List of Exhibits in Support of Motion for Summary Judgment. *See* ECF No. 140-5, at 3; ECF No. 140-7. The "Edit Tracking" report was attached as Exhibit 19 to Defendant's Master List of Exhibits. *See id.* Plaintiff moved to strike these exhibits in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, ECF No. 151, at 10-12, and Plaintiffs' Reply In Support of Plaintiffs' Motion for Partial Summary Judgment, ECF No. 158, at 14-15. Plaintiff moved to strike these exhibits because Defendant claimed in multiple meet and confer discussions that they did not exist at all and then sandbagged Plaintiff with these exhibits two days before the October 25, 2017 discovery cut-off, and three days after Plaintiff deposed Defendant's Rule 30(b)(6) witness. *See id.* The Court agreed with Plaintiff and struck the exhibits:

> Plaintiffs move to strike Exhibits 18 and 19 to the declaration of Bob Keith which was filed on January 8, 2018. (Dkt. No 140, Declaration of Bob Keith ("Bob Keith Decl."), Exs. 18 and 19.) According to Keith, Exhibit 18 "is a screenshot of an 'ECA Advanced Trace Report'" and "does not show a phone number ending in 5193" which is the number associated with plaintiff Perez (*Id.* ¶ 12.) Exhibit 19 is a screenshot of a defendant's "'Edit Tracking Report' for Daniel Reynoso's account." (*Id.* ¶ 13.) Defendant argues that these reports show that Perez's number was not skip-traced and therefore Perez cannot meet the class definition.

> Plaintiffs aver that these exhibits should be stricken pursuant to Fed. R. Civ. Pro. 37(c)(1) because defendant failed to "provide [this] information as required by Rule 26(a)." Specifically, plaintiffs proffer evidence that defendant represented on May 8, 2017, that no "ECA reports were generated for . . . Perez." (Dkt. No. 151, Ex. 38.) Counsel further represented on May 8, 2017, that plaintiffs "already have everything which my client can produce in this regard." (*Id.*)
>
> Defendant counters that these reports were generated for Reynoso, not for Perez. Rash Curtis does not persuade. The Court finds defendant's representation that plaintiffs "already [had] everything that [Rash Curtis] can produce" in regard to ECA Advanced Trace and Edit Tracking Reports relevant to Perez's claims inconsistent with defendant's current position that Exhibits 18 and 19 "conclusively establish that Mr. Perez's 5194 number was not skip-traced." Accordingly, the Court **STRIKES** Exhibits 18 and 19 to the declaration of Bob Keith.

ECF No. 167, at 12 n. 9.

Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Apparently, striking the two exhibits was an insufficient sanction for Defendant's discovery abuse. Accordingly, Plaintiff asks that the Court again strike all references to the exhibits and sanction Defendant for its willful disregard of the Court's order.

### B. The Court Should Strike Arguments Concerning Evidence That Defendant Claimed Did Not Exist In Discovery

Defendant also cites to new evidence that it previously stated did not exist. Like this Court, Judge Corley has repeatedly warned Defendant against such tactics. *See, e.g.*, Order Regarding Defendant's Discovery Letter Brief, ECF No. 240, at 1 (striking Defendant's letter brief and stating that the "Court expects that counsel who practice in this District will abide by their representations made to opposing counsel. The Court further expects that to the extent any party intends to rely on any data in this lawsuit, be it in support of or in opposition to a motion or at trial, the party shall first produce that data to the opposing party."); Order Compelling Production of Calling Records, ECF No. 228, at 1 ("To allow Defendant to withhold documents central to its defense under these circumstances would be contrary to the purpose of the Federal Rules of Civil Procedure").

Repeatedly throughout its motion, Defendant chastises Plaintiff for purportedly never requesting or referring to records with the "'SKP' or skip trace status code" to try to identify

telephone numbers that were obtained by Defendant through skip tracing.  Specifically, Defendant states:

> **Although records do exist [that] would reveal the so-called "SKP" or skip trace status code**, neither Mr. Snyder no Plaintiffs' other experts, Mr. Weir and Ms. Verkhovskaya, used these records to identify the telephone numbers which were allegedly obtained by Rash Curtis through skip tracing.  **It is in the collection notes used by Rash Curtis' collectors that the unique "SKP" skip trace status code is to be found, and those collection notes have never been requested or produced for any of the putative class members.**
>
> To complicate matters further, the "SKP" status code simply means that skip-tracing is needed to obtain new contact information…

Def's Br. at 4 (emphasis added).  Defendant also states:

> Mr. [Steven] Kizer **accurately explains that a debtor's account gets marked with the "SKP" status code** when a collector determines that skip-tracing efforts are required to obtain new contact information so that Rash Curtis could continue attempting to collect on the account.
> ...
> Collectors were also free to perform manual skip-tracing on accounts not marked with the SKP status code, further complicated matters.  In other words, using the "SKP" status code to determine which telephone numbers were skip-traced and then subsequently called by Rash Curtis is not a fool-proof or perfect method …
> …
> Rather, as Mr. Kizer testified, **the SKP identifier code is found only in Rash Curtis' collection notes**…

*Id.*, at 14 (bolding added, underlining omitted).  Defendant also states:

> These opinions ignore Mr. Kizer's testimony … that the way to determine whether a number was skip-traced is to (1) consult the collection notes and look for the "SKP" prefix …

*Id.*, at 20.

Defendant's arguments that (1) Plaintiff never sought account records bearing the SKP marking and that (2) the records in fact exist are incredibly troubling at this late stage of the proceeding.   As an initial matter, Plaintiff's Request for Production No. 23 sought "DOCUMENTS sufficient to identify every SKIP-TRACED CALL RECIPIENTS' first name, last name, area code, cellular number, date, and result of each call to a SKIP-TRACED CALL RECIPIENT with the CLASS PERIOD."  Krivoshey Decl., Ex. 4 at 8.[2]  Plaintiff's Request for

---

[2] "SKIP-TRACED CALL RECIPIENTS" was defined as "all persons whose cellular telephone numbers [Defendant] obtained through the use of skip-tracing AND to whom [Defendant] placed

Production No. 25 sought the production of "DOCUMENTS sufficient to identify ALL telephone numbers YOU obtained through skip tracing within the CLASS PERIOD." Krivoshey Decl., Ex. 5 at 6. To the extent Defendant now argues that skip-traced telephone numbers can be identified through scanning the collection notes for "SKP" markings, Defendant is in violation of Rule 37(c)(1) for failing to produce such documents in discovery.

Even more troubling, however, is Defendant's interrogatory responses and meet and confer communications stating that account records bearing the "SKP" marking *do not exist*, and, further, that Defendant *never even used such a marking*. For instance, Plaintiff's Interrogatory No. 8 and Defendant's Response to Plaintiff's Interrogatory No. 8 are set out in full below:

> **INTERROGATORY NO. 8:**
>
> IDENTIFY ALL debtor's accounts in YOUR DAKCS OR Beyond ARM software bearing a "SKP" status code or marker during the CLASS PERIOD.
>
> **RESPONSE TO INTERROGATORY NO. 8:**
>
> Objection; this interrogatory is vague and ambiguous, overbroad and oppressive, unduly burdensome and harassing, and seeks information that is neither relevant nor reasonable calculated to lead to the discovery of admissible evidence. Without waving the foregoing objection(s), this responding party responds as follows: **None.**

Krivoshey Decl., Ex. 6 at 2 (emphasis added).

In subsequent meet and confer emails, Defendant's counsel explained that "None" really meant "None." In a June 28, 2017 email, counsel for Defendant stated:

> [A]s noted in Rash Curtis' responses to your client's second set of interrogatories ... **Rash Curtis does not use the "SKP" status code on any of its collection accounts. I know this probably contradicts what your star witness, Steve Kizer, testified to, but he simply has no clue what he is talking about.** He was a compliance manager responsible for training new collectors, not generating campaign lists or notating collection accounts.

Krivoshey Decl., Ex. 7 (emphasis added). On July 22, 2017, Defendant's counsel again stated that Defendant did not have a single account bearing an "SKP" marking:

> [T]o my knowledge, **none of Rash Curtis' accounts are marked SKP, despite what that liar Steven Kizer told you**..."

Krivoshey Decl., Ex. 8 (emphasis added).

---

PHONE CALLS to such persons' cellular telephones after obtaining their cellular telephone number through the use of skip tracing." Krivoshey Decl., Ex. 4 at 2.

1

2    Throughout all of fact and expert discovery, Defendant maintained that its former

3    compliance manager Mr. Kizer lied under oath by testifying that skip-traced telephone numbers

4    could be identified, in part, by analyzing debtor accounts bearing the "SKP" marking.  Defendant

5    stated in response to a narrow interrogatory that not a single account in its entire account database

6    bore the "SKP" marking.  Now, after the close of discovery, Defendant argues that Mr. Kizer was

7    apparently telling the truth the whole time, and that Defendant does in fact use the "SKP" marking.

8    *See* Def's Br. at 4 ("records do exist [that] would reveal the so-called "SKP" or skip trace status

9    code"); *id.*, at 14 ("Mr. Kizer accurately explains that a debtor's account gets marked with the

10   'SKP' status code when a collector determines that skip-tracing efforts are required …"); *id.*, at 30

11   (These opinions ignore Mr. Kizer's testimony … that the way to determine whether a number was

12   skip-traced is to (1) consult the collection notes and look for the "SKP" prefix …").

13       Defendant even argues that "the SKP identifier code is found only in in Rash Curtis'

14   collection notes," which are "accessible from within Rash Curtis' collection software, Beyond

15   ARM."  *See id.*, at 14-15.  *See also id.*, at 20 (stating that "ECA Advanced Trace reports" and "Edit

16   Tracking history" are "both … stored in Rash Curtis' collection software, Beyond ARM.").  If that

17   is true, Defendant's response that it had zero ("None") accounts in its "Beyond ARM software

18   bearing a 'SKP' status code or marker" to Plaintiff's Interrogatory No. 8 is blatantly false.

19       Defendant's insistence throughout fact discovery that it did not have any account records

20   bearing the SKP marking colored and influenced nearly every decision Plaintiff made throughout

21   the litigation of this case, including decisions regarding what discovery was pursued, what motions

22   to compel Plaintiff filed, what experts were hired, how class members would be identified, and

23   how notice to class members would be given.  Pursuant to Fed. R. Civ. P. 37(c)(1), Plaintiff

24   believes that Defendant's egregious discovery conduct deserves severe sanctions, including, *e.g.*,

25   the striking of its *Daubert* motions, preventing Defendant from arguing that Plaintiff's experts

26   failed to consider the referenced material at trial, instructing the jury as to Defendant's discovery

27   violations, imposing an adverse inference as to the telephone numbers Plaintiff's experts identified

28   as having been obtained from skip-tracing, and striking Defendant's answer.  *See, e.g., Fair Hous.*

*of Marin v. Combs*, 285 F.3d 899, 905–906 (9th Cir. 2002) (affirming district court's striking of defendant's answer where the defendant misrepresented that certain documents did not exist); *R & R Sails Inc. v. Ins. Co. of State of PA*, 251 F.R.D. 520, 528–529 (S.D. Cal. 2008) (recommending that the district judge "preclude Defendant from relying on or introducing any documents, testimony, or expert witness' testimony which relies on documents or electronically-stored information that was requested by Plaintiff but was not produced").

As discussed herein, however, despite Defendant's discovery abuse, Plaintiff's experts have been able to accurately identify the number of calls made to skip-traced phone numbers.

## III.   PLAINTIFF PROPOSED A RELIABLE METHOD FOR IDENTIFYING CALLS TO CLASS MEMBERS

On September 6, 2017, the Court certified four classes, which required, *inter alia*, (1) that class members received calls from one of Defendant's autodialers, (2) that the calls were received on their cellular telephones, (3) that class members did not provide their cellular telephone numbers in an application for credit to a creditor that has opened an account with defendant in such debtor's name, (4) that Defendant never had a debt-collection account in the class members' names, and (5) that their telephone numbers were obtained from skip tracing – *i.e.*, not from the class members themselves.  *See* ECF No. 81, at 15-16.  Plaintiff has identified 40,420 class-member telephone numbers that meet the above definition.  *See* Verkhovskaya Report, at ¶ 26.

Plaintiff identified the above class member numbers through a combination of three experts, Randall A. Snyder, Colin B. Weir, and Anya Verkhovskaya.  Plaintiff's experts formed their opinions, and ran their analyses, based on the testimony of Defendant's Fed. R. Civ. P. 30(b)(6) witness, Dan Correa, the testimony of Defendant's IT Analyst Nick Keith, a review of Defendant's call logs and account data, third-party information service companies (Interactive Marketing Solutions, LexisNexis, TransUnion), and their many years of experience working in the telecommunication and class notice industries and on TCPA cases.[3]

---

[3] Although Defendant spends nearly its entire motion discussing the testimony of Steven Kizer, Defendant's former compliance manager, Mr. Kizer's testimony is not cited even once (nor relied on) in Plaintiff's experts' opinions concerning assembling class call lists.  *See, e.g.*, Snyder Decl., at ¶ 83-101 (Kizer not cited anywhere in ascertainability section); Verkhovskaya Report (Kizer not cited in the entire report); Weir Decl. (Kizer not in the entire report).

1

2

3

4

5

6

7

8

9

Defendant's process for calling numbers using its VIC, Global Connect, and TCN dialers has been extensively litigated.  "Defendant generally receives debt-accounts from creditors." Summary Judgment Order, ECF No. 167, at 3.  "While some of these accounts include debtors' phone numbers – such individuals are excluded from the class definition ... – [D]efendant receives many accounts without any telephone numbers at all."  *Id*.  "For [accounts without phone numbers], [D]efendant uses a process referred to as 'skip tracing' to obtain phone numbers associated with the names on the accounts."  *Id*.  "Skip tracing is a method or process for locating individuals for the purpose of contacting them, using data analysis of personal information obtained from various and multiple public and private databases."  *Id*. (quotations omitted).

10

11

12

13

14

15

Defendant's account database supports up to ten telephone number fields for each account. Defendant's collection managers choose which telephone number fields in Defendant's system are loaded into its dialers according to criteria set for any given call campaign.  Phone fields 1-4 are reserved for phone numbers Defendant receives from its creditor-clients.  *See* Krivoshey Decl., Ex. 9 ("N. Keith Dep."), at 14:11-15:7, 15:14-16 ("[P]hone field 1 through 4 are what comes in from the client, whatever phone number comes in from the client.").

16

17

18

19

20

21

In 2013, Defendant instituted a policy whereby all skip traced numbers were solely placed in phone fields 5-10.  *See* N. Keith Dep., at 64:24-66:14, 77:23-78:12 (Defendant instituted a policy whereby numbers obtained through skip tracing from companies such as Accurint and ECA would be placed into phone fields 5-10); Krivoshey Decl., Ex. 10 ("Correa Dep."), at 51:20-52:19, 69:5-9, 70:19-71:14 (skip traced numbers obtained electronically are *automatically* uploaded into phone fields 5-10).  Defendant's IT Analyst, Nick Keith, described this policy in internal emails:

22

23

24

> I was talking to Chris [Paff] and Bob [Keith] and Chris's Theory is if we have all ECA, and Accurint skip tracing phone numbers placed in fields 5-10 we can make the dialer and global not call these phone numbers and only the first four fields which are ALWAYS reserved for client given phone numbers or approved phone numbers by the debtor.

25

26

27

Krivoshey Decl. Ex. 11, at 3.  *See also* Krivoshey Decl., Ex. 12 at 3 ("We made it so ECA's don't put phone numbers in the top fields and the rest of the numbers would be what came from the client.  The collectors should be putting skip traced number[s] into the lower fields.").  In fact,

28

most skip traced numbers were placed into phone fields 5-10 even before Defendant made it official policy. *See* Correa Dep., at 70:4-18 ("Q. Okay. But I'm asking before Rash Curtis instituted the 5 through 10 system, where would these cell phone – skip trace cell phones go? A. Most skip trace numbers have always gone through there..."). Skip traced numbers obtained through skip tracing software (as opposed to manual look-ups by Defendant's employees), such as provided by Accurint, have *always* been uploaded into phone fields 5-10. *See id.*, at 70:22-71:14. Defendant also ran a "spin" to collect all skip traced telephone numbers for which Defendant does not have consent to call and transferred all such numbers into phone fields 5-10. N. Keith Dep., at 71:18-72:8, 73:23-75:13; Krivoshey Decl., Ex. 13, at 3 ("We are currently waiting [for] a spin from Dakcs that will get all phone numbers (sequence 1-4) that were ... [obtained] from [skip tracing]. When these are gathered they will place them into sequence 5-10.").

Daniel Correa, Defendant's Rule 30(b)(6) witness, affirmed that Defendant does not have consent to call phone numbers in phone fields 5-10:

Q.  What is a skip list?

A.  That would be a list of – we'd pull a list of accounts with – that haven't had contact and see if there's anything that we can manually skip trace on.

Q.  Okay. So how would that process work?

A.  You see a name, and you'd Google it. You'd take a look at, you know, just internet sites, see what you could find, if you can find who the person is in a particular city or where they're working, maybe they're a business owner, Google it, make a call. That's all done manually.

Q.  So say that you found a number for those people. Where would that number go?

A.  Without contact, it would go into fields 5 through 10.

Q.  Okay. And with contact?

A.  If they are giving us a consent to call, it would go into 1 through 4.

Q.  And why would the numbers for the ones with no contact – why would they go into ... phone fields 5 through 10?

A.  We don't have consent to call.

Q.  *You don't have consent to call numbers in phone fields 5 through 10?*

A.      *Correct.*

Correa Dep., at 51:20-52:19 (emphasis added).  *See also id.*, at 59:7-25 (Q.  How do you determine if you have consent to call that number?  A.  From our clients in the fields 1 through 4.").

Based on Defendant's Rule 30(b)(6) witness's testimony (1) that Defendant placed all skip-traced phone numbers into phone fields 5-10, and (2) that Defendant does not have consent to call any phone numbers in phone fields 5-10, Plaintiff's experts sought to analyze phone numbers in phone fields 5-10 *as a starting point* in tabulating the total number of calls made to class members. Krivoshey Decl., Ex. 14 ("Snyder Dep."), at 91:2-92:11, 108:7-20; Weir Decl., at ¶¶ 6, 9, 12-13.

In opposing Plaintiff's Motion for Sanctions, Defendant argued that Plaintiff failed to account for the possibility that not all phone numbers in phone fields 5-10 were obtained solely through skip tracing because there was a possibility that some phone numbers in phone fields 5-10 were *first* stored in phone fields 1-4 (and, thus, purportedly obtained from a creditor).  Plaintiff's November 12, 2018 Expert Reports, however, cured this issue entirely.  Mr. Weir, Plaintiff's damages expert, found that 99 percent of telephone numbers in phone fields 5-10 are not also contained in fields 1-4.  Weir Decl. ¶ 9.  To be conservative, *every single instance* of a phone number contained in phone fields 5-10 that was also contained in phone fields 1-4 was eliminated from the final class call tabulation.  *See id.*, ¶ 12.  Mr. Weir eliminated all overlapping phone field 1-4 numbers that were in any of the three sets of data that Defendant provided – historical data sets, present-day data sets, and part of a large historical data subset.  *See id.*, ¶ 9.  Thus, the final class call tabulation does not contain a single phone number that has ever been in phone fields 1-4. Accordingly, even before proceeding to the next step of Plaintiff's methodology, the data set exclusively contained phone numbers that Mr. Correa admitted Defendant has no consent to call.

After Mr. Weir narrowed the proposed class list to telephone numbers from phone fields 5-10 that were not also contained in phone fields 1-4, he provided the proposed class list to Ms. Verkhovskaya for the next step of the methodology.  Using Mr. Weir's list, Ms. Verkhovskaya identified class member telephone numbers that were cellular telephones at the time the calls at issue were made.  Verkhovskaya Report, at ¶¶ 16-19.  Next, using a multi-step process involving

LexisNexis and TransUnion, Ms. Verkhovskaya was able to determine the historical customary users of the telephone numbers at issue at the time that Defendant made the calls. *See id.* ¶¶ 25. Ms. Verkhovskaya then compared the customary known users of the telephone numbers at issue with the names of the debtors listed on Defendant's accounts, and eliminated all instances from the dataset where the name of the debtor matched the historical customary known user on that same telephone number. *See id.*, at ¶¶ 26-34.

At this stage of Plaintiff's methodology, the only numbers that were left (1) were numbers that Defendant's Rule 30(b)(6) witness admitted Defendant had no consent to call, (2) were gathered from fields used to store skip-traced telephone numbers, (3) were cross-checked against the list of phone numbers that Defendant obtained from its creditors, (4) were cellphones at the time the calls were made, (5) were actually called by one of Defendant's autodialers, and (6) were cross-checked against a list of the historical users of the telephone numbers to eliminate all numbers that belonged to the actual debtors on the accounts. Not one of these numbers was provided to Defendant or a creditor on the specific account by the person receiving the call, as all debtors were eliminated. Not one of these numbers was contained in phone fields 1-4 – phone fields Defendant reserves for phone numbers obtained from creditors or the debtors. Thus, although it is *conceivable* that a number on the final list may not have been obtained through skip tracing, the suggestion is not plausible, and, more importantly, Defendant has not presented a shred of evidence that it obtained even one such number from a creditor (not through skip tracing). Certainly, Plaintiff should be allowed to prove at trial that it is "more likely than not" that every single number on the final list was obtained through skip tracing.

Defendant's extensive briefing stating that Mr. Snyder (and all of Plaintiff's experts) assumed that "every" phone number in phone fields 5-10 was obtained through skip tracing is simply incorrect and misconstrues his testimony. *See, e.g.*, Def's Br. At 5 ("Plaintiffs have misled their own expe[r]t, Mr. Snyder, as well as this Court, to believe that <u>all</u> numbers in phone fields 5-10 were obtained by skip-tracing.") (underlining in original). As Mr. Snyder testified repeatedly at his deposition, and as discussed above, looking at whether a phone number was in phone fields 5-

10 was the *starting point* of his methodology, not the end-all:

> [Mr. Ellis]: Again, that was the discussion that we were having immediately before we took our lunch break with respect to it is your belief that if a number appears in Phone Fields 5 through 10 and does not also appear in Phone Fields 1 through 4, that is a skiptraced number for purposes of class determination?
>
> [OBJECTION]
>
> [Mr. Snyder]: Well, I don't think I actually said that was the only criteria.  That was one step in the process.
>
> [Mr. Ellis]: What are the other steps?
>
> [Mr. Snyder]: The idea is that under the general procedures and policies of Rash Curtis, my understanding is those phone number Fields 5 through 10 that don't appear in 1 through 4 were skiptraced numbers.  But there's another step of determining whether those numbers were associated with somebody having an account with Rash Curtis or they were actually a debtor or they had owned a debt or they should have been called by Rash Curtis so it's a step-by-step process.
>
> So that even if – that's why I said before I don't say "every" or "all" or "absolute."  We're looking at large numbers of records here and mistakes do happen.  There's a lot of data entry and mistyping and things like that.  But overall, these records are generally very accurate but it's not just that step.  That's the first filtering step.
>
> The other step is to see that the number that was skiptraced is not somebody associated with Rash Curtis, that they shouldn't call them.  That's part of what makes up the class.  I understand from the other expert witnesses they've performed that analysis and determined skiptraced numbers that were not debtors to Rash Curtis.

Snyder Dep., at 91:2-92:11.  Mr. Snyder also stated as follows:

> [Mr. Ellis]: To you understanding based upon all this evidence, those numbers go into Phone Fields 5 through 10?
>
> [OBJECTION]
>
> [Mr. Snyder]: Yes, And my understanding from the totality of the evidence is that these Phone Fields 5 through 10 are – the general procedure at Rash Curtis is to put skiptraced numbers in there.  That doesn't mean that's the only numbers they can put in there and I'm not testifying to that but of course the key issue is do these numbers have debtor accounts associated with them.  And if there's a number in there that's not associated at all with a debtor account, that's the additional criteria.

*Id.*, at 108:7-20.

Plaintiff timely made his expert witness disclosures on November 12, 2018.  Pursuant to the Court's 11/6/2018 Scheduling Order No. 2, Defendant's deadline to serve rebuttal reports was on

November 26, 2018.  ECF No. 246.  Defendant did not disclose any rebuttal witnesses, and did not serve any rebuttal reports.  Krivoshey Decl., ¶ 17.  Expert discovery closed on December 21, 2018.  ECF No. 246.  The Court also set January 11, 2019 as the deadline for the parties to exchange exhibits to be used at trial.  *See id*.

Defendant has been in possession of Plaintiff's expert reports since November 12, 2018.  Krivoshey Decl., at ¶ 18.  Notably, Defendant has had documentation of the identity of each of the 40,420 class member numbers identified in Ms. Verkhovskaya's report and the identity of each of the numbers for which Mr. Weir has prepared a damages report.  *See* Verkhovskaya Report, at ¶ 26; Weir Decl., at ¶ 15.  For each of the identified phone numbers, Defendant has knowledge of the account number associated with the telephone, the identity of the debtor associated with the account and telephone number, and has access to the entire universe of data in its account database regarding these telephone numbers.  Defendant's IT Analyst, Nick Keith, testified that Defendant even keeps a record of all files sent electronically by its creditor-clients just in case such files are necessary during litigation to prove that Defendant obtained the numbers from the clients:

> Q:  Okay.  And the fourth bullet point there says, "We are currently and since the beginning of me starting in IT, keep all files that have been sent to us electronically for any backup.  In case of a suit, we can prove these phone numbers were provided on the clients' file."  Do you see that?
>
> A.  Yes.
>
> Q.  And so, you say, "And since the beginning of me starting in IT."  Are you referring to 2011?
>
> A.  Yes.
>
> …
>
> Q.  Are you able to retrieve them?
>
> A.  Yes.
>
> Q.  How quickly?
>
> A.  It depends on the file.
>
> Q.  Would it be more than a week?
>
> A.  Typically, no.

1

Q.    Okay.

2

A.    Okay.  Correction on that.  This would be for files that were sent to us from the client, like a new business file, not any other electronic files.  This is specifically meaning for the file that was sent to us from the client, as in going back up to No. 3, numbers provided by the client.  No. 4 is referring to that.  And it's not all electronic files for backup.  It is particularly from the client.  I just want to point that out.

3

4

5

N. Keith Dep., at 78:21-79:25.

6

However, in the nearly three months of having Plaintiff's expert reports in its possession,

7

Defendant has failed to rebut that a single one of the 40,420 class member numbers was obtained

8

through skip tracing.  Indeed, at trial, *Defendant bears the burden* to prove that it had consent to

9

call these numbers, *i.e.*, that it obtained these numbers from its creditor-clients.  *Van Patten*, 847

10

F.3d at 1044.  Even though Defendant apparently keeps a record of *all electronic records sent by*

11

*its creditor-clients containing the debtor's phone numbers*, Defendant has not produced a single

12

document showing that it obtained any of the 40,420 numbers from its creditor-clients.

13

Further, Defendant states that it *can* identify numbers obtained through skip tracing.  *See*

14

Def's Br. at 17 (discussing a way to "definitively determine whether a given telephone number was

15

first obtained by Rash Curtis via skip-tracing").  In discovery, Plaintiff sought "DOCUMENTS

16

sufficient to identify ALL telephone numbers YOU obtained through skip tracing within the

17

CLASS PERIOD."  Krivoshey Decl., Ex. 5 at 6.  Plaintiff's Interrogatory No. 10 also asked

18

Defendant to "IDENTIFY ALL telephone numbers within the CLASS PERIOD YOU obtained

19

through skip tracing."  Krivoshey Decl., Ex. 15.  To the extent Defendant now suggests that a

20

single one of the 40,420 numbers identified by Plaintiff did not come from skip tracing, Defendant

21

is foreclosed from making this argument by Rule 37(c)(1) for its failure to disclose which of the

22

40,420 numbers were, or were not, obtained through skip tracing.

23

Expert discovery is now closed, the rebuttal expert disclosure deadline has long passed, and

24

the deadline to disclose exhibits to be used at trial has passed.  Thus, even if, in theory, Defendant

25

has records showing that it obtained a few of the 40,420 numbers from its creditor-clients and not

26

from skip tracing, Defendant cannot rely on such records at trial.  Defendant did not disclose (or

27

produce) a single document showing that it obtained any of the 40,420 class member numbers from

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

its creditor-clients or from the debtors themselves.  Defendant's motion does not even challenge

Plaintiff's experts' opinions that each of the 40,420 numbers were cellphones, did not belong to

debtors, were contained in phone fields 5-10, were not contained in phone fields 1-4, and were

called by Defendant's autodialers.  Defendant also does not challenge the expertise or

qualifications of Plaintiff's experts.  Accordingly, Plaintiff's evidence that the 40,420 class

member numbers were obtained through skip tracing will effectively be unrebutted at trial.  *See*

Order Regarding Defendant's Discovery Letter Brief, ECF No. 240, at 1 ("The Court further

expects that to the extent any party intends to rely on any data in this lawsuit, be it in support of or

in opposition to a motion or at trial, the party shall first produce that data to the opposing party.").

## IV.  LEGAL STANDARDS

"[S]cientific, technical, or other specialized knowledge' by a qualified expert is admissible

if it will 'help the trier of fact to understand the evidence or to determine a fact in issue.'"

*AngioScore, Inc. v. TriReme Med., Inc.*, 2015 WL 5258786, at *6 (N.D. Cal. Sept. 8, 2015).  "An

expert should be permitted to testify if the proponent demonstrates that: (i) the expert is qualified;

(ii) the evidence is relevant to the suit; and (iii) the evidence is reliable."  *Abante Rooter &*

*Plumbing, Inc. v. Alarm.com Inc.*, 2018 WL 3707283, at *3 (N.D. Cal. Aug. 3, 2018).

"The Ninth Circuit has determined that a 'trial court not only has broad latitude in

determining whether an expert's testimony is reliable, but also in deciding how to determine the

testimony's reliability.'"  *AngioScore, Inc.*, 2015 WL 5258786, at *6 (quoting *Elsayed Mukhtar v.*

*Cal State. Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002)).  "Unlike an ordinary witness, an expert is

permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge

or observation."  *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 592 (1993) (citation omitted).

"The focus [of a district court] must be solely on principles and methodology, not on the

conclusions that they generate."  *Daubert*, 509 U.S. at 595.

However, "[d]isputes as to the strength of [an expert's] credentials, faults in his use of a [a

particular] methodology, or lack of textual authority of his opinion, go to the weight, not

admissibility, of his testimony."  *Romero v. S. Schwab Co., Inc.*, 2017 WL 5885543, at *2 (S.D.

Cal. Nov. 29, 2017) (quotations omitted).  "The relative weakness or strength of the factual underpinnings of the expert's opinion goes to the weight and credibility, rather than admissibility." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n. 5 (9th Cir. 1987).  Likewise, "[a]rguments that an expert relied on unfounded assumptions in forming his opinion go to the weight, not the admissibility of expert testimony."  *Haiping Su v. Nat'l Aeronautics & Space Admin.*, 2011 WL 7293396, at *2 (N.D. Cal. Apr. 7, 2011).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

Further, in consideration of the burden of proof and the "liberal thrust" of Fed. R. Evid. 702, experts are not required to establish causation to a scientific or statistical certainty.  *See, e.g., McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1106 (D. Or. 2010) ("In keeping with the court's proper role and the 'liberal thrust' of Rule 702, I will not exclude plaintiffs' expert testimony simply because the evidence supporting it does not establish causation to a scientific or medical certainty.") (citing *Daubert*, 509 U.S. at 588).  Experts are also not required to eliminate all alternative explanations or potential causes, so long as the cause identified is a substantial causative factor.  *See Wendell v. GlaxoSmithKline LLC*, 858 F. 3d 1227, 1237 (9th Cir. 2017) ("We do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable.  It is enough that the proposed cause be a substantial causative factor.") (quotations and citation omitted).  "Lack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano v. Cook*, 598 F. 3d 558, 565 (9th Cir. 2010).

## V.  THE COURT SHOULD DENY DEFENDANT'S MOTION TO STRIKE OR EXCLUDE MR. SNYDER'S TESTIMONY

### A.    Mr. Snyder's Opinions Regarding Class Membership Easily Pass *Daubert's* Admissibility Test

With regards to the skip-tracing issue, Defendant does not challenge Mr. Snyder's qualifications or the relevance of his proposed testimony.  Defendant's sole argument for exclusion is that Mr. Snyder's methodology for identifying the number of calls made to skip-traced phone numbers is flawed because (1) he makes an improper assumption that all phone numbers in phone

1    fields 5-10 are obtained through skip tracing and, relatedly, (2) because Mr. Snyder fails to rule out

2    alternative reasons that phone numbers could be in phone fields 5-10 unrelated to skip tracing.

3           As an initial matter, Defendant's arguments are factually incorrect.  As discussed in length

4    above, Mr. Snyder does not opine, and did not assume, that every single phone number in phone

5    fields 5-10 was obtained through skip tracing.  Mr. Snyder explained that looking at phone fields 5-

6    10 was the *first step* of a multi-step analysis.  Snyder Dep. at 91:2-92:11, 108:7-20.  Further, Mr.

7    Snyder did effectively rule out alternative reasons that phone numbers could be in phone fields 5-

8    10 unrelated to skip tracing, as the full methodology whittled down the class list to phone numbers

9    from non-debtors, that were in phone fields 5-10, that had never appeared in phone fields 1-4, and

10   for whom, as of this date, Defendant has not produced a single document showing that Defendant

11   obtained the numbers from a creditor or a debtor.

12          In any case, whether Mr. Snyder based his opinion on an improper assumption and whether

13   he failed to rule out alternative explanations go to the weight, not admissibility, of his testimony.

14   *Bergen*, 816 F.2d at 1352 n. 5; *Romero*, 2017 WL 5885543, at *2; *Haiping Su*, 2011 WL 7293396,

15   at *2.  *See also Abante Rooter*, 2018 WL 3707283, at *8 (Gonzalez Rogers, Hon.) (holding that

16   defendant's "objections fundamentally challenge the weight of Ms. Verkhovskaya's testimony, not

17   its admissibility" where defendant argued that Ms. Verkhovskaya failed to account for alternative

18   meanings of call disposition codes); *AngioScore, Inc*., 2015 WL 5258786, at *7 (Gonzalez Rogers,

19   Hon.) ("The Court agrees that some of Olsen's decisions regarding comparable licenses are

20   questionable, however those concerns, in this case, are more properly directed to the weight of the

21   testimony, not admissibility.").

22          Several courts have rejected nearly identical arguments from defendants in TCPA cases

23   before.  For instance, in *Krakauer v. Dish Network, L.L.C.*, 2015 WL 5227693, at *6-8 (M.D.N.C.

24   Sept. 8, 2015) the defendant argued that the plaintiff's expert – Ms. Verkhovskaya – presented an

25   unreliable methodology for ascertaining the number of class members in a "do not call" TCPA

26   class (persons who received calls after requesting not to be called).  In *Krakauer*, Ms.

27   Verkhovskaya identified class members who requested to not be called by looking at whether

28

defendant's accounts were marked with "DNC" and "Do Not Call" codes.  *See id.*  Defendant

argued that Ms. Verkhovskaya's methodology was unreliable because defendant's "general

manager testified that the 'DNC' and 'Do Not Call' codes 'do not indicate a 'do not call' request

by a called individual,' but rather signal [defendant's] agents to not call the individual because a

'particular SSN agent would personally call back that individual (*i.e.*, it was 'their lead')."  *Id.*,

2015 WL 5227693 at *7.  *See also Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 393

(M.D.N.C. 2015) ("Dish has offered evidence that its IDNC list is not limited to individuals who

ask not to be called, but also includes other individuals Dish has decided not to call for other

reasons, such as allegations of rude behavior.  Dish contends that because its IDNC list includes

more than just individuals who request not to be called and because neither [plaintiff] nor Dish can

tell who on the list made such a request, the members of the IDNC class are not ascertainable…").

Accordingly, the defendant argued that Ms. Verkhovskaya's methodology was

overinclusive, in that it would capture persons who made requests for the defendant to stop calling

and other persons who did not make such a request.  *See Krakauer*, 311 F.R.D. at 393.  Judge

Catherine C. Eagles, disagreed, and held that Ms. Verkhovskaya's methodology was admissible:

> First, as discussed, plaintiff's counsel's influence in defining these codes for
> Ms. Verkhovskaya does not *per se* render her report inadmissible.  Second, this
> influence and the correctness of the facts underlying Ms. Verkhovskaya's
> identification of IDNC class members is more properly a question for the trier
> of fact … The phrases "DNC" and "Do Not Call" from SSN's call records are,
> in context, persuasive circumstantial evidence that persons associated with
> those numbers are on SSN's IDNC list … If Ms. Verkhovskaya was wrong in
> her analysis of SSN's IDNC list, this may undermine the weight and credibility
> of her report, but that does not affect admissibility.

*Krakauer*, 2015 WL 5227693, at *8.  *See also Krakauer*, 311 F.R.D. at 393 ("Dish's claim that it

failed to distinguish persons who made an internal do-not-call request from other persons Dish says

it decided not to call for different reasons does not make the list unreliable…"); *Id.* at 394

("[Plaintiff] is not required to prove that, without a doubt, every single person on the class list

would be able to recover…"); *Krakauer v. Dish Network L.L.C.*, 2017 WL 2455095, at *6

(M.D.N.C. June 6, 2017) ("To the extent there was conflicting evidence that questioned the

validity, credibility, and weight of Ms. Verkhovskaya's opinions, the jury weighed that evidence

and rejected Dish's evidence.").

Here, the class list is composed of numbers in phone fields 5-10 (where *all* skip-traced numbers were placed and for which Defendant admits it has no consent to call), that have never appeared in phone fields 1-4 (where numbers from the creditor go), that do not belong to the actual debtor on the account, and for which Defendant has not presented any evidence showing that the numbers came from the creditors (as it must at trial to prove its consent defense). As in *Krakauer*, Plaintiff's experts' methodology offers "persuasive circumstantial evidence" that those numbers were obtained through skip tracing. As in *Krakauer*, Defendant's argument that Plaintiff's experts failed to account for the possibility that some of the numbers were placed in phone fields 5-10 for reasons other than skip tracing goes to the weight of the evidence, not admissibility.

*Reyes v. BCA Fin. Servs., Inc*. 2018 WL 3145807 (S.D. Fla. June 26, 2018) is also on point. In *Reyes*, the plaintiff's expert – again, Ms. Verkhovskaya – proposed to identify class members in a "wrong number" TCPA class action by tabulating calls made to accounts with "B" or "WN" markings. *Reyes*, 2018 WL 3145807, at *1, *4-5, *12-15. The defendant in *Reyes* argued that the proposed methodology was overinclusive because the "B" and "WN" codes did not necessarily mean that the defendant was calling the wrong number. *See id*., at *4-5 (the "B" flag could also mean that the number was disconnected, the call resulted in a triple tone, the call did not result in a ring, and that the call resulted in a busy signal). Judge Jonathan Goodman held that such potential factual inconsistencies go to the weight of the evidence, not admissibility. *See Reyes*, 2018 WL 3145807, at *13-14. In his analysis, Judge Goodman also stressed the evidence that the defendant *failed* to present:

> In addition, my conclusion is further supported by not just what Reyes has presented, but also by what BCA has *failed* to present. Specifically, although BCA *says* that a "B" flag may have meanings other than to indicate a "wrong number," BCA presents no *evidence* of any actual phone number that was coded with a "B" flag to indicate something *other than* a wrong number. Similarly, BCA has presented no *evidence* that a WN-coded phone number corresponded to something from a wrongly-dialed number. And neither has BCA shown a single instance whether a phone number designated as a cellphone was not actually a cellphone when the subject calls took place.

*Reyes*, 2018 WL 3145807, at *14 (emphasis in original). And so it is here. While Defendant *says*

that some of the numbers Plaintiff's experts have identified may have been obtained through methods other than skip tracing, it has not presented any *evidence* of that fact.  Defendant did not serve any rebuttal expert reports.  Fact and expert discovery are closed.  The deadline to exchange exhibits to be used at trial has passed.  And, even though it is Defendant's burden to show that it obtained class members' numbers directly from class members (or their creditors) at trial, Defendant has not produced even one such document.  Notably, Defendant's IT analyst stated that it saved all electronic records from its creditors showing the provision of debtor phone numbers at account opening for purposes of litigation.  *See* N. Keith Dep. at 78:21-79:25.  Defendant's failure to produce even one such document in this case is telling.

Critically, Plaintiff needs only prove that it is "more likely than not" that Defendant called skip traced phone numbers using its autodialers.  Whatever conflicting evidence Defendant intends to put forth at trial will go to the weight of Mr. Snyder's testimony in light of Plaintiff's burden of proof.  *See Primiano*, 598 F. 3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Finally, Defendant's argument that Plaintiff's methodology fails to identify every single class member is, in effect, a rehash of its argument at class certification that class membership is not ascertainable.  At class certification, the Court noted that Defendant's ascertainability arguments are "borderline sanctionable," as they ignore controlling Ninth Circuit case law stating that Rule 23 "does not impose a freestanding administrative feasibility prerequisite to class certification."  *See* ECF No. 81, at 12 n. 12 (quoting *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1126 (9th Cir. 2017)).  Here, whether a person's telephone number was obtained through skip-tracing is not actually an *element* of the TCPA, but rather a proposed method for ascertaining class membership.  If Plaintiff proves that each call Defendant made to phone numbers identified through Plaintiffs' experts' methodology violates the TCPA, differences in recovery and the amounts of statutory damages are immaterial.  *See, e.g., Yokoyama v. Midland Nat. Life Ins. Co*., 594 F.3d 1087, 1089 (9th Cir. 2010) ("The potential existence of individualized damage assessments, however, does not detract from the action's suitability for class certification.").

1

**B.      Mr. Snyder's Opinions Regarding Rash Curtis' Autodialers Are Admissible As Background Information Helpful To The Jury**

2

Defendant asks that the Court strike Mr. Snyder's testimony regarding the functionality and

3

operation of Defendant's three autodialers because the Court has already determined that the

4

dialers are ATDS as a matter of law, and, accordingly, such testimony would be irrelevant or

5

potentially confuse the jury. *See* Def's Br. at 21-23.  But just because the issue of whether

6

Defendant's dialers constitute ATDS within the meaning of the TCPA is now "law of the case"

7

does not mean that testimony regarding how Defendant's dialers worked in practice is irrelevant or

8

unhelpful.  Part of Plaintiff's case at trial will focus on whether Defendant knowingly or willfully

9

violated the TCPA.  To prove knowledge and willfulness, Plaintiff will need to demonstrate that

10

Defendant's employees knowingly loaded cellphone and skip traced numbers into the dialers, and

11

explain how the dialers operated.  Without background testimony regarding how Defendant's

12

dialers operated, such testimony would be devoid of context and confusing.  Further, in a TCPA

13

case, it would be absurd to deprive the jury on background information concerning the types of

14

dialers used to call class members.

15

**C.      Defendant's Other Objections Are Meritless[4]**

16

Defendant also asks the Court to strike portions of Mr. Snyder's report that "bolster" the

17

testimony of Ms. Verkhovskaya because the opinion is "speculative" and "lacks adequate

18

foundation." *See* Def's Br. at 24-25.  Specifically, Defendant wishes to strike paragraph 91 of Mr.

19

Snyder's report, where Mr. Snyder discusses Class Experts Group's (Ms. Verkhovskaya's firm)

20

ability to ascertain contact information from telephone numbers and other account data, and the

21

ability to ascertain whether such numbers were cellular numbers at the time that they were called.

22

*See* Snyder Decl., at ¶ 91.  But this opinion is not based on "speculation" and "naked assertions."

23

As Mr. Snyder explains in the same paragraph, the opinion is based on his "personal and technical

24

experience" with Class Experts Group. *Id.*  Further, Mr. Snyder has over 34 years of experience in

25

the telecommunications field and has been an expert is over 320 cases regarding cellular

26

---

[4] Defendant asks that the Court exclude Mr. Snyder from testifying that Defendant knew it was

27

violating the TCPA, citing to paragraph 107 of Mr. Snyder's report. *See* Def's Br. at 23-24.
Plaintiff agrees to exclude paragraph 107 of Mr. Snyder's report, and will not present evidence

28

from Mr. Snyder regarding Defendant's knowledge that it was violating the TCPA.

telecommunications technology.  *See gen., id.*, at Ex. A (curriculum vitae).  Such vast experience qualifies him to have an opinion regarding the ability to ascertain contact information from telephone numbers, ascertain whether numbers were cellular at the time a call was made, and give an opinion, in light of his experience, of which companies are able to perform such work.  *See Abante Rooter*, 2018 WL 3707283, at *8 (denying motion to exclude where "Plaintiffs offer Mr. Snyder to opine that the Cell Phone Class members received calls that were made using an ATDS and to bolster Ms. Verkhovskaya's opinions regarding the number of TCPA violations.").

Defendant also asks that the Court strike paragraph 105 of Mr. Snyder's report, where he states that "Plaintiff Perez was called repeatedly using an automatic telephone dialing system and he had no debt-collection account with Rash Curtis."  *See* Def's Br. at 24.  According to Defendant, this testimony is speculative because he "simply took Mr. Perez's allegations as true and accepted Plaintiffs' counsel's conclusions that Mr. Perez was a class member."  *See id.*, at 24-25.  That is not true, and completely misconstrues Mr. Snyder's report.  As stated in his report, Mr. Snyder bases this opinion "on the account records produced," the testimony of Mr. Kizer, and his "knowledge, education, experience, [and] training."  Snyder Decl., at ¶¶ 102-104, 106.

Defendant also moves to strike all testimony that Plaintiff Perez is a "representative class member" and that "the evidence produced in this case can demonstrate … that the proposed class members meet the requirements of the proposed Class definitions."  *See* Def's Br. at 3-4.  To be clear, Mr. Snyder is not actually going to testify literally that Plaintiff Perez is a "representative class member."  Rather, Mr. Snyder will testify that it is his opinion that 1) Plaintiff was not a debtor, 2) his cellphone was called with an autodialer, 3) and that his phone number was obtained through skip tracing.  Although each of these factors make Plaintiff Perez meet the general requirements of the Classes he represents, Mr. Snyder will only testify to the facts of the case, not whether Plaintiff Perez is, legally, a "representative class member."

For absent class members, Mr. Snyder will testify that Defendant called 1) cellphones, 2) belonging to non-debtors, 3) whose numbers were obtained through skip tracing, 4) using an autodialer, or 5) a prerecorded or artificial voice.  Of course, such facts can establish that the class

has been ascertained and that Defendant violated the TCPA.  Whether Defendant called such persons, who are, by definition, class members, is not a "legal" issue but one of fact.  *See, e.g., Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 817 (N.D. Ill. 2014) ("[P]ursuant to Federal Rule of Evidence 704, Snyder is not barred from giving an opinion as to the ultimate issue before the trier of fact.  [The defendant] has not shown that Snyder has overstepped his bounds as an expert witness or that Snyder is attempting to instruct the court as to the law as a legal expert.") (citation omitted).  Such issues can be better addressed by making proper objections at trial.

Defendant also asks the Court to strike Mr. Snyder's opinion that Defendant obtained Plaintiff's phone number through skip tracing.  *See* Def's Br. at 3-4, 21.  Defendant asserts that Mr. Snyder lacks sufficient foundation for his opinion, as purportedly his years of experience, the review of the account for which Plaintiff Perez received calls, and review of the deposition testimony of Mr. Kizer are insufficient.  *See id.  See also* Snyder Decl., at ¶¶ 102-104.  That argument clearly goes to the weight the jury should give Mr. Snyder's opinion, not admissibility.  *See Bergen*, 816 F.2d at 1352 n. 5 ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to the weight and credibility, rather than admissibility.").  Further, the Court has already relied on identical testimony from Mr. Snyder and repeatedly held that Plaintiff has established typicality and that his number was obtained through skip tracing.  *See* Order Granting Plaintiffs' Motion for Class Certification, ECF No. 81, at 11 ("Plaintiffs have demonstrated that Perez's claims are typical of the claims of the classes, which he seeks to represent, namely that defendant[] called Perez after obtaining his phone number through skip tracing"); *id.*, at 10-11 (discussing evidence regarding skip tracing and citing to Mr. Snyder's report); Order Re: Cross Motions for Summary Judgment, ECF No. 167, at 12 n. 9 (rejecting Defendant's argument that "Perez's number was not skip-traced and therefore Perez cannot meet the class definition" and striking the same exhibits that Defendant now contends show otherwise).

Finally, Defendant asks that the Court strike all of Mr. Snyder's opinions regarding Defendant's use of an artificial or prerecorded voice and the capacity of Defendant's autodialers because, according to Defendant, the opinions are speculative and lack foundation.  *See* Def's Br.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

at 6-7.  According to Defendant, Mr. Snyder's testimony "simply parrots the testimony of lay witness Dan Correa" and is "based on his cursory review of the dialers manuals and call logs."  *Id.*, at 6.  In *Legg*, Defendant's only cited case in support of its position, the court's holding rested on the fact that the foundation for Mr. Snyder's opinion rested *solely* on the client handbook, as Mr. Snyder did not "review any testimony" regarding the process by which the defendant utilized its dialer.  *See Legg v. Voice Media Grp., Inc.*, 2014 WL 1767097, at *5 (S.D. Fla. May 2, 2014); Def's Br. at 6-7.  Here, Dan Correa is Defendant's Rule 30(b)(6) witness, not just a "lay witness."  Mr. Snyder based his opinions on Defendant's Rule 30(b)(6) witness's admissions (Dan Correa) regarding how and when Defendant utilized its dialers and how and when Defendant utilized prerecorded messages and an artificial voice, Defendant's IT analyst's testimony (Nick Keith) concerning Defendant's use of its dialers, Mr. Snyder's many years of experience in this field, the manuals for Defendant's dialers, the disposition codes in the call logs, and Defendant's admissions in other cases concerning use of the exact same dialer (*see* Ex. F. to Snyder Decl.).  Snyder Decl., at ¶¶ 32-65.  That is more than enough foundation for his testimony.  *See, e.g., Abante Rooter*, 2018 WL 3707283, at *9 ("Further, the fact that Mr. Snyder did not physically inspect the Ytel Dialer does not preclude Mr. Snyder's testimony about its nature.").

Further, Mr. Snyder's discussion regarding the definition of an Automatic Telephone Dialing System is useful for background purposes and to provide an overview of his report, and is admissible.  *See Sterk*, 46 F. Supp. 3d at 817 ("[The defendant] argues that in the portions of the Snyder Report objected to by [the defendant], Snyder offers his opinion as to what he believes the TCPA prohibits, how FCC rulings should be interpreted, and whether certain legal standards have been met in this case.  However, Snyder merely discusses the law and facts to give a background and overview for his report … Therefore, no section of the Snyder Report is stricken.").

## VI.  CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion, should once again strike all references to previously stricken exhibits, and sanction Defendant for misleading the Court and Plaintiff regarding the presence of documents bearing the "SKP" marking.

1

Dated:  February 11, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Yeremey Krivoshey*
   Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email:  ltfisher@bursor.com
   ykrivoshey@bursor.com
   breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*