**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey O. Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
            ykrivoshey@bursor.com
            breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail:  scott@bursor.com

*Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA MCMILLION, JESSICA ADEKOYA, and IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>                              Defendant. | Case No. 4:16-cv-03396-YGR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION TO STRIKE OR EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT COLIN B. WEIR**<br><br>Date:  March 19, 2019<br>Time:  2:00 p.m.<br>Courtroom: 1<br><br>Judge:  Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

PAGE(S)

I. INTRODUCTION ................................................................................................1

II. OBJECTIONS TO EVIDENCE .........................................................................2

III. COLIN B. WEIR EXECUTES A RELIABLE METHOD FOR
IDENTIFYING CLASS MEMBERS PROPOSED BY RANDALL A.
SNYDER ...............................................................................................................5

    A. Background Regarding Phone Numbers Defendant Admitted It Does
Not Have Consent To Call ...................................................................................6

    B. Mr. Weir's Analysis ............................................................................................8

    C. Mr. Weir's Methodology Reliably Ascertains The Number Of Calls
Made To Class Members ...................................................................................12

IV. LEGAL STANDARD ........................................................................................15

V. THE COURT SHOULD DENY DEFENDANT'S MOTION TO STRIKE
OR EXCLUDE MR. WEIR'S TESTIMONY ..................................................19

    A. Mr. Weir's Testimony Is Helpful To The Jury, Is Based On
Sufficient Facts, And Relies On And Applies A Reliable
Methodology .......................................................................................................19

    B. The TCN Calls Are Included Within The Class ..............................................24

VI. CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
  2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) .................................................. 15, 22

*AngioScore, Inc. v. TriReme Med., Inc.*,
  2015 WL 5258786 (N.D. Cal. Sept. 8, 2015) .......................................... 15, 16, 22

*Bergen v. F/V St. Patrick*,
  816 F.2d 1345 (9th Cir. 1987) .................................................................... 16, 22

*BladeRoom Grp., Ltd., v. Facebook, Inc.*,
  2018 WL 1611835 (N.D. Cal. Apr. 3, 2018) .................................................... 17

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................................... 16, 17

*Elsayed Mukhtar v. Cal State. Univ.*,
  299 F.3d 1053 (9th Cir. 2002) .......................................................................... 16

*Fair Hous. of Marin v. Combs*,
  285 F.3d 899 (9th Cir. 2002) .............................................................................. 5

*Fauley v. Drug Depot, Inc.*,
  323 F.R.D. 594 (N.D. Ill. 2018) ....................................................................... 18

*Gonzalez Production Sys., Inc. v. Martinrea Int'l Inc.*,
  2015 WL 4771096 (E.D. Mich. Aug. 13, 2015) .......................................... 18, 20

*Haiping Su v. Nat'l Aeronautics & Space Admin.*,
  2011 WL 7293396 (N.D. Cal. Apr. 7, 2011) .............................................. 16, 22

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d Supp. 717, 744 (3d Cir. 1994) .............................................................. 17

*Krakauer v. Dish Network L.L.C.*,
  311 F.R.D. 384 (M.D.N.C. 2015) ................................................................ 22, 23

*Krakauer v. Dish Network, L.L.C.*,
  2015 WL 5227693 (M.D.N.C. Sep. 8, 2015) .......................................... 18, 19, 22

*Legg v. Voice Media Grp., Inc.*,
  2014 WL 1767097 (S.D. Fla. May 2, 2014) ............................................... 19, 24

*Mascagni v. Schlumberger Tech Corp*,
  2017 WL 4127714 (W.D. La. Sep. 15, 2017) ........................................... 18, 20

*McClellan v. I-Flow Corp.*,
  710 F. Supp. 2d 1092 (D. Or. 2010) ................................................................. 16

*Primiano v. Cook*,
  598 F. 3d 558 (9th Cir. 2010) ........................................................................... 17, 24

*R & R Sails Inc. v. Ins. Co. of State of PA*,
  251 F.R.D. 520 (S.D. Cal. 2008) ........................................................................... 5, 6

*Reyes v. BCA Fin. Servs., Inc.*,
  2018 WL 3145807 (S.D. Fla. June 26, 2018) .............................................................. 23

*Romero v. S. Schwab Co., Inc.*,
  2017 WL 5885543 (S.D. Cal. Nov. 29, 2017) ....................................................... 16, 22

*Solstice Oil & Gas I LLC v. OBES Inc.*,
  2015 WL 5059601 (E.D. La. Aug. 26, 2015) ........................................................ 18, 20

*Stemple v. QC Holdings, Inc.*,
  2014 WL 4409817 (S.D. Cal. Sep. 5, 2014) ......................................................... 18, 20

*United States v. Northrop Grumman Corp.*,
  2003 WL 27366224 (C.D. Cal. Jan. 6, 2003) ....................................................... 17, 21

*United States v. Soulard*,
  730 F.2d 1292 (9th Cir. 1984) .................................................................................. 17

*Van Patten v. Vertical Fitness Grp., LLC*,
  847 F.3d 1037 (9th Cir. 2017) .................................................................................. 14

*Wendell v. GlaxoSmithKline LLC*,
  858 F. 3d 1227 (9th Cir. 2017) ................................................................................. 16

*Wrather v. Farnam Cos., Inc.*,
  2003 WL 25667639 (C.D. Cal. Nov. 3, 2003) ........................................................... 17

**RULES**

Fed. R. Civ. P. 37(c)(1) ........................................................................................... 5

Fed. R. Evid. 702 ....................................................................................... 16, 18, 19

# I. INTRODUCTION

Plaintiff's damages expert, Colin B. Weir, has identified 534,698 autodialed calls made to 40,420 class-member telephone numbers. *See gen*, Krivoshey Decl., Ex. 1, Nov. 12, 2018 Declaration of Colin B. Weir ("Weir Decl."), at ¶ 15; *id*., Ex. 2, Class Member Data Tabulation Report of Anya Verkhovskaya ("Verkhovskaya Report"), at ¶ 26. Mr. Weir's methodology involved a multi-step process of analyzing millions of calls made using Defendant's autodialers, analyzing millions of account records, merging large databases of data, analyzing call disposition codes, and working with Plaintiff's other expert, Anya Verkhovskaya. Despite the complicated methodology, Defendant argues that any "layman" could have performed Mr. Weir's methodology, and, accordingly, his testimony would not be helpful to the trier of fact. According to Defendant's extreme position, the Court should order the jury to spend months manually sifting through millions of calls, match those calls to millions of account numbers, and look through millions of disposition codes, instead of having an expert data analyst present the data in any easy-to-understand format over the course of an hour or two of live testimony. Although Defendant would prefer to send the jury off to get "lost in the weeds," surely that cannot be the right course of action.

Defendant also wishes to exclude Mr. Weir's testimony because his methodology may have included calls to numbers Defendant did not obtain through skip-tracing. In essence, that is the same argument Defendant uses to attack Randall A. Snyder's testimony (Plaintiff's ascertainability expert), and fails for the same reasons. Defendant's attacks on the sources of data used by Mr. Weir go to the weight the jury should give to his testimony, not admissibility. At trial, Plaintiff will only need to prove that it is "more likely than not" that the 40,420 numbers belonged to class members. As discussed below, the circumstantial and direct evidence overwhelmingly show that the 40,420 identified numbers were, in fact, obtained through skip-tracing. Further, considering that Defendant has not presented any rebuttal evidence or witnesses and has not disclosed a single document or exhibit to be used at trial to show that any of the 40,420 numbers were not obtained through skip tracing, Plaintiff's case will essentially be unrebutted at trial. The Court should deny Defendant's motion to strike Mr. Weir.

## II. OBJECTIONS TO EVIDENCE

Defendant cites to new evidence that it previously stated did not exist. Like this Court, Judge Corley has repeatedly warned Defendant against such tactics. *See* Order Regarding Defendant's Discovery Letter Brief, ECF No. 240, at 1 (the "Court expects that counsel who practice in this District will abide by their representations made to opposing counsel. The Court further expects that to the extent any party intends to rely on any data in this lawsuit, be it in support of or in opposition to a motion or at trial, the party shall first produce that data to the opposing party."); Order Compelling Production of Calling Records, ECF No. 228, at 1.

Repeatedly throughout all three of its *Daubert* motions, Defendant chastises Plaintiff for purportedly never requesting or referring to records with the "'SKP' or skip trace status code" to try to identify skip-traced telephone numbers. Specifically, Defendant states:

> **Although records do exist [that] would reveal the so-called "SKP" or skip trace status code**, neither Mr. Weir, not the other experts in this case, Mr. Snyder and Ms. Verkhovskaya, use these records to estimate the number of skip-traced calls made by Rash Curtis. **It is the collection notes used by Rash Curtis' collectors that the unique "SKP" skip-trace status code is to be found**, which was not a factor in Mr. Weir's analysis**.

Def's Br. at 4 (emphasis added). *See also* Defendant's Motion to Strike or Exclude the Opinions of Plaintiffs' Expert Witness Randall A. Snyder, ECF Doc. No. 254, at 4 (largely identical language but adding that Plaintiff purportedly never requested any records concerning the "SKP" marking). Defendant also states:

> There is another problem because **the mere fact that collection notes contain the status code "SKP,"** does not necessarily mean a phone number, as opposed to other demographic information, was obtained, much less called. In any event, Mr. Weir's methodology does not purport to involve any analysis of whether accounts are marked with the status code "SKP," which, **even if he had filtered his "matches" to accounts marked "SKP,"** would still be insufficient. The only way to tell if an account contains a phone number obtained through skip tracing is to open the individual account notes. **Mr. Kizer testified that the "SKP" code indicates that an account is eligible for skip-tracing** because "[t]here are no numbers to call"] not because it actually has any skip traced phone numbers associated with it.

Def's Br. at 3 n. 4 (citations and emphasis omitted) (bolding added). Relatedly, in Defendant's Motion to Strike or Exclude Mr. Snyder's testimony, Defendant also states:

> Mr. [Steven] Kizer **accurately explains that a debtor's account gets marked with the "SKP" status code** when a collector determines that skip-tracing efforts are required to obtain new contact information so that Rash Curtis could

continue attempting to collect on the account.

...

Rather, as Mr. Kizer testified, **the SKP identifier code is found only in Rash Curtis' collection notes**...

ECF Doc. No. 254, at 14 (bolding added, underlining omitted).  Defendant also states:

These opinions ignore Mr. Kizer's testimony ... that the way to determine whether a number was skip-traced is to ... look for the "SKP" prefix ...

*Id.*, at 20.

Defendant's arguments that (1) Plaintiff never sought account records bearing the SKP marking and that (2) the records in fact exist are incredibly troubling at this late stage of the proceeding.   Plaintiff's Request for Production No. 23 sought "DOCUMENTS sufficient to identify every SKIP-TRACED CALL RECIPIENTS' first name, last name, area code, cellular number, date, and result of each call to a SKIP-TRACED CALL RECIPIENT with the CLASS PERIOD."  Krivoshey Decl., Ex. 3 at 8.[1]  Plaintiff's Request for Production No. 25 sought the production of "DOCUMENTS sufficient to identify ALL telephone numbers YOU obtained through skip tracing within the CLASS PERIOD."  Krivoshey Decl., Ex. 4 at 6.  To the extent Defendant now argues that skip-traced telephone numbers can be identified through scanning the collection notes for "SKP" markings, Defendant is in violation of Rule 37(c)(1) for failing to produce such documents in response to Requests for Production Nos. 23 and 25.

Even more troubling, however, is Defendant's interrogatory responses and meet and confer communications stating that account records bearing the "SKP" marking *do not exist*, and, further, that Defendant *never even used such a marking*.  For instance, Plaintiff's Interrogatory No. 8 and Defendant's Response to Plaintiff's Interrogatory No. 8 are set out in full below:

**INTERROGATORY NO. 8:**

IDENTIFY ALL debtor's accounts in YOUR DAKCS OR Beyond ARM software bearing a "SKP" status code or marker during the CLASS PERIOD.

**RESPONSE TO INTERROGATORY NO. 8:**

Objection; this interrogatory is vague and ambiguous, overbroad and

---

[1] "SKIP-TRACED CALL RECIPIENTS" was defined as "all persons whose cellular telephone numbers [Defendant] obtained through the use of skip-tracing AND to whom [Defendant] placed PHONE CALLS to such persons' cellular telephones after obtaining their cellular telephone number through the use of skip tracing."  Krivoshey Decl., Ex. 4 at 2.

oppressive, unduly burdensome and harassing, and seeks information that is neither relevant nor reasonable calculated to lead to the discovery of admissible evidence. Without waving the foregoing objection(s), this responding party responds as follows: **None.**

Krivoshey Decl., Ex. 5 at 2 (emphasis added).

In subsequent meet and confer emails, Defendant's counsel explained that "None" really meant "None." In a June 28, 2017 email, counsel for Defendant stated:

[A]s noted in Rash Curtis' responses to your client's second set of interrogatories … **Rash Curtis does not use the "SKP" status code on any of its collection accounts. I know this probably contradicts what your star witness, Steve Kizer, testified to, but he simply has no clue what he is talking about.** He was a compliance manager responsible for training new collectors, not generating campaign lists or notating collection accounts.

Krivoshey Decl., Ex. 6 (emphasis added). On July 22, 2017, Defendant's counsel again stated that Defendant did not have a single account bearing an "SKP" marking:

[T]o my knowledge, **none of Rash Curtis' accounts are marked SKP, despite what that liar Steven Kizer told you**…"

Krivoshey Decl., Ex. 7 (emphasis added).

Throughout all of fact and expert discovery, Defendant maintained that its former compliance manager Mr. Kizer lied under oath by testifying that skip-traced telephone numbers could be identified, in part, by analyzing debtor accounts bearing the "SKP" marking. Defendant stated in response to a narrow interrogatory that not a single account in its entire account database bore the "SKP" marking. Now, after the close of discovery, Defendant argues that Mr. Kizer was apparently telling the truth. *See* Def's Br. at 4 ("records do exist [that] would reveal the so-called "SKP" or skip trace status code"); ECF Doc. No. 254, at 14 ("Mr. Kizer accurately explains that a debtor's account gets marked with the 'SKP' status code when a collector determines that skip-tracing efforts are required …"); *id*., at 30 ("These opinions ignore Mr. Kizer's testimony … that the way to determine whether a number was skip-traced is to … look for the "SKP" prefix …"). Defendant even argues that "the SKP identifier code is found only in in Rash Curtis' collection notes," which are "accessible from within Rash Curtis' collection software, Beyond ARM." *See id*., at 14-15. If true, Defendant's response that it had zero accounts in its "Beyond ARM software bearing a 'SKP' status code or marker" is blatantly false.

Defendant's insistence throughout fact discovery that it did not have any account records

bearing the SKP marking colored and influenced nearly every decision Plaintiff made throughout the litigation of this case, including decisions regarding what discovery was pursued, what motions to compel Plaintiff filed, what experts were hired, how class members would be identified, and how notice to class members would be given. Pursuant to Fed. R. Civ. P. 37(c)(1), Plaintiff believes that Defendant's egregious discovery conduct deserves severe sanctions, including, *e.g.*, the striking of its *Daubert* motions, preventing Defendant from arguing that Plaintiff's experts failed to consider the referenced material at trial, instructing the jury as to Defendant's discovery violations, imposing an adverse inference as to the telephone numbers Plaintiff's experts identified as having been obtained from skip-tracing, and striking Defendant's answer. *See, e.g., Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905–906 (9th Cir. 2002) (affirming district court's striking of defendant's answer where the defendant misrepresented that certain documents did not exist); *R & R Sails Inc. v. Ins. Co. of State of PA*, 251 F.R.D. 520, 528–529 (S.D. Cal. 2008) (recommending that the district judge "preclude Defendant from relying on or introducing any documents, testimony, or expert witness' testimony which relies on documents or electronically-stored information that was requested by Plaintiff but was not produced").

As discussed herein, however, despite Defendant's discovery abuse, Plaintiff's experts have been able to accurately identify the number of calls made to skip-traced phone numbers.

## III.  COLIN B. WEIR EXECUTES A RELIABLE METHOD FOR IDENTIFYING CLASS MEMBERS PROPOSED BY RANDALL A. SNYDER

On September 6, 2017, the Court certified four classes, which required, *inter alia*, (1) that class members received calls from one of Defendant's autodialers, (2) that the calls were received on their cellular telephones, (3) that class members did not provide their cellular telephone numbers in an application for credit to a creditor that has opened an account with defendant in such debtor's name, (4) that Defendant never had a debt-collection account in the class members' names, and (5) that their telephone numbers were obtained from skip tracing – *i.e.*, not from the class members themselves. *See* ECF No. 81, at 15-16. Plaintiff has identified 40,420 class-member telephone numbers that meet the above definition. *See* Verkhovskaya Report, at ¶ 26.

Plaintiff identified the above class member numbers through a combination of three

experts, Randall A. Snyder, Colin B. Weir, and Anya Verkhovskaya. Mr. Snyder offers an opinion of how calls to class members can be ascertained, while Ms. Verkhovskaya and Mr. Weir execute Mr. Snyder's proposed methodology. Mr. Weir, as a damages expert, then summarizes the multi-step methodology in an easy-to-understand format to assist the jury with determining how many calls were made to class members and the range of potential statutory damages.

A.   **Background Regarding Phone Numbers Defendant Admitted It Does Not Have Consent To Call**

Defendant's process for calling numbers using its VIC, Global Connect, and TCN dialers has been extensively litigated. "Defendant generally receives debt-accounts from creditors." Summary Judgment Order, ECF No. 167, at 3. "While some of these accounts include debtors' phone numbers – such individuals are excluded from the class definition ... – [D]efendant receives many accounts without any telephone numbers at all." *Id.* "For [accounts without phone numbers], [D]efendant uses a process referred to as 'skip tracing' to obtain phone numbers associated with the names on the accounts." *Id.* "Skip tracing is a method or process for locating individuals for the purpose of contacting them, using data analysis of personal information obtained from various and multiple public and private databases." *Id.* (quotations omitted).

Defendant's account database supports up to ten telephone number fields for each account. Defendant's collection managers choose which telephone number fields are loaded into its dialers according to criteria set for any given call campaign. Phone fields 1-4 are reserved for phone numbers Defendant receives from its creditor-clients. Krivoshey Decl., Ex. 8 ("N. Keith Dep."), at 14:11-15:7, 15:14-16 ("[P]hone field 1 through 4 are what comes in from the client, whatever phone number comes in from the client.").

In 2013, Defendant instituted a policy whereby all skip traced numbers were solely placed in phone fields 5-10. *See* N. Keith Dep., at 64:24-66:14, 77:23-78:12 (Defendant instituted a policy whereby numbers obtained through skip tracing from companies such as Accurint and ECA would be placed into phone fields 5-10); Krivoshey Decl., Ex. 9 ("Correa Dep."), at 51:20-52:19, 69:5-9, 70:19-71:14 (skip traced numbers obtained electronically are *automatically* uploaded into phone fields 5-10). Defendant's IT Analyst, Nick Keith, described this policy in internal emails:

I was talking to Chris [Paff] and Bob [Keith] and Chris's Theory is if we have all ECA, and Accurint skip tracing phone numbers placed in fields 5-10 we can make the dialer and global not call these phone numbers and only the first four fields which are ALWAYS reserved for client given phone numbers or approved phone numbers by the debtor.

Krivoshey Decl. Ex. 10, at 3. *See also* Krivoshey Decl., Ex. 11 at 3 ("We made it so ECA's don't put phone numbers in the top fields and the rest of the numbers would be what came from the client. The collectors should be putting skip traced number[s] into the lower fields."). In fact, most skip traced numbers were placed into phone fields 5-10 even before Defendant made it official policy. *See* Correa Dep., at 70:4-18. Skip traced numbers obtained through skip tracing software (as opposed to manual look-ups by Defendant's employees) have *always* been uploaded into phone fields 5-10. *See id.*, at 70:22-71:14.[2]

Daniel Correa, Defendant's Rule 30(b)(6) witness, affirmed that Defendant does not have consent to call phone numbers in phone fields 5-10:

Q. What is a skip list?

A. That would be a list of – we'd pull a list of accounts with – that haven't had contact and see if there's anything that we can manually skip trace on.

Q. Okay. So how would that process work?

A. You see a name, and you'd Google it. You'd take a look at, you know, just internet sites, see what you could find, if you can find who the person is in a particular city or where they're working, maybe they're a business owner, Google it, make a call. That's all done manually.

Q. So say that you found a number for those people. Where would that number go?

A. Without contact, it would go into fields 5 through 10.

Q. Okay. And with contact?

A. If they are giving us a consent to call, it would go into 1 through 4.

Q. And why would the numbers for the ones with no contact – why would they go into ... phone fields 5 through 10?

---

[2] Defendant also ran a "spin" to collect all skip traced telephone numbers for which Defendant does not have consent to call and transferred all such numbers into phone fields 5-10. N. Keith Dep., at 71:18-72:8, 73:23-75:13; *see also* Krivoshey Decl., Ex. 12, at 3 ("We are currently waiting [for] a spin from Dakcs that will get all phone numbers (sequence 1-4) that were ... [obtained] from any ECA's or batching from skip tracing vendors. When these are gathered they will place them into sequence 5-10.")

A.    We don't have consent to call.

Q.    *You don't have consent to call numbers in phone fields 5 through 10?*

A.    *Correct.*

Correa Dep., at 51:20-52:19 (emphasis added).  *See also id.*, at 59:7-25 (Q.  How do you determine if you have consent to call that number?  A.  From our clients in the fields 1 through 4.").

## B.    Mr. Weir's Analysis

Contrary to nearly the entirety of Defendant's motion to strike, Mr. Weir did not "assume[] that _every_ number found in phone fields 5-10 as Rash Curtis was skip traced."  Def's Br. at 4 (emphasis in original).  In fact, as a damages expert, Mr. Weir did not make any assumptions or proffer any opinions of whether any of the analyzed calls were obtained through skip tracing, belonged to debtors, whether the telephone numbers were landlines or cellular, or whether Defendant's dialers constitute ATDs within the meaning of the TCPA.  *See* Krivoshey Decl., Ex. 13 ("Weir Dep."), at 46:12-20; 49:10-15; 62:17-20 ("I have not been asked to opine about what a number being in phone fields one through four means or five through ten means"); 63:4-7 ("I was asked to analyze phone calls made to numbers contained in fields five through ten.  I'm not offering an opinion about what it means to be in fields five through ten."); 65:11-12 ("It was not part of my assignment to determine which calls were skiptraced."); 64:19-65:5 (stating that "[i]t was not part of my assignment" to determine whether the analyzed calls went to debtors or non-debtors); 67:2-3 ("It was the responsibility of another expert to determine which numbers were mobile phones.").  Rather, Plaintiff's expert Mr. Snyder offers opinions regarding whether the numbers obtained through a combination of Mr. Weir's and Ms. Verkhovskaya's multi-step methodology were obtained through skip tracing, while Ms. Verkhovskaya offers an opinion regarding whether the phone numbers were assigned to cellular telephone numbers and belonged to debtors.

Based on Defendant's Rule 30(b)(6) witness's testimony (1) that Defendant placed all skip-traced phone numbers into phone fields 5-10, and (2) that Defendant does not have consent to call any phone numbers in phone fields 5-10, Plaintiff's experts sought to analyze phone numbers in

phone fields 5-10 *as a starting point* in tabulating the total number of calls made to class members. Krivoshey Decl., Ex. 14 ("Snyder Dep."), at 91:2-92:11, 108:7-20; Weir Decl., at ¶¶ 6, 9, 12-13. Plaintiff's experts did not assume that every phone number in phone field 5-10 was obtained through skip tracing.   Snyder Dep., at 91:2-92:11; 108:7-20.

Mr. Weir's methodology involved the analysis of vast quantities of data.  Mr. Weir's analysis began by importing (1) Defendant's call logs of all calls made by all three of Defendant's dialers within the class period, and (2) account records (which include, inter alia, account numbers and debtor names) for all accounts with phone numbers in phone fields 5-10 into Stata, a program commonly used by researchers to perform complex data analysis.  *See* Weir Decl. ¶¶ 6-9; Weir Dep., at 56:9-57:22.  Mr. Weir then performed a "data cleaning" process of removing what appeared to be nonsensical data and eliminating invalid phone numbers from the data set.  *See* Weir Dep., at 56:9-57:22; 69:7-70:15 (discussing process of eliminating invalid telephone numbers).  Mr. Weir then "merged" the data sets into one data set by synching the phone field 1-10 account data with the call log data, making sure that the software synched calls made to phone numbers from phone fields 5-10 to the accounts where such phone numbers were, in fact, in phone fields 5-10.  *See* Weir Decl., at ¶ 6 ("Match Account and Telephone Number from CDR to Account data").  It was critical that this synching process was performed accurately for the millions of calls at issue because, as Mr. Weir stated in his deposition, "you might have one account where a number is in phone field one through four and another where it's in field five through ten."  *See* Weir Dep., at 57:16-19; 59:7-60:24 (describing sorting process); *id.*, at 60:22 (stating that the resulting data set contained roughly 1.5 million unique telephone numbers).

In opposing Plaintiff's Motion for Sanctions, Defendant argued that Plaintiff failed to account for the possibility that not all phone numbers in phone fields 5-10 were obtained solely through skip tracing because there was a possibility that some phone numbers in phone fields 5-10 were *first* stored in phone fields 1-4 (and, thus, purportedly obtained from a creditor).  Mr. Weir's November 12, 2018 expert report, however, cured this issue entirely.  Mr. Weir found that 99 percent of telephone numbers in phone fields 5-10 are not also contained in fields 1-4.  Weir Decl.

¶ 9. To be conservative, *every single instance* of a phone number contained in phone fields 5-10 that was also contained in phone fields 1-4 was eliminated from the final class call tabulation. *See id.*, ¶ 12. Mr. Weir eliminated all overlapping phone field 1-4 numbers that were in any of the three sets of data that Defendant provided – historical data sets, present-day data sets, and part of a large historical data subset. *See id.*, ¶ 9. Thus, the final class call tabulation does not contain a single phone number that has ever been in phone fields 1-4. Accordingly, even before proceeding to the next step of Plaintiff's methodology, the data set exclusively contained phone numbers that Mr. Correa admitted Defendant has no consent to call.

This initial data set showed that Defendant made more than 14 million calls using its dialers to phone numbers in phone fields 5-10, that were not also contained in phone fields 1-4. Defendant spends significant time discussing the fact that Mr. Weir did not opine whether these 14 million phone calls were made to phone numbers obtained through skip tracing. *See* Def's Br. at 11-16; 18:20-25, 19:5-11. As discussed above, as a damages expert, Mr. Weir does not offer any opinions about whether any numbers were obtained through skip tracing. That is Mr. Snyder's role. In any case, Plaintiff's rather conservative methodology would ultimately parse the list of calls to class members from this 14 million call figure to *just over 500,000 calls*, so Defendant's argument is a red herring. *See* Weir Decl., at ¶ 15.

Next, Mr. Weir parsed the 14 million call data down to (1) calls made using Global Connect with the call disposition of "Answered," and that were at least six seconds or longer in duration, (2) calls made using TCN with the call disposition of "Answered," and that were at least six seconds or longer in duration, and (3) calls made using VIC that had a call disposition of "Message – Party Connect," "Message – Hang Up," and "Message VIC Voice Mail." *See id.*, at ¶ 12. That data was then given to Ms. Verkhovskaya for her part in Plaintiff's overall methodology for identifying calls made to class members. *See id. See also* Weir Dep., at 96:4-20 (discussing data provided to Ms. Verkhovskaya).

Using Mr. Weir's list, Ms. Verkhovskaya identified class member telephone numbers that were cellular telephones at the time the calls were made. Verkhovskaya Report, at ¶¶ 16-19. Next,

using a multi-step process involving LexisNexis and TransUnion, Ms. Verkhovskaya was able to determine the historical customary users of the telephone numbers at issue at the time that Defendant made the calls. *See id.* ¶¶ 25. Ms. Verkhovskaya then compared the customary known users of the telephone numbers at issue with the names of the debtors listed on Defendant's accounts, and eliminated all instances from the dataset where the name of the debtor matched the historical customary known user on that same telephone number. *See id.*, at ¶¶ 26-34. Ms. Verkhovskaya then provided the resulting data back to Mr. Weir, who summarized the results of Plaintiff's entire methodology in his report, and included the final summary of all calls for which Plaintiff will seek to prove TCPA liability at trial. *See* Weir Decl., at ¶¶ 13-15.

Mr. Weir also provided a damages analysis for the named Plaintiff, Mr. Perez. *See id.*, at ¶ 16. Through a review of the entire call log dataset provided by Defendant (which, as discussed above, included millions of calls made within the class period), Mr. Weir was able to isolate 14 calls made to Plaintiff Perez's cellphone number that had a call disposition of "Answered" and that lasted six seconds or more. *See id.* The 14 identified calls were not derived from simply looking at Plaintiff's account file, but rather by analyzing the entire call log database produced by Defendant.

Notably, as a damages expert, Mr. Weir's *analysis* of the underlying data did not rely on the opinions of anyone else. *See* Weir Dep., at 52:22-56:3 (discussing the account records and call log data Mr. Weir relied on). Although Defendant spends nearly the entirety of its motion discussing the testimony of its former compliance manager, Steven Kizer, Mr. Weir does not rely on Mr. Kizer's testimony whatsoever. *Id.*, at 52:12-15; 62:6-11 ("Q. Okay. So now I want to go back to Mr. Kizer's testimony. You did rely upon that testimony, or you did not? A. To be honest, I don't think I'm relying on it in my final report, because I don't even remember what I would have taken from it."). Rather, his *understanding* of what the data represents was based on representations of counsel and the expert reports of Mr. Snyder and Ms. Verkhovskaya. Weir Dep., at 40:1-41:11; 52:2-11; 101:13-23.

As a damages expert, Mr. Weir presumed liability would be established for the calls identified through the use of his methodology. *See* Weir Dep., at 49:21-50:50:23 ("whatever

plaintiffs' theory of liability is, you should assume that defendants will be held liable for that harm"); 106:17-108:4 ("I've been instructed that these are the calls for which plaintiffs are going to seek statutory damages. If they are successful in proving that these calls – again, this is the assumption of liability – if they are correct that liability could be established for these calls, these are the damages."). He did not, however, make any opinions of whether the calls were obtained through skip tracing, belonged to debtors, whether the telephone numbers were landlines or cellular, whether Defendant's dialers constitute ATDS within the meaning of the TCPA, *etc*. Weir Dep., at 46:12-20; 49:10-15; 62:17-20 ("I have not been asked to opine about what a number being in phone fields one through four means or five through ten means"); 63:4-7 (same); 65:11-12 ("It was not part of my assignment to determine which calls were skiptraced."); 64:19-65:5 (stating that "[i]t was not part of my assignment" to determine whether the analyzed calls went to debtors or non-debtors); 67:2-3 ("It was the responsibility of another expert to determine which numbers were mobile phones."). As discussed above, Plaintiff's expert Mr. Snyder opines whether the numbers revealed through a combination of Mr. Weir's and Ms. Verkhovskaya's methodology were obtained through skip tracing, while Ms. Verkhovskaya offers an opinion regarding whether the phone numbers were assigned to cellular telephone numbers and belonged to debtors.

## C. Mr. Weir's Methodology Reliably Ascertains The Number Of Calls Made To Class Members

The telephone numbers identified in Mr. Weir's report for which Plaintiff seeks damages includes solely the numbers that (1) were numbers that Defendant's Rule 30(b)(6) witness admitted Defendant had no consent to call, (2) were gathered from fields used to store skip-traced telephone numbers, (3) were cross-checked against the list of phone numbers that Defendant obtained from its creditors, (4) were cellphones at the time the calls were made, (5) were actually called by one of Defendant's autodialers, and (6) were cross-checked against a list of the historical users of the telephone numbers to eliminate all numbers that belonged to the actual debtors on the accounts. Not one of these numbers was provided to Defendant or a creditor on the specific account by the person receiving the call, as all debtors were eliminated. Not one of these numbers was contained in phone fields 1-4 – phone fields Defendant reserves for phone numbers obtained from creditors

or the debtors. Thus, although it is *conceivable* that a number on the final list may not have been obtained through skip tracing, the suggestion is not plausible, and, more importantly, Defendant has not presented a shred of evidence that it obtained even one such number from a creditor (not through skip tracing). Certainly, Plaintiff should be allowed to prove at trial that it is "more likely than not" that every single number on the final list was obtained through skip tracing.

Plaintiff timely made his expert witness disclosures on November 12, 2018. Pursuant to the Court's 11/6/2018 Scheduling Order No. 2, Defendant's deadline to serve rebuttal reports was on November 26, 2018. ECF No. 246. Defendant did not disclose any rebuttal witnesses, and did not serve any rebuttal reports. Krivoshey Decl., ¶ 17. Expert discovery closed on December 21, 2018. ECF No. 246. The Court also set January 11, 2019 as the deadline for the parties to exchange exhibits to be used at trial. *See id*.

Defendant has been in possession of Plaintiff's expert reports since November 12, 2018. Krivoshey Decl., at ¶ 18. Notably, Defendant has had documentation of the identity of each of the 40,420 class member numbers identified in Ms. Verkhovskaya's report and the identity of each of the numbers for which Mr. Weir has prepared a damages report. *See* Verkhovskaya Report, at ¶ 26; Weir Decl., at ¶ 15. For each of the identified phone numbers, Defendant has knowledge of the account number associated with the telephone number, the identity of the debtor associated with the account and telephone number, and has access to the entire universe of data in its account database regarding these telephone numbers. Defendant's IT Analyst, Nick Keith, testified that Defendant even keeps a record of all files sent electronically by its creditor-clients just in case such files are necessary during litigation to prove that Defendant obtained the numbers from the clients:

> Q: Okay. And the fourth bullet point there says, "We are currently and since the beginning of me starting in IT, keep all files that have been sent to us electronically for any backup. In case of a suit, we can prove these phone numbers were provided on the clients' file." Do you see that?
>
> A. Yes.
>
> Q. And so, you say, "And since the beginning of me starting in IT." Are you referring to 2011?
>
> A. Yes.

...

Q. Are you able to retrieve them?

A. Yes.

Q. How quickly?

A. It depends on the file.

Q. Would it be more than a week?

A. Typically, no.

Q. Okay.

A. Okay. Correction on that. This would be for files that were sent to us from the client, like a new business file, not any other electronic files. This is specifically meaning for the file that was sent to us from the client, as in going back up to No. 3, numbers provided by the client. No. 4 is referring to that. And it's not all electronic files for backup. It is particularly from the client. I just want to point that out.

N. Keith Dep., at 78:21-79:25.

However, in the nearly three months of having Plaintiff's expert reports in its possession, Defendant has failed to rebut that a single one of the 40,420 class member numbers was obtained through skip tracing. Indeed, at trial, *Defendant bears the burden* to prove that it had consent to call these numbers, *i.e.*, that it obtained these numbers from its creditor-clients. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017). Even though Defendant apparently keeps a record of *all electronic records sent by its creditor-clients containing the debtor's phone numbers*, Defendant has not produced a single document showing that it obtained any of the 40,420 numbers from its creditor-clients.

Further, Defendant admits that it *can* identify numbers obtained through skip tracing. *See* Def's Br. at 17 (discussing a way to "definitively determine whether a given telephone number was first obtained by Rash Curtis via skip-tracing"). In discovery, Plaintiff sought "DOCUMENTS sufficient to identify ALL telephone numbers YOU obtained through skip tracing within the CLASS PERIOD." Krivoshey Decl., Ex. 4 at 6. Plaintiff's Interrogatory No. 10 also asked Defendant to "IDENTIFY ALL telephone numbers within the CLASS PERIOD YOU obtained through skip tracing." Krivoshey Decl., Ex. 15. To the extent Defendant now suggests that any of

the 40,420 numbers identified by Plaintiff did not come from skip tracing, Defendant is foreclosed from making this argument by Rule 37(c)(1) for its failure to disclose which of the 40,420 numbers were, or were not, obtained through skip tracing. Further, despite Defendant's stated capability of identifying which numbers were obtained through skip tracing, its inability to show that *even one* of the 40,420 numbers were not obtained through skip tracing is telling.

Fact and expert discovery are now closed, the rebuttal expert disclosure deadline has long passed, and the deadline to disclose exhibits to be used at trial has passed. Thus, even if, in theory, Defendant has records showing that it obtained a few of the 40,420 numbers from its creditor-clients and not from skip tracing, Defendant cannot rely on such records at trial. Defendant did not disclose (or produce) a single document showing that it obtained any of the 40,420 class member numbers from its creditor-clients or from the debtors themselves. Defendant's motion does not even challenge Plaintiff's experts' opinions that each of the 40,420 numbers were cellphones, did not belong to debtors, were contained in phone fields 5-10, were not contained in phone fields 1-4, and were called by Defendant's autodialers. Defendant also does not challenge the expertise or qualifications of Plaintiff's experts. Accordingly, Plaintiff's evidence that the 40,420 class member numbers were obtained through skip tracing will effectively be unrebutted at trial. *See* Order Regarding Defendant's Discovery Letter Brief, ECF No. 240, at 1 ("The Court further expects that to the extent any party intends to rely on any data in this lawsuit, be it in support of or in opposition to a motion or at trial, the party shall first produce that data to the opposing party.").

## IV. LEGAL STANDARD

"[S]cientific, technical, or other specialized knowledge' by a qualified expert is admissible if it will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *AngioScore, Inc. v. TriReme Med., Inc.*, 2015 WL 5258786, at *6 (N.D. Cal. Sept. 8, 2015). "An expert should be permitted to testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable." *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2018 WL 3707283, at *3 (N.D. Cal. Aug. 3, 2018).

"The Ninth Circuit has determined that a 'trial court not only has broad latitude in

determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability.'" *AngioScore, Inc.*, 2015 WL 5258786, at *6 (quoting *Elsayed Mukhtar v. Cal State. Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002)). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 592 (1993) (citation omitted). "The focus [of a district court] must be solely on principles and methodology, not on the conclusions that they generate." *Id.*, 509 U.S. at 595.

However, "[d]isputes as to the strength of [an expert's] credentials, faults in his use of a [a particular] methodology, or lack of textual authority of his opinion, go to the weight, not admissibility, of his testimony." *Romero v. S. Schwab Co., Inc.*, 2017 WL 5885543, at *2 (S.D. Cal. Nov. 29, 2017) (quotations omitted). "The relative weakness or strength of the factual underpinnings of the expert's opinion goes to the weight and credibility, rather than admissibility." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n. 5 (9th Cir. 1987). Likewise, "[a]rguments that an expert relied on unfounded assumptions in forming his opinion go to the weight, not the admissibility of expert testimony." *Haiping Su v. Nat'l Aeronautics & Space Admin.*, 2011 WL 7293396, at *2 (N.D. Cal. Apr. 7, 2011). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Further, in consideration of the burden of proof and the "liberal thrust" of Fed. R. Evid. 702, experts are not required to establish causation to a scientific or statistical certainty. *See, e.g., McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1106 (D. Or. 2010) ("In keeping with the court's proper role and the 'liberal thrust' of Rule 702, I will not exclude plaintiffs' expert testimony simply because the evidence supporting it does not establish causation to a scientific or medical certainty.") (citing *Daubert*, 509 U.S. at 588). Experts are also not required to eliminate all alternative explanations or potential causes, so long as the cause identified is a substantial causative factor. *See Wendell v. GlaxoSmithKline LLC*, 858 F. 3d 1227, 1237 (9th Cir. 2017) ("We do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be

reliable. It is enough that the proposed cause be a substantial causative factor.") (quotations and citation omitted). "Lack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano v. Cook*, 598 F. 3d 558, 565 (9th Cir. 2010).

"The ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle is sufficiently reliable so that it will aid the jury in reaching accurate results." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d Supp. 717, 744 (3d Cir. 1994) (bracketing and quotations omitted). "A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *Id.* at 744–745. "He or she will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." *Id.* at 745. "The same standard of reliability extends to the step in the expert's analysis that 'fits' his or her conclusions to the case at hand." *Id.*

Experts that opine solely on the issue of damages are allowed to, and often are required to, assume that liability will be established for their particular methodology of calculating damages. *See, e.g., BladeRoom Grp., Ltd., v. Facebook, Inc*., 2018 WL 1611835, at *6 (N.D. Cal. Apr. 3, 2018) ("Nor must a damages expert establish causation before his or her opinion becomes admissible. It is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages.") (quotations and bracketing omitted). When making the assumption of liability, damages experts are frequently required to rely on assumptions provided by counsel or other experts in the case. *See United States v. Northrop Grumman Corp*., 2003 WL 27366224, at *6 (C.D. Cal. Jan. 6, 2003) (holding that the damages expert's "reliance on assumptions provided by counsel or other experts is not a bar to her testimony"); *Wrather v. Farnam Cos., Inc*., 2003 WL 25667639, at *2 (C.D. Cal. Nov. 3, 2003) ("A typical damage expert is usually not qualified to determine the injury for which he establishes a value."). *See also United States v. Soulard,* 730 F.2d 1292, 1299 (9th Cir. 1984) (affirming the district court's admission of expert testimony summarizing evidence furnished by counsel and other experts).

Under Rule 702, a damages expert "can be employed if his testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding." S. Saltzburg & K. Redden, *Federal Rule of Evidence Manual* 451 (3d ed. 1982). "Even if an individual calculation appears straightforward, an expert's ability to present, in an understandable format, a vast quantity of calculations derived from disparate sources can assist the trier of fact." *Mascagni v. Schlumberger Tech Corp*, 2017 WL 4127714, at *2 (W.D. La. Sep. 15, 2017) (quotations omitted); *Gonzalez Production Sys., Inc. v. Martinrea Int'l Inc.*, 2015 WL 4771096, at *11 (E.D. Mich. Aug. 13, 2015) ("Although Mr. Simon's final formula does consist of adding up values, the Daubert hearing made it clear that these values were [derived from many disparate sources] … Indeed, the 'simple arithmetic' described by [the defendant] actually makes it easier for the average jury to reach its conclusion."); *Solstice Oil & Gas I LLC v. OBES Inc.*, 2015 WL 5059601, at *5 (E.D. La. Aug. 26, 2015) ("Regardless of whether [the damages expert's] calculations involve complex methodology, his ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the trier of fact.").

In TCPA class actions, damages experts are often necessary to cross-check the large number of class-members' phone numbers with the defendant's call logs to calculate the total number of calls at issue. *See, e.g., Stemple v. QC Holdings, Inc.*, 2014 WL 4409817, at *7 (S.D. Cal. Sep. 5, 2014) (denying motion to strike expert's testimony where the expert used "fairly simple computer cross-referencing methods" to cross-reference class members' names and telephone numbers with the defendant's call logs); *Fauley v. Drug Depot, Inc.*, 323 F.R.D. 594, 598 (N.D. Ill. 2018) (denying motion to exclude expert testimony where the expert's "detailed inclusion of the process, coupled with the explanation of which faxes were sent successfully, provides an understanding of exactly the number of fax advertisements sent by ProFax on behalf of APS"). *See also, e.g., Krakauer v. Dish Network, L.L.C.*, 2015 WL 5227693, at *3 (M.D.N.C. Sep. 8, 2015) (denying motion to exclude Ms. Verkhovskaya's testimony where she used "programmatic queries …, a commonly-used data analysis procedure, to identify connected calls that were second or later calls to the same number in any 12-month period during the class period")

(internal quotations omitted). In these cases, it is the damages experts' ability to analyze and distill large quantities and sources of data into easy-to-understand charts and tables, and not necessarily the "simple arithmetic" performed by the experts, that helps the jury under Rule 702. *See id.*

## V. THE COURT SHOULD DENY DEFENDANT'S MOTION TO STRIKE OR EXCLUDE MR. WEIR'S TESTIMONY

### A. Mr. Weir's Testimony Is Helpful To The Jury, Is Based On Sufficient Facts, And Relies On And Applies A Reliable Methodology

Defendant argues that Mr. Weir's testimony should be excluded because his methodology is not sufficiently difficult enough, and, accordingly, is not "beyond the common knowledge of the average layman." *See* Def's Br. at 9-15. According to Defendant, Mr. Weir's analysis "requires no more than a straightforward inspection of the spreadsheets provided by Rash Curtis." *Id.*, at 11. Thus, Defendant proposes that the jury perform Mr. Weir's analysis on its own. *See id.*, at 13.

Defendant's position is so extreme that it is likely that Defendant has not actually thought through what it is asking for the Court to order the jury to do. As discussed above, Mr. Weir analyzed call logs (from three separate dialers) which consisted of *millions of calls to more than a million unique phone numbers* and the account records for all accounts with phone numbers in phone field 5-10, merged these disparate data sources into one, excluded entries for phone numbers where the phone number in phone field 5-10 matched a phone number in phone field 1-4 (resulting in roughly 1.5 million unique account/phone number combinations), excluded invalid phone numbers, and sorted the calls by call disposition codes. Weir Decl., at ¶¶ 6-12. How exactly could lay persons be expected to do this kind of calculation? Does Defendant propose that the jury deliberate for several months while manually comparing the various databases? In Defendant's cited case in support of its argument, the court held that, "though perhaps time-consuming," the jury was able to review a spreadsheet containing a total of 1,846 messages originating from 1,026 unique cellular telephone numbers. *See Legg v. Voice Media Grp., Inc.*, 2014 WL 1767097, at *3 (S.D. Fla. May 2, 2014); Def's Br. at 9-13. Here, one of the first steps in Mr. Weir's analysis whittled down Defendant's entire call log database for the class period to more than 14 million calls *after* excising all calls made to phone numbers that were not in phone fields 5-10. Weir Decl.,

at ¶¶ 6-11.  Surely, the Court cannot expect a group of lay persons to take on such a monumental task by hand, at least to the extent it expects the jury to arrive anywhere close to an accurate accounting of the data.  *See, e.g., Stemple*, 2014 WL 4409817, at *7 (denying motion to strike expert's testimony where the expert used "fairly simple computer cross-referencing methods" to cross-reference class members' names and telephone numbers with the defendant's call logs).

Further, Mr. Weir's report would greatly assist the jury in understanding Ms. Verkhovskaya's report.  As discussed above, Ms. Verkhovskaya based her analysis on data that was first analyzed and processed by Mr. Weir.  Without Mr. Weir's explanation of his analysis of the data, the jury would have little to no information regarding the foundation on which Ms. Verkhovskaya bases her opinions.

Defendant also wishes to separate the steps of Mr. Weir's analysis by separating the "Match Sorting" process from the "Damages Calculations."  *See* Def's Br. at 9-15.  But just because *one step* of Mr. Weir's multi-step methodology is simple, does not mean that it would be unhelpful to the jury for Mr. Weir to explain the entirety of his methodology as a whole.  *See Gonzalez Production Sys., Inc.*, 2015 WL 4771096, at *11 ("Although Mr. Simon's final formula does consist of adding up values, the Daubert hearing made it clear that these values were derived by conducting detailed interviews, assessing a string of invoices in comparison with the original payment terms of the Agreement, and assessing a series of purchase orders and engineering change orders … Indeed, the 'simple arithmetic' described by [the defendant] actually makes it easier for the average jury to reach its conclusion."); *Solstice Oil & Gas I LLC*, 2015 WL 5059601, at *5 ("Regardless of whether [the damages expert's] calculations involve complex methodology, his ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the trier of fact."); *Mascagni*, 2017 WL 4127714, at *2 ("Even if an individual calculation appears straightforward, an expert's ability to present, in an understandable format, a vast quantity of calculations derived from disparate sources can assist the trier of fact.") (quotations omitted).

Likewise, it would assist the jury for Mr. Weir to explain how he calculated the number of

calls, lasting six second or more, made to Plaintiff Perez's cellphone number with the disposition

code "Answered." *See* Weir Decl., at ¶ 16. Mr. Weir did not arrive at Plaintiff's individual call

counts or damages simply by looking at Plaintiff's account notes, which do not contain the duration

of the calls made. Rather, Mr. Weir analyzed Defendant's entire call log database for all three

dialers for the entire class period, which consisted of many millions of calls. The jury could not be

expected to sift through *millions* of calls to essentially find a "needle in a haystack."

Defendant also devotes two and a half pages of its argument to quoting portions of Mr.

Weir's deposition where he testifies that he is not offering an opinion as to whether the numbers in

his report came from skip tracing, belonged to debtors, or any other issues affecting liability. *See*

Def's Br. at 18-20. But, as a damages expert, it is perfectly acceptable for Mr. Weir to assume that

liability will be established and to rely on Plaintiff's other experts – Mr. Snyder and Ms.

Verkhovskaya – to inform his opinions. *See, e.g., Northrop Grumman Corp.*, 2003 WL 27366224,

at *6 (holding that the damages expert's "reliance on assumptions provided by counsel or other

experts is not a bar to her testimony"). Thus, to the extent that Defendant attacks the factual

underpinning or foundation of Mr. Weir's methodology, Defendant is in fact attacking Mr.

Snyder's and Ms. Verkhovskaya's reports, not Mr. Weir's.

In any case, as with Mr. Snyder, Defendant's sole argument for exclusion is that Mr. Weir's

methodology for identifying the number of calls made to skip-traced phone numbers is flawed

because (1) he makes an improper assumption that all phone numbers in phone fields 5-10 are

obtained through skip tracing and, relatedly, (2) because Mr. Weir fails to rule out alternative

reasons that phone numbers could be in phone fields 5-10 unrelated to skip tracing. As discussed

above, Mr. Snyder (whose testimony Mr. Weir relies on), does not opine, and did not assume, that

every single phone number in phone fields 5-10 was obtained through skip tracing. Mr. Snyder

explained that looking at phone fields 5-10 was the *first step* of a multi-step analysis. Snyder Dep.

at 91:2-92:11, 108:7-20. Further, Mr. Snyder did effectively rule out alternative reasons that phone

numbers could be in phone fields 5-10 unrelated to skip tracing, as the full methodology whittled

down the class list to phone numbers from non-debtors, that were in phone fields 5-10, that had

never appeared in phone fields 1-4, and for whom, as of this date, Defendant has not produced a single document showing that Defendant obtained the numbers from a creditor or a debtor.

In any case, whether Mr. Weir based his opinion on an improper assumption and whether he failed to rule out alternative explanations go to the weight, not admissibility, of his testimony. *Bergen*, 816 F.2d at 1352 n. 5; *Romero*, 2017 WL 5885543, at *2; *Haiping Su*, 2011 WL 7293396, at *2. *See also Abante Rooter*, 2018 WL 3707283, at *8 (holding that defendant's "objections fundamentally challenge the weight of Ms. Verkhovskaya's testimony, not its admissibility" where defendant argued that Ms. Verkhovskaya failed to account for alternative meanings of call disposition codes); *AngioScore, Inc.*, 2015 WL 5258786, at *7 ("The Court agrees that some of Olsen's decisions regarding comparable licenses are questionable, however those concerns, in this case, are more properly directed to the weight of the testimony, not admissibility.").

Several courts have rejected nearly identical arguments from defendants in TCPA cases before. For instance, in *Krakauer v. Dish Network, L.L.C.*, 2015 WL 5227693, at *6-8 (M.D.N.C. Sept. 8, 2015), Ms. Verkhovskaya identified class members who requested to not be called by looking at whether defendant's accounts were marked with "DNC" and "Do Not Call" codes. Defendant argued that her methodology was inadmissible because there were multiple reasons that a "DNC" code could be used, not all of which meant that the person requested not to be called. *Krakauer*, 2015 WL 5227693, at *7. Judge Catherine C. Eagles disagreed:

> [T]he correctness of the facts underlying Ms. Verkhovskaya's identification of IDNC class members is more properly a question for the trier of fact … The phrases "DNC" and "Do Not Call" from SSN's call records are, in context, persuasive circumstantial evidence that persons associated with those numbers are on SSN's IDNC list … If Ms. Verkhovskaya was wrong in her analysis of SSN's IDNC list, this may undermine the weight and credibility of her report, but that does not affect admissibility.

*Krakauer*, 2015 WL 5227693, at *8. *See also Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 393 (M.D.N.C. 2015) ("Dish's claim that it failed to distinguish persons who made an internal do-not-call request from other persons Dish says it decided not to call for different reasons does not make the list unreliable…"); *Id.* at 394 ("[Plaintiff] is not required to prove that, without a doubt, every single person on the class list would be able to recover…").

Here, the class list is composed of numbers in phone fields 5-10 (where *all* skip-traced numbers were placed and for which Defendant admits it has no consent to call), that have never appeared in phone fields 1-4 (where numbers from the creditor go), that do not belong to the actual debtor on the account, and for which Defendant has not presented any evidence showing that the numbers came from the creditors (as it must at trial to prove its consent defense). As in *Krakauer*, Plaintiff's experts' methodology offers "persuasive circumstantial evidence" that those numbers were obtained through skip tracing. As in *Krakauer*, Defendant's argument that Plaintiff's experts failed to account for the possibility that some of the numbers were placed in phone fields 5-10 for reasons other than skip tracing goes to the weight of the evidence, not admissibility.

*Reyes v. BCA Fin. Servs., Inc*. 2018 WL 3145807 (S.D. Fla. June 26, 2018) is also on point. In *Reyes*, the plaintiff's expert – again, Ms. Verkhovskaya – proposed to identify class members in a "wrong number" TCPA class action by tabulating calls made to accounts with "B" or "WN" markings. *Reyes*, 2018 WL 3145807, at *1, *4-5, *12-15. The defendant in *Reyes* argued that the proposed methodology was overinclusive because the "B" and "WN" codes did not necessarily mean that the defendant was calling the wrong number. *See id*., at *4-5 Judge Jonathan Goodman held that such potential factual inconsistencies go to the weight of the evidence, not admissibility. *See Reyes*, 2018 WL 3145807, at *13-14. In his analysis, Judge Goodman also stressed the evidence that the defendant *failed* to present:

> In addition, my conclusion is further supported by not just what Reyes has presented, but also by what BCA has *failed* to present. Specifically, although BCA *says* that a "B" flag may have meanings other than to indicate a "wrong number," BCA presents no *evidence* of any actual phone number that was coded with a "B" flag to indicate something *other than* a wrong number. Similarly, BCA has presented no *evidence* that a WN-coded phone number corresponded to something from a wrongly-dialed number. And neither has BCA shown a single instance whether a phone number designated as a cellphone was not actually a cellphone when the subject calls took place.

*Reyes*, 2018 WL 3145807, at *14 (emphasis in original). And so it is here. While Defendant *says* that some of the numbers Plaintiff's experts have identified may have been obtained through methods other than skip tracing, it has not presented any *evidence* of that fact. Defendant did not serve any rebuttal expert reports. Fact and expert discovery are closed. The deadline to exchange

exhibits to be used at trial has passed.  And, even though it is Defendant's burden to show that it obtained class members' numbers directly from class members (or their creditors) at trial, Defendant has not produced even one such document.

Critically, Plaintiff needs only prove that it is "more likely than not" that Defendant called skip traced phone numbers using its autodialers.  Whatever conflicting evidence Defendant intends to put forth at trial will go to the weight of Mr. Weir's testimony in light of Plaintiff's burden of proof.  *See Primiano*, 598 F. 3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Defendant's oft-cited case *Legg*, 2014 WL 1767097, at *3-4, is inapposite.  *See* Def's Br., at 10-11, 21-25.  In *Legg*, the plaintiff sought certification of a class of persons who sent a "STOP ALL" text message to the defendant *and continued receiving advertisements*.  *See Legg*, 2014 WL 1767097, at *3-4.  The plaintiff sought to satisfy the numerosity prong simply by looking at persons who sent a "STOP ALL" text message, without looking at whether such persons received any more advertisements after sending the text message(s) (some persons sent more than one STOP ALL message).  *See id*.  The court held that this showing was insufficient because the plaintiff did not bother to determine which persons *continued receiving advertisements* after sending the message.  *See id*.  Here, however, Plaintiff has put forward a reliable methodology for identifying persons 1) who are not debtors, 2) whose numbers were obtained through skip tracing, and 3) *who actually received calls* from Defendant's dialers, including an analysis of the precise number of calls such persons received.  *See gen*. Weir Decl., at ¶¶ 6-15.  Unlike in *Legg*, Plaintiff here has not simply failed to establish a requirement for class membership.  Rather, Defendant disagrees with the *number* of skip-traced phone numbers identified by Plaintiff, an argument that goes to the weight of the evidence, not admissibility.  And, as discussed above, Defendant has failed to introduce evidence that a single one of the 40,420 class-member numbers identified by Plaintiff were not obtained through skip-tracing.

**B.**     **The TCN Calls Are Included Within The Class**

Defendant argues that calls made using the "TCN" dialer are not within the scope of the

Court's class certification order, which only mentions calls made "from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer." Def's Br. at 23. However, throughout the pendency of this case, Defendant has used the terms Global Connect and TCN interchangeably, as Global Connect *became TCN* within the class period. For instance, at class certification, when describing how Defendant utilized the Global Connect dialer, Defendant cited to the 6/30/2017 Declaration of Darrin Bird, ECF No. 50-3. *See* Defendant's Opposition to Plaintiffs' Motion for Class Certification, ECF No. 50, at 13. As stated in Mr. Bird's declaration, he is the "Chief Operating Officer of TCN (formerly known as Global Connect)." ECF Doc. No. 50-3, at ¶ 1. In Defendant's class certification briefing, when discussing "the way Defendant's debt collection software interacts with Global Connect's software," Defendant cited to Mr. Bird's declaration, who does not mention Global Connect once in his declaration other than to state that TCN is "formerly known as Global Connect." ECF No. 50, at 13. Further, in discovery, Defendant produced records of all calls made by both the TCN and Global Connect dialers, used the terms TCN and Global Connect interchangeably, and never objected to the production of these records on the basis that the TCN dialer purportedly falls outside the scope of the class certification order. *See, e.g.*, Joint Report re Status of Defendant's Production of Documents, ECF No. 125, at ¶ 4 ("Defendant has produced all known manuals for its telephone dialing equipment, including the VIC dialer and the Global Connect (now TCN) dialer."); *id.*, at ¶ 9 ("Defendant has produced call logs showing all calls placed by Global Connect/TCN from January 2014 to October 2017"); *id.*, at 3 ("The only remaining documents left to be produced are the remaining call logs from Global Connect/TCN from June 2012 to December 2013"). To the extent that Defendant now argues that the TCN dialer does not fall within the scope of the class certification order, the argument is waived.[3]

## VI. CONCLUSION

The Court should deny Defendant's motion and sanction Defendant for misleading the Court and Plaintiff regarding the presence of documents bearing the "SKP" marking.

---

[3] In the alternative, Plaintiff requests that the Court modify the class certification order to include calls made using the TCN dialer, as the parties have litigated the entire case as if the TCN dialer were encompassed within the order.

Dated: February 11, 2019

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: ___/s/ Yeremey Krivoshey___
       Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No.295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email:  ltfisher@bursor.com
       ykrivoshey@bursor.com
       breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*