**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey O. Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        ykrivoshey@bursor.com
        breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

**ELLIS LAW GROUP LLP**
Mark E. Ellis - 127159
Anthony P. J. Valenti - 284542
Lawrence K. Iglesias - 303700
1425 River Park Drive, Suite 400
Sacramento, CA 95815
Tel: (916) 283-8820
Fax: (916) 283-8821
mellis@ellislawgrp.com
avalenti@ellislawgrp.com
liglesias@ellislawgrp.com

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA MCMILLION, JESSICA ADEKOYA, and IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>Defendant. | Case No. 4:16-cv-03396-YGR<br><br>Hon. Yvonne Gonzalez Rogers<br><br>**JOINT PRETRIAL CONFERENCE STATEMENT**<br><br>Date: April 12, 2019<br>Time: 9:00 a.m.<br>Courtroom 1, 4th Floor |

## I.  SUBSTANCE OF THE ACTION

### A.  Plaintiff's Statement Of Elements Of Proof

Plaintiff asserts a single claim against Rash Curtis for violation of the TCPA.  "The elements for a TCPA claim are that (1) a 'call' was made; (2) using an ATDS; (3) *or* an artificial or prerecorded voice; (4) the number called was assigned to a cellular telephone service; and (5) the 'call' was not made with the 'prior express consent' of the receiving party."  *Pimental v. Google, Inc.* 2012 WL 1458179, at *2 n.2 (N.D. Cal. Apr. 26, 2012) (Gonzalez Rogers, J.) (citing 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)).  Although "prior express consent" is often referred to as an "element" of a TCPA claim, "express consent is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof."  *Meyer v. Bebe Stores, Inc.*, 2015 WL 431148, at *3 n.3 (N.D. Cal. Feb. 2, 2015) (Gonzalez Rogers, J.) (quoting *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011)).  Plaintiffs will use the following evidence to prove each of these claims:

**A call was made:**  Rash Curtis produced logs of 534,698 calls it made using Global Connect, TCN, and DAKCS/VIC dialers (the "Dialers") during the class period (the "Call Logs").  Plaintiff will introduce summaries of these call logs into evidence with their expert witness, Colin Weir, and Anya Verkhovskaya, as the supporting witness.  Plaintiff will also introduce logs of calls Rash Curtis made to Mr. Perez using the Dialers during the class period.

**Using an ATDS:**  The Court has already determined that "[Rash Curtis'] Global Connect, TCN, and DAKCS/VIC dialers (the "Dialers") constitute Automatic Telephone Dialing Systems ("ATDSs") within the meaning of the TCPA."  Dkt. No. 167 at 2.

**Using a prerecorded or artificial voice:**  Plaintiff will introduce his own testimony that he heard a prerecorded or artificial voice when answering calls.  Plaintiff will also introduce the expert testimony of Randall A. Snyder who determined, through a review of Defendant's deposition testimony, dialer manuals, and Defendant's admissions, that Defendant used prerecorded or artificial voice when making calls with its Global Connect and VIC dialers.  Plaintiff will also introduce expert testimony from Colin B. Weir discussing the number of calls Defendant made to class members utilizing a prerecorded or artificial voice.

**The number called was assigned to a cellular telephone service:** At Summary Judgment, it was undisputed that Mr. Perez was called on his cellular telephone. In fact, Rash Curtis did not refute Mr. Perez was called on a cellular telephone. Dkt. No. 152. Plaintiff's expert witness, Ms. Verkhovskaya, will testify that her searches using the LexisNexis database confirmed that class members' phone numbers were assigned to cellular telephone services at the times the calls were made.

**The call was made without the prior express consent of the receiving party:** The Court has already determined that "[Rash Curtis] lacked prior express consent to call [Plaintiff] Perez." Dkt. No. 167 at 12.

## B. Defendant's Defenses

**Prior Express Consent:** No violation of the TCPA occurs when a phone call using an automatic telephone dialing system, or an artificial or prerecorded voice, is initiated with the "prior express consent" of the called party. 47 U.S.C. § 227(b)(1). "[P]rior express consent is a complete defense" to a TCPA claim. *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017). "Persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 8752, 8769 (1992). A debt collector, such as Rash Curtis, who calls on behalf of the party to whom consent has been provided, operates within that consent. *Hudson v. Sharp Healthcare*, 2014 WL 2892290, at *3 (S.D. Cal. June 25, 2014).

Plaintiff has not proven that Rash Curtis lacked the prior express consent to place any of the calls to any of the persons Plaintiff has identified as putative class members. Plaintiff Perez' cell phone number does not appear on the list Plaintiff has described as class members. Rash Curtis can prove through its records that some of the persons identified by Plaintiff's experts as class members voluntarily provided their phone numbers to Rash Curtis or its creditor-clients with prior express consent to be called. Rash Curtis' collection notes, ECA Advanced Trace reports, and Edit Tracking reports may show whether a specific telephone number was obtained through skip tracing, or by other methods. Plaintiffs experts have erroneously assumed that all telephone

numbers in phone fields 5 through 10 were obtained by skip tracing and thus failed to reliably separate phone numbers obtained by Rash Curtis through skip tracing from phone numbers obtained through other methods, including those which were obtained with prior express consent. Plaintiff has not established that any phone number stored in phone fields 5 through 10 was obtained through skip tracing, or that Rash Curtis lacked prior express consent to dial any phone number stored in those fields. *Snapp v. United Transportation Union,* 889 F.3d 1088, 1104 (9th Cir. 2018).

**Good Faith**: TCPA liability does not extend to debt collectors where the phone number provided to the debt collector by its creditor-client "gave Defendant a good-faith basis to believe that it had prior express consent to contact Plaintiff at that number." *See, e.g., Chyba v. First Financial Asset Management, Inc.*, 2014 WL 1744136, at *11 (S.D. Cal. 2014) *aff'd* 671 Fed.App'x 989 (9th Cir. 2016). The Ninth Circuit has confirmed that liability under the TCPA is not appropriate where "[t]here appears to have been little that the Defendant could have done to further ascertain whether there was consent except to call Plaintiff". *Id.*

Here, Rash Curtis obtained a cell phone number from its creditor client, Sutter General Hospital ostensibly affiliated with a debt owed to Sutter by Daniel Reynoso. Rash Curtis reasonably relied upon this information from Sutter; it did not know that the cell phone number in question had been ported from Daniel Reynoso to Plaintiff Perez, until June 7, 2016, the first time that Plaintiff Perez answered. On that date, upon notice, Rash Curtis deleted the cell number from Mr. Reynoso's account, and never called Plaintiff Perez again. The evidence, including testimony from Rash Curtis' employees, as well as its business records, show that Rash Curtis reasonably and in good faith believed that it possessed prior express consent to call the phone number in question up until June 7, 2016. This defense is relevant to liability and the measure of damages.

**ATDS**: Rash Curtis raises, so as not to waive, the issue of whether Plaintiff has stated a claim as to Rash Curtis' use of "automatic telephone dialing systems" within the meaning of 47 U.S.C. § 227(a)(1). Rash Curtis submits that the TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, ***using a random or sequential number generator***; and (B) to dial such numbers." Although

the Ninth Circuit recently embraced a more expansive definition which includes all dialing equipment that has the capacity to store phone numbers and dial them, there is a split among Circuits, and the defendant in *Marks v. Crunch San Diego, LLC*, filed a petition for a writ of certiorari to the Supreme Court of the United States on January 28, 2019, requesting the Supreme Court resolve the circuit-split. The interpretation of the TCPA's definition of an "automatic telephone dialing system" given by other circuits would obviate some or all of Plaintiff's class claims because Rash Curtis' dialing equipment has never possessed the capacity to "generate" telephone numbers "using a random or sequential number generator". *See, e.g., Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 120 (3rd Cir. 2018); *ACA Int'l v. Federal Commc'ns Comm'n*, 885 F.3d 687, 696-697 (D.C. Cir. 2018). Rash's dialers, like smartphones, are only used to dial phone numbers off a list of specific phone numbers loaded and stored in Rash's dialers, and not numbers which it "generated" randomly or sequentially.

**Safe Harbor**: Last year, the D.C. Circuit Court's decision in *ACA v. FCC, supra,* set aside the FCC's "one-call safe harbor;" previously, the FCC had permitted "one liability-free call, rather than impose a traditional strict liability standard, because it interpreted a caller's ability under the statute to rely on a recipient's 'prior express consent' to mean reasonable reliance. And when a caller has no knowledge of a reassignment, the [FCC] understandably viewed the caller's continued reliance on the prior subscriber's consent to be reasonable." *ACA International, supra,* 894 F.3d at 706-707 (some internal quotation marks omitted). The D.C. Circuit discussed the purpose of the FCC's reasonable reliance approach:

> Elsewhere in the Declaratory Ruling, the Commission echoed the same "reasonable reliance" understanding of the statute's approval of calls based on "prior express consent." The ruling accepts that a caller can rely on consent given by a wireless number's "customary user" ("such as a close relative on a subscriber's family calling plan"), rather than by the subscriber herself. [] That is because the "caller in this situation cannot reasonably be expected to divine that the consenting person is not the subscriber." [] The [FCC] reiterated in that regard that, in "construing the term 'prior express consent' in section 227(b)(1)(A), we consider the caller's reasonableness in relying on consent. [][¶] The [FCC] thus consistently adopted a "reasonable reliance" approach when interpreting the TCPA's approval of calls based on "prior express consent," including as the justification for

allowing a one-call safe harbor when a consenting party's number is reassigned. The [FCC], though, gave no explanation of why reasonable-reliance considerations would support limiting the safe harbor to just one call or message. That is, why does a caller's reasonable reliance on a previous subscriber's consent necessarily cease to be reasonable once there has been a single, post-reassignment call? The first call or text message, after all, might give the caller no indication whatsoever of a possible reassignment (if, for instance, there is no response to a text message, as would often be the case with or without a reassignment).

*ACA International, supra,* 885 F.3d at 707 (internal citations omitted).

In setting aside the one-call safe harbor, the D.C. Circuit <u>did not</u> set aside the FCC's "reasonable reliance understanding of calls based on prior express consent." *Id.* (Internal quotation marks omitted.) Unlike some TCPA cases (e.g., junk fax cases) where there is no prior express consent from a previous subscriber upon which the defendant reasonably relied, the FCC has "consistently adopted a 'reasonable reliance' approach" in these circumstances. *Id. ACA* noted, "the [FCC] said that 'it could have interpreted the TCPA to impose a traditional strict liability standard,' i.e., 'a zero call' approach.' [] But the agency declined to 'require a result that severe'". *Id.* at 708. The *ACA* court went on to set aside the one-call safe harbor <u>only</u> because it was under the impression that the FCC does not treat reassigned number cases as strict-liability cases:

When we invalidate a specific aspect of an agency's action, we leave related components of the agency's action standing only if "we can say without any 'substantial doubt' that the agency would have adopted the severed portion on its own." [][¶] Here, we have no such assurance. If we were to excise the Commission's one-call safe harbor alone, that would leave in place the Commission's interpretation that "called party" refers to the new subscriber. And that in turn would mean that a caller is strictly liable for *all* calls made to the reassigned number, even if she has no knowledge of the reassignment. [¶] We cannot be certain that the agency would have adopted that rule in the first instance. … We cannot say without substantial doubt that the agency would have embraced the "severe" implications of a pure, strict-liability regime in the absence of any safe harbor.

*ACA Int'l, supra,* 885 F.3d at 708 (internal citations omitted).

Thus, when the *ACA* court set aside the FCC's treatment of reassigned numbers, it did not contemplate leaving in place a strict-liability regime in reassigned number cases; rather, it left in place a "reasonable reliance" standard. *Id.* The TCPA imposes liability based upon negligence and

willfulness standards. *See, e.g.,* 47 U.S.C. § 227(b)(3). Here, Rash Curtis' conduct in calling Plaintiff Perez does not rise to the level of "negligent" conduct, let alone "willful" or "knowing" within the plain language of the TCPA. *See* 47 U.S.C. § 227(b)(3).

**No Proper Class**: Rash Curtis raises, so as not to waive, the issue that Federal Rule of Civil Procedure 23 is not satisfied in this litigation. Rash intends to submit a motion to decertify in the coming days explaining the basis for its defense in more detail. There are two primary issues here: first, class certification was granted on the basis that individual issues would not predominate because the classes only included skip traced phone numbers, and Rash could "easily identify" which phone numbers were skip traced by searching for a unique status code. Now that expert discovery has been conducted, it is clear that Plaintiff's experts do not intend to rely on any unique status code, and instead, assert that calls placed to phone numbers obtained through "a variety of sources", other than by skip tracing fall, within the scope of this litigation. Plaintiff's experts have not conducted any adequate analysis of skip tracing by review of the relevant records and, as such, have no non-speculative way of separating skip traced phone numbers from phone numbers obtained with prior express consent.

Second, Plaintiff Perez is not designated as a member of the certified classes as framed by Plaintiff and Plaintiff's experts' reports. The evidence demonstrates that his phone number was given to Rash Curtis by its creditor-client, Sutter General, who was given the phone number by Sutter's patient, Daniel Reynoso. Plaintiff defines the class merely by assuming that <u>all</u> phone numbers stored in dialer fields five through ten (and which were not stored in fields one through four) were skip traced; this assumption has no evidentiary support, and, conflicts with the testimony of Rash's former Compliance Director, Steve Kizer, who Plaintiff deposed in April of 2017 and upon whose testimony his experts rely. Plaintiff Perez' phone number was not even stored in one of those fields (5-10). As testified to by Kizer, Plaintiff Perez' phone number was stored in phone field 1.

Plaintiff's experts' methodology for identifying class members whose phone numbers were obtained through skip tracing, which begins with an analysis of which phone numbers were stored in which phone fields in Rash Curtis' database, was a methodology invented solely for this

litigation. Methodology which is "invented" for preparing an opinion for use in a particular case and "likely never will be used again" is inherently unreliable. *In re SFPP Right-of Way Claims,* 2017 WL 2378363, at *7 (C.D. Cal. May 23, 2017) (citing *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1056 (9th Cir. 2003).

**Due Process**: This defense is both relevant to liability and damages. As to liability, "Congress did not intend to depart from the common law understanding of consent because the statute does not treat the term differently from its common law usage." *Gager v. Dell Financial Services, LLC,* 727 F.3d 265, 271 (3rd Cir. 2013). Here, where Rash was validly given prior express consent to call Mr. Reynoso at the cell number in question prior to the number being reassigned to Plaintiff Perez, and no revocation of that consent was made until June 7, 2016, the first time Plaintiff Perez spoke with anyone from Rash Curtis, due process requires revocation of consent be made "clearly and expressly" before liability may be imposed. *See Van Patten, supra,* 847 F.3d at 1048. Imposing liability for calls placed after Rash had obtained prior express consent but before it was notified that the consent was withdrawn, especially on a classwide basis, violates common law principles of consent (under which the TCPA operates) and thus violates due process. *Id.*; *Gager, supra,* 727 F.3d at 271. Additionally, class-wide liability would deprive Rash Curtis of an opportunity to set forth its defenses to individual claims in violation of due process.

Due process is also relevant to the issue of damages, where the TCPA's "adding-machine" damages were created to incentivize individual actions (for a nominal harm not otherwise likely to be pursued by individual plaintiffs) but can quickly create ruinous liability on a class-wide basis. While the TCPA's statutory damages are not facially unconstitutional, they "may become unconstitutional as applied in an individual case." *Maryland v. Universal Electronics, Inc.*, 862 F.Supp.2d 457, 465 (D. Md. 2012) ("In such situations, a damages award may violate due process or constitute an 'excessive file' under the Eighth Amendment"); *see also Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 405 (E.D. Pa. 1995) (noting that the statutory damages allowed under the TCPA were designed by Congress to be sufficient to incentivize individual actions and that class actions posed the risk of "horrendous, possibly annihilating punishment, unrelated to any damage to the purported class"); *see also Texas v. American Blastfax, Inc.,* 164 F.Supp.2d 892, 900-901

(W.D. Tex. 2001) (awarding 7 cents per TCPA violation, instead of $500 or more, for equitable, reasonableness, and due process concerns).

### C. Plaintiff's Response to Defendant's Listed Defenses

The Court has already determined as a matter of law that "[D]efendant lacked prior express consent to call [Plaintiff] Perez." Dkt. No. 167, at 12. The Court further denied Defendant's arguments regarding a purported "good faith" or "reasonable reliance" defense to call Plaintiff, and denied Defendant's motion for reconsideration on these issues. Accordingly, whether Defendant had consent to call Plaintiff Perez (and whether Defendant had a good faith basis to believe it had consent to call his number) will not be an issue to be proved at trial. *See* Dkt. No. 199, at 5-6 (Order denying Defendant's motion for reconsideration where Defendant made the same "good faith" and "reasonable reliance" argument). And, as this Court has held, there is no such thing as a good faith defense in the first place. *See Abrantes v. Northland Grp., Inc.*, 2015 WL 1738255, at *1 (N.D. Cal. Apr. 13, 2015).

Defendant also states that it may prove through its records that some of the class members identified in Plaintiff's expert reports provided prior express consent or that their phone numbers were not obtained through skip tracing, including through the use of ECA Advanced Trace reports and Edit Tracking reports. However, fact and expert discovery have long closed. Defendant has not designated any rebuttal witnesses, and its deadline to do so has lapsed. Defendant also has not disclosed or identified *a single* document that it may use to prove consent or absence of skip tracing for the identified class members, and its deadline to disclose or exchange exhibits to be used at trial passed on January 11, 2019. Dkt. No. 246, at 1. Accordingly, Defendant is foreclosed from relying on any such undisclosed documents at trial. Dkt. No. 240, at 1 ("to the extent any party intends to rely on any data in this lawsuit, be it in support of or in opposition to a motion or at trial, the party shall first produce that data to the opposing party").

Plaintiff will address the other listed defenses in the relevant future pretrial filings.

## II. RELIEF PRAYED

Plaintiff seeks the following relief:

1. For Rash Curtis' violations of the TCPA, Plaintiff and class members seek at minimum "statutory damages in the amount of $500 per violation." *See Meyer v. Bebe Stores, Inc.*, 2015 WL 431148, at *2 (N.D. Cal. Feb. 2, 2015) (Gonzalez Rogers, J.). Plaintiff also intends to present evidence that Rash Curtis' conduct was knowing and willful. "In the case of knowing or willful violations, statutory damages of up to $1,500 per violation may be awarded." *Id.* Here, Plaintiff will present testimony from Mr. Weir who has reported that his analysis of Rash Curtis' Call Logs revealed 534,698 calls to class members using the Dialers during the class period. At the statutory floor of $500 per violation under the TCPA, damages total $267,349,000. If Plaintiff establishes that Rash Curtis' violations were knowing or willful, damages total $802,047,000.

2. Plaintiffs also seek an injunction precluding Rash Curtis from calling class members using an ATDS and/or artificial or prerecorded voice.

Defendant seeks the following relief:

1. That Plaintiff Perez takes nothing from this action;

2. An order decertifying the classes;

3. That the putative class members take nothing from this action;

4. An order that Defendant did not violate the TCPA; and

5. An order denying Plaintiff's requested injunctive relief.

### III. THE FACTUAL BASIS OF THE ACTION

#### A. Undisputed Facts

**Background**

1. Plaintiff Perez filed the Class Action Complaint on June 17, 2016.

2. The Court appointed Plaintiff Perez as class representative of the certified classes in this case on September 6, 2017. Dkt. No. 81.

3. The Court appointed Bursor & Fisher, P.A. as class counsel to represent the certified classes in this case on September 6, 2017. Dkt. No. 81.

4. Defendant Rash Curtis & Associates is a nationwide debt collection agency specializing in the collection of healthcare debt.

5. Rash Curtis' principal place of business in Vacaville, California.

6.      Rash Curtis obtains debtor accounts from healthcare providers for the purpose of collecting debts and may include one or more telephone numbers.

7.      As part of its efforts to collect debt, Rash Curtis regularly calls debtors and other people related to them.

**Rash Curtis' Use of Skip Tracing**

8.      Each of the certified classes requires, as a precondition to membership, that the class members' telephone numbers called by Rash Curtis were "obtained through skip tracing." Dkt. No. 81.

9.      Skip tracing is a method of obtaining demographic information about individuals. Skip tracing is used for a number of purposes including obtaining contact information such as home telephone numbers, current home addresses, last known addresses, places of employment, work phone numbers, fax numbers, spouse phone numbers (cellular or land line), family member phone numbers, additional addresses or phone numbers such as neighbors or friends, assets, credit scores, and searching for bankruptcy filings. Skip tracing may be performed via data analysis of personal information obtained from various public and private databases. Through skip tracing, a company like Rash Curtis may obtain new telephone numbers, addresses, and/or employment or asset information on a debtor or third-parties.

10.      Rash Curtis uses skip tracing to obtain various information about debtors, such as telephone numbers for the files it receives when it does not contain current telephone numbers for debtors, additional telephone numbers for accounts it receives that do contain telephone numbers, employment information, and, among other things, location information. Rash Curtis may also use skip tracing to obtain other information pertinent to its collection activity.

11.      Rash Curtis stores the telephone numbers it obtains from skip tracing in certain areas of its collection database.

12.      Rash Curtis maintains a database containing all of its collection accounts.  Each account record has ten telephone number "fields" used for storing phone numbers associated with the account.

13.     It is Rash Curtis' policy and procedure to place telephone numbers that it receives from its creditor-clients in phone fields one through four.

14.     It is Rash Curtis' policy and procedure to place the telephone numbers that it obtains from skip tracing in phone fields five through ten.

**Rash Curtis' Use of the Global Connect Dialer:**

15.     In the course of collecting debts, Rash Curtis regularly called consumers using Global Connect, a progressive dialer.

16.     A progressive dialer is a type of automatic telephone dialer whereby the equipment initiates outbound telephone calls by progressively dialing through a stored list of telephone numbers

17.     At the time Rash Curtis was using Global Connect, Global Connect could make 10 simultaneous calls per each of Rash Curtis' available debt collection agents.

18.     Global Connect could make thousands of calls within minutes.

19.     The Global Connect dialer allows for calling telephones using a prerecorded voice.

20.     Rash Curtis' employees would load lists of numbers for Global Connect to call prior to Global Connect placing calls.

21.     The Court has already determined that Rash Curtis' Global Connect dialer is an automatic telephone dialing system under the TCPA, 47 U.S.C. § 227(a)(1).  Dkt. No. 167.

22.     The Global Connect dialer is no longer in use by Rash Curtis.

**Rash Curtis' Use of the VIC Dialer**

23.     In the course of collecting debts, Rash Curtis regularly called consumers using VIC, a predictive dialer.

24.     A predictive dialer is a type of automatic telephone dialer that provides the capability to "predict" the availability of call center agents that can respond to the outbound calls that have been dialed by the predictive dialing system and answered by the called party.

25.     The VIC dialer utilizes debt collection business software sold by a company called DAKCS.

26.     At the time Rash Curtis was using VIC, VIC could make a minimum of three

simultaneous calls per each of Rash Curtis' available debt collection agents.

27. The VIC dialer allows for calling telephones using a prerecorded voice.

28. Rash Curtis' employees would load lists of numbers for VIC to call prior to VIC placing calls.

29. The Court has already determined that Rash Curtis' VIC dialer is an automatic telephone dialing system under the TCPA, 47 U.S.C. § 227(a)(1). Dkt. No. 167.

30. The VIC dialer is no longer in use by Rash Curtis.

**Rash Curtis' Use of the TCN Dialer**

31. In the course of collecting debts, Rash Curtis regularly calls consumers using TCN, a predictive dialer.

32. TCN can make 10 simultaneous calls per each of Rash Curtis' available debt collection agents.

33. Rash Curtis' employees load lists of numbers for TCN to call prior to TCN placing calls.

34. The Court has already determined that Rash Curtis' TCN dialer is an automatic telephone dialing system under the TCPA, 47 U.S.C. § 227(a)(1). Dkt. No. 167.

**Rash Curtis' Calls to the 5193 Phone Number**

35. Rash Curtis called Plaintiff Perez's cellphone (ending in 5193) attempting to collect a debt purportedly owed by a man named Daniel Reynoso.

36. Rash Curtis' call logs show that it made 26 calls to Plaintiff Perez's cellphone, all of which were placed through its dialing system "Global Connect" and none of which were placed through the VIC or TCN dialers. The calls were placed on the following dates: (1) June 3, 2015, (2) February 24, 2016, (3) March 2, 2016, (4) March 9, 2016, (5) March 15, 2016, (6) March 28, 2016, (7) April 5, 2016, (8) April 6, 2016, (9) April 13, 2016, (10) April 18, 2016, (11) April 20, 2016, (12) April 22, 2016, (13) April 25, 2016, (14) April 27, 2016, (15) May 12, 2016, (16) May 16, 2016, (17) May 20, 2016, (18) May 24, 2016, (19) May 25, 2016, (20) May 26, 2016, (21) May 27, 2016, (22) May 28, 2016, (23) May 31, 2016, (24) June 1, 2016, (25) June 3, 2016, and (26) June 7, 2016.

37.     Rash Curtis' call logs show that it made 14 calls to Plaintiff Perez where the call lasted six seconds or longer (indicating possible use of an artificial or prerecorded voice).

38.     Plaintiff Perez does not know Daniel Reynoso.

39.     Plaintiff Perez did not provide his cellphone number to Sutter General Hospital or to Rash Curtis in connection with Mr. Reynoso's purported debt.

40.     Plaintiff Perez provided his cellphone number to Sutter General Hospital at various times as part of his job as a caregiver.

41.     Plaintiff Perez also provided his cellphone number to Sutter General Hospital in connection with medical services both for himself and for his father.

42.     Rash Curtis has never had an account in Plaintiff Perez's name.

43.     Plaintiff Perez told Rash Curtis to stop calling his cellphone on June 7, 2016.

44.     Rash Curtis did not obtain the patient information sheet with Plaintiff Perez's cellphone number until after this case commenced.

45.     The Court has already determined that Rash Curtis lacked prior express consent to call Plaintiff Perez.  Dkt. No. 167.

**B.      Disputed Factual Issues**

**1.      Plaintiff's List of Disputed Factual Issues**

1.      Whether Rash Curtis made 501,043 calls to class members through the Global Connect dialer that were answered and lasted six seconds or longer.

2.      Whether Rash Curtis made 31,064 calls to class members through the TCN dialer that were answered and lasted six seconds or longer.

3.      Whether Rash Curtis made 1679 calls to class members through the VIC dialer that resulted in the disposition code "Message – Hang Up."

4.      Whether Rash Curtis utilized a prerecorded or artificial voice on calls with the disposition code "Message – Hang Up."

5.      Whether Rash Curtis made 237 calls to class members through the VIC dialer that resulted in the disposition code "Message – VIC Voice Mail."

6. Whether Rash Curtis utilized a prerecorded or artificial voice on calls with the disposition code "Message – VIC Voice Mail."

7. Whether Rash Curtis made 675 calls to class members through the VIC dialer that resulted in the disposition code "Message – Party Connect."

8. Whether Rash Curtis utilized a prerecorded or artificial voice on calls with the disposition code "Message – Party Connect."

9. Whether Rash Curtis made 534,698 calls to class members' cellphones during the class period using an autodialer.

10. Whether Rash Curtis made calls to Plaintiff Perez using prerecorded voice.

11. Whether Rash Curtis made 503,634 calls to class members' cellphones using an artificial or prerecorded voice.

12. Whether Rash Curtis knowingly or willfully loaded cellphone numbers obtained through skip tracing into its dialers.

13. Whether Rash Curtis knowingly or willfully called cellphone numbers obtained through skip tracing using its dialers.

14. Whether Rash Curtis called phone numbers in phone fields 5-10 that were not also contained in phone fields 1-4 using its dialers.

15. Whether Rash Curtis had prior express consent to call class members' telephone numbers.

16. Whether Rash Curtis would run campaigns where its dialers were programmed to exclusively call third parties and telephone numbers obtained through skip tracing.

17. Whether Rash Curtis could determine if telephone numbers in its records were cellphone numbers or landline telephone numbers.

### 2. Rash Curtis' List of Additional Disputed Factual Issues:

1. On April 4, 2014, Sutter General Hospital provided medical treatment to a man named Daniel Reynoso.

2. Sutter General Hospital's records on Mr. Reynoso indicate that Mr. Reynoso gave Sutter his cell phone number ending in 5193 to Sutter to call him.

3.     Mr. Reynoso gave Sutter consent to dial the 5193 cell phone number.

4.     Mr. Reynoso's April 4, 2014 medical treatment had an outstanding balance which was assigned to Rash Curtis for collection.

5.     Sutter General Hospital transmitted Mr. Reynoso's account to Rash Curtis as a data file through its client portal with Rash Curtis on May 7, 2015.

6.     Sutter General Hospital transmitted demographic information to Rash Curtis when it assigned Mr. Reynoso's account for collection, including the 5193 phone number, as well as another phone number ending in 3071 belonging to Darlene Lopez, believed to be a relative of Mr. Reynoso.

7.     The 5193 phone number was stored in the "home" field, i.e., phone field 1 by Rash Curtis in its database.

8.     At some time between July of 2015 and July of 2016, the 5193 cell phone number was reassigned to Plaintiff Perez.

9.     Plaintiff Perez did not acquire the 5193 cell phone number until some point in time after Mr. Reynoso's debt account was assigned to Rash Curtis for collection on May 7, 2015.

10.     Rash Curtis typically obtains its debt accounts for collection from its creditor-clients such as Sutter General Hospital through a data file directly from the creditor, as opposed to obtaining the paper face sheets that the patients fill out at the hospital.

11.     Rash Curtis did not obtain the 5193 phone number through skip tracing, but rather, directly from Sutter General Hospital, Rash's creditor-client, when Mr. Reynoso's account was referred for collection.

12.     Rash Curtis did not obtain any phone numbers through skip tracing related to Mr. Reynoso's account, including the reassigned phone number ending in 5193 now belonging to Plaintiff Perez.

13.     The calls placed to Plaintiff Perez were "wrong number" calls placed after Mr. Reynoso's phone number was ported to Plaintiff Perez, unbeknownst to Rash Curtis.

14.     Skip tracing is a legal process. When Rash Curtis obtains a phone number through skip tracing, does not always autodial the skip-traced phone number immediately. In some cases,

Rash Curtis places manual calls, which are not regulated by the TCPA, to the skip traced phone number to establish whether the phone number is accurate and to obtain prior express consent to autodial it in the future.

15. Plaintiff's experts have not performed any analysis of any manually dialed calls placed by Rash Curtis to skip traced phone numbers.

16. Plaintiff's experts have not performed any analysis of whether prior express consent to dial any of the phone numbers Plaintiff's experts assert belong to class members was first obtained during a manually dialed call prior to any autodialed calls.

17. Plaintiff's experts have not performed any analysis of whether Rash Curtis obtained prior express consent to dial any of the calls which they purport were in violation of the TCPA in any other way, such as from Rash Curtis' creditor-clients, from a third-party, or directly from the debtor.

18. It is impossible to know whether a phone number stored in phone fields 5 through 10 was obtained by Rash Curtis through skip tracing without looking at the individual collection notes for each account.

19. Plaintiffs experts have not looked at the individual collection notes for any of the class members to determine whether any phone numbers were skip traced.

20. It is impossible to know whether Rash Curtis had prior express consent to dial any phone number stored in fields 5 through 10 without looking at the individual collection notes for each account.

21. Plaintiffs experts have not looked at the individual collection notes for any of the class members to determine whether any phone numbers were skip traced.

22. Plaintiff's experts' have assumed that all phone numbers stored in phone fields 5 through 10 were obtained through skip tracing..

23. Phone numbers stored in phone fields 5 through 10 are obtained by Rash Curtis through a variety of sources, including when an account is assigned from its creditor-clients in a data file, directly from debtors, directly from a debtors' family members or other related third-parties, as well as through skip tracing

24.     Plaintiff's experts have not determined which phone numbers have been skip traced and which have not by looking at Rash Curtis' collection notes.

25.     Plaintiff's claim that all phone numbers stored in phone fields 5 through 10 are skip traced is not supported by the evidence.

26.     At least some, and potentially most or even all, of the third-party phone numbers Plaintiff's experts assert belong to putative class members were obtained by Rash Curtis with prior express consent.

27.     At least some, and potentially most or even all, of the third-party phone numbers Plaintiff's experts assert belong to the putative class members were not obtained by Rash Curtis through skip tracing

28.     Plaintiff has not established whether any of the persons asserted by Plaintiff's experts as belonging to the putative classes provided prior express consent to be called prior to one, several, or all of the calls placed by Rash Curtis using its dialers (i.e., whether a manual call was placed prior to any autodialed calls wherein the third-party gave Rash Curtis prior express consent to use autodialers and/or artificial or prerecorded voices to call him or her).

29.     Whether Rash Curtis obtained the phone numbers belonging to the pool of persons Plaintiff's experts identified as putative class members through any method other than skip tracing.

30.     Whether Rash Curtis obtained the phone numbers belonging to the pool of persons Plaintiff's experts identified as putative class members with prior express consent.

31.     Whether Rash Curtis knowingly or willingly, or even negligently, violated the TCPA as to Plaintiff Perez.

32.     Whether Rash Curtis knowingly or willingly, or even negligently, violated the TCPA as to any of the other persons identified by Plaintiff's experts as purportedly belonging to the classes.

33.     Whether Rash Curtis' dialers have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers.

34. Whether Rash Curtis had a good-faith basis to dial the 5193 phone number up until the time Plaintiff Perez notified Rash that it was dialing a phone number that no longer belonged to Mr. Reynoso (on June 7, 2016).

## C. Agreed Statement

The parties have met and conferred and do not believe that all or part of this action may be presented upon an agreed statement of facts.

## D. Stipulations

1. The parties stipulate to the authenticity of any document produced by a party in this case. This stipulation shall not be deemed or interpreted to be a stipulation that any document is admissible in evidence.

2. The parties stipulate that copies of documents may be used at trial in lieu of originals and shall not be deemed inadmissible solely on the basis that they are copies.

3. The parties stipulate that venue is proper in this Court.

4. The parties stipulate that this Court has personal jurisdiction over the parties for purposes of this action.

5. The parties stipulate that they may call witnesses out of order (including Plaintiff calling witnesses during Rash Curtis' direct case and vice versa) if necessary, to accommodate third-party witness' schedules.

6. The parties stipulate that they will identify the live witnesses they intend to call by 9:00 a.m. the calendar day before the day on which they intend to call that witness.

## IV. DISPUTED LEGAL ISSUES

Plaintiff does not believe that there are any disputed legal issues.

Defendant believes the following legal issues have not been resolved:

1. If Rash Curtis had a good faith basis to believe that it was placing calls to Mr. Reynoso instead of Plaintiff Perez until Plaintiff Perez informed Rash Curtis that it was dialing the wrong number on June 7, 2016, whether that good faith believe should preclude TCPA liability.

2. Whether Plaintiff Perez is an adequate class representative following expert discovery (especially in light of the fact that Plaintiff's expert's list of purported class members does not include Plaintiff Perez).

3. What a reasonable safe harbor is for callers who place calls to a phone number that has been reassigned between the time that the phone number was provided with prior express consent and the time the time that the calls were placed but without notice of reassignment to the caller.

4. Whether individualized issues of prior express consent predominate over any common issues.

5. Whether the damages calculated proposed by Plaintiff's experts would violate due process.

6. Whether any award of statutory damages predicated upon a "wrong number" call to a reassigned phone number would violate due process.

7. Raised as not to waive the issue, whether Rash Curtis' dialers constitute an "automatic telephone dialing system" within the meaning of 47 U.S.C. § 227(a)(1).

8. Whether a debt collector may reasonably rely on prior express consent transmitted to it by its creditor-client which was originally obtained by the debtor to the creditor directly.

9. Whether statutory damages under the TCPA predicated on calls placed to a phone number that was obtained with prior express consent, but then subsequently reassigned to a different subscriber, and where the caller had no notice of the reassignment, would violate the caller's right to due process.

**10.** Whether Rash Curtis may be held liable for calls placed without prior express consent via TCN in light of the certified class definitions.

## V. FURTHER DISCOVERY OR MOTIONS

All discovery has been completed. Defendant has indicated that it intends to file a motion for decertification of the classes. Plaintiff does not anticipate filing any additional motions at this time. However, Plaintiff notes that Plaintiff's unopposed Proposed Notice of Pendency of Class

Action, ECF Doc. No. 249, is still pending.  As discussed in the Notice, Plaintiff has proposed that class members be given 60 days to request exclusion from the class from the date that notice is disseminated.  Considering that trial is scheduled to begin on May 6, 2019, Plaintiff respectfully requests that the Court rule on the proposed notice plan as soon as possible.

The parties are currently meet and conferring regarding the amount of costs that Defendant will remit to Plaintiff for taking Plaintiff's experts' depositions.  Should the parties fail to agree on a cost figure, Plaintiff may file a motion seeking an order for Defendant to pay the difference in costs Defendant agrees to pay and the amount Plaintiff believes Defendant is obligated to pay.

**Defendant's Further Statement:** Defendant has not yet opposed the proposed notice procedure but disputes that Plaintiff's proposed class notice plan is proper, which will be discussed in greater detail in Defendant's upcoming motion to decertify classes. Defendant's position is that an opt-in procedure, rather than an opt-out procedure, would be more suitable under the circumstances. Defendant has identified at least one person on Plaintiff's proposed class list who has already settled a TCPA case with Defendant (and, importantly, whose phone number was *not* obtained by Defendant through skip tracing).

## VI.  ESTIMATE OF TRIAL TIME

Plaintiff estimates that his direct case will take three to four trial days.  Rash Curtis estimates the trial (both sides) will take 6 to 7 trial days, including opening statements, closing arguments, and instructing the jury.

## VII.  LIST OF MOTIONS *IN LIMINE*

**Plaintiff's Motions in Limine:**

No. 1:  To Preclude Any Evidence Or Testimony Regarding Previously Stricken Evidence

No. 2:  Hearsay And Misleading Testimony Regarding Trial Exhibits 504 And 505

No. 3:  Preclude Cumulative Evidence

No. 4:  Preclude Evidence Regarding Non-Class Representative Plaintiffs

No. 5:  Preclude Deposition Transcript, Hearsay Declaration, Court Orders, Case Filings

No. 6:  Preclude Evidence Regarding The "Good Faith Defense" And Consent To Call Plaintiff

No. 7: Preclude Defendant From Presenting Deposition Excerpts It Did Not Timely Disclose

No. 8: Preclude Defendant And Its Counsel From Making Statements Regarding Defendant's Financial Condition Or Ability To Pay A Judgment In This Case

No. 9: Exclude Defendant's Witnesses' Testimony That Defendant Purportedly Never Made Calls To Phone Numbers From Phone Fields 5 Through 10

**Defendant's Motion in Limine:**

No. 1: To Use Documentary Screenshot Evidence From Rash Curtis' "Beyond ARM" Software Pertaining to Its Storage of the 5193 Phone Number in Phone Field No. 1, and Documentary Screenshot Evidence of Rash Curtis' ECA Advance Trace Report for Daniel Reynoso Showing That The 5193 Phone Number Was Not Obtained Through an ECA Advance Trace.

## VIII. JUROR QUESTIONNAIRE

The parties intend to file proposed additional questions for jury selection in accordance with Item 3.h of the Court's pretrial standing order.

## IX. SETTLEMENT DISCUSSIONS

On August 16, 2017, the parties attended a full-day mediation with Doug DeVries at Judicate West in San Francisco. Both prior to and after the mediation, the parties have had several phone calls regarding settlement. Those attempts to settle the case have failed.[1] The parties do not believe a settlement is likely at this time and do not have any settlement discussions planned.

## X. CONSENT TO TRIAL BEFORE A MAGISTRATE JUDGE

The parties do not consent to trial before a magistrate judge.

## XI. AMENDMENTS, DISMISSALS

The parties intend to file stipulations of dismissal of the claims of Plaintiffs McMillion and Adekoya in the near future as required by the settlements with those plaintiffs.

---

[1] The parties did reach a settlement of the individual claims of Plaintiffs Adekoya and McMillion.

## XII. BIFURCATION, SEPARATE TRIAL OF ISSUES

The parties agree that bifurcation is not appropriate in this case.

Dated: February 15, 2019        Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Yeremey Krivoshey*
       Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No.295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Email: ltfisher@bursor.com
       ykrivoshey@bursor.com
       breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

Dated: February 15, 2019        **ELLIS LAW GROUP LLP**

By:    */s/ Mark E. Ellis*
       Mark E. Ellis

Mark E. Ellis (State Bar No. 127159)
Anthony P.J. Valenti (State Bar No. 288164)
Lawrence K. Iglesias (State Bar No. 303700)
1425 River Park Drive, Suite 400
Sacramento, CA 95815
Tel: (916) 283-8820
Fax: (916) 283-8821
Email: mellis@ellislawgrp.com
avalenti@ellislawgrp.com
liglesias@ellislawgrp.com

*Attorneys for Defendant*