VOLUME 1

PAGES 1 – 151

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE**

| | |
|---|---|
| IGNACIO PEREZ, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, ) ) ) ) | |
| PLAINTIFFS, ) | NO. C-16-3396 YGR |
| ) | |
| VS. ) | MONDAY, MAY 6, 2019 |
| ) | |
| RASH CURTIS & ASSOCIATES, ) | OAKLAND, CALIFORNIA |
| ) | |
| ) | JURY TRIAL |
| DEFENDANT. ) | |
| _____) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFFS:              BURSOR FISHER, P.A.
                            1990 N. CALIFORNIA BLVD., STE. 940
                            WALNUT CREEK, CALIFORNIA 94596
                      BY:   TIMOTHY FISHER, ESQUIRE
                            YEREMEY O. KRIVOSHEY, ESQUIRE
                            BLAIR REED, ESQUIRE

                            BURSOR & FISHER
                            2665 S. BAYSHORE DR.
                            MIAMI, FLORIDA 33133
                      BY:   SCOTT A. BURSOR, ESQUIRE

FOR DEFENDANT:               ELLIS LAW GROUP LLP
                            1425 RIVER PARK DRIVE, STE. 400
                            SACRAMENTO, CALIFORNIA 95815
                      BY:   MARK E. ELLIS, ESQUIRE
                            ANTHONY P.J. VALENTI, ESQUIRE
                            LARRY IGLESIAS, ESQUIRE

REPORTED BY:          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER
            TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1

2                    I N D E X

3                                        PAGE    VOL.

4    JURY SELECTION                        12      1

5    OPENING STATEMENT – MR. BURSOR       104      1

6    OPENING STATEMENT – MR. ELLIS        118      1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    MONDAY, MAY 6, 2019                              8:00 A.M.

 2                    P R O C E E D I N G S

 3       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE PROSPECTIVE

 4    JURORS.)

 5              THE COURT:  GOOD MORNING.

 6          MR. ELLIS:  GOOD MORNING.

 7          MR. BURSOR:  GOOD MORNING, YOUR HONOR.

 8          THE CLERK:  ALL RIGHT.  CALLING CIVIL ACTION 16-3396

 9    IGNACIO PEREZ VERSUS RASH CURTIS & ASSOCIATES.  COUNSEL,

10    PLEASE STATE YOUR APPEARANCES.

11          MR. BURSOR:  GOOD MORNING, YOUR HONOR.  SCOTT BURSOR

12    FROM BURSOR AND FISHER.  WITH ME TODAY, THOUGH THEY ARE NOT --

13    THEY ARE COMING FROM THE ATTORNEY LOUNGE, ARE MY PARTNERS TIM

14    FISHER AND YEREMEY KRIVOSHEY AND OUR ASSOCIATE, BLAIR REED.

15          THE COURT:  OKAY.  GOOD MORNING.

16          MR. ELLIS:  GOOD MORNING, YOUR HONOR.  MARK ELLIS,

17    ELLIS LAW GROUP, LLP, ON BEHALF OF DEFENDANT, RASH CURTIS.

18    AND WITH ME, AS ALWAYS, IS MR. VALENTI, ONE OF MY ASSOCIATES,

19    AND MR. IGLESIAS, ONE OF MY ASSOCIATES, AND ROBERT KEITH, WHO

20    WILL BE THE REPRESENTATIVE.  HE'S THE VICE PRESIDENT OF

21    OPERATIONS AT RASH CURTIS.  AND, WHILE NO ONE ELSE IS IN THE

22    COURTROOM, WE ALSO HAVE ADAM WILLIAMS, WHO WILL BE HERE DURING

23    THE TRIAL.  HE IS A REPRESENTATIVE FROM THE INSURANCE COMPANY.

24          THE COURT:  OKAY.  ALL RIGHT.  GOOD ENOUGH.  GOOD

25    MORNING.
```

1          IN TERMS OF THIS MORNING, ARE THERE ANY QUESTIONS OR

2     ISSUES THAT YOU WISH TO DISCUSS?  I WAS IN PRETTY EARLY, SO

3     I'M ASSUMING THAT THERE WAS A LINE OUTSIDE.  I DIDN'T SEE IT

4     WHEN I CAME IN.

5          **THE CLERK:**  THEY ARE ALL IN NOW.

6          **THE COURT:**  I AM ASSUMING OUR JURORS ARE ALL IN,

7     GETTING PROCESSED AND WATCHING VIDEOS AND DOING THE

8     QUESTIONNAIRES.

9          BUT IN THE SHORT ORDER, ARE THERE QUESTIONS OR ISSUES TO

10    DISCUSS?  I THINK I MENTIONED THIS BEFORE, MR. ELLIS YOU NEED

11    TO BE AT THE MIC BUT I WILL ALWAYS ASK FIRST THING IN THE

12    MORNING FOR THE LIST.  I DON'T WANT TO HAVE ARGUMENT, I JUST

13    WANT THE LIST FIRST.

14         SO, WE'LL START WITH PLAINTIFFS ALWAYS.  SIR.

15         **MR. BURSOR:**  SO, YOUR HONOR, FOR THE PLAINTIFFS WE --

16    OUR ONLY QUESTION IS IF THE COURT HAS A VERDICT FORM AND IF WE

17    WILL SEE THAT BEFORE WE GIVE THE OPENING STATEMENT.

18         **THE COURT:**  PROBABLY NOT.

19         **MR. BURSOR:**  OKAY.

20         **THE COURT:**  YOU SENT IT TO ME THIS WEEKEND.  ONE OF

21    THE THINGS WE HAVE TO DO IS TRY TO MAINTAIN OUR DOCKET WHILE

22    WE ARE IN TRIAL, AND I DON'T HAVE TO GET TO THE VERDICT FORM

23    UNTIL THE END OF THE WEEK.  SO I WILL GET IT TO YOU SOON AND

24    RESPOND BUT, FRANKLY, I WAS DEALING WITH MY OTHER CASES

25    BECAUSE I'M GOING TO BE DEALING WITH YOUR CASE MOST OF THE

| | |
|---|---|
| 1 | WEEK. |
| 2 | **MR. BURSOR:**  UNDERSTOOD, YOUR HONOR.  SO THE |
| 3 | DEFENDANT MADE A SUBMISSION YESTERDAY THAT THE COURT DID NOT |
| 4 | INVITE. |
| 5 | **THE COURT:**  OKAY.  SO VERDICT FORM IS ONE THING. |
| 6 | ANYTHING ELSE TO TALK ABOUT? |
| 7 | **MR. BURSOR:**  NOPE. |
| 8 | **THE COURT:**  HOW ABOUT FROM THE DEFENSE? |
| 9 | **MR. ELLIS:**  THE ONLY THING WE HAVE SEEN THE LIST OF |
| 10 | WITNESSES.  WE GOT THAT THIS MORNING.  AND THERE SEEMED TO |
| 11 | BE -- THERE MAY BE AN ISSUE WITH TWO OF THE WITNESSES, |
| 12 | MR. KIZER AND MR. KEITH.  IT IS MY UNDERSTANDING THAT |
| 13 | PLAINTIFFS INTEND TOMORROW TO PLAY THEIR VIDEOTAPED OR |
| 14 | EXCERPTS FROM THEIR VIDEOTAPED DEPOSITION.  NEITHER ONE OF |
| 15 | THOSE FOLKS ARE PARTIES AND I HAVE NOT SEEN ANYTHING THAT |
| 16 | WOULD INDICATE THEY ARE UNAVAILABLE TO TESTIFY THEMSELVES. |
| 17 | AND I THINK THIS COMES UP WHEN WE WERE HAVING OUR -- |
| 18 | **THE COURT:**  WELL, KEITH, IS VP OF OPERATIONS. |
| 19 | **MR. ELLIS:**  NICK KEITH.  BOB KEITH IS VICE PRESIDENT |
| 20 | OF OPERATIONS HERE BUT NICK KEITH IS THE IT MANAGER, AND HE |
| 21 | WAS NOT DISCLOSED AS A 30B WITNESS.  WE WOULD HAVE NO |
| 22 | OBJECTION TO THE PLAYING OF THE 30B WITNESS BUT NEITHER |
| 23 | MR. KIZER NOR MR. KEITH -- I CAN SAY FOR SURE WITH NICK KEITH, |
| 24 | HE IS NOT UNAVAILABLE.  SO -- |
| 25 | **THE COURT:**  OKAY.  SO LET'S -- ANY OTHER ISSUES? |

1       **MR. ELLIS:**  NO.  NO, MA'AM.

2       **THE COURT:**  SO WITH RESPECT TO THE VERDICT FORM, I

3   DON'T KNOW WHAT HE SENT ME.  ALL I KNOW IS I GOT SOMETHING.

4   REGARDLESS OF WHETHER IT WAS INVITED OR NOT, WHATEVER I WAS

5   GOING TO PRESENT TO YOU, I WAS GOING TO PRESENT TO YOU.  I

6   DON'T EVER GIVE VERDICT FORMS OR JURY INSTRUCTIONS WITHOUT

7   TALKING TO THE PARTIES.

8       SO IF I -- IF HE SENT IT NOW, HE WAS GOING TO BE ABLE TO

9   SEND IT SOME OTHER TIME.  SO, ANYWAY, I DON'T KNOW THAT THAT

10  ULTIMATELY MATTERS.  PEOPLE ARE TRYING TO GET PREPARED AND

11  DEALING WITH THINGS.  SO I WILL LOOK AT IT AND DEAL WITH IT

12  AND, OBVIOUSLY, INVITE YOUR COMMENTS AT THE APPROPRIATE TIME.

13  I DON'T KNOW THAT RIGHT THIS SECOND IS THE APPROPRIATE TIME,

14  GIVEN THAT I HAVEN'T LOOKED AT IT.

15      SECOND, NOW WITH RESPECT TO THE WITNESSES, YOUR COMMENT IN

16  RESPONSE?

17      **MR. BURSOR:**  YOUR HONOR, WE DESIGNATED THE VIDEOTAPED

18  TESTIMONY, I BELIEVE IT WAS IN JANUARY, AND THERE WERE NO

19  OBJECTIONS TO IT AT THAT TIME.  SO WE INTENDED TO PLAY THE

20  VIDEO OF THESE THREE WITNESSES.  IT'S ABOUT HOUR AND-A-HALF

21  TOTAL, MAYBE AN HOUR, 45, AND THIS WAS DISCUSSED AT A PRIOR

22  HEARING WHERE WE WENT THROUGH THIS.  THERE WERE NO OBJECTIONS.

23      **MR. ELLIS:**  MAY I RESPOND, YOUR HONOR?

24      **THE COURT:**  YOU MAY.

25      **MR. ELLIS:**  SO THERE ARE NO OBJECTIONS TO THE CLIPS.

1    THAT'S WHAT WE WERE TALKING ABOUT.  WHAT -- BUT IN TERMS OF

2    OTHER PROCEDURAL RULES, I MEAN, IF -- YOU SIMPLY, I DON'T

3    BELIEVE, CAN PLAY A VIDEO CLIP IF THE WITNESS IS AVAILABLE.

4    AND MR. KIZER IS AVAILABLE AND HE WILL BE TESTIFYING BECAUSE

5    WE SUBPOENAED HIM FOR FRIDAY MORNING.  SO EITHER HE CAN SHOW

6    UP OR, I GUESS, BE HELD IN CONTEMPT.  AND MR. NICK KEITH IS ON

7    OUR WITNESS LIST.  AND HE WILL -- HE WILL BE APPEARING.

8        NOW, THE PLAINTIFFS HAVE NOT SUBPOENAED HIM WITH A RULE 45

9    TRIAL SUBPOENA, BUT MY REPRESENTATION IS THAT HE WILL BE HERE.

10       **THE COURT:**  WELL, I DON'T KNOW WHAT IT IS YOU AGREED

11   TO AND IF YOU AGREED TO SOMETHING EXPLICIT.  THE RULES ARE THE

12   RULES.  AND IN TERMS OF MY OWN RULINGS, I HAVE TO USE THE

13   RULES TO BE FAIR.

14       SO, THE RULES ARE THAT YOU CAN PLAY ANY CLIP OR READ

15   ANYTHING FROM A PARTY OPPONENT, BUT THAT'S NOT THE CASE WITH

16   RESPECT TO SOMEONE WHO IS NOT.  THERE HAS TO BE AN EVIDENTIARY

17   SHOWING AS TO WHETHER OR NOT THAT SHOULD BE THAT TESTIMONY,

18   WHICH IS NOT THE BEST TESTIMONY AS LIVE TESTIMONY, SHOULD BE

19   USED AS A SUBSTITUTE BECAUSE SOMEONE IS UNAVAILABLE.

20       SO -- AND IF THEY CAN'T, THEN IT'S THERE AND IT IS READY

21   TO GO.  BUT YOU HAVE TO MEET THAT EVIDENTIARY HURDLE FIRST.

22       **MR. BURSOR:**  YOUR HONOR, THESE ARE ALL EMPLOYEES OF

23   THE DEFENDANT.  WHILE MR. KIZER IS A FORMER EMPLOYEE --

24       **THE COURT:**  SO DO YOU HAVE LAW THAT SUPPORTS THAT?

25       **MR. BURSOR:**  WE DIDN'T KNOW THIS WAS GOING TO BE AN

1    ISSUE.  IT WAS RAISED FOR THE FIRST TIME TWO MINUTES AGO, SO

2    NO.

3            **THE COURT:**  SO, THAT IS WHY WE ARE HERE, THAT IS WHY

4    WE HAVE TIME.  YOU MAY WANT TO START RESEARCHING WHETHER THERE

5    IS AN EVIDENTIARY BASIS FOR BRINGING IT IN.  AND I WILL LOOK

6    AS WELL AND TAKE A LOOK AT THE CASE LAW AND SEE WHAT THE CASE

7    LAW SAYS.  OTHERWISE, I WILL DEEM HIM TO BE UNAVAILABLE IF HE

8    IS NOT HERE TOMORROW.  CAN HE BE HERE TOMORROW?  MR KEITH?

9            **MR. ELLIS:**  SURE.  HE CAN.

10           **THE COURT:**  OKAY.  WHY DON'T WE THEN -- IF THERE IS

11   NOTHING ELSE YOU WANT TO TALK ABOUT, WE WILL STAND IN RECESS

12   WHILE YOU RESEARCH THE TOPIC.  LET ME KNOW IF YOU FIND

13   SOMETHING.  WHEN I HEAR FROM THE JURY ROOM THAT WE HAVE JURORS

14   READY TO COME IN, I WILL LET YOU KNOW.

15       ANYBODY HAVE ANY FURTHER QUESTIONS ON JURY SELECTION?  NO?

16           **MR. ELLIS:**  I GUESS I DO.  FOR SOME REASON I THOUGHT

17   I HEARD YOU SAY THAT WE ARE GOING TO HAVE FOUR PEREMPTORIES?

18   DID I MISHEAR THAT?  IS IT GOING TO BE THE NORMAL THREE?

19           **THE COURT:**  NO.  I'M SEATING EIGHT.  I GIVE YOU FOUR.

20           **MR. ELLIS:**  OH, OKAY.

21           **THE COURT:**  IT IS TYPICALLY THREE, BUT MY VIEW THAT

22   IS THREE OUT OF SIX AND I'M SEATING AN ALTERNATE -- I'M

23   SEATING EIGHT JUST IN CASE AND SO I GIVE YOU AN EXTRA ONE WHEN

24   I SEAT EIGHT.

25           **MR. ELLIS:**  OKAY.

1          **THE COURT:**  AND THEN -- DO WE HAVE THOSE?  HAVE WE

2      GIVEN THEM TO THEM OR NOT?

3          WHAT I DECIDED TO DO AS I WENT BACK AND LOOKED AT THE

4      STIPULATED FACTS, IS I'M JUST READING WHAT YOU ALL DON'T

5      OBJECT TO.  SO, THOSE ARE THE ONES THAT I AM READING.

6      EVERYTHING ELSE, TO THE EXTENT IT IS RELEVANT, YOU CAN PROVE

7      IT.  YOU CAN JUST ASK QUESTIONS.  BUT IN TERMS OF WHAT I READ

8      TO THEM AND WHAT IS IN THEIR BINDER, IT'S THAT SET OF

9      STIPULATED FACTS.

10         OKAY?  SO WE WILL STAND IN RECESS.  LET ME KNOW IF YOU

11     HAVE SOMETHING TO TALK ABOUT.

12         **MR. BURSOR:**  CAN I ASK ONE MORE QUESTION?

13         **THE COURT:**  SURE.

14         **MR. BURSOR:**  A VERSION OF THIS IS GOING TO BE

15     PREPARED THAT IS GOING TO GO INTO THE JURY ROOM AT THE END OF

16     THE CASE?

17         **THE COURT:**  WE ARE PUTTING IT STRAIGHT INTO THEIR

18     BINDERS, THAT THEY HAVE THEM.

19         **MR. BURSOR:**  ARE THEY GOING TO HAVE BINDERS DURING

20     THE TRIAL?

21         **THE COURT:**  YES.  SO THEY WILL HAVE BINDERS.  I'LL

22     REVIEW THEM WITH THEM AFTER THEY ARE SEATED.  THE BINDERS HAVE

23     NOTEBOOK PAPER.  THEY HAVE THE TRIAL SCHEDULE, IN TERMS OF THE

24     DAYS THAT WE ARE IN SESSION WHEN WE TAKE BREAKS.  WHEN YOU

25     GIVE ME THEIR PICTURES, THEY NEED TO BE THREE-HOLE PUNCHED SO

```
1    THEY CAN GO INTO THE TRIAL BINDER.  THEY HAVE A BLANK FORM FOR
2    PURPOSES OF ASKING QUESTIONS, IF THEY WANT TO SUBMIT
3    QUESTIONS.
4        AND THEN THEY WILL GET A SECOND -- AND THEN THEY WILL GET
5    A BINDER -- ACTUALLY WE JUST GIVE THEM THE SHEETS OF THE
6    CLOSING INSTRUCTIONS.  I GIVE THEM HARD COPIES OF CLOSING
7    INSTRUCTIONS, NOT OF PRE-INSTRUCTIONS BUT OF CLOSING
8    INSTRUCTIONS.  SO THOSE WILL GO INTO THEIR BINDER AT THE END
9    OF THE CASE.  THIS THREE-PAGE OF STIPULATED FACTS, WE WILL
10   JUST HAVE A COPY OF THEM IN THEIR BINDER.
11           MR. BURSOR:  YOUR HONOR, THE VERSION THAT THE JURORS
12   GET WILL NOT HAVE THE STRIKE-THROUGHS ON IT?
13           THE COURT:  CORRECT.  IT WILL BE A CLEAN VERSION BUT
14   I THOUGHT IT WOULD BE EASIER FOR YOU IF I DID A TRACK CHANGE
15   SO YOU THAT YOU WOULD KNOW EXPLICITLY WHAT I'M NOT READING.
16           MR. BURSOR:  THE NUMBERING -- THE REASON I AM ASKING
17   IS BECAUSE I MAY WANT TO REFERENCE OF A NUMBER --
18           THE COURT:  WE WILL GIVE YOU A CLEAN COPY SO YOU CAN
19   HAVE IT.
20           MR. BURSOR:  OKAY.
21           THE COURT:  ANYTHING ELSE?  OKAY.
22           THE CLERK:  THEY FILED THEIR STIPULATIONS.
23           THE COURT:  TERRIFIC.  THANK YOU VERY MUCH.  ALL
24   RIGHT.  WE WILL STAND IN RECESS.
25       (PROCEEDINGS RECESSED AT 8:13 A.M.; RESUMED AT 8:14 A.M.)
```

1        **THE COURT:**  LET'S GO ON THE RECORD.

2      WE ARE BACK ON THE RECORD.  I RECEIVED A PROPOSED REVISED

3   STATEMENT OF THE CASE.  I'M NOT SURE WHERE THIS IS COMING FROM

4   AND WHAT IT SPECIFICALLY RELATES TO.

5        **MR. ELLIS:**  SO WHEN I WAS GOING BACK THROUGH THIS

6   WEEKEND AND LOOKING AT THE MATERIALS, I KNEW THAT YOU HAD SAID

7   THAT YOU WERE PREPARING ONE OR HAD PREPARED ONE.  I JUST

8   WANTED TO PUT SOMETHING IN TO SHOW YOU THAT THAT'S KIND OF

9   ALONG THE LINES THAT I WAS THINKING ABOUT.  THAT IT'S VERY,

10  VERY SHORT AND VERY PLAIN AND VERY NONARGUMENTATIVE.  THAT'S

11  ALL, YOUR HONOR.

12        **THE COURT:**  OKAY.  WELL, I'LL TAKE A LOOK AT IT.

13  I'VE ALREADY PREPARED MY COMMENTS AND IT WAS -- AND IT'S

14  EQUALLY, IF NOT EVEN SHORTER, THAN WHAT YOU'VE PROVIDED.

15      JUST A REMINDER.  IN TERMS OF WHAT IT IS I'M TELLING THE

16  JURY, I HAVE A LOT TO TELL THE JURY WHEN THEY COME IN FOR

17  SELECTION.

18        **MR. ELLIS:**  YEAH.

19        **THE COURT:**  THEY -- ONE OF THE THINGS THAT I TELL

20  THEM TOMORROW TYPICALLY IS THAT THEY REMEMBER ANYTHING THAT I

21  SAID ON MONDAY AS A MEANS OF REMINDING THEM THEY HAVE TO TAKE

22  NOTES.  USUALLY THEY DON'T REMEMBER ANYTHING.  THE ONLY

23  THING -- ALL I WANT THEM TO KNOW IS THIS IS A TCPA CASE AND

24  THAT THE DEFENDANTS DENY EVERYTHING.  OTHERWISE, YOU KNOW, IT

25  IS NOT A CRIMINAL CASE, IT IS NOT AN ANTITRUST CASE.  THEY

```
 1    JUST HAVE TO HAVE THE BASIC UNDERSTANDING OF WHAT WE ARE DOING

 2    TODAY.  THAT'S REALLY THE WHOLE POINT OF IT.  ALL RIGHT?

 3       OKAY.  THANK YOU.

 4           MR. ELLIS:  THANK YOU.

 5       (RECESS TAKEN AT 8:16 A.M.; RESUMED AT 9:15 A.M.)

 6       (PROCEEDINGS HELD IN THE PRESENCE OF PROSPECTIVE JURORS.)

 7           THE CLERK:  MY NAME IS FRANCES.  I'M THE JUDGE'S

 8    CLERK AND I'M GOING TO REQUEST CALL THE ROLL.  SO IF YOU WILL

 9    RESPOND OUT LOUD, RAISE YOUR HAND AND WE'LL START.

10       CARLOS ARAGON?

11           PROSPECTIVE JUROR:  HERE.

12           THE CLERK:  CLAUS BLEM?

13           PROSPECTIVE JUROR:  HERE.

14           THE CLERK:  DAVID BRADY?

15           PROSPECTIVE JUROR:  HERE.

16           THE CLERK:  ROBERT CAMP?

17           PROSPECTIVE JUROR:  HERE.

18           THE CLERK:  ROBERT CARRIGAN.

19           PROSPECTIVE JUROR:  HERE.

20           THE CLERK:  SARABJIT CHAHAL?

21           PROSPECTIVE JUROR:  HERE.

22           THE CLERK:  ALL RIGHT.

23       MARIANNE COOPER?

24           PROSPECTIVE JUROR:  HERE.

25           THE CLERK:  SAMANEH GHASEMIGOHAR?
```

1           **PROSPECTIVE JUROR:** HERE.

2           **THE CLERK:** LOV KUMAR GOEL?

3           **PROSPECTIVE JUROR:** HERE.

4           **THE CLERK:** KELLY GUIDI?

5           **PROSPECTIVE JUROR:** HERE.

6           **THE CLERK:** CHRISTIAN HINDERLIE?

7           **PROSPECTIVE JUROR:** HERE.

8           **THE CLERK:** MATTHEW HUIZINGH?  I'M SORRY, I LOOKED

9    DOWN AT THE NAME.  THANK YOU.

10       SORRY.

11       CATHY JEW?

12           **PROSPECTIVE JUROR:** HERE.

13           **THE CLERK:** NANCY MOWBRAY.

14           **PROSPECTIVE JUROR:** HERE.

15           **THE CLERK:** DANIEL NICHOLAS?

16           **PROSPECTIVE JUROR:** HERE.

17           **THE CLERK:** GERTRUDIS OCHOA?

18           **PROSPECTIVE JUROR:** HERE.

19           **THE CLERK:** MARISA ONG?

20           **PROSPECTIVE JUROR:** HERE.

21           **THE CLERK:** GARY OTTO?

22           **PROSPECTIVE JUROR:** HERE.

23           **THE CLERK:** FREESIA RAFELLO?

24           **PROSPECTIVE JUROR:** HERE.

25           **THE CLERK:** BEN RAMOS?

| | |
|---|---|
| 1 | **PROSPECTIVE JUROR:**  HERE. |
| 2 | **THE CLERK:**  JOSEPH ROUSSEU? |
| 3 | **PROSPECTIVE JUROR:**  HERE. |
| 4 | **THE CLERK:**  BELARMINO RUSTIA? |
| 5 | **PROSPECTIVE JUROR:**  HERE. |
| 6 | **THE CLERK:**  THOMAS SYLVIA?  YES? |
| 7 | **PROSPECTIVE JUROR:**  I AM DAVID THOMAS SYLVIA? |
| 8 | **THE CLERK:**  IS IT SYLVA? |
| 9 | **PROSPECTIVE JUROR:**  LAST NAME IS SYLVIA. |
| 10 | **THE CLERK:**  SYLVIA.  THANK YOU.  I DIDN'T HEAR IT. |
| 11 | SORRY. |
| 12 | AARON SKILKEN? |
| 13 | **PROSPECTIVE JUROR:**  HERE. |
| 14 | **THE CLERK:**  NOAM SMOOHA? |
| 15 | **PROSPECTIVE JUROR:**  HERE. |
| 16 | **THE CLERK:**  ELISARAH SUDHARMADJI? |
| 17 | **PROSPECTIVE JUROR:**  HERE. |
| 18 | **THE CLERK:**  ALL RIGHT.  CHRISTOPHER TENNYSON? |
| 19 | **PROSPECTIVE JUROR:**  HERE. |
| 20 | **THE CLERK:**  GINA VELEZ? |
| 21 | **PROSPECTIVE JUROR:**  HERE. |
| 22 | **THE CLERK:**  JULIA WATLEY? |
| 23 | **PROSPECTIVE JUROR:**  HERE. |
| 24 | **THE CLERK:**  CHRISTOPHER WHITE? |
| 25 | **PROSPECTIVE JUROR:**  HERE. |

| | |
|---|---|
| 1 | **THE CLERK:** GINA WILKINS? |
| 2 | **PROSPECTIVE JUROR:** HERE. |
| 3 | **THE CLERK:** WILLIAM WILSON? |
| 4 | **PROSPECTIVE JUROR:** HERE. |
| 5 | **THE CLERK:** THERESA WOO? |
| 6 | **PROSPECTIVE JUROR:** HERE. |
| 7 | **THE CLERK:** AND YUN XU? |
| 8 | **PROSPECTIVE JUROR:** HERE. |
| 9 | **THE COURT:** OKAY. I'M GOING TO CALL UP YOUR NAME. I |
| 10 | WILL CALL UP 18 PEOPLE TO SIT IN THE BOX. THE FIRST PERSON, I |
| 11 | WILL COME AND SHOW YOU WHERE YOU ARE GOING TO SIT. THE FIRST |
| 12 | PERSON COMES AND SITS HERE AND WE MOVE DOWN THE ROW. I'LL |
| 13 | DIRECT YOU. SO THE FIRST PERSON COMES AND SITS IN THIS CHAIR |
| 14 | (INDICATING). |
| 15 | CLAUS BLEM, B-L-E-M. |
| 16 | ROBERT CAMP. |
| 17 | MARIANNE COOPER. |
| 18 | SAMANEH GHASEMIGOHAR. LAST NAME IS |
| 19 | G-H-A-S-E-M-I-G-O-H-A-R. THAT'S FOR COUNSEL AND MY BENEFIT. |
| 20 | **PROSPECTIVE JUROR:** THAT'S ME. |
| 21 | **THE CLERK:** ALL RIGHT. |
| 22 | KUMAR GOEL, G-O-E-L. |
| 23 | KELLY GUIDI, G-U-I-D-I. |
| 24 | **PROSPECTIVE JUROR:** IT IS PRONOUNCED GUIDI. |
| 25 | **THE CLERK:** CHRISTIAN HINDERLIE, H-I-N-D-E-R-L-I-E. |

1          MATTHEW HUIZINGH, H-U-I-Z-I-N-G-H.

2                **PROSPECTIVE JUROR:**  HUIZINGH.

3                **THE CLERK:**  CATHY JEW, J-E-W.

4      OKAY.  THE NEXT NAME THAT I CALL IS GOING TO COME WAY IN

5   THE BACK ROW, WAY OVER ON THE RIGHT WAY ON THE END.  NOT

6   MS. JEW BUT THE NEXT PERSON.

7      DANIEL NICHOLAS, N-I-C-H-O-L-A-S.  SO YOU GO WAY DOWN ON

8   THE END IN THE BACK THERE.

9      MARISA ONG, O-N-G.

10     FREESIA RAFELLO, R-A-F-E-L-L-O.

11     JOSEPH ROUSSEU, R-O-U-S-S-E-U.

12     GINA VELEZ, V-E-L-E-Z.

13     CHRISTOPHER WHITE, W-H-I-T-E.

14     WILLIAM WILSON, W-I-L-S-O-N.

15     THERESA WOO, W-O-O.

16     AND YUN XU, X-U.

17     SORRY, CAN YOU GET AROUND THE SCREEN THERE?

18     GREAT.  I'LL GO AND GET THE JUDGE.

19                    (PAUSE IN THE PROCEEDINGS.)

20           **THE COURT:**  GOOD MORNING, EVERYONE.

21   EVERYONE:  GOOD MORNING.

22           **THE CLERK:**  YOU MAY BE SEATED.

23           **THE COURT:**  GOOD MORNING.  YOU HAVE ALL BEEN CALLED

24   AS PROSPECTIVE JURORS IN THE CASE OF IGNACIO PEREZ VERSUS RASH

25   CURTIS & ASSOCIATES, CASE NUMBER 16-3396.

1          IF YOU ALL PLEASE RISE AGAIN AND YOU WILL BE SWORN IN.

2          (PROSPECTIVE JURORS SWORN.)

3          **THE COURT:**  WELL, I CAN TELL BY YOUR LUKEWARM

4     RESPONSE TO MY EXCITED GOOD MORNING THAT NO ONE IS HAPPY TO BE

5     HERE.  MAYBE A COUPLE OF YOU.  I UNDERSTAND.

6          LET ME START OFF BY THANKING YOU FOR HONORING YOUR

7     CITIZENSHIP TODAY.  THE RIGHT TO A TRIAL BY JURY IS GUARANTEED

8     TO EACH AND EVERY ONE OF US BY THE CONSTITUTION.  IT'S

9     GUARANTEED.  BUT THAT RIGHT CANNOT BE EFFECTUATED IN

10    COURTROOMS ACROSS THE UNITED STATES UNLESS INDIVIDUALS LIKE

11    EACH AND EVERY ONE OF YOU DO YOUR CIVIC DUTY AND APPEAR.  SO,

12    AGAIN, I THANK YOU.

13         BEFORE I CONTINUE, CAN EVERYONE HEAR ME?  IF NOT, WE HAVE

14    ASSISTED LISTENING DEVICES.  RAISE YOUR HAND AND WE CAN BRING

15    YOU ONE.

16         ALL RIGHT.  THANK YOU.

17         SO I WOULD LIKE TO THINK THAT WE CAN ALL AGREE AT A

18    MINIMUM THAT A RIGHT TO A TRIAL BY JURY IS ONE OF OUR MOST

19    CHERISHED RIGHTS.  IT IS GUARANTEED TO US IN THE SIXTH AND

20    SEVENTH AMENDMENTS.  I HAVE HAD THIS OLD COPY OF THE

21    CONSTITUTION WITH ME SINCE LAW SCHOOL.

22         BUT, FRANKLY, IF YOU PICK UP THE NEWSPAPER ON ANY GIVEN

23    DAY AND YOU LOOK AT THE WORLD SECTION, YOU WILL PROBABLY FIND

24    THAT THAT RIGHT IS NOT GUARANTEED TO PEOPLE ACROSS THE GLOBE.

25    SO, IN THOSE PLACES DEMOCRACY DOESN'T GOVERN.  ONCE A YEAR

MAYBE YOU GET ASKED TO COME AND ENGAGE IN YOUR DEMOCRACY.  I

UNDERSTAND DEMOCRACY IS NOT CONVENIENT.  IT REALLY ISN'T.

    BUT WE REAP THE BENEFITS OF A DEMOCRATIC SOCIETY AND ONCE

IN A WHILE THAT MEANS THAT WE HAVE TO TAKE SOME TIME OUT OF

OUR DAY TO PARTICIPATE IN OUR DEMOCRACY.  THE RIGHT TO SERVE

AS A TRIAL JUROR IS GUARANTEED TO EACH AND EVERY ONE OF YOU.

AND THAT RIGHT CANNOT BE DENIED TO YOU ON THE BASIS OF YOUR

GENDER, SEX, SEXUAL ORIENTATION, RELIGION, ECONOMIC STATUS,

AND, FRANKLY, IT WAS NOT THAT LONG AGO IN OUR COUNTRY'S

HISTORY WHEN I COULD NOT SAY THAT.  IN FACT, IT WAS NOT THAT

LONG AGO IN OUR COUNTRY'S HISTORY WHEN MANY OF US IN THIS

COURTROOM DID NOT HAVE THE RIGHT TO SERVE AS JURORS.  MYSELF

INCLUDED.

    FOR THOSE WOMEN IN THE ROOM, WE ARE CELEBRATING THE

ANNIVERSARY OF THE RIGHT GIVEN TO WOMEN TO VOTE, THE 20TH

AMENDMENT.  SO JUST REMEMBER, THERE WAS A TIME IN OUR

COUNTRY'S HISTORY WHEN THE RULE OF LAW WAS BEING DECIDED BY A

SELECT GROUP OF PEOPLE, MANY OF YOU WERE NOT INVITED, MUCH

LESS GIVEN THE RIGHT TO PARTICIPATE.

    SO LET ME SHARE WITH YOU JUST A LITTLE BIT ABOUT THIS

CASE.  THIS IS A CIVIL CASE AND I'LL TELL YOU ABOUT IT AND

INTRODUCE THE PARTIES IN A MOMENT.  BUT IT IS THE DUTY OF

JURORS TO DETERMINE THE FACTS OF THE CASE.  THAT IS WHAT WE --

THAT IS WHAT THIS PROCESS IS ABOUT.  EVIDENCE IS PRESENTED.

THE PARTIES CAN'T AGREE ON WHAT THE FACTS ARE, AND WE ASK

JURORS TO DECIDE IN THEIR COLLECTIVE WISDOM WHAT THE FACTS

ARE.  JURORS ARE THE JUDGES OF THE WEIGHT AND THE EVIDENCE AND

THE CREDIBILITY OF THE WITNESSES.  BUT THERE'S AN IMPORTANT

LIMITATION AND RESTRICTION AND THAT IS THAT JURORS HAVE TO

DECIDE THE CASE BASED UPON THE RULE OF LAW.  AND THAT'S WHERE

A JUDGE COMES IN.  IT IS MY JOB, NOT TO BE AN ADVOCATE, BUT TO

SAY WHAT THE RULES OF THE LAW ARE AND WHAT THE LAW PROVIDES

AND TO INSTRUCT THE JURY ON THE LAW.

AND IT IS THE JURORS' OBLIGATION TO ACCEPT THOSE

INSTRUCTIONS WITHOUT RESERVATION.  AND THAT IS BECAUSE I DON'T

MAKE THE LAW, I JUST TELL YOU WHAT THE LAW IS.  THAT -- THOSE

LAWS ARE DETERMINED BY OUR ELECTED REPRESENTATIVES AND BY THE

COURTS OF APPEAL WHO DECIDE WHAT THE LAW IS WHEN THERE IS

AMBIGUITY.  SO WE WANT THE JURORS TO DECIDE THE CASE BASED

UPON THE LAW, NOT BASED UPON THEIR OWN PERSONAL OPINIONS, BUT

ON THE LAW.

NOW, THE ROLE OF THE LAWYERS IS SEPARATE.  THEY HAVE A

DISTINCT DUTY TO ADVOCATE FOR THEIR CLIENTS AND IT IS THEIR

JOB TO DO THAT PIECE.  SO WHEN WE ARE ALL IN THE COURTROOM

EACH DOING OUR OWN JOB, WE BELIEVE THAT WE ARE GOING TO GET TO

THE RIGHT RESULT.  AND I AM A TRUE BELIEVER IN JURIES.  I

THINK THE JURIES GET TO THE RIGHT RESULT.

OKAY.  THAT RESULT IS SHOWN IN WHAT WE CALL A VERDICT, AND

YOU MAY HAVE HEARD OF THAT.  IT IS IMPORTANT THAT JURORS

ALWAYS KEEP AN OPEN MIND.  I'VE TRIED ENOUGH CASES TO KNOW

```
 1    WHEN YOU HEAR ONE SIDE'S VERSION, YOU THINK, OH, THAT IS

 2    GREAT, THEY MUST BE RIGHT.  UNTIL YOU HEAR THE OTHER SIDE'S

 3    VERSION, YOU ARE REALLY NOT QUITE SURE.  SO, IT IS IMPORTANT

 4    TO KEEP AN OPEN MIND UNTIL ALL OF THE PIECES OF THE PUZZLE

 5    HAVE BEEN PRESENTED TO YOU AND, WHOEVER IS CHOSEN, I'LL HAVE

 6    SOME MORE INSTRUCTIONS FOR YOU ON THAT.

 7        BUT LET'S SHIFT GEARS AND, AGAIN, I'M GOING TO PAUSE.

 8    DOES ANYBODY HAVE ANY LANGUAGE ISSUES WHERE THEY CANNOT

 9    UNDERSTAND WHAT I'M SAYING, RAISE YOUR HAND?  OKAY.  NONE ARE

10    RAISED.

11        SO LET'S TALK A LITTLE BIT MORE ABOUT THIS CASE.  FIRST

12    SOME INTRODUCTIONS.  I WILL HAVE THE PARTIES INTRODUCE

13    THEMSELVES.  MR. BURSOR, IF WILL YOU INTRODUCE YOURSELF FOR

14    THE PLAINTIFFS AND YOUR TEAM, PLEASE.

15            MR. BURSOR:  GOOD MORNING, EVERYONE.  MY NAME IS

16    SCOTT BURSOR.  I AM FROM THE LAW FIRM OF BURSOR & FISHER AND

17    SEVERAL OF THE LAWYERS FROM MY FIRM THAT WILL BE WORKING WITH

18    ME DURING THE TRIAL ARE ALSO HERE.  MY PARTNER TIM FISHER,

19    BLAIR REED FROM OUR FIRM AND YEREMEY KRIVOSHEY FROM OUR FIRM

20    CAME IN A COUPLE OF MINUTES LATE AND WITH HIM IS OUR CLIENT,

21    IGNACIO PEREZ, WHO'S SITTING IN THE BACK WITH MR. KRIVOSHEY.

22    HE WILL PROBABLY COME UP HERE LATER BUT THEY DIDN'T WANT TO

23    DISTURB YOUR HONOR'S PRESENTATION.

24            THE COURT:  THANK YOU.  MR. ELLIS.

25            MR. ELLIS:  THANK YOU, YOUR HONOR.  GOOD MORNING,
```

1    LADIES AND GENTLEMEN.  MY NAME IS MARK ELLIS, AND I'M FROM A

2    LAW FIRM, ELLIS LAW GROUP, LLP.  AND I'LL BE THE LEAD TRIAL

3    ATTORNEY FOR THE DEFENSE.  AND WITH ME IS ANTHONY VALENTI, ONE

4    OF MY ASSOCIATES.  HE'S A SENIOR ASSOCIATE.  LARRY IGLESIAS,

5    ANOTHER ASSOCIATE.  HE'S A JUNIOR ASSOCIATE SITTING IN HIS

6    FIRST TRIAL.  AND WITH ME RIGHT HERE IS ROBERT KEITH AND HE IS

7    THE REPRESENTATIVE OF RASH CURTIS, WHO IS THE DEFENDANT IN

8    THIS CASE, AND HE'S THE VICE PRESIDENT OF OPERATIONS THERE.

9    GOOD MORNING.

10          **THE COURT:**  THANK YOU.  OKAY.  SO I'D LIKE YOU ALL TO

11   LOOK AROUND THE ROOM.  ALL THE JURORS SEEM TO HAVE COME ON

12   THIS SIDE.  I'M LOOKING FOR EIGHT JURORS.  THAT'S ALL I'M

13   LOOKING FOR, EIGHT JURORS.  SO MOST OF YOU WILL NOT BE WITH

14   US.

15          TIMING.  THIS IS ACTUALLY A VERY SHORT CASE AS FAR AS

16   FEDERAL CASES GO.  A COUPLE OF YEARS AGO AT THIS POINT IN

17   TIME, I WAS PICKING A JURY FOR A FOUR-MONTH CRIMINAL TRIAL.

18   THAT IS NOT THIS CASE.  AND YOU JUST RANDOMLY HAPPENED TO GET

19   SELECTED TO BE ON A SHORT CASE.  I EXPECT THIS CASE TO BE

20   FINISHED BY NEXT WEEK, SO IT IS AS SHORT AS THEY COME FOR

21   FEDERAL CASES.

22          OUR TRIAL DAY IS AS FOLLOWS:  I OPERATE FROM 8:30 TO

23   1:30 WITH MY TRIAL DAYS.  I ACTUALLY START WITH THE LAWYERS

24   EARLIER BUT EVIDENCE IS PRESENTED BETWEEN 8:30 AND 1:30.  WE

25   DO NOT TAKE LUNCH.  WE TAKE TWO 15-MINUTE BREAKS AT

1   10:00 O'CLOCK AND 11:45 IN CASE YOU HAVE CONFERENCE CALLS TO

2   SCHEDULE AND THEN TAKE LUNCH AFTERWARDS.

3       I DO THIS FOR A NUMBER OF REASONS.  ONE, FOR THOSE OF YOU

4   WHO ARE TRAVELING WHO ARE NOT LOCAL TO OAKLAND, YOU GET BACK

5   ON THE ROAD BEFORE THERE IS ANY TRAFFIC AND IT MAKES IT MUCH

6   FASTER.

7       TWO, IN FEDERAL COURT OUR CASES DON'T GO AWAY WHEN WE ARE

8   IN TRIAL.  I HAVE 300 OTHER CASES.  SO WHEN YOU LEAVE, I DEAL

9   WITH MY OTHER CASES.  THEY DON'T GO AWAY.  PEOPLE ARE SITTING

10  IN THE COURTROOM.  I HAVE HEARINGS AFTER YOU GO.  SO I CAN

11  FEEL YOUR PAIN.  WHEN I AM IN TRIAL, I STILL HAVE WORK TO DO

12  TOO, SO I UNDERSTAND.

13      BUT, I CAN PROMISE YOU, I'M ONE OF THE MORE EFFICIENT

14  TRIAL JUDGES AROUND.  WE DO NOT WASTE TIME.  I MAKE THE

15  PARTIES WORK LATE AND COME IN EARLY SO WHEN YOU ARE HERE, ALL

16  YOU ARE DOING IS HEARING EVIDENCE.

17      NOW, ONCE THE CASE IS SUBMITTED TO YOU FOR DELIBERATION, I

18  TRY TO GET IT OVER WITH, SO I HAVE YOU DELIBERATE ALL DAY.  SO

19  YOU CAN BE DELIBERATING AND I CAN BE WORKING IN HERE, SO THAT

20  WORKS FOR ME.  BUT THAT WAY IT ALSO GETS YOU DONE SOONER.  SO,

21  THIS IS LIKE I SAID A PRETTY SHORT TRIAL.

22      NOW, WITH RESPECT TO HARDSHIPS, AND I HAVE SEEN SOME

23  PEOPLE HAVE INDICATED THAT THEY HAVE GOT SOME HARDSHIPS AND WE

24  WILL TALK ABOUT THAT.  ECONOMIC HARDSHIP IS NOT A REASON IN

25  AND OF ITSELF TO BE EXCUSED.  NOR ARE GENERAL TRAVEL PLANS, IF

1    YOU LIKE TO TRAVEL, BUT THERE ARE SOME SITUATIONS WHERE I

2    WOULD GRANT A HARDSHIP.  THEY ARE NARROWLY GRANTED, NARROWLY

3    GRANTED.

4        SO WHAT I WOULD LIKE YOU TO DO IS LOOK TO YOUR NEIGHBOR.

5    WHEN YOU ARE ASKING FOR A HARDSHIP, THE QUESTION I'M GOING TO

6    HAVE FOR YOU IS WHAT MAKES YOU SO SPECIAL THAT YOUR NEIGHBOR

7    SHOULD SIT BUT NOT YOU.  THAT'S THE QUESTION.  NOW, IF YOU ARE

8    TAKING CARE OF AN ELDERLY PARENT WHO HAS NO -- CANNOT MOVE,

9    CANNOT FEED THEMSELVES, YEAH, I WOULD SAY THAT IS A HARDSHIP.

10   SOMETIMES I LET OUT ELEMENTARY SCHOOL TEACHERS BECAUSE I

11   THINK THAT CHILDREN IN SCHOOLS SHOULD NOT BE SITTING THERE

12   WATCHING VIDEOS BECAUSE OUR SCHOOL DISTRICTS CAN'T AFFORD TO

13   PAY SUBSTITUTES TO COME IN AND TEACH THEM.  BUT IT'S GOT TO BE

14   SOMETHING SPECIAL.

15   NOW, THAT DOESN'T MEAN YOU WILL GET SELECTED.  LOOK

16   AROUND.  ONLY LOOKING FOR EIGHT.  IF YOU ARE ASKING FOR A

17   HARDSHIP, THAT'S DIFFERENT.  THAT'S ME SAYING THAT YOU'RE

18   SPECIAL AND YOU SHOULDN'T SERVE BUT YOUR NEIGHBOR SHOULD.

19   SO LET ME TELL YOU A LITTLE MORE ABOUT THIS SPECIFIC CASE.

20   THIS IS WHAT WE CALL A CLASS ACTION LAWSUIT.  PLAINTIFF,

21   MR. PEREZ, AND THE CLASS MEMBERS ALLEGE THAT THE DEFENDANT,

22   RASH CURTIS & ASSOCIATES, WHICH IS A DEBT COLLECTOR, CALLED

23   PEOPLE ON THEIR CELLULAR TELEPHONES AND THAT RASH CURTIS

24   OBTAINED THEIR NUMBER THROUGH A PROCESS CALLED SKIP-TRACING.

25   THE PLAINTIFF AND THE CLASS MEMBERS ALLEGE THAT ALL OF THOSE

1    CALLS VIOLATED THE TELEPHONE CONSUMER PROTECTION ACT.  THIS IS

2    IN TITLE 47 OF THE UNITED STATES CODE AT SECTION 227.  AND

3    PLAINTIFF AND THE CLASS MEMBERS HAVE THE BURDEN TO PROVE THEIR

4    CLAIMS.  RASH CURTIS DENIES ALL OF THE CLAIMS AND DENIES THAT

5    THERE WAS A SKIP-TRACING THAT CAN BE PROVED.

6        NOW, I HAD THE LAWYERS AND THEIR PARTIES INTRODUCE

7    THEMSELVES.  LET ME INTRODUCE MY STAFF.  HERE IS MY COURTROOM

8    DEPUTY, FRANCES STONE.  SHE IS THE PERSON WITH WHOM YOU WOULD

9    HAVE THE MOST INTERACTION.  AND MY COURT REPORTER, DIANE

10   SKILLMAN.  NOW, DIANE IS THE PERSON I SAY WHO IS IN THE

11   COURTROOM WHO WORKS 100 PERCENT OF THE TIME.  WHEN THE LAWYERS

12   ARE ASKING QUESTIONS, I COULD BE DOZING OFF.  I DON'T BUT I

13   COULD BE.  BUT DIANE, SHE HAS TO TYPE DOWN EVERY SINGLE THING

14   THAT IS SAID.  AND SHE'S VERY PATIENT WITH ME BECAUSE I DON'T

15   LIKE TO TAKE BREAKS.  BUT, ONCE IN A WHILE I DO HAVE TO TAKE A

16   BREAK BECAUSE, IF I DON'T, SHE DOESN'T GET A BREAK AND SHE HAS

17   TO TYPE EVERYTHING THAT EVERYONE SAYS.

18       ALL RIGHT.  NOW, I'VE GIVEN YOU SOME BACKGROUND AND WE ARE

19   GOING TO START THE PROCESS OF VOIR DIRE.  I SAW IN THE

20   QUESTIONNAIRES THERE IS A TEXAN OR SOMEONE WHO WAS IN TEXAS,

21   WHO WENT TO SCHOOL IN TEXAS.  IF YOU ARE IN TEXAS, WHERE I

22   WENT TO LAW SCHOOL, THEY CALL IT VOIR DIRE.  VOIR DIRE, SAME

23   AS VOIR DIRE, BUT VOIR DIRE IS ACTUALLY FRENCH, IT'S NOT

24   TEXAN.  IT COMES FROM THE 1600S AND THAT WORD IS AN

25   ANGLO-FRENCH WORD, WHICH LITERALLY MEANS TO SPEAK THE TRUTH.

1        SO THIS PROCESS OF VOIR DIRE IS A PROCESS BY WHICH WE ASK

2    YOU TO SPEAK THE TRUTH IN RESPONSE TO OUR QUESTIONS.  IF AT

3    ANY TIME -- AND I DON'T -- BECAUSE THIS ISN'T A SENSITIVE

4    CASE, IT'S NOT A CRIMINAL CASE.  FREQUENTLY, I HAVE TO TALK TO

5    PEOPLE ABOUT SOMETHING THAT IS PARTICULARLY SENSITIVE.  I'M

6    HAPPY TO PROVIDE YOU WITH A MEASURE OF PRIVACY.  IF THERE IS

7    SOMETHING YOU NEED TO TELL ME THAT YOU DON'T WANT ANYONE ELSE

8    TO HEAR, THAT'S FINE.  I CAN GIVE YOU THAT PRIVACY BUT JUST

9    LET ME KNOW.  AND DON'T NOT ANSWER THE QUESTION, JUST TELL ME

10   YOU WOULD LIKE SOME PRIVACY AND I CAN PROVIDE THAT.

11       OKAY.  NOW, WE'RE GOING TO GO AND REVIEW YOUR

12   QUESTIONNAIRES.  AND I THINK AS YOU MAY BE ABLE TO TELL AT

13   THIS POINT, THE QUESTIONNAIRES WERE GEARED TOWARD THAT.  SO,

14   IF WE HAVE THE MIC, WE WILL START OFF.

15           **THE CLERK:**  AND THEN YOU NEED TO HOLD THE MIC MUCH IN

16   FRONT LIKE THIS.  IF YOU HOLD IT DOWN HERE, WE CAN'T HEAR IT.

17   THERE YOU ARE.

18           **THE COURT:**  MR. BLEM?

19           **PROSPECTIVE JUROR:**  YES.

20           **THE COURT:**  DID I SAY THAT RIGHT?

21           **PROSPECTIVE JUROR:**  YES.

22           **THE COURT:**  GOOD MORNING.

23           **PROSPECTIVE JUROR:**  GOOD MORNING.

24           **THE COURT:**  SO IN TERMS OF YOUR -- YOU'RE CURRENTLY

25   EMPLOYED AT KAISER, RIGHT?

1         **PROSPECTIVE JUROR:** CORRECT.

2         **THE COURT:** SO WE DON'T HAVE AN ISSUE WITH RESPECT

3 TO -- KAISER IS ONE OF THESE INSTITUTIONS THAT ACTUALLY

4 COMPENSATES YOU --

5         **PROSPECTIVE JUROR:** YES. I'M GETTING PAID VERY WELL

6 RIGHT NOW, SO....

7         **THE COURT:** OKAY.

8   CAN YOU TELL ME -- YOU CHECKED THE BOX ABOUT HAVING FAMILY

9 MEMBERS OR SELF-EXPERIENCE WITH DEBT COLLECTORS. CAN YOU JUST

10 GIVE ME A LITTLE MORE INFORMATION ON THAT TOPIC. YOU SAID

11 THERE WAS A BANKRUPTCY --

12         **PROSPECTIVE JUROR:** MY DAUGHTER GOT INTO TROUBLE WITH

13 A DEBT COLLECTION AND WAS SENT TO DEBT COLLECTORS. AND I

14 THINK SHE ULTIMATELY PAID THEM.

15   AT ONE POINT, I THINK ABOUT 30 YEARS AGO, I HAD TO DECLARE

16 BANKRUPTCY. SO, I'M FAMILIAR WITH DEBT COLLECTORS AS WELL.

17         **THE COURT:** CAN YOU TELL ME ANYTHING ABOUT YOUR

18 EXPERIENCE? WHAT I AM INTERESTED IN HERE -- WHAT WE ARE

19 LOOKING FOR ARE JURORS WHO CAN BE FAIR. RIGHT?

20   SO, DID YOU HAVE A PARTICULARLY BAD OR GOOD OR JUST

21 NEUTRAL EXPERIENCE WITH THE DEBT COLLECTORS?

22         **PROSPECTIVE JUROR:** I MEAN, THEY ARE JUST DOING THEIR

23 JOB. SO, I OWED MONEY, THEY WERE ASKING FOR THE MONEY. SO --

24         **THE COURT:** OKAY.

25         **PROSPECTIVE JUROR:** IT'S UNDERSTANDABLE.

```
 1            THE COURT:  AND THERE'S NOTHING -- DO YOU HARBOR ANY

 2    ILL FEELINGS TOWARD DEBT COLLECTORS THAT PERHAPS THE

 3    DEFENDANTS SHOULD KNOW ABOUT?

 4            PROSPECTIVE JUROR:  NO.

 5            THE COURT:  OKAY.

 6            PROSPECTIVE JUROR:  WISH I DIDN'T HAVE TO PAY THE

 7    MONEY BACK THEN, BUT....

 8            THE COURT:  NOW, YOU SAID YOU STRONGLY AGREE THERE

 9    ARE TOO MANY LAWSUITS.  TELL ME YOUR THOUGHTS ON THAT FRONT.

10            PROSPECTIVE JUROR:  WHAT'S THAT QUOTE THAT THE UNITED

11    STATES HAS 90 PERCENT OF THE WORLD'S ATTORNEYS?

12            THE COURT:  THEY DON'T ALL LITIGATE.

13            PROSPECTIVE JUROR:  NO, THEY DON'T ALL LITIGATE.  BUT

14    IT IS AN OVERWHELMING PROPORTION.

15            THE COURT:  AND, IN TERMS OF YOUR OPINIONS WITH

16    RESPECT TO OUR LEGAL SYSTEM, MOST OF THAT WAS -- YOUR COMMENT

17    WAS RELATED TO CRIMINAL?

18            PROSPECTIVE JUROR:  CORRECT.

19            THE COURT:  DO YOU HAVE ANYTHING TO SAY WITH RESPECT

20    TO THE CIVIL SIDE?

21            PROSPECTIVE JUROR:  NO.

22            THE COURT:  OKAY.  ALL RIGHT.

23       OKAY.  THANK YOU.

24            PROSPECTIVE JUROR:  THANK YOU.  DO I PASS IT?

25            THE COURT:  YES, PLEASE.
```

1          MR. CAMP?

2                    **PROSPECTIVE JUROR:**  YES.

3              **THE COURT:**  GOOD MORNING, SIR.

4              **PROSPECTIVE JUROR:**  HI.

5              **THE COURT:**  SO, MR. CAMP, CAN YOU -- DID YOU GET A

6    DEGREE AT BERKELEY IN ELECTRONICS --

7              **PROSPECTIVE JUROR:**  NO.

8              **THE COURT:**  -- OR DID YOU JUST TAKE COURSES?

9              **PROSPECTIVE JUROR:**  UNDERGRADUATE.  I NEVER GOT THE

10   DEGREE.  JUST STUDIED VARIOUS COURSES.

11             **THE COURT:**  I COULDN'T QUITE TELL.  THE NAME OF THE

12   COMPANY -- YOU ARE AN INVENTORY MANAGER, IS THAT IT?

13             **PROSPECTIVE JUROR:**  YES.

14             **THE COURT:**  WHAT IS THE NAME OF THE COMPANY, SIR?

15             **PROSPECTIVE JUROR:**  ANDERSON HONDA.

16             **THE COURT:**  ANDERSON HONDA.

17             **PROSPECTIVE JUROR:**  YES.

18             **THE COURT:**  AND YOU HAVE BEEN ON A JURY THREE TIMES.

19   WERE THEY ALL CRIMINAL CASES IN STATE COURT?

20             **PROSPECTIVE JUROR:**  ONE WAS DOMESTIC VIOLENCE, ONE

21   WAS DUI AND ONE WAS ROBBERY.

22             **THE COURT:**  OKAY.  NOW, IN EACH OF THOSE CASES --

23   LET'S START WITH THE DV.  DID THE JURY REACH A VERDICT?

24             **PROSPECTIVE JUROR:**  WHICH ONE WAS THAT?

25             **THE COURT:**  DOMESTIC VIOLENCE.

1      **PROSPECTIVE JUROR:**  WE WERE SPLIT ON THAT ONE.

2      **THE COURT:**  SO YOU HUNG?  THE JURY HUNG?

3      **PROSPECTIVE JUROR:**  (NODS HEAD.)

4      **THE COURT:**  WERE YOU THE FOREPERSON?

5      **PROSPECTIVE JUROR:**  ON THAT ONE, NO.

6      **THE COURT:**  HOW ABOUT THE DUI?  WAS THERE A VERDICT

7  IN THE DUI?

8      **PROSPECTIVE JUROR:**  YES, THERE WAS.

9      **THE COURT:**  WHAT WAS THAT VERDICT?

10     **PROSPECTIVE JUROR:**  GUILTY.

11     **THE COURT:**  GUILTY.  WERE YOU THE FOREPERSON THERE?

12     **PROSPECTIVE JUROR:**  I WAS.

13     **THE COURT:**  AND THEN WITH RESPECT TO THE ROBBERY

14  CASE, WAS THERE A VERDICT?

15     **PROSPECTIVE JUROR:**  GUILTY VERDICT.

16     **THE COURT:**  GUILTY?  WERE YOU THE FOREPERSON AGAIN?

17     **PROSPECTIVE JUROR:**  NO.

18     **THE COURT:**  OKAY.  AND WAS THAT IN SAN FRANCISCO

19  SUPERIOR COURT?

20     **PROSPECTIVE JUROR:**  I SAY ONE WAS OAKLAND, ONE WAS

21  SANTA CLARA, AND ONE WAS SAN FRANCISCO.

22     **THE COURT:**  YOU'VE MOVED AROUND A LOT THEN?

23     **PROSPECTIVE JUROR:**  I'VE HAD A FEW HOUSES.

24     **THE COURT:**  NOW, IN TERMS OF -- YOU CHECKED THE BOX

25  THAT YOU TESTIFIED IN A TRIAL; IS THAT RIGHT?

1          **PROSPECTIVE JUROR:**  YES.

2          **THE COURT:**  CAN YOU TELL US A LITTLE BIT ABOUT YOUR

3     EXPERIENCE TESTIFYING?

4          **PROSPECTIVE JUROR:**  I JUST HAD TO VERIFY THAT THERE

5     WERE RECKLESS DRIVING GOING ON, ON A STREET IN FRONT OF MY

6     HOUSE.  SPEEDING AND THAT TYPE OF STUFF.

7          **THE COURT:**  OKAY.

8       AND THEN YOU'VE ALSO HAD TO BE INVOLVED IN A LAWSUIT WITH

9     RESPECT TO TRYING TO GET BACK RENT FROM A TENANT.  CAN YOU

10    TELL US ABOUT THAT?

11         **PROSPECTIVE JUROR:**  YES.  THEY WERE ALMOST A YEAR IN

12    ARREARS.

13         **THE COURT:**  WE'RE GETTING A LOT OF BACK --

14         **THE CLERK:**  YOU KNOW WHAT?  IF I TURN IT DOWN, WE

15    CAN'T HEAR HIM.  THE ONLY WAY I CAN DO IT IS TO TURN THAT DOWN

16    AND TRY TO GET THAT OUT.

17         **THE COURT:**  LET'S HOLD OFF THEN.

18       SO -- JUST HOLD THE MIC A LITTLE BIT LOWER.

19         **PROSPECTIVE JUROR:**  LITTLE LOWER?

20         **THE COURT:**  LET'S SEE IF THAT WORKS.

21       WERE YOU ABLE TO GET YOUR CASE RESOLVED IN STATE COURT?

22         **PROSPECTIVE JUROR:**  THEY WERE SUPPOSED TO PAY ME BUT

23    THEY NEVER DID.

24         **THE COURT:**  BUT YOU WERE ABLE TO GET A JUDGMENT?

25         **PROSPECTIVE JUROR:**  YES, I GOT A JUDGMENT.

1          **THE COURT:**  WERE YOU ABLE TO EVICT THE PERSON?

2          **PROSPECTIVE JUROR:**  I WAS.

3          **THE COURT:**  NOW, YOU NOTED THAT YOU THOUGHT DAMAGES

4    AWARDS FROM CIVIL LAWSUITS WERE TOO HIGH.  CAN YOU TELL ME

5    YOUR THOUGHTS ON THAT TOPIC?

6          **PROSPECTIVE JUROR:**  I JUST THINK, IN GENERAL, THEY

7    SEEM EXCESSIVE.

8          **THE COURT:**  IS THERE ANYTHING IN PARTICULAR THAT

9    LEADS YOU TO THAT CONCLUSION?

10          **PROSPECTIVE JUROR:**  JUST MY EXPERIENCES.

11          **THE COURT:**  YOUR EXPERIENCES?  OKAY.

12      ALL RIGHT.  THANK YOU, MR. CAMP.

13      MS. COOPER?

14          **PROSPECTIVE JUROR:**  YES.

15          **THE COURT:**  GOOD MORNING.

16          **PROSPECTIVE JUROR:**  GOOD MORNING.

17          **THE COURT:**  SO, CAN YOU TELL ME WHAT YOUR ROLE IS AT

18    STANFORD?

19          **PROSPECTIVE JUROR:**  SURE.  I'M A SOCIOLOGIST AT A

20    RESEARCH INSTITUTE THAT FOCUSES ON GENDER.

21          **THE COURT:**  OKAY.  SO YOU'RE DOING RESEARCH?  YOU

22    NOTED YOU WERE A MANAGER, SO I WAS TRYING TO UNDERSTAND.

23          **PROSPECTIVE JUROR:**  I AM.  I HAVE ONE RESEARCHER WHO

24    REPORTS TO ME, THAT I DO RESEARCH AND WRITING.

25          **THE COURT:**  OKAY.  AND THEN YOU'VE ALSO -- YOU WERE

```
1    ON A DUI CASE; IS THAT RIGHT?
2              PROSPECTIVE JUROR:  YES.
3              THE COURT:  AND WAS THERE A VERDICT IN THAT --
4              PROSPECTIVE JUROR:  YES.  GUILTY.
5              THE COURT:  WERE YOU THE FOREPERSON?
6              PROSPECTIVE JUROR:  (SHAKES HEAD.)
7              THE COURT:  NO?
8              PROSPECTIVE JUROR:  NO.
9              THE COURT:  I HAVE TO MAKE SURE.  YOU NOD YOUR HEAD,
10   I HAVE WORDS SO WE CAN NOTE IT ON THE TRANSCRIPT.
11        OKAY.  AND THEN YOU KNOW SOMEONE WHO IS ON YOUR RESEARCH
12   PROJECT WHO HAD PROBLEMS WITH A DEBT COLLECTOR MAYBE?  COULD
13   YOU GIVE US --
14             PROSPECTIVE JUROR:  I WROTE A BOOK ON FINANCIAL
15   INSECURITY AND ONE -- FOR THE RESEARCH, I FOLLOWED AROUND
16   SEVERAL FAMILIES AND I INTERVIEWED HUNDRED FAMILIES, AND ONE
17   OF THE FAMILIES I FOCUSED ON IN MY BOOK IS A FAMILY WHO WAS
18   EXPERIENCING DOWNWARD MOBILITY AND WAS RECEIVING PHONE CALLS
19   FROM DEBT COLLECTORS FREQUENTLY.  AND SO I WAS THERE TO SEE
20   THOSE CALLS AND I WRITE ABOUT IT IN MY BOOK, THE IMPACT OF
21   THOSE CALLS.
22             THE COURT:  OKAY.  NOW, DO YOU KNOW WHETHER THE -- AS
23   PART OF YOUR RESEARCH, DID YOU EVER ENCOUNTER THE DEFENDANT?
24             PROSPECTIVE JUROR:  NO, NOT THAT I KNOW OF.
25             THE COURT:  AND IN THOSE CALLS WITH RESPECT TO THOSE
```

```
1   FAMILIES, WAS THERE EVER AN ALLEGATION THAT THE DEBT COLLECTOR

2   DIDN'T HAVE CONSENT TO CALL THE INDIVIDUALS?

3        PROSPECTIVE JUROR:  THAT DIDN'T COME UP IN MY

4   OBSERVATIONS.

5        THE COURT:  OKAY.  WHAT WAS YOUR CONCLUSION?  IF --

6   TO THE EXTENT THERE WAS ONE?

7        PROSPECTIVE JUROR:  SO, THIS IS BASED ON BOTH THE

8   RESEARCH THAT I'VE DONE AND MY EXPERTISE AND SORT OF ECONOMIC

9   INSECURITY AND BANKRUPTCY MORE BROADLY IS THAT OFTENTIMES THE

10  TACTICS ARE QUITE AGGRESSIVE.

11       THE COURT:  OKAY.

12       PROSPECTIVE JUROR:  WHAT I SAW, IT WAS CAUSING --

13  THERE WERE MANY THINGS GOING WRONG FOR THIS FAMILY.  THIS IS

14  ONE OF THEM BUT IT WAS A PARTICULAR POIGNANT MOMENT AS I HEARD

15  THE PERSON I WAS RESEARCHING EXPLAIN WHY SHE COULDN'T PAY IT

16  BACK AND --

17       THE COURT:  RIGHT.

18       PROSPECTIVE JUROR:  YEAH.

19       THE COURT:  AND WHEN WAS THAT BOOK PUBLISHED?

20       PROSPECTIVE JUROR:  2014.

21       THE COURT:  NOW, THERE ISN'T ANY -- IN THIS CASE,

22  IT'S A DIFFERENT KIND OF CASE WITH RESPECT TO THE CLAIMS ARE

23  THAT THE TELEPHONE CALLS WERE MADE WITHOUT CONSENT.

24       PROSPECTIVE JUROR:  YES.

25       THE COURT:  SO THERE ISN'T AN ALLEGATION OF
```

1   HARASSMENT OR ANYTHING LIKE THAT.  DO YOU THINK, BASED UPON

2   YOUR EXPERIENCE, THAT YOU WOULD NOT BE ABLE TO TREAT THE

3   DEFENDANT FAIRLY IN THIS CASE?

4            **PROSPECTIVE JUROR:**  I WOULD HOPE I CAN.  I MEAN, THAT

5   WOULD BE MY EXPECTATION OF MYSELF.  BUT I DO JUST WANT TO BE

6   VERY UPFRONT THAT I KNOW PROBABLY MORE THAN THE AVERAGE PERSON

7   ABOUT BANKRUPTCY AND ECONOMIC INSECURITY AND THE CAUSES AND

8   EXPERIENCES.  SO I THINK I CAN BE A REASONABLE AND IMPARTIAL

9   JUROR, BUT OTHER PEOPLE SHOULD JUST KNOW THAT THAT'S WHERE I

10  COME FROM.

11           **THE COURT:**  RIGHT.  DID YOU EVER HAVE ANY OCCASION TO

12  LEARN ABOUT THE SPECIFIC TELEPHONE SYSTEMS THAT THEY USE IN

13  THESE KINDS OF OPERATIONS?

14           **PROSPECTIVE JUROR:**  NO.  I JUST KNOW MORE ABOUT THE

15  EMPLOYEE SIDE OF IT AS WELL.  THERE IS A FAIR AMOUNT OF

16  RESEARCH ABOUT PEOPLE WHO WORK IN THE ACTUAL JOB OF A DEBT

17  COLLECTOR AND WHAT THAT IS LIKE AS WELL.  SO, THAT IS -- TO

18  THE DEGREE THAT I WOULD KNOW ANYTHING ABOUT IT, IT'S FROM THAT

19  LENS.

20           **THE COURT:**  OKAY.  NOW, YOUR HUSBAND IS -- OR YOUR

21  SPOUSE, I SHOULD SAY, IS IN BIOTECH?

22           **PROSPECTIVE JUROR:**  UH-HUH.

23           **THE COURT:**  THAT IS YES?

24           **PROSPECTIVE JUROR:**  YES.

25           **THE COURT:**  AND THAT'S -- WHERE IS THE BIOTECH

1    COMPANY LOCATED?

2             **PROSPECTIVE JUROR:**  SOUTH SAN FRANCISCO.

3             **THE COURT:**  OKAY.  SO AS YOU SAW, OR AS YOU HEARD, IF

4    YOU WERE SELECTED TO BE AS A JUROR, YOU WOULD BE DONE BY

5    1:30 IN THE AFTERNOON --

6             **PROSPECTIVE JUROR:**  YES.

7             **THE COURT:**  -- WHICH WOULD GET YOU BACK TO THE SOUTH

8    BAY --

9             **PROSPECTIVE JUROR:**  YES.

10            **THE COURT:**  -- WELL BEFORE 5:00 O'CLOCK.

11            **PROSPECTIVE JUROR:**  HARD PART WOULD BE THE MORNINGS

12   TO GET HERE BY 8:30.

13            **THE COURT:**  IS THERE SOME REASON YOUR HUSBAND CAN'T

14   TAKE YOUR KIDS TO SCHOOL?

15            **PROSPECTIVE JUROR:**  MOST DAYS HE CAN.  IT IS JUST IF

16   HE ENDS UP NEEDING TO TRAVEL FOR WORK.  ASSUMING THIS CASE IS

17   A SHORTER CASE, I THINK THIS IS POSSIBLE.

18            **THE COURT:**  OKAY.

19            **PROSPECTIVE JUROR:**  I AM FLAGGING THAT IT WOULD START

20   TO NOT BE POSSIBLE AT A CERTAIN POINT.

21            **THE COURT:**  OKAY.  GREAT.  ALL RIGHT.  THANK YOU.

22      OKAY.  NOW, YOU ARE GOING TO HAVE TO TELL ME HOW TO

23   PRONOUNCE YOUR LAST NAME.

24            **PROSPECTIVE JUROR:**  GHASEMIGOHAR.  YOU CAN CALL ME

25   GOHAR, IF IT IS SHORTER.

1          **THE COURT:**  GOHAR?

2          **PROSPECTIVE JUROR:**  YES.

3          **THE COURT:**  THANK YOU.

4       SO YOU SAID YOU HAVE -- WHEN DID YOU COME FROM IRAN?

5          **PROSPECTIVE JUROR:**  2010.

6          **THE COURT:**  AND YOU SAID YOU HAD SOME COLLEGE.  WAS

7    IT IN IRAN OR HERE IN THE STATES?

8          **PROSPECTIVE JUROR:**  HERE IN SOUTHERN CALIFORNIA, LOS

9    ANGELES.

10         **THE COURT:**  WHAT KINDS OF CLASSES DID YOU TAKE?

11         **PROSPECTIVE JUROR:**  BUSINESS ADMINISTRATIVE.

12         **THE COURT:**  OKAY.  AND WHAT IS YOUR CURRENT

13   OCCUPATION?

14         **PROSPECTIVE JUROR:**  I'M A STAY-AT-HOME MOM.

15         **THE COURT:**  OKAY.  AND ARE YOU -- AND YOU ARE MARRIED

16   AND SAME KINDS OF QUESTIONS.  YOUR HUSBAND IS A SOFTWARE

17   ENGINEER FOR WHOM?

18         **PROSPECTIVE JUROR:**  MACYS.COM.

19         **THE COURT:**  HOW DO YOU SPELL THAT?

20         **PROSPECTIVE JUROR:**  MACY'S.

21         **THE COURT:**  OH, MACY'S.  AND WHERE IS HIS HOME BASE?

22         **PROSPECTIVE JUROR:**  IT IS HERE IN DOWNTOWN

23   SAN FRANCISCO BUT HE HAS TO TRAVEL A LOT BECAUSE OF HIS JOB.

24   AND SOMETIMES BECAUSE OF THE TRAINING PURPOSES AND RIGHT NOW

25   HE IS OUT OF TOWN.  OUT OF THE STATE ACTUALLY.

1        **THE COURT:**  DOES ANYONE ELSE LIVE WITH YOU?

2        **PROSPECTIVE JUROR:**  NO.  RIGHT NOW MY NEIGHBOR IS

3   WATCHING MY THREE YEAR OLD.

4        **THE COURT:**  AND DOES YOUR CHILD GO TO DAYCARE?

5        **PROSPECTIVE JUROR:**  HE'S TAKING ONLY TWO DAYS AND FOR

6   THREE HOURS, SO IT IS VERY PART TIME THAT I HAVE TO DROP HIM

7   OFF AND PICK HIM UP.

8        **THE COURT:**  OKAY.  DO YOU KNOW YOUR HUSBAND'S

9   SCHEDULE FOR THE NEXT WEEK?

10        **PROSPECTIVE JUROR:**  HE WILL COME, I THINK, NEXT

11   THURSDAY.  I MEAN, I KNOW HE IS COMING BACK NEXT THURSDAY.

12        **THE COURT:**  OKAY.  AND DID YOU HAVE ANY OPINIONS

13   ON -- IT LOOKS LIKE YOU DON'T HAVE ANY OPINIONS ON WHETHER

14   THERE ARE TOO MANY LAWSUITS OR DAMAGES ARE TOO HIGH, ANYTHING

15   LIKE THAT?

16        **PROSPECTIVE JUROR:**  WELL -- YES, NO OPINION.  NO

17   EXPERIENCE.

18        **THE COURT:**  AND NO FAMILY IN THE AREA?

19        **PROSPECTIVE JUROR:**  NO.

20        **THE COURT:**  OKAY.  THANK YOU.

21     MR. GOEL?

22        **PROSPECTIVE JUROR:**  GOOD MORNING, YOUR HONOR.

23        **THE COURT:**  DID I SAY THAT RIGHT?

24        **PROSPECTIVE JUROR:**  THAT'S RIGHT.

25        **THE COURT:**  SO YOU HAVE YOUR JD.

1          **PROSPECTIVE JUROR:**  YES.

2          **THE COURT:**  HERE IS YOUR CHANCE TO BE A JUROR.

3      ARE YOU PRACTICING LAW OR YOU ARE DOING BUSINESS STRATEGY

4   WORK?

5          **PROSPECTIVE JUROR:**  I WORK FOR A STARTUP AT THE

6   MOMENT.  I WAS AN ATTORNEY LITIGATING FOR FIVE YEARS.

7          **THE COURT:**  WHEN DID YOU GET YOUR JD?

8          **PROSPECTIVE JUROR:**  2010.

9          **THE COURT:**  AND SO YOU WENT IN-HOUSE AFTER BEING AT

10  KIRKLAND AND DAVIS, RIGHT?

11         **PROSPECTIVE JUROR:**  YES, MA'AM.

12         **THE COURT:**  AND WERE YOU LITIGATING WHEN YOU WERE AT

13  THE FIRMS?

14         **PROSPECTIVE JUROR:**  YES, MA'AM.

15         **THE COURT:**  AND NOW YOU'RE DOING WHAT?  YOU DIDN'T

16  NOTE THAT YOU ARE A GC.

17         **PROSPECTIVE JUROR:**  CORRECT.  I HEAD UP BUSINESS

18  DEVELOPMENT.  I DO SOME -- MOST OF THE LEGAL WORK FOR THE

19  COMPANY AS WELL BUT NOT IN A FORMAL TITLE CAPACITY.

20         **THE WITNESS:**  OF A GENERAL COUNSEL.

21         **PROSPECTIVE JUROR:**  IT IS 20-PERSON COMPANY, SO WE

22  WEAR A LOT OF HATS.

23         **THE COURT:**  YES.

24      OKAY.  DO YOU HAVE -- YOUR THOUGHTS ABOUT TOO MANY

25  LAWSUITS, GIVEN THAT YOU WERE LITIGATING THOSE LAWSUITS?  WHAT

1    ARE YOUR THOUGHTS ON THAT TOPIC?

2            **PROSPECTIVE JUROR:**  MY PRACTICE IS PRIMARILY

3    HIGH-TECH PATENT LITIGATION DEFENSE.  SO I THINK IT'S

4    REASONABLE THAT I WOULD THINK THERE ARE A LOT OF LAWSUITS

5    AGAINST MY CLIENTS AND FORMER CLIENTS --

6            **THE COURT:**  I WOULD AGREE.

7            **PROSPECTIVE JUROR:**  -- AND THE DAMAGES AGAINST THEM

8    THAT WERE AWARDED WERE TOO HIGH.

9            **THE COURT:**  ANY CONCERNS ABOUT SITTING ON THIS CASE?

10            **PROSPECTIVE JUROR:**  ABSOLUTELY NOT.  I WOULD MERELY

11    ASK THAT I'M SCHEDULED TO GO TO SMALL CLAIMS COURT NEXT

12    FRIDAY, IF YOU COULD PROVIDE LEAVE TO HAVE THAT PUSHED BACK

13    SOMEHOW.

14            **THE COURT:**  I THINK WE WILL PROBABLY BE DONE BY THEN.

15    THANK YOU, SIR.

16        MS. GUIDI?  HOW DO I SAY IT?

17            **PROSPECTIVE JUROR:**  GUIDI.  GOOD MORNING, YOUR HONOR.

18            **THE COURT:**  GOOD MORNING.

19        OKAY.  SO DID YOU GET YOUR DEGREE FROM -- WELL, I GUESS

20    YOU DID.  YOU RECEIVED A BUSINESS FINANCE DEGREE FROM BOSTON

21    UNIVERSITY?

22            **PROSPECTIVE JUROR:**  THAT'S RIGHT.

23            **THE COURT:**  AND YOU SAY YOU ARE AN INDEPENDENT

24    CONTRACTOR.  CAN YOU TELL ME MORE ABOUT WHAT YOU DO?

25            **PROSPECTIVE JUROR:**  SURE.  I WORK FOR CISCO AS AN

1    INDEPENDENT CONTRACTOR.  IT'S -- WITH INTERNET SECURITY.

2            **THE COURT:**  OKAY.

3            **PROSPECTIVE JUROR:**  I NORMALLY WORK FROM HOME AND

4    I'M -- RIGHT NOW I HAVE TWO KIDS IN COLLEGE, ONE OF THEM GOING

5    TO JUNIOR COLLEGE AND I'M TRYING TO KEEP CLOSE TABS ON HIM AND

6    MAKING SURE THAT HE IS ACTUALLY GOING TO CLASS.  SO THAT IS

7    ONE OF MY CONCERNS WITH BEING HERE.

8        THE OTHER THING IS THAT, IF I'M NOT WORKING, I'M NOT

9    GETTING PAID.  BUT I DO FEEL THAT I HAVE -- I RESPECT MY RIGHT

10   TO PERFORM MY CIVIC DUTY AS A JUROR BUT I'M A LITTLE WORRIED

11   ABOUT IT.

12           **THE COURT:**  OKAY.

13       WELL, I APPRECIATE UNDERSTANDING YOUR PERSPECTIVE AND I

14   THINK IT'S IMPORTANT FOR THE PARTIES TO AS WELL.  IT SAYS YOU

15   WERE A JUROR IN A STATE COURT CRIMINAL CASE?

16           **PROSPECTIVE JUROR:**  (NODS HEAD.)

17           **THE COURT:**  CAN YOU TELL ME ABOUT THAT ONE?

18           **PROSPECTIVE JUROR:**  ACTUALLY I WASN'T.  I WAS ALMOST

19   SELECTED AND THEN I WASN'T.  THEN I REALIZED THAT DIDN'T

20   COUNT.

21           **THE COURT:**  OKAY.  GREAT.  NOW, YOUR EXPERIENCE WITH

22   DEBT COLLECTORS TO THE EXTENT -- OR FAMILY, CAN YOU TELL ME

23   ABOUT THAT EXPERIENCE?

24           **PROSPECTIVE JUROR:**  YEAH.  I HAD A CLAIM AGAINST ME

25   ONCE.  THEY HAD MY ADDRESS WRONG, SO I WASN'T GETTING THE

1    BILLS.  AND THEN SO WHEN IT WENT TO DEBT COLLECTION, THEY

2    CONTACTED ME.  MIRACULOUSLY, THEY WERE ABLE TO FIND MY

3    ADDRESS.  AND THEN I JUST PAID THE BILL AND IT WAS DONE.

4              **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE THAT MIGHT

5    LEAD YOU TO HARBOR ANY ILL FEELINGS AGAINST THE DEFENDANT?

6              **PROSPECTIVE JUROR:**  THE ONLY THING THAT I WAS UPSET

7    ABOUT, ACTUALLY, WAS THAT I DIDN'T FEEL LIKE ANY OF THIS --

8    ANY OF WHAT HAPPENED WAS ANYTHING THAT I HAD DONE ON MY PART.

9    I FELT LIKE IT WAS INFORMATION THAT WAS TAKEN DOWN WRONG AND

10   SO I NEVER RECEIVED THE INFORMATION.  AND I TRIED TO GET IT

11   CLEARED AND I COULDN'T GET IT CLEARED.  THEY SAID TOO BAD.  SO

12   I WAS A LITTLE RESENTFUL ABOUT THAT BECAUSE NOW I HAVE THIS ON

13   MY RECORD.  OTHERWISE I HAVE A PERFECT RECORD, SO....

14             **THE COURT:**  IS THAT WITH THE CREDIT AGENCIES THAT YOU

15   COULDN'T GET IT CLEARED AS OPPOSED TO THE DEBT COLLECTORS --

16             **PROSPECTIVE JUROR:**  IT WAS -- WELL, IT WAS THE DEBT

17   COLLECTOR.

18             **THE COURT:**  OKAY.  WAS IT THIS PARTICULAR COMPANY,

19   RASH CURTIS?

20             **PROSPECTIVE JUROR:**  NO, IT WAS NOT.

21             **THE COURT:**  OKAY.  DO YOU THINK YOU CAN BE FAIR TO

22   THEM, GIVEN THAT IT IS NOT THE COMPANY THAT TREATED YOU NOT

23   IDEALLY?

24             **PROSPECTIVE JUROR:**  I DON'T GROUP THEM ALL TOGETHER.

25   I THINK EVERYBODY IS INDEPENDENT AND, YOU KNOW, EVERY

```
 1    SITUATION.

 2              THE COURT:  YOU WERE INVOLVED IN A LAWSUIT.  CAN YOU

 3    TELL ME A LITTLE BIT ABOUT THAT?

 4              PROSPECTIVE JUROR:  YEAH.  THAT WAS A REALLY LONG

 5    TIME AGO.  I JUST -- I WENT TO A RESTAURANT AND IMMEDIATELY

 6    CAME DOWN WITH SALMONELLA.  AND, AT THE TIME, I WAS REALLY

 7    YOUNG, JUST GRADUATED FROM COLLEGE, JUST STARTED A NEW JOB AND

 8    I COULDN'T WORK.  AND I WAS ALMOST AT THE POINT WHERE THEY

 9    WEREN'T GOING TO KEEP ME HIRED ON ANYMORE BECAUSE I HAD JUST

10    STARTED AND I THOUGHT I WAS GOING TO DIE.

11        AND SO I JUST SUED THEM TO COMPENSATE MY LOSS OF INCOME

12    BECAUSE I WASN'T GETTING PAID ANY SICK TIME AND THAT WAS IT.

13              THE COURT:  DID IT RESOLVE IN A WAY THAT WAS

14    SATISFACTORY?

15              PROSPECTIVE JUROR:  YEAH.  YES.

16              THE COURT:  THANK YOU.  ALL RIGHT.

17        SIR, IF YOU CAN TELL ME HOW TO PRONOUNCE YOUR NAME.

18              PROSPECTIVE JUROR:  CHRISTIAN HINDERLIE.  GOOD

19    MORNING.

20              THE COURT:  HINDERLIE.

21              PROSPECTIVE JUROR:  HINDERLIE.

22              THE COURT:  WHERE DID YOU GO TO HIGH SCHOOL?

23              PROSPECTIVE JUROR:  IRVINGTON HIGH SCHOOL IN FREMONT.

24              THE COURT:  SO YOU HAVE BEEN LOCAL HERE FOR A WHILE?

25              PROSPECTIVE JUROR:  CORRECT.
```

1      **THE COURT:**  CAN YOU TELL ME ABOUT THE LAWSUIT THAT

2   YOU WERE INVOLVED IN WITH RESPECT TO YOUR BACK INJURY?

3      **PROSPECTIVE JUROR:**  SURE.  I SUSTAINED A BACK INJURY

4   WHILE AT WORK.  WENT HOME, SAW THE DOCTOR, AND IT WAS

5   DETERMINED IT WAS PART OF, YOU KNOW, WORKERS COMPENSATION.

6   AND SO WHAT HAPPENED WAS I HAD MADE AN APPOINTMENT WITH THE

7   DOCTOR AND THE COMPANY THAT I WORKED FOR GOT INVOLVED AND

8   CANCELED THAT APPOINTMENT.  SO, BASICALLY, MY HANDS WERE TIED.

9   I WAS LAID UP COMPLETELY, BASICALLY CRIPPLED, COULDN'T WALK,

10  COULDN'T SIT, AND SO IT WAS SOMETHING, UNFORTUNATELY, I HAD TO

11  DO.

12     **THE COURT:**  SO -- IS IT -- IT IS STILL THE SAME

13  COMPANY YOU ARE WORKING FOR?

14     **PROSPECTIVE JUROR:**  THAT'S CORRECT.

15     **THE COURT:**  DID IT RESOLVE ITSELF?  HOW LONG AGO WAS

16  IT?

17     **PROSPECTIVE JUROR:**  YES.  THANKFULLY.  BODY IS

18  AMAZING, HEALS ITSELF, AND I WAS ABLE TO CONTINUE ON AND WORK

19  FOR THAT COMPANY.

20     **THE COURT:**  WHEN DID THIS HAPPEN?

21     **PROSPECTIVE JUROR:**  THAT WAS IN 2015.

22     **THE COURT:**  DID YOU ACTUALLY HAVE TO FILE SUIT?

23     **PROSPECTIVE JUROR:**  WE WERE ABLE TO, YOU KNOW, SETTLE

24  OUT OF COURT.

25     **THE COURT:**  OKAY.  OKAY.  DO YOU HAVE ANY CONCERNS

```
1    ABOUT SITTING ON THE JURY?

2            PROSPECTIVE JUROR:  NO CONCERNS.

3            THE COURT:  OKAY.  THANK YOU, MR. HINDERLIE.

4       OKAY.

5            PROSPECTIVE JUROR:  HUIZINGH.

6            THE COURT:  HUIZINGH.  GOOD MORNING, SIR.

7            PROSPECTIVE JUROR:  GOOD MORNING.

8            THE WITNESS:  SO, WHY DOES SOMEONE COME TO CALIFORNIA

9    FROM HAWAII?  HAWAII SEEMS PRETTY GOOD.

10           PROSPECTIVE JUROR:  I KEEP ASKING MYSELF THAT EVERY

11   DAY.

12           THE COURT:  SO YOU CAME TO CALIFORNIA ABOUT NINE

13   YEARS AGO?

14           PROSPECTIVE JUROR:  YEAH, THAT'S CORRECT.

15           THE COURT:  AND YOU'RE -- IN TERMS OF BEING AN

16   ACCOUNTANT, I GUESS WE ARE LUCKY BECAUSE IT IS PAST

17   APRIL 15TH.

18           PROSPECTIVE JUROR:  YES.  I HAD TO GET A POSTPONEMENT

19   FOR THIS ONE.

20           THE COURT:  ARE YOU IN YOUR OWN COMPANY?  I MEAN,

21   YOU'RE SELF-EMPLOYED?

22           PROSPECTIVE JUROR:  THAT IS CORRECT.

23           THE COURT:  LET'S SEE.  CAN YOU TELL ME ABOUT YOUR

24   EXPERIENCE WITH DEBT COLLECTORS?

25           PROSPECTIVE JUROR:  JUST MAINLY UNPAID BILLS, YEAH.
```

1   JUST RECENTLY HAD ONE, SO IT IS KIND OF FRESH FOR ME.

2          **THE COURT:**  ANY INTERACTION WITH THE DEFENDANT IN

3   THIS CASE?

4          **PROSPECTIVE JUROR:**  NOT -- I'M NOT SURE.  I DID WORK

5   WITH DEBT COLLECTORS ON IT BUT I CAN'T REMEMBER THE NAME OF

6   THEM.

7          **THE COURT:**  OKAY.  IN TERMS OF THAT INTERACTION WITH

8   THE DEBT COLLECTORS, IS THERE ANYTHING ABOUT THAT EXPERIENCE

9   THAT WOULD LEAD YOU TO NOT TREAT THE DEFENDANT HERE FAIRLY?

10         **PROSPECTIVE JUROR:**  I DON'T THINK SO.  THEY WERE

11  JUST -- I WASN'T A BIG FAN OF THE WHOLE PROCESS BUT I DON'T

12  THINK THAT WOULD AFFECT MY JUDGMENT HERE.

13         **THE COURT:**  DID THE PEOPLE WHO WERE CALLING YOU --

14  WELL, YOU ACKNOWLEDGED YOU HAD DEBT.  IT WASN'T -- THESE

15  WEREN'T PHONE CALLS THAT WERE JUST OUT OF THE BLUE, RANDOM

16  PHONE CALLS, I TAKE IT?

17         **PROSPECTIVE JUROR:**  THEY WERE RANDOM FOR ME, JUST

18  BECAUSE I DIDN'T GET THE BILL AND THEY SENT IT TO ME ABOUT A

19  YEAR LATER AND THEN I WAS ALREADY IN COLLECTIONS AT THAT TIME.

20         **THE COURT:**  I SEE.

21         **PROSPECTIVE JUROR:**  YEAH.

22         **THE COURT:**  AND WERE YOU ABLE TO RESOLVE IT?

23         **PROSPECTIVE JUROR:**  I RESOLVED IT WITH -- IT WAS WITH

24  A HOSPITAL, MEDICAL BILLS.  SO I JUST RESOLVED IT WITH THEM

25  BECAUSE I COULDN'T GET IT FIGURED OUT WITH THE DEBT

1  COLLECTORS.

2          **THE COURT:**  AND WHICH HOSPITAL WAS IT?

3          **PROSPECTIVE JUROR:**  SAINT JOSEPH.

4          **THE COURT:**  OKAY.  NOW, YOU SAY THAT YOU BELIEVE

5  THERE ARE TOO MANY LAWSUITS.  WHERE DOES THAT BELIEF COME

6  FROM?

7          **PROSPECTIVE JUROR:**  I JUST BELIEVE IN DOING THE RIGHT

8  THING.  IF YOU DO THE RIGHT THING, YOU PROBABLY WON'T SEE

9  THESE LAWSUITS.

10          **THE COURT:**  ANY CONCERNS ABOUT SERVING ON THE JURY?

11          **PROSPECTIVE JUROR:**  SOME OF THE NAMES BECAUSE I

12  PREPARE TAX RETURNS FOR A FIRM IN SAN RAFAEL.  SOME OF THE

13  NAMES LOOK FAMILIAR BUT I DON'T KNOW ANY OF THEM, I DON'T

14  BELIEVE.  BUT WE DEAL WITH A LOT OF INDIVIDUAL RETURNS SO SOME

15  OF THOSE LAST NAMES LOOK KIND OF FAMILIAR.

16          **THE COURT:**  PRIMARILY PEOPLE FROM SAN RAFAEL.

17          **PROSPECTIVE JUROR:**  NO.  THEY ARE MAINLY FROM THE

18  CITY, OAKLAND, SAN FRANCISCO.

19          **THE COURT:**  OKAY.  THANK YOU.

20      MS. JEW?  MUCH EASIER NAME THAN SOME OF THE NAMES.

21          **PROSPECTIVE JUROR:**  THAT'S TRUE.

22          **THE COURT:**  GOOD MORNING.

23          **PROSPECTIVE JUROR:**  GOOD MORNING.

24          **THE COURT:**  NOW, I SAW YOUR NOTE HERE ABOUT NEEDING

25  TO BE OUT OF TOWN ON THE 18TH.  WE WILL DEFINITELY BE DONE BY

1    THEN, SO THAT IS NOT A CONCERN.

2             **PROSPECTIVE JUROR:**  MY CONCERN WAS THE FRIDAY --

3             **THE COURT:**  WE SHOULD BE DONE.  WE SHOULD BE DONE.

4       OKAY.  YOU'VE NEVER SERVED ON A JURY, SO THIS IS YOUR

5    OPPORTUNITY.

6             **PROSPECTIVE JUROR:**  RIGHT.

7             **THE COURT:**  DO YOU HAVE ANY CONCERNS GIVEN THE TOPICS

8    WE HAVE BEEN TALKING ABOUT ABOUT SERVING ON THIS JURY?

9             **PROSPECTIVE JUROR:**  NO.

10            **THE COURT:**  NO?

11            **PROSPECTIVE JUROR:**  HUH-UH.

12            **THE COURT:**  ANYTHING TO -- ANYTHING THAT YOU THINK

13   THE PARTIES MIGHT WANT TO KNOW ABOUT YOU IN TERMS OF YOUR

14   ABILITY TO BE FAIR AND IMPARTIAL?

15            **PROSPECTIVE JUROR:**  WELL, I'VE HAD TO DELIBERATE SIX

16   CHILDREN THAT I RAISED.

17            **THE COURT:**  WELL, I TELL YOU, BEING A PARENT IS AN

18   IMPORTANT SKILL.  I TAKE IT -- YOU KNOW, BECAUSE PEOPLE ARE

19   GOING TO DISAGREE ABOUT FACTS.  AND I'M SURE -- HAVE YOU EVER

20   HAD A CIRCUMSTANCE WHERE YOU HAD ONE CHILD SAY ONE THING AND

21   THE OTHER CHILD SAY THE OTHER THING, RIGHT?

22      LIKE MOST OF US YOU HAVE TO WAIT TO GET ALL THE

23   INFORMATION BEFORE MAKING A DECISION.  DO YOU WORK WELL IN

24   GROUPS?

25            **PROSPECTIVE JUROR:**  YES, I BELIEVE SO.

1          **THE COURT:**  AND AS A REGISTERED NURSE, DID YOU HAVE

2     TO WORK IN TEAMS?

3          **PROSPECTIVE JUROR:**  LONG -- YES, WHEN I DID.

4          **THE COURT:**  OKAY.  ALL RIGHT.  TERRIFIC.  WE ARE

5     GOING TO PASS IT ALL THE WAY OVER HERE, BACK TO MR. NICHOLAS.

6        GOOD MORNING, SIR.

7          **PROSPECTIVE JUROR:**  GOOD MORNING.

8          **THE COURT:**  SO WHAT KIND OF ENGINEERING WORK DO YOU

9     DO FOR E & M?

10         **PROSPECTIVE JUROR:**  INDUSTRIAL AUTOMATION, TECH

11    SUPPORT.

12         **THE COURT:**  WHAT DOES THAT MEAN, INDUSTRIAL

13    AUTOMATION?

14         **PROSPECTIVE JUROR:**  ANYTHING THAT MOVES IN

15    MANUFACTURING OR WATER TREATMENT, FOOD PROCESSING.  IT'S ALL

16    CONTROLLED BY CONTROL SYSTEMS, AND WE SELL THE HARDWARE AND

17    SOFTWARE THAT RUNS THOSE.

18         **THE COURT:**  OKAY.  AND -- DO YOU HAVE ANY CONCERNS

19    ABOUT SERVING ON THE JURY?

20         **PROSPECTIVE JUROR:**  NO, I DON'T.

21         **THE COURT:**  IT LOOKS LIKE YOU MANAGE INDIVIDUALS?

22         **PROSPECTIVE JUROR:**  A FEW, YEAH.

23         **THE COURT:**  SO, AS AN ENGINEER, SOMETIMES ENGINEERS

24    ARE VERY ISOLATED IN THEIR WORK VERSUS WORKING IN GROUPS.  YOU

25    KNOW, KIND OF GOT BOTH TYPES.  WHAT TYPE ARE YOU?

1          **PROSPECTIVE JUROR:**  I CAN DO BOTH.  RIGHT NOW, ME AND

2     MY TEAM, WE WORK INDIVIDUALLY BUT WE'RE WORKING WITH CUSTOMERS

3     OR GROUPS OF CUSTOMERS ALL THE TIME.

4          **THE COURT:**  OKAY.  AND I TAKE IT YOU MUST BE PRETTY

5     DETAIL-ORIENTED IF YOU ARE AN ENGINEER?

6          **PROSPECTIVE JUROR:**  FAIRLY.

7          **THE COURT:**  I HAVE A SON WHO IS AN AERONAUTICAL

8     ENGINEER AND HE IS VERY DETAIL-ORIENTED.

9          **PROSPECTIVE JUROR:**  I HOPE SO.

10         **THE COURT:**  OKAY.  MR. NICHOLAS, ANY CONCERNS?

11         **PROSPECTIVE JUROR:**  NONE.

12         **THE COURT:**  ALL RIGHT.  THANK YOU.

13         **PROSPECTIVE JUROR:**  THANK YOU.

14         **THE COURT:**  MS. ONG, GOOD MORNING.

15         **PROSPECTIVE JUROR:**  GOOD MORNING.

16         **THE COURT:**  SO DID YOU TAKE CLASSES AT STANFORD OR

17    DID YOU GET A DEGREE FROM STANFORD?  WHERE DID THE STANFORD

18    LINGUISTICS PIECE, HOW DID THAT WORK?

19         **PROSPECTIVE JUROR:**  I GOT A DEGREE AT STANFORD IN

20    LINGUISTICS, A BACHELOR'S.

21         **THE COURT:**  OH, YOU DID GET A BACHELOR'S.  YOU DIDN'T

22    WRITE THAT DOWN.

23         **PROSPECTIVE JUROR:**  SORRY.

24         **THE COURT:**  THAT'S OKAY.  WHAT IS YOUR ROLE AS A

25    PROJECT MANAGER FOR THE TECHNOLOGY COMPANY HERE?

1      **PROSPECTIVE JUROR:**  MERCENARY TECHNOLOGY IS A SMALL

2  FIRM THAT SPECIALIZES IN ENGINEERING FOR VIDEO GAMES.  SO AS A

3  PROJECT MANAGER, I'M PRETTY MUCH IN CHARGE OF, YOU KNOW,

4  WHATEVER IT TAKES.  SO MANAGING QA TESTERS, SCHEDULING,

5  COMMUNICATING WITH THE CLIENTS, DOCUMENTATION.

6      **THE COURT:**  SO HOW DOES ONE GET FROM LINGUISTICS TO

7  VIDEO GAMES?  I MEAN, IT IS FASCINATING.  HOW DID YOU DO THAT?

8      **PROSPECTIVE JUROR:**  WELL, WHEN I GRADUATED IN

9  LINGUISTICS, THERE WERE ONLY THREE REAL AVENUES, OBVIOUSLY, AT

10  THE TIME.  THERE WAS LIKE THE CIA, THE FOREIGN SERVICE -- YOU

11  KNOW, THE STATE DEPARTMENT, AND LIKE A TRANSLATOR.  BUT I'VE

12  ALWAYS BEEN FASCINATED BY GAMES AND BY COMPUTERS, SO I MANAGED

13  TO LUCK INTO THE INDUSTRY, SO....

14      **THE COURT:**  THAT'S GREAT.  IT SOUNDS LIKE YOU HAD TO

15  GIVE A DEPOSITION IN A CIVIL CASE.  CAN YOU TELL ME ABOUT

16  THAT?

17      **PROSPECTIVE JUROR:**  IT WAS A SMALL STARTUP COMPANY

18  AND, ESSENTIALLY, WAS ABOUT CONTROL OF THE COMPANY.  THERE

19  WERE THREE CO-FOUNDERS AND, ESSENTIALLY, TWO OF THEM WERE

20  TRYING TO OUST THE THIRD.

21      **THE COURT:**  PATENT CASE, IP CASE?

22      **PROSPECTIVE JUROR:**  NO.  JUST, YOU KNOW, CONTRACTUAL.

23      **THE COURT:**  OKAY.  DID YOU EVER HAVE TO TESTIFY IN

24  COURT?

25      **PROSPECTIVE JUROR:**  NO.

1        **THE COURT:**  DID THEY VIDEOTAPE YOUR DEPOSITION?

2        **PROSPECTIVE JUROR:**  NO.

3        **THE COURT:**  DO YOU HAVE ANY CONCERNS ABOUT SERVING?

4        **PROSPECTIVE JUROR:**  NONE THAT I CAN THINK OF.

5        **THE COURT:**  ALL RIGHT.  THANK YOU, MS. ONG.

6    MS. RAFELLO?

7        **PROSPECTIVE JUROR:**  YES.

8        **THE COURT:**  GOOD MORNING.

9        **PROSPECTIVE JUROR:**  GOOD MORNING.

10        **THE COURT:**  WHAT KIND OF EVENT MANAGING DO YOU DO?

11        **PROSPECTIVE JUROR:**  I PLAN EVENTS FOR CORPORATIONS.

12        **THE COURT:**  CAN YOU GIVE ME A COUPLE OF EXAMPLES?

13        **PROSPECTIVE JUROR:**  I PLAN EVENTS FOR GOOGLE,

14    BUSINESS-RELATED EVENTS.

15        **THE COURT:**  SO YOU PLAN THE DINNER OR THE CONFERENCE?

16    WHAT IS IT YOU ARE PLANNING?

17        **PROSPECTIVE JUROR:**  ALL OF THE ABOVE.

18        **THE COURT:**  AND IT LOOKS LIKE YOU'VE BEEN DOING THIS

19    NOW AT A MINIMUM FOR FOUR YEARS OR SO?

20        **PROSPECTIVE JUROR:**  YES.

21        **THE COURT:**  OKAY.  DO YOU HAVE ANY CONCERNS ABOUT

22    SERVING ON THE JURY?

23        **PROSPECTIVE JUROR:**  JUST THAT I HAVE AN EVENT ON

24    MONDAY AFTERNOON BUT I THINK, IF WE'RE OUT BY 1:30, I CAN MAKE

25    IT.

1          **THE COURT:**  OKAY.

2       THIS COMING MONDAY?

3          **PROSPECTIVE JUROR:**  UH-HUH.

4          **THE COURT:**  THAT'S A YES?

5          **PROSPECTIVE JUROR:**  WHAT WAS THAT?

6          **THE COURT:**  IS THAT A YES?

7          **PROSPECTIVE JUROR:**  SORRY.  YES.  THIS COMING MONDAY

8    AND TUESDAY I HAVE AN EVENT -- TWO EVENTS IN THE AFTERNOON.

9          **THE COURT:**  WHAT TIME DO THEY START?

10          **PROSPECTIVE JUROR:**  THEY START AT FIVE BUT I SHOULD

11    BE THERE BY THREE FOR SETUP.

12          **THE COURT:**  OKAY.

13          **PROSPECTIVE JUROR:**  IN SAN FRANCISCO AS WELL.

14          **THE COURT:**  IN SAN FRANCISCO?

15          **PROSPECTIVE JUROR:**  YES.

16          **THE COURT:**  OKAY.  THAT'S HELPFUL TO KNOW.

17       GIVEN THE TOPICS WE'VE BEEN DISCUSSING, DO YOU THINK THE

18    PARTIES WOULD LIKE TO KNOW ANYTHING ABOUT YOU IN TERMS OF YOUR

19    ABILITY TO BE FAIR AND IMPARTIAL?

20          **PROSPECTIVE JUROR:**  NO.  I WOULD SAY I'M PRETTY EASY

21    GOING, UNBIASED OPINION HERE.

22          **THE COURT:**  IF YOU ARE DOING EVENTS, YOU MUST LIKE TO

23    WORK WITH PEOPLE?

24          **PROSPECTIVE JUROR:**  YES, LOVE WORKING WITH PEOPLE AND

25    GROUPS.

1      **THE COURT:**  GOOD.  ALL RIGHT.  THANK YOU.

2      **PROSPECTIVE JUROR:**  THANK YOU.

3      **THE COURT:**  MR. ROUSSEU?

4      **PROSPECTIVE JUROR:**  GOOD MORNING.

5      **THE COURT:**  GOOD MORNING.  DID I SAY THAT RIGHT?

6      **PROSPECTIVE JUROR:**  YEP.

7      **THE COURT:**  THANK YOU.

8      SO WHEN DID YOU GET YOUR BUSINESS DEGREE, SIR?

9      **PROSPECTIVE JUROR:**  THAT WAS WHILE WORKING, I'D SAY,

10     2002.

11     **THE COURT:**  AS A SALES ENGINEER, FOR DIGITAL REALTY,

12     WHAT DOES THAT MEAN?

13     **PROSPECTIVE JUROR:**  I SUPPORT OUR SALES ON MAKING

14     SURE IT'S A TECHNICALLY SOUND SOLUTION FOR OUR CUSTOMERS.

15     **THE COURT:**  CAN YOU GIVE ME AN EXAMPLE?

16     **PROSPECTIVE JUROR:**  DIGITAL REALTY IS A DATA CENTER

17     PROVIDER.  SO IN DATA CENTERS, YOU NEED TO PROPERLY ACCOUNT

18     FOR POWER COOLING AND SECURITY FOR -- TO MAKE THEIR

19     ENVIRONMENT SECURE.

20     **THE COURT:**  OKAY.  SO IT IS NOT A REAL ESTATE

21     COMPANY, IT IS A DATA COMPANY?

22     **PROSPECTIVE JUROR:**  IT'S A LITTLE BIT OF BOTH.

23     **THE COURT:**  IN WHAT WAY?

24     **PROSPECTIVE JUROR:**  THERE'S MASSIVE LAND ACQUISITIONS

25     TO BE HAD.  SO IT STARTS OFF AS DIRT AND, AT THE END RESULT,

1    YOU WILL HAVE AN OPERATING DATA CENTER.

2          **THE COURT:**  WHAT IS THE NATURE OF THE CLIENTELE?  CAN

3    YOU GENERALIZE SO WE HAVE A BETTER SENSE OF THAT?

4          **PROSPECTIVE JUROR:**  THINK OF YOUR TOP SOCIAL MEDIA

5    PROVIDERS, TOP SOFTWARE PROVIDERS.  SO FACEBOOK, GOOGLE,

6    TWITTER, MICROSOFT ORACLE, AND THE LIKE.

7          **THE COURT:**  AND YOU -- SO TAKE ANYONE OF THOSE, YOU

8    SUPPORT THEM AND GIVE -- YOU DO WHAT?

9          **PROSPECTIVE JUROR:**  SO WE HAVE TERRITORIES BROKEN UP

10    AND SO I SUPPORT THE WEST.  SO WE HAVE ACCOUNTS, BUILDINGS,

11    WHICH ARE TECHNICALLY DATA CENTERS AND SALES REPS THAT I AM

12    RESPONSIBLE FOR.

13          **THE COURT:**  WHAT KIND OF DATA ARE THEY MANAGING?  ALL

14    KINDS OF DATA OR IS THERE A PARTICULAR --

15          **PROSPECTIVE JUROR:**  MORE OR LESS, THEY MAY HAVE LIKE

16    A CERTAIN DATA CENTER REQUIREMENT.  IT IS IMPORTANT TO

17    UNDERSTAND WHAT THE REQUIREMENT IS AND BUILD TO THAT, FINDING

18    THE RIGHT LOCATION AND CONNECTIVITY AND POWER REQUIREMENTS.

19          **THE COURT:**  I SEE.  SO YOU ARE FINDING THEM DATA

20    CENTER PLACES?

21          **PROSPECTIVE JUROR:**  IN CERTAIN -- WITH CERTAIN

22    COMPANIES, THEY NEED LIKE A BIG LAND GRAB, OTHERS MAY HAVE A

23    SMALLER APPLICATION AND THROUGHOUT OUR PORTFOLIO WE TRY TO

24    FIND THE RIGHT FIT.

25          **THE COURT:**  I SEE.  OKAY.

```
 1        ANY CONCERNS ABOUT SERVING?

 2             PROSPECTIVE JUROR:  JUST THAT I'M A SINGLE FATHER AND

 3   THE SCHEDULING IN THE MORNING FROM SAN RAMON TO HERE IS

 4   CHALLENGING.

 5             THE COURT:  AND HOW DID YOU GET YOUR KIDS TO SCHOOL

 6   TODAY?

 7             PROSPECTIVE JUROR:  THIS WAS NOT A DAY THAT FELL ON

 8   MY DAY.  SO I'LL HAVE WEDNESDAY THROUGH FRIDAY -- OR ACTUALLY

 9   WEDNESDAY THROUGH SUNDAY, AND MONDAY MORNING IS MY DAYS.  SO

10   THIS IS THE ONE WEEKEND THAT IS NOT A WEEKEND, SO IT DOESN'T

11   FALL ON A MONDAY MORNING FOR ME.  IT IS EVERY OTHER MONDAY

12   MORNING.

13             THE COURT:  DO YOUR KIDS ACTUALLY WHY STAY WITH YOU?

14             PROSPECTIVE JUROR:  YES.

15             THE COURT:  SO YOUR EX-WIFE, I TAKE IT YOU GUYS MUST

16   LIVE RELATIVELY CLOSE IF THE KIDS ARE GOING TO THE SAME

17   SCHOOL?

18             PROSPECTIVE JUROR:  RIGHT.

19             THE COURT:  IS IT THEORETICALLY POSSIBLE THAT SHE CAN

20   HELP YOU GET THEM TO SCHOOL?

21             PROSPECTIVE JUROR:  I BELIEVE, CONSIDERING THE

22   TIMELINES YOU ARE TALKING ABOUT, YES.

23             THE COURT:  GREAT.  OKAY.  THANK YOU, SIR.

24        MS. VELEZ, GOOD MORNING.

25             PROSPECTIVE JUROR:  GOOD MORNING.
```

1          **THE COURT:**  SO YOU DO HAVE YOUR JD?

2          **PROSPECTIVE JUROR:**  I DO.

3          **THE COURT:**  HAVE YOU EVER WORKED AS A LAWYER?

4          **PROSPECTIVE JUROR:**  I DID NOT.  JUST SOME IN-HOUSE

5    STUFF FOR MY DAD'S COMPANY.

6          **THE COURT:**  AND WHAT WAS THAT?

7          **PROSPECTIVE JUROR:**  HE WAS DOING HAZARDOUS WASTE.

8          **THE COURT:**  OKAY.  YOU GOT THROUGH ALL THAT LAW

9    SCHOOL AND THEN DECIDED YOU DIDN'T WANT TO BE A LAWYER?

10          **PROSPECTIVE JUROR:**  EXACTLY.

11          **THE COURT:**  SO, NOW YOU ARE WORKING IN THE CHILDCARE

12    INDUSTRY, I GUESS; IS THAT RIGHT?

13          **PROSPECTIVE JUROR:**  I DO.  I WORK FOR A

14    INTERGENERATIONAL MONTESSORI PROGRAM.  I'M THE SITE DIRECTOR.

15          **THE COURT:**  OKAY.  AND IN TERMS OF NEEDING BREAKS,

16    DID YOU SEE THE TIMING THAT I PUT UP?  SO WE GO -- WE HAVE

17    15-MINUTE BREAKS AFTER AN HOUR AND A HALF.  DOES THAT WORK FOR

18    YOU?

19          **PROSPECTIVE JUROR:**  THAT'S FINE.

20          **THE COURT:**  THE CHILD CUSTODY CASE THAT YOU WERE --

21    WHERE YOU TESTIFIED, CAN YOU SHARE ANY OF THOSE DETAILS WITH

22    US?

23          **PROSPECTIVE JUROR:**  IT WAS A STUDENT AT OUR SCHOOL

24    AND DAD MISREPRESENTED SOMETHING THAT I HAD SAID, SO MOM

25    CALLED ME BACK AS A REBUTTAL WITNESS.

1          **THE COURT:**  THAT WAS OBVIOUSLY STATE COURT?

2          **PROSPECTIVE JUROR:**  YES.

3          **THE COURT:**  AND YOU'VE SERVED ON A JURY IN A CRIMINAL

4    CASE?

5          **PROSPECTIVE JUROR:**  YES.  IT WAS A CHILD MOLESTATION

6    CASE.

7          **THE COURT:**  IT SOUNDS LIKE YOU DIDN'T DELIBERATE.

8    YOU WERE AN ALTERNATE?

9          **PROSPECTIVE JUROR:**  I WAS AN ALTERNATE.

10         **THE COURT:**  DO YOU HAVE ANY CONCERNS ABOUT SERVING?

11         **PROSPECTIVE JUROR:**  NO.

12         **THE COURT:**  AND YOU ARE IN THE CAMP OF THERE ARE TOO

13   MANY LAWSUITS?

14         **PROSPECTIVE JUROR:**  I AM.

15         **THE COURT:**  DO YOU HOLD IT AGAINST THE PLAINTIFFS IN

16   THIS PARTICULAR CASE FOR HAVING BROUGHT A LAWSUIT?

17         **PROSPECTIVE JUROR:**  NO.

18         **THE COURT:**  YOU CAN BE FAIR TO THEM?

19         **PROSPECTIVE JUROR:**  I BELIEVE SO.

20         **THE COURT:**  OKAY.  THANK YOU.

21      MR. WHITE, GOOD MORNING.

22         **PROSPECTIVE JUROR:**  GOOD MORNING, YOUR HONOR.

23         **THE COURT:**  SEE, THERE IS AN AEROSPACE ENGINEER.  SO,

24   YOU ARE DETAIL-ORIENTED, AREN'T YOU?

25         **PROSPECTIVE JUROR:**  YES.

1           **THE COURT:**  AND WHAT DO YOU DO FOR INFINERA?

2           **PROSPECTIVE JUROR:**  INFINERA.

3           **THE COURT:**  INFINERA.

4           **PROSPECTIVE JUROR:**  ANOTHER MADE-UP WORD, OF COURSE.

5     YES.  I AM NOT IN THE BUSINESS OF AEROSPACE ENGINEERING ANY

6     LONGER.  WE ARE A TELECOMMUNICATIONS AND NETWORKING EQUIPMENT

7     MANUFACTURER.  AND MY SOMEWHAT CRYPTIC JOB TITLE THERE WOULD

8     BE BEST DESCRIBED AS SALES ENGINEER.

9           **THE COURT:**  WHAT DOES A SALES ENGINEER DO?

10          **PROSPECTIVE JUROR:**  MY JOB IS TO WORK WITH OUR

11    CUSTOMERS AND POTENTIAL CUSTOMERS TO DESIGN SYSTEMS TO MEET

12    THEIR REQUIREMENTS AND, HOPEFULLY, THAT THEY WOULD PURCHASE.

13          **THE COURT:**  OKAY.  SO THE -- GIVEN WHAT I'VE SAID

14    ABOUT SCHEDULING, I DON'T THINK WE HAVE AN ISSUE; IS THAT

15    RIGHT?

16          **PROSPECTIVE JUROR:**  YEAH.  YOU CAN IGNORE MY LENGTHY

17    WORDS THERE.

18          **THE COURT:**  THAT'S OKAY.  DO YOU HAVE ANY CONCERNS

19    ABOUT SERVING?

20          **PROSPECTIVE JUROR:**  NO, I DON'T.

21          **THE COURT:**  OKAY.  THANK YOU.  MR. WHITE.

22          **PROSPECTIVE JUROR:**  THANK YOU.

23          **THE COURT:**  MR. WILSON?  GOOD MORNING.

24          **PROSPECTIVE JUROR:**  GOOD MORNING.

25          **THE COURT:**  SEE YOU'RE THE TEXAN.

1          **PROSPECTIVE JUROR:**  I AM.

2          **THE COURT:**  WHERE DID YOU GROW UP?

3          **PROSPECTIVE JUROR:**  DALLAS, TEXAS.

4          **THE COURT:**  I GREW UP IN SAN ANTONIO.

5          **PROSPECTIVE JUROR:**  HOW NICE.

6          **THE COURT:**  CAN YOU TELL ME SOMETHING ABOUT YOUR JOB

7    AS A PRODUCT MANAGER?

8          **PROSPECTIVE JUROR:**  WELL, I MANAGE OUR PRODUCT.

9          **THE COURT:**  WHICH IS WHAT?

10         **PROSPECTIVE JUROR:**  IT'S -- WE DO A SPECIALTY BANKING

11   AND PAYMENT SERVICE THAT SERVICES THE DEBT SETTLEMENT

12   INDUSTRY.  AND WE ALSO -- WE'RE A BIT OF A CUSTODIAN FOR

13   CONSUMERS THAT ARE SAVING MONEY IN ORDER TO WORK OUT DEBT WITH

14   THEIR CREDITORS.

15         **THE COURT:**  IN TERMS OF THIS PARTICULAR AGENCY, HAVE

16   YOU EVER HAD ANY INTERACTIONS WITH THEM?

17         **PROSPECTIVE JUROR:**  WE WORK WITH SO MANY.  I DIDN'T

18   IDENTIFY THE NAME WHEN I SAW THE CASE.

19         **THE COURT:**  OKAY.  DO YOU HAVE ANY -- OR HAVE YOU HAD

20   ANY OCCASION TO UNDERSTAND THE TECHNOLOGY THAT IS USED

21   SOMETIMES, THE TELEPHONE PHONE SYSTEMS, DO YOU HAVE ANY KIND

22   OF SPECIAL UNDERSTANDING OR BACKGROUND IN THAT AREA?

23         **PROSPECTIVE JUROR:**  I WOULDN'T SAY SPECIAL.  I HAVE A

24   GENERAL UNDERSTANDING OF HOW THOSE SYSTEMS WORK.

25         **THE COURT:**  WHAT IS YOUR UNDERSTANDING?

1        **PROSPECTIVE JUROR:**  THEY USE -- THEY SOMEWHAT NEED TO

2   IDENTIFY OR TRY TO FIGURE OUT WHERE THE DEBTOR -- OR HOW TO

3   CONTACT THE DEBTOR.  THE SYSTEMS THAT THEY USE TYPICALLY PULL

4   OR GATHER INFORMATION FROM VARIOUS SOURCES IN ORDER TO FIGURE

5   OUT, OKAY, WHAT IS THE PERSON'S CURRENT TELEPHONE NUMBER,

6   ADDRESS.  AND I KNOW IT'S A BIG INDUSTRY, SO THERE ARE SEVERAL

7   VENDORS OF VARYING QUALITY THAT PROVIDE THAT SOFTWARE TO DEBT

8   BUYERS, COLLECTION AGENCIES.

9        **THE COURT:**  HAVE YOU EVER HEARD OF THE TERM OF

10  SKIP-TRACING?

11       **PROSPECTIVE JUROR:**  YES.

12       **THE COURT:**  WHAT IS YOUR UNDERSTANDING OF THAT TERM?

13       **PROSPECTIVE JUROR:**  IT HELPS PEOPLE -- WHEN YOU SAY

14  DEBT COLLECTORS, IT IS A BIGGER INDUSTRY.  SO THERE ARE DEBT

15  BUYERS AND WITH ORIGINAL ISSUERS.  I THINK IT'S TYPICALLY DEBT

16  COLLECTION AGENCIES THAT USE THAT SOFTWARE.  THERE IS NO

17  NEGATIVE.  IT SEEMS LIKE USE OF THAT SOFTWARE HAS A NEGATIVE

18  CONNOTATION FROM WHAT I'M HEARING.  I'VE NEVER HEARD A

19  NEGATIVE CONNOTATION AROUND IT.

20       **THE COURT:**  ALL I'M TRYING TO UNDERSTAND IS WHETHER

21  OR NOT, GIVEN YOUR JOB, WHETHER YOU HAVE ANY PARTICULAR

22  UNDERSTANDING OF THESE TERMS SO THAT THE PARTIES KNOW THAT A

23  POTENTIAL JUROR HAS AN UNDERSTANDING.

24       **PROSPECTIVE JUROR:**  GENERAL UNDERSTANDING.

25       **THE COURT:**  OKAY.  NOW, YOU'VE BEEN IN A JURY IN A

```
1    CRIMINAL CASE IN FEDERAL COURT.  REALLY?

2            PROSPECTIVE JUROR:  ACTUALLY, IT WAS SAN MATEO COUNTY

3    COURT.  I APOLOGIZE.

4            THE COURT:  OKAY.  SO STATE COURT.

5            PROSPECTIVE JUROR:  STATE COURT.

6            THE COURT:  I WAS SURPRISED BECAUSE, YOU KNOW, WE

7    HAVE SO FEW TRIALS RELATIVE TO THE COUNTIES, IT IS ALWAYS

8    INTERESTING IF I SEE SOMEONE WHO HAS BEEN IN FEDERAL COURT.

9            PROSPECTIVE JUROR:  I CHECKED THE WRONG BOX.  I

10   APOLOGIZE.

11           THE COURT:  THAT'S OKAY.  WAS THERE A VERDICT IN THAT

12   CASE?

13           PROSPECTIVE JUROR:  THERE WAS NOT.

14           THE COURT:  THE JURY HUNG?

15           PROSPECTIVE JUROR:  THE JURY HUNG.

16           THE COURT:  WHAT KIND OF A CASE WAS IT?

17           PROSPECTIVE JUROR:  IT WAS ASSAULT WITH A DEADLY

18   WEAPON INVOLVING A MINOR.

19           THE COURT:  WERE YOU THE FOREPERSON?

20           PROSPECTIVE JUROR:  I WAS NOT.

21           THE COURT:  AND WHAT WAS THE DEADLY WEAPON?

22           PROSPECTIVE JUROR:  HARD TO DESCRIBE BUT CHAIN-LINK

23   FENCES.  IN ORDER FOR WIND TO NOT DISTURB THE LAWN BEYOND IT,

24   THERE'S THESE VERY THIN WOODEN SLATS THAT KEEP LEAVES FROM

25   BLOWING THROUGH.  I THINK IT'S BALSA WOOD.  THAT WAS THE
```

1   DEADLY WEAPON.

2           **THE COURT:**  OKAY.  ANY CONCERNS ABOUT SERVING OR

3   BEING FAIR AND IMPARTIAL TO BOTH SIDES?

4           **PROSPECTIVE JUROR:**  I'M A BIT SYMPATHETIC TO THE DEBT

5   COLLECTION INDUSTRY, IN THE INTEREST OF FULL DISCLOSURE.

6           **THE COURT:**  NOW, THIS IS REALLY A CASE ABOUT

7   TELEPHONE CALLS AND WHETHER TELEPHONE CALLS WERE MADE WITH

8   CONSENT.  IS THE PLAINTIFF AT A DISADVANTAGE WITH YOU, GIVEN

9   THE NATURE OF THEIR CASE?

10          **PROSPECTIVE JUROR:**  I WOULD HAVE TO SAY NO, THEY ARE

11  NOT AT A DISADVANTAGE.

12          **THE COURT:**  ALL RIGHT.  GOOD ENOUGH, MR. WILSON.

13  THANK YOU.

14          **PROSPECTIVE JUROR:**  THANK YOU.

15          **THE COURT:**  GOOD MORNING, MS. WOO.

16          **PROSPECTIVE JUROR:**  GOOD MORNING.

17          **THE COURT:**  MS. WOO, DO YOU LIVE IN OAKLAND OR

18  ORINDA?

19          **PROSPECTIVE JUROR:**  I LIVE IN OAKLAND.

20          **THE COURT:**  OAKLAND.  OKAY.  I COULDN'T QUITE TELL.

21      AND IN TERMS OF YOUR JOB, IS IT -- ARE YOU PROVIDING

22  DIRECT SERVICES OR ARE YOU MORE OF A MANAGER AT THIS POINT?

23          **PROSPECTIVE JUROR:**  I'M A MANAGER OF PEOPLE WHO

24  PROVIDE DIRECT SERVICES.

25          **THE COURT:**  OKAY.  HOW LONG HAVE YOU BEEN IN THE

1   MANAGERIAL POSITION?

2   **PROSPECTIVE JUROR:** THE CURRENT ONE, FOUR YEARS BUT

3   PRIOR TO THAT I HAVE BEEN A MANAGER FOR THE STATE 16 YEARS.

4   **THE COURT:** OKAY. AND YOUR TEAMS HAVE RANGED UP TO A

5   HUNDRED?

6   **PROSPECTIVE JUROR:** UH-HUH.

7   **THE COURT:** THAT IS A YES?

8   **PROSPECTIVE JUROR:** YES.

9   **THE COURT:** CAN YOU TELL US ABOUT YOUR EXPERIENCE OR

10  WHAT YOU KNOW ABOUT YOUR BROTHER'S EXPERIENCE WITH THE DEBT

11  COLLECTOR AND HOW THAT MIGHT IMPACT YOUR ABILITY TO SERVE?

12  **PROSPECTIVE JUROR:** MY BROTHER HAS A BRAIN INJURY AND

13  WAS HAVING PROBLEMS MANAGING HIS FINANCES, SO MY FATHER AND I

14  WERE ASSISTING HIM. AND I DON'T THINK HE FULLY UNDERSTOOD

15  WHAT HE WAS -- HE HAS ALWAYS HAD A HISTORY SINCE HIS HEAD

16  INJURY WITH MONEY MANAGEMENT. I STILL TO THIS DAY HELP HIM

17  WITH THAT. HE HAD TO FILE BANKRUPTCY BECAUSE HE WASN'T ABLE

18  TO KEEP UP WITH HIS CREDIT CARD PAYMENTS.

19  **THE COURT:** DID YOU EVER ENACT -- ENGAGE YOURSELF ON

20  HIS BEHALF WITH THE -- WITH ANY DEBT COLLECTORS?

21  **PROSPECTIVE JUROR:** NOT WITH THE DEBT COLLECTORS, NO.

22  **THE COURT:** DO YOU HARBOR ANY ILL FEELINGS AGAINST

23  THE DEFENDANT, GIVEN -- YOU KNOW, THAT PARTICULAR EVENT?

24  **PROSPECTIVE JUROR:** WELL, I THINK -- YOU KNOW, PEOPLE

25  DIDN'T UNDERSTAND -- I DON'T KNOW IF YOU KNOW MUCH ABOUT

1    PEOPLE WITH HEAD INJURIES, BUT A LOT OF TIMES THEY DON'T KNOW

2    WHO TO ADVOCATE FOR THEMSELVES.  THEY THINK THEY ARE OKAY,

3    THEY TRY TO PASS AS THEY'RE OKAY, BUT HE REALLY DIDN'T KNOW

4    HOW TO ADVOCATE FOR HIMSELF AND DIDN'T KNOW ASK FOR HELP IN

5    THIS SITUATION.  SO THEY DIDN'T UNDERSTAND THE IMPACT OF HIS

6    COGNITIVE POSSIBILITIES.

7         **THE COURT:**  YOU DIDN'T CIRCLE THAT YOU KNEW THE

8    DEFENDANT HERE.  CAN YOU BE FAIR TO THE DEFENDANT, DO YOU

9    THINK, IN THIS CASE?

10        **PROSPECTIVE JUROR:**  SO IN MY JOB I WORK WITH PEOPLE

11   WITH DISABILITIES WHO ARE UNEMPLOYED AND UNDEREMPLOYMENT

12   EMPLOYED.  SO WE OFTEN HAVE TO ADVOCATE FOR THEM BECAUSE THEY

13   AREN'T ABLE TO PAY THEIR BILLS A LOT.  SO, YOU KNOW, I'VE

14   SPENT MY WHOLE CAREER BEING AN ADVOCATE, SO....

15        **THE COURT:**  SO MY QUESTION IS --

16        **PROSPECTIVE JUROR:**  I'M NOT SURE TO ANSWER YOUR

17   QUESTION.

18        **THE COURT:**  ALL RIGHT.  AND YOUR COMMENTS ABOUT THE

19   LEGAL SYSTEM FOCUSED ON THE CRIMINAL SIDE.  ANY PARTICULAR

20   COMMENTS ABOUT THE CIVIL SIDE OF THE LEGAL SYSTEM THAT YOU

21   WOULD LIKE TO SHARE?  OR THAT YOU CAN --

22        **PROSPECTIVE JUROR:**  I DON'T HAVE REALLY ANY

23   EXPERIENCE WITH THAT.

24        **THE COURT:**  OKAY.  THANK YOU.

25     IS IT XU OR HOW DO I PRONOUNCE IT?

| | |
|---|---|
| 1 | **PROSPECTIVE JUROR:**  MY LAST NAME? |
| 2 | **THE COURT:**  YES. |
| 3 | **PROSPECTIVE JUROR:**  XU. |
| 4 | **THE COURT:**  GOOD MORNING. |
| 5 | **PROSPECTIVE JUROR:**  GOOD MORNING. |
| 6 | **THE COURT:**  YOU'RE AN ACCOUNTANT FOR WELLS FARGO. |
| 7 | WHERE DO YOU COMMUTE FOR PURPOSES OF WORKING WITH WELLS FARGO? |
| 8 | **PROSPECTIVE JUROR:**  I WORK IN THE CITY IN SAN |
| 9 | FRANCISCO. |
| 10 | **THE COURT:**  OKAY.  AND DO YOU JUST WORK GENERALLY AS |
| 11 | AN ACCOUNTANT OR IS THERE A PARTICULAR DEPARTMENT? |
| 12 | **PROSPECTIVE JUROR:**  I WORK FOR THE WHOLESALES, MAINLY |
| 13 | SUPPORT LIKE COMMERCIAL LOANS, BUSINESS LOANS. |
| 14 | **THE COURT:**  OKAY.  SO COMMERCIAL LOANS.  AND YOU'VE |
| 15 | BEEN ON A JURY BEFORE? |
| 16 | **PROSPECTIVE JUROR:**  UH-HUH, YES. |
| 17 | **THE COURT:**  WHICH COUNTY WAS THAT? |
| 18 | **PROSPECTIVE JUROR:**  ALAMEDA COUNTY. |
| 19 | **THE COURT:**  ALAMEDA? |
| 20 | **PROSPECTIVE JUROR:**  YES. |
| 21 | **THE COURT:**  WHAT WAS THE NATURE OF THE CASE? |
| 22 | **PROSPECTIVE JUROR:**  IT WAS A CRIMINAL CASE.  SEXUAL |
| 23 | ASSAULT. |
| 24 | **THE COURT:**  OKAY.  WAS THERE A VERDICT? |
| 25 | **PROSPECTIVE JUROR:**  YES. |

1          **THE COURT:**  WHAT WAS THE VERDICT?

2          **PROSPECTIVE JUROR:**  VERDICT WAS GUILTY.

3          **THE COURT:**  WERE YOU THE FOREPERSON?

4          **PROSPECTIVE JUROR:**  NO.

5          **THE COURT:**  AND WHEN DID YOU COME TO THE UNITED

6    STATES FROM CHINA?

7          **PROSPECTIVE JUROR:**  IN 2002.

8          **THE COURT:**  2002.  NOW, YOU DIDN'T ANSWER THE

9    QUESTION ABOUT WHETHER YOU HAVE ANYONE WHO HAS WORKED IN

10   COLLECTIONS OR HAD TO COLLECT DEBT AGAINST A THIRD PARTY.

11   WOULD THE ANSWER TO THAT QUESTION BE YES OR NO?

12         **PROSPECTIVE JUROR:**  NO.

13         **THE COURT:**  AND THEN IN TERMS OF TIMING, AGAIN, IT

14   LOOKS LIKE YOUR CONFLICTS ARE IN THE END OF MAY, JUNE.  SO IS

15   THERE ANY CONCERN WITHIN THE NEXT WEEK AND A HALF?

16         **PROSPECTIVE JUROR:**  LIKE, BECAUSE I'M UNDER SOME

17   MEDICAL TREATMENT, THE TREATMENT GOES NEXT THREE MONTHS FROM

18   END OF APRIL TO -- ALL THE WAY TO JULY.

19         **THE COURT:**  WHEN IS YOUR NEXT APPOINTMENT?

20         **PROSPECTIVE JUROR:**  NEXT WEEK.

21         **THE COURT:**  WHEN?

22         **PROSPECTIVE JUROR:**  I THINK WEDNESDAY.

23         **THE COURT:**  AT WHAT TIME?

24         **PROSPECTIVE JUROR:**  10:30.

25         **THE COURT:**  OKAY.  GREAT.  THANK YOU.

1          OKAY.  LADIES AND GENTLEMEN, I'M GOING TO AT THIS POINT

2     ALLOW THE ATTORNEYS TO ASK YOU QUESTIONS.  I WANT TO LET YOU

3     KNOW IN ADVANCE THAT THEY ARE ON TIME LIMITS.  I GIVE THEM

4     TIME LIMITS.  AND BECAUSE OF THAT, IT IS PROBABLY LIKELY THAT

5     ALL OF YOU WON'T GET ASKED QUESTIONS.  THEY ARE REALLY GOING

6     TO FOCUS IN ON PEOPLE WHO THEY WANT TO HEAR FROM.  SO, I WOULD

7     ASK YOU PLEASE NOT TO HOLD THAT AGAINST THEM.  THEY WOULD

8     REALLY LOVE TO KNOW LOTS ABOUT YOU.  IF I GAVE THEM THE TIME,

9     THEY WOULD TAKE IT.  THEY DON'T HAVE IT, SO YOU CAN HOLD IT

10    AGAINST ME IF YOU HAVE TO HOLD IT AGAINST SOMEONE.

11         BUT I WILL ALLOW THEM SOME TIME TO ASK YOU QUESTIONS AND

12    WE WILL BEGIN WITH YOU, MR. BURSOR.

13              **MR. BURSOR:**  THANK YOU, YOUR HONOR.

14              **THE COURT:**  YOU'RE WELCOME.

15              **MR. BURSOR:**  MAY I START WITH MR. WILSON?  CAN WE

16    PASS --

17              **THE COURT:**  PASS HIM THE MIC, PLEASE.

18              **MR. BURSOR:**  MR. WILSON, I'M SCOTT BURSOR.  I

19    INTRODUCED MYSELF A FEW MOMENTS AGO.  I JUST WANT TO ASK YOU

20    ABOUT THE SOFTWARE THAT YOU SELL.  IT IS SOFTWARE, RIGHT, THAT

21    YOU SELL?

22              **PROSPECTIVE JUROR:**  WELL, IT IS -- WE DON'T SELL

23    SOFTWARE PER SE.  IT'S A TECHNICAL SOLUTION FOR SPECIALTY

24    BANKING.  IN OTHER WORDS, EVERYTHING IS RUN THROUGH SOFTWARE

25    BUT WE ACTUALLY PROVIDE A SERVICE TO THE DEBT SETTLEMENT

1    INDUSTRY.  SO THE DEBT SETTLEMENT INDUSTRY, THERE ARE

2    SPECIALTY CONSULTING FIRMS THAT DEAL WITH CONSUMERS IN BAD

3    DEBT SITUATIONS AND LAW FIRMS.  WE ACTUALLY HELP SET UP THE

4    BANKING ACCOUNTS THAT CAN BE ADMINISTRATED BY LAWYERS OR BY

5    THOSE DEBT SETTLEMENT CONSULTANTS AND THEN ALSO MAKE

6    DISTRIBUTIONS TO ORIGINAL ISSUERS, DEBT BUYERS AND DEBT

7    COLLECTION AGENCIES ONCE A SETTLEMENT HAS BEEN REACHED.

8            **MR. BURSOR:**  SO, WOULD A DEBT COLLECTION INDUSTRY --

9    SORRY -- A DEBT COLLECTION COMPANY, WOULD THEY BE A POTENTIAL

10   CUSTOMER FOR YOUR SOLUTION?

11           **PROSPECTIVE JUROR:**  WE WOULDN'T HAVE A BILLING

12   RELATIONSHIP WITH A COLLECTION AGENCY.  WE DO HAVE SITUATIONS

13   WHERE WE HAVE TO INTEGRATE OUR PAYMENT SOLUTION INTO THEIR

14   ACCOUNTING SYSTEM AND, PRIMARILY, THAT IS BECAUSE EACH

15   SETTLEMENT THAT IS REACHED, IT NEEDS TO BE ACCOUNTED FOR AND

16   RECONCILED ON THE OTHER SIDE, SO THE SITUATION GETS RESOLVED.

17           **MR. BURSOR:**  SO YOU SAY YOUR SOLUTION IS NOT

18   SOFTWARE, IT IS SOFTWARE BASED?  YOU HAVE TO INTEGRATE THE

19   SOFTWARE WITH THE DEBT COLLECTION AGENCY SOFTWARE?

20           **PROSPECTIVE JUROR:**  WELL, IT IS MORE ON THE LAW FIRM

21   SIDES AND THE CRM'S ON THE CONSULTANT SIDES.  THERE ARE TOUCH

22   POINTS WITH COLLECTION AGENCIES' ACCOUNTING SOFTWARE.  SO

23   THERE ARE INTEGRATION POINTS WITH VARIOUS PARTIES THROUGHOUT

24   THE ECOSYSTEM.

25           **MR. BURSOR:**  YOUR ROLE AS THE PRODUCT MANAGER, WOULD

```
1     YOU INTERACT WITH THE FOLKS AT THE DEBT COLLECTION AGENCY?

2              PROSPECTIVE JUROR:  YES.

3              THE COURT:  ON A DAY-TO-DAY BASIS?

4              PROSPECTIVE JUROR:  FOR THE LARGER COLLECTION

5     AGENCIES, NOT DAY-TO-DAY.  SO MY OTHER MANAGERS SORT OF -- WE

6     HAVE AS RELATIONSHIP MANAGEMENT TEAM THAT DOES THE DAY-TO-DAY

7     BUT IF FEATURES ARE REQUESTED, IT BUBBLES UP TO ME AND

8     SOMETIMES I GET ON THE PHONE TO CLARIFY WHAT THE PURPOSE IS.

9              MR. BURSOR:  SO DO YOU VIEW THE DEBT COLLECTION

10    AGENCIES THAT YOU WORK WITH AS CLIENTS OF YOURS?

11             PROSPECTIVE JUROR:  AGAIN, WE DON'T HAVE A BILLING

12    RELATIONSHIP WITH THEM, SO I WOULDN'T CALL THEM CLIENTS.

13             MR. BURSOR:  BUT IF THEY HAVE AN ISSUE WITH YOUR

14    PRODUCT, THEY CALL YOU AND YOU HELP THEM TO WORK THROUGH THE

15    USE OF YOUR PRODUCT.

16             PROSPECTIVE JUROR:  THAT'S CORRECT.

17             MR. BURSOR:  ALL RIGHT.  AND THANK YOU, MR. WILSON.

18      CAN I TALK TO MR. ROUSSEU?  GOOD MORNING, MR. ROUSSEU.

19             PROSPECTIVE JUROR:  GOOD MORNING.

20             MR. BURSOR:  YOU WORK WITH DATA.

21             PROSPECTIVE JUROR:  NOT EXACTLY, NO.

22             MR. BURSOR:  OKAY.  I TRIED TO MAKE NOTES WHEN

23    EVERYONE WAS TALKING AND IT IS REALLY TOUGH BECAUSE THERE IS

24    18 OF YOU, I THINK.  BUT YOU WORK AT A DIGITAL REALTY COMPANY

25    AND WHAT EXACTLY IS YOUR JOB?
```

1          **PROSPECTIVE JUROR:**  SO, I'M A SALES ENGINEER THERE

2     AND WE WORK TO ENSURE OUR CUSTOMERS HAVE THE RIGHT SOLUTION,

3     GIVEN THE DIFFERENT DATA CENTER PORTFOLIO THAT WE PROVIDE.

4     SO, WE ARE MORE INFRASTRUCTURE ONLY AND OUR CLIENTS THAT WE

5     SELL TO -- OUR CUSTOMERS, THEY MANAGE THEIR OWN DATA AND

6     APPLICATIONS AND THEIR DEPLOYMENTS FOR THEIR ENVIRONMENT

7     WITHIN OUR DATA CENTERS.

8               **MR. BURSOR:**  DO YOU SELL SOFTWARE?

9          **PROSPECTIVE JUROR:**  NOT AT ALL.

10              **MR. BURSOR:**  DO YOU MANAGE DATA?

11         **PROSPECTIVE JUROR:**  OUR CUSTOMERS MANAGE THEIR OWN

12    DATA.  WE MANAGE OUR DATA CENTER PORTFOLIO.

13              **MR. BURSOR:**  HAVE YOU EVER USED MICROSOFT EXCEL?

14         **PROSPECTIVE JUROR:**  SURE.

15              **MR. BURSOR:**  ANYBODY ON THE PANEL WHO HAS NEVER USED

16    MICROSOFT EXCEL?

17        (NO RESPONSE.)

18              **MR. BURSOR:**  OKAY.  HAVE YOU EVER USE A PROGRAM

19    CALLED STATA?

20         **PROSPECTIVE JUROR:**  NEVER HEARD OF IT.

21              **MR. BURSOR:**  DO YOU HAVE A CELLPHONE?

22         **PROSPECTIVE JUROR:**  YES.

23              **MR. BURSOR:**  ALL RIGHT.  IS THERE ANYONE ON THE PANEL

24    THAT DOES NOT HAVE A CELLPHONE?

25        (NO RESPONSE.)

1          **MR. BURSOR:**  ALL RIGHT.  MR. ROUSSEU, HAVE YOU EVER

2    RECEIVED A PHONE BILL?

3          **PROSPECTIVE JUROR:**  YES.

4          **MR. BURSOR:**  DO YOU REMEMBER WHEN PHONE BILLS USED TO

5    HAVE EACH PHONE CALL YOU MADE ON THE BILL?

6          **PROSPECTIVE JUROR:**  YES.

7          **MR. BURSOR:**  YOU'VE RECEIVED BILLS LIKE THAT?

8          **PROSPECTIVE JUROR:**  IT HAS BEEN QUITE SOME TIME

9    BECAUSE ALL I HAVE IS A CELLPHONE NOW.  BUT, YES.

10          **MR. BURSOR:**  YOU REMEMBER WHEN PHONE BILLS HAD EVERY

11    CALL ON THE BILL?

12          **PROSPECTIVE JUROR:**  YES.

13          **MR. BURSOR:**  AND IS THERE ANYONE ON THE PANEL THAT

14    THAT HAS NEVER SEEN A PHONE BILL LIKE THAT?

15                          (NO RESPONSE.)

16          **MR. BURSOR:**  PROBABLY BECAUSE YOU ARE TOO YOUNG.

17          **PROSPECTIVE JUROR:**  NO.  BECAUSE I JUST MOVED --

18          **MR. BURSOR:**  OKAY.

19      MR. WHITE?  HI.

20          **PROSPECTIVE JUROR:**  HI.

21          **MR. BURSOR:**  GOOD MORNING, MR. WHITE.  I'M SCOTT

22    BURSOR.

23      DO YOU MANAGE DATA IN YOUR JOB?

24          **PROSPECTIVE JUROR:**  IN MANY WAYS, I'M SIMILAR TO, I

25    THINK, MR. ROUSSEU, IS IT?

1          **PROSPECTIVE JUROR:**  YES.

2          **PROSPECTIVE JUROR:**  YES.  OUR COMPANY IS,

3    ESSENTIALLY, PROVIDING NETWORKING EQUIPMENT THAT OUR CUSTOMERS

4    CAN PASS THEIR DATA OVER.  SO, WE ARE -- IN PROBABLY MORE

5    SIMPLE TERMS, WE'RE SORT OF PROVIDING THE EQUIPMENT THEY NEED

6    TO BUILD THE BIG FAT PIPES AND THEN THEY PUMP WHATEVER THEIR

7    OWN DATA IS ACROSS THOSE.  SO WE ARE GIVING THEM THE HARDWARE

8    TO DO THAT AND SOFTWARE THAT ALLOWS THEM TO PROVISION AND

9    CONFIGURE THAT NETWORK, BUT I'M NOT ENCOUNTERING THEIR DATA.

10   IT'S KIND OF AGNOSTIC TO US WHAT THEY ARE PUTTING ACROSS THOSE

11   LINES.

12         **MR. BURSOR:**  HAVE YOU EVER MANAGED A LARGE DATABASE

13   OR USED A LARGE DATABASE IN YOUR JOB?

14         **PROSPECTIVE JUROR:**  NOTHING -- I MEAN, MICROSOFT

15   ACCESS, SMALL DATABASE, BUT NOTHING OF MAJOR SIGNIFICANCE, I

16   GUESS.

17         **MR. BURSOR:**  OKAY.  SO YOU'VE USED MICROSOFT ACCESS

18   DATABASE SOFTWARE?

19         **PROSPECTIVE JUROR:**  QUITE SOME TIME AGO.

20         **MR. BURSOR:**  OKAY.  YOU'VE ALSO WORKED WITH EXCEL?

21         **PROSPECTIVE JUROR:**  YES.

22         **MR. BURSOR:**  ALL RIGHT.  YOU'VE SEEN PHONE BILLS THAT

23   HAVE THE PHONE CALLS BROKEN OUT --

24         **PROSPECTIVE JUROR:**  JUST TO CLARIFY.  WHEN YOU SAY

25   PHONE BILLS, YOU'RE TALKING A LANDLINE, NOT A MOBILE PHONE?

```
1            MR. BURSOR:  EITHER WAY.

2            PROSPECTIVE JUROR:  OKAY.  SO, YEAH, I THINK EVEN

3    TODAY MY MOBILE PHONE BILL BREAKS IT OUT THAT WAY.

4            MR. BURSOR:  OKAY.

5       YOUR HONOR, MAY I JUST HAVE A MOMENT?

6            THE COURT:  YOU MAY.

7                 (PAUSE IN THE PROCEEDINGS.)

8            MR. BURSOR:  YOUR HONOR, THAT IS ALL I HAVE RIGHT

9    NOW.

10           THE COURT:  THANK YOU.

11      MR. ELLIS?

12           MR. ELLIS:  THANK YOU, YOUR HONOR.

13      HI.

14           PROSPECTIVE JURORS:  HELLO.

15           MR. ELLIS:  SO, WHEN THE MICROPHONE GETS PASSED

16   AROUND, TYPICALLY, IF IT GOES UP AND DOWN THE ROWS, AS THE

17   MICROPHONE GETS CLOSE TO SOMEBODY, YOU CAN SEE THE PANIC ON

18   THE FACES OF THE NEXT PERSON UP.

19      MS. COOPER, PROBABLY NOT SURPRISING, YOU KNOW, I'M GOING

20   TO ASK YOU A COUPLE OF QUESTIONS.

21      SO, WRITING THAT BOOK, HOW MANY -- THIS IS NOT REALLY A

22   STRICT QUESTION.  HOW MANY PAGES IS THAT?

23           PROSPECTIVE JUROR:  I KNOW.  IT IS HAS LIKE SEVEN

24   CHAPTERS OR SOMETHING LIKE THAT.

25           MR. ELLIS:  IS THAT LIKE AVAILABLE ON AMAZON --
```

1          **PROSPECTIVE JUROR:**  YES.

2          **MR. ELLIS:**  -- OR GOOGLE?

3          **PROSPECTIVE JUROR:**  YEAH.

4          **MR. ELLIS:**  YOU KNOW, THE THING ABOUT VOIR DIRE IS

5     THAT YOU HAVE TWO PARTIES IN THE COURTROOM.  YOU'VE GOT THIS

6     TABLE THAT'S GOT A PARTY AND THAT TABLE THAT'S GOT A PARTY,

7     AND WHAT WE ARE TRYING TO FIGURE OUT, AND WHAT THE COURT IS

8     TRYING TO FIGURE OUT IS WHETHER OR NOT YOU'RE THE RIGHT JUROR

9     FOR THIS CASE.  OKAY?  AND WHAT DOES THAT MEAN?  WELL, IT

10    MEANS THAT YOU'RE FAIR TO BOTH SIDES; THAT IS, STARTING OFF

11    WE'RE EVEN-STEVEN.

12         SO, I'M GOING TO COME BACK TO YOU IN A SECOND.  BUT THE

13    QUESTION IS THIS:  YOU KNOW, THERE IS PROBABLY THE SCALES OF

14    JUSTICE SOMEPLACE IN THIS COURTROOM.  AND AT THE BEGINNING OF

15    A TRIAL, WE ATTORNEYS TRY TO FIGURE OUT, OKAY, WHEN WE START

16    OFF IN THIS CASE, ARE THE SCALES EVEN?  RIGHT?

17         THEY ARE NOT TILTED A LITTLE ONE WAY OR THE OTHER.  AND BY

18    THE WAY, IF IT SOUNDS LIKE I AM MUMBLING, I HAD DENTAL SURGERY

19    A COUPLE WEEKS AGO AND IT IS STILL NOT QUITE RIGHT.  IT SOUNDS

20    REALLY FUNNY TO ME.  SO, THAT'S WHAT WE ARE TRYING TO FIGURE

21    OUT.  EVERYONE -- ARE WE STARTING OFF EVEN?  OR BECAUSE OF

22    YOUR LIFE EXPERIENCES, YOU KNOW, THERE'S WHAT WE CALL BIAS.  I

23    DON'T MEAN BIAS IN A BAD WAY, BUT BIAS IN THE SENSE THAT,

24    BASED ON YOUR LIFE EXPERIENCES, MY CLIENT WHICH HAS THE OPEN

25    QUOTE, DEBT COLLECTOR, CLOSE QUOTE NAME.  FOR SOME PEOPLE THAT

1    JUST CREATES ALL SORTS OF ISSUES.

2         SO NOW LET ME GET BACK TO YOU AND ASK MY QUESTION:

3    HONESTLY, CAN YOU BE FAIR TO MY CLIENT?  ARE THEY STARTING OFF

4    EVEN-STEVEN OR ARE THE SCALES OF JUSTICE EQUALLY BALANCED?

5    BECAUSE YOU HAVEN'T HEARD ANY EVIDENCE YET, HAVE YOU?

6              **PROSPECTIVE JUROR:**  NO.

7              **MR. ELLIS:**  NONE.  SO, HERE'S THE QUESTION:  CAN YOU

8    BE FAIR?

9              **PROSPECTIVE JUROR:**  I ALSO HAPPEN TO BE AN EXPERT ON

10   UNCONSCIOUS BIAS.  SO WHILE I BELIEVE THAT I CAN BE IMPARTIAL,

11   MY EXPERT OPINION LOOKING AT SOMEONE LIKE ME IS THAT I'M

12   COMING IN WITH A CERTAIN LENS ON THIS INDUSTRY THAT IS NOT --

13   NOT AS COMPLETELY IMPARTIAL AS SOMEONE ELSE WHO'S NEVER REALLY

14   THOUGHT ABOUT IT OR BEEN EXPOSED TO THOSE ISSUES.

15             **MR. ELLIS:**  RIGHT.  YOU DON'T KNOW IF RASH CURTIS WAS

16   THE PERSON THAT CALLED ANY OF THE SUBJECTS THAT YOU DEALT

17   WITH.

18             **PROSPECTIVE JUROR:**  NO.  I HAVE A GENERAL

19   UNDERSTANDING OF THE INDUSTRY --

20             **MR. ELLIS:**  RIGHT.

21             **PROSPECTIVE JUROR:**  -- AND THE REASONS BEHIND WHY THE

22   INDUSTRY HAS GROWN, WHICH IS A LARGER ECONOMIC EXPLANATION.

23   IN ANY CASE --

24             **MR. ELLIS:**  SO YOU THINK YOU ARE GOING TO BRING

25   THAT -- THAT LENS TO ALL THE EVIDENCE AND TO YOUR

```
1   DELIBERATIONS?

2           PROSPECTIVE JUROR:  IT WOULD -- BASED ON EVERYTHING I

3   KNOW ABOUT HOW PEOPLE PROCESS INFORMATION, THAT WOULD BE TRUE.

4           MR. ELLIS:  OKAY.  LOOK, I REALLY APPRECIATE -- I

5   MEAN, THIS WHOLE PROCESS, YOU KNOW, DEPENDS ON PEOPLE BEING

6   OPEN AND HONEST.  FROM A DEFENSE VIEWPOINT, AND THAT'S PRETTY

7   MUCH WHAT I DO, I DEFEND COLLECTION AGENCIES AND ATTORNEYS,

8   THE TWO THINGS THAT PEOPLE MAKE THE MOST JOKES ABOUT, RIGHT?

9   YOU KNOW, THE THING THAT WE DON'T WANT IS SOMEONE THAT IS ON

10  THE JURY THAT HAS AN AXE TO GRIND BUT DOESN'T TALK ABOUT IT.

11  RIGHT?  AND THEN, YOU KNOW, THEY ARE TRYING TO GET BACK AT

12  SOMEBODY OR SOME INDUSTRY OR SOME AGENCY BECAUSE OF THAT.

13      ALL RIGHT?  SO LET ME JUST -- YOU'VE BEEN VERY KIND TO LET

14  ME TALK WITH YOU ABOUT THIS.

15      LADIES AND GENTLEMEN, IS THERE ANYONE ELSE THAT CAN RAISE

16  THEIR HAND AND, AFTER LISTENING TO ME, SAY THAT THEY ARE GOING

17  TO HAVE A BIAS GOING INTO THE JURY ROOM?  ANYBODY ELSE?

18      (HANDS RAISED.)

19          MR. ELLIS:  YES, MA'AM.  AND I'M -- YOU KNOW WHAT?

20  LET ME GO BACK.  MS. WOO?

21          PROSPECTIVE JUROR:  UH-HUH.

22          MR. ELLIS:  START WITH YOU.  SO GO AHEAD.  LET ME

23  HAVE IT.

24          PROSPECTIVE JUROR:  WELL, I THINK SO MANY TIMES WE

25  KNOW NAMES AND THIS NAME DIDN'T PAY A BILL BUT YOU DON'T KNOW
```

1    THE CIRCUMSTANCES OF WHY THEY DIDN'T PAY THE BILL AND THE

2    PERSON OF WHO THEY ARE, THAT THEY WANTED TO PAY THE BILL BUT

3    THEY WEREN'T ABLE TO BECAUSE THEY WERE UNEMPLOYED OR ON SOCIAL

4    SECURITY BENEFITS.  I CAN GO ON WHY PEOPLE DON'T PAY BILLS.

5         **MR. ELLIS:**  NO.  I KNOW.  SO HOW DOES THAT AFFECT YOU

6    PERSONALLY IN TERMS OF SERVING ON THIS JURY?

7         **PROSPECTIVE JUROR:**  I JUST THINK OF A LOT OF

8    CIRCUMSTANCES WHERE PEOPLE HAVE NOT BEEN ABLE TO PAY BILLS AND

9    COLLECTION AGENCIES HAVE GONE AFTER THEM.

10        **MR. ELLIS:**  YEAH.  SO IS THAT GOING TO -- I HATE

11   LISTENING TO MY OWN VOICE RIGHT NOW.  I AM SORRY, LADIES AND

12   GENTLEMEN.  BUT IS THAT GOING TO AFFECT YOU AS YOU LISTEN TO

13   THE EVIDENCE, DO YOU THINK, OR WHEN YOU GO BACK INTO THE ROOM

14   AND -- THE JURY ROOM AND HAVE TO BE DELIBERATE?  I MEAN,

15   HONESTLY, YES OR NO.

16        **PROSPECTIVE JUROR:**  I MEAN, IT COULD.  I DON'T KNOW

17   ANY DETAILS OF THE CASE --

18        **MR. ELLIS:**  RIGHT.

19        **PROSPECTIVE JUROR:**  -- BUT IT COULD BE SIMILAR

20   SITUATIONS.  I DON'T KNOW ANY OF THE NAMES OR ANYTHING LIKE

21   THAT, BUT IT COULD BE SIMILAR SITUATIONS THAT I'VE ADVOCATED

22   FOR SOMEBODY.

23        **MR. ELLIS:**  AGAIN, YOU UNDERSTAND MY ANALOGY WHEN I

24   USED THE SCALES OF JUSTICE?  EVERYONE UNDERSTANDS THAT, RIGHT?

25   I MEAN -- YOU KNOW, WHAT WE WANT IS TO HAVE A LEVEL PLAYING

 1    FIELD AND THEN PIECE BY PIECE EVIDENCE IS GOING TO BE PUT ON

 2    THE SCALES, ONE SIDE OR THE OTHER.  UNDERSTAND?

 3              **PROSPECTIVE JUROR:**  UH-HUH.

 4         **MR. ELLIS:**  ALL RIGHT.  SO YOU THINK YOU CAN BE FAIR

 5    BUT YOU HAVE SOME DOUBTS.  IS THAT A FAIR --

 6              **PROSPECTIVE JUROR:**  I'M JUST NOT SURE, YEAH, WITHOUT

 7    KNOWING MORE DETAILS.

 8         **MR. ELLIS:**  ALL RIGHT.  IT'S MR HUIZINGH?

 9              **PROSPECTIVE JUROR:**  YEAH.

10         **MR. ELLIS:**  IF YOU ACTUALLY GET ON THE JURY PANEL,

11    YOU WILL SEE ME BLOW NAMES ALL THROUGH THE TRIAL.  I DON'T GET

12    MY KIDS' NAMES RIGHT.  ANYWAY, YOU EXPLAINED A LITTLE BIT

13    ABOUT YOUR ISSUES BUT -- SO TALK TO ME.

14              **PROSPECTIVE JUROR:**  I THINK FOR ME IT'S -- I'M JUST

15    NOT A BIG FAN OF THE INDUSTRY ITSELF.  IT IS NOT REALLY THE

16    PROCESS, IT IS MORE THE BUSINESS MODEL.  MAKING MONEY OFF

17    PEOPLE'S DEBT IS KIND OF A WEIRD BUSINESS MODEL IN MY MIND.

18    THAT IS THE ONLY REASON WHY I MENTION THAT.

19         **MR. ELLIS:**  BUT IN RAISING YOUR HAND, YOU'RE --

20    BRAVELY BY THE WAY, RATHER THAN JUST SIT THERE SILENTLY.

21    THERE IS ENOUGH CONCERN YOU WANT ME TO KNOW ABOUT IT.

22              **PROSPECTIVE JUROR:**  WELL, I MEAN, NOT KNOWING ANY OF

23    THE FACTS OR CIRCUMSTANCES, I WOULD SAY I HAVE SOME BIAS

24    ALREADY, BUT I THINK I'M A FAIR PERSON AND FACTS AND

25    CIRCUMSTANCES DEFINITELY CHANGES THAT.

1            **MR. ELLIS:**  OKAY.  SO THE QUESTION IS, THIS TRIAL

2     WILL -- WE THINK WILL PRETTY MUCH BE OVER, YOU KNOW, FRIDAY OR

3     MONDAY -- FRIDAY OR HOPEFULLY MONDAY AT THE LATEST.  THINGS

4     ALWAYS HAPPEN.  BUT SO ARE YOU -- WHAT YOU ARE SAYING RIGHT

5     NOW IS THAT WE ARE STARTING OFF EVEN-STEVEN OR WE'RE REALLY

6     NOT.

7            **PROSPECTIVE JUROR:**  PROBABLY NOT.  BUT THE FACTS AND

8     CIRCUMSTANCES, THAT IS WHAT I WOULD NEED TO KNOW MORE ABOUT.

9            **MR. ELLIS:**  OKAY.  YOU UNDERSTAND WHAT MY CONCERN

10    WOULD BE WHEN I HEAR A JURY SAY THAT?

11           **PROSPECTIVE JUROR:**  UH-HUH.

12           **MR. ELLIS:**  ALL RIGHT.  SO LET ME -- I'M ALMOST DONE.

13    SO LET ME MAKE THIS COMMENT.  DOES ANYONE DISAGREE THAT IF YOU

14    ENTER INTO A CONTRACT OR, YOU KNOW, YOU INCUR A DEBT, EVEN IF

15    CIRCUMSTANCES ARE BAD, SOMEONE DESERVES TO BE PAID?  DOES

16    ANYONE DISAGREE WITH THAT?  I MEAN, IF YOU DO, RAISE YOUR

17    HAND.  BECAUSE, YOU KNOW, THE FACT IS DEBT COLLECTORS,

18    ATTORNEYS, THE PARTS OF OUR SOCIETY THAT PEOPLE MAKE THE JOKES

19    ABOUT YOU KNOW HOW MANY AT THE BOTTOM OF AN OCEAN, GOOD START,

20    BLAH, BLAH, BLAH.

21        THE FACT IS -- DOES ANYONE HERE -- IF YOU DO, I WOULD LIKE

22    TO KNOW.  DOES ANYONE DISAGREE THAT DEBT COLLECTION IS A PART

23    OF SOCIETY THAT DOES A SERVICE TO MAKE SURE THAT, YOU KNOW,

24    PEOPLE GET PAID?  DOES ANYONE DISAGREE WITH THAT?

25           **MR. ELLIS:**  OKAY.

1        **PROSPECTIVE JUROR:**  IT FEELS -- I MAY BE ENTERING

2    PHILOSOPHICAL AREA HERE BUT I THINK THE QUESTION IS A

3    MISREPRESENTATION -- I THINK THE QUESTION KIND OF PROVIDES A

4    PRETTY NARROW LENS ON WHAT IS ACTUALLY HAPPENING.  SO, DO I

5    THINK WHEN PEOPLE GET IN CAR ACCIDENTS AND COME OUT OF THE

6    HOSPITAL $150,000 IN DEBT, THAT SOMEONE SHOULD BE PAID FOR

7    THAT?  THERE IS LOT OF DIFFERENT LENSES TO LOOK THROUGH THAT.

8    OF COURSE, THE DOCTORS, NURSES, ALL THOSE PEOPLE SHOULD GET

9    PAID.  THE QUESTION IS WHO SHOULD PAY AND WHO SHOULD PAY THE

10   CONSEQUENCES OF THAT DEBT.  SO, IN GENERAL, I THINK PEOPLE

11   SHOULD BE PAID FOR THE SERVICES THAT THEY PROVIDE.  WHO IS

12   RESPONSIBLE FOR PAYING IS A DIFFERENT QUESTION.  DEPENDING ON

13   THE SITUATION WE ARE BRINGING UP, IT HAS A LOT OF MORAL

14   IMPLICATIONS ABOUT WHETHER OR NOT WE THINK PEOPLE SHOULD HAVE

15   HEALTHCARE.  SO I'M GOING TO PUSH BACK ON THE NARROWNESS ON

16   THE QUESTION.

17       **MR. ELLIS:**  I APPRECIATE THAT AND, YOU KNOW,

18   MS. COOPER, I THINK YOU'RE RIGHT.  I DON'T DISAGREE WITH THAT.

19   I GUESS THIS IS NOT THE TIME FOR A PHILOSOPHICAL DEBATE

20   NECESSARILY, BUT THERE ARE ALSO JOE'S LAWN CARE THAT DOESN'T

21   GET PAID.  THERE ARE LOTS OF SMALL BUSINESSES THAT DON'T GET

22   PAID.  WE ARE NOT TALKING ABOUT HUGE INSTITUTIONS.  WE ARE

23   TALKING ABOUT PEOPLE -- YOU KNOW, THE PIZZA STORE THAT DOESN'T

24   GET PAID.  THOSE ARE ALL PEOPLE THAT HAVE TO MAKE PAYROLLS AND

25   HAVE PAYCHECKS AND THEIR LIGHTS ARE ON.  YOU AGREE WITH THAT,

1    TOO, I TAKE IT?

2            **PROSPECTIVE JUROR:**  YES.

3            **MR. ELLIS:**  ALL RIGHT.  SO LET ME JUST KIND OF WRAP

4    THIS UP AND GO TO ONE OTHER AREA.  SO, LADIES AND GENTLEMEN,

5    BECAUSE I'M THE DEFENSE, I ALWAYS GO SECOND AND THE COURT TO

6    ALLUDED TO THIS.  BUT HERE IS THE DEAL.  YOU ARE GOING TO HEAR

7    FROM PLAINTIFFS FIRST EVERY SINGLE TIME.  OPENING STATEMENTS,

8    MR. BURSOR GETS TO GO FIRST.  WITH EVIDENCE, MR. BURSOR GETS

9    TO GO FIRST.

10       IS THERE ANYONE HERE THAT CAN'T WAIT UNTIL I PUT ON MY

11   EVIDENCE OR I DO MY CROSS-EXAMINATION?  IS THERE ANYONE THAT

12   CAN'T DO THAT FOR ME?  ANYBODY?  MS. RAFELLO, CAN YOU DO THAT

13   FOR ME?

14           **PROSPECTIVE JUROR:**  YES.

15           **MR. ELLIS:**  OKAY.  BECAUSE I CAN TELL YOU HAVING

16   TRIED A FEW CASES, IF YOU GO WITH THE FIRST THING YOU HEAR, IT

17   IS GOING TO CHANGE AT SOME POINT LATER.  IT MAY NOT CHANGE

18   YOUR MIND ULTIMATELY, BUT IT IS GOING TO CHANGE YOUR VIEW OF

19   WHAT HAPPENED.  OKAY?  SO ALL OF YOU ALL CAN DO THAT FOR ME?

20       ALL RIGHT.  IS THERE ANYONE SITTING IN HERE THAT IS BRAVE

21   ENOUGH WITHOUT ME ASKING A SPECIFIC QUESTION TO SAY, YOU KNOW,

22   I'M NOT SURE I'M THE RIGHT PERSON FOR THIS CASE, MAYBE THE

23   NORTHERN DISTRICT OF CALIFORNIA, ALAMEDA, OAKLAND BRANCH CAN

24   FIND ANOTHER CASE FOR ME.  I DON'T WANT TO BE ON THIS CASE.

25   IS THERE ANYONE HERE THAT FEELS THAT WAY?

1      (NO RESPONSE.)

2           **MR. ELLIS:**  OKAY.  I'M GOING TO SIT DOWN NOW.  BUT I

3      AM ACTUALLY GOING TO REACH OUT.  MS. GUIDI, I HAVE BEEN

4      WATCHING YOU SITTING DOWN HERE AND I FEEL SOME AMBIVALENCE

5      FROM YOU.  I DON'T THINK IT IS THE PROCESS BUT HOW ARE YOU

6      FEELING ABOUT -- NOT LAWSUITS IN GENERAL BUT ABOUT MY CLIENT?

7           **PROSPECTIVE JUROR:**  I FEEL THAT I HAVE TO BE

8      OPEN-MINDED AND NOT TAKE MY OWN PERSONAL EXPERIENCE AND PUT IT

9      ON THE CASE AND THAT I NEED TO THINK OF THEM BOTH

10     INDEPENDENTLY AND NOT BE BIASED ABOUT IT --

11          **MR. ELLIS:**  CORRECT.

12          **PROSPECTIVE JUROR:**  -- AND JUST TAKE THE SITUATION

13     FOR WHAT IT IS AND EVALUATE IT IN THAT SENSE.

14          **MR. ELLIS:**  WELL, THAT IS WHAT I LOVE TO HERE.  IS

15     THAT GRUDGING?  I MEAN, ARE YOU GOING TO BE FIGHTING YOUR OWN

16     FEELINGS EVERY STEP OF THE WAY?

17          **PROSPECTIVE JUROR:**  I DON'T BELIEVE SO, BECAUSE I'M A

18     PRETTY STRONG FORCE WHERE THAT IS CONCERNED.

19          **MR. ELLIS:**  OKAY.

20          **PROSPECTIVE JUROR:**  WITH RAISING KIDS AND EVERYTHING

21     ELSE, THAT IS -- PRACTICE WHAT YOU PREACH AND THAT'S WHAT I

22     FOCUS ON.

23          **MR. ELLIS:**  WELL, IF YOU HAVE HAD TO DEAL WITH TWO

24     KIDS AND TRIED TO JUDGE CREDIBILITY THE WAY I HAVE DONE WITH

25     MINE, I UNDERSTAND.

1          **PROSPECTIVE JUROR:**  YOU HAVE TO BE VERY OPEN-MINDED.

2          **MR. ELLIS:**  YOU'RE BRINGING SOME REAL WAR EXPERIENCE

3   HERE.  THANK YOU, FOLKS, VERY MUCH.

4          **THE COURT:**  THANK YOU, MR. ELLIS.  LADIES AND

5   GENTLEMEN, WE ARE GOING TO TAKE A BREAK.  I NEED TO SPEAK WITH

6   THE LAWYERS AND I HAVE A SERIES OF LITTLE "DO NOT" SLIDES FOR

7   YOU, WHICH WE ARE GOING TO GO THROUGH HERE.  BUT WHAT IS GOING

8   TO HAPPEN IS, AS SOON AS I GIVE YOU YOUR "DO NOT"

9   ADMONISHMENTS, I WILL HAVE YOU LEAVE THE COURTROOM.  YOU CAN

10  GO IF YOU HAVE TIME -- IF YOU THINK YOU HAVE TIME AND CAN GET

11  BACK THROUGH SECURITY, YOU CAN GO GRAB A QUICK CUP OF COFFEE

12  OR SOMETHING IF YOU WANT BUT I WOULD LIKE YOU BACK HERE AT

13  11:30.  IT IS GOING TO BE 11.  I NEED TO SPEAK WITH THE

14  LAWYERS.  AND WHAT I WILL HAVE YOU DO IS -- THOSE OF YOU WHO

15  ARE UP HERE, YOU WON'T BE COME BACK TO THESE SEATS.  YOU WILL

16  STAY IN THE AUDIENCE.  OKAY?

17      SO WE ARE IN THE MIDDLE OF VOIR DIRE, WHICH MEANS THAT, AS

18  YOU KNOW, AS YOU SAW, WE ARE TRYING TO GET YOUR OPINIONS AND

19  WE ARE ENTITLED TO YOUR OPINION NOT INFLUENCED BY ANYTHING

20  ELSE.  SO WHEN YOU LEAVE THIS COURTROOM, IT IS IMPORTANT THAT

21  YOU DO NOT DISCUSS YOUR OPINIONS WITH ANYONE ELSE.

22      WHICH SLIDES DO WE HAVE HERE, FRANCES?  ALL RIGHT.  YES,

23  WE WANT TO KNOW YOUR OPINION AND ONLY YOUR OPINION, NO ONE

24  ELSE'S.  WHAT'S NEXT?  NO CELLPHONES, NO TALKING, NO

25  ELECTRONIC MEDIA.  THAT MEANS NO TWITTER, NO INSTAGRAM, NO

84

```
1    DOING ANY RESEARCH, NO TALKING ABOUT -- WITH ANYONE WHAT WE

2    ARE DOING IN HERE.  YOU HAVE ALL BEEN SWORN.  SO I CANNOT AND

3    DO NOT WANT YOU TO DO ANYTHING WITH RESPECT TO THIS CASE.

4         I DO NOT WANT YOU TO TALK TO ANY OF THE OTHER JURORS, THE

5    ATTORNEYS, THE WITNESSES, THE SPECTATORS, FAMILY, YOUR

6    FRIENDS, YOUR EMPLOYERS.  IF YOU ARE SEATED AS A JURORS, I

7    WILL TELL YOU WHAT YOU CAN AND CANNOT SAY.  YOU CANNOT NOT DO

8    ANY RESEARCH, ANY INVESTIGATION ON THIS TOPIC OR ANY OF THE

9    TOPICS WE HAVE BEEN DISCUSSING.  YOU ARE ORDERED, IF YOU START

10   LISTENING TO THE NEWS -- I DON'T KNOW THAT THIS IS GETTING

11   PICKED UP.  SOMETIMES IT DOES, SOMETIMES IT DOESN'T.  BUT IF

12   YOU HAPPEN TO HEAR ANYTHING, YOU CANNOT LISTEN TO IT, SO JUST

13   TURN THAT OFF.

14        AND WHILE YOU ARE OUT, GO AHEAD, CHECK YOUR EMAIL, DO

15   SOMETHING THAT'S PERSONAL TO YOU.  DO NOT DO ANYTHING RELATIVE

16   TO THIS CASE.  DO NOT TALK TO EACH OTHER ABOUT WHAT WE ARE

17   TALKING ABOUT.  WE NEED -- IF WE HAVE FOLLOW-UP QUESTIONS, I

18   NEED TO KNOW YOUR OPINION, NOT YOUR OPINION INFLUENCED BY ANY

19   OTHER DISCUSSION.

20        THE LAWYERS HAVE BEEN INSTRUCTED NOT TO COMMUNICATE WITH

21   YOU IN ANY WAY, SHAPE OR FORM.  IF YOU ACCIDENTALLY HAPPEN TO

22   ENCOUNTER THEM ON A BREAK, PLEASE JUST IGNORE THEM.  THEY WILL

23   NOT THINK YOU'RE RUDE.  THEY WILL BE FOLLOWING MY ORDER NOT TO

24   ENGAGE WITH YOU.

25        WE DO THIS BECAUSE WE WANT TO MAKE SURE THAT EVERYONE GETS
```

1    A FAIR TRIAL AND I WANT TO MAKE SURE THAT YOU ARE NOT DOING

2    ANYTHING INAPPROPRIATE.  IF YOU DO ANY OF THAT STUFF THAT I

3    HAVE SAID NOT TO, THAT COULD BE VIEWED AS INAPPROPRIATE.

4        OKAY.  SO WE WILL SEE YOU BACK HERE AT 11:30.  PLEASE WAIT

5    OUTSIDE THE COURTROOM AND WE WILL LET YOU IN WHEN IT'S AN

6    APPROPRIATE TIME.

7        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE PROSPECTIVE

8    JURORS.)

9        **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THE JURY

10   POOL HAS LEFT THE COURTROOM.

11       I'M GOING TO GIVE YOU A FEW MINUTES TO LOOK AT YOUR NOTES.

12   I WILL TAKE YOUR CHALLENGES FOR CAUSE, AND THEN WE WILL DO

13   PEREMPTORIES.  IF YOU WANT TO RUN TO THE BATHROOM, YOU'RE

14   WELCOME TO DO THAT.  I WILL BE BACK HERE IN ABOUT FIVE

15   MINUTES.

16       (RECESS TAKEN AT 11:03 A.M.; RESUMED AT 11:11 A.M.)

17       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

18       **THE CLERK:**  REMAIN SEATED.  THE COURT IS IN SESSION.

19   I DON'T KNOW IF WE HAVE EVERYBODY BACK.

20       **THE COURT:**  BACK ON THE RECORD.  AND WE WILL START

21   WITH PEREMPTORIES -- CHALLENGES FOR CAUSE.  I AM SORRY.  ANY

22   FROM THE PLAINTIFF?

23       **MR. BURSOR:**  YES, YOUR HONOR.

24       **THE COURT:**  JUST GIVE ME THE LIST FIRST.

25       **MR. BURSOR:**  MR. WILSON AND -- ONE MOMENT, YOUR

```
 1   HONOR.    MR. WILSON AND MR. GOEL.

 2            THE COURT:  ANY FROM THE DEFENSE?

 3            MR. ELLIS:  YES, YOUR HONOR.  MS. COOPER, MS. WOO --

 4            THE COURT:  HOLD ON.

 5            MR. ELLIS:  I'M SORRY.

 6            THE COURT:  OKAY.

 7            MR. ELLIS:  AND MR. HUIZINGH. H-U-I-Z-I-N-G-H.

 8            THE CLERK:  ARE YOU --

 9            THE COURT:  WHAT IS THE ARGUMENT WITH RESPECT TO

10   MR. GOEL?  WHAT IS YOUR CLAIM FOR CAUSE?

11            MR. BURSOR:  YOUR HONOR, MR. GOEL -- THIS IS THE

12   DEFENSE LAWYER.

13            THE COURT:  YES.  WHAT IS YOUR CLAIM FOR CAUSE?

14            MR. BURSOR:  HE APPEARED TO BE SYMPATHETIC WITH THE

15   DEFENSE.  HE THINKS THERE'S TOO MANY LAWSUITS, THAT JUDGMENTS

16   AGAINST HIS CLIENTS HAVE BEEN TOO HIGH.

17            THE COURT:  THAT'S DENIED.  YOU CAN MAKE YOUR RECORD

18   ON THESE THINGS LATER.  I WANT TO MAKE SURE WE ARE MOVING

19   ALONG.

20       THE COURT IS GOING -- UNLESS YOU WANT TO ARGUE, THE COURT

21   IS INCLINED TO GRANT WITH RESPECT TO WILSON AND COOPER AND

22   WITH RESPECT TO WOO.  I THINK MR. HUIZINGH, HE'S TRYING TO GET

23   OUT OF JURY SERVICE.  THAT WAS ALL POST -- SO I WILL NOT GRANT

24   WITH RESPECT TO HIM.

25            MR. ELLIS:  THANK YOU, YOUR HONOR.
```

1          **THE COURT:**  AND LIKE I SAID, IF YOU WANT TO MAKE A

2     RECORD AFTERWARDS, YOU CAN.

3        ALL RIGHT.  AT THIS POINT SINCE YOU ARE GOING TO BE

4     EXERCISING PEREMPTORIES, IF YOU WANT TO BE SIT AT COUNSEL

5     TABLE, THAT IS FINE WITH ME.

6          **THE CLERK:**  OKAY --

7          **THE COURT:**  WE ARE GOING TO TURN OFF YOUR MICS SO

8     THAT YOU CAN TALK TO EACH OTHER.  JUST SPEAK UP.

9          **MR. ELLIS:**  THANK YOU, YOUR HONOR.

10          **MR. BURSOR:**  YOUR HONOR, MAY I ASK ONE QUESTION

11     BEFORE WE DO THAT?

12          **THE COURT:**  YES.

13          **MR. BURSOR:**  IF WE PASS AND THEY PASS, YOU SEAT THE

14     JURY?

15          **THE COURT:**  CORRECT.

16          **MR. BURSOR:**  IF WE PASS AND THEY EXERCISE ONE, WE --

17          **THE COURT:**  YOU'VE NOT WAIVED YOUR RIGHT.

18          **MR. BURSOR:**  OKAY.  THANK YOU.

19          **THE COURT:**  SO, CURRENTLY, THE JURY IS VELEZ, WHITE,

20     NICHOLAS, ONG, GHASEMIGOHAR, JEW, GUIDI AND RAFELLO.  ALTHOUGH

21     LET ME JUST SAY, ON -- I AM INCLINED ON GHASEMIGOHAR, WHICH IS

22     THE MUCH LONGER ONE -- SHE HAS GOT A THREE-YEAR OLD AND

23     DOESN'T SEEM TO HAVE ANY SUPPORT SYSTEM, ANY PRESCHOOL,

24     ANYTHING TO GET HER HERE.  I AM INCLINED TO GRANT A HARDSHIP

25     ON HER.

```
1           DOES ANYBODY HAVE AN OBJECTION TO THAT?

2              MR. ELLIS:  NOT FROM DEFENSE, YOUR HONOR.

3              MR. BURSOR:  NO OBJECTION.

4              THE COURT:  ALL RIGHT.  SO SHE'S EXCUSED FOR

5    HARDSHIP, WHICH THEN WOULD PUT COOPER INTO THE GROUP OF

6    EIGHT -- NO, COOPER IS OUT.

7              MR. BURSOR:  I THINK YOU GRANTED....

8              THE COURT:  PUTS CAMP INTO THE GROUP OF EIGHT.

9       OKAY.  FIRST PEREMPTORY FROM PLAINTIFF.

10             MR. BURSOR:  PASS.

11             THE COURT:  PLAINTIFF PASSES.

12      FROM DEFENSE?

13             MR. ELLIS:  MS. RAFELLO.

14             THE COURT:  RAFELLO?

15             MR. ELLIS:  YES, YOUR HONOR.  R-A-F-E-L-L-O.  IT'S

16   JUROR NO. 8.

17             THE COURT:  OKAY.  MS. RAFELLO IS EXCUSED, THAT

18   BRINGS ONTO THE PANEL XU, X-U.

19       FROM THE PLAINTIFF?

20             MR. BURSOR:  MR. CAMP.

21             THE COURT:  MR. CAMP IS EXCUSED.

22      FROM THE DEFENSE?

23             MR. ELLIS:  THANK YOU, YOUR HONOR.  MR. --

24             THE COURT:  LET ME JUST SAY.  NOW, WE HAVE -- RIGHT.

25   SO, HUIZINGH.
```

1          **MR. ELLIS:**  HE JUST GOT ON AND WE ARE EXCUSING HIM,

2   YOUR HONOR.

3          **THE COURT:**  OKAY.  SO HE IS EXCUSED, WHICH BRINGS ON

4   ROUSSEU.

5      FROM THE PLAINTIFF?

6          **MR. BURSOR:**  ONE MOMENT, YOUR HONOR.

7                   (PAUSE IN THE PROCEEDINGS.)

8          **MR. BURSOR:**  PLAINTIFF PASSES.

9          **THE CLERK:**  I'M SORRY?

10          **THE COURT:**  PLAINTIFF PASSES.

11          **THE CLERK:**  OKAY.  THANKS.

12          **THE COURT:**  FROM THE DEFENSE?

13          **MR. ELLIS:**  YOUR HONOR, DEFENSE WOULD EXCUSE MS. ONG,

14   O-N-G.  THAT IS JUROR NO. 4.

15          **THE COURT:**  YES.  SO MS. ONG IS EXCUSED, WHICH BRINGS

16   ON MR. HINDERLIE.

17      FROM THE PLAINTIFFS?

18          **MR. BURSOR:**  PASS.

19          **THE COURT:**  PLAINTIFF PASSES.

20      NOW, THIS IS THE LAST PEREMPTORY THAT THE DEFENSE HAS, SO

21   LET ME JUST GO OVER AGAIN WHO WE HAVE.

22      WE HAVE VELEZ, WHITE, NICHOLAS, JEW, GUIDI, RAFELLO.

23          **MR. ELLIS:**  I THINK RAFELLO IS OUT, YOUR HONOR.

24          **THE CLERK:**  YES.

25          **MR. ELLIS:**  THAT WAS MY FIRST PEREMPTORY.

1              **THE COURT:**  OH, I AM SORRY.  THANK YOU.

2         SO THEN THAT WOULD BE XU IS THE NEXT ONE, ROUSSEU AND

3    HINDERLIE.  EVERYBODY ON THE SAME PAGE?

4              **MR. ELLIS:**  YES, MA'AM.

5              **THE COURT:**  YES?

6              **MR. BURSOR:**  YES.

7              **THE COURT:**  MR. ELLIS?

8              **MR. ELLIS:**  YES, YOUR HONOR.

9              **THE COURT:**  DO YOU WISH TO EXERCISE YOUR LAST?

10             **MR. ELLIS:**  I DO.  WE ARE GOING TO THANK AND EXCUSE

11   MS. GUIDI, JUROR 7.

12             **THE COURT:**  ALL RIGHT.  THE DEFENSE HAS NO MORE

13   PEREMPTORIES.

14        THE NEXT ONE IS GOEL AND AFTER THAT IS BLEM.

15        PLAINTIFFS?

16             **MR. BURSOR:**  GOEL.  EXCUSE GOEL, PLEASE.

17             **THE COURT:**  OKAY.  SO THAT PUTS BLEM AS THE NEXT ONE

18   ON AND DEFENSE HAS NO MORE PEREMPTORIES.

19        DO YOU WISH TO EXERCISE ANOTHER PEREMPTORY?

20             **MR. BURSOR:**  NO, YOUR HONOR.

21             **THE COURT:**  OKAY.  WE HAVE OUR JURY.  DOES ANYBODY

22   WISH TO PUT ANYTHING ON THE RECORD WITH RESPECT TO THE

23   FOR-CAUSE CHALLENGES?

24             **MR. BURSOR:**  NOT FROM PLAINTIFFS, YOUR HONOR.

25             **MR. ELLIS:**  NOT FROM DEFENSE.

```
1            THE COURT:  AND WE'LL STAND IN RECESS FOR FIVE

2    MINUTES AND THEN WE WILL START CALLING THEM IN.

3            MR. BURSOR:  MAY I ASK YOUR HONOR, ARE WE GOING TO

4    COME BACK INTO SESSION AND THEN --

5            THE COURT:  SO THIS IS WHAT WE ARE GOING TO DO.  I

6    WILL CALL THEM UP, I WILL BRING THE EIGHT UP.

7        AND GIVEN THAT WE HAVE ALREADY JUST TAKEN A BREAK, MY PLAN

8    WOULD BE TO THANK AND EXCUSE THE BALANCE OF THE PANEL.  I WILL

9    THEN INSTRUCT THE EIGHT JURORS, AND WE WILL START OPENING

10   STATEMENTS IMMEDIATELY AFTER -- AS SOON AS THEY GET BACK IN.

11           MR. BURSOR:  YOU'RE GOING TO DO THE PRE-EVIDENCE

12   INSTRUCTIONS AND THEN OPENING STATEMENTS?

13           THE COURT:  CORRECT.

14           MR. BURSOR:  GOT IT.  THANK YOU.

15           THE COURT:  ALL RIGHT.

16       DO WE HAVE THE BINDERS?  CAN WE PUT THE BINDERS ON THE --

17           THE CLERK:  YES.

18           THE COURT:  -- ON THE CHAIRS?

19           MR. BURSOR:  MAY I OPEN THE COMPUTER BACK UP JUST TO

20   MAKE SURE IT IS WORKING?

21           THE COURT:  SURE.

22           MR. BURSOR:  THIS IS WORKING.  OKAY.

23           THE CLERK:  FOUR IN THE FRONT --

24           MR. BURSOR:  I AM SORRY FOR HAVING SO MANY QUESTIONS,

25   YOUR HONOR, BUT WILL WE BE GIVEN A COPY OF THE SAME BINDER
```

1    THAT THE JURORS ARE GETTING?

2             **THE COURT:**  NO.  BUT YOU CAN LOOK AT IT.  THERE IS

3    NOTHING IN IT OTHER THAN PAPER.  IT LOOKS PRETTY.  YOU'RE

4    WELCOME TO LOOK AT IT.

5        WHY DON'T YOU GRAB A COPY AND LET THEM LOOK AT IT?

6             **MR. BURSOR:**  THANK YOU.

7             **MR. ELLIS:**  YOUR HONOR, DOES THE COURT WANT THE JURY

8    QUESTIONNAIRES BACK?  THE ONES -- I AM SORRY.

9             **THE COURT:**  NO, I AM -- I DON'T SEE ANY REASON FOR

10   YOU TO KEEP THEM.  IF YOU NEED TO KEEP THEM FOR APPELLATE

11   PURPOSES, LET ME KNOW.  BUT, OTHERWISE, IT'S PROBABLY BEST TO

12   GIVE THEM BACK.

13            **THE CLERK:**  ACTUALLY, THEY ARE SUPPOSED TO BE -- THE

14   QUESTIONNAIRES ARE SUPPOSED TO BE RETURNED TO ME.

15            **THE COURT:**  OKAY.

16            **MR. BURSOR:**  YOUR HONOR, THE ONLY THING OF SUBSTANCE

17   IN HERE IS THE STIPULATED FACTS.

18            **THE COURT:**  CORRECT.

19            **MR. BURSOR:**  AND I INTENDED TO MAKE REFERENCE TO THEM

20   DURING OPENING STATEMENT.  THAT'S NOT GOING TO COME AS A

21   SURPRISE, RIGHT?

22            **THE COURT:**  NO.  YOU TOLD US YOU WERE WHICH IS WHY WE

23   GAVE YOU A COPY OF THEM.  AND I DON'T KNOW EXACTLY WHERE --

24       WHERE DID YOU PUT THEM?

25            **LAW CLERK:**  THEY ARE BEHIND THE SCHEDULE.

1          **THE COURT:**  I SEE.

2              (QUESTIONNAIRES RETURNED TO THE CLERK.)

3          **THE CLERK:**  THANK YOU.

4          **MR. BURSOR:**  YOUR HONOR, I DON'T HAVE A CLICKER FOR

5     THIS COMPUTER AND SO I INTEND TO JUST PUSH A BUTTON ON THE

6     COMPUTER.  MAY I SPEAK FROM HERE IF AND WHEN I NEED TO DO

7     THAT?

8          **THE COURT:**  YES.

9              (PAUSE IN THE PROCEEDINGS.)

10        (PROCEEDINGS HELD IN THE PRESENCE OF THE PROSPECTIVE

11    JURORS.)

12         **THE COURT:**  OKAY.  WE ARE BACK ON THE RECORD.  THE

13    RECORD WILL REFLECT THE PARTIES ARE PRESENT AND THE JURY PANEL

14    IS PRESENT.

15       IF I COULD HAVE THE FOLLOWING JURORS PLEASE COME BACK UP

16    HERE.  MS. VELEZ.  MS. VELEZ, IF YOU WILL COME TAKE THE FIRST

17    CHAIR CLOSEST TO ME, PLEASE.  MR. WHITE?  YOU WILL SIT RIGHT

18    NEXT TO HER, MR. WHITE.

19       MR. NICHOLAS, YOU MAY WANT TO GO THE OTHER WAY.  THAT'S

20    OKAY IF YOU ARE GOING TO WAIT FOR HIM.  PERFECT.  THANK YOU.

21    GO IN THAT WAY.

22       AND MS. JEW, MS. XU.  MS. XU, I'M GOING TO HAVE YOU TAKE

23    THE FIRST SEAT IN THE BACK ROW, PLEASE.

24       MR. ROUSSEU, MR. HINDERLIE, AND MR. BLEM.

25       OKAY.  IF THE EIGHT OF YOU WILL PLEASE STAND TO BE SWORN.

```
 1                         (JURORS SWORN.)

 2           THE CLERK:  ALL RIGHT.  YOU MAY BE SEATED.

 3           THE COURT:  ALL RIGHT.  SO FOR THE REST OF THE JURORS

 4    IN THE COURTROOM, THANK YOU FOR YOUR SERVICE.  YOU ARE

 5    EXCUSED.  WE HAVE OUR JURY.  HAVE A WONDERFUL DAY AND THANK

 6    YOU FOR COMING IN.

 7                (PROSPECTIVE JURORS EXIT THE COURTROOM.)

 8           THE COURT:  OKAY.  LADIES AND GENTLEMEN, WELCOME.  WE

 9    ARE GETTING STARTED RIGHT AWAY.  NO TIME TO WASTE, RIGHT?  NO

10    TIME BETTER THAN THE PRESENT.

11        I HAVE A NUMBER OF INSTRUCTIONS FOR YOU, WHICH I'M GOING

12    TO GIVE YOU.  YOU HAVE ON YOUR SEAT A JURY BINDER.  LET'S JUST

13    TALK BRIEFLY ABOUT WHAT IS IN THAT BINDER.

14        FIRST OF ALL, THERE IS A DAILY REMINDER.  EVERY TIME YOU

15    OPEN IT UP ABOUT SOME INSTRUCTIONS I'M GOING TO GIVE YOU AND

16    THAT INCLUDES MANY OF THOSE "DO NOTS" THAT I WAS TALKING ABOUT

17    BEFORE.  THERE IS PAPER.  THERE IS A CALENDAR.  THERE ARE SOME

18    FACTS THAT I WILL REVIEW WITH YOU.

19        BUT THIS IS YOUR BINDER TO USE FOR THE COURSE OF THE

20    TRIAL, SO THAT YOU CAN TAKE NOTES.  WE TAKE PICTURES OF ALL OF

21    THE WITNESSES.  WE WILL GIVE YOU A PICTURE SO THAT YOU CAN

22    REMEMBER WHO IT IS THAT IS TESTIFYING.  WE DO ALL SORTS OF

23    THINGS TO HELP YOU REMEMBER WHAT YOU'VE HEARD IN COURT SO THAT

24    YOU CAN DO YOUR JOB.  ALL RIGHT?

25        SO, NOW THAT YOU HAVE BEEN SEATED AS JURIES -- AS JURORS
```

1    IN THIS CASE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.   THESE

2    INSTRUCTIONS ARE PRELIMINARY TO HELP YOU UNDERSTAND THE

3    PRINCIPLES THAT APPLY TO CIVIL CASES AND TO HELP YOU

4    UNDERSTAND THE EVIDENCE AS YOU LISTEN TO IT.

5        THESE INSTRUCTIONS ARE NOT GIVEN TO YOU PHYSICALLY, SO

6    JUST PAY ATTENTION.  AT THE END I HAVE ANOTHER SET OF

7    INSTRUCTIONS.  THOSE I WILL GIVE YOU PHYSICALLY FOR YOUR

8    REVIEW DURING DELIBERATIONS, BUT THESE ARE MORE BASIC

9    PRINCIPLES THAT YOU SHOULD CONSIDER.

10       IT IS YOUR DUTY TO FIND THE FACTS FROM ALL OF THE EVIDENCE

11   IN THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE

12   IT TO YOU AND YOU MUST FOLLOW THE LAW WHETHER YOU AGREE WITH

13   IT OR NOT.  YOU MUST NOT BE INFLUENCED BY PERSONAL LIKES OR

14   DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY AND THAT MEANS YOU

15   MUST DECIDE THE CASE SOLELY ON THE EVIDENCE THAT IS PRESENTED

16   BEFORE YOU.  YOU WILL RECALL JUST MOMENTS AGO, YOU TOOK AN

17   OATH DO SO.

18       PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING

19   THAT I MAY SAY OR DO THAT I HAVE AN OPINION REGARDING THE

20   EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.  DURING THIS CASE,

21   WHEN A PARTY HAS THE BURDEN OF PROVING ANY CLAIM OR

22   AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE, IT

23   MEANS THAT YOU MUST BE PERSUADED BY THE EVIDENCE THAT THE

24   CLAIM OR AFFIRMATIVE DEFENSE IS PROBABLY MORE TRUE THAN NOT.

25   THAT'S WHAT PREPONDERANCE OF THE EVIDENCE MEANS.  WHAT'S MORE

1    PROBABLY TRUE THAN NOT.

2        THIS IS NOT A CRIMINAL CASE WHERE THE STANDARD IS BEYOND A

3    REASONABLE DOUBT.  IT IS A CIVIL CASE, AND THE CIVIL CASE

4    STANDARD IS PREPONDERANCE OF THE EVIDENCE.

5        SO YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE

6    REGARDLESS OF WHICH PARTY PRESENTS IT.  SO WHAT IS THE

7    EVIDENCE?  THE EVIDENCE YOU ARE TO CONSIDER WITH RESPECT TO

8    THE FACTS ARE THE FOLLOWING:  ONE, THE SWORN TESTIMONY OF ANY

9    WITNESS.  TWO, THE EXHIBITS THAT ARE ADMITTED INTO EVIDENCE.

10   THREE, ANY FACTS TO WHICH THE LAWYERS HAVE AGREED.  AND FOUR,

11   ANY FACTS THAT I WILL INSTRUCT YOU TO ACCEPT AS PROVED.

12       NOW, IN REACHING YOUR VERDICT YOU CAN ONLY CONSIDER THAT

13   TESTIMONY AND EVIDENCE.  CERTAINLY THINGS ARE NOT EVIDENCE AND

14   YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE.

15   THEY ARE THE FOLLOWING:

16       ONE.  THE ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

17   EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY SAY IN

18   THEIR OPENING STATEMENTS AND CLOSING ARGUMENTS AND AT OTHER

19   TIMES DURING THE TRIAL, THEY SAY IT TO HELP YOU UNDERSTAND OR

20   INTERPRET THE EVIDENCE.  BUT IT IS NOT EVIDENCE.

21       TWO.  QUESTIONS AND OBJECTIONS BY THE LAWYERS ARE NOT

22   EVIDENCE.  LAWYERS HAVE A DUTY TO SHARE -- OR TO THEIR CLIENTS

23   TO OBJECT WHEN THEY BELIEVE A QUESTION IS NOT APPROPRIATE OR

24   IMPROPER UNDER THE RULES OF EVIDENCE, AND YOU SHOULD NOT BE

25   INFLUENCED BY THE OBJECTION OR THE COURT'S RULING ON IT.

1    THREE.  TESTIMONY THAT IS EXCLUDED OR STRICKEN OR THAT YOU

2   HAVE BEEN INSTRUCTED TO DISREGARD IS NOT EVIDENCE AND YOU MUST

3   NOT CONSIDER IT.  IN ADDITION, SOMETIMES I'LL ALLOW EVIDENCE

4   FOR A LIMITED PURPOSE.  AND WHEN I HAVE INSTRUCTED YOU TO

5   CONSIDER IT FOR THAT PURPOSE, AND I WILL EXPLAIN IT AT THE

6   TIME, YOU MAY ONLY DO SO AND CONSIDER IT FOR THAT PURPOSE.

7    ONE OF THE THINGS I DO WHEN I'M TAKING NOTES, IF I THEN

8   GET AN OBJECTION AND I SUSTAIN THE OBJECTION AND STRIKE IT, I

9   LITERALLY STRIKE IT FROM MY NOTES.  SO THAT WAY I REMEMBER I'M

10   NOT SUPPOSED TO CONSIDER IT.

11    ANYTHING YOU HEAR OR SEE WHEN COURT IS NOT IN SESSION IS

12   NOT EVIDENCE AND YOU ARE TO DECIDE THE CASE SOLELY ON THE

13   EVIDENCE RECEIVED.

14    SO EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

15   EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS THE TESTIMONY OF A

16   WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW, HEARD, OR DID.

17   CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

18   WHICH YOU COULD FIND SOME OTHER FACT.  AND YOU SHOULD CONSIDER

19   BOTH KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION ABOUT

20   THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

21   EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE ANY

22   EVIDENCE.

23    SO LET ME GIVE YOU AN EXAMPLE.  IMAGINE THAT YOU WAKE UP

24   IN THE MORNING AND YOU SEE WATER ON THE SIDEWALK.  WELL, THE

25   WATER COULD BE EVIDENCE THAT IT RAINED OVERNIGHT.  IT COULD

1    ALSO BE EVIDENCE THAT SOMEONE LEFT A GARDEN HOSE ON.  SO

2    BEFORE YOU DECIDE WHAT A FACT IS AND WHETHER IT'S PROVED BY

3    CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE EVIDENCE

4    IN LIGHT OF REASON, EXPERIENCE, AND COMMON SENSE.

5        WITH RESPECT TO OBJECTIONS, THERE ARE RULES OF EVIDENCE

6    THAT CONTROL WHAT CAN BE RECEIVED INTO EVIDENCE.  AND WHEN A

7    LAWYER ASKS A QUESTION OR OFFERS AN EXHIBIT INTO EVIDENCE AND

8    THE OTHER LAWYER ON THE OTHER SIDE THINKS IT IS NOT PERMITTED,

9    THAT LAWYER MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE

10   QUESTION CAN BE ANSWERED OR EXHIBIT RECEIVED.  IF I SUSTAIN

11   THE OBJECTION, THE QUESTION CANNOT BE ANSWERED AND THE

12   EXHIBITS NOT RECEIVED.  WHEN I SUSTAIN AN OBJECTION, YOU MUST

13   IGNORE THE QUESTION OR NOT GUESS WHAT THE ANSWER MIGHT HAVE

14   BEEN.

15       AND AS I SAID, IF I'VE STRICKEN IT, THEN YOU MAY NOT

16   CONSIDER IT.  IN DECIDING THE FACTS IN THIS CASE, YOU MIGHT

17   HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY

18   NOT TO BELIEVE.

19       YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT,

20   OR NONE OF IT.  IN CONSIDERING THE TESTIMONY OF ANY WITNESS,

21   YOU MAY CONSIDER THE FOLLOWING:

22       THE OPPORTUNITY AND ABILITY THAT A WITNESS MAY SEE, HEAR,

23   OR KNOW THE THINGS THAT THEY TESTIFY TO, THE WITNESS'S MEMORY,

24   THE WITNESS'S MANNER WHILE TESTIFYING, THE WITNESS'S INTEREST

25   IN THE OUTCOME OF THE CASE, IF ANY, THE WITNESS'S BIAS OR

1    PREJUDICE, IF ANY, AND WHETHER OTHER EVIDENCE CONTRADICTS THAT

2    WITNESS'S TESTIMONY.  THE REASONABLENESS OF THE TESTIMONY IN

3    LIGHT OF ALL THE OTHER EVIDENCE, AND ANY OTHER FACTS WHICH

4    BEAR ON THAT PERSON'S BELIEVABILITY.

5        SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

6    CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

7    DIFFERENT WITNESSES MAY GIVE DIFFERENT VERSIONS OF WHAT

8    HAPPENED.

9        PEOPLE OFTEN FORGET THINGS.  THEY MAY MAKE MISTAKES IN

10   WHAT THEY REMEMBER.  ALSO TWO PEOPLE COULD SEE THE EXACT SAME

11   EVENT AND REMEMBER IT DIFFERENTLY.

12       YOU MAY CONSIDER THESE DIFFERENCES, BUT DO NOT DECIDE THE

13   TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER

14   TESTIMONY.  HOWEVER, IF YOU DECIDE THAT A WITNESS HAS

15   DELIBERATELY TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT,

16   YOU MAY CHOOSE NOT TO BELIEVE ANYTHING THAT THAT WITNESS SAYS.

17   ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED

18   UNTRUTHFULLY ABOUT SOME THINGS BUT TRUTHFULLY ABOUT OTHERS,

19   YOU MAY ACCEPT THE PART THAT YOU BELIEVE IS TRUE AND IGNORE

20   THE REST.

21       THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

22   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

23   WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND HOW

24   MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

25       NOW, I URGE YOU TO PAY CLOSE ATTENTION TO THE TRIAL

1    TESTIMONY AS IT'S GIVEN BECAUSE DURING DELIBERATIONS YOU WILL

2    NOT HAVE A TRANSCRIPT.  ALL RIGHT?  SO YOU NEED TO MAKE SURE

3    THAT YOU LISTEN CAREFULLY AND, TO THE EXTENT YOU WANT TO TAKE

4    NOTES, YOU TAKE NOTES.

5         HOWEVER, IF YOU TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

6    UNTIL YOU GO TO THE JURY ROOM TO DECIDE THE CASE.  DO NOT LET

7    NOTE-TAKING DISTRACT YOU.  WHEN YOU LEAVE AT THE END OF THE

8    DAY, YOU MUST LEAVE YOUR NOTEBOOKS AND ALL YOUR NOTES IN THE

9    JURY ROOM.  NO ONE WILL READ THEM.

10        WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

11   MEMORY OF THE EVIDENCE.  NOTES ARE THERE TO HELP YOU REMEMBER

12   AND ASSIST IN YOUR MEMORY.  SO DO NOT BE OVERLY INFLUENCED BY

13   YOUR NOTES OR THOSE OF OTHER JURORS.

14        FROM TIME TO TIME DURING THE TRIAL, IT MAY BE NECESSARY

15   FOR ME TO TALK TO THE LAWYERS OUTSIDE OF YOUR PRESENCE.  I

16   RARELY IF EVER DO THIS, BUT SOMETIMES IT HAPPENS.

17        SO EITHER BY HAVING A CONFERENCE AT SIDEBAR OR I MAY ASK

18   YOU TO LEAVE THE COURTROOM AND I MAY CALL A RECESS.  PLEASE

19   UNDERSTAND THAT WHILE YOU ARE WAITING WE ARE HERE WORKING.

20   THE PURPOSE OF THE CONFERENCE IS NOT TO KEEP RELEVANT

21   INFORMATION FROM YOU, BUT TO MAKE SURE AND DECIDE HOW EVIDENCE

22   IS TO BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID

23   CONFUSION AND ERROR.

24        I WILL DO WHAT I CAN TO KEEP THE LENGTH AND NUMBER OF

25   THESE CONFERENCES TO A MINIMUM, AND I DON'T ALWAYS GRANT AN

1    ATTORNEY A REQUEST FOR A CONFERENCE BECAUSE WE MEET BEFORE YOU

2    GET HERE.  BUT IN ANY EVENT, DO NOT CONSIDER MY GRANTING OR

3    DENYING ANY REQUEST ANY INDICATION OF MY OPINION ABOUT THE

4    CASE OR WHAT YOUR VERDICT SHOULD BE.

5        IN THE FRONT POCKET OF YOUR NOTEBOOKS, THERE IS A BLANK

6    FORM AND WE CAN GIVE YOU MORE IF NEEDED.  I ALLOW JURORS TO

7    PROPOSE QUESTIONS TO WITNESSES AFTER THE LAWYERS HAVE

8    COMPLETED THEIR EXAMINATION.

9        THE PURPOSE IS TO ALLOW YOU TO CLARIFY THE TESTIMONY.  YOU

10   ARE NOT TO EXPRESS ANY OPINION ABOUT THE TESTIMONY.  YOU ARE

11   NOT TO ARGUE WITH THE WITNESS.  IF YOU PROPOSE A QUESTION,

12   REMEMBER THAT YOUR ROLE IS TO BE THE NEUTRAL FACT FINDER,

13   RIGHT?  NOT AN ADVOCATE FOR ONE SIDE OR THE OTHER.  SO BEFORE

14   I EXCUSE A WITNESS, I'LL OFFER AN OPPORTUNITY AND, IF YOU HAVE

15   A QUESTION, EITHER AT A BREAK OR AT THE END, PLEASE LET ME

16   KNOW, WRITE IT DOWN, AND WE WILL COLLECT IT.  I WILL ALWAYS

17   REVIEW THE QUESTION WITH THE LAWYERS TO MAKE SURE IT IS

18   APPROPRIATE AND PROPER UNDER THE RULES OF EVIDENCE.

19       THERE ARE SOME PROPOSED QUESTIONS THAT I DO NOT PERMIT.

20   AND THERE ARE SOME WHERE I HAVE CHANGED THE WORDING SLIGHTLY

21   TO MAKE IT APPROPRIATE.  THIS MIGHT HAPPEN, AGAIN, DUE TO THE

22   RULES OF EVIDENCE OR FOR SOME OTHER LEGAL REASONS OR SOMETIMES

23   BECAUSE WE EXPECT THE QUESTION TO BE ANSWERED WITH A DIFFERENT

24   WITNESS AND THIS ISN'T THE APPROPRIATE WITNESS.

25       SO DO NOT GIVE UNDUE WEIGHT TO QUESTIONS THAT YOU OR

1    OTHERS PROPOSE, BUT YOU SHOULD EVALUATE THE ANSWERS IN THE

2    SAME MANNER AS YOU WOULD EVALUATE ALL OTHER EVIDENCE IN THE

3    CASE.

4         BY GIVING YOU THIS OPPORTUNITY TO PROPOSE QUESTIONS, I'M

5    NOT SUGGESTING OR EVEN REQUESTING THAT YOU DO IT.  IT'S JUST

6    YOUR OPPORTUNITY.

7         LET ME MAKE -- I'LL HAVE SOME MORE INSTRUCTIONS FOR YOU

8    BEFORE YOU LEAVE AT THE END OF THE DAY.  LET ME SAY THIS:  IN

9    TERMS OF HOW THE TRIAL PROCEEDS, EACH SIDE IS GOING TO BE

10   GIVEN AN OPPORTUNITY TO MAKE AN OPENING STATEMENT.  REMEMBER

11   AN OPENING STATEMENT IS NOT EVIDENCE.  IT'S JUST SIMPLY AN

12   OUTLINE TO HELP YOU UNDERSTAND WHAT EACH SIDE BELIEVES THE

13   EVIDENCE WILL SHOW.

14        THE PLAINTIFF WILL, AFTER THIS, TOMORROW -- BEGINNING

15   TOMORROW THE PLAINTIFF WILL PRESENT EVIDENCE AND THEN COUNSEL

16   FOR DEFENSE MAY CROSS-EXAMINE AND THEN THE DEFENSE GETS TO

17   PRESENT ITS CASE.  AFTER ALL THE EVIDENCE HAS BEEN PRESENTED,

18   I'LL INSTRUCT YOU ON THE LAW THAT APPLIES TO THE CASE AND THE

19   ATTORNEYS THE MAKE CLOSING ARGUMENTS, AFTER WHICH YOU WILL GO

20   INTO THE JURY ROOM TO DELIBERATE.

21        ONE OF THE FIRST THINGS I'LL DO AFTER OPENINGS IS TO READ

22   YOU THE FACTS THAT THE PARTIES HAVE STIPULATED TO, SO YOU WILL

23   BE INSTRUCTED TO TREAT THOSE FACTS AS PROVEN AND YOU ACTUALLY

24   HAVE A COPY OF THEM THERE IN YOUR BINDER, WHICH I THINK SOME

25   OF THE PARTIES MAY REFER TO.  BUT IN TERMS OF KEEPING AN OPEN

1   MIND, LET ME SUGGEST TO YOU THE FOLLOWING:

2       THINK ABOUT A TRIAL LIKE A PUZZLE.  DOES ANYBODY LIKE

3   PUZZLES?  I'M KIND OF A PUZZLER, SO I LIKE PUZZLES.  BUT IN A

4   TRIAL, THERE IS NO COVER, A LOT OF PIECES.  SO THE OPENING

5   STATEMENTS ARE REALLY IN A WAY, EACH SIDE IS TELLING YOU WHAT

6   THAT COVER SHOULD LOOK LIKE.  THAT'S WHAT AN OPENING STATEMENT

7   IS.  AND THE TRIAL IS US COLLECTING ALL OF THOSE PIECES TO THE

8   PUZZLE AND PUTTING THEM IN THE BOX.

9       BUT UNTIL THEY ARE ALL IN THE BOX, WE CAN'T FIGURE OUT

10  WHAT THE COVER LOOKS LIKE.  AND AT THE END OF THE TRIAL, YOU

11  WILL HAVE ALL THOSE PIECES IN THE BOX AND THEN THE LAWYERS

12  WILL COME BACK AND THEY WILL ARGUE ABOUT WHAT THEY THINK THAT

13  COVER LOOKS LIKE, BASED UPON THE ACTUAL EVIDENCE THAT YOU

14  HEARD.

15      BUT THEN YOU GET TO GO BACK AND DECIDE WHAT DID ALL THAT

16  EVIDENCE SHOW?  WHAT DOES THE COVER OF THAT BOX LOOK LIKE,

17  GIVEN THE EVIDENCE THAT WE'VE HEARD?  IT IS KIND OF WHY WE

18  TELL YOU TO WAIT, WAIT BEFORE MAKING A DECISION UNTIL YOU HAVE

19  ALL THE PIECES.  CAN'T DECIDE WHAT THAT COVER LOOKS LIKE UNTIL

20  YOU KNOW WHAT ALL YOU -- WHAT YOU HAVE.  SO PERHAPS THAT WILL

21  HELP YOU.

22      OKAY.  AT THIS POINT I'M GOING TO ALLOW THE PARTIES TO

23  MAKE THEIR OPENING STATEMENTS.  WE WILL BEGIN WITH MR. BURSOR.

24      YOU MAY PROCEED.  AND WE MAY HAVE A COUPLE OF MINUTES TO

25  GET IT SET UP, OR IS IT ALL SET UP?

1          **MR. BURSOR:**  YOUR HONOR, YOU JUST MENTIONED THAT YOU

2    WERE GOING TO READ THE STIPULATED FACTS?

3          **THE COURT:**  WHEN WE GET TO THE EVIDENTIARY PORTION.

4          **MR. BURSOR:**  OKAY.

5          **THE COURT:**  BUT THEY DO HAVE IT IN THEIR BINDER IF

6    YOU WANT TO REFER TO IT, MR. BURSOR.  WE ARE JUST NOT AT THE

7    EVIDENTIARY PORTION YET.

8          **MR. BURSOR:**  THANK YOU, YOUR HONOR.

9                        **OPENING STATEMENT**

10         **MR. BURSOR:**  GOOD MORNING AGAIN.

11         MY NAME IS SCOTT BURSOR, AND I REPRESENT -- I'M ONE OF THE

12   LAWYERS REPRESENTING THE PLAINTIFF IN THIS LAWSUIT.  AND THE

13   PLAINTIFF IS A GENTLEMEN NAMED IGNACIO PEREZ.  HE'S SITTING

14   NEXT TO ME AT THE COUNSEL TABLE RIGHT HERE.  MR. PEREZ, CAN

15   YOU STAND UP FOR A MOMENT?

16         THANK YOU.

17         THE OPENING STATEMENT IS MY OPPORTUNITY TO TELL YOU ABOUT

18   THE PROOF WE ARE GOING TO PUT ON AT THE TRIAL.  AND ONE OF THE

19   THINGS THAT WE'RE GOING TO PROVE IS THAT ON MAY 28TH OF 2015,

20   MR. PEREZ'S CELLPHONE RANG AND HE ANSWERED THE CALL.  AND WE

21   WILL PROVE THAT, WHEN HE ANSWERED THE PHONE CALL, HE HEARD A

22   PRERECORDED MESSAGE, PRESS ONE FOR THIS, PRESS TWO FOR THAT.

23   WE WILL PROVE THAT PHONE CALL LASTED 54 SECONDS.

24         WE WILL PROVE THAT THE PARTY WHO MADE THAT PHONE CALL WAS

25   THE DEFENDANT, RASH CURTIS.  WE WILL PROVE THAT THEY MADE THAT

1    PHONE CALL WITH A MACHINE CALLED AN AUTO DIALER.  WE WILL

2    PROVE THAT IT WAS THE GLOBAL CONNECT AUTO DIALER THAT CALLED

3    MR. PEREZ'S CELLPHONE AND WE WILL PROVE THAT THAT DIDN'T

4    HAPPEN JUST THAT ONE TIME ON MAY 28TH, 2015.  WE WILL PROVE

5    THAT THE DEFENDANT CALLED MR. PEREZ'S CELLPHONE AT LEAST 26

6    TIMES BETWEEN MAY 28TH OF 2015 AND JUNE 7 OF 2016.

7        WE'LL PROVE ALL THOSE THINGS BUT WE ARE GOING TO PROVE

8    SOMETHING ELSE AS WELL, WHICH IS MR. PEREZ DID NOT OWE ANY

9    DEBT TO RASH CURTIS OR TO ANY OF RASH CURTIS' CLIENTS.  HE WAS

10   NOT THE PERSON THAT THEY WERE TRYING TO CALL.  THEY WERE

11   TRYING TO CALL SOMEONE ELSE BUT THEY GOT MR. PEREZ'S NUMBER

12   INSTEAD AND CALLED HIM.

13       THE JUDGE MENTIONED IN YOUR WHITE BINDER YOU HAVE A SET OF

14   STIPULATED FACTS AND STIPULATED FACT NO. 35 SAYS THAT RASH

15   CURTIS HAS NEVER HAD AN ACCOUNT IN MR. PEREZ'S NAME AND THAT

16   IS TRUE.

17       SO MR. PEREZ HAD NOTHING TO DO WITH THESE PEOPLE BUT THEY

18   CALLED HIM 26 TIMES.  WE WILL PROVE THAT HE ANSWERED 14 OF

19   THOSE PHONE CALLS AND THAT HE ANSWERED 14 CALLS THAT WERE SIX

20   SECONDS OR LONGER IN DURATION, INDICATING THAT THE PHONE CALLS

21   WERE MADE WITH A PRERECORDED VOICE.  AND THAT IS A VERY

22   SPECIFIC THING FOR ME TO SAY THAT WE ARE GOING TO PROVE BUT

23   THE REASON THAT I CAN SAY SO SPECIFICALLY WHAT WE ARE GOING TO

24   PROVE IS THAT, WHEN A PHONE CALL IS MADE, THERE'S A RECORD OF

25   THE PHONE CALL, JUST LIKE YOU'VE SEEN ON YOUR PHONE BILLS.

1    AND SO WE WILL PROVE THAT ALL THESE CALLS HAPPENED, WE WILL

2    PROVE THE EXACT DATE AND TIME THEY HAPPENED, WE WILL PROVE THE

3    EXACT LENGTH OF EACH PHONE CALL WITHIN A 62ND MARGIN AND WE

4    WILL PROVE ALL THOSE THINGS WITH THE DEFENDANT'S OWN CALL

5    LOGS.

6         NOW, BECAUSE HE RECEIVED THESE PHONE CALLS, MR. PEREZ SUED

7    THE COMPANY, SUED RASH CURTIS FOR VIOLATING A STATUTE CALLED

8    THE TELEPHONE CONSUMER PROTECTION ACT, WHICH THE JUDGE

9    MENTIONED EARLIER.

10        THE COURT -- THE COURT DECIDES CERTAIN THINGS AND YOU ARE

11   GOING TO DECIDE CERTAIN THINGS.  AND ONE ISSUE THAT MR. PEREZ

12   HAS BROUGHT TO THE COURT'S ATTENTION IS THAT HE'S NOT THE ONLY

13   PERSON THAT RECEIVED THESE PHONE CALLS.  WE WILL PROVE THAT

14   THE DEFENDANT MADE 79 MILLION PHONE CALLS THROUGH THREE AUTO

15   DIALERS.  YOU'RE GOING TO HEAR ABOUT THREE AUTO DIALERS IN

16   THIS CASE.  ONE OF THEM IS CALLED GLOBAL CONNECT.  WE WILL

17   PROVE THE DEFENDANT USED A SECOND AUTO DIALER CALLED VIC,

18   V-I-C.  WE WILL PROVE THE DEFENDANT USED A THIRD AUTO DIALER

19   CALLED TCN.  WE WILL PROVE THROUGH THOSE THREE AUTO DIALERS

20   THE DEFENDANT MADE 79 MILLION PHONE CALLS.

21        NOW, SOME OF THOSE CALLS WERE MADE TO PEOPLE THAT OWED

22   DEBTS AND YOU HEARD A LOT OF DISCUSSION OF THAT DURING VOIR

23   DIRE, ABOUT DEBT COLLECTORS CALLING ABOUT DEBTS.  BUT

24   MR. PEREZ DID NOT OWE ANY DEBT.  AND THERE WERE A LOT OF

25   PEOPLE LIKE MR. PEREZ, WHO ALSO DID NOT OWE DEBTS, WHO ALSO

1    GOT A LOT OF THESE PHONE CALLS.  WE WILL PROVE THAT THERE WERE

2    40,420 UNIQUE PHONE NUMBERS THAT THE DEFENDANT CALLED TO

3    PEOPLE WHO WERE NOT DEBTORS ON ACCOUNTS WITH RASH CURTIS AND

4    WE WILL PROVE THAT RASH CURTIS MADE 534,698 PHONE CALLS TO

5    THOSE PEOPLE.  AND THE WAY WE WILL PROVE THAT IS WITH THE

6    PHONE BILL, WITH THE CALL LOGS, WITH THE AUTO DIALER CALL

7    LOGS.  WE KNOW EXACTLY WHAT THEY DID AND WE KNOW EXACTLY WHEN

8    THEY DID IT.

9        NOW, BECAUSE THERE ARE SO MANY OF THOSE PEOPLE, THE COURT

10   APPOINTED MR. PEREZ AS CLASS REPRESENTATIVE OF THE CERTIFIED

11   CLASSES IN THIS CASE.  AND THE COURT APPOINTED MY LAW FIRM,

12   BURSOR & FISHER, AS CLASS COUNSEL TO REPRESENT THE CERTIFIED

13   CLASSES IN THIS CASE.  SO OUR JOB IN THIS CASE IS TO PRESENT

14   THE EVIDENCE, NOT JUST OF THE PHONE CALLS THAT THE DEFENDANT

15   MADE TO MR. PEREZ, BUT ALSO THE PHONE CALLS TO THE 40,420

16   OTHER PEOPLE WHO DIDN'T HAVE AN ACCOUNT WITH RASH CURTIS BUT

17   STILL GOT ALL THESE PHONE CALLS.  AND I'M GOING TO EXPLAIN TO

18   YOU HOW WE'RE GOING TO PRESENT THAT EVIDENCE AND, AT THE END

19   OF THE CASE, YOU'RE GOING TO BE ASKED TO COUNT THOSE PHONE

20   CALLS AND DETERMINE HOW MANY WERE MADE.  AND SO OUR JOB WAS TO

21   COUNT THEM, TO PRESENT YOU THE EVIDENCE OF OUR COUNT, AND --

22   SO THAT YOU CAN EVALUATE THAT EVIDENCE AND DETERMINE HOW MANY

23   PHONE CALLS THERE WERE.

24       SO, I HAVE SOME SLIDES THAT I AM GOING TO DISPLAY ON YOUR

25   SCREEN TO SHOW YOU HOW WE COUNTED THE PHONE CALLS.

```
 1                    (DISPLAYED ON SCREEN.)

 2          THE CLERK:  FRANCES, CAN WE MAKE THIS ONE SHOW UP ON

 3   THE --

 4          THE COURT:  IT'S UP.

 5          THE CLERK:  IS IT ON?

 6          THE COURT:  YOUR MONITOR MAY NOT BE UP BUT I SEE IT

 7   ON THE FLAT SCREENS.  DO YOU SEE LIKE THE LAVA?

 8          MR. BURSOR:  I SEE BLUE -- MINE IS BLUE, THOUGH.

 9          THE CLERK:  YOU ARE THE MIDDLE ONE CART VIDEO.  DO

10   YOU CLICK?  CAN YOU CLICK?

11          MR. BURSOR:  NO, I'M RIGHT HERE.

12          THE CLERK:  THIS IS NOT MY SCREEN.  I DON'T KNOW.

13          MR. BURSOR:  SOMETIMES IT WORKS AND SOMETIMES IT

14   TAKES A LITTLE TIME.  WE ARE GOING TO GET IT SORTED OUT.

15      THERE WE GO.

16                    (DISPLAYED ON SCREEN.)

17          MR. BURSOR:  OKAY.  SO OUR JOB IN THIS CASE AS CLASS

18   COUNSEL WAS TO COUNT HOW MANY PHONE CALLS THE DEFENDANTS MADE

19   THAT WERE LIKE THE PHONE CALLS THAT MR. PEREZ RECEIVED.  THAT

20   IS NOT AN EASY THING TO DO BECAUSE, AS I SAID, THERE WERE CALL

21   LOGS FOR 79 MILLION PHONE CALLS.  IT WAS A BIG DATA CRUNCH

22   JOB.  SO THE WAY WE DID THAT WAS WE HAD TO HIRE SOME EXPERTS

23   TO CRUNCH THE DATA.  AND I'M GOING TO TELL YOU ABOUT THEM.

24      THE FIRST EXPERT THAT YOU WILL HEAR FROM IS A GENTLEMEN

25   NAMED COLIN WEIR.  HE IS AN EXPERT IN TELECOMMUNICATIONS AND
```

1    DATA ANALYSIS.  WE HAVE A SECOND EXPERT NAMED ANYA

2    VERKOVSKAYA.  SHE IS AN EXPERT IN CLASS ACTION ADMINISTRATION

3    AND DATA ANALYSIS.  AND WE HAVE A THIRD EXPERT, WHOSE NAME IS

4    RANDALL SNYDER AND HE IS AN EXPERT IN TELECOMMUNICATIONS

5    TECHNOLOGY.

6        NOW, I WANT TO BEGIN WITH MR. SNYDER.

7        I MENTIONED THAT THE PHONE CALLS WERE ALL MADE WITH

8    TECHNOLOGY THAT IS CALLED AN AUTO DIALER.  WHAT THAT MEANS IS

9    THERE IS NOT A HUMAN BEING PUNCHING BUTTONS ON A PHONE TO MAKE

10   THESE PHONE CALLS.  THERE IS A MACHINE, A COMPUTER THAT DIALS

11   THE PHONE CALLS VERY FAST AND IN VERY HIGH VOLUME.  IN OTHER

12   WORDS, LOTS OF CALLS ALL AT ONCE.

13       MR. SNYDER IS AN EXPERT IN THOSE MACHINES AND HOW THEY

14   WORK AND AN EXPERT IN HOW THOSE MACHINES KEEP RECORDS AND HOW

15   TO UNDERSTAND THOSE RECORDS.  SO MR. SNYDER REVIEWED THE

16   MANUALS FOR THE AUTO DIALERS, LOOKED AT SAMPLES OF THE

17   RECORDS, AND TOLD US HOW WE COULD DO OUR JOB, WHICH WAS TO

18   IDENTIFY THE CALLS THAT WERE MADE, JUST THE CALLS THAT WERE

19   MADE TO CLASS MEMBERS LIKE MR. PEREZ WHO DID NOT OWE A DEBT.

20       SO, SINCE YOU ARE GOING TO BE ASKED TO DO THAT COUNT WITH

21   US, HOW MANY PHONE CALLS THERE WERE, I'M GOING TO SHARE WITH

22   YOU THE CRITERIA THAT WE HAD TO USE TO NARROW DOWN THE RECORDS

23   FROM THE 79 MILLION PHONE CALLS THAT WE STARTED WITH, DOWN TO

24   THE 534,698 CALLS TO CLASS MEMBERS THAT WE ENDED UP WITH.

25       **THE COURT:**  DOES ANYBODY WANT A PEN WHO MAY NOT HAVE

1    ONE?

2                    (PAUSE IN THE PROCEEDINGS.)

3         **MR. BURSOR:**  AND YOU ARE GOING TO HEAR THESE NUMBERS

4    OVER AND OVER AGAIN, SO IF YOU MISS THE EXACT NUMBER, DON'T

5    WORRY TOO MUCH BECAUSE I'M GOING TO REPEAT THEM QUITE OFTEN.

6         SO, OUR JOB IN THIS CASE AS CLASS COUNSEL AND MR. PEREZ'S

7    JOB AS THE CLASS REPRESENTATIVE WAS TO IDENTIFY THE PHONE

8    CALLS THAT RASH CURTIS MADE TO PHONE NUMBERS THAT WERE

9    OBTAINED BY SKIP-TRACING, THAT WERE MADE USING EITHER AN AUTO

10   DIALER OR PRERECORDED MESSAGE TO CELLPHONE NUMBERS THAT

11   BELONGED TO NON-DEBTORS.  IN OTHER WORDS, PEOPLE LIKE

12   MR. PEREZ, THEY DIDN'T EVEN HAVE AN ACCOUNT.

13        SO MR. WEIR STARTED OFF THIS JOB BY LOOKING AT THE DEBTORS

14   ACCOUNT RECORDS.  THE ACCOUNT RECORDS ARE CONTAINED IN A

15   DATABASE.  I'M GOING TO SHOW YOU A SAMPLE OF THAT DATABASE.

16   MR. WEIR ALSO LOOKED AT THE CALL LOGS FOR THE THREE AUTO

17   DIALERS.  THOSE CALL LOGS CONTAINED RECORDS OF MORE THAN

18   79 MILLION PHONE CALLS.  I'M GOING TO SHOW YOU A SAMPLE OF

19   WHAT THOSE CALL LOGS LOOKED LIKE.  AND MR. WEIR CREATED THE

20   SUMMARIES THAT YOU'RE GOING TO SEE DURING THE TRIAL BECAUSE I

21   CAN'T SHOW YOU A LOG OF 79 MILLION PHONE CALLS.  IT'S JUST TOO

22   BIG.  SO I HAVE TO SHOW YOU A SAMPLE OR AN EXCERPT SO THAT YOU

23   CAN SEE WHAT IT LOOKS LIKE, AND THEN MR. WEIR WILL TESTIFY

24   ABOUT THOSE DATA AND WHAT HE DID WITH THEM.

25        SO LET'S START WITH THE DEBTOR ACCOUNTS RECORDS.  RASH

OPENING STATEMENT – BURSOR

1    CURTIS IS A DEBT COLLECTION AGENCY.  THEY HAVE ACCOUNTS OF

2    DEBTS THAT HAVE BEEN REFERRED TO THEM BY CLIENTS AND THEY

3    STORE THOSE IN A DATABASE.  THE DATABASE LOOKS LIKE THIS.

4         THIS IS EXHIBIT 60.  IT'S AN EXHIBIT THAT IS GOING TO BE

5    IN EVIDENCE DURING THE TRIAL.  AND I EXPECT THAT IT IS

6    PROBABLY TOO SMALL FOR YOU TO READ ON THAT SCREEN RIGHT NOW.

7    SO -- BUT I CAN TELL YOU THAT IT'S A DATABASE THAT INCLUDES

8    DEBTORS' NAMES, DEBTORS' ADDRESSES AND DEBTORS' PHONE NUMBERS.

9    NOW, I'M GOING TO ZOOM IN ON THE TOP RIGHT-HAND PORTION OF

10   THIS EXCERPT FROM THE DATABASE.  IT'S EXHIBIT 60.  YOU ARE

11   GOING TO SEE IT DURING THE TRIAL.  THIS WILL NOT BE THE ONLY

12   TIME YOU'RE GOING TO SEE IT.  YOU WILL SEE IT PLENTY.

13        THE POINT I WANT TO MAKE ABOUT THIS DATABASE THAT IS

14   IMPORTANT TO UNDERSTAND IS THAT THE DATABASE HAS FIELDS FOR UP

15   TO TEN PHONE NUMBERS.  SO I HOPE THAT THAT IS NOW LEGIBLE.  WE

16   ZOOMED IN SO YOU COULD SEE ON THIS MICROSOFT EXCEL EXCERPT

17   FROM THE DATABASE.  COLUMNS H THROUGH Q ARE PHONE FIELDS ONE

18   THROUGH TEN.  AND THE FIRST ROW IS THE HEADER ROW.  IT SAYS

19   PHONE ONE, PHONE TWO, PHONE THREE, UP TO PHONE TEN.

20        I SEE I INADVERTENTLY TOUCHED THE SCREEN AND MADE SOME

21   HIGHLIGHTING, SO PLEASE DISREGARD THAT.  I DON'T KNOW HOW TO

22   CLEAR IT.  I AM GOING TO LEARN HOW TO DO THAT BETTER.

23        I'M JUST SHOWING THIS TO YOU SO YOU CAN SEE THERE ARE TEN

24   PHONE FIELDS.

25        NOW, THERE IS GOING TO BE EVIDENCE IN THIS CASE AND

OPENING STATEMENT - BURSOR

1    THERE'S ALSO A STIPULATED FACT THAT WHEN RASH CURTIS OBTAINS A

2    PHONE NUMBER ON A DEBT THAT'S REFERRED TO IT, IT PUTS THOSE

3    PHONE NUMBERS INTO PHONE FIELDS ONE THROUGH FOUR.

4        THERE IS ALSO GOING TO BE TESTIMONY, AND IT IS A

5    STIPULATED FACT IN YOUR BINDER, THAT WHEN RASH CURTIS OBTAINS

6    A PHONE NUMBER FROM SKIP-TRACING, THAT PHONE NUMBER GOES IN

7    PHONE FIELDS FIVE THROUGH TEN.

8        AND YOU CAN SEE SOME OF THE FIELDS FOR SOME OF THE RECORDS

9    ARE EMPTY.  SO, FOR SOME THEY HAVE SKIP-TRACE NUMBERS AND FOR

10   SOME THEY DON'T.  FOR SOME THEY HAVE NUMBERS PROVIDED BY THE

11   CLIENT REFERRING THE DEBT AND FOR SOME THEY DON'T.

12       SO THE FIRST THING MR. WEIR DID WAS HE LIMITED HIS SEARCH

13   TO JUST THE PHONE NUMBERS APPEARING IN FIELDS FIVE THROUGH TEN

14   THAT DO NOT ALSO APPEAR IN ANY OTHER FIELD BECAUSE HE WANTED

15   TO GET JUST THE SKIP-TRACE NUMBERS AND THAT IS JUST A DATABASE

16   OPERATION THAT HE DID WITH SOME SOPHISTICATED DATABASE

17   SOFTWARE.  YOU CAN'T DO IT IN MICROSOFT EXCEL.  I KNOW A LOT

18   OF PEOPLE HERE HAVE SEEN EXCEL.  BUT WHEN A FILE IS TOO BIG,

19   YOU CAN'T USE EXCEL FOR VERY LARGE FILES THAT HAVE 7 MILLION

20   RECORDS.  SO MR. WEIR USED A PROGRAM NAMED STATA AND HE MAY

21   HAVE USED SOME OTHER HIGH-END DATABASE SOFTWARE PRODUCTS IN

22   ORDER TO DO THIS.

23       THE FIRST THING HE DID WAS HE LIMITED THE LIST TO THE

24   PHONE NUMBERS THAT APPEARED ONLY IN FIELDS FIVE THROUGH TEN

25   AND IN NO OTHER SOURCE.

OPENING STATEMENT – BURSOR

1        ALL RIGHT.  NOW, THE SECOND CRITERIA FOR CLASS MEMBERS IN

2    THIS CASE IS THAT THEY HAVE TO HAVE BEEN CALLED EITHER USING

3    AN AUTO DIALER OR WITH A PRERECORDED MESSAGE.  IN OTHER WORDS,

4    NOT A MANUALLY DIALED CALL.  SO, MR. WEIR MADE SURE THAT EVERY

5    PHONE NUMBER ON HIS LIST WAS CALLED WITH AN AUTO DIALER

6    BECAUSE EVERY NUMBER HE HAD CAME FROM A CALL LOG FOR AN AUTO

7    DIALER.

8        NOW, THIS IS EXHIBIT 57B.  THIS IS AN EXCERPT FROM THE

9    GLOBAL CONNECT -- FROM THE CALL LOG FOR THE GLOBAL CONNECT

10   AUTO DIALER.  THERE WERE TENS OF MILLIONS OF PHONE CALLS ON

11   THIS CALL LOG, AND THIS IS JUST, JUST A LIST OF 21 OF THEM

12   THAT I'M JUST SHOWING YOU SO THAT YOU CAN SEE WHAT THE RECORDS

13   LOOK LIKE.

14       SO THE CALL LOG FOR THE AUTO DIALERS SHOW THE DATE EVERY

15   PHONE CALL WAS MADE.  THEY SHOW THE NAME ON THE DEBTOR

16   ACCOUNT, FIRST NAME, LAST NAME.  THEY SHOW THE PHONE NUMBER

17   THAT WAS CALLED.  THEY HAVE CODES IN COLUMN F.  YOU CAN SEE

18   THERE ARE CODES WHETHER THE CALL WAS ANSWERED, WHETHER IT WAS

19   ANSWERED BY A MACHINE, AND THE COLUMN ON THE RIGHT, COLUMN G,

20   SHOWS THE DURATION OF EACH PHONE CALL IN SIX-SECOND

21   INCREMENTS.

22       WE HAVE A CASE ABOUT COUNTING PHONE CALLS AND THE WAY WE

23   ARE GOING TO PROVE HOW MANY PHONE CALLS WERE MADE IS WITH THE

24   AUTO DIALER CALL LOGS.  WE KNOW EXACTLY HOW MANY PHONE CALLS

25   WERE MADE.  THIS IS HOW WE ARE GOING TO PROVE IT.

1    SO THE SECOND CRITERIA FOR OUR CLASS LIST IS THAT THE CALL

2    HAS TO HAVE BEEN MADE BY AN AUTO DIALER OR WITH A PRERECORDED

3    MESSAGE BUT EVERY, EVERY PHONE CALL ON THE LIST CAME FROM AN

4    AUTO DIALER CALL LOG.  WE WILL PROVE THAT AND MR. WEIR IS

5    GOING TO TESTIFY TO THAT.  THAT'S WHERE HE GOT THE PHONE

6    NUMBERS FROM, THOSE CALL LOGS.

7    SO, MR. WEIR DID THESE TWO THINGS.  HE LIMITED THE LIST TO

8    JUST THE NUMBERS OBTAINED BY SKIP-TRACING IN PHONE FIELDS FIVE

9    THROUGH TEN AND JUST THE AUTO DIALER CALLS.  HE MADE THOSE

10   LISTS.  THERE WERE A LITTLE OVER 14 MILLION PHONE CALLS ON

11   THOSE LISTS.

12   AND THEN HE GAVE THOSE LISTS TO MS. VERKOVSKAYA, WHO IS

13   THE SECOND EXPERT THAT DID WORK FOR US ON THIS CASE.  AND THE

14   REASON HE GAVE THE LIST TO MS. VERKOVSKAYA WAS SO THAT SHE

15   COULD DETERMINE WHICH TELEPHONE NUMBERS WERE CELLPHONES AND

16   SHE COULD ALSO DETERMINE WHICH TELEPHONE NUMBERS BELONGED TO

17   NON-DEBTORS.

18   AND THE WAY THAT SHE DID THAT WAS FIRST SHE HAD THE PHONE

19   NUMBER.  THIS IS THE SAME CALL LOG WE JUST LOOKED AT FROM THE

20   GLOBAL CONNECT DIALER.  YOU CAN SEE THE PHONE NUMBERS IN

21   COLUMN E.

22   MS. VERKOVSKAYA TOOK THOSE PHONE NUMBERS AND COMPARED THEM

23   TO A DATABASE, A DATABASE THAT IS MAINTAINED BY A COMPANY

24   CALLED IMS.  IT IS A DATABASE OF ALL PHONE NUMBERS IN THE

25   UNITED STATES.  IT'S -- WHEN YOU DIAL A PHONE NUMBER, YOUR

1    PHONE CALL GOES THROUGH THIS DATABASE SO THAT THE PHONE SYSTEM

2    KNOWS WHICH COMPANY TO CONNECT IT TO.  IT KNOWS IF YOUR PHONE

3    NUMBER IS AFFILIATED WITH VERIZON OR AT&T OR SOME OTHER

4    CARRIER.  THAT IS HOW PHONE CALLS GET CONNECTED.  THERE IS A

5    DATABASE THAT SAYS WHAT PHONE NUMBER BELONGS TO WHAT DEVICE ON

6    WHAT NETWORK.

7         SO MS. VERKOVSKAYA TOOK THE 14 MILLION PHONE NUMBERS THAT

8    MR. WEIR GAVE HER AND CHECKED THEM AGAINST THE IMS DATABASE TO

9    NARROW THE LIST DOWN TO ONLY CELLPHONES AND EXCLUDE THE

10   LANDLINES.

11        THE SECOND THING MS. VERKOVSKAYA DID WAS, YOU CAN SEE ON

12   THE CALL LOG THERE'S A NAME ON THE DEBTOR'S ACCOUNT, COLUMN B

13   IS FIRST NAME, COLUMN C IS LAST NAME.

14        SHE COMPARED THE NAME ON THE DEBTOR ACCOUNT TO THE NAME OF

15   THE REGISTERED OR CUSTOMARY USER OF THE CELLPHONE TO SEE IF IT

16   MATCHED.  IF IT MATCHED, THEN THAT WAS A PERSON WHO WAS A

17   DEBTOR ON THE ACCOUNT AT RASH CURTIS AND THEY WERE EXCLUDED.

18   IF IT DID NOT MATCH, THEN THEY WERE LIKE MR. PEREZ, NO-DEBTORS

19   WHO HAD NO ACCOUNT WITH RASH CURTIS, WHO WERE CALLED WHEN THEY

20   SHOULD NOT HAVE BEEN CALLED.

21        SO, THE LAST TWO CRITERIA, MS. VERKOVSKAYA CONFIRMED THAT

22   EVERY PHONE NUMBER ON THE CLASS LIST WAS A CELLPHONE BY

23   CROSS-REFERENCING IT WITH THE IMS DATABASE FILES, AND SHE'S

24   GOING TO COME IN AND EXPLAIN THAT, AND SHE CONFIRMED THAT THE

25   PHONE NUMBERS BELONGED TO NON-DEBTORS BY COMPARING THE NAME,

1    THE DEBTOR NAME ON THE RASH CURTIS ACCOUNT WITH THE HISTORICAL

2    CUSTOMARY USER OF THE PHONE NUMBER AS REPORTED TO TWO DATABASE

3    COMPANIES, ONE IS CALLED LEXIS NEXIS AND THE OTHER ONE IS

4    CALLED TRANSUNION.  MS. VERKOVSKAYA IS GOING TO COME IN AND

5    EXPLAIN HOW SHE DID THAT.

6         SO, THIS PROCESS NARROWED DOWN THE 79 MILLION PHONE CALLS

7    TO JUST THE CALLS TO CLASS MEMBERS THAT WERE OBTAINED BY

8    SKIP-TRACING USING AN AUTO DIALER TO A CELLPHONE TO SOMEONE

9    WHO HAD NO ACCOUNT AT RASH CURTIS AND RASH CURTIS HAD NO

10   BUSINESS CALLING.  THAT'S OUR LIST.  AS I SAID, THERE ARE --

11   WE WILL PROVE THERE ARE 40,420 OF THOSE PEOPLE THAT ARE IN THE

12   CLASS THAT WE WERE APPOINTED TO REPRESENT.

13        NOW, MS. VERKOVSKAYA GAVE THE DATA BACK TO MR. WEIR AND

14   MR. WEIR REPORTED IT IN TABLE 4 OF HIS REPORT.  I WOULD VERY

15   MUCH LIKE TO CLEAR THIS SCREEN.

16             THE CLERK:  I CLEARED.  THE CORNER SAYS CLEAR AND YOU

17   HIT THE GLASS.

18             THE COURT:  BOTTOM LEFT.

19         MR. BURSOR:  BOTTOM LEFT.  GOT IT.

20        SO WE DID THAT FOUR-STEP PROCESS THROUGH MR. WEIR AND

21   MS. VERKOVSKAYA AND THEY -- AND MR. WEIR REPORTED THE RESULTS.

22   NOW, I TOLD YOU THERE IS THREE AUTO DIALERS IN THE CASE THAT

23   RASH CURTIS USED.  THE FIRST ONE IS GLOBAL CONNECT AND

24   MR. WEIR COUNTED HOW MANY PHONE CALLS THE DEFENDANTS MADE TO

25   SKIP-TRACED NUMBERS WITH THE GLOBAL CONNECT DIALER AND THE

1    COUNT WAS 501,043.  MR. WEIR -- NOT JUST CALLS, CALLS THAT

2    WERE PLACED ANSWERED AND AT LEAST SIX SECONDS IN DURATION.  IF

3    THE CALL WAS PLACED AND WAS NOT ANSWERED, IT WAS EXCLUDED FROM

4    THE LIST.  MR. WEIR DID THE SAME THING FOR THE TCN DIALER AND

5    HE FOUND THAT THERE WERE 31,064 PHONE CALLS THAT THE DEFENDANT

6    PLACED TO NON-DEBTORS TO NUMBERS OBTAINED BY SKIP-TRACING TO

7    THEIR CELLPHONES WITH THE TCN AUTO DIALER.

8        AND WITH RESPECT TO THE VIC DIALER, MR. WEIR DETERMINED

9    THAT THERE WERE -- SO THESE THREE YOU HAVE TO ADD TOGETHER AND

10   THE COPY OF THE SLIDE THAT I HAVE DOESN'T HAVE MY NOTES ON IT

11   BUT I BELIEVE IT IS 1,679 PLUS 237 PLUS 675.  IF I REMEMBER

12   CORRECTLY, THAT ADS UP TO 2,591 BUT I'M GOING TO CHECK THE

13   MATH ON THAT.  I AM GOING TO SHOW YOU THIS SLIDE MANY, MANY

14   TIMES -- THIS TABLE 4 -- MANY, MANY TIMES DURING THE TRIAL.

15   THAT IS WHAT THIS TRIAL IS ABOUT.

16       AND IT'S A LITTLE BIT -- IT'S A LITTLE BIT DIFFERENT FOR

17   ME, BECAUSE ORDINARILY AS THE PLAINTIFFS' LAWYER, I STAND UP

18   DURING THE OPENING STATEMENT AND I SAY I'M GOING TO ASK YOU

19   FOR MONEY.  BUT I'M NOT GOING TO DO THAT HERE.  I'M NOT GOING

20   TO ASK YOU FOR MONEY.  I'M GOING TO ASK YOU TO COUNT THE PHONE

21   CALLS.  THERE IS GOING TO BE A VERDICT FORM THAT IS GOING TO

22   REQUIRE YOU TO COUNT THE PHONE CALLS.  AND WE ARE GOING TO

23   PRESENT THIS COUNT TO YOU AND WE'RE GOING TO ASK YOU TO WRITE

24   CERTAIN OF THESE NUMBERS ONTO THE VERDICT FORM.

25       AND I EXPECT THAT THE DEFENDANT WILL DISPUTE THIS COUNT

1    BUT THEY DON'T HAVE A DIFFERENT COUNT.  SO I BELIEVE THIS

2    COUNT IS GOING TO BE THE ONLY ONE YOU'RE GOING TO SEE DURING

3    THE TRIAL.  SO WE WILL PROVE THAT THE PHONE CALLS LISTED ON

4    TABLE 4 ARE THE PHONE CALLS THE DEFENDANT MADE.  WE WILL PROVE

5    EVERY ONE OF THEM WAS MADE TO A SKIP-TRACED CELLPHONE NUMBER

6    OF A NON-DEBTOR, TO OTHER CLASS MEMBER.  AFTER WE PROVE THAT,

7    WE ARE GOING TO REST AND ASK YOU FOR A VERDICT THAT CONFIRMS

8    OUR COUNT.

9        THANK YOU.

10           **THE COURT:**  MR. ELLIS.

11       **MR. ELLIS:**  THANK YOU, YOUR HONOR.

12          **THE CLERK:**  SO, DEFENSE, YOU WILL HAVE YOUR --

13       **MR. VALENTI:**  PLEASE.

14       **THE CLERK:**  OKAY.

15                     **OPENING STATEMENT**

16       **MR. ELLIS:**  IT IS, IT IS NOW AFTERNOON SO I WILL SAY

17    GOOD AFTERNOON.

18        SO AS I SAID IN VOIR DIRE, I GET TO GO SECOND.  AND I

19    THINK SUFFICE IT TO SAY WE ARE HERE BECAUSE THERE IS A DISPUTE

20    IN THE EVIDENCE.  OKAY?

21        SO NOW I'M GOING TO RUN THROUGH REALLY QUICKLY WHAT I

22    THINK THE EVIDENCE IS GOING TO SHOW, BUT I DO WANT TO GO BACK

23    AND SAY THERE IS... THERE IS ONE THING THAT MR. BURSOR SAID

24    THAT I AGREE ABOUT.

25        THIS CASE IS REALLY GOING TO ALMOST BREAK DOWN INTO TWO

1    CASES.  THERE'S GOING TO BE SOME FACTS ABOUT MR. PEREZ, WHO IS

2    SITTING HERE AT THE TABLE, AND HOW MANY PHONE CALLS CAME IN TO

3    HIM OR DIDN'T COME IN, AND THEN WE ARE GOING TO HAVE ALMOST

4    REALLY SOMETHING COMPLETELY DIFFERENT WITH RESPECT TO THE

5    CLASS, AND HOW MANY PHONE CALLS WENT TO THE CLASS AND HOW AND

6    WHY.  ALL RIGHT?

7        SO WITHOUT FURTHER ADO, LADIES AND GENTLEMEN, LET ME RIP

8    INTO MY OPENING STATEMENT.

9        AGAIN, I REPRESENT -- NEXT SLIDE?

10                        (DISPLAYED ON SCREEN.)

11        SO, AGAIN, THIS IS WHAT I BELIEVE THE EVIDENCE IS GOING TO

12    SHOW.  SO I'VE TRIED MORE THAN A HUNDRED CASES, AND THE ONE

13    THING I CAN SAY TO YOU FOLKS IS THAT AT THE BEGINNING WHAT I

14    THOUGHT THE EVIDENCE -- WHAT THE EVIDENCE WAS GOING TO SHOW IS

15    NEVER EXACTLY THE SAME FOR EITHER SIDE.  AS IT TURNS OUT,

16    THINGS HAPPEN DURING TRIAL.  BUT THIS IS WHAT WE BELIEVE THE

17    EVIDENCE IS GOING TO SHOW.

18        SO RASH CURTIS & ASSOCIATES.  THEY ARE A DEBT COLLECTION

19    AGENCY.  AND THEY SPECIALIZE IN COLLECTING ON MEDICAL DEBT.

20    SO THE DEBT GETS SENT TO THEM FROM HOSPITALS, AND DOCTOR'S

21    OFFICES, DENTAL OFFICES, SO FORTH AND SO.  YOU CAN SEE THAT IT

22    HAS ITS PRINCIPAL PLACE OF BUSINESS THERE IN VACAVILLE,

23    CALIFORNIA.  AND IT HAS ABOUT 60 EMPLOYEES, AND IT HAS 30 OR

24    40 COLLECTORS, NOT ALL OF WHICH ARE ON THE FLOOR AT THE SAME

25    TIME.  AND AS I SAID, IT COLLECTS MOSTLY DEBT FOR HEALTHCARE

1   PROVIDERS.

2       AND SO WHEN AN ACCOUNT GETS ASSIGNED TO RASH CURTIS, THE

3   INFORMATION IT RECEIVES TYPICALLY COMES FROM THE HEALTHCARE

4   PROVIDERS THEMSELVES.  AND SO --

5       LET'S GO ON TO THE NEXT SLIDE.

6                   (DISPLAYED ON SCREEN.)

7       SO WHAT IT TYPICALLY GETS WITH AN ASSIGNMENT IS SO-CALLED

8   DEMOGRAPHIC INFORMATION.  OKAY?  SO WHAT THAT MEANS IS THAT IT

9   GETS PHONE NUMBERS, IT GETS ADDRESSES, PLACES OF EMPLOYMENT,

10  AND ALL OF THIS IS TYPICALLY DELIVERED TO RASH CURTIS

11  ELECTRONICALLY, COMES OVER IN COMPRESSED FILES, AND THEN IT IS

12  DOWNLOADED INTO RASH CURTIS' SOFTWARE OF VARIOUS TYPES.

13      IT'S GOT COLLECTION SOFTWARE THAT IS PROPRIETARY THAT'S

14  MADE -- ONE OF THINGS ABOUT THIS TRIAL, BY THE WAY, LADIES AND

15  GENTLEMEN, IN TERMS OF GOING INTO A TRIAL, YOU ARE GOING TO

16  LEARN LOTS OF INFORMATION ABOUT A FIELD THAT YOU PROBABLY

17  DIDN'T KNOW ANYTHING ABOUT.  I HOPE YOU FIND IT INTERESTING.

18      BUT -- SO THIS INFORMATION COMES IN FROM THE HEALTHCARE

19  PROVIDERS, HOSPITALS, AND SO FORTH.  AND WHY DOES IT GET THAT

20  INFORMATION?  WELL, IT NEEDS TO HAVE A GOOD ADDRESS, A GOOD

21  PHONE NUMBER, TO REACH OUT AND CONTACT THE DEBTOR, AND BEGIN

22  THE PROCESS OF ATTEMPTING TO COLLECT THE DEBT.

23      ONE OF THE FACTS THAT IS NOT ON THE SLIDE, BUT THAT YOU

24  WILL HEAR IS THAT IS TYPICALLY THE HARDEST THING FOR A

25  COLLECTION AGENCY TO DO IS TO ACTUALLY CONNECT WITH THE DEBTOR

1    AND THEN BEGIN THE PROCESS OF TRYING TO GET IT PAID OR INTO A

2    PAYMENT PLAN, OR SOMETHING LIKE THAT.  AND THAT'S ONE OF THE

3    REASONS WHY THERE ARE SO MANY PHONE CALLS THAT GET MADE.

4    THAT'S BECAUSE MOST OF THEM NEVER CONNECT.  NEVER CONNECT.

5        SO WHERE DOES THIS INFORMATION COME FROM?  THE HEALTHCARE

6    PROVIDERS THAT RASH CURTIS GETS.  WELL, IT COMES FROM -- THINK

7    ABOUT GOING TO THE DENTIST.  YOU GO IN, THERE'S AN ADMISSION

8    FORM.  THERE'S A, YOU KNOW, AGREEMENT TO PAY.  YOU KNOW, IT

9    MAY SAY WE WILL BILL YOUR INSURANCE, BUT BLAH, BLAH, BLAH.

10   DOWN AT THE BOTTOM IT SAYS, GIVE US THE CONTACT INFORMATION,

11   GIVE US YOUR BEST ADDRESS.

12       THAT'S WHERE THE INFORMATION COMES FROM.  AND IT COMES

13   WITH THAT ORIGINAL ASSIGNMENT ELECTRONICALLY INTO RASH CURTIS

14   AND IT BEGINS TO AUTO POPULATE IN THE COLLECTION SOFTWARE.

15   UNDERSTAND?  MAKE SENSE?  OKAY.

16       SO IN DOING THIS, YOU CAN SEE THIS LAST BULLET PART --

17   BULLET POINT IS THAT RASH, YOU KNOW, THESE ARE ALL PART OF ITS

18   EFFORTS TO COLLECT A DEBT.  AND, AGAIN, MOST OF THESE -- AND

19   THIS WILL HAVE SOME INTERESTING -- YOU'LL SEE WITH RESPECT TO

20   THE FACTS AS THEY COME IN, WITH RESPECT TO MR. PEREZ, IN TERMS

21   OF THE ACTUAL COMMUNICATIONS WITH HIM.

22       NEXT SLIDE.

23                     (DISPLAYED ON SCREEN.)

24       SO THIS CASE, AS MR. BURSOR SAID THOUGH, REALLY COMES DOWN

25   TO THAT -- REMEMBER HE GAVE YOU FOUR THINGS THAT HE SAID THAT

1    HE WAS GOING TO PROVE?  I TOOK THE NOTES.  BUT THE VERY FIRST

2    THING THAT HE SAID THAT HIS EXPERTS WERE GOING TO SHOW WAS

3    THAT THE NUMBERS THAT RASH CURTIS CALLED WERE OBTAINED THROUGH

4    SKIP-TRACING.  OKAY?

5        HERE IS WHAT SKIP-TRACING IS.  SKIP-TRACING IS A SOFTWARE

6    THAT IS SOLD BY VARIOUS VENDORS THAT ARE ANCILLARY WITH THE

7    DEBT COLLECTION INDUSTRY.  SO LEXIS NEXIS MAY HAVE IT.  THERE

8    MAY BE EXPERIAN, WHICH IS -- TYPICALLY ACTS AS A DEBT REPORTER

9    AS TO... AS TO YOUR CREDIT SCORE.

10       BUT YOU CAN SEE WHAT THEY -- WHAT SKIP-TRACING IS FOR

11   RIGHT HERE.  THIS IS WHAT OUR EVIDENCE IS GOING TO PROVE.

12   THEY DON'T JUST SKIP-TRACE FOR TELEPHONE NUMBERS.  OKAY?  THEY

13   DON'T.  THEY SKIP-TRACE FOR CURRENT ADDRESSES, PLACES OF

14   EMPLOYMENT, WORK NUMBERS, FAX NUMBERS, ADDITIONAL ADDRESSES,

15   SPOUSE SOMETIMES.

16       AGAIN, WHY DO THEY TRY TO GATHER ALL THIS INFORMATION?

17   BECAUSE THEY WANT TO MAKE A CONNECTION WITH THE DEBTOR SO THEY

18   CAN BEGIN THE COLLECTION PROCESS.

19       AND SO YOU CAN SEE HERE, THEY ALSO GO IN AND THEY FIND

20   THINGS LIKE THIS.  HAVE YOU FILED FOR BANKRUPTCY?  BECAUSE IF

21   YOU ARE IN BANKRUPTCY, A COLLECTION AGENCY CAN'T COLLECT

22   AGAINST YOU.  IT'S AGAINST THE LAW.

23       THEY LOOK FOR THE EMPLOYMENT.  THEY SOMETIMES LOOK FOR

24   ASSET INFORMATION TO SEE IF YOU'VE GOT CREDIT CARDS, YOU KNOW,

25   AND THINGS LIKE THAT.

1    SO RASH CURTIS, TO SUM UP, USES THE SKIP-TRACING TO OBTAIN

2    INFORMATION PERTINENT TO HELPING IT WITH ITS COLLECTIONS.

3                    (DISPLAYED ON SCREEN.)

4        NOW, IN RASH CURTIS, IT MAINTAINS A DATABASE WHICH

5    CONTAINS ALL THE DEBTOR INFORMATION OF DEBTORS THAT HAVE BEEN

6    DENT TO IT TO BE COLLECTED AGAINST.  YOU CAN SEE, THIS IS

7    WHAT'S KNOWN AS BEYOND.  SO BEYOND IS A CUSTOM MADE SOFTWARE

8    PLATFORM WHICH IS MANUFACTURED BY A COMPANY NAMED DAKCS, WHICH

9    IS BACK EAST, WHICH CREATES THE SOFTWARE PRODUCTS.

10        NOW, THIS IS WHERE MR. BURSOR AND I AGREE.  SO BEYOND HAS

11   TEN PHONE FIELDS IN IT.  AND THESE ARE USED FOR STORING PHONE

12   NUMBERS ASSOCIATED WITH A DEBTOR ACCOUNT AT RASH CURTIS.  AND

13   SO THE -- THESE PHONE FIELDS BREAK DOWN INTO -- MR. BURSOR AND

14   I AGREE ON THIS -- INTO TWO SECTIONS.  THERE IS ONE THROUGH

15   FOUR, AND THEN THERE IS FIVE THROUGH TEN.  ONE THROUGH FOUR

16   ARE THE NUMBERS THAT COME IN FROM RASH'S CREDITOR CLIENTS.

17   YOU UNDERSTAND WHAT I'M SAYING?

18        SO THESE HAVEN'T BEEN -- WHEN IT OBTAINS THESE NUMBERS,

19   THEY HAVEN'T BEEN SKIP-TRACED.  THEY ARE GETTING THEM FROM

20   THEIR CREDITOR CLIENTS.  AND THEY PUT THOSE INTO FIELDS ONE

21   THROUGH FOUR, OKAY?  AND THESE ARE TYPICALLY CELLPHONE

22   NUMBERS.  THEY COULD BE LAND LINES, BUT TYPICALLY THEY ARE

23   CELLPHONE NUMBERS.  ARE YOU WITH ME SO FAR?

24        NOW, THEY START CALLING THOSE NUMBERS.  RIGHT?  BUT MAYBE

25   THE NUMBER HAS BEEN CHANGED.  MAYBE IT'S NO LONGER GOOD.  AND

1    SO THEY WILL GO OUT AND THEY WILL BEGIN TO SKIP-TRACE.

2        NEXT SLIDE.

3                    (DISPLAYED ON SCREEN.)

4        SO THIS IS A KEY SLIDE.  AND THE COURT -- THE COURT SAID,

5    YOU KNOW, IF YOU WANT TO TAKE NOTES, YOU CAN.  IF YOU DON'T

6    WANT TO TAKE NOTES, DON'T.  BUT IF THERE'S EVER A TIME TO TAKE

7    SOME NOTES, THIS IS -- BECAUSE IT IS REALLY IMPORTANT TO

8    UNDERSTAND THIS FOR THE REST OF THE CASE.

9        IT IS RASH CURTIS' POLICY AND PROCEDURE TO PLACE ONLY

10   CELLPHONE NUMBERS IN PHONE FIELDS THAT THEY HAVE -- LET ME GO

11   BACK.

12       IT'S RASH CURTIS' POLICY AND PROCEDURE TO TAKE THE

13   CELLPHONE NUMBERS THAT THEY HAVE OBTAINED BY THEIR CLIENTS WHO

14   HAVE -- WHO IN TURN HAVE OBTAINED THOSE WITH THE CONSENT OF

15   THE DEBTORS, THE PATIENTS, AND PUT THOSE IN PHONE FIELDS ONE

16   THROUGH FOUR.  OKAY?

17       THOSE NUMBERS, CELLPHONE NUMBERS THAT THEY HAVE OBTAINED

18   FROM THEIR CLIENTS, RASH THEN LOADS INTO ITS AUTO DIALERS AND

19   CALLS THOSE NUMBERS WITH AUTO DIALERS.  WHY?  BECAUSE THEY

20   HAVE GOT THE CONSENT OF THE PATIENT AS PROVIDED THROUGH THE

21   CREDITOR CLIENT TO DO SO.  OKAY?

22       NOW, RASH CURTIS' POLICY AND PROCEDURE IS TO PLACE PHONE

23   NUMBERS THAT THEY HAVE GOTTEN FROM OTHER PLACES, EVEN FROM --

24   EVEN FROM THE PATIENTS THEMSELVES THAT DON'T FIT INTO ONE

25   THROUGH FOUR, PHONE FIELDS ONE THROUGH FOUR; THEY PLACE THOSE

1    IN PHONE FIELDS FIVE THROUGH TEN.

2         NOW, THIS IS WHERE I THINK THE EVIDENCE IS GOING TO PART

3    WAYS AND WHERE I -- WHERE OUR CASE PARTS WAYS WITH THE

4    PLAINTIFFS' CASE.  BECAUSE PLAINTIFFS' POSITION AND EVIDENCE

5    THROUGH THEIR EXPERTS, WHO I WILL COME BACK TO AND TALK ABOUT

6    AT THE VERY END, THEIR EXPERTS CLAIM THAT EVERY ONE OF THOSE

7    501 AND SOME THOUSAND PHONE CALLS WERE SKIP-TRACED.

8         AND I'M GOING TO TELL YOU WRITE RIGHT NOW I DO NOT BELIEVE

9    THAT IS WHAT THE EVIDENCE IS GOING TO SHOW.

10        YOU'VE HEARD FROM ME DURING VOIR DIRE ABOUT BURDEN OF

11   PROOF.  YOU'VE HEARD FROM THE COURT, SHE READ AN INSTRUCTION

12   ON BURDEN OF PROOF.  IT IS THE PLAINTIFFS' BURDEN OF PROOF TO

13   DEMONSTRATE TO YOU THAT THOSE NUMBERS THAT WERE CALLED BY RASH

14   CURTIS WERE OBTAINED BY RASH CURTIS THROUGH SKIP-TRACING.  AND

15   I'M GOING TO TELL YOU I DO NOT BELIEVE AT THE END OF THE DAY

16   THE EVIDENCE IS GOING TO SHOW THAT.

17        NOW, I WILL SAY THIS, AND LOOK AT THE FIRST BULLET POINT.

18   NUMBERS THAT WERE OBTAINED BY SKIP-TRACING WERE PUT IN PHONE

19   FIELDS FIVE THROUGH TEN, BUT NOT ALL PHONE NUMBERS IN PHONE

20   FIELDS FIVE THROUGH TEN ARE SKIP-TRACED.  DO YOU UNDERSTAND MY

21   POINT THERE?

22        SO WHO KNOWS HOW MANY SKIP-TRACED NUMBERS ARE IN THERE?

23   I'M GOING TO TELL YOU THAT I DON'T THINK THAT MR. SNYDER, OR

24   MR. WEIR, OR MS. VERKOVSKAYA IS GOING TO BE ABLE TO TELL YOU.

25        AND, LADIES AND GENTLEMEN, IT IS PLAINTIFFS' BURDEN TO

1   PROVE THAT EVERY SINGLE NUMBER, AND YOU JUST HEARD IT, THAT

2   WAS PUT IN THOSE PHONE FIELDS WAS SKIP-TRACED.  IT'S NOT MY

3   BURDEN.  I DON'T HAVE TO PUT ON A PIECE OF EVIDENCE IF

4   PLAINTIFF HASN'T MET THEIR BURDEN.

5       SO THE NUMBERS IN PHONE FIELDS FIVE THROUGH TEN UNDER RASH

6   CURTIS' POLICIES AND PROCEDURES SHOULD BE DIALED MANUALLY.

7   WHY?  BECAUSE THE NUMBERS THAT GO INTO THOSE FIELDS WE DON'T

8   NECESSARILY HAVE CONSENT TO CALL THOSE NUMBERS.

9                   (DISPLAYED ON SCREEN.)

10      THIS IS ANOTHER KEY PIECE OF EVIDENCE THAT I THINK THAT

11  I'M GOING TO PROVE ON THIS SLIDE RIGHT IN FRONT OF YOU.

12      THAT IS, THE PHONE NUMBERS PLACED BY RASH CURTIS IN PHONE

13  FIELDS FIVE THROUGH TEN ARE OBTAINED BY A VARIETY OF SOURCES,

14  AND FROM A VARIETY OF SOURCES.  SO WHAT'S THE FLIP SIDE OF

15  THAT COIN?  MEANS ONLY ONE OF THE SOURCES OUT OF MANY MAY BE

16  SKIP-TRACING.

17                  (DISPLAYED ON SCREEN.)

18      AS PART OF ITS TCPA COMPLIANCE, IN THE COURSE OF

19  COLLECTING DEBTS, RASH CURTIS CALLED CONSUMERS WHOSE NUMBERS

20  WERE IN PHONE FIELDS ONE THROUGH FOUR, THAT IS, NUMBERS THAT

21  HAD BEEN GIVEN TO ITS CREDITOR CLIENTS WITH CONSENT AND IN

22  TURN PASSED ON TO RASH CURTIS, THOSE WERE THE ONLY NUMBERS,

23  ACCORDING TO THE POLICY, THAT WERE SUPPOSED TO BE CALLED WITH

24  AN AUTOMATIC DIALER.

25      SO PROGRESSIVE OR AUTOMATIC DIALER IS A TYPE OF TELEPHONE

1    EQUIPMENT WHICH AUTOMATICALLY INITIATES PHONE CALLS.  THERE I

2    GO WITH MY DENTAL SURGERY.  I APOLOGIZE.  AY-AY-AY.

3        THE GLOBAL CONNECT DIALER IS NO LONGER USED AT RASH

4    CURTIS.  THAT FACT PROBABLY DOESN'T MAKE ANY IMPRESSION ON YOU

5    AT ALL.  BY THE END OF THE CASE WHEN I COME BACK AND SAY THAT

6    THAT'S WHAT THE EVIDENCE SHOWED, IT WILL MAKE A DIFFERENCE.

7        NEXT SLIDE.

8                    (DISPLAYED ON SCREEN.)

9        THE VIC DIALER.  AS MR. BURSOR SAID, THERE WERE THREE

10   DIALING PLATFORMS USED AT RASH.  THERE WAS THE VIC DIALER.

11   THAT'S THE EARLIEST ONE AND PROBABLY THE -- FOR YOU FOLKS THAT

12   ARE SO TECHNOLOGICALLY SAVVY, IT IS PROBABLY THE MOST

13   PRIMITIVE DIALER.  AND IT WAS USED IN 2012, I THINK, THROUGH

14   2013, MAYBE EARLY INTO 2014.  IT'S NO LONGER USED BY RASH

15   CURTIS ALSO.  NOT BECAUSE THE EQUIPMENT IS INHERENTLY EVIL,

16   AND -- OR ANYTHING LIKE THAT, BUT IT JUST GOT TOO OLD.

17       AND, AGAIN, WHILE THIS FACT MAY NOT MAKE ANY IMPRESSION ON

18   YOU RIGHT NOW, REMEMBER IT IF YOU CAN BECAUSE AT THE END OF

19   THE CASE THE FACT THAT THE VIC DIALER IS NO LONGER IN USE IS

20   GOING TO BE IMPORTANT.

21       NEXT SLIDE.

22                   (DISPLAYED ON SCREEN.)

23       AND NOW THE LAST DIALER THAT RASH USES AND THIS -- IT USED

24   IT IN 2016, 2017, IS THIS SO-CALLED TCN DIALER.  JUST ANOTHER

25   DIALING PLATFORM.

1          CAN YOU GO BACK FOR A SECOND, ANTHONY?

2                    (DISPLAYED ON SCREEN.)

3          AGAIN, THIS IS GOING TO BE IMPORTANT.  LET ME GIVE YOU

4     WHAT I THINK THE EVIDENCE IS GOING TO SHOW.  I THINK THE

5     EVIDENCE IS GOING TO SHOW THAT MR. PEREZ, WHEN HE WAS

6     ATTEMPTED TO BE CONTACTED THIS 26 TIMES THAT MR. BURSOR

7     ALLUDED TO, THAT WAS ONLY WITH THE GLOBAL CONNECT DIALER.  IT

8     WASN'T WITH THE VIC DIALER AND IT WASN'T WITH THE TCN DIALER.

9     I BELIEVE AT THE END OF THE CASE THAT'S GOING TO BE IMPORTANT.

10                   (DISPLAYED ON SCREEN.)

11         SO LET'S TALK ABOUT MR. PEREZ SPECIFICALLY.  RASH CURTIS'

12    CALL LOGS INDICATE THAT IT ATTEMPTED 26 PHONE CALLS TO THE

13    CELLPHONE NUMBER IN 5193, THAT ENDED IN 5193.  AGAIN, YOU CAN

14    SEE NONE OF THESE CALLS WERE PLACED WITH THE VIC OR TCN

15    DIALERS.

16         YOU CAN SEE I'M NOT TRYING TO HIDE THE ATTEMPTS, RIGHT?

17    THERE WERE 26 ATTEMPTS.  NOW HERE'S WHAT YOU'RE GOING TO BE

18    ASKED TO EVALUATE.  HOW MANY OF THOSE ATTEMPTS ACTUALLY LED

19    THIS GLOBAL CONNECT DIALER AT RASH CURTIS TO REACH OUT AND

20    ACTUALLY CONNECT WITH MR. -- WITH THE PLAINTIFFS' PHONE

21    SYSTEM?  LET ME GO BACK AND SAY THAT BECAUSE THAT WASN'T THE

22    GREATEST THING I EVER STATEMENT THAT I EVER MADE.

23         SO THE IDEA -- WHAT YOU HEARD WAS THAT MR. BURSOR SAID

24    THERE WAS A -- THAT FIRST PHONE CALL, REMEMBER HIM SAYING

25    THAT, IN MAY OF 2015, AND HE SAYS WE REACHED OUT AND TALKED

1   WITH MR. PEREZ.

2        I WANT YOU TO EVALUATE THAT FROM THE RECORDS THAT YOU'RE

3   GOING TO SEE AND FROM THE TESTIMONY THAT YOU'RE GOING TO SEE.

4   AND I -- ONE OF THE THINGS AT THE END OF THE CASE, AS

5   MR. BURSOR SAID, IS THAT YOU'RE GOING TO BE ASKED TO LIKE

6   TALLY UP THE NUMBERS.  YOU'RE GOING TO TALLY UP THE ACTUAL

7   PHONE CALLS THAT CONNECTED WITH MR. PEREZ, AND THEN SEPARATELY

8   YOU'RE GOING TO BE ASKED TO FIGURE OUT OF THESE 540,000 PHONE

9   CALLS, ONE, SOME, ANY OF THOSE ACTUALLY GO THROUGH, GET

10  CONNECTED, AND WE'LL TALK ABOUT THE EVALUATION OF THE EXPERTS'

11  TESTIMONY IN A SECOND, BUT YOU'RE GOING TO HAVE TO REALLY,

12  REALLY SCRUTINIZE THE THREE EXPERTS FOR PLAINTIFF'S TESTIMONY.

13       HERE IS WHAT I THINK THE EVIDENCE IS GOING TO SHOW.

14       THE FIRST 25 PHONE CALLS ATTEMPTED BY RASH CURTIS WENT

15  UNANSWERED.  WHY DID THEY KEEP CALLING?  BECAUSE RASH CURTIS

16  HAS NOTHING BETTER TO DO THAN TO ANNOY PEOPLE?  NO.  THEY WERE

17  TRYING TO GET HOLD OF MR. PEREZ.  AND HERE'S WHAT I BELIEVE

18  THE EVIDENCE IS GOING TO SHOW.  THE FIRST TIME HE ACTUALLY

19  PICKED UP THE PHONE AND SPOKE WITH THEM WAS ON JUNE 7TH, 2016.

20                 (DISPLAYED ON SCREEN.)

21       DURING THAT PHONE CALL PEREZ -- MR. PEREZ TOLD RASH CURTIS

22  HE WAS NOT THE DEBTOR THEY WERE LOOKING FOR.  AFTER TALKING TO

23  MR. PEREZ, PURSUANT TO COMPANY POLICY, THEY TOOK THE 5193

24  NUMBER OUT OF THE DIALER.  THEY TOOK IT OUT SO IT COULDN'T BE

25  CALLED AGAIN.

1        AND THE TESTIMONY AND THE EVIDENCE WILL BE UNDISPUTED THAT

2    THEY NEVER DARKENED HIS DOORWAY AGAIN ONCE THEY FINALLY

3    CONNECTED WITH HIM AND THEY TOLD -- THEY WERE TOLD THAT HE WAS

4    NOT THE PERSON THEY WERE LOOKING FOR.

5        SO, HERE ARE THE TWO KEY ISSUES.

6                    (DISPLAYED ON SCREEN.)

7        IN THE SMALL CASE, THE PEREZ CASE, WHETHER MR. PEREZ'S

8    CELLPHONE NUMBER ENDING IN 5193 WAS OBTAINED BY SKIP-TRACING.

9    BECAUSE REMEMBER WHAT MR. BURSOR SAID TO YOU?  THAT'S THE

10   FIRST CRITICAL QUESTION IN THE FOUR QUESTIONS THAT HE SAID

11   THAT YOU'RE GOING TO LOOK AT.

12       THEY LOSE ON THAT ONE.  THAT PART IS OVER.

13                    (DISPLAYED ON SCREEN.)

14       SECOND KEY ISSUE IS WHETHER THERE IS GOING TO BE EVIDENCE,

15   CREDIBLE, RELIABLE, DEPENDABLE EVIDENCE THAT DEMONSTRATES THAT

16   ANY ONE -- ANY ONE OF THE CLASS MEMBERS CAN SHOW THAT RASH

17   CURTIS OBTAINED THEIR TELEPHONE NUMBER BY SKIP-TRACING AND

18   CALLED IT.

19       WHY IS THAT IMPORTANT?  BECAUSE IT'S THE FIRST ELEMENT OF

20   THEIR CASE.  AND IF THEY CAN'T PROVE IT TO YOU, IT FALLS, THE

21   CASE FALLS.

22                    (DISPLAYED ON SCREEN.)

23       SO HERE ARE THE WITNESSES THAT YOU'RE GOING TO HEAR.  SO

24   BOB KEITH YOU'VE HEARD ABOUT HIM -- HE INTRODUCED HIMSELF IN

25   THE COURTROOM.  HE'S SITTING AT COUNSEL TABLE BY THE SCREEN.

1       BOB, CAN YOU STAND UP?

2       SO HE'S THE VICE PRESIDENT OF OPERATIONS AT RASH CURTIS.

3       CHRIS PAFF IS ALSO AN EXECUTIVE VICE PRESIDENT OF

4  OPERATIONS AT RASH CURTIS, AND HE'LL COME IN.

5       NICK KEITH IS THE INFORMATION TECHNOLOGY, THE IT GUY

6  THERE, AND HE WILL TALK TO YOU ABOUT RASH CURTIS' POLICIES AND

7  PROCEDURES AND SKIP-TRACING.

8       AND SO WILL DAN CORREA SINCE HE IS THE MANAGER OF THE

9  COLLECTION FLOOR.  HE'S THE COLLECTION MANAGER.

10      STEVE KIZER IS AN EX-EMPLOYEE OF RASH CURTIS.  HE IS NO

11  FAN OF RASH CURTIS.  BUT I BELIEVE YOU WILL GET VALUABLE

12  INFORMATION FROM HIM.  HOPEFULLY HE WILL SHOW UP.

13      MR. PEREZ WILL BE ON THE STAND TOMORROW AS I UNDERSTAND

14  IT, AND YOU WILL HEAR FROM MR. BURSOR.  HE WILL ELICIT

15  TESTIMONY, AND THEN YOU WILL SEE ME CROSS-EXAMINE MR. PEREZ.

16      NOW, THE LAST THREE WITNESSES, WHICH ARE REALLY THE HEART

17  OF THE CASE, THESE ARE THE EXPERTS FOR PLAINTIFF.

18      LADIES AND GENTLEMEN, I BELIEVE THE EVIDENCE IS GOING TO

19  SHOW THIS; THEY ARE PROFESSIONAL EXPERTS.  THE EVIDENCE WILL

20  SHOW SIMPLY IN THIS CASE, BETWEEN THE THREE OF THEM, THEY

21  HAVE -- HAD BILLED THROUGH THE END OF 2018 MORE THAN $150,000.

22  AND YOU WILL BE ASKED TO EVALUATE THE CREDIBILITY AND

23  RELIABILITY OF THESE EXPERTS, BUT YOU WILL SEE THAT AT LEAST

24  TWO OF THEM ARE REPEATED PLAYERS ON BEHALF OF THIS LAW FIRM.

25      SO, $70,000 FOR -- FOR EXAMPLE, MR. WEIR, WAS PAID THROUGH

```
1    THE END OF 2018.  I DON'T KNOW HOW MANY OTHER CASES THE

2    EVIDENCE WILL SHOW -- WE'LL FIND OUT OVER THE COURSE OF THE

3    NEXT TWO OR THREE DAYS, WE'LL FIND OUT -- AND YOU WILL SEE AN

4    EMAIL THAT WILL -- THAT WILL COME IN, JUST AS MR. BURSOR SAID

5    THERE ARE CERTAIN EXHIBITS THAT WILL COME IN, THERE'S AN EMAIL

6    FROM ONE OF THE EXPERTS SAYING, WHY DIDN'T YOU INVITE ME TO

7    YOUR CHRISTMAS PARTY?  I'VE MADE YOU ENOUGH MONEY THIS YEAR,

8    OR WORDS TO THAT EFFECT.

9        ONE OF THE THINGS THAT SOMETIMES JURORS WHO ARE NOT

10   TECHNOLOGICALLY SAVVY -- AND LET ME JUST SAY I AM NOT

11   TECHNOLOGICALLY SAVVY, BUT THEY SOMETIMES DEFER OR DON'T WANT

12   TO SECOND-GUESS EXPERTS WHO TELL YOU THAT THERE WERE 541,000

13   PEOPLE THAT WERE SKIP-TRACED, OR THAT THEY WERE ALL

14   NON-DEBTORS, OR SO FORTH AND SO ON, OR THAT THERE WERE

15   MESSAGES LEFT BECAUSE THE TIME PERIOD IS MORE THAN SIX SECONDS

16   ON THE PHONE BILLS.

17       YOU WILL NEED TO LOOK AT THAT OVER THE COURSE OF THE NEXT

18   FOUR OR FIVE DAYS VERY, VERY CAREFULLY TO SEE WHETHER OR NOT

19   YOU BELIEVE THAT EVIDENCE IS CREDIBLE.  BECAUSE YOU, AS THE

20   COURT SAID, ARE THE SOLE JUDGES OF THE CREDIBILITY AND THE

21   FACTS.

22                   (DISPLAYED ON SCREEN.)

23       SO, THIS REALLY SIMPLY REPEATS.  THIS JUST GIVES YOU SOME

24   SPECIFIC INFORMATION HERE.  YOU CAN SEE WHEN THE LAWSUIT WAS

25   FILED.  YOU CAN SEE WHEN MR. PEREZ WAS APPOINTED CLASS REP.
```

1    YOU CAN SEE, AS MR. BURSOR SAID, HIS LAW FIRM WAS APPOINTED AS

2    CLASS COUNSEL.

3        THEN WE GET BACK TO THE $64,000 QUESTION IN THIS CASE,

4    WHICH IS, EACH OF THE CERTIFIED CLASSES REQUIRES, AS A

5    PRECONDITION TO MEMBERSHIP, THAT THE CLASS MEMBER'S PHONE

6    NUMBER WHICH WAS CALLED BY RASH CURTIS WAS OBTAINED BY RASH

7    CURTIS THROUGH SKIP-TRACING AS OPPOSED TO ONE OF THE OTHER

8    MYRIAD SOURCES THAT IT OBTAINS PHONE NUMBERS, AND PUT IN PHONE

9    FIELDS FIVE THROUGH TEN.

10       THANK YOU, ALL.  I KNOW IT'S BEEN -- IT HAS ONLY BEEN HALF

11   A DAY.  I KNOW IT HAS BEEN A LONG AND EXHAUSTING DAY TO PICK

12   THE JURY.  I WON'T HAVE A CHANCE TO TALK WITH YOU FOLKS AGAIN

13   DIRECTLY UNTIL THE END OF THE CASE, WHETHER IT'S FRIDAY

14   AFTERNOON OR MONDAY, HOWEVER IT TURNS OUT, BUT I HOPE YOU DO

15   ENJOY IT.

16       I THANK YOU FOR YOUR ATTENTION.  REMEMBER, AS I GO AND SIT

17   DOWN, THAT EVERY TIME PLAINTIFF PUTS A WITNESS ON THE STAND, I

18   WILL HAVE A CHANCE TO CROSS-EXAMINE THAT PERSON SO WAIT UNTIL

19   YOU HEAR ALL THE EVIDENCE BEFORE YOU MAKE A DECISION.  AND

20   REMEMBER THE SCALES OF JUSTICE.

21       AND HAVE A NICE DAY.

22          **THE COURT:**  ALL RIGHT.  THANK YOU, MR. ELLIS.

23       OKAY.  LET'S -- IF YOU WILL DO A COUPLE OF THINGS BEFORE I

24   LET YOU GO FOR THE DAY.

25       SO GO AHEAD AND GRAB YOUR BINDER.  AND BEHIND THE

1   TELEPHONE REMINDERS THERE IS A CALENDAR.  I THINK THAT YOU

2   WILL PROBABLY, AT THE LATEST, GET THE CASE FOR DELIBERATIONS

3   BY MONDAY.  SO YOU SEE WHERE IT SAYS "DELIBERATIONS TO PROCEED

4   ALL DAY"?  THAT'S REALLY PROBABLY STARTING ON TUESDAY.  YOU

5   WILL PROBABLY BE DELIBERATING BY TUESDAY.  ALL RIGHT?  JUST

6   FOR PLANNING PURPOSES.

7        SO THAT'S ONE THING.

8        THE NEXT IS I AM GOING TO GO AHEAD, NOW THAT WE'VE HAD THE

9   OPENING STATEMENTS, AND READ TO YOU WHAT ARE THE STIPULATED

10  FACTS.  BELIEVE IT OR NOT, THIS IS JUST GOING TO MAKE

11  EVERYTHING GO FASTER, WHICH IS WHY I'M GOING TO READ THEM TO

12  YOU.  I UNDERSTAND THAT IT CAN BE TAXING, WHICH IS WHY YOU

13  HAVE THEM IN YOUR BINDER SO YOU CAN FOLLOW ALONG.  YOU DON'T

14  HAVE TO TAKE NOTES, BUT THE FOLLOWING FACTS ARE DEEMED TO BE

15  PROVED, AND THEY ARE AS FOLLOWS:

16       1.  PLAINTIFF PEREZ FILED A CLASS ACTION COMPLAINT ON

17  JUNE 17TH, 2016.

18       2.  THE COURT APPOINTED PLAINTIFF PEREZ AS THE CLASS

19  REPRESENTATIVE OF THE CERTIFIED CLASSES IN THIS CASE ON

20  SEPTEMBER 6, 2017.

21       3.  THE COURT APPOINTED BURSOR & FISHER AS CLASS COUNSEL

22  TO REPRESENT THE CERTIFIED CLASSES IN THIS CASE ON

23  SEPTEMBER 6, 2017.

24       4.  DEFENDANT RASH CURTIS & ASSOCIATES IS A NATIONWIDE

25  DEBT COLLECTION AGENCY SPECIALIZING IN THE COLLECTION OF

HEALTHCARE DEBT.

5.  RASH CURTIS' PRINCIPAL PLACE OF BUSINESS IS VACAVILLE,
CALIFORNIA.

6.  RASH CURTIS OBTAINS DEBTOR ACCOUNTS FROM HEALTHCARE
PROVIDERS FOR THE PURPOSE OF COLLECTING DEBTS AND MAY INCLUDE
ONE OR MORE TELEPHONE NUMBERS.

7.  AS PART OF ITS EFFORTS TO COLLECT DEBT, RASH CURTIS
REGULARLY CALLS DEBTORS AND OTHER PEOPLE RELATED TO THEM.

8.  EACH OF THE CERTIFIED CLASSES REQUIRES, AS A
PRECONDITION TO MEMBERSHIP, THAT THE CLASS MEMBERS' TELEPHONE
NUMBERS CALLED BY RASH CURTIS WERE OBTAINED THROUGH
SKIP-TRACING.

9.  SKIP-TRACING IS A METHOD OF OBTAINING DEMOGRAPHIC
INFORMATION ABOUT INDIVIDUALS.  SKIP-TRACING IS USED FOR A
NUMBER OF PURPOSES INCLUDING OBTAINING CONTACT INFORMATION
SUCH AS HOME TELEPHONE NUMBERS, CURRENT HOME ADDRESSES, LAST
KNOWN ADDRESSES, PLACES OF EMPLOYMENT, WORK PHONE NUMBERS, FAX
NUMBERS, SPOUSE PHONE NUMBERS, CELLULAR OR LAND LINE, FAMILY
MEMBER PHONE NUMBERS, ADDITIONAL ADDRESSES OR PHONE NUMBERS
SUCH AS NEIGHBORS OR FRIENDS, ASSETS, CREDIT SCORES, AND
SEARCHING FOR BANKRUPTCY FILINGS.  SKIP-TRACING MAY BE
PERFORMED VIA DATA ANALYSIS OF PERSONAL INFORMATION OBTAINED
FROM A VARIETY OF PUBLIC AND PRIVATE DATABASES.  THROUGH
SKIP-TRACING, A COMPANY LIKE RASH CURTIS MAY OBTAIN NEW
TELEPHONE NUMBERS, ADDRESSES, AND/OR EMPLOYMENT OR ASSET

1    INFORMATION ON A DEBTOR OR THIRD PARTIES.

2       10.   RASH CURTIS USES SKIP-TRACING TO OBTAIN VARIOUS

3    INFORMATION ABOUT DEBTORS SUCH AS TELEPHONE NUMBERS FOR THE

4    FILES IT RECEIVES WHEN IT DOES NOT CONTAIN TELEPHONE NUMBERS

5    FOR DEBTORS, ADDITIONAL TELEPHONE NUMBERS FOR ACCOUNTS IT

6    RECEIVES THAT DO NOT CONTAIN TELEPHONE NUMBERS, EMPLOYMENT

7    INFORMATION AND, AMONG OTHER THINGS, LOCATION INFORMATION.

8    RASH CURTIS MAY ALSO USE SKIP-TRACING TO OBTAIN OTHER

9    INFORMATION PERTINENT TO ITS COLLECTION ACTIVITY.

10      11.   RASH CURTIS STORES THE TELEPHONE NUMBERS IT OBTAINS

11   FROM SKIP-TRACING IN CERTAIN AREAS OF ITS COLLECTION DATABASE.

12      12.   RASH CURTIS MAINTAINS A DATABASE CONTAINING ALL OF

13   ITS COLLECTION ACCOUNTS.  EACH ACCOUNT RECOVERED -- I'M SORRY.

14   EACH ACCOUNT RECORD HAS TEN TELEPHONE NUMBER FIELDS USED FOR

15   STORING PHONE NUMBERS ASSOCIATED WITH THE ACCOUNT.

16      13.   IT IS RASH CURTIS' POLICY AND PROCEDURE TO PLACE

17   TELEPHONE NUMBERS THAT IT RECEIVES FROM ITS CREDITOR CLIENTS

18   IN PHONE FIELDS ONE THROUGH FOUR.

19      14.   IT IS RASH CURTIS' POLICY AND PROCEDURE TO PLACE THE

20   TELEPHONE NUMBERS THAT IT OBTAINS FROM SKIP-TRACING IN PHONE

21   FIELDS FIVE THROUGH TEN.

22      15.   IN THE COURSE OF COLLECTING DEBTS, RASH CURTIS

23   REGULARLY CALLS CONSUMERS USING GLOBAL CONNECT, A PROGRESSIVE

24   DIALER.

25      16.   A PROGRESSIVE DIALER IS A TYPE OF AUTOMATIC TELEPHONE

1    DIALER WHEREBY THE EQUIPMENT INITIATES OUTBOUND TELEPHONE

2    CALLS BY PROGRESSIVELY DIALING THROUGH A STORED LIST OF

3    TELEPHONE NUMBERS.

4         17.  AT THE TIME RASH CURTIS WAS USING GLOBAL CONNECT,

5    GLOBAL CONNECT COULD MAKE TEN SIMULTANEOUS CALLS PER EACH OF

6    RASH CURTIS' AVAILABLE DEBT COLLECTION AGENTS.

7         18.  GLOBAL CONNECT COULD MAKE THOUSANDS OF CALLS WITHIN

8    MINUTES.

9         19.  THE GLOBAL CONNECT DIALER ALLOWS FOR CALLING

10   TELEPHONES USING A PRERECORDED VOICE.

11        20.  RASH CURTIS' EMPLOYEES WOULD LOAD LISTS OF NUMBERS

12   FOR GLOBAL CONNECT TO CALL PRIOR TO THE GLOBAL CONNECT PLACING

13   CALLS.

14        21.  RASH CURTIS' GLOBAL CONNECT DIALER IS AN AUTOMATIC

15   TELEPHONE DIALING SYSTEM UNDER THE TCPA.  THAT'S TITLE 47 OF

16   THE UNITED STATES CODE, AT SECTION 227(A)(1).

17        22.  IN THE COURSE OF COLLECTING DEBTS, RASH CURTIS

18   REGULARLY CALLED CONSUMERS USING VIC, A PREDICTIVE DIALER, OR

19   VIC.

20        A PREDICTIVE DIALER IS A TYPE OF AUTOMATIC TELEPHONE

21   DIALER THAT PROVIDES THE CAPABILITY TO PREDICT THE

22   AVAILABILITY OF CALLS CENTER AGENTS THAT CAN RESPOND TO THE

23   OUTBOUND CALLS THAT HAVE BEEN DIALED BY THE PREDICTIVE DIALING

24   SYSTEM AND ANSWERED BY THE CALLED PARTY.  THE VIC DIALER

25   UTILIZES DEBT COLLECTION BUSINESS SOFTWARE SOLD BY A COMPANY

1    CALLED DAKCS.

2        AT THE TIME RASH CURTIS WAS USING VIC, VIC COULD MAKE A

3    MINIMUM OF THREE SIMULTANEOUS CALLS FOR EACH OF RASH CURTIS'

4    AVAILABLE DEBT COLLECTION AGENTS.

5        THE VIC DIALER ALLOWS FOR CALLING TELEPHONES USING A

6    PRERECORDED VOICE.

7        RASH CURTIS' --

8        27.  RASH CURTIS' EMPLOYEES WOULD LOAD LISTS OF NUMBERS

9    FOR VIC TO CALL PRIOR TO VIC PLACING CALLS.

10       28.  THE COURT HAS ALREADY DETERMINED THAT RASH CURTIS'

11   VIC DIALER IS AN AUTOMATIC TELEPHONE DIALING SYSTEM UNDER THE

12   TCPA, TITLE 47, U.S. CODE, SECTION 227(A)(1).

13       29.  IN THE COURSE OF COLLECTING DEBTS, RASH CURTIS

14   REGULARLY CALLS CONSUMERS USING TCN, A PREDICTIVE DIALER.

15       TCN CAN MAKE TEN SIMULTANEOUS CALLS PER EACH OF RASH

16   CURTIS' AVAILABLE DEBT COLLECTION AGENTS.

17       31.  RASH CURTIS' EMPLOYEES LOAD LISTS OF NUMBERS FOR TCN

18   TO CALL PRIOR TO TCN PLACING CALLS.

19       32.  RASH CURTIS' TCN DIALER IS AN AUTOMATIC TELEPHONE

20   DIALING SYSTEM UNDER THE TCPA SECTION 47 -- TITLE 47, U.S.

21   CODE, SECTION 227(A)(1).

22       33.  RASH CURTIS' CALL LOGS SHOW THAT IT MADE 26 CALLS TO

23   PLAINTIFF PEREZ'S CELLPHONE, ALL OF WHICH WERE PLACED THROUGH

24   ITS DIALING SYSTEM GLOBAL CONNECT AND NONE OF WHICH WERE

25   PLACED THROUGH THE VIC OR TCN DIALER.  THE CALLS WERE PLACED

1   ON THE FOLLOWING DATES:  (1) JUNE 3RD, 2015, (2) FEBRUARY 24,

2   2016, (3) MARCH 2, 2016, (4) MARCH 9TH, 2016, (5) MARCH 15TH,

3   2016, (6) MARCH 28TH, 2016, (7) APRIL 5TH, 2016, (8) APRIL 6,

4   2016, (9) APRIL 13TH, 2016, (10) APRIL 18TH, 2016, (11)

5   APRIL 20TH, 2016, (12), APRIL 22ND, 2016, (13), APRIL 25TH,

6   2016, (14) APRIL 27TH, 2016, (15) MAY 12TH, 2016, (16)

7   MAY 16TH, 2016, (17) MAY 20TH, 2016, (18) MAY 24TH, 2016, (19)

8   MAY 25TH, 2016, (20) MAY 26TH, 2016, (21), MAY 27TH, 2016,

9   (22) MAY 22ND (SIC), 2016, (23) MAY 31ST, 2016, (24) JUNE 1ST,

10  2016, (25) JUNE 3RD, 2016, AND (26) JUNE 7TH, 2016.

11      34.  RASH CURTIS' CALL LOGS SHOW THAT IT MADE 14 CALLS TO

12  PLAINTIFF PEREZ WHERE THE CALL LASTED SIX SECONDS OR LONGER

13  INDICATING POSSIBLE USE OF AN ARTIFICIAL OR PRERECORDED VOICE.

14      NO. 35.  RASH CURTIS HAS NEVER HAD AN ACCOUNT IN PLAINTIFF

15  PEREZ'S NAME.

16      36.  PLAINTIFF PEREZ TOLD RASH CURTIS TO STOP CALLING HIS

17  CELLPHONE ON JUNE 7TH, 2016.

18      37.  RASH CURTIS LACKED PRIOR EXPRESS CONSENT TO CALL

19  PLAINTIFF PEREZ.

20      THOSE FACTS ARE DEEMED PROVED.

21      I'M GOING TO RELEASE YOU TO GO INTO THE JURY ROOM AT WHICH

22  POINT MY COURTROOM DEPUTY WILL GIVE YOU YOUR JURY BADGE,

23  SHE'LL GIVE YOU BASIC INFORMATION ABOUT HOW TO GET INTO THE

24  JURY ROOM AT THE BEGINNING OF EACH DAY.  AND WE WILL TAKE YOUR

25  CELLPHONE NUMBERS.

1      SHE'LL ALSO GIVE YOU A TELEPHONE NUMBER THAT YOU CAN GIVE

2   TO YOUR FAMILY IN THE EVENT OF AN EMERGENCY.  WE ARE CONNECTED

3   ELECTRONICALLY, MY COURTROOM DEPUTY AND I.  SO THE PHONE

4   NUMBERS SHE GIVES YOU IS A PHONE NUMBER THAT IS PICKED UP

5   WHILE WE ARE IN SESSION.  IF THERE IS AN EMERGENCY, I CAN

6   ASSURE YOU THAT SOMEONE WILL PICK UP THE PHONE, LET FRANCES

7   KNOW WHO WILL LET ME KNOW, AND I WILL STOP THE PROCEEDINGS.

8   SO I DON'T WANT YOU TO WORRY ABOUT THAT.  SO THAT YOU KNOW,

9   THAT IF THERE IS AN EMERGENCY, WE WILL GET THAT INFORMATION TO

10  YOU.  OKAY?

11     NOW, A REMINDER TO PLEASE KEEP AN OPEN MIND THROUGHOUT THE

12  TRIAL.  DO NOT DECIDE WHAT THE VERDICT SHOULD BE UNTIL I'VE

13  SENT IT TO YOU FOR DELIBERATIONS.

14     A REMINDER THAT YOU CAN ONLY DECIDE THE CASE ON THE

15  EVIDENCE THAT'S HERE IN THE COURTROOM.

16     YOU ARE INSTRUCTED THAT YOU MAY NOT COMMUNICATE WITH

17  ANYONE IN ANY WAY AND DO NOT LET ANYONE COMMUNICATE WITH YOU

18  IN ANY WAY ABOUT THE MERITS OF THIS CASE OR ANYTHING TO DO

19  WITH IT.  THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN

20  WRITING, BY PHONE, OR ELECTRONIC MEANS, VIA EMAIL, TEXT

21  MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE OR

22  APPLICATION INCLUDING BUT NOT LIMITED TO FACEBOOK, YOUTUBE,

23  TWITTER, INSTAGRAM, LINKEDIN, SNAPCHAT, OR SOME OTHER SOCIAL

24  MEDIA FORM.  I SHOULD UPDATE MY LIST.  THEY ARE CHANGING ALL

25  THE TIME.  EVERYTHING APPLIES.  YOU CANNOT USE IT.

THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS UNTIL I GIVE YOU THE CASE FOR DELIBERATION.  IT APPLIES TO COMMUNICATING WITH EVERYONE ELSE, INCLUDING FAMILY MEMBERS, EMPLOYERS, THE MEDIA, THE PRESS, ANYBODY INVOLVED IN THE TRIAL.  YOU CAN NOTIFY YOUR FAMILY AND EMPLOYER THAT YOU HAVE BEEN SEATED AS A JUROR IN THIS CASE AND HOW LONG IT'S EXPECTED TO PROCEED.

BUT IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR SERVICE OR ANYTHING TO DO WITH THIS CASE, YOU MUST TELL THEM THAT YOU HAVE BEEN ORDERED NOT TO RESPOND, AND PLEASE REPORT THAT CONTACT TO ME SO THAT I CAN INVESTIGATE.

BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL INSTRUCTION THAT YOU MAY CONSIDER TO RETURN A VERDICT, DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.  DO NOT DO ANY RESEARCH.  DO NOT GO FIGURE OUT ANYTHING ABOUT THESE DIALERS.  DO NOT FIGURE OUT ANYTHING ABOUT THE TCPA.  DO NOT CONSULT DICTIONARIES.  DO NOT SEARCH THE INTERNET OR USE ANY OTHER REFERENCE MATERIALS.  DO NOT MAKE ANY INVESTIGATION.

IF YOU GET A PHONE CALL ON YOUR PHONE, DO NOT COUNT HOW MANY SECONDS.  OKAY?  DO NOT DO ANY OF THAT.

DO NOT RESEARCH THE LAW, OR THE PEOPLE, OR THE WITNESSES, OR THE LAWYERS.  YOU CAN DO ALL OF THAT WHEN YOU ARE EXCUSED BUT YOU CANNOT DO IT NOW.

REALLY, THE REASON THAT I HAVE ALL THESE RULES IS BECAUSE

```
 1    IT'S CRITICALLY IMPORTANT THAT EACH SIDE GET A FAIR TRIAL AND

 2    YOU ALL SEE THE EXACT SAME EVIDENCE AND CONSIDER THE EXACT

 3    SAME THINGS WHEN YOU GO BACK THERE TO DECIDE THE CASE.

 4        SO ALL OF THESE RULES ARE HERE TO MAKE SURE THAT THESE

 5    FOLKS GET A FAIR TRIAL.  AND ANY JUROR WHO VIOLATES THESE

 6    RULES REALLY DOES JEOPARDIZE THE FAIRNESS OF ALL OF THESE

 7    PROCEEDINGS AND A MISTRIAL COULD RESULT.  SO WE DON'T WANT

 8    THAT TO HAPPEN.

 9        THAT SAID, SOMETIMES THINGS HAPPEN INADVERTENTLY.  IF

10    SOMETHING HAPPENS, JUST LET ME KNOW AND THAT WAY I CAN MAKE

11    SURE THAT IT'S OKAY.  ALL RIGHT?  THAT'S MY JOB.  SO DON'T BE

12    AFRAID TO SAY IF SOMETHING HAPPENS.

13        DOES ANYBODY HAVE ANY QUESTIONS BEFORE YOU GO BACK?

14        YES, SIR.

15            JUROR:  8:30 IS WHEN WE ARE TO BE --

16            THE COURT:  WE WILL CALL YOU IN RIGHT AT 8:30.  SO

17    YOU CAN -- DEPENDING ON WHEN YOU GET HERE, THE COURTHOUSE

18    OPENS EARLY.  YOU CAN GO SIT IN THE JURY ROOM IF YOU GET HERE

19    EARLY.  THEY WILL SHOW YOU THE DOOR TO USE.  AND THAT DOOR IS

20    OPEN TO YOU AT 8:00 A.M.

21        SO I HAVE LAW CLERKS, AND THEY WILL BUZZ YOU IN.  BUT I

22    KIND OF WORK MY LAW CLERKS PRETTY HARD.  THEY WORK LATE INTO

23    THE NIGHT.  SO 8:00 O'CLOCK IS WHEN THEY HAVE TO BE HERE.  IF

24    YOU BUZZ BEFORE THEN, SOMEONE MAY NOT BE HERE.  AT

25    8:00 O'CLOCK, YOU CAN BUZZ AND THEY WILL LET YOU IN.
```

1          OTHER QUESTIONS?  NO?  OKAY.

2          WE'LL SEE YOU TOMORROW.  THANK YOU.

3          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4               **THE COURT:**  OKAY.  WE ARE BACK ON THE RECORD.  THE

5     RECORD WILL REFLECT THE JURY HAS LEFT THE COURTROOM.  THERE

6     ARE JUST A COUPLE OF THINGS I WANT TO TIE UP LOOSE ENDS BEFORE

7     YOU LEAVE FOR THE DAY.

8          ONE IS, AS YOU KNOW, YOU'VE GOT YOUR 11 HOURS LESS

9     OPENINGS AND CLOSINGS.  DOES ANYBODY -- YOU ARE GOING TO GET

10    DAILY TIME SHEETS.  DOES ANYBODY WANT ME TO RESERVE TIME FOR

11    YOUR CLOSINGS SO YOU DON'T RUN OUT AT THE END?

12         IF YOU'VE GOT A GOOD HANDLE ON IT, THAT'S FINE.  I DO

13    OFFER THAT SO PEOPLE DON'T GET -- PLAINTIFF, ANY?

14              **MR. BURSOR:**  YEAH.  I WOULD LIKE TO RESERVE AN HOUR

15    FOR CLOSING.

16              **THE COURT:**  DEFENSE?

17              **MR. ELLIS:**  AND FOR ME, YOUR HONOR, 45 MINUTES.

18              **THE COURT:**  OKAY.

19         THE OTHER THING WAS, MR. ELLIS, YOU WERE GOING TO TELL ME

20    WHETHER YOU WERE ASKING FOR EXTRA TIME ON THE ISSUES OF... THE

21    BIFURCATED ISSUES WITH RESPECT TO --

22              **MR. ELLIS:**  WITH RESPECT TO THE TREBLE DAMAGES.

23              **THE COURT:**  RIGHT.

24              **MR. ELLIS:**  I THINK WHERE WE LEFT IT IS YOU WERE

25    INDICATING THAT YOU THOUGHT WHEN THE JURY WAS OUT WE COULD --

1          **THE COURT:**  THAT IS WHERE I LEFT IT.  BUT THE

2    QUESTION IS HOW MUCH TIME, IF ANY -- PLAINTIFFS' PERSPECTIVE

3    IS THEY ARE ABLE TO PUT THAT EVIDENCE ON WITHIN THEIR

4    FRAMEWORK OF 11 HOURS.  YOU WANTED TIME TO THINK ABOUT IT.

5    YOU'VE BEEN GIVEN TIME, SO --

6          **MR. ELLIS:**  I WOULD LIKE AN EXTRA HALF AN HOUR.

7          **THE COURT:**  ALL RIGHT.

8      OKAY.  IT'S IN MY STANDING ORDER.  I KNOW EVERYBODY HAS

9    BEEN BUSY.  MR. BURSOR, YOU NEED TO COME IN AND FIGURE OUT HOW

10   TO USE THAT SCREEN.  THERE ARE DIRECTIONS THERE.  THEY ARE

11   INTERACTIVE.  FIGURE OUT HOW TO DO IT.  OKAY?

12         **MR. BURSOR:**  YES.

13         **THE COURT:**  OKAY.  TONIGHT I'LL LOOK AT THE VERDICT

14   FORM.  WE CAN TALK ABOUT THAT TOMORROW.

15     DOES ANYBODY ELSE WANT TO TALK ABOUT ANYTHING OR PUT

16   ANYTHING ON THE RECORD?

17         **MR. BURSOR:**  WELL, YOUR HONOR, THERE IS THE ISSUE OF

18   OUR -- THE THREE WITNESSES THAT WE INTEND TO PRESENT BY VIDEO

19   TOMORROW.  I DON'T KNOW HOW OR WHEN THAT'S --

20         **THE COURT:**  I HAVE TO TELL YOU THE RULE SAYS -- YOU

21   HAVE A LOT OF LAWYERS SITTING AT THAT TABLE.

22     THE RULE PROVIDES THAT YOU CAN ONLY USE DEPOSITION

23   TESTIMONY UNDER RULE 32 IN CERTAIN SITUATIONS.  AND 32(A)(3),

24   IN TERMS OF A PARTY OPPONENT, DEFINES WHAT A PARTY OPPONENT

25   IS, AND THEY HAVE TO BE UNAVAILABLE.

1        SO YOU HAVE TO FOLLOW THE RULES UNLESS YOU HAVE SOME

2    EVIDENTIARY BASIS FOR SAYING THAT YOU CAN GET IT IN IN SOME

3    OTHER FORM.

4            **MR. BURSOR:**  SO MY UNDERSTANDING WAS ANY OBJECTION TO

5    THE USE OF THOSE VIDEOS WAS WAIVED WHEN IT WAS NOT MADE.  IF

6    THERE WAS AN OBJECTION, THESE VIDEOS CAN'T BE PLAYED BECAUSE

7    THE WITNESS IS AVAILABLE OR THE WITNESS ISN'T AN AGENT, THAT

8    SHOULD HAVE BEEN DEALT WITH IN JANUARY AND FEBRUARY WHEN WE

9    WERE EXCHANGING THE PRETRIAL MATERIALS.

10       THE DEFENDANTS HAVE KNOWN SINCE, I THINK, JANUARY THAT WE

11   HAVE THESE THREE WITNESSES BY VIDEO.  THAT'S WHY WE DESIGNATED

12   THE TESTIMONY.  THEY WERE REQUIRED TO MAKE OBJECTIONS BY A

13   CERTAIN DATE.  THEY HAD NO OBJECTIONS.  IF THE OBJECTION WAS

14   RULE 32(A), YOU DON'T MEET THOSE CRITERIA, THE OBJECTION

15   SHOULD HAVE BEEN MADE.  IT WAS NOT, AND WHEN IT WAS WAIVED, WE

16   RELIED ON THAT AND EXPECTED THAT WE WERE GOING TO BE ABLE TO

17   PRESENT THE TESTIMONY BY VIDEO.

18           **THE COURT:**  RESPONSE.

19           **MR. ELLIS:**  SO NO RULE 32 WAIVER.

20       WHAT I WAS ASKED TO DO IS DID I AGREE WITH THE CLIPS

21   COMING IN.  YES, I AGREED WITH THE CLIPS COMING IN.  BUT THERE

22   WAS A REPRESENTATION IN THE PRETRIAL STATEMENT -- I DON'T

23   HAVE -- I PROBABLY DO HAVE THE ECF NUMBER, THAT THESE PEOPLE

24   WERE GOING TO COME IN AND TESTIFY.  THESE WERE GOING TO BE THE

25   WITNESSES.

1        AND THERE WERE 9 OR 11 OF THEM.  THAT REPRESENTATION, AS I

2   UNDERSTAND IT FROM MY EXPERIENCE IN FEDERAL COURT AND FROM

3   CASE LAW THAT I'VE SEEN, IS A REPRESENTATION THAT THOSE PEOPLE

4   ARE GOING TO SHOW UP.  AND IF THEY ARE NOT GOING TO SHOW UP

5   AND IT'S ONLY GOING TO BE BY VIDEO, THEN THAT SHOULD HAVE BEEN

6   MADE CLEAR TO EVERYBODY.  I DON'T THINK IT WAS MADE CLEAR TO

7   COURT.  IT CERTAINLY WASN'T MADE CLEAR TO ME.

8        FOR THE FIRST TIME I GOT SOME KIND OF IDEA DURING OUR

9   CONFERENCE CALL ON FRIDAY WHEN YOU ASKED WAS MR. KIZER GOING

10  TO TESTIFY, AND THERE WAS A PAUSE ON THE OTHER LINE.

11       NOW, WITH RESPECT TO MR. KIZER, I DID GO AHEAD AND

12  SUBPOENA HIM FOR FRIDAY.  SO HE'S GOING TO SHOW UP.  AND AT

13  THAT POINT IN TIME IF THEY WANT TO PUT VIDEO CLIPS IN, THAT'S

14  FINE.

15       BUT WITH RESPECT TO PEOPLE THAT ARE -- IF THEY WANT TO PUT

16  THEM IN WITH RESPECT TO DAN CORREA, TO THE EXTENT THAT HE WAS

17  A RULE 30(B) WITNESS, THEY ARE ABLE TO DO THAT.  BUT

18  OTHERWISE, THEY ARE GOING TO HAVE TO SHOW THAT THESE PEOPLE

19  ARE UNAVAILABLE.

20       HOW DO WE FIGURE OUT WHETHER THEY ARE UNAVAILABLE FOUR

21  MONTHS BEFORE?  YOU DO IT DURING TRIAL.  AND SO THAT'S WHY I

22  DON'T THINK MR. BURSOR'S ARGUMENT HOLDS ANY WATER AT ALL.

23            **MR. BURSOR:**  SO, YOUR HONOR, CAN I EXPLAIN WHY THAT

24  MAKES NO SENSE AT ALL?

25            **THE COURT:**  LET ME TELL YOU, MR. BURSOR, I HAVE TRIED

1    A LOT OF CASES IN FEDERAL COURT, AND THIS IS THE FIRST TIME

2    THIS HAS COME UP.  TYPICALLY WE ARE FIGHTING OVER WHETHER

3    SOMEONE IS AVAILABLE OR NOT.

4              **MR. BURSOR:**  WELL, I'VE NOT TRIED AS MANY AS YOUR

5    HONOR, BUT I HAVE TRIED CASES IN FEDERAL COURT, TOO.  YOUR

6    HONOR'S RULES REQUIRE --

7              **THE COURT:**  I'M PULLING THEM UP RIGHT NOW.

8                   (PAUSE IN THE PROCEEDINGS.)

9              **MR. BURSOR:**  IT MAKES NO SENSE TO DESIGNATE VIDEO FOR

10   SOMEONE WHO IS GOING TO BE HERE.

11             **THE COURT:**  OF COURSE IT DOES.

12             **MR. BURSOR:**  YOU CAN'T PLAY VIDEO OF A WITNESS WHEN

13   THE WITNESS IS ON THE STAND UNLESS YOU ARE IMPEACHING THEM,

14   WHICH YOU DON'T HAVE TO DESIGNATE FOR IN THE FIRST PLACE.  THE

15   ONLY REASON TO MAKE A DESIGNATION --

16             **THE COURT:**  WHY -- LOOK, WHY ISN'T HE COMING LIVE?

17             **MR. BURSOR:**  KIZER?

18             **THE COURT:**  YES.

19             **MR. BURSOR:**  BECAUSE WE HAVE WHAT WE NEED ON THE

20   VIDEO.  WE DON'T NEED TO BRING HIM LIVE.  IT IS HARDER TO

21   PRESENT THE EVIDENCE LIVE WHEN I HAVE A VIDEOTAPE THAT SAYS

22   EXACTLY WHAT I NEED.

23             **THE COURT:**  HE CAN'T BE CROSS-EXAMINED.

24             **MR. BURSOR:**  MR. --

25             **THE COURT:**  HE CAN'T BE CROSS-EXAMINED.  THAT'S THE

1    PROBLEM.  WE DON'T -- THIS IS AN ALTERNATIVE MECHANISM FOR

2    PRESENTING EVIDENCE TO -- IN TRIAL.

3         **MR. BURSOR:**  YOUR HONOR, THAT'S NOT CORRECT BECAUSE

4    HE CAN BE CROSS-EXAMINED.  THE DEFENDANT HAD NOTICE OF THE

5    DEPOSITION AND THEY COULD ATTEND AND CROSS-EXAMINE HIM AT THE

6    DEPOSITION.  THEY HAD AN OPPORTUNITY TO MAKE

7    COUNTERDESIGNATIONS, WHICH THEY DID NOT DO.  AND THEY HAD AN

8    OPPORTUNITY TO MAKE THESE OBJECTIONS, WHICH THEY DID NOT

9    OBJECT.  SO ALL OF THIS SHOULD HAVE HAPPENED MONTHS AGO.  IT

10   WAS ALL WAIVED.

11        AND IF THEY WANT TO SUBPOENA HIM FOR FRIDAY, THAT DOESN'T

12   HELP ME BECAUSE I WANT TO PUT HIM ON TOMORROW BY VIDEO.  NOW,

13   IF THEY WANT TO CROSS-EXAMINE HIM ON FRIDAY, IF THEY CAN GET

14   HIM HERE, FINE.  BUT I DON'T HAVE TO GET HIM HERE.  I CAN PLAY

15   THE VIDEO.

16        **MR. ELLIS:**  SO MY RESPONSE IS, AND, AGAIN, LET ME

17   JUST ADD TO THE LITANY HERE.  I'VE TRIED A LOT OF CASES IN

18   FEDERAL COURT, NEVER -- AND STATE COURT.  IF THERE HAD BEEN

19   SOME SORT OF INDICATION THAT THIS TRIAL WAS GOING TO BE PUT ON

20   IN ABSENTIA WITH ALL THE WITNESSES, THEN IT SHOULD HAVE BEEN

21   DISCLOSED.

22        **THE COURT:**  IT'S NOT AS IF YOU DIDN'T KNOW.  THOSE

23   WERE THERE.  I HAVE ALSO HAD PEOPLE SAY, HEY, WE OBJECT

24   BECAUSE THEY HAVEN'T MADE A SHOWING.  THIS HAS BEEN THE

25   PROBLEM IN PART WITH THIS CASE.

1              **MR. BURSOR:**  YOUR HONOR, IF I MAY?

2              **THE COURT:**  NO.  WAIT.

3                    (PAUSE IN THE PROCEEDINGS.)

4              **THE COURT:**  WHAT?  MR. BURSOR, YOU WANT TO SAY

5    SOMETHING?

6              **MR. BURSOR:**  YES, YOUR HONOR.

7         YOUR HONOR HAS RULES ABOUT WHEN THINGS GET DISCLOSED PRIOR

8    TO TRIAL, AND WE FOLLOWED THOSE RULES.  THE RULES SAY DISCLOSE

9    YOUR DEPOSITION DESIGNATIONS AT A CERTAIN TIME.  WE DID THAT.

10   THE RULES SAY OBJECTIONS HAVE TO COME IN AT A CERTAIN TIME.

11   AND THERE WERE NO OBJECTIONS.

12        AND SO TO SAY NOW THAT WE CAN'T PLAY THE VIDEO OF WHAT WAS

13   DESIGNATED AND NOT OBJECTED TO WOULD BE THE SAME THING AS

14   STRIKING OUR -- THE DESIGNATIONS THAT WE MADE BACK IN JANUARY.

15   AND THAT'S NOT FAIR.

16        WE FOLLOWED THE RULES.  WE TIMELY MADE THE DESIGNATIONS.

17   THERE CAN BE NO REASON TO MAKE THOSE DESIGNATIONS OTHER THAN

18   TO PLAY THE VIDEO AT THE TRIAL.  YOU DON'T NEED DESIGNATIONS

19   IF THE WITNESS IS HERE.  YOU CAN IMPEACH HIM WITH ANYTHING ON

20   THE VIDEO.  AND IF THE WITNESS IS HERE, YOU CAN'T PLAY

21   ANYTHING THAT DOESN'T IMPEACH HIM.  SO IF YOU SAY WE CAN'T

22   PLAY THE VIDEO --

23             **THE COURT:**  THIS IS A REPEAT OF WHAT YOU JUST SAID.

24             **MR. BURSOR:**  OKAY.

25             **THE COURT:**  IS THERE ANYTHING NEW?

1          **MR. BURSOR:**  THAT'S IT.

2          **THE COURT:**  ANY RESPONSE?

3          **MR. ELLIS:**  SAME ARGUMENT.

4          **THE COURT:**  ALL RIGHT.  THE OBJECTION IS OVERRULED.

5    I'M LOOKING AT MY RULE.  YOU SHOULD HAVE RAISED THE ISSUE.

6    THEY CAN PLAY THEM.

7       NEXT.  YOU CAN BRING 'EM IN LIVE, TOO, OBVIOUSLY.

8          **MR. ELLIS:**  RIGHT.

9          **THE COURT:**  I SAID TO DESIGNATE THEM.  I SAID TO MEET

10   AND CONFER.  IF YOU HAD ISSUES, YOU SHOULD HAVE RAISED IT.

11         **MR. ELLIS:**  I JUST WANT TO MAKE THIS CLEAR FOR THE

12   RECORD THOUGH.  32(A), IN TERMS OF WHETHER SOMEONE IS GOING TO

13   BE AVAILABLE, I JUST DON'T KNOW HOW I WAS SUPPOSED TO KNOW SIX

14   MONTHS AGO.  SO I DON'T AGREE WITH YOUR RULING, BUT I'VE MADE

15   MY RECORD.

16         **THE COURT:**  AND YOU COULD HAVE EASILY SAID -- YOU

17   KNOW, HE'S NOT A PARTY.  SO YOU COULD HAVE EASILY SAID THAT

18   YOU WOULD OBJECT TO THE EXTENT -- LAWYERS HAVE DONE THIS.

19   OBJECT TO THE EXTENT THAT THE RULE -- THAT THEY HAVEN'T SHOWN

20   UNAVAILABILITY.  I DON'T KNOW WHERE HE LIVES.  I DON'T KNOW

21   WHERE --

22         **MR. ELLIS:**  HE LIVES 48 MILES AWAY.  SO HE'S WITHIN

23   THE HUNDRED MILES.

24         **THE COURT:**  WELL, LIKE I SAID, I HAVEN'T -- YOU GUYS

25   HAVE HAD LOTS OF ISSUES, AND WE NEED TO GET THIS THING JUST

```
 1    TRIED.

 2              MR. ELLIS:  IT DOES NEED TO BE TRIED.  BUT THE

 3    FAIRNESS GOES BOTH WAYS.

 4              THE COURT:  I DON'T DISAGREE THAT THE FAIRNESS NEEDS

 5    TO GO BOTH WAYS, MR. ELLIS.  I'M NOT TRYING TO PICK ON YOU.

 6    BUT THE RULING IS WHAT THE RULING IS.

 7              MR. ELLIS:  RIGHT.  I GET IT.

 8              THE COURT:  ALL RIGHT.

 9              MR. BURSOR:  SO ARE WE EXCUSED UNTIL 8:00 A.M.?

10              THE COURT:  YES.

11              MR. BURSOR:  THANK YOU, YOUR HONOR.

12              THE COURT:  WE'LL SEE YOU THEN.  THANK YOU.

13         WE ARE ADJOURNED FOR THE DAY.

14                   (PROCEEDINGS CONCLUDED AT 1:18 P.M.)

15

16                      CERTIFICATE OF REPORTER

17         I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

18    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

19    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

20    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21

22

23              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

24                   MONDAY, MAY 6, 2019

25
```