1  Mark E. Ellis - 127159
   Anthony P. J. Valenti - 284542
2  Lawrence K. Iglesias - 303700
   ELLIS LAW GROUP, LLP
3  1425 River Park Drive, Suite 400
   Sacramento, CA 95815
4  Tel: (916) 283-8820
   Fax: (916) 283-8821
5  mellis@ellislawgrp.com
   avalenti@ellislawgrp.com
6  liglesias@ellislawgrp.com

7  Attorneys for
   DEFENDANT RASH CURTIS & ASSOCIATES
8

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12  IGNACIO PEREZ, on Behalf of Himself and all       Case No.: 4:16-cv-03396-YGR JSC
    Others Similarly Situated,
13                                                     **INDEX OF EXHIBITS IN SUPPORT OF**
                            Plaintiff,
14                                                     **(1) RASH CURTIS' *EX PARTE* REQUEST
    Vs.                                                    FOR STAY OF ENFORCMENT
15                                                         PURSUANT TO FEDERAL RULE OF
    RASH CURTIS & ASSOCIATES,                              CIVIL PROCEDURE  62(b)**
16
                            Defendant.                 **(2) RASH CURTIS' MOTION FOR THE
17                                                         COURT TO WAIVE THE
                                                           REQUIREMENT OF A BOND ON
18                                                         APPEAL BY PERMITTING RASH
                                                           CURTIS TO POST AN ALTERNATIVE
19                                                         FORM OF SECURITY PURSUANT TO
                                                           FEDERAL RULE OF CIVIL
20                                                         PROCEDURE 62(b)**

21

22

23

24

   | Exhibit No. | Description |
   | --- | --- |
   | 1 | September 9, 2019, Letter from Bursor to Honorable Yvonne Gonzalez Rogers, re: Withdrawal of TCPA "Willfully or Knowingly" Claim (ECF 369) |

25

26

27

28

                                    - 1 -

| Exhibit No. | Description |
|---|---|
| 2 | September 9, 2019, Final Judgment (ECF 370) |
| 3 | September 22 and 23, 2019, Emails between Ellis and Bursor re Waiver of Bond on Appeal |
| 4 | Excerpts from the May 13, 2019, Reporter's Transcript of Proceedings at Trial in the Instant Matter |
| 5 | September 16, 2019, Max H. Stern Email to Mark E. Ellis, re Filing Motion to Stay Judgment |
| 6 | 2017 Federal Corporate Tax Return for KBR, Inc. (Under Seal) |
| 7 | Excerpts from the May 9, 2019, Reporter's Transcript of Proceedings at Trial in the Instant Matter |
| 8 | Plaintiffs' Proposed Notice of Pendency of Class Action filed November 12, 2018 |
| 9 | Excerpts from the March 19, 2019, Reporter's Transcript of Proceedings in the Instant Matter |
| 10 | Plaintiffs' Motion for an Award of Attorney's Fees, Costs and Expenses and Service Award for the Class Representative and Supporting Documents, filed on September 23, 2019 (EFC 371) |
| 11 | Declaration of Yeremey Krivoshey in Support of Plaintiffs' Opposition to Defendant's Motion to Enforce Settlement Agreement, filed March 24, 2017 (ECF 35-1) |
| 12 | Excerpts from the May 10, 2019, Reporter's Transcript of Proceedings at Trial in the Instant Matter |
| 13 | September 13, 2019, Article in News TCPA Advocacy, "Another District Court Adopts Narrow Statutory Definition of ATDS" |
| 14 | Published Memorandum Opinion and Order, *Gadelhak v. AT&T Services*, 2019 WL1429346 |
| 15 | Published Order, *Snow v. General Electric Company*, 2019 WL2500407 |

- 2 -

| Exhibit No. | Description |
|---|---|
| 16 | Memorandum Opinion and Order, *Smith v. Premier Dermatology*, 2019 WL 4261245 |
| 17 | October 3, 2019, Rash Curtis I Associates Notice of Appeal in the Instant Matter (EFC 372) |

Dated: October 7, 2019

By /s/ *Mark E. Ellis*
Mark E. Ellis,
Attorney for
DEFENDANT RASH CURTIS & ASSOCIATES

INDEX OF EXHIBITS IN SUPPORT (1) RASH CURTIS' *EX PARTE* REQUEST FOR STAY OF ENFORCMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 62(b); (2) RASH CURTIS' MOTION FOR THE COURT TO WAIVE THE REQUIREMENT OF A BOND ON APPEAL BY PERMITTING RASH CURTIS TO POST AN ALTERNATIVE FORM OF SECURITY PURSUANT TO FRCP 62(b)

# EXHIBIT 1

# BURSOR FISHER
P.A.

2665 S. BAYSHORE DR.
SUITE 220
MIAMI, FL 33133
www.bursor.com

SCOTT A. BURSOR
Tel: 305.330.5512
Fax: 305.676.9006
scott@bursor.com

September 9, 2019

*Via ECF*

Honorable Yvonne Gonzalez Rogers
U.S. District Court, Northern District of California
Oakland Courthouse, Courtroom 1 – 4th Floor
1301 Clay Street
Oakland, CA 94612

Re:   *Ignacio Perez, et al. v. Rash Curtis & Associates*; Case No. 4:16-cv-03396-YGR JSC

Dear Judge Gonzalez Rogers:

Plaintiff, on behalf of himself and the Class, hereby withdraws the claim that Defendant violated the TCPA "willfully or knowingly."

The issue of whether Defendant violated the TCPA "willfully or knowingly" was presented to the Court during a brief "Phase 2" of the trial of this matter, which began while the jury was deliberating. When the jury returned its verdict, your Honor asked "is this [Phase 2] really necessary at this point?" Trial Tr. at 803. I responded that it was, and the presentation of evidence for Phase 2 was completed that day. The parties submitted closing arguments concerning Phase 2 on May 20, 2019. Docs. 361 & 362. Thereafter the parties had two settlement conferences, but no settlement has been reached.

Class Counsel recognize that our decision to withdraw the claim is a reversal of the position we took during Phase 2 of the trial. We also understand that our failure to withdraw the claim earlier, when your Honor suggested it, may have caused the Court to do extra work that could have been avoided. Nevertheless, we now believe that withdrawing the claim will best serve the interests of the Class.

Class Counsel respectfully requests that the Court simply enter final judgment in the form that we previously submitted, Doc. 359.

Very truly yours,

Scott A. Bursor

# EXHIBIT 2

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Yeremey O. Krivoshey (SBN 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
          ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Attorneys for Plaintiff and the Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA MCMILLION, JESSICA ADEKOYA, and IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>Defendant. | Case No. 4:16-cv-03396-YGR<br><br>~~[PROPOSED]~~ FINAL JUDGMENT<br><br>Judge:  Yvonne Gonzalez Rogers |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FINAL JUDGMENT**

Pursuant to Federal Rules of Civil Procedure 23, 54, and 58, the Court now enters Final Judgment on behalf of the certified Classes, defined as follows:

> **(a) Skip-Trace Class 1:** All persons who received a call on their cellular telephones from June 17, 2012 through April 2, 2019 from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose cellular telephone was obtained by Rash Curtis through skip tracing.

> **(b) Skip-Trace Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones from June 17, 2012 through April 2, 2019 from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

> **(c) Non-Debtor Class 1:** All persons who received a call on their cellular telephones from June 17, 2012 through April 2, 2019 from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis never had a debt-collection account in their name.

> **(d) Non-Debtor Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones from June 17, 2012 through April 2, 2019 from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis has never had a debt-collection account in their name.

> Excluded from the Classes are persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with Rash Curtis in such debtor's name prior to Rash Curtis first placing a call using an automatic telephone dialing system and/or prerecorded voice.

The dissemination of the Class Notice, ECF Nos. 249, 293: (a) constituted the best practicable notice to Class Members under the circumstances, (b) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action, their right to exclude themselves, and the binding effect of the Final Judgment, (c) and met all applicable requirements of law, including, but not limited to, the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and the Rules of this Court, as well as complied with the Federal Judicial Center's illustrative class action notices.  No Class Members requested exclusion.

Consistent with the jury's verdict on May 13, 2019, ECF No. 347, each member of the Classes shall recover from the Defendant, Rash Curtis & Associates, the amount of $500 per call

made in violation of the Telephone Consumer Protection Act, for an aggregate award in favor of the Classes of $267,349,000.

With regard to Plaintiff Ignacio Perez's individual claim under the Telephone Consumer Protection Act, Plaintiff Perez shall recover from Defendant, Rash Curtis & Associates, the amount of $500 per call made in violation of the Telephone Consumer Protection Act, for an aggregate award in favor of Plaintiff Perez of $7,000.

The Classes and Plaintiff Perez are entitled to post-judgment interest on the jury's award at a rate of 2.36% per annum.

Pursuant to Federal Rules of Civil Procedure 23(h)(1) and 54(d), and Local Rule 54, any motion for attorneys' fees, expenses, costs, and incentive awards shall be filed no later than 14 days after entry of this Judgment. Notice of the motion shall be directed to Class Members pursuant to Fed. R. Civ. P. 23(h)(1). Class Members may object to the motion pursuant to Fed. R. Civ. P. 23(h)(2). Plaintiff shall file a motion for a proposed notice plan in accordance with Fed. R. Civ. P. 23(h)(2) within 28 days of the entry of Final Judgment.

**IT IS SO ORDERED.**

Dated:   September 9, 2019

YVONNE GONZALEZ ROGERS
United States District Judge

# EXHIBIT 3

**Mark Ellis**

| | |
|---|---|
| From: | Mark Ellis |
| Sent: | Sunday, September 22, 2019 3:49 PM |
| To: | Scott A. Bursor |
| Cc: | Mark Ellis (mellis@ellislawgrp.com); Anthony Paul John Valenti; Lawrence Iglesias; Paula Crary; Rosanne Estrella; Crystal Strong; Michael Malter; Stern, Max H. |
| Subject: | Perez |

Scott:

I am in the process of completing a motion under FRCP 62 asking the court to waive any supersedeas bond _on the class aspect of the judgment_; Rash will be appealing.

Given its resources, you know it is impossible for Rash to bond the appeal from the class judgment. Rash's carrier will bond the judgment **_as to Mr. Perez_** and it is willing to put up as much as a million dollars to bond costs on appeal.

As such, I am meeting and conferring here on two issues:

First, will you agree to stipulate to waive the need for Rash to post a supersedeas bond on the class part of the judgment given the size of the judgment and because as you yourself have recognized in court --this is "monopoly" money.

Second, if you will not agree to that, would you stipulate to either shorten time on having the waiver motion heard before the 9th or alternatively agree that the stay on enforcement can be continued until the court rules on our waiver motion. The motion should be completed after I see your cost bill which I understand is due tomorrow.

Next, what is going on if anything with class administration? Have letters/notice gone out to putative class members. We need to be given the status of this immediately.

Please let me know your response on these issues asap. Thank you.

Mark E. Ellis
Certified Specialist, Legal Malpractice
Managing Partner
**ELLIS LAW GROUP, LLP**
1425 River Park Drive, Suite 400
Sacramento, CA 95815

Tel: (916) 283-8820
Fax: (916) 283-8821
Web: ellislawgrp.com

_This e-mail transmission and any document, file or previous message attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient (or a person responsible for delivering it to the intended recipient), you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in, or attached to, this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please: (1) immediately notify me by reply e-mail, or by telephone call to 916-283-8820; and (2) destroy the original transmission and its attachments without reading or saving in any manner._

| | |
|---|---|
| **From:** | Mark Ellis |
| **Sent:** | Monday, September 23, 2019 7:59 PM |
| **To:** | Scott A. Bursor |
| **Cc:** | Anthony Paul John Valenti; Lawrence Iglesias; Paula Crary; Rosanne Estrella; Crystal Strong; Michael Malter; Stern, Max H.; L. Timothy Fisher; Yeremey Krivoshey; Brittany Scott; Blair Reed; Mark Ellis (mellis@ellislawgrp.com) |
| **Subject:** | RE: Perez |

Thank you.

Mark E. Ellis
Certified Specialist, Legal Malpractice
Managing Partner
**ELLIS LAW GROUP, LLP**
1425 River Park Drive, Suite 400
Sacramento, CA  95815

Tel:  (916) 283-8820
Fax: (916) 283-8821
Web: ellislawgrp.com

*This e-mail transmission and any document, file or previous message attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient (or a person responsible for delivering it to the intended recipient), you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in, or attached to, this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please: (1) immediately notify me by reply e-mail, or by telephone call to 916-283-8820; and (2) destroy the original transmission and its attachments without reading or saving in any manner.*

**From:** Scott A. Bursor <scott@bursor.com>
**Sent:** Monday, September 23, 2019 7:22 PM
**To:** Mark Ellis <mellis@ellislawgrp.com>
**Cc:** Anthony Paul John Valenti <AValenti@ellislawgrp.com>; Lawrence Iglesias <liglesias@ellislawgrp.com>; Paula Crary <pcrary@ellislawgrp.com>; Rosanne Estrella <restrella@ellislawgrp.com>; Crystal Strong <cstrong@ellislawgrp.com>; Michael Malter <michael@bindermalter.com>; Stern, Max H. <MHStern@duanemorris.com>; L. Timothy Fisher <ltfisher@bursor.com>; Yeremey Krivoshey <ykrivoshey@bursor.com>; Scott A. Bursor <scott@bursor.com>; Brittany Scott <bscott@bursor.com>; Blair Reed <breed@bursor.com>
**Subject:** Re: Perez

Mark:

The answer to your first and second requests are no and no.

On September 11, I offered to settle with Defendant for zero dollars with an assignment of Defendant's claim against the insurer in exchange for a covenant not to execute the judgment against Defendant.  That deal should have been done in a day.  I do not understand how Defendant could say no to that offer.

Since Defendant won't negotiate in good faith, we will have to do everything the hard way.  If October 9 comes and we don't have Defendant's signature assigning that claim to us, we will seek to enforce the judgment right away.

--Scott

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE**

|  |  |  |
|---|---|---|
| IGNACIO PEREZ, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) | |
| PLAINTIFFS, | ) ) | NO. C-16-3396 YGR |
| VS. | ) ) | MONDAY, MAY 13, 2019 |
| RASH CURTIS & ASSOCIATES, | ) ) | OAKLAND, CALIFORNIA |
| DEFENDANT. | ) ) ) | JURY TRIAL |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**         BURSOR & FISHER, P.A.
                1990 N. CALIFORNIA BLVD., STE. 940
                WALNUT CREEK, CALIFORNIA 94596
            BY: TIMOTHY FISHER, ESQUIRE
                YEREMEY O. KRIVOSHEY, ESQUIRE
                BLAIR REED, ESQUIRE

                BURSOR & FISHER
                2665 S. BAYSHORE DR.
                MIAMI, FLORIDA 33133
            BY: SCOTT A. BURSOR, ESQUIRE

**FOR DEFENDANT:**         ELLIS LAW GROUP LLP
                1425 RIVER PARK DRIVE, STE. 400
                SACRAMENTO, CALIFORNIA 95815
            BY: MARK E. ELLIS, ESQUIRE
                ANTHONY P.J. VALENTI, ESQUIRE
                LARRY IGLESIAS, ESQUIRE

**REPORTED BY:**         DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                OFFICIAL COURT REPORTER
        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

1   AND THEY ALL SAT DOWN.  WE TALKED FOR A LONG TIME.  WE WILL

2   SEE WHAT THEY HAVE TO SAY.

3           **MR. BURSOR:**  OKAY.

4       (RECESS TAKEN AT 10:26 A.M.; RESUMED AT 11:19 A.M.)

5           **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

6   COME TO ORDER.

7           **THE COURT:**  LET'S GO BACK ON THE RECORD.

8       THE RECORD WILL REFLECT THAT WE HAVE THE PARTIES PRESENT

9   AND THAT EVERYONE HAS HAD AN OPPORTUNITY, I GUESS, TO SPEAK TO

10  SOME OF THE JURORS AND ENJOY SOME PIE.

11      FROM WHAT I UNDERSTAND, THE FOREPERSON SAID HE WAS

12  INSPIRED BY MY SUGGESTION THAT WHEN I WAS A STATE COURT JUDGE

13  MY YOUNG SON, AT THAT TIME YOUNG AND MUCH SMALLER THAN I, USED

14  TO BAKE THINGS AND I WOULD BRING THEM IN FOR JURORS.  SO HE

15  BROUGHT IN TWO PIES HOMEMADE TODAY THAT EVERYBODY GOT A CHANCE

16  TO EAT.  BUT I GUESS THEY MUST HAVE BEEN FULL ON BREAKFAST

17  BECAUSE THERE WAS A LOT LEFT SO HE GAVE IT TO FOLKS OUT IN THE

18  HALLWAY.  DIDN'T WANT TO TAKE HOME ALL THE CALORIES.

19      SO A GOOD GROUP OF PEOPLE.  THEY WERE VERY EXCITED ABOUT

20  HAVING BEEN JURORS, WHICH I THINK IS OUR JOB TO DO.  SO IT'S

21  ALL GOOD.

22      IF I CAN GET THE LAWYERS AT THE MICS, I WANT TO ASK A

23  COUPLE OF QUESTIONS IN TERMS OF WHERE WE GO FROM HERE.

24      AND AS YOU ALL KNOW, WE WERE IN THE MIDDLE OF -- OR JUST

25  GETTING STARTED ON TAKING ADDITIONAL EVIDENCE ON PHASE II FOR

WILLFULNESS.

THIS MAY BE ABOVE YOUR PAY GRADE, MY QUESTION, BUT MY QUESTION TO THE PLAINTIFFS IS:  IS THIS REALLY NECESSARY AT THIS POINT?  THAT IS, THE NUMBERS THAT WE ARE TALKING ABOUT EXCEED $250 MILLION.  SO IS THERE -- ARE THE PLAINTIFFS PURSUING AN AWARD IN ADDITION UPON WHICH THEY ARE LOOKING FOR A WILLFULNESS FINDING?

**MR. BURSOR:**  YOUR HONOR, THE ANSWER IS YES.  AND I'LL TELL YOU THAT WE -- IT'S NOT IMPORTANT TO US TO GET A LARGER DOLLAR AMOUNT ON THE AWARD.  THAT IS NOT IMPORTANT TO US.

I EXPECT THAT THERE ARE GOING TO BE FURTHER PROCEEDINGS IN THIS CASE, POSSIBLY IN COURTS OTHER THAN THIS ONE, AND I WANT TO ENSURE THAT -- WHAT WE WANT IS A RULING FROM YOUR HONOR ON WILLFULNESS.

I THINK IT'S IMPORTANT THAT THERE'S A RECORD OF WHAT HAPPENED HERE BOTH IN TERMS OF THE CASE AND WHAT HAPPENED AT THIS TRIAL, AND WE THINK IT'S IMPORTANT THAT SOME RECORD BE MADE OF WHAT THE COURT'S FINDING IS AS TO WILLFULNESS AND FINDING IS AS TO THE CONDUCT OF THIS TRIAL.

I EXPECT THERE'S GOING TO BE PROCEEDINGS IN OTHER COURTS THAT ARE GOING TO FOLLOW THIS ONE, AND THAT'S WHY WE WANT THAT.

SO WE UNDERSTAND THAT WE ARE TALKING -- WE ARE PROBABLY TALKING ABOUT MONOPOLY MONEY AT THIS POINT, AND I DON'T WANT TO IMPOSE ANY MORE OF A BURDEN ON THE COURT THAN NEED BE.  SO

1  IF THERE IS AN EFFICIENT WAY TO DO THAT, WE ARE ALL FOR

2  EFFICIENCY, BUT I WOULD LIKE A FINDING FROM THE COURT ON

3  WILLFULNESS.

4        **THE COURT:**  MR. ELLIS, THERE WAS ONLY TWO RESULTS

5  COMING OUT OF LAST WEEK'S EVIDENCE, AS YOU ARTFULLY ARGUED,

6  ZERO OR UPWARDS OF $250 MILLION.

7        **MR. ELLIS:**  RIGHT.

8        **THE COURT:**  ARE YOUR CLIENTS INTERESTED IN TRYING

9  TO -- INTERESTED IN TRYING TO SETTLE THIS CASE OR, AS I TELL

10  MY LAW CLERKS, YOU KNOW, TRIALS ARE THE GIFT THAT KEEPS ON

11  GIVING.  THEY JUST NEVER SEEM TO STOP.

12     SO WHAT ARE WE GOING TO BE DOING HERE?  YOU HAVE A

13  JUDGMENT FROM THE -- A VERDICT.  YOU MUST HAVE TALKED TO YOUR

14  CLIENTS ABOUT THIS POSSIBILITY.

15        **MR. ELLIS:**  SURE.

16        **THE COURT:**  ARE THEY INTERESTED IN GOING NOW IN A

17  DIFFERENT POSTURE TO A SETTLEMENT CONFERENCE OR ARE WE

18  PROCEEDING TO THE NINTH CIRCUIT?

19        **MR. ELLIS:**  WELL, PROBABLY BOTH, I MEAN, HONESTLY.

20  SO -- YEAH.  SURE, WE'RE INTERESTED IN SETTLEMENT NEGOTIATIONS

21  AND GETTING IN FRONT PERHAPS OF A MAGISTRATE OR

22  COURT-APPOINTED MEDIATOR.  AND THE ANSWER IS YES.

23        **THE COURT:**  ALL RIGHT.  HAVE I SENT YOU TO A

24  MAGISTRATE JUDGE --

25        **MR. ELLIS:**  I DON'T THINK --

1          **THE COURT:**  -- FOR SETTLEMENT CONFERENCE?

2          **MR. BURSOR:**  NO, YOUR HONOR.

3          **MR. ELLIS:**  I DON'T THINK SO.  WE DID HAVE A

4     MEDIATION EARLY ON IN THE LATE SUMMER OF 2017.  I THINK THAT

5     WAS BEFORE YOUR CLASS CERT RULING.

6          **THE COURT:**  AND I TAKE IT THE PLAINTIFFS AREN'T

7     OPPOSED TO SETTLEMENT DISCUSSIONS?

8          **MR. BURSOR:**  WE ARE VERY INTERESTED IN SETTLEMENT

9     DISCUSSIONS.

10          **THE COURT:**  IS THERE ANY -- ANYONE ON THE COURT WHO

11     YOU'VE HAD SUCCESS WITH IN THE PAST TO WHOM YOU WOULD LIKE ME

12     TO REFER YOU EVEN IF WE ARE DOING THESE ON PARALLEL TRACKS?

13          **MR. ELLIS:**  I THINK THAT MAGISTRATE ELENA JAMES IS --

14          **THE COURT:**  I'M HAPPY TO HAVE YOU PAY HER.  SHE HAS

15     NOW LEFT THE COURT.

16          **MR. ELLIS:**  OH, SHE HAS?

17          **THE COURT:**  SHE IS AT ADR SERVICES OR JAMS --

18          **MR. ELLIS:**  I DIDN'T REALIZE THAT.  OR MAGISTRATE

19     SPERO.  HE'S TERRIFIC.

20          **THE COURT:**  HE'S A LITTLE BUSY RIGHT THIS SECOND.  I

21     JUST SENT MY BAIL CASE TO HIM.

22          **MR. BURSOR:**  JUDGE CORLEY?

23          **THE COURT:**  NO, THAT'S NOT GOING TO HAPPEN.  SHE WAS

24     THE DISCOVERY JUDGE IN THIS CASE.  THAT NEVER WORKS VERY WELL.

25          **MR. ELLIS:**  I APOLOGIZE.  YOU KNOW, THE MAGISTRATES

1   THAT SIT HERE, I JUST CAN'T REMEMBER THEIR NAMES.

2           **THE COURT:**  HERE WE HAVE WESTMORE AND RYU.  WE HAVE

3   JUDGE -- WE HAVE A NEWER JUDGE WHO PROBABLY HAS AVAILABILITY

4   TOM HIXON OVER IN SAN FRANCISCO.  HE WAS A PARTNER AT ONE OF

5   THE BIG FIRMS.  REALLY SMART GUY.  I CAN TRY HIM.

6       DOES THAT WORK?

7           **MR. ELLIS:**  I DON'T KNOW ANYTHING ABOUT HIM --

8           **THE COURT:**  HE'S ON THE NEWER SIDE, BUT HE'S A VERY

9   SMART, CONSCIENTIOUS PERSON.  HE MAY BE ABLE TO HELP YOU.

10          **MR. BURSOR:**  JUDGE HIXON IS ACCEPTABLE TO THE

11  PLAINTIFFS.

12          **MR. ELLIS:**  SURE.

13          **THE COURT:**  ALL RIGHT.  I WILL REFER YOU TO

14  MAGISTRATE JUDGE HIXON FOR SETTLEMENT TALKS AND WE WILL KEEP

15  DOUBLE TRACKING THIS, YOU KNOW, AND WE'LL PROCEED FROM HERE.

16      IS MR. KEITH BACK?  WE NEED TO FINISH OFF HERE.

17          **MR. IGLESIAS:**  HE'S IN THE BATHROOM.

18          **MR. ELLIS:**  HE'S IN THE COURTHOUSE, AS I UNDERSTAND.

19      AND, HONESTLY, YOUR HONOR, I AM DONE WITH HIM.  I'M NOT

20  GOING TO PUT ANY MORE TESTIMONY ON.  I DON'T KNOW IF YOU WANT

21  TO CROSS-EXAMINE HIM.

22          **THE COURT:**  WELL, I HAVE QUESTIONS FOR HIM.

23          **MR. ELLIS:**  OKAY.

24          **MR. BURSOR:**  I THINK WE WILL HAVE A BRIEF CROSS,

25  MR. KRIVOSHEY.

1      **MR. ELLIS:**  NO?

2      **MR. BURSOR:**  YES.

3      **THE COURT:**  COME ON FORWARD, MR. KEITH.  BACK ONTO

4  THE WITNESS STAND, PLEASE.

5           (PAUSE IN THE PROCEEDINGS.)

6      **THE WITNESS:**  DO I NEED TO BE SWORN AGAIN?

7      **THE COURT:**  NO.  YOU ARE STILL UNDER OATH, SIR.  YOU

8  HAVE NOT BEEN EXCUSED.

9      THE RECORD WILL REFLECT MY UNDERSTANDING THAT MR. ELLIS

10  HAS COMPLETED HIS EXAMINATION; IS THAT CORRECT?

11      **MR. ELLIS:**  THAT IS CORRECT, YOUR HONOR.

12      **THE COURT:**  ALL RIGHT.  MR. KRIVOSHEY, YOU MAY

13  PROCEED.

14      **MR. KRIVOSHEY:**  WE WOULD LIKE TO INTRODUCE -- DISPLAY

15  EXHIBIT 11?  STIPED TO ADMIT.

16      MAY I APPROACH THE WITNESS?

17      **THE COURT:**  YOU MAY.

18           (EXHIBIT HANDED TO WITNESS.)

19                **CROSS-EXAMINATION**

20  BY MR. KRIVOSHEY:

21  **Q.**  GOOD MORNING, MR. KEITH.

22  **A.**  GOOD MORNING.

23  **Q.**  DO YOU HAVE EXHIBIT 11 IN FRONT OF YOU?

24  **A.**  I DO.

25  **Q.**  HAVE YOU SEEN THIS DOCUMENT BEFORE?

1    **CERTIFICATE OF REPORTER**

2          I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

3    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

4    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

5    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6

7          _Diane E. Skillman_

8          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

9          MONDAY, MAY 13, 2019

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

# EXHIBIT 5

# Mark Ellis

| | |
|---|---|
| **From:** | Stern, Max H. <MHStern@duanemorris.com> |
| **Sent:** | Monday, September 16, 2019 1:02 PM |
| **To:** | Mark Ellis; Terry Paff; Bob Keith |
| **Cc:** | 'Williams, Adam' |
| **Subject:** | McMillion v. Rash Curtis & Associates #3719870 |

Dear Mark, Terry and Bob:

Mark has proposed filing a motion to stay enforcement of the judgment asap this week. Moreover, to the extent Mark thinks it will help, he is authorized to confirm in that motion that IHIC will provide a bond on appeal for the $1 million TCPA sublimit.

Thank you,
Max

**Max H. Stern**
Partner

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
**P:** +1 415 957 3129
**F:** +1 415 276 5887
**C:** +1 415 999 1647

MHStern@duanemorris.com
www.duanemorris.com

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

**BEING SUBMITTED UNDER SEAL**

**EXHIBIT 6**

# EXHIBIT 7

VOLUME 4

PAGES 473 - 649

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE**

| | | |
|---|---|---|
| IGNACIO PEREZ, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) | |
| PLAINTIFFS, | ) ) | NO. C-16-3396 YGR |
| VS. | ) ) | THURSDAY, MAY 9, 2019 |
| RASH CURTIS & ASSOCIATES, | ) ) | OAKLAND, CALIFORNIA |
| DEFENDANT. | ) ) ) | JURY TRIAL |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**
    BURSOR FISHER, P.A.
    1990 N. CALIFORNIA BLVD., STE. 940
    WALNUT CREEK, CALIFORNIA 94596
    BY: TIMOTHY FISHER, ESQUIRE
    YEREMEY O. KRIVOSHEY, ESQUIRE
    BLAIR REED, ESQUIRE

    BURSOR & FISHER
    2665 S. BAYSHORE DR.
    MIAMI, FLORIDA 33133
    BY: SCOTT A. BURSOR, ESQUIRE

**FOR DEFENDANT:**
    ELLIS LAW GROUP LLP
    1425 RIVER PARK DRIVE, STE. 400
    SACRAMENTO, CALIFORNIA 95815
    BY: MARK E. ELLIS, ESQUIRE
    ANTHONY P.J. VALENTI, ESQUIRE
    LARRY IGLESIAS, ESQUIRE

**REPORTED BY:**
    DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
    OFFICIAL COURT REPORTER
    TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1      (**ROBERT KEITH**, CALLED AS A WITNESS FOR THE DEFENDANT,

2    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

3          **THE WITNESS:**  I DO.

4          **THE CLERK:**  ALL RIGHT.  PLEASE BE SEATED.

5      I AM GOING TO REMOVE A CUP OVER HERE THAT IS NOT YOURS.

6          **THE WITNESS:**  THANK YOU.

7          **THE CLERK:**  IF YOU WILL SCOOT THE MIC UP TO YOU AND

8    THEN PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

9          **THE WITNESS:**  ROBERT KEITH.  THAT IS SPELLED

10   K-E-I-T-H.

11         **THE COURT:**  GOOD MORNING, MR. KEITH.

12         **THE WITNESS:**  GOOD MORNING.

13         **THE COURT:**  YOU MAY PROCEED.

14         **MR. ELLIS:**  THANK YOU, YOUR HONOR.

15              **DIRECT EXAMINATION**

16   BY MR. ELLIS:

17   **Q.**  GOOD MORNING, MR. KEITH?

18   **A.**  GOOD MORNING.

19   **Q.**  MR. KEITH, CAN YOU GIVE THE JURY A THUMBNAIL SKETCH OF

20   YOUR WORK BACKGROUND?

21   **A.**  OF MY WHAT, I AM SORRY?

22   **Q.**  OF YOUR WORK BACKGROUND.

23   **A.**  I HAVE BEEN IN COLLECTIONS FOR PROBABLY 30 YEARS NOW.

24   I'VE DONE EVERY LEVEL OF COLLECTIONS THERE REALLY IS.

25      I STARTED WITH THE -- BEING A COLLECTOR, MOVED MY WAY UP

1     TO VICE PRESIDENT.

2     **Q.**  AND TELL THE JURY WHERE YOU ARE VICE PRESIDENT.

3     **A.**  I'M SORRY, RASH CURTIS & ASSOCIATES.

4     **Q.**  AND HOW LONG HAVE YOU HAD THAT POSITION?

5     **A.**  I BELIEVE IT'S EIGHT, NINE YEARS.

6     **Q.**  AND WHAT DO YOUR JOB RESPONSIBILITIES AT RASH CURTIS

7     ENTAIL?

8     **A.**  CHRIS AND I SHARE THE DUTIES OF PRETTY MUCH EVERYTHING IN

9     THE OFFICE.  EVERYBODY REPORTS UP TO US AND WE REPORT TO THE

10    OWNERS.

11        AS AN OPERATIONS, I PERSONALLY DO A LOT WITH WORKING WITH

12    YOUR FIRM, MARKETING, CLIENT SERVICE, AND COLLECTORS.  AND,

13    YOU KNOW, IF I'M NOT AVAILABLE, CHRIS TAKES OVER AND VICE

14    VERSA.

15    **Q.**  OKAY.

16    **A.**  AND OPERATIONS OF THE COLLECTION STAFF, OF COURSE.

17    **Q.**  IN TERMS OF TESTIFYING TODAY, ARE YOU A LITTLE BIT

18    NERVOUS?

19    **A.**  I HAVE A FEAR OF PUBLIC SPEAKING AND I HAVE HAD IT EVER

20    SINCE I WAS A LITTLE KID.  YEAH, A LITTLE BIT.

21    **Q.**  WHEN YOU SAY CHRIS, CAN YOU TELL THE JURY -- THEY PROBABLY

22    KNOW.

23    **A.**  CHRIS PAFF.  HE IS ANOTHER VP AT RASH CURTIS.

24    **Q.**  WHAT ARE MR. PAFF -- CHRIS PAFF'S JOB RESPONSIBILITIES?

25    **A.**  HE IS VICE PRESIDENT OF OPERATIONS ALSO.  HE DEALS

1  DAY-TO-DAY -- YOU KNOW, COLLECTIONS AND TRAINING AND, WHEN I'M

2  NOT IN THE OFFICE, CLIENT SERVICES.

3  Q.  OKAY.  SO, TELL THE JURY A LITTLE BIT ABOUT WHO YOUR

4  CLIENTS ARE.

5  A.  MOST OF OUR CLIENTS ARE MEDICAL CLIENTS, HOSPITALS,

6  DOCTORS, DENTISTS, BILLING COMPANIES.

7  Q.  AND TELL THE JURY AT A HIGH LEVEL, IF YOU DON'T MIND, HOW

8  DOES THAT INFORMATION, THAT IS, HOW DOES A DEBTOR'S ACCOUNT

9  COME IN TO RASH CURTIS TYPICALLY?

10  A.  MOST OF THE BIGGER CLIENTS THEY STILL LIST ELECTRONICALLY.

11  THEY EITHER COME OVER -- IF THEY ARE FTP OR TO OUR SECURE

12  WEBSITE IN FTP FORMAT ELECTRONICALLY.  THERE'S STILL SOME OF

13  THE REALLY SMALL DOCTORS THAT SEND STUFF OVER, PAPER.  WE HAVE

14  TO DATA INPUT, BUT VERY LITTLE.

15  Q.  HOW ABOUT THE SUTTER HOSPITAL GROUP; HOW DOES THEIR

16  INFORMATION COME OVER?

17  A.  ELECTRONICALLY.

18  Q.  NOW, YOU SAID SOMETHING ABOUT A FTP.

19      CAN YOU EXPLAIN WHAT THAT IS?

20  A.  I AM NOT AN IT GUY.  I KNOW IT MEANS FILE TRANSFER

21  PROTOCOL, BUT I WOULD HAVE TO DEFER THAT QUESTION TO NICHOLAS

22  KEITH.

23  Q.  AND SPEAKING OF NICHOLAS KEITH, IS THAT YOUR SON?

24  A.  IT IS.

25  Q.  AND HOW LONG HAS HE WORKED AT THE -- AT RASH CURTIS?

1    **A.**   I THINK IT'S GOING ON 11-PLUS YEARS.

2    **Q.**   SO AND THE OWNERS OF RASH CURTIS ARE WHO?

3    **A.**   TERRY AND NATASHA PAFF.

4    **Q.**   AND THEN CHRISTOPHER PAFF IS THEIR SON?

5    **A.**   YES.

6    **Q.**   SO IS IT FAIR TO SAY THAT THIS IS A MOM-AND-POP OPERATION?

7    **A.**   YES.

8    **Q.**   HOW MANY EMPLOYEES TOTAL DOES RASH CURTIS HAVE?

9    **A.**   WE FLUCTUATE BETWEEN 60 AND 80 EMPLOYEES, DEPENDING ON THE

10   NEED.

11   **Q.**   OF THAT, HOW MANY ARE COLLECTORS?

12   **A.**   30 TO 40.

13   **Q.**   NOW, EXPLAIN TO THE JURY HOW INFORMATION COMES IN AND THEN

14   IS ALLOCATED INTO VARIOUS PHONE FIELDS.  SO I GUESS THE

15   INFORMATION, PHONE NUMBERS WHEN THEY COME IN, EXPLAIN TO THE

16   JURY HOW THAT HAPPENS.

17   **A.**   WELL, IF IT COMES IN ELECTRONICALLY, THEY GET PUT IN

18   ELECTRONICALLY.  STARTING -- IF IT COMES FROM THE CLIENT, IT

19   STARTS IN PHONE FIELD ONE AND GOES THROUGH FOUR AND ANY

20   OVERFLOW MOVES OVER INTO FIVE THROUGH TEN.

21   **Q.**   SO WE'VE HEARD SOME -- WE'VE HEARD SOME TESTIMONY ABOUT

22   THE PHONE FIELDS AND WHAT THEY DO.  EXPLAIN TO THE JURY THE

23   SIGNIFICANCE OF INFORMATION GOING INTO PHONE FIELDS ONE

24   THROUGH FOUR.

25   **A.**   THESE ARE NUMBERS THAT WE GOT BY OUR CLIENTS THAT GOT FROM

1  THE PATIENTS.  THEY EITHER GAVE IT TO 'EM VERBALLY WHEN THEY

2  CHECKED IN OR WITH PUT IT ON THEIR CONDITIONS OR ADMISSIONS OR

3  FINANCIAL CONTRACTS OR THE INPUT, THE INTAKE.  A LOT OF

4  HOSPITALS CALL THESE THINGS DIFFERENT THINGS.  WHATEVER THEY

5  SIGN WHEN THEY COME IN, THEY ALWAYS ASK FOR THEIR PHONE NUMBER

6  AND THEY PUT THEIR PHONE NUMBER DOWN THERE FOR THEM TO BE

7  CONTACTED AT THAT NUMBER.

8  **Q.**  AND WHERE DOES THAT PHONE NUMBER, THAT IS AT THE HOSPITAL

9  OR MEDICAL CENTER CAPTURES FROM THE PATIENT, IN WHAT PHONE

10  FIELD DOES THAT GO INTO AT RASH CURTIS?

11  **A.**  IT GOES IN ONE THROUGH FOUR UNLESS THIS IS MORE THAN FOUR;

12  OTHERWISE, IT ROLLS INTO FIVE THROUGH TEN.

13  **Q.**  ARE YOU SAYING THAT IT IS POSSIBLE THAT PHONE NUMBERS THAT

14  GO INTO FIELDS FIVE THROUGH TEN ALSO COME IN WITH THE CONSENT

15  OF A PATIENT?

16  **A.**  YES, IT IS DEFINITELY POSSIBLE.

17  **Q.**  AND HAVE YOU PERSONALLY SEEN THAT HAPPEN WHEN YOU'VE

18  REVIEWED ACCOUNTS?

19  **A.**  I HAVE.

20  **Q.**  HAS -- HAVE YOU HAD THE OPPORTUNITY TO DO SOME SORT OF

21  STATISTICAL SURVEY TO SEE HOW MANY PHONE NUMBERS ARE OBTAINED

22  WITH CONSENT THAT GO INTO PHONE FIELDS FIVE THROUGH TEN?

23  **A.**  NO, I HAVEN'T.

24        **MR. BURSOR:**  OBJECTION.

25        **THE COURT:**  WHAT IS THE OBJECTION?

1          **MR. BURSOR:**  UNDISCLOSED EXPERTS STATISTICAL

2    ANALYSIS.  IT WASN'T IN THE PRETRIAL DISCLOSURE.

3          **THE COURT:**  WELL, HE SAID HE HASN'T DONE ANY, SO

4    THERE'S NOTHING TO DISCLOSE.

5          **MR. BURSOR:**  WITHDRAWN.  I AM SORRY, YOUR HONOR.

6          **THE WITNESS:**  SIR, WHEN YOU OBJECT -- I'M HARD OF

7    HEARING.  I MIGHT HAVE ANSWERED WITHOUT HEARING HIM SAY THAT.

8          **THE COURT:**  YOU SAID NO, BUT THAT MOOTS THE

9    OBJECTION.

10          **THE WITNESS:**  OKAY.

11          **THE COURT:**  GO AHEAD.

12          **MR. ELLIS:**  THANK YOU, YOUR HONOR.

13    **BY MR. ELLIS:**

14    **Q.**  HAVE YOU REVIEWED THE COLLECTION NOTES DEALING WITH THE

15    PHONE NUMBER IN QUESTION, THE 5193 NUMBER RELATED TO

16    MR. PEREZ?

17    **A.**  I HAVE.

18          **MR. ELLIS:**  CAN WE PUT 78 UP?

19                    (DISPLAYED ON SCREEN.)

20        MR. VALENTI, CAN YOU BLOW THAT UP, PLEASE?

21    **BY MR. ELLIS:**

22    **Q.**  SO, MR. KEITH, AND IF I CAN ASK YOU, CAN YOU -- I KNOW YOU

23    ARE NERVOUS BUT CAN YOU SLOW YOUR ANSWERS DOWN JUST A LITTLE

24    BIT TO HELP THE COURT REPORTER?

25    **A.**  YES.

**Q.** THANK YOU.

TELL THE JURY WHAT THIS DOCUMENT IS CALLED IN RASH CURTIS LINGO.

**A.** THIS IS FIRST -- THIS IS THE DEBTOR ACCOUNT HISTORY AND JUST HERE IS WHAT WE CALL THE HEADER AND IT HAS THE PATIENT DEMOGRAPHICS ON IT.

**Q.** NOW, THERE ARE A COUPLE OF QUESTIONS I WANT TO ASK.

SO THIS PARTICULAR PERSON, DANIEL REYNOSO, THAT IS WHO RASH CURTIS WAS ATTEMPTING TO COLLECT AGAINST?

**A.** YES.

**Q.** AND WHEN IT SAYS, IT SAYS RET -- WHERE IT SAYS UNDOMICILED, DO YOU KNOW WHAT THAT MEANS?

**A.** IT MEANS THAT THEY DIDN'T HAVE AN ADDRESS OR THEY WERE HOMELESS.

**Q.** OKAY. NUMBER -- SO WHAT IT WAS IN THIS CASE, YOU JUST DON'T KNOW?

**A.** I DON'T KNOW.

**Q.** AND THEN IT HAS RET MAIL. WHAT DOES THAT MEAN?

**A.** RETURN MAIL.

**Q.** AND THEN YOU WILL SEE THAT IT'S GOT A CITY, SACRAMENTO. DO YOU SEE THAT?

**A.** I DO.

**Q.** AND IS THAT WHERE -- WHEN THE INFORMATION CAME IN, THAT'S WHAT SUTTER HOSPITAL TOLD YOU WHERE HE LIVED?

**A.** THAT'S WHAT THEY PUT IN THE ELECTRONIC FORMAT AND SENT TO

1    US, YES.

2    **Q.**  LET ME GO BACK FOR A SECOND.

3        HOW LONG HAS RASH CURTIS WORKED WITH SUTTER HOSPITAL?

4    **A.**  I WOULD HAVE TO LOOK TO BE HONEST WITH YOU.  PROBABLY OVER

5    FIVE YEARS.

6    **Q.**  AND ARE THEY AN IMPORTANT CLIENT?

7    **A.**  YES.

8    **Q.**  AND DO THEY SEND INFORMATION TO YOU VIRTUALLY EVERY DAY?

9    **A.**  I'M NOT SURE HOW OFTEN THEY LIST.

10   **Q.**  WHO WOULD KNOW THAT BETTER THAN YOU IN TERMS OF WHEN THE

11   INFORMATION COMES IN?

12   **A.**  PROBABLY NICHOLAS KEITH OR SOMEONE IN CLIENT SERVICES.

13   **Q.**  ALL RIGHT.  AND THEN WE SEE THAT THERE IS A SOCIAL

14   SECURITY NUMBER.

15   **A.**  CORRECT.

16   **Q.**  WE NEED TO REDACT THAT.

17       AND THEN YOU SEE THAT IT SAYS EMPLOY AND IT SAYS GREEN

18   VALLEY SECURITY?

19   **A.**  CORRECT.

20   **Q.**  WHAT DOES THAT MEAN?

21   **A.**  THE PLACE OF EMPLOYMENT FOR MR. REYNOSO.

22   **Q.**  NOW, I WANT TO GO BACK OVER TO THE LEFT AND YOU SEE THAT

23   THERE IS A PHONE FIELD.

24       DO YOU SEE THAT?

25   **A.**  I DO.

1   **Q.**   BUT THERE IS NO PHONE NUMBER THERE?

2   **A.**   IT WAS TAKEN OUT.

3   **Q.**   OKAY.  BUT WAS THERE A PHONE NUMBER THERE WHEN THIS

4   INFORMATION CAME OVER TO RASH CURTIS?

5   **A.**   YES.

6   **Q.**   AND WHAT PHONE NUMBER WAS THERE?

7   **A.**   MR. PEREZ'S CELLPHONE NUMBER.

8          **MR. BURSOR:**  OBJECTION.

9          **THE COURT:**  SUSTAINED.  AND THAT IS STRICKEN, LADIES

10  AND GENTLEMEN.  WE HAVE NO IDEA -- I NEED TO KNOW WHERE, IF AT

11  ALL, HE THINKS HE GOT THAT INFORMATION FROM.

12     SUSTAINED.

13  **BY MR. ELLIS:**

14  **Q.**   CAN YOU GO BACK AND CAN YOU TELL THE JURY WHERE RASH

15  CURTIS GOT MR. REYNOSO'S TELEPHONE NUMBER FROM?

16  **A.**   SUTTER MEMORIAL.

17  **Q.**   HOW DO YOU KNOW THAT?

18  **A.**   I'VE SEEN THE PAPERWORK.

19  **Q.**   OKAY.

20  **A.**   AND I'VE SEEN THE NOTES FROM OUR CLIENT, JAMES, WHERE HE

21  TALKED TO ONE OF MY CLIENT SERVICE AND THEY NOTED THE ACCOUNT

22  THAT HE HAD THIS NUMBER ON FILE ON THE PATIENT.

23          **THE COURT:**  SUSTAINED.  AND ALL OF THAT IS STRICKEN.

24     THAT IS WHAT WE CALL HEARSAY.  HE CANNOT TESTIFY AS TO

25  SOMETHING ELSE THAT SOMEONE ELSE DID OR KNOWS.

1          **THE WITNESS:** I APOLOGIZE.

2    **BY MR. ELLIS:**

3    **Q.** SO WHERE DID YOU -- OTHER THAN THAT, WHERE DID YOU LEARN

4    THAT THIS NUMBER CAME IN FROM SUTTER?

5          **MR. BURSOR:** OBJECTION.

6          **THE COURT:** SUSTAINED AS TO THE FORM OF THE QUESTION,

7    WHICH ASSUMES A FACT NOT YET IN EVIDENCE.

8    **BY MR. ELLIS:**

9    **Q.** WHERE DID THIS NUMBER COME FROM?

10          **MR. BURSOR:** OBJECTION.

11          **THE COURT:** THERE IS NO NUMBER THERE, MR. ELLIS.

12          **MR. ELLIS:** OKAY. ALL RIGHT. SO I'LL LAY THE

13   FOUNDATION IN A SECOND. THANK YOU.

14       CAN WE GO TO THE NEXT PAGE, PLEASE.

15              (DISPLAYED ON SCREEN.)

16   **BY MR. ELLIS**

17   **Q.** AGAIN, WHAT IS THIS SCREEN?

18   **A.** THIS IS STILL PART OF THE DEBTOR ACCOUNT HISTORY

19   CONTINUED. THIS GIVES US MORE DEMOGRAPHICS ABOUT THE DEBT

20   ITSELF.

21   **Q.** OKAY. AND IT TELLS YOU WHO THE CLIENT IS, CORRECT?

22   **A.** CORRECT.

23   **Q.** AND THAT'S SUTTER GENERAL HOSPITAL?

24   **A.** CORRECT.

25   **Q.** IT TELLS YOU WHO THE DEBTOR IS, CORRECT?

1    A.   CORRECT.

2    Q.   AND IT TELLS YOU THE DATE OF REFERRAL, IS THAT TRUE?

3    A.   YES.

4    Q.   AND JUST SO -- CAN YOU EXPLAIN TO THE JURY THOSE NUMBERS

5    050715?  WHAT DOES THAT MEAN?

6    A.   MAY 7TH, 2015.

7    Q.   AND THE DATE OF SERVICE, THAT IS WHEN MR. REYNOSO WAS

8    SEEN?

9    A.   YES.

10   Q.   AND THAT'S APRIL 4TH, 2014?

11   A.   CORRECT.

12   Q.   NOW, IT HAS DOWN THERE A TERM, JACK DATE.

13        WHAT DOES THAT MEAN?

14   A.   THAT'S THE DATE THAT THE COLLECTOR WANTED TO SEE IT NEXT.

15   IT IS ACTUALLY THE DAY BEFORE.  IF YOU JACK DATE IT FOR

16   6/9/16, THEY WILL SEE IT THE MORNING OF THE 10TH.

17   Q.   ALL RIGHT.

18        AND THEN IF WE GO BACK TO THE OTHER SIDE, THERE IS A

19   REFERENCE TO LAST LETTER 362.  DO YOU SEE THAT?

20   A.   I DO.

21   Q.   WHAT DOES THAT MEAN?

22   A.   THAT IS A PARTICULAR LETTER NUMBER --

23   Q.   OKAY.

24   A.   -- THAT WAS SENT.

25   Q.   LET'S GO BACK FOR A SECOND.

1      WE SEE HERE THAT A DATE OF REFERRAL IS MAY 7TH, 2015; IS

2   THAT CORRECT?

3   A.  YES.

4   Q.  AND WHAT HAPPENS ON THAT DATE WITH RASH CURTIS?

5   A.  THAT DATE IS -- WELL, WE START WORKING THE ACCOUNT.  WE

6   DROP THE ACCOUNTS, THE DATE OF REFERRAL THE NEXT DAY.  UNLESS

7   IT'S A FRIDAY, THEN THE MONDAY WE START WORKING THE ACCOUNT.

8   Q.  AND AS PART OF THAT YOU SEND A LETTER?

9   A.  WE DO.

10  Q.  THAT'S CALLED A FIRST NOTICE?

11  A.  CORRECT.

12  Q.  ALL RIGHT.

13      AND WE SEE DOWN IN THE FIELD, THERE'S A STATUS CODE.  DO

14  YOU SEE THAT?

15  A.  I DO.

16  Q.  AND IT SAYS ATY.  WHAT DOES THAT MEAN?

17  A.  ATTORNEY.

18  Q.  AND SO WHY WOULD THIS ACCOUNT SAY ATY?

19  A.  BECAUSE THERE'S AN ATTORNEY INVOLVED IN THIS ACCOUNT.

20  Q.  AND SO THAT WOULD HAVE PUT IN THAT WOULD HAVE BEEN PUT IN

21  AFTER THE LAWSUIT CAME IN?

22  A.  YES.

23  Q.  ALL RIGHT.  AND THEN WE GO DOWN AND THERE'S THE AMOUNT

24  THAT IS BEING REFERRED, CORRECT?

25  A.  YES.

1  Q.  AND SO THE TOTAL AMOUNT THAT WAS REFERRED TO RASH CURTIS

2  WAS $879.23?

3  A.  NO.  THE AMOUNT REFERRED WAS 791.70.

4  Q.  ALL RIGHT.  AND THEN INTEREST IS ADDED?

5  A.  YES.

6  Q.  ALL RIGHT.  SO LET'S GO DOWN TO THE NEXT PAGE.

7              (DISPLAYED ON SCREEN.)

8     NOW, THE TOP OF THIS, WHAT IS THIS?

9  A.  THIS IS MORE OF THE ACCOUNT -- DEBTOR ACCOUNT HISTORY.

10  AND IT'S THE START OF THE HISTORY NOTES OF THE HISTORY OF THE

11  ACCOUNT.

12  Q.  SO LET'S GO TO THE VERY FIRST LINE, AND IT'S GOT AN M STAR

13  AND THEN IT'S GOT A DATE.

14     CAN YOU TELL THE JURY WHAT DOES THE M STAR REPRESENT?

15  A.  I DON'T KNOW.

16  Q.  OKAY.  WOULD CHRIS PAFF OR --

17  A.  CHRIS OR NICK WOULD KNOW.

18  Q.  OKAY.  AND THEN WE SEE A LINE THAT SAYS REQUESTED ECA

19  ADVANCED TRACE, ASSETS, BANKRUPTCY, SCORE, BANK CARD?

20  A.  CORRECT.

21  Q.  SO, WHAT DOES THAT MEAN?

22  A.  IT'S A COLLECTIBILITY SCORE THAT WE SEND OUT FOR ON ALL

23  ACCOUNTS WHEN THEY COME IN.

24  Q.  I AM SORRY.  I DIDN'T HEAR.

25  A.  COLLECTIBILITY SCORE.

1  **Q.** SO TELL THE JURY WHAT THAT IS?

2  **A.** IT GIVES US JUST LIKE KIND OF A CREDIT SCORE. GIVES US A

3  NUMBER OF COLLECTIBILITY. IT GIVES US -- MIGHT GIVE US AN

4  ASSET, MAYBE A CREDIT CARD, IF THEY HAD AVAILABLE CREDIT. IF

5  THE PATIENT FILED BANKRUPTCY OR NOT IT WOULD TELL US, SO WE

6  WOULD CANCEL THE ACCOUNT.

7  **Q.** FROM THIS LINE, WAS THE NUMBER -- THE TELEPHONE NUMBER

8  SKIP-TRACED?

9  **A.** NO.

10  **Q.** HOW DO YOU KNOW THAT?

11  **A.** NOT FROM THIS LINE, I CAN'T TELL ANYTHING. BUT THE PHONE

12  NUMBER, WE GOT IT FROM SUTTER.

13  **Q.** SO, LET'S GO DOWN TO THE NEXT LINE. AND LET'S HIGHLIGHT

14  THAT.

15  YOU WILL SEE THERE IS A TELEPHONE NUMBER 5193; IS THAT

16  CORRECT?

17  **A.** YES.

18  **Q.** AND IS THAT -- THAT IS AUTOMATICALLY INPUT INTO YOUR

19  COLLECTION NOTES FROM THE INFORMATION THAT YOU GET FROM

20  SUTTER?

21  **A.** THAT'S -- THAT WAS INPUT BY GLOBAL CONNECT.

22  **Q.** OKAY. AND HOW DOES GLOBAL CONNECT GET THE NUMBER?

23  **A.** WE PUT -- THE COLLECTION MANAGER PUTS IT IN.

24  **Q.** OKAY. SO WHEN WE SEE ON THE LEFT-HAND COLUMN GC, THAT

25  STANDS FOR GLOBAL CONNECT?

1 **A.** YES.

2 **Q.** AND THAT'S -- WE'VE HEARD SOME INFORMATION DURING THE

3 TRIAL ABOUT THE DIALING PLATFORM THAT RASH CURTIS USED.

4   IS GLOBAL CONNECT ONE OF THE DIALING PLATFORMS?

5 **A.** ONE OF THE WHAT?

6 **Q.** DIALING PLATFORMS.

7 **A.** YES.

8 **Q.** AND IF WE SEE GLOBAL CONNECT IN CONNECTION WITH ANY OF

9 THESE LINES, THAT WILL INDICATE TO YOU THAT THE CALL WAS MADE

10 USING THAT DIALING PLATFORM?

11 **A.** MADE OR NOT MADE, IT WAS LOADED ONTO THAT PLATFORM.  IN

12 THE FIRST ONE, IT WAS SKIPPED.  IT WASN'T MADE.

13 **Q.** OKAY.

14   SO... LET'S GO ACROSS AND MAKE SURE THE JURY UNDERSTANDS.

15 SO THE FIRST PHONE CALL, AS I UNDERSTAND LOOKING AT THIS, IS

16 MADE ON WHAT DAY?

17 **A.** LOOKS LIKE IT WAS MADE ON MAY 28TH, 2015 AT 9:45 A.M.

18 **Q.** I THINK YOU'RE -- LET'S GO BACK UP.  I DON'T THINK YOU ARE

19 UNDERSTANDING ME, MR. KEITH.

20 **A.** OKAY.

21 **Q.** THE FIRST ATTEMPTED PHONE CALL WAS MADE ON WHAT DATE?

22 **A.** THE 28TH OF MAY.

23 **Q.** OKAY.  WELL, WHAT IS HAPPENING ON MAY 27TH?

24 **A.** THE CALL WAS SKIPPED.  IT WASN'T MADE.  IT SAYS NOT MADE.

25 **Q.** SO, IT IS NOT EVEN LEAVING -- IT IS NOT LEAVING --

1    **A.**   FOR WHATEVER THE CRITERIA WAS PUT IN FOR THE DAY, IT

2    DIDN'T MEET THE CRITERIA, SO IT DIDN'T GET CALLED.

3    **Q.**   SO LET'S GO BACK.  I WANT TO MAKE SURE THAT IS CLEAR TO

4    THE JURY.

5         SO LET'S GO TO THE SECOND LINE WHERE IT SAYS, CALL

6    SKIPPED, NOT MADE.

7         SO WE SEE THERE IS A NUMBER THERE, 5193.  DO YOU SEE THAT?

8    **A.**   YES.

9    **Q.**   AND SO WHEN IT SAYS, CALL SKIPPED, WHAT DOES THAT MEAN?

10   **A.**   THAT THE CALL WAS SKIPPED.  IT DIDN'T GET MADE.

11   **Q.**   WHAT DOES THAT MEAN?  THAT THE DIALER SKIPS OVER IT?

12   **A.**   YES.

13   **Q.**   OKAY.  SO THERE'S NOT EVEN AN ATTEMPTED CALL?

14   **A.**   CORRECT.

15   **Q.**   ALL RIGHT.  AND THEN WE GO TO THE NEXT LINE AND WE SEE IT

16   SAYS GC AGAIN, 05.  THAT MEANS MAY, CORRECT?

17   **A.**   CORRECT.

18   **Q.**   AND THEN THE 28TH, CORRECT?

19   **A.**   YES.

20   **Q.**   2015?

21   **A.**   YES.

22   **Q.**   AND THE PHONE CALL GOES OUT AT 9:45?

23   **A.**   YES.

24   **Q.**   AGAIN, IT GOES TO THE 5193 NUMBER?

25   **A.**   YES.

1    Q.   AND IT SAYS THE PHONE IS ANSWERED --

2    A.   CORRECT.

3    Q.   -- DO YOU SEE THAT?  THEN IT SAYS NO LINK BACK?

4    A.   CORRECT.

5    Q.   EXPLAIN TO THE JURY WHAT THAT MEANS.  WHAT DOES NO LINK

6    BACK?

7    A.   IT WAS DEAD AIR.  NOBODY WAS THERE.

8    Q.   SO I WANT TO SKIP DOWN -- WITHDRAW THAT.

9         AT RASH CURTIS, ARE COLLECTORS TRAINED TO MAKE NOTES IN

10   THE RECORDS IF THEY ARE TALKING WITH SOMEBODY?

11   A.   YES.

12   Q.   IS THAT SUPPOSED TO BE AN INVARIABLE PRACTICE AND

13   PROCEDURE?

14   A.   YES.

15   Q.   AND ONCE THEY MAKE THE NOTES IN THE RECORD, CAN THEY BE

16   REMOVED?

17   A.   NO.

18   Q.   AND THAT'S PART OF YOUR QUALITY CONTROL SYSTEM?

19   A.   CORRECT.

20   Q.   SO YOU WERE HERE WHEN YOU HEARD THE VIDEO CLIPS OF

21   MR. KIZER, CORRECT?

22   A.   CORRECT.

23   Q.   AND SO YOUR COLLECTORS ARE TRAINED A MINIMUM OF 21 DAYS

24   BEFORE THEY GO LIVE?

25   A.   YES.  IT DOESN'T -- EVERYBODY THAT COMES INTO RASH CURTIS

1    GETS THE SAME TRAINING, EVEN IF THEY HAVE HAD EXPERIENCE IN

2    THE PAST.

3    **Q.** SO AS PART OF THAT TRAINING, THAT IS TO PUT RECORDS OF

4    TELEPHONE CALLS IN WHAT YOU CALL THE HISTORY, CORRECT?

5    **A.** CORRECT.

6    **Q.** ALL RIGHT. AND SO IF THERE WAS A COMMUNICATION WITH A

7    DEBTOR, YOU WOULD EXPECT TO SEE THAT IN THE CALL HISTORY

8    NOTES?

9    **A.** I WOULD.

10       **MR. ELLIS:** SO, MR. VALENTI, CAN WE SKIP DOWN TO

11   JUNE 7TH?

12       AND LET'S LOOK AT... CORRECT.

13                  (DISPLAYED ON SCREEN.)

14   **Q.** SO, IN THIS CASE, MR. KEITH, YOU WILL SEE THAT IT SAYS

15   THAT WE DON'T SEE A GLOBAL CONNECT THERE, WE SEE A 23.

16       DO YOU SEE THAT?

17   **A.** CORRECT.

18   **Q.** WHAT DOES THAT MEAN?

19   **A.** COLLECTOR NO. 23.

20   **Q.** THAT WAS A MANUALLY DIALED CALL?

21   **A.** IT WAS -- THE NOTE WAS PUT IN BY A COLLECTOR BUT THEN IN

22   THE OTHER ONE, IT SAYS GC.

23   **Q.** OKAY. IN THE --

24   **A.** IF YOU GO TO THE RIGHT --

25   **Q.** I SEE. WE'LL GET THERE.

1    **A.**    OKAY.

2    **Q.**    SO THIS IS A COLLECTOR -- IT'S NOT NECESSARILY A COLLECTOR

3    CALLING OUT?

4    **A.**    IT COULD HAVE BEEN.    IT -- IT -- YOU PROBABLY NEED TO ASK

5    DAN THIS QUESTION.    HE IS MORE FAMILIAR WITH THIS PART THAN I

6    AM BECAUSE A LOT OF TIMES WE HAVE A POP-ALL CAMPAIGN.

7              **THE COURT:**    POP ALL?

8              **THE WITNESS:**    P-O-P, AND THEN A-L-L.

9              **THE COURT:**    THANK YOU.

10             **THE WITNESS:**    JUST TO BE CLEAR --

11   **BY MR. ELLIS**

12   **Q.**    AND I WAS GOING TO ASK HIM THOSE QUESTIONS BUT SINCE YOU

13   BROUGHT IT UP, WHAT IS A POP-ALL CAMPAIGN?

14   **A.**    IT JUST MEANS THAT A LIST OF PHONE NUMBERS WILL COME UP

15   AND THE COLLECTOR WILL HAVE TO SELECT WHICH ONE IT WANTS TO

16   CALL.

17   **Q.**    THERE WOULD BE HUMAN INTERVENTION AT THAT POINT?

18   **A.**    YES, THERE WOULD BE HUMAN INTERVENTION.

19   **Q.**    THERE --

20   **A.**    THEY WERE ON GLOBAL CONNECT BUT THEY NOTED IT.

21   **Q.**    BUT THERE WOULD BE A CLICK ON A BUTTON?

22   **A.**    YEAH.

23   **Q.**    ALL RIGHT.    BY A COLLECTOR?

24   **A.**    IF IT WAS A POP-ALL CAMPAIGN, YES.

25   **Q.**    ALL RIGHT.    SO, WHAT WE SEE HERE IS THE NUMBER COMES UP,

1    5193?

2    **A.**   UH-HUH.

3    **Q.**   IS THAT A YES?

4    **A.**   YES.  I AM SORRY.

5    **Q.**   THAT IS THE NUMBER YOU GOT FROM SUTTER?

6    **A.**   YES.

7    **Q.**   AND IT SAYS GC, SO THE DIALING -- THE GLOBAL CONNECT

8    DIALING PLATFORM WAS USED IN SOME WAY?

9    **A.**   YES.

10   **Q.**   BUT YOU CAN'T TELL FROM THIS WHETHER IT WAS AUTOMATICALLY

11   DIALED OR THERE WAS A CLICK BY A COLLECTOR.  IS THAT TRUE?

12   **A.**   THAT IS TRUE.  BUT, NORMALLY, IF IT IS DIALED BY GLOBAL

13   CONNECT WITHOUT COLLECTOR INTERVENTION, YOU CAN SEE YOU WILL

14   SEE THE 1GC IN FRONT OF IT.

15   **Q.**   LET ME MAKE SURE WE HAVE GOT THIS CLEAR.  WE SEE IN LINES

16   ABOVE THESE LINES THAT START WITH 23, WE SEE A GC PREFIX; IS

17   THAT CORRECT?

18   **A.**   CORRECT.

19   **Q.**   THAT TYPICALLY, IN YOUR UNDERSTANDING AND INTERPRETATION

20   OF THESE BUSINESS RECORDS, THAT INDICATES THAT THAT WOULD BE

21   AN AUTOMATICALLY DIALED CALL?

22   **A.**   TO MY KNOWLEDGE, YES.

23   **Q.**   NOW, LET'S GO BACK TO THIS RECORD.

24        SO WE HAVE -- WE SEE AT THE FRONT 23.  SO THAT IS A

25   COLLECTION AGENT?

1   **A.** YES.

2   **Q.** AND THEN WE SEE RES. WHAT DOES THAT MEAN?

3   **A.** RESIDENCE.

4   **Q.** AND DOES THAT REFER BACK TO THE 5193 NUMBER?

5   **A.** YES. RESIDENCE FIELD IS PHONE LINE.

6   **Q.** LET'S TALK ABOUT THAT.

7   WHEN NUMBERS COME IN FROM YOUR CREDITOR CLIENTS, DOESN'T

8   HAVE TO BE SUTTER, COULD BE ANYBODY, THE PROCESS IS PRETTY

9   MUCH INVARIABLE, IS IT NOT? IN TERMS OF WHAT PHONE FIELDS

10  NUMBERS GOES INTO?

11  **A.** UNLESS THERE IS MORE THAN FOUR, THEN THEY ROLL OVER TO

12  FIVE THROUGH TEN, YES. IF THEY GIVE THEM -- THIS IS THEIR

13  MAIN CONTACT NUMBER, IT USUALLY GOES INTO FIELD ONE.

14  **Q.** AND SO FIELD ONE ARE NUMBERS THAT COME IN WITH CONSENT?

15  **A.** YES.

16  **Q.** AND WHEN I SAY CONSENT, CONSENT TO CALL THAT NUMBER?

17  **A.** FROM THE CLIENT, YES.

18  **Q.** AND IS THAT PART OF YOUR POLICY AND PROCEDURE AND YOUR

19  CONTRACTS WITH YOUR CLIENTS?

20  **A.** I AM SORRY. I DON'T UNDERSTAND THE QUESTION.

21  **Q.** IT WASN'T A GOOD QUESTION.

22  SO WHEN YOU ARE DEALING WITH YOUR MEDICAL CLIENT, OKAY?

23  WHEN THEY SEND YOU NUMBERS, IF IT IS A RESIDENCE NUMBER OR A

24  HOME NUMBER, YOU PUT THAT IN WHAT FIELD?

25  **A.** ONE.

1    Q.  AND THAT'S WHY?

2    A.  THAT'S THE -- THE NUMBER THAT THE PATIENT GAVE THE CLIENT

3    TO GET AHOLD OF THEM AT AS A FIRST NUMBER.

4    Q.  SO THAT IS A PHONE NUMBER THAT THE PATIENT TOLD YOUR

5    CLIENT THEY HAD CONSENT TO CALL?

6    A.  CORRECT.

7    Q.  AND THOSE ARE THE NUMBERS THAT GO IN WHAT FIELDS?

8    A.  ONE THROUGH FOUR, UNLESS THERE IS MORE THAN FOUR.

9    Q.  SO LET ME JUST ASK YOU THAT.

10       AS PART OF YOUR BUSINESS, ARE THERE TIMES WHEN PATIENTS

11   GIVE YOU -- OR YOU RECEIVE NUMBERS THAT YOU HAVE CONSENT TO

12   CALL FOR MORE THAN FOUR NUMBERS?

13       IS THAT WHAT YOU ARE TELLING US?

14   A.  YES.

15   Q.  AND SO NUMBERS WITH CONSENT CAN POPULATE INTO FIELDS FIVE

16   THROUGH TEN?

17   A.  YES.

18   Q.  OKAY.  AND YOU SEE THAT HAPPEN ON A REGULAR BASIS?

19   A.  YES.

20   Q.  LET'S GO BACK TO THIS DOCUMENT.  AGAIN, WE ARE TALKING

21   ABOUT EXHIBIT 78.

22   A.  SORRY.  MR. WEIR SAW IT HAPPEN, TOO.

23   Q.  PARDON?

24   A.  MR. WEIR SAID IT HAPPEN, TOO.  HE REMOVED SOME THAT WERE

25   ALREADY IN ONE THROUGH FOUR.

1    Q.   THANK YOU.  WE'LL GET THERE, MR. KEITH.

2         SO WE THEN SEE IT SAYS QA, WHICH IS TALKING ABOUT

3    QUALIFYING THE PERSON?

4    A.   QUALITY ASSURANCE.

5    Q.   OKAY.  QUALITY ASSURANCE.  RIGHT?

6    A.   UH-HUH.

7    Q.   THEN IT SAYS NSP.  WHAT DOES THAT MEAN?

8    A.   NO SUCH PERSON.

9    Q.   AND THEN IT SAYS REMV (SIC), WHAT DOES THAT MEAN?

10   A.   IT SAYS RMV.  IT MEANS REMOVED.

11   Q.   PN IS PHONE?

12   A.   CORRECT.

13   Q.   SO TAKEN TOGETHER, CAN YOU TELL THE JURY -- WELL, YOU

14   START AT 5193 AND END AT PN.  CAN YOU TELL THE JURY WHAT

15   ACTION THAT REFLECTS?

16   A.   THEY CALLED PHONE NUMBER 5193, WHICH IS A RESIDENCE

17   NUMBER, IT GAVE THE QUALITY ASSURANCE, WHICH MEANS WE TOLD

18   THEM THEY ARE BEING RECORDED, AND THE PERSON SAID THERE IS NO

19   SUCH PERSON.  THEY DIDN'T KNOW THAT PERSON, SO THEY REMOVED

20   THE PHONE NUMBER.

21   Q.   OKAY.  NOW, I WANT TO GO BACK UP TO THE TOP.

22        AND BY THE WAY, WHO REMOVES THE PHONE NUMBER?

23   A.   THE COLLECTOR THAT WAS ON THE PHONE.

24   Q.   OKAY.  WHY IS THE NUMBER REMOVED ENTIRELY?

25   A.   SO WE DON'T CALL IT AGAIN.  IT'S A NO GOOD NUMBER.  WE

1  DON'T WANT TO KEEP CALLING IT.  IT IS NO USE TO US.

2  **Q.**  AND, OF COURSE, THE PERSON TOLD YOU NOT TO CALL AGAIN?

3  **A.**  RIGHT.

4  **Q.**  WE SEE AT THE TOP IT SAYS JUNE -- I AM SORRY.  LET'S GO

5  BACK DOWN AGAIN.

6      SO THE PHONE NUMBER IS REMOVED IMMEDIATELY?

7  **A.**  YES.

8  **Q.**  AND IS THERE A WAY THAT A COLLECTOR ON THE FLOOR CAN GO

9  BACK AND FIND THAT NUMBER, IF THEY WANT TO AGAIN AND CALL IT

10  AGAIN?

11  **A.**  I DON'T UNDERSTAND.

12  **Q.**  THE PHONE NUMBER IS REMOVED FROM -- LET ME GO BACK.

13      WHAT SOFTWARE, IF ANY, IS RUNNING THIS PROGRAM, THIS

14  DEBTOR HISTORY PROGRAM?

15  **A.**  DAKCS.

16  **Q.**  IS THAT THE BEYOND SOFTWARE?

17  **A.**  YES.

18  **Q.**  AND THE NUMBER IS REMOVED, SO NO ONE CAN CALL IT --

19  **A.**  THE NUMBER IS REMOVED BECAUSE IT IS A BAD NUMBER AND THEY

20  TOLD US NOT TO CALL IT ANYMORE, BUT THEY CAN STILL SEE THE

21  PRIOR NUMBERS IN THE HISTORY.

22  **Q.**  ALL RIGHT.  AND THAT'S ALL THE SOFTWARE FUNCTION, BY

23  REMOVING IT?

24  **A.**  DON'T UNDERSTAND.

25  **Q.**  SO THIS IS MANUALLY REMOVED?

1    A.  YES.

2    Q.  ALL RIGHT.  OKAY.  SO NOW, LET'S GO BACK AND I WANT TO --

3          MR. ELLIS:  LET'S GO ALL THE WAY BACK TO THE

4    BEGINNING, MR. VALENTI.  THAT'S WHAT I WANT.

5    BY MR. ELLIS

6    Q.  WHAT DOES JUNE 15TH, 2016 MEAN?

7    A.  THE DATE WE PRINTED THIS DOCUMENT.

8    Q.  OKAY.  AND -- ALL RIGHT.

9          AND SO THIS IS WHAT THE DOCUMENT LOOKED LIKE ON THAT DAY?

10   A.  CORRECT.

11   Q.  AND IT'S LOOK LIKE -- LOOKS LIKE THERE HAS BEEN ONE

12   ADDITION MADE TO IT AND LET'S GO DOWN TO THE NEXT SCREEN.

13         MR. ELLIS:  I AM SORRY, MR. VALENTI.  GO BACK TO THE

14   SECOND PAGE AND LET'S ZOOM IN ON THIS.

15   BY MR. ELLIS:

16   Q.  SO IT LOOKS LIKE THERE'S A STATUS CODE WITH ATTORNEY.  DO

17   YOU SEE THAT?

18   A.  YES.

19   Q.  DO YOU BELIEVE THAT THAT'S THE DATE THAT YOU WERE NOTIFIED

20   THAT THERE MAY BE AN ATTORNEY CONNECTED WITH THIS AND THAT IS

21   WHY IT WAS PRINTED, OR DO YOU KNOW?

22   A.  YES.  I WOULD HAVE PRINTED IT BECAUSE I BELIEVE THAT IS

23   THE DATE THAT WE GOT THE FIRST NOTICE FROM THE ATTORNEYS IN

24   REGARDS TO THIS PHONE NUMBER.

25   Q.  OKAY.  ALL RIGHT.

1    MR. KEITH, LET'S TALK TO THE JURY A LITTLE ABOUT THE PHONE

2  FIELDS FIVE THROUGH TEN.  WE HAVE TALKED A LITTLE BIT ABOUT

3  THAT.

4    DO ONLY SKIP-TRACED NUMBERS GO IN PHONE FIELDS FIVE

5  THROUGH TEN?

6  **A.**  NOT ONLY SKIP-TRACED NUMBERS, NO.

7  **Q.**  WHAT OTHER SOURCES OF NUMBERS GO INTO THOSE PHONE FIELDS?

8  **A.**  ANY --

9  **Q.**  MR. KEITH, REMEMBER THE ADMONITION TO TALK SLOWLY.

10  **A.**  RIGHT.  ANY ROLLOVER NUMBERS THAT COME FROM MY CLIENT WILL

11  ROLL OVER INTO FIVE THROUGH TEN.

12  **Q.**  LET ME STOP YOU RIGHT THERE.  SO YOU'VE TALKED ABOUT WHEN

13  PHONE NUMBERS COME IN FROM THE CLIENT, THEY START IN PHONE

14  FIELD ONE.  THAT'S WHAT YOU'VE CALLED THE RESIDENCE OR THE

15  HOME NUMBER?

16  **A.**  YES.

17  **Q.**  AND PURSUANT TO YOUR AGREEMENTS WITH YOUR CLIENTS, THOSE

18  ARE NUMBERS THAT THE CLIENT OBTAINS WITH CONSENT TO CALL THAT

19  NUMBER?

20  **A.**  YES.

21  **Q.**  AND THAT COULD BE A CELLPHONE NUMBER?

22  **A.**  YES.

23  **Q.**  THAT COULD BE A LANDLINE NUMBER?

24  **A.**  YES.

25  **Q.**  OR IT COULD BE A COMBINATION OF TELEPHONE NUMBERS,

1    CORRECT?

2    **A.** YES.

3    **Q.** AND SO WHAT YOU'RE SAYING IS, IF SOMEHOW THE CLIENT GETS

4    SIX, SEVEN OR EIGHT NUMBERS, THEY ARE POPULATED IN THE FIELDS

5    IN A CERTAIN SEQUENCE; IS THAT CORRECT?

6    **A.** YES.

7    **Q.** AND WHO DOES THAT? HOW DOES THAT HAPPEN?

8    **A.** IT COMES IN ELECTRONICALLY. SO, NICK WOULD PROBABLY BE

9    THE BEST PERSON TO ANSWER THAT. BUT IT'S MAPPED AND IT GOES

10   TO THE FIELDS THAT IT WAS DESIGNATED FOR.

11   **Q.** WHEN YOU SAY THE FIELDS IT WAS DESIGNATED FOR, ARE SOME OF

12   THOSE FIELDS SET UP PURSUANT TO AN AGREEMENT WITH YOUR

13   CREDITOR CLIENT AS TO WHERE THEY WANT THEM IT BE?

14   **A.** YES.

15   **Q.** SO WE KNOW THAT NUMBERS, IF THEY ARE SKIP-TRACED, THEY DO

16   GO INTO PHONE FIELDS FIVE THROUGH TEN --

17   **A.** CORRECT.

18   **Q.** OKAY. AND THEN YOU COULD HAVE NUMBERS THAT HAVE ROLLED

19   OVER WITH CLIENT CONSENT. THEY CAN GO INTO PHONE FIELDS FIVE

20   THROUGH TEN?

21   **A.** YES.

22   **Q.** WHAT ARE OTHER SOURCES OF NUMBERS THAT YOU OBTAINED THAT

23   GO INTO PHONE FIELDS FIVE THROUGH TEN?

24   **A.** OTHER THAN SKIP-TRACED NUMBERS?

25   **Q.** AND NUMBERS THAT ROLL OVER FROM YOUR CLIENTS -- WHERE ELSE

1    DO YOU FIND NUMBERS THAT GO INTO THOSE FIELDS?

2    **A.**  DIFFERENT METHODS OF -- YOU KNOW, SOMEBODY MIGHT CALL IN

3    SAY, OH, HERE'S THEIR NUMBER.  WE WILL PUT IT INTO THAT FIELD,

4    LIKE A THIRD PARTY.

5    **Q.**  NOW, WHAT ABOUT DEBTORS THEMSELVES?  ARE YOUR COLLECTORS

6    TRAINED TO TRY TO OBTAIN INFORMATION WHEN THEY MAKE PHONE

7    CALLS TO DEBTORS?

8    **A.**  YES.

9    **Q.**  AND IF YOU'VE ALREADY GOT A RESIDENCE NUMBER AND A DEBTOR

10   GIVES YOUR COLLECTOR MORE PHONE NUMBERS, IT IS MY SPOUSE'S

11   PHONE NUMBER, THIS IS MY PLACE OF EMPLOYMENT, THINGS LIKE

12   THAT, ARE YOUR COLLECTORS TRAINED TO PUT THOSE NUMBERS ALSO,

13   FOR EXAMPLE, IN PHONE FIELDS FIVE THROUGH TEN?

14   **A.**  THEY COULD IF THERE WASN'T ANY MORE ROOM IN ONE THROUGH

15   FOUR.

16   **Q.**  ALL RIGHT.  AND THEN WHAT ABOUT FRIENDS OR RELATIVES, IF

17   YOU GET THAT INFORMATION?  WHERE DOES THAT GO?

18   **A.**  FIVE THROUGH TEN.

19   **Q.**  OKAY.  EVEN IF YOU GET THAT THROUGH NONSKIP-TRACING?

20   **A.**  YES -- WELL, I DON'T KNOW THE ANSWER TO THAT.  IT DEPENDS

21   ON WHERE IT IS MAPPED AND WHAT SEQUENCE IT CAME OVER FROM THE

22   CLIENT.

23   **Q.**  SO -- ALL RIGHT.  I WOULD LIKE TO SHOW YOU AN EXHIBIT THAT

24   WAS INTRODUCED YESTERDAY.  IT WAS 523, EXHIBIT 523.

25                    (DISPLAYED ON SCREEN.)

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

1    AND I THINK THAT YOU WERE SITTING IN THE COURTROOM WHEN

2  THIS EXHIBIT WAS PUT UP AND I TALKED WITH MS. VERKHOVSKAYA

3  ABOUT THAT.  DO YOU RECALL THAT?

4  **A.**  MR. WHO?

5  **Q.**  MS. VERKHOVSKAYA.

6  **A.**  YES, YES.

7  **Q.**  LET'S GO TO THE NEXT PAGE.  LET'S GO TO THE NEXT PAGE.

8        **MR. ELLIS:**  OKAY.  LET'S BLOW THAT UP.

9  **BY MR. ELLIS:**

10  **Q.**  SO, MS. VERKHOVSKAYA INDICATED THAT DIANE STEELE WAS A

11  NON-DEBTOR.  DO YOU REMEMBER THAT TESTIMONY?

12  **A.**  I DO.

13  **Q.**  IS THAT CORRECT?

14  **A.**  NO.

15  **Q.**  HOW DO YOU KNOW THAT THAT WAS INCORRECT TESTIMONY?

16  **A.**  I, MYSELF, PERSONALLY WORKED ON THIS ACCOUNT.

17  **Q.**  ON MS. STEELE'S ACCOUNT?

18  **A.**  YES.

19  **Q.**  AND SO SHE WAS A DEBTOR?

20  **A.**  YES.

21  **Q.**  ALL RIGHT.  IN RASH CURTIS, WHEN -- FIRST OF ALL, STEVE

22  KIZER, DO YOU KNOW WHO HE IS?

23  **A.**  YES.

24  **Q.**  DID MR. KIZER USED TO WORK AT RASH CURTIS?

25  **A.**  YES.

1  Q. DID MR. KIZER HAVE ANYTHING TO DO WITH YOUR TCPA

2  COMPLIANCE PROGRAM?

3  A. NO.

4  Q. WAS MR. KIZER SOMEONE THAT YOU LOOKED TO FOR TCPA

5  EXPERTISE?

6  A. NO.

7  Q. DOES MR. KIZER STILL WORK THERE?

8  A. NO.

9  Q. AND WHEN DID MR. KIZER LAST WORK THERE?

10  A. IT'S BEEN A FEW YEARS. I DON'T REMEMBER THE EXACT DATE.

11  Q. IN TERMS OF -- IN TERMS OF WHERE MR. KIZER WAS LOCATED IN

12  THE BUILDING, CAN YOU EXPLAIN TO THE JURY WHERE HE WAS IN --

13  LET'S SAY IN 2016, IN RELATION TO WHERE YOUR OFFICE IS AT?

14  A. YES. MY OFFICE IS RIGHT OFF OF THE COLLECTION FLOOR. HIS

15  OFFICE IS IN THE VERY BACK OF THE OFFICE. IT'S ALSO OFF THE

16  COLLECTION FLOOR BUT IT'S IN THE FAR LEFT AND HE HAS A -- IT

17  IS WHAT WE CALL OUR TRAINING ROOM. IT HAS SIX STATIONS IN

18  THERE FOR TRAINING NEW EMPLOYEES. AND HIS -- HE -- HE SITS IN

19  THERE. THAT WAS HIS OFFICE. SO HE HAS HIS DOOR RIGHT THERE.

20  HIS DESK IS AT THE VERY BACK OF THAT OFFICE.

21  Q. AND IS THAT WHERE HIS OFFICE WAS LOCATED FOR SOME PERIOD

22  OF TIME?

23  A. YES.

24  Q. DO YOU REMEMBER -- WELL, LET ME JUST ASK YOU.

25      DID YOU EVER COME OUT OF YOUR OFFICE AND SCREAM ACROSS THE

1  FLOOR WE'RE BEING SUED OR WORDS TO THAT EFFECT BECAUSE WE'RE

2  NOT TCPA COMPLIANT?

3  **A.**  NO.  I WOULD NEVER COME OUT AND SCREAM AT MY STAFF LIKE

4  THAT.

5  **Q.**  WELL, ALL RIGHT.

6      THAT'S ALL I HAVE, THANK YOU.

7          **THE COURT:**  CROSS?

8              **CROSS—EXAMINATION**

9  **BY MR. BURSOR:**

10  **Q.**  GOOD MORNING, MR. KEITH.

11  **A.**  GOOD MORNING.

12  **Q.**  WAS DIANE STEELE THE DEBTOR ON THAT ACCOUNT?

13  **A.**  YES.

14  **Q.**  ON THE ACCOUNT THAT YOU JUST SAW ON EXHIBIT 523?

15  **A.**  YES.

16  **Q.**  MR. KEITH, ISN'T IT TRUE THAT A MAN NAMED STEPHEN MILLIGAN

17  IS THE NAME OF THE DEBTOR ON THAT ACCOUNT?

18  **A.**  I BELIEVE HE WAS ALSO A DEBTOR ON THAT ACCOUNT, YES.

19  **Q.**  DID DIANE STEELE SUE YOUR COMPANY?

20  **A.**  YES.

21  **Q.**  WHY?

22  **A.**  I BELIEVE IT WAS TCPA AND ROSENTHAL, IF I REMEMBER

23  CORRECTLY.

24  **Q.**  SHE SUED YOU FOR VIOLATING THE TCPA, RIGHT?

25  **A.**  SHE CLAIMED THAT WE VIOLATED.

## REDIRECT EXAMINATION

**BY MR. ELLIS:**

Q. MR. KEITH, LET'S TALK ABOUT THE THREE DIALING SYSTEMS, THE THREE PLATFORMS. OKAY?

SO, WE'VE GOT -- AND LET'S START KIND OF HISTORICALLY. I THINK THE JURY HAS PICKED THIS UP BUT LET'S MAKE SURE WE ARE ON THE SAME PAGE.

THE VIC DIALER WAS THE EARLIEST TECHNOLOGY THAT IS COVERED IN THE CLASS PERIOD. AND, AGAIN, THE CLASS PERIOD AS WE'VE HEARD IS FROM 2012 TO SOMETIME IN 2018. ARE YOU WITH ME?

A. I AM.

Q. SO TCN OR GLOBAL CONNECT, THOSE DIALING SYSTEMS WEREN'T USED IN 2012, WERE THEY?

A. I DON'T BELIEVE SO, BUT DAN WOULD PROBABLY BE ABLE TO ANSWER THAT QUESTION.

Q. OKAY.

AND THEN THERE WAS A TRANSITION INTO ANOTHER DIALING PLATFORM, CORRECT?

A. YES.

Q. AND THEN A TRANSITION INTO THE THIRD DIALING PLATFORM, WHICH IS TCN?

A. CORRECT.

Q. NOW IT SOUNDS LIKE, EVEN THOUGH IT IS NOT PART OF THE CASE, YOU ARE USING EVEN STILL A DIFFERENT DIALING PLATFORM NOW?

1    A.  WE ARE.

2    Q.  ALL RIGHT.  THAT'S WHAT IS CALLED THE LIVOX?

3    A.  YES.

4    Q.  LET'S GO BACK.  I THINK THE IMPRESSION HAS BEEN GIVEN THAT

5    THESE DIALERS ONLY DIAL AUTOMATICALLY.

6        LET ME JUST -- LET'S GO BACK TO THE JURY.

7        YOU WILL HAVE ONE DIALING PLATFORM THAT WILL BE EMPLOYED

8    TO, IN FACT, DIAL NUMBERS IN WHAT WE'VE HEARD ARE CAMPAIGNS,

9    AND THEY WILL BE DIALED AUTOMATICALLY.  CORRECT?

10   A.  CORRECT.

11   Q.  YOUR POLICY AND PROCEDURE IS THAT THOSE DIALING CAMPAIGNS

12   ONLY DIAL NUMBERS THAT YOU'VE RECEIVED FROM THE CLIENT AND IN

13   WHICH THE CLIENT IN TURN HAS RECEIVED CONSENT TO HAVE THOSE

14   NUMBERS DIALED?

15   A.  THAT IS OUR POLICY AND PROCEDURES, YES.

16   Q.  AND THAT'S TO MAKE SURE YOU'RE TCPA COMPLIANT?

17   A.  YES.

18   Q.  BUT THAT SAME DIALING PLATFORM, LET'S JUST START WITH THE

19   VIC, ALSO PERMITS A NUMBER TO BE SENT TO A COLLECTOR, CORRECT?

20   A.  CORRECT.

21   Q.  IT COMES UP ON THE COLLECTOR'S SCREEN, CORRECT?

22   A.  CORRECT.

23   Q.  AND THEN THE COLLECTOR CLICKS A BUTTON OR MANUALLY DIALS

24   THE NUMBER?

25   A.  CORRECT.  OR BACK IN THE EARLY DAYS, WE USED TO BE ABLE TO

1  USE THE F KEYS TO PUSH THE BUTTON TO DO IT, YES.

2  **Q.** WE HAVE SEEN THAT IN SOME OF THE DOCUMENTATION, THERE'S AN

3  F6 KEY?

4  **A.** RIGHT.

5  **Q.** AND THAT'S WHAT WOULD CLICK AND THEN THE PHONE CALL WOULD

6  GO OUT, CORRECT?

7  **A.** CORRECT.

8  **Q.** THAT WAS THE HUMAN INTERVENTION PART, CORRECT?

9  **A.** CORRECT.

10  **Q.** AND YOU DID THAT BECAUSE?

11  **A.** IT'S JUST THE WAY THE TECHNOLOGY WAS BACK THEN, YOU KNOW

12  WHAT I MEAN, FOR THAT ONE, YEAH.  OR WE WANT TO MANUALLY DIAL

13  IT.

14  **Q.** RIGHT.  AND YOU WANTED TO MANUALLY DIAL IT BECAUSE THAT

15  WOULD NOT BE A VIOLATION, AS YOU UNDERSTOOD IT, OF THE TCPA?

16  **A.** CORRECT.

17  **Q.** BUT YOU WERE USING THE SAME DIALING SYSTEM, CORRECT?

18  **A.** CORRECT.

19  **Q.** AND SO WHEN SOMEONE PULLS THOSE RECORDS UP FROM VIC OR

20  FROM GLOBAL CONNECT, THERE WILL BE A PHONE CALL THERE,

21  CORRECT?

22  **A.** CORRECT.

23  **Q.** BUT IT WON'T SHOW IN THOSE RECORDS WHETHER IT WAS

24  AUTOMATICALLY DIALED OR IT WAS DIALED WITH A CLICK, WILL IT?

25  **A.** CORRECT.

1          **MR. BURSOR:**  OBJECTION.  THIS IS OUTSIDE THE SCOPE OF

2    BOTH THE CROSS AND THE PRETRIAL DISCLOSURE.

3          **MR. ELLIS:**  I'M SORRY?

4          **THE COURT:**  OVERRULED ON THAT BASIS.  I'LL TELL YOU

5    WHAT IS INAPPROPRIATE AND THAT IS THE NATURE OF THE QUESTIONS

6    WHICH ARE LEADING.  LET'S HEAR IT FROM HIM, NOT FROM YOU,

7    MR. ELLIS.

8          **MR. ELLIS:**  ALL RIGHT.

9    **BY MR. ELLIS:**

10   **Q.**  LET ME GO BACK AND ASK ALL THESE QUESTIONS AGAIN.

11         **THE COURT:**  I DIDN'T STRIKE IT.

12         **MR. ELLIS:**  THANK YOU.

13   **BY MR. ELLIS:**

14   **Q.**  SO WOULD THE QUESTIONS AND ANSWERS THAT WE'VE JUST -- THE

15   COLLOQUY THAT WE'VE JUST HAD, WOULD THE SAME BE TRUE WITH EACH

16   ONE OF THE DIALING SYSTEMS?

17   **A.**  TO MY KNOWLEDGE, YES.  I BELIEVE SO.

18   **Q.**  AND SO....

19         **MR. ELLIS:**  THAT'S ALL I HAVE.

20         **THE COURT:**  ANY REDIRECT -- RECROSS?

21         **MR. BURSOR:**  NO, YOUR HONOR.

22         **THE COURT:**  YOU MAY STEP DOWN MR. KEITH.

23      NEXT WITNESS.

24         **THE WITNESS:**  THANK YOU.  YOU WANT ME TO TAKE

25   THESE --

1          THE COURT:  WE WILL PICK THEM UP.  JUST LEAVE THEM

2    THERE.

3          THE WITNESS:  ALL RIGHT.

4          MR. ELLIS:  YOUR HONOR, NEXT WITNESS IS DAN CORREA.

5       (DAN CORREA, CALLED AS A WITNESS FOR THE DEFENDANT, HAVING

6    BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

7          THE WITNESS:  YES, I DO.

8          THE CLERK:  PLEASE BE SEATED.  I'M JUST GOING TO

9    REMOVE A CUP.

10       ALL RIGHT.  AND THEN PLEASE STATE YOUR FULL NAME AND SPELL

11   YOUR LAST NAME.

12         THE WITNESS:  DANIEL CORREA, C-O-R-R-E-A.

13         THE COURT:  GOOD MORNING, SIR.

14         THE WITNESS:  GOOD MORNING.

15         THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

16         MR. ELLIS:  THANK YOU, YOUR HONOR.

17                       **DIRECT EXAMINATION**

18   BY MR. ELLIS:

19   Q.  GOOD MORNING, MR. CORREA.

20   A.  GOOD MORNING.

21   Q.  CAN YOU TELL THE JURY WHERE YOU WORK AT?

22   A.  RASH CURTIS & ASSOCIATES.

23   Q.  AND WHAT DO YOU DO THERE?

24   A.  I'M THE SENIOR DIRECTOR OF OPERATIONS, MANAGE THE

25   COLLECTIONS DEPARTMENT.

# EXHIBIT 8

1  **BURSOR & FISHER, P.A.**
   L. Timothy Fisher (SBN 191626)
2  Yeremey O. Krivoshey (SBN 295032)
   1990 North California Blvd., Suite 940
3  Walnut Creek, CA 94596
   Telephone: (925) 300-4455
4  Facsimile: (925) 407-2700
   E-Mail: ltfisher@bursor.com
5          ykrivoshey@bursor.com

6  **BURSOR & FISHER, P.A.**
   Scott A. Bursor (State Bar No. 276006)
7  888 Seventh Avenue
   New York, NY 10019
8  Telephone: (212) 989-9113
   Facsimile: (212) 989-9163
9  E-Mail: scott@bursor.com

10 *Attorneys for Plaintiffs*

11

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15 SANDRA MCMILLION, JESSICA            Case No. 4:16-cv-03396-YGR
   ADEKOYA, and IGNACIO PEREZ, on
16 Behalf of Themselves and all Others    **PLAINTIFF'S PROPOSED NOTICE OF**
   Similarly Situated,                   **PENDENCY OF CLASS ACTION**
17
18                       Plaintiffs,     Judge: Hon. Yvonne Gonzalez Rogers

19        v.

20 RASH CURTIS & ASSOCIATES,

21                       Defendant.

22

23

24

25

26

27

28

PLAINTIFF'S PROPOSED NOTICE OF PENDENCY OF CLASS ACTION
CASE NO. 4:16-cv-03396-YGR

1    Plaintiff Ignacio Perez ("Plaintiff" or "Class Representative") respectfully submits this

2    proposed notice plan pursuant to the Court's November 6, 2018 Case Management and Pretrial

3    Scheduling Order No. 2. ECF Doc. No. 246.

4    **I.      BACKGROUND REGARDING CLASS MEMBERSHIP**

5        On September 6, 2017, the Court granted Plaintiff's motion for class certification and

6    appointed Plaintiff Perez as Class Representative. The classes consist of persons who are 1) non

7    debtors, and 2) received calls on their cellular telephone, 3) within four years of the filing of the

8    complaint, 4) from one of Defendant's autodialers *or* through the use of a prerecorded message or

9    artificial voice, 5) whose cellphone Defendant obtained through skip tracing. *See* ECF Doc. No.

10   81, at 15-16.

11       As has been briefed extensively in Plaintiff's motion for sanctions, Plaintiff has identified

12   class membership in part based on Defendant's account records and account classification

13   procedures. *See* ECF Doc. Nos 212, 225, 247. Telephone numbers that Defendant obtains from

14   creditors are placed into phone fields 1-4, while phone numbers that Defendant obtains through

15   skip tracing are placed into phone fields 5-10. *See* ECF Doc. No. 212, at 3-6. Defendant produced

16   account records for all phone numbers contained in phone fields 1-4 and fields 5-10 within the

17   class period. *See* Plaintiffs' Motion for Leave to Submit Newly Discovered Evidence in Support of

18   Motion for Sanctions, ECF Doc. No. 247 (discussing Defendant's production history).

19       Plaintiff's expert, Colin B. Weir, eliminated all instances of accounts where a number in

20   phone fields 5-10 also appeared in phone fields 1-4. *See id.*, Ex. 1 (11/6/2018 Weir Declaration).

21   This process eliminated all numbers within the dataset that Defendant may have obtained from a

22   creditor. Of these numbers, Mr. Weir narrowed the data set to numbers that received at least one

23   call from one of Defendant's autodialers and/or numbers to which Defendant made calls using a

24   prerecorded message or artificial voice. Plaintiff provided the resulting dataset to Anya

25   Verkhovskaya of Class Experts Group, LLC. The dataset contains the relevant phone numbers,

26   call dispositions, dates of calls, and the names and addresses of the debtors on the relevant

27   accounts. A summary of Ms. Verkhovskaya's data processing and tabulations is filed herewith.

28   *See* Class Member Data Tabulation Report of Anya Verkhovskaya.

To identify class members, Ms. Verkhovskaya first removed all landline telephone numbers from the dataset, leaving only cellphone numbers. *Id.* ¶¶ 16-19.  Using this list, Ms. Verkhovskaya loaded the list of numbers and the dates of Defendant's calls into a LexisNexis reverse lookup portal. *See id.*, ¶¶ 20-22.  The LexisNexis reverse lookup process identified (1) the customary users of the phone numbers at the times of the calls, and (2) the customary users' postal addresses at the time of the calls. *See id.*  In some instances, LexisNexis did not return any name(s)/address(es) for a telephone number. *See id.*, ¶ 22.  For all such numbers, Ms. Verkhovskaya ran a secondary search through TransUnion, which, like LexisNexis, was able to provide reliable historical name and address data. *See id.*, ¶ 23-24.

Ms. Verkhovskaya then compared the historical users of the telephone numbers (using the LexisNexis/TransUnion data) with the debtor names listed on the relevant accounts. *See id.* ¶¶ 26-34.  She then excluded all numbers where the historical users of the telephone numbers matched the debtor names listed on Defendant's accounts. *See id.*  The remaining numbers are identified as belonging to class members.  Ms. Verkhovskaya tabulated a total of 40,420 such numbers. *Id.* ¶ 26.  In sum, these numbers (1) belong to persons who are not debtors (all "matches" between the historical users and debtors have been eliminated, as well as all numbers from phone fields 1-4), are (2) cellphones, and (3) were actually dialed by one of Defendant's autodialers or were called using a prerecorded message or artificial voice.

Through the LexisNexis/TransUnion lookup process, Ms. Verkhovskaya was able to obtain postal address information for 35,126 of the 40,420 numbers belonging to class members (about 87 percent). *See id.* ¶ 37.  Further, for all class member numbers, Ms. Verkhovskaya then ran a subsequent search for email addresses through TransUnion.  Ms. Verkhovskaya was able to identify email addresses for 27,185 class members. *Id.* ¶ 36.  Of the 13,235 telephone number without identified email addresses, 8,966 have full or partial mailing addresses. *Id.* ¶ 37.  Accordingly, Ms. Verkhovskaya was able to locate email address or postal addresses for 36,151 of the 40,420 class member telephone numbers, representing over 89 percent of class member telephone numbers. *See Edwards v. National Milk Producers Fed'n*, 2017 WL 3623734, at *4

1   (N.D. Cal. June 26, 2017) ("notice plans estimated to reach a minimum of 70 percent are

2   constitutional and comply with Rule 23").

3        This Court has previously approved an almost identical methodology used by Ms.

4   Verkhovskaya for identifying class members in *West v. California Service Bureau, Inc.*, Case No.

5   3:16-cv-03124-YGR (N.D. Cal. Jan. 3, 2018). *See West*, Order re Plaintiffs' Notice of Pendency of

6   Class Action, ECF Doc. No. 73; *id.*, ECF Doc. No. 66 (Declaration of Yitzchak Kopel re

7   Identification of Class Members and Dissemination of Class Notice) (discussing Ms.

8   Verkhovskaya's methodology for identifying class members).

9   **II.     PROPOSED NOTICE PLAN**

10       "For any class certified under Rule 23(b)(3), the court must direct the best notice that is

11   practicable under the circumstances, including individual notice to all members who can be

12   identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). For due process purposes, class

13   notice must be reasonably calculated to apprise interested parties of the pendency of the action and

14   afford them an opportunity to opt-out. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306,

15   314 (1950). The purpose of the mandatory notice requirement in Rule 23(b)(3) actions is to

16   present a fair recital of the subject matter of the suit and to inform all class members of their

17   opportunity to be heard. *Hunt v. Check Recovery Sys., Inc.*, 2007 WL 2220972, at *3 (N.D. Cal.

18   Aug. 1, 2007) (citing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977).

19       The gold standard for notification of class certification under Rule 23(c)(2) is direct notice

20   coupled with publication notice to ensure the action binds absent class members. *See Eisen v.*

21   *Carlisle & Jacquelin*, 417 U.S. 156, 173–77 (1974). Plaintiff's multifaceted notice plan is

22   designed to maximize the efficacy of notice and complies with the Federal Rules and due process.

23       Plaintiff has retained Kurtzman Carson Consultants ("KCC") to serve as the class notice

24   administrator. Immediately upon approval of this notice plan, Plaintiff will provide KCC with the

25   list of names, phone numbers, email addresses, and postal addresses as tabulated by Ms.

26   Verkhovskaya.

27

28

Plaintiff's proposed notice plan is threefold.  First, KCC will cause a copy of the Long Form notice to be sent by email to all class members for whom email addresses are identified.  A copy of the Long Form notice is attached hereto as Exhibit A.

Second, for all class members for whom email addresses are not identified or whose emails came back undeliverable, but postal addresses are identified, KCC will cause a copy of the Post Card notice to be mailed to such postal addresses.  KCC shall update the addresses using the National Change of Address database before dissemination.  A copy of the proposed Post Card notice is attached hereto as Exhibit B.

Third, KCC shall cause a copy of the class notice to be posted on a dedicated website together with links to important case documents, such as the Court's class certification and summary judgment orders, Plaintiff's complaint, and Defendant's answer.  The address for the dedicated website will be www.rashcurtislawsuit.com.

## III.    CONTENT OF NOTICE PLAN

The requirements for the content of class notices for (b)(3) classes are specified in Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).  The Long Form and Post-Card notices meet all of these requirements, as detailed in the following table:

| Requirement | Long Form | Post-Card |
|---|---|---|
| "The nature of the action."  Fed. R. Civ. P. 23(c)(2)(B)(i). | First introductory bullet; Q&A nos. 2 and 6. | ¶¶ 1, 3. |
| "The definition of the class certified."  Fed. R. Civ. P. 23(c)(2)(B)(ii). | Second introductory bullet; Q&A no. 4. | ¶ 2. |
| "The class claims, issues, or defenses."  Fed. R. Civ. P. 23(c)(2)(B)(iii). | First introductory bullet; Q&A nos. 2, 6 and 7. | ¶¶ 1, 3. |
| "That a class member may enter an appearance through an attorney if the member so desires."  Fed. R. Civ. P. 23(c)(2)(B)(iv). | Q&A no. 14. | ¶ 4. |

| Requirement | Long Form | Post-Card |
|---|---|---|
| "That the court will exclude from the class any member who requests exclusion." Fed. R. Civ. P. 23(c)(2)(B)(v). | Table of "Your Legal Rights and Options;" Q&A nos. 11 & 12. | ¶ 4. |
| "The time and manner for requesting exclusion." Fed. R. Civ. P. 23(c)(2)(B)(vi). | Fourth introductory bullet; Q&A no. 12. | ¶ 4. |
| "The binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B)(vii). | Table of "Your Legal Rights and Options"; Fourth introductory bullet; Q&A nos. 10 and 11. | ¶ 4. |

In addition to meeting the specific legal requirements of Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii), the Long Form and Post-Card Form notices are based on the Federal Judicial Center's model forms for notice of pendency of a class action. FJC prepared these models at the request of the Subcommittee on Class Actions of the U.S. judicial branch's Advisory Committee on the Federal Rules of Civil Procedure. *See* www.fjc.gov. The FJC models are designed to illustrate how attorneys and judges might comply with Fed. R. Civ. P. 23(c)(2)(B)'s requirement that class action notices "must concisely and clearly state in plain, easily understood language" specific information about the nature and terms of a class action and how it might affect potential class members' rights. *See* www.fjc.gov. FJC explained its methodology for preparing these models as follows:

> We began this project by studying empirical research and commentary on the plain language drafting of legal documents. We then tested several notices from recently closed class actions by presenting them to nonlawyers, asking them to point out any unclear terms, and testing their comprehension of various subjects. Through this process, we identified areas where reader comprehension was low. We found, for example, that nonlawyers were often confused at the outset by use of the terms "class" and "class action." Combining information from the pilot test with principles gleaned from psycholinguistic research, we drafted preliminary illustrative class action notices and forms. We then asked a lawyer-linguist to evaluate them for readability and redrafted the notices in light of his suggestions.

1  *Id.* FJC then tested the redrafted model notices "before focus groups composed of ordinary citizens
2  from diverse backgrounds" and also through surveys "[u]sing objective comprehension measures."
3  *Id.*

4         Based on FJC's testing, Plaintiff believes that the Long Form and Post-Card notice, which
5  are very closely based on FJC models, with the format and content adopted almost verbatim in
6  most instances, are accurate, balanced, and comprehensible.

7  **IV.    SCHEDULING**

8         Plaintiff proposes that the deadline for class members to request exclusion from the class
9  shall be 60 days after the dissemination of notice.  Plaintiff and KCC will be able to effectuate
10 notice within 14 days of an order from this Court approving the proposed notice plan.

11 **V.    CONCLUSION**

12         For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order as
13 soon as practicable directing notice to the class in accordance with the notice plan described herein.

14

15 Dated: November 12, 2018                **BURSOR & FISHER, P.A.**

16                                         By:   */s/ Yeremey Krivoshey*
17                                                Yeremey Krivoshey

18                                         L. Timothy Fisher (State Bar No. 191626)
19                                         Yeremey Krivoshey (State Bar No.295032)
                                           1990 North California Blvd., Suite 940
20                                         Walnut Creek, CA  94596
                                           Telephone: (925) 300-4455
21                                         Email:  ltfisher@bursor.com
                                                   ykrivoshey@bursor.com
22
                                           **BURSOR & FISHER, P.A.**
23                                         Scott A. Bursor (State Bar No. 276006)
                                           888 Seventh Avenue
24                                         New York, NY  10019
                                           Telephone: (212) 989-9113
25                                         Facsimile:  (212) 989-9163
                                           E-Mail: scott@bursor.com
26
                                           *Attorneys for Plaintiffs*
27

28

**EXHIBIT A**

United States District Court for the Northern District of California

# If You Received Wrong-Number Calls From Rash Curtis & Associates, A Class Action Lawsuit May Affect Your Rights

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- A lawsuit has been filed against Rash Curtis & Associates ("Defendant" or "Rash Curtis"), claiming that they placed wrong-number calls using an autodialer and/or an artificial or prerecorded voice to individuals without prior consent in violation of the Telephone Consumer Protection Act ("TCPA").

- The Court has allowed the lawsuit to be a class action on behalf of all persons who received a call on their cellular telephones from June 17, 2012 through the date this notice is disseminated (the "Class Period") from Rash Curtis' autodialers or who received a prerecorded message or robocall whose telephone number was obtained by Rash Curtis through skip tracing.

- Excluded from the class are all persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with Defendant in such debtor's name prior to Defendant first placing a call using an automatic telephone dialing system and/or prerecorded voice, in addition to entities related to Defendant, Defendant's agents and employees, and any judge or magistrate judge to whom this action is assigned.

- The Court has not decided whether Defendant did anything wrong. There are no benefits available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS | |
| --- | --- |
| **WHAT IS THIS?** | The Court has certified this lawsuit as a class action. The lawsuit alleges that Defendant called consumers using an autodialer and/or an artificial or prerecorded voice without prior consent in violation of the TCPA. |
| **DO NOTHING** | **Stay in the lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money or benefits that may come from a trial or a settlement. But, you give up any rights to sue Defendant separately about the same legal claims in this lawsuit. |

| | |
|---|---|
| **EXCLUDE YOURSELF** | **Get out of this lawsuit.  Get no benefits from this lawsuit.  Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those.  But, you keep any rights to sue Defendant separately about the same legal claims in this lawsuit. |

- Your options – and the deadlines to exercise them – are explained in this notice.  To ask to be excluded, you must act before **[DATE]**.

- Lawyers must prove the claims against Defendant at a trial.  If money or benefits are obtained from Defendant, you will be notified about how to ask for a share.

## BASIC INFORMATION

### 1.     Why did I get this notice?

This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you.  You have legal rights and options that you may exercise before the Court holds a trial.  The trial is to decide whether the claims being made against Defendant, on your behalf, are correct.   Judge Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California, is overseeing this class action.   The lawsuit is known as *McMillion, et al. v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR.

### 2.     What is this lawsuit about?

The lawsuit alleges Defendant called consumers using an autodialer and/or an artificial or prerecorded voice without prior consent in violation of the TCPA.

### 3.     What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case, Ignacio Perez) sue on behalf of other people who have similar claims.  The people together are a "Class" or "Class Members."  The named plaintiff who sued – and all the Class Members like them — are called the Plaintiffs.  The company they sued (in this case, Rash Curtis & Associates) is called the Defendant.  One court resolves the issues for everyone in the Class – except for those people who choose to exclude themselves from the Class.

### 4.     Am I part of this Class?

The Court has allowed the lawsuit to be a class action on behalf of the following classes:

Skip-Trace Class 1: All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class notice is disseminated from Rash

Questions?  Visit www.rashcurtislawsuit.com
or contact Class Counsel at info@bursor.com

- 2 -

Curtis' DAKCS VIC dialer and/or Global Connect dialer whose cellular telephone was obtained by Rash Curtis through skip tracing.

Skip-Trace Class 2: All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

Non-Debtor Class 1: All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis never had a debt-collection account in their name.

Non-Debtor Class 2: All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis has never had a debt-collection account in their name.

Excluded from the class are all persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with Defendant in such debtor's name prior to Defendant first placing a call using an automatic telephone dialing system and/or prerecorded voice, in addition to entities related to Defendant, Defendant's agents and employees, and any judge or magistrate judge to whom this action is assigned.

## 5.     Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Order Certifying the Class <link>, which is available at www.rashcurtislawsuit.com.

## THE CLAIMS IN THE LAWSUIT

## 6.     What does the lawsuit complain about?

Plaintiffs allege that between June 17, 2012 through the date of this notice, Defendant made hundreds of thousands of wrong-number phone calls using an autodialer and/or artificial or prerecorded voice without prior consent. You can read Plaintiffs' Class Action Complaint <link> at www.rashcurtislawsuit.com.

## 7.     How does Defendant answer?

Questions?  Visit www.rashcurtislawsuit.com
or contact Class Counsel at info@bursor.com

- 3 -

Defendant denies any wrongdoing and denies the Plaintiffs' allegations.   You can read Defendant's answer to the complaint <link> at www.rashcurtislawsuit.com.

## 8.   Has the Court decided who is right?

The Court hasn't decided whether the Defendant or the Plaintiffs are correct.  By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case.  The Plaintiffs must prove their claims in the litigation, including at a trial, if necessary.

## 9.   What are the Plaintiffs asking for?

The Plaintiffs are generally asking Defendant for at least $500 per wrong-number call placed to parties without prior consent.  Plaintiffs also seek to obtain injunctive relief preventing Defendant from calling these parties using an autodialer or artificial or prerecorded voice in the future.

No money or benefits are available now because the Court has not yet made a final decision whether Defendant did anything wrong, and the two sides have not settled the case.  There is no guarantee that money or benefits ever will be obtained.  If they are, you will be notified about how to ask for a share.

## YOUR RIGHTS AND OPTIONS

You have to decide now whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

## 10.   What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit.  By doing nothing, you are staying in the Class.  If you stay in and the Class is awarded money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement).

Keep in mind that if you do nothing now, regardless of whether the class representatives win or lose the trial, you will not be able to separately sue, or continue to sue, Defendant – as part of any other lawsuit – for the same legal claims that are the subject of this lawsuit.  You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

## 11.   Why would I ask to be excluded?

If you exclude yourself from the Class – which is sometimes called "opting-out" of the Class – you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between Defendant and Plaintiffs.  However, you may then be able to separately sue or continue to sue Defendant

for the legal claims that are the subject of this lawsuit. If you exclude yourself, you will not be legally bound by the Court's judgments in this class action.

If you bring your own lawsuit against Defendant after you exclude yourself, you will have to hire and pay your own lawyer for that lawsuit, and you will have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against Defendant, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

## 12.    How do I exclude myself from the Class?

To exclude yourself from the Class, you must send a request for exclusion *postmarked no later than [DATE]*, to:

> Rash Curtis TCPA Litigation
> c/o _____
> P. O. Box _____
> **[City], [State], [Zip Code]**

Your request for exclusion *must* contain: (1) the name of this lawsuit, *"McMillion, et al. v. Rash Curtis & Associates.*, Case No. 16-cv-03396-YGR" (2) your full name and current address; (3) a clear statement of intention to exclude yourself such as "I wish to be excluded from the Class"; and (4) your signature. You may also get an Exclusion Request form <link> at www.rashcurtislawsuit.com.

## THE LAWYERS REPRESENTING YOU

## 13.    Do I have a lawyer in this case?

The Court appointed the law firm of Bursor & Fisher, P.A. to represent the Plaintiffs and all Class Members as "Class Counsel." More information about this law firm, their practices, and their lawyers' experience is available at www.bursor.com.

## 14.    Should I get my own lawyer?

If you choose to remain in the Class, you do not need to hire your own lawyer because Class Counsel are working on your behalf. But, if you want your own lawyer, you will be responsible for paying that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

## 15.    How will the lawyers be paid?

If Class Counsel get money or benefits for the Class, they may ask the Court for fees and expenses. You will not have to pay these fees and expenses. If the Court grants Class Counsel's request, the fees and expenses would be either deducted from any money obtained for the Class or paid separately by Defendant.

## THE TRIAL

**16.    How and when will the Court decide who is right?**

As long as the case isn't resolved by a settlement or otherwise, Class Counsel will have to prove the Plaintiffs' claims in this litigation, including at a trial if necessary.  There is no guarantee that the Plaintiffs will win, or that they will get any money for the Class.  The trial will take place on May 6, 2018 at 8:30 a.m.

**17.    Do I have to come to the trial?**

You do not need to attend the trial.  Class Counsel will present the case for the Class members, and Defendant will present the defenses.  You are welcome to come at your own expense.  If you wish to participate in the trial, you should contact Class Counsel.

**18.    Will I get money after the trial?**

If the Class obtains money or benefits as a result of the trial or a settlement, you will be notified about how to participate.  We do not know how long this will take.

## GETTING MORE INFORMATION

**19.    Are more details available?**

Visit the website, at www.rashcurtislawsuit.com, where you will find the Court's Order Certifying the Class <link>, the Court's Summary Judgment Order <link>, the Plaintiffs Class Action Complaint <link>, Defendant's Answer <link>, and an Exclusion Request Form <link>.

You may also contact the class notice administrator by email at _____, or by writing to: Rash Curtis TCPA Litigation, c/o _____, P. O. Box _____, **[City], [State], [Zip Code]**.

**PLEASE DO NOT CALL OR WRITE TO THE COURT FOR INFORMATION OR ADVICE.**

DATED: November 12, 2018                **BY ORDER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

Questions?  Visit www.rashcurtislawsuit.com
or contact Class Counsel at info@bursor.com

- 6 -

**EXHIBIT B**

P.O. Box _____,
[City], [State] [Zip Code]

Control#: [Account ID]-[NoticeID]
[FirstName] [LastName]
[Attention]
[Address 1]
[Address 2]
[City], [State] [Zip Code]
[Country Code]

# If You Received Wrong-Number Calls From Rash Curtis & Associates,
## A Class Action Lawsuit May Affect Your Rights

You may be affected by a class action lawsuit alleging violations of the Telephone Consumer Protection Act ("TCPA") against Rash Curtis & Associates. ("Defendant") alleging that Defendant placed wrong-number calls to individuals using an autodialer and/or an artificial or prerecorded voice with prior consent.  The lawsuit is called *McMillion, et al. v. Rash Curtis & Associates, Case No. 16-cv-03396-YGR*, and is in the United States District Court for the Northern District of California.

**WHO'S INCLUDED?**  The Court has allowed the lawsuit to be a class action on behalf of all persons who received a call on their cellular telephones from June 17, 2012 through the date this notice is disseminated (the "Class Period") from Rash Curtis' autodialers or who received a prerecorded message or robocall whose telephone number was obtained by Rash Curtis through skip tracing.  Excluded from the class are all persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with Defendant in such debtor's name prior to Defendant first placing a call using an autodialer and/or prerecorded voice, in addition to entities related to Defendant, Defendant's agents and employees, and any judge or magistrate judge to whom this action is assigned.

**WHAT IS THE CASE ABOUT?**  Plaintiffs allege that between June 17, 2012 through the date of this notice, Defendant made thousands of wrong-number phone calls using an autodialer and/or artificial or prerecorded voice without prior consent.  The lawsuit seeks to recover at least $500 per wrong-number call placed without prior consent.  Plaintiffs also seek injunctive relief preventing Defendant from calling these parties using an autodialer or artificial or prerecorded voice in the future.  Defendant denies these allegations.  The Court has not decided whether the Plaintiffs' claims have any merit.  Over the course of the suit, the lawyers for the Plaintiffs will have to prove their case.

**WHAT ARE YOUR OPTIONS?**  You have a choice of whether to stay in the Class or not, and you must decide this now.  If you stay in the Class, you will be legally bound by all orders and judgments of the Court, and you won't be able to sue, or continue to sue, Defendant as part of any other lawsuit involving the same claims that are in this lawsuit.  If money or benefits are obtained, you will be notified about how to get a share.  To stay in the Class, you do not have to do anything now.  While class counsel has already been appointed to represent class members, you may also hire separate counsel to appear on your behalf at your own expense, if you prefer.  If you ask to be excluded from the Class, you cannot get any money or benefits from this lawsuit if any are awarded, but you will keep any rights to sue Defendant for these claims, now or in the future, and will not be bound by any orders or judgments of the Court.  To ask to be excluded, send a letter to the address below that indicates you want to be excluded from this lawsuit.  This letter must actually be received by the addressee on or before [DATE].  Include your name, address, and telephone number.

For more information, visit www.rashcurtislawsuit.com.

# EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE**

SANDRA MCMILLION, ET AL.,          )
                                   )
          PLAINTIFFS,              )
                                   )
     VS.                           )     NO. C-16-3396 YGR
                                   )
RASH CURTIS & ASSOCIATES,          )     TUESDAY, MARCH 19, 2019
                                   )
                                   )     OAKLAND, CALIFORNIA
                                   )
          DEFENDANT.               )     MOTION TO STRIKE/EXCLUDE
                                   )     EXPERT WITNESS OPINIONS
_____    )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:

                    BURSOR FISHER, P.A.
                    1990 N. CALIFORNIA BLVD., STE. 940
                    WALNUT CREEK, CALIFORNIA 94596
             BY:    TIMOTHY FISHER, ESQUIRE
                    YEREMEY O. KRIVOSHEY, ESQUIRE
                    SCOTT A. BURSOR, ESQUIRE
                    BLAIR REED, ESQUIRE

FOR DEFENDANT:

                    ELLIS LAW GROUP LLP
                    1425 RIVER PARK DRIVE, STE. 400
                    SACRAMENTO, CALIFORNIA 95815
             BY:    MARK E. ELLIS, ESQUIRE
                    ANTHONY P.J. VALENTI, ESQUIRE
                    LARRY IGLESIAS, ESQUIRE

REPORTED BY:

                    DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                    OFFICIAL COURT REPORTER

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1   EVENT.  WE ARE GOING TO TRY THIS CASE.  THIS CASE HAS BEEN OUT

2   THERE FOR A LONG TIME.  I'M NOT GRANTING YOU LEAVE TO FILE A

3   MOTION TO DECERTIFY.  AND, YOU KNOW, THIS HAS BEEN A

4   HARD-FOUGHT CASE, AND IT HAS TO COME TO A RELATIVE END.  I USE

5   THE WORD "RELATIVE" BECAUSE AS I TELL MY LAW CLERKS, TRIALS

6   ARE THE GIFT THAT KEEPS ON GIVING.  EVERYONE THINKS THAT IT'S

7   THE END BUT IT IS ACTUALLY NOT.  WE GET SOME ANSWER AND THEN I

8   GET POST-TRIAL BRIEFS AND APPEALS AND EVERYTHING ELSE.  BUT,

9   IN EFFECT, WE DO HAVE TO BRING THIS TO A CLOSE.

10   AND SO IF THAT MEANS I HAVE TO SHORTEN THE CLASS NOTICE

11   PERIOD, SO BE IT.  IN THESE KINDS OF CASES, YOU KNOW, YOU'RE

12   LOOKING AT A 2 PERCENT RETURN IN ANY EVENT PERHAPS, 2 TO

13   5 PERCENT.  SO THE FACT THAT WE'RE DECREASING THE NOTICE

14   PERIOD, I THINK, GIVEN ALL OF THE CONSIDERATIONS IS FINE.

15   THE REASON THAT I ASKED YOU TO BRING YOUR TRIAL BINDERS IS

16   THAT ONCE I DECIDED I WAS GOING TO DENY THE MOTIONS, I THOUGHT

17   THAT HAVING -- I TOOK A QUICK LOOK AT YOUR BINDERS.  IT LOOKS

18   LIKE THERE'S ACTUALLY -- WE COULD PROBABLY MOVE THROUGH THIS

19   PRETTY QUICKLY.  AND IF I CAN AVOID HAVING YOU COME BACK AND

20   SPEND MORE TIME HERE, WE CAN PROBABLY DO THAT.

21   WE CAN TALK BRIEFLY -- WE STILL HAVE TO DEAL WITH THE

22   MOTIONS BECAUSE I HAD NOT BEEN GIVEN COURTESY COPY OF THE

23   MOTIONS.  THEY WEREN'T ACTUALLY DUE, BUT IT LOOKED LIKE YOU

24   WERE ALL DONE.

25   SO I THOUGHT I WOULD RUN THROUGH THIS QUICKLY WITH YOU IN

```
 1
 2
 3                    CERTIFICATE OF REPORTER
 4         I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE
 5   UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY
 6   CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
 7   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
 8
 9                    _Diane E. Skillman_
10            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
11                    FRIDAY, MARCH 22, 2019
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

# EXHIBIT 10

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Yeremey O. Krivoshey (SBN 295032)
Blair E. Reed (SBN 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
     breed@bursor.com
     ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (SBN 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO PEREZ, on Behalf of Himself and All Others Similarly Situated,<br><br>                Plaintiff,<br><br>   v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>                Defendant. | Case No. 4:16-cv-03396-YGR<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEY'S FEES, COSTS AND EXPENSES, AND SERVICE AWARD FOR THE CLASS REPRESENTATIVE**<br><br>Date: January 14, 2020<br>Time: 2:00 p.m.<br>Courtroom: 1<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

1  **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2      **PLEASE TAKE NOTICE THAT** on January 14, 2020 at 2:00 p.m. or as soon thereafter

3  as counsel may be heard by the above-captioned Court, located at 1301 Clay Street, Oakland, CA

4  94612, Courtroom 1, 4th Floor in the Courtroom of Judge Yvonne Gonzalez Rogers, Plaintiff

5  Ignacio Perez ("Plaintiff" or "Class Representative"), by and through his undersigned counsel of

6  record, will move and hereby does move, pursuant to Fed. R. Civ. P. 23(h) and 54(d), for an order

7  awarding attorney's fees, reimbursement of litigation costs and expenses, and payment of a class

8  representative service award.

9      This motion is made on the grounds that an award of attorney's fees, reimbursement of

10  litigation costs and expenses, and payment of a class representative service award is proper, given

11  that Plaintiff won a judgment awarding $267,349,000 to the certified Classes, ECF No. 370, thus

12  Plaintiff and Class Counsel have conferred a substantial benefit to the Class, and such awards are

13  permitted under the laws of this Circuit.

14      This motion is based on: (1) this Notice of Motion and Motion, (2) the Memorandum of

15  Points and Authorities in support thereof, (3) the Declarations of Scott A. Bursor and Ignacio Perez

16  in Support of Plaintiff's Motion for an Award of Attorney's Fees, Costs and Expenses, and Service

17  Award for the Class Representative filed herewith, (4) the papers and pleadings on file, and (5) the

18  arguments of counsel at the hearing on the Motion.

19      **CIVIL RULE 7-4(a)(3) STATEMENT OF ISSUE TO BE DECIDED**

20      Whether the Court should award attorney's fees, reimbursement of litigation costs and

21  expenses, and payment of a class representative service award.

22  Dated: September 23, 2019              Respectfully submitted,

23                                         **BURSOR & FISHER, P.A.**

24
                                           By:   */s/ Scott A. Bursor*
25                                                 Scott A. Bursor

26                                         Scott A. Bursor (SBN 276006)
                                           2665 S. Bayshore Dr., Suite 220
27                                         Miami, FL 33133
                                           Telephone: (305) 330-5512
28

1

2
Facsimile:  (305) 676-9006
E-Mail:  scott@bursor.com

3
**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)

4
Yeremey O. Krivoshey (SBN 295032)
Blair E. Reed (SBN 316791)

5
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596

6
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

7
E-Mail:  ltfisher@bursor.com
         ykrivoshey@bursor.com

8
         breed@bursor.com

9
*Class Counsel*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF CONTENTS**

PAGE(S)

I.      INTRODUCTION ..................................................................................................... 1

II.     CLASS COUNSEL'S REQUESTED ATTORNEY'S FEE AWARD IS
        FAIR AND REASONABLE .................................................................................... 2

        A.      The Percentage Of The Benefit Method ...................................................... 3

                1.      Class Counsel Achieved Extraordinary Results For The Class .......... 4

                2.      Plaintiff's Novel Claims Carried Substantial Litigation Risk ............ 5

                3.      Market Rates As Reflected By Awards In Similar Cases .................... 7

                4.      The Contingent Nature Of The Fee And Financial Burden
                        Borne By Class Counsel ................................................................... 10

        B.      A Lodestar Cross-Check Is Not Required ................................................. 11

III.    CLASS COUNSEL'S EXPENSES WERE REASONABLE AND
        NECESSARILY INCURRED ................................................................................ 12

IV.     THE REQUESTED SERVICE AWARD FOR THE CLASS
        REPRESENTATIVE IS FAIR AND REASONABLE ........................................... 12

V.      CONCLUSION ...................................................................................................... 14

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Blair v. CBE Grp., Inc.*,
   309 F.R.D. 621 (S.D. Cal. 2015) ................................................................. 5

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ................................................................................. 2

*Charvat v. Travel Servs.*,
   2015 WL 76901 (N.D. Ill. Jan. 5, 2015) ......................................................... 5

*Couser v. Comenity Bank*,
   125 F. Supp. 3d 1034 (S.D. Cal. 2015) ......................................................... 5

*Dakota Med., Inc. v. RehabCare Grp., Inc.*,
   2017 WL 4180497 (E.D. Cal. Sept. 21, 2017) ................................................. 8

*Ebarle v. Lifelock, Inc.*,
   2016 WL 5076203 (N.D. Cal. Sep. 20, 2016) ................................................. 11

*Fischel v. Equitable Life Assur. Soc'y of U.S.*,
   307 F.3d 997 (9th Cir. 2002) ...................................................................... 2

*Gehrich v. Chase Bank USA, N.A.*,
   316 F.R.D. 215 (N.D. Ill. 2016) ................................................................... 5

*Gene And Gene LLC v. BioPay LLC*,
   541 F.3d 318 (5th Cir. 2008) ...................................................................... 5

*Glass v. UBS Fin. Servs., Inc.*,
   2007 WL 221862 (N.D. Cal. Jan. 26, 2007) .................................................... 11

*Hageman v. AT & T Mobility LLC*,
   2015 WL 9855925 (D. Mont. Feb. 11, 2015) ................................................... 8

*Hamilton v. Maryland Cas. Co.*,
   27 Cal. 4th 718 (2002) .............................................................................. 1

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................. 2, 3

*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994) ........................................................................ 12

*Hashw v. Dep't Stores Nat'l Bank*,
   182 F. Supp. 3d 935 (D. Minn. 2016) ............................................................ 5

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEY'S FEES, COSTS
AND EXPENSES, AND SERVICE AWARD FOR THE CLASS REPRESENTATIVE
CASE NO. 4:16-cv-03396-YGR

iv

*High-Tech Employee Antitrust Litig.*,
    2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ............................................................. 14

*Ibarra v. Wells Fargo Bank, N.A.*,
    2018 WL 5276295 (C.D. Cal. Sep. 28, 2018) ............................................................. 13

*In re Activision Sec. Litig.*,
    723 F. Supp. 1373 (N.D. Cal. 1989) ............................................................................ 7

*In re Capital One Telephone Consumer Protection Act Lit.*,
    80 F. Supp. 3d 781 (N.D. Ill. Feb. 12, 2015) ..................................................... 3, 4, 5

*In re Google Referrer Header Privacy Litig.*,
    869 F.3d 737 (9th Cir. 2017) ..................................................................................... 11

*In re Lithium Ion Batteries Antitrust Litig.*,
    2019 WL 3856413 (N.D. Cal. Aug. 16, 2019) ...................................................... 2, 10

*In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Cap Antitrust Litig.*,
    2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ....................................................... passim

*In re Optical Disk Drive Prods. Antitrust Litig.*,
    2016 WL 7364803 (N.D. Cal. Dec. 19, 2016) ............................................................. 9

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ......................................................................................... 7

*James v. JPMorgan Chase Bank, N.A.*,
    2017 WL 2472499 (M.D. Fla. June 5, 2017) .............................................................. 8

*Kifafi v. Hilton Hotels Retirement Plan*,
    999 F. Supp. 2d 88 (D.D.C. 2013) ............................................................................ 13

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015) .................................................................................. 5

*Krakauer v. Dish Network, L.L.C.*,
    2018 WL 6305785 (M.D.N.C. Dec. 3, 2018) ....................................................... passim

*Martin v. AmeriPride Servs., Inc.*,
    2011 WL 2313604 (S.D. Cal. June 9, 2011) ............................................................... 7

*Meyer v. Portfolio Recovery Associates*,
    707 F.3d 1036 (9th Cir. 2012) ..................................................................................... 5

*Morris v. Lifescan, Inc.*,
    54 Fed. App'x 663 (9th Cir. 2003) ............................................................................. 7

*Purdy v. Pacific Automobile Ins. Co.*,
    157 Cal. App.3d 59 (1984) ......................................................................................... 1

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) .................................................................... 13

*Rose v. Bank of Am. Corp.*,
    2014 WL 4273358 (N.D. Cal. Aug. 29, 2014) ........................................... 5

*Singer v. Becton Dickinson & Co.*,
    2010 WL 2196104 (S.D. Cal. June 1, 2010) .............................................. 8

*Van Vranken v. Atl. Richfield Co.*,
    901 F. Supp. 294 (N.D. Cal. 1995) ..................................................... 13, 14

*Vandervort v. Balboa Capital Corp.*,
    8 F. Supp. 3d 1200 (C.D. Cal. 2014) ......................................................... 8

*Vasquez v. Coast Valley Roofing, Inc.*,
    266 F.R.D. 482 (E.D. Cal. 2010) ............................................................... 7

*Velez v. Novartis Pharm. Corp.*,
    2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .......................................... 14

*Versteeg v. Bennett, Deloney & Noyes, P.C.*,
    271 F.R.D. 668 (D. Wyo. 2011) ............................................................. 5, 7

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ................................................. 3, 9, 10, 11

*Weil v. Metal Techs. Inc.*,
    2018 WL 2971030 (S.D. Ind. June 13, 2018) .......................................... 13

*Williams v. MGM-Pathe Comm'ns Co.*,
    129 F.3d 1026 (9th Cir. 1997) ................................................................... 7

*Wright v. Nationstar Mortgage LLC*,
    2016 WL 4505169 (N.D. Ill. Aug. 29, 2016) ............................................ 5

**RULES**

Fed. R. Civ. P. 23 ........................................................................... 2, 4, 12

Fed. R. Civ. P. 54(d) ........................................................................... 2, 12

## I.  INTRODUCTION

Plaintiff Ignacio Perez and Class Counsel achieved an historic result in this case.  They won the first and only TCPA class action trial against a debt collector.  They also won the first and only TCPA class action trial involving skip-tracing.  The jury awarded 100% of the relief Plaintiff sought.  And the $267,349,000 trial judgment, ECF No. 370, is one of the largest trial judgments ever obtained in a consumer class action.  For this extraordinary result, Class Counsel seek a fee of one-third of the judgment, plus reimbursement of litigation costs and expenses incurred to date.

At the outset, it is important to recognize that this fee application is different from most.  There is no settlement here.[1]  This case was tried to verdict and judgment has been entered.  There is no pot of money to distribute, at least not yet.  Defendant's counsel recently stated in writing that Defendant will file for bankruptcy protection, and that it will "tie the case up in righteous appeals for years."  Bursor Decl. ¶ 17.  Class Counsel anticipates thousands of additional hours of work will be required to defeat any appeals, to navigate a likely bankruptcy filing, to obtain assignment of Defendant's rights under the insurance policy either through settlement or through bankruptcy, and to pursue full recovery from Defendant's insurer.  *Id.* ¶ 21.

A fee of one-third of the judgment is reasonable given the extraordinary result Class Counsel obtained, the risks they faced (and continue to face), and the time, money, and resources they invested (and continue to invest).  Indeed, Class Counsel's work is not yet nearly done.  Class

---

[1] In 2016 and 2017, Defendant and its insurer, X.L. America, Inc., rejected four written offers to settle this action for amounts below the policy limits.  *See* Bursor Decl. ¶¶ 4-8.  On August 16, 2017, the parties participated in a mediation where Plaintiff made a demand below the policy limit and the Defendant and its insurer walked out without making any offer to settle.  *Id.* ¶¶ 7-8.  Thereafter Defendant and its insurer rejected multiple invitations to resume mediation, refused to negotiate, and did not make a settlement offer until after the jury had rendered its verdict.  *Id.* ¶¶ 8-13.  Based on these facts, Class Counsel believes there is a strong claim against the insurer for its bad faith failure to settle this action within the policy limits.  Plaintiff and Class Counsel thus expect to obtain assignment of Defendant's rights under the insurance policy, and to pursue recovery of the full amount of the judgment from the insurer.  *Id.* ¶¶ 14-21.  *See, e.g., Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 725 (2002) ("Where the underlying action has proceeded to trial and a judgment in excess of the policy limits has been entered against the insured, the insurer is ordinarily liable to its insured for the entire amount of that judgment ...."); *Purdy v. Pacific Automobile Ins. Co.*, 157 Cal. App.3d 59, 74 (1984) (affirming trial court verdict against insurer for bad faith failure to settle within policy limits, and holding the insurer liable for the entire judgment despite the insured's insolvency and bankruptcy).

Counsel will be required to continue advancing expenses, and to continue working on collection efforts, bankruptcy litigation, and bad faith litigation against the insurer, possibly for years.

Despite this ongoing work, Fed. R. Civ. P. 23(h) and 54(d)(2) require Class Counsel to file this fee application now.  For these reasons, and those explained in more detail below, Plaintiff and Class Counsel respectfully request an Order:

(1) Awarding Class Counsel a reasonable fee of one-third (33.33%) of the judgment, totaling $89,116,333.33;

(2) Awarding Class Counsel reimbursement for reasonable litigation costs and expenses, in the amount of $314,179.97;

(3) Awarding Mr. Perez a class representative service award of $50,000.

## II.   CLASS COUNSEL'S REQUESTED ATTORNEY'S FEE AWARD IS FAIR AND REASONABLE

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  The Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The common fund doctrine is most often applied to funds created by settlements.  But it is also a basis for a fee award on a litigated judgment. *See, e.g.*, *id.* at 481-82 (applying the common fund doctrine to affirm a district court's fee award on a class action judgment); *Krakauer v. Dish Network, L.L.C.*, 2018 WL 6305785, at *4-5 (M.D.N.C. Dec. 3, 2018) (applying the common fund doctrine to award fees on a TCPA class action judgment after plaintiff and the class prevailed at trial).

In common fund cases, the Ninth Circuit permits district courts to award attorney's fees under either the "percentage-of-the-benefit" method or the "lodestar" method. *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  The percentage method, however, is nearly always employed. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2019 WL 3856413, at *7 (N.D. Cal. Aug. 16,

2019) ("[T]he primary basis of the fee award remains the percentage method."), quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 & n.5 (9th Cir. 2002).

A percentage fee was awarded on the $75.5 million settlement in *In re Capital One Telephone Consumer Protection Act Lit.*, 80 F. Supp. 3d 781, 789 (N.D. Ill. Feb. 12, 2015), which remains the largest TCPA class settlement to date. In the order approving the settlement, the court explained why a percentage fee award, and not a lodestar-based fee, was appropriate:

> Here, had an arm's length negotiation been feasible, the court
> believes that the class would have negotiated a fee arrangement
> based on a percentage of the recovery, consistent with the normal
> practice in consumer class actions. An *ex ante* agreement based on
> lodestar requires a client to monitor counsel, and the class-member
> "clients" here had little incentive to do so. There are
> approximately 17.5 million class members in this case, the
> prospective relief is minimal, and none of the class members
> suffered tangible damages beyond the inconvenience of receiving
> one or more debt-collection calls to their cell phones on ostensibly
> overdue credit card bills. The class would not have negotiated a
> compensation scheme that required a level of monitoring the class
> members were not interested in or capable of providing. Instead,
> the class would have chosen the compensation scheme that
> required the least monitoring to align the incentives of the class
> and its counsel – the percentage method. The court will therefore
> apply the percentage method as well.

*In re Capital One*, 80 F. Supp. 3d at 795. Similarly, in *Krakauer v. Dish Network, L.L.C.*, 2018 WL 6305785 (M.D.N.C. Dec. 3, 2018), one of only a handful of class TCPA cases to ever go to trial, Judge Catherine C. Eagles awarded 33.33% of the $61 million judgment in attorney's fees.

### A.    The Percentage Of The Benefit Method

The Ninth Circuit established 25% of the common fund as a starting benchmark. *Hanlon*, 150 F.3d at 1029. "While the benchmark is not per se valid, the Ninth Circuit has recognized that requesting the 25% benchmark award only shows the reasonableness of a fee request." *In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) (quotations omitted) (hereafter, "*In re NCAA*"). "[I]n most common fund cases, the award exceeds the [25%] benchmark." *Id.* (quotations omitted).

"Courts consider the following factors to determine whether to apply either an upward or downward adjustment from that benchmark: (1) the results obtained by counsel; (2) the risks and

complexity of issues in the case; (3) whether the attorney's fees were entirely contingent upon success and whether counsel risked time and effort and advanced costs with no guarantee of compensation; (4) whether awards in similar cases justify the requested fee; and (5) whether the class was notified of the requested fees and had an opportunity to inform the Court of any concerns they have with the request." *In re NCAA*, 2017 WL 6040065, at *2.[2]

### 1. Class Counsel Achieved Extraordinary Results For The Class

The benefit obtained for the class is foremost among the factors in determining a reasonable fee. In this case, Class Counsel's success in obtaining a judgment for 100% of the relief sought, in an amount exceeding $267 million, weighs heavily in favor of an upward departure from the 25% benchmark. The jury found that Defendant made 534,698 phone calls to Class Members in violation of the TCPA, which resulted in a judgment of $267,349,000. There are 40,420 unique phone numbers on the class list. Trial Tr. at 291:8-12; *id.* at 318:11-12; *id.* at 324:11-15. Simply dividing the $267,349,000 judgment by 40,420 Class Members amounts to $6,614 per Class Member. If Class Counsel are awarded the 33.33% fee they seek, the average recovery per Class Member will be approximately $4,402 net of fees and expenses. Class Counsel expects this will be the largest per-class-member recovery in any TCPA case. By far. It is almost double the per-class-member recovery in *Krakauer*, where a $61 million judgment was awarded to a class with approximately 18,000 members. *Krakauer*, 2018 WL 6305785, at *3. A 33.33% fee was awarded in *Krakauer*, where the judgment obtained was approximately $3,388 per class member, and $2,259 per class member net of the attorney's fees.

The largest TCPA settlement to date was made in *In re Capital One*, which settled for $75.5 million. The judgment here is more than 3 times that amount. On a per-class-member basis, though, the result here is even more favorable. In *In re Capital One* the recovery per class member was "a relatively diminutive $2.72." 80 F. Supp. 3d at 789. Here, the amount of the judgment per-

---

[2] The September 9, 2019 Final Judgment, ECF No. 370, instructs Class Counsel to file a proposed notice plan in accordance with Fed. R. Civ. P. 23(h)(2) within 28 days of the entry of Final Judgment. ECF No. 370, at 2. Should any class members file objections after being provided notice of the present motion, Plaintiff will supplement his motion responding to any such objections.

1   class-member, $6,614, is more than two thousand times larger than *In re Capital One*. It is also

2   hundreds of times larger than the typical recoveries in TCPA class settlements.[3] This extraordinary

3   result weighs heavily in favor of an upward adjustment from the 25% benchmark.

4       **2.    Plaintiff's Novel Claims Carried Substantial Litigation Risk**

5

6       The second factor looks to the risk and novelty of the claims at issue. This case was both

7   risky and novel. So far as we are aware, this is the first and only TCPA class case concerning debt

8   collection or skip-tracing to ever go to trial.

9       Defendant vigorously litigated this case and raised numerous significant defenses. There

10  was a substantial risk that the class would not be certified given Defendant's argument that

11  individual issues of consent predominated over common ones, and that it would be impossible to

12  identify class members. While Class Counsel believed the motion to certify the classes was

13  meritorious, court decisions on whether to certify TCPA class claims against debt collectors were

14  mixed. *Compare Meyer v. Portfolio Recovery Associates*, 707 F.3d 1036, 1042 (9th Cir. 2012)

15  (upholding class certification) *with Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th

16  Cir. 2008) (reversing class certification). Indeed, obtaining class certification and maintaining

17  class certification through trial is exceedingly difficult in the debt collection context. *See, e.g.,*

18  *Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 630 (S.D. Cal. 2015) ("Courts have recognized that

19  similar TCPA actions involving debt collections require extensive individual fact inquiries into

20  whether each individual gave 'express consent' by providing their wireless number to the creditor

21  during the transaction that resulted in the debt owed.") (quotations omitted); *Versteeg v. Bennett,*

22  *Deloney & Noyes, P.C.*, 271 F.R.D. 668, 674 (D. Wyo. 2011) ("This will require an individual

23

24  ---
    [3] *See, e.g., Rose v. Bank of Am. Corp.*, 2014 WL 4273358, *10 (N.D. Cal. Aug. 29, 2014) ($20 to
    $40 per claimant); *Kazemi v. Payless Shoesource, Inc.*, No. 09-cv-5142, dkt. 94 (N.D. Cal. Apr. 2,

25  2012) ($25 merchandise voucher); *Hashw v. Dep't Stores Nat'l Bank*, 182 F. Supp. 3d 935, 944
    (D. Minn. 2016) ($33.20 per class member); *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1044

26  (S.D. Cal. 2015) ($13.75 per class member); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D.
    Ill. 2015) ($30 per class member); *Wright v. Nationstar Mortgage LLC*, 2016 WL 4505169, at *8

27  (N.D. Ill. Aug. 29, 2016) ($45 per class member); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D.
    215, 228 (N.D. Ill. 2016) ($52.50 per class member); *Charvat v. Travel Servs.*, 2015 WL 76901, at

28  *1 (N.D. Ill. Jan. 5, 2015) ($48.37 per class member).

review of loan documents and other files related to the underlying debt obligation. These questions require individual inquiries that would predominate over the class action.").

There was substantial risk at the summary judgment stage as well. Defendant's summary judgment motion asserted Defendant had consent to call the Plaintiff and presented a lengthy factual record in support. *See* ECF Nos. 140, 140-1, 140-2, 140-3, 140-4, 140-5, 140-6, 140-7. Class Counsel defeated that summary judgment motion, and won summary judgment for the Plaintiff on two key issues: holding Defendants' dialers were ATDSs and that Defendant lacked consent to call Mr. Perez. ECF No. 167. Defendant twice sought reconsideration and amendment of the summary judgment order. ECF Nos. 199 and 218. These motions presented significant risk to the class claims.

There was also substantial risk that *ACA Int'l v. FCC, et al* pending in the D. C. Circuit, or *Marks v. Crunch San Diego*, pending in the Ninth Circuit, would change the law with regard to the definitions of ATDS and prior express consent. The results of those cases were far from certain and, even after the D.C. Circuit's ruling, district courts were split as to the its meaning. *See, e.g.*, Rash Curtis & Associates' Notice of Additional Supplemental Authority in Support of Defendant's Motion for Reconsideration, ECF No. 196.

Plaintiff also faced substantial risk due to Defendant's sandbagging, discovery abuse, and false testimony. *See, e.g,* Order Re: Cross Motions for Summary Judgment, ECF No. 167, at 12 n. 9 ("The Court previously warned defendant that 'delaying and sandbagging tactics' would not be tolerated"); Pretrial Order No. 3 Re: Remaining Motion *in Limine*, ECF No. 320, at 13 ("defendant did not acknowledge that it had shifted positions and contradicted prior representations to the Court and opposing counsel"). Class Counsel had to navigate an unlevel playing field. Defendant had possession of all of the key documents and information Plaintiff needed to prosecute the case. Defendant repeatedly withheld information and provided false testimony regarding important issues to be decided at trial. To overcome these abuses Class Counsel had to file, and win, seven motions to compel discovery, just to obtain the evidence needed to present the claims at trial. *See* ECF Nos. 40, 51, and 98-103.

1    Plaintiff also faced substantial risk at trial.  As the Court will recall, multiple defense

2  witnesses testified that Defendant's dialers did not call skip-traced numbers in phone fields 5

3  through 10.  And defense counsel emphatically urged the jury to find that Defendant made <u>zero</u>

4  calls in violation of the TCPA.  Trial Tr. at 719:14-17 ("Did he prove to us that each one of those

5  phone calls was the phone number that we used was obtained by skip-tracing.  If he didn't, I'm

6  going to suggest to you, the number is zero, not 540,000."); *id.* at 758:25-759:21 ("Question 4: Did

7  Rash Curtis make calls with its Global Connect dialer to class members' cellular telephone

8  numbers obtained through skip-tracing during the class period without their prior express consent?

9  …  If you find that not all of the calls were made to numbers obtained by skip-tracing, you have to

10  say no.  Even if you find everyone in the class was a non-debtor.").  If the jury had been persuaded

11  by those falsehoods, Plaintiff would have lost the trial and likely would have been saddled with

12  Defendant's costs of litigation.

13    The extreme risk that both litigation and trial presented in this case weighs heavily in favor

14  of an upward departure from the 25% benchmark.

15    ### 3.    **Market Rates As Reflected By Awards In Similar Cases**

16    Although the Ninth Circuit has established a benchmark fee of 25%, it is not uncommon for

17  courts in this Circuit to award fees above that benchmark.  One court in this District has stated the

18  benchmark "should be set at 30%," to "encourage plaintiffs' attorneys to move for early settlement,

19  provide predictability for the attorneys and the class members, and reduce the time consumed by

20  counsel and court in dealing with voluminous fee petitions." *In re Activision Sec. Litig.*, 723 F.

21  Supp. 1373, 1378–79 (N.D. Cal. 1989) (awarding 32.8% of the recovery); *see also In re Pac.*

22  *Enters. Sec. Litig.*, 47 F.3d 373, 378-79 (9th Cir. 1995) (affirming attorney's fee of 33.33% of the

23  recovery); *Williams v. MGM-Pathe Comm'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (33.33% of

24  total fund awarded); *Morris v. Lifescan, Inc.*, 54 Fed. App'x 663, 664 (9th Cir. 2003) (affirming fee

25  award of 33% of the recovery); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 492 (E.D.

26  Cal. 2010) (citing five class actions where federal district courts approved attorney fee awards

27  ranging from 30% to 33.3%); *Martin v. AmeriPride Servs., Inc.*, 2011 WL 2313604, at *8 (S.D.

28

Cal. June 9, 2011) (noting that "courts may award attorney's fees in the 30%-40% range"); *Singer v. Becton Dickinson & Co.*, 2010 WL 2196104, at \*8-9 (S.D. Cal. June 1, 2010) (approving attorney fee award of 33.33% of the common fund and holding that award was similar to awards in three other cases where fees ranged from 33.33% to 40%); *Rippee v. Boston Mkt. Corp.*, Case No. 05-CV-1359 TM (JMA), ECF No. 70, at 7 (S.D. Cal. Oct. 10, 2006) (awarding a 40% fee in a common fund settlement).

In TCPA settlements as well, courts often award percentage fees of more than 25% percent. *See, e.g., Dakota Med., Inc. v. RehabCare Grp., Inc.*, 2017 WL 4180497, at \*10 (E.D. Cal. Sept. 21, 2017) (awarding one-third of common fund in attorney's fees); *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1210 (C.D. Cal. 2014) (awarding 33.33%); *Hageman v. AT & T Mobility LLC*, 2015 WL 9855925, at \*4 (D. Mont. Feb. 11, 2015) (awarding one-third of the common fund recovery in attorney's fees); *James v. JPMorgan Chase Bank, N.A.*, 2017 WL 2472499, at \*2 (M.D. Fla. June 5, 2017) (approving a request for a 30% attorney's fee). In *West v. Cal. Service Bureau, Inc.*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019), this Court approved a 33.33% fee in a TCPA settlement.

Class Counsel's requested fee is also reasonable when compared to the attorney's fees awarded in *Krakauer*, where a TCPA class action was litigated through trial to a \$61 million judgment. Judge Eagles awarded 33.33% of that judgment as attorney's fees. *Krakauer*, 2018 WL 6305785, at \*4-5.

Although at first glance the size of the judgment here might appear to create a "megafund," Judge Claudia Wilken explained in *In re NCAA* why megafund principles and analysis are not applicable to a case like this:

> This is not a mass tort or fraud case in which mere disclosure of a government investigation all but guarantees the creation of a megafund, notwithstanding what counsel does or does not do; instead, this case went from zero recovery to megafund *solely* because of counsel's efforts and expenditures of expert fees and other expenses. Relatedly, the size of the common fund obtained in this case is not "merely a factor of the size of the class." A megafund was created in this case despite the size of the classes, not because of it. And above-benchmark fees frequently are awarded where megafunds must be shared by hundreds of

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEY'S FEES, COSTS AND EXPENSES, AND SERVICE AWARD FOR THE CLASS REPRESENTATIVE
CASE NO. 4:16-cv-03396-YGR

8

thousands, if not millions, of class members.  Here, there are approximately 53,748 class members.

So while applying the so-called "increase-decrease" principle may be appropriate in certain cases, it is tenuous here, where the size of the fund is not merely a factor of the size of the classes but is instead directly related to the efforts of plaintiffs' counsel, who achieved exceptional, megafund results for a relatively discrete set of class members.

*In re NCAA*, 2017 WL 6040065, at *6-7 (emphasis in original).

Here, as in *In re NCAA*, the judgment exists "***solely*** because of counsel's efforts and expenditures of expert fees and other expenses." *Id.* The judgment here is larger than the settlement in *In re NCAA*, with fewer class members, resulting in an even greater recovery per class member.

|  | *In re NCAA* (settlement) | *Perez v. Rash Curtis* (judgment) |
|---|---|---|
| Amount Recovered | $208,664,445 | $267,349,000 |
| Class Members | 53,748 | 40,420 |
| Recovery Per Class Member | $3,882.27 | $6,614.28 |

So Judge Wilken's rationale for rejecting the "increase-decrease principle" in *In re NCAA* applies here even more strongly.  Here too, "the size of the fund is not merely a factor of the size of the classes but is instead directly related to the efforts of plaintiffs' counsel, who achieved exceptional, megafund results for a relatively discrete set of class members." *See id.* at *6-7.

Even if the Court were to consider this judgment a megafund, there is no rule in the Ninth Circuit "requiring an automatic reduction in attorney fees." *In re Optical Disk Drive Prods. Antitrust Litig.*, 2016 WL 7364803, at *12 (N.D. Cal. Dec. 19, 2016). *See also Vizcaino*, 290 F.3d at 1047 (rejecting categorical "megafund" rule).  In *In re NCAA*, Judge Wilken analyzed the empirical rates of attorney's fees in megafund cases:

As a court in this District recognized, "in most common fund cases, the award exceeds the [25%] benchmark."  And this Court has referred to "the many cases in this circuit that have granted fee awards of 30% or more."

1

2

3

4

5

6

7

8

9

10

> … A study of attorneys' fees, known as the EMG Study, looked at awards in 458 class actions between 2009 and 2013, finding that 21% was the midpoint for fees where the recovery exceeded $100 million. The largest recoveries, over $100 million, had mean and median fee percentages ranging from 16.6% to 25.5%, depending on the year. Twenty-one percent is the mid-point of that range and below the average award of 22.3% for the highest recoveries (above $67.5 million). The report finds that "[o]n average, fees were 27% of gross recovery during the 2009-2013 period, which is higher than the average fee percentage of 23% that we reported in our analyses of the 1993-2008 period." And of the 53 settlements in this District, the mean and median awards were 26% and 25%, respectively, matching the mean and median percentages found more broadly in the 144 settlements surveyed in the Ninth Circuit. Further, of the 19 antitrust settlements between 2009 and 2013, with a mean recovery of $501.09 million and a median recovery of $37.3 million, the mean and median fee percentages were 27% and 30%.

11

*Id.*, at *2, (citations omitted).

12

13

14

15

16

17

18

19

20

21

22

  In *Vizcaino*, 290 F.3d 1043, the Ninth Circuit attached an Appendix listing "Percentage-Based Attorneys' Fee Awards in Common Fund Cases of $50-200 million." "[O]f the three common funds of nearly equivalent size cited by the Ninth Circuit in [*Vizcaino*], ***all three cases awarded fees at or above the 25 percent benchmark*.*"* *In re NCAA*, 2017 WL 6040065, at *5 (emphasis in original).  In *In re Lithium Ion Batteries Antitrust Lit.*, 2019 WL 3856413, at *7 (N.D. Cal. Aug. 16, 2019), this Court awarded 30 percent of a $113.45 million common fund as attorney's fees. As Judge Wilken noted, "[f]ar lesser results (with 20% recovery of damages or less) have justified upward departures from the 25% benchmark" in megafund cases. *In re NCAA*, 2017 WL 6040065, at *3. Here, Class Counsel obtained a judgment for 100% of the classwide damages. There can be no stronger showing to support an upward departure from the 25% benchmark.

23

    **4.**  **The Contingent Nature Of The Fee And Financial Burden Borne By Class Counsel**

24

25

26

27

  Class Counsel advanced $314,179.97 in out-of-pocket expenses to pay for experts, notice to the class, and all other litigation expenses, with no guarantee of repayment. Class Counsel worked on this case for more than three years with no payment, and no guarantee of payment absent a successful outcome. And the work of Class Counsel is not yet done. Class Counsel anticipates

28

thousands of additional hours of work will be necessary to defeat any appeals, to navigate a likely bankruptcy filing, to obtain assignment of Defendant's rights under the insurance policy, and to pursue full recovery from Defendant's insurer, which rejected numerous offers to settle this action within the policy limits. *See supra* footnote 1.   Class Counsel will likely be required to continue advancing expenses, and to continue working on collection efforts and bad faith litigation against the insurer for years to come.

Taking on this litigation was a risky endeavor for Class Counsel.  And it remains fraught with risk now, even after the trial has been won, due to the likely appeals, bankruptcy filing, and anticipated litigation with Defendant's insurer.  Thus, like all of the other factors, the contingent nature of the fee and the financial burden borne by Class Counsel weigh heavily in favor of an upward departure from the 25% benchmark.

### B.   A Lodestar Cross-Check Is Not Required

Courts in the Ninth Circuit sometimes look to a lodestar calculation as a cross-check on the percentage fee award to ensure that counsel will not receive a "windfall." *Vizcaino*, 290 F.3d at 1050.  But the court is "not required to do so." *See In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 748 (9th Cir. 2017) ("Although not required to do so, the district court took an extra step, cross-checking this result by using the lodestar method.") (underlining added). *See also Ebarle v. Lifelock, Inc.*, 2016 WL 5076203, at *11 (N.D. Cal. Sep. 20, 2016) (awarding $10.2 million in attorney's fees while "declin[ing] to conduct a lodestar cross-check"); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *15 (N.D. Cal. Jan. 26, 2007) (holding that no lodestar cross-check was required over the objections of class members and the New York attorney general, and approving a $11,250,000 fee (25% of fund) even though the relevant court dockets "show no litigation activity of substance other than the filing of the complaints").

In any event, there will be no windfall here because there is no settlement.  At this point there is a judgment, a likely bankruptcy, and a likely claim against the insurer for its bad faith refusal to settle this action within the policy limits. *See supra* footnote 1.  Regardless of the amount of the fee award, Class Counsel will receive no "windfall" because there is no money to

pay it. Instead, Class Counsel will face thousands of hours of additional work to defeat any appeals, to navigate a likely bankruptcy filing, and to pursue full recovery from Defendant's insurer. These endeavors remain uncertain and fraught with risk.

Class Counsel recognize that the Northern District has published Procedural Guidance For Class Action Settlements which suggest that a lodestar calculation should be included in the motion for preliminary approval of class settlements. *See* https://www.cand.uscourts.gov/ ClassActionSettlementGuidance at ¶ 6. That procedural guidance does not apply because there is no settlement and this is not a motion for preliminary approval. This case was tried to verdict, judgment has been entered, and Class Counsel now seek an award of fees and costs pursuant to Fed. R. Civ. P. 23(h) and 54(d)(2).

## III.  CLASS COUNSEL'S EXPENSES WERE REASONABLE AND NECESSARILY INCURRED

Under Fed. R. Civ. P. 23(h), a trial court may award nontaxable costs that are authorized by law or the parties' agreement. "The prevailing view is that expenses are awarded in addition to the fee percentage." *Krakauer*, 2018 WL 6305785, at *6 (awarding $481,317.73 in expenses on top of the 33.33% attorney's fees). Class Counsel is entitled to reimbursement for standard out-of-pocket expenses that an attorney would ordinarily bill a fee-paying client. *See, e.g., Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

To date, Class Counsel has incurred out-of-pocket costs and expenses of $314,179.97. An itemized listing of each of these expenses is attached as Exhibit A to the Declaration of Scott A. Bursor. Each of these expenses was necessarily and reasonably incurred to bring this case through trial, and they reflect market rates for the various categories of expenses incurred. Bursor Decl. ¶ 25. These expenses amount to less than two-tenths of one percent of the judgment.

## IV.  THE REQUESTED SERVICE AWARD FOR THE CLASS REPRESENTATIVE IS FAIR AND REASONABLE

In recognition of his efforts on behalf of the Class, Ignacio Perez seeks a service award of $50,000 for his time and effort serving as the Class Representative in this litigation.

Service awards "are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Such awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* at 958-59. Class representative service awards are committed to the sound discretion of the trial court and should be awarded based upon the court's consideration of, *inter alia*, the amount of time and effort spent on the litigation, the duration of the litigation and the degree of personal gain obtained as a result of the litigation. *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995). Service awards are appropriate when a class representative will not benefit beyond ordinary class members. For example, where a class representative's claim makes up "only a tiny fraction of the common fund," a service award is justified. *See id.* at 299.[4]

The requested amount of $50,000 for Mr. Perez is appropriate given the circumstances of this case. Mr. Perez assisted Class Counsel with the initial investigation of this case and provided detailed information about the calls he had received from Defendant. Perez Decl. ¶ 2. For more than 3 years during the course of the litigation, Mr. Perez held regular in person and telephonic meetings with Class Counsel to receive updates on the progress of the case and to discuss strategy. *Id.* ¶ 3. Mr. Perez sat for a lengthy deposition and testified live at trial. *Id.* ¶ 4. He spent many hours conferring with counsel in preparation for both. *Id.* He also travelled from Sacramento to Oakland multiple times to appear at trial. *Id.* Moreover, Mr. Perez will be required to continue to work with Class Counsel to pursue collection efforts through the likely bankruptcy and insurance litigation. *Id.* ¶ 6; *see also* Bursor Decl. ¶ 26.

---

[4] Service awards are most often sought in the context of class action settlements. But service awards have been made on litigated class judgments as well. *See, e.g.*, *Ibarra v. Wells Fargo Bank, N.A.*, 2018 WL 5276295, at *7 (C.D. Cal. Sep. 28, 2018) (awarding $10,000 service award after plaintiff and class prevailed on the merits at summary judgment); *Kifafi v. Hilton Hotels Retirement Plan*, 999 F. Supp. 2d 88, 105 (D.D.C. 2013) (awarding $50,000 service award in ERISA class action after plaintiff prevailed on the merits at summary judgment); *Weil v. Metal Techs. Inc.*, 2018 WL 2971030, at *5 (S.D. Ind. June 13, 2018) (awarding service award after plaintiff and the class won a bench trial), *vacated and remanded on other grounds by Weil v. Metal Techs. Inc.*, 925 F.3d 352 (7th Cir. 2019).

1    Accordingly, a class representative service award of $50,000 for Mr. Perez is fair and

2  reasonable. *Pan v. Qualcomm, Inc.*, 2017 WL 3252212, at *14 (S.D. Cal. July 31, 2017) (awarding

3  $50,000 service award); *In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730, at *17

4  (N.D. Cal. Sept. 2, 2015) (authorizing $80,000 and $120,000 service awards, in addition to $20,000

5  award to each for prior settlement); *Van Vranken*, 901 F. Supp. at 300 (awarding $50,000 service

6  award). *See also Velez v. Novartis Pharm. Corp.*, 2010 WL 4877852, at *24 (S.D.N.Y. Nov. 30,

7  2010) (citing seven cases where courts approved service awards between $50,000 and $300,000).

8                        **V.  CONCLUSION**

9    Class Counsel advanced $314,179.97 in out-of-pocket costs and expenses, and have worked

10  on this case without payment for more than three years.  Those efforts produced a judgment

11  awarding Class Members more than $267 million.  This is more than three times the amount of the

12  largest TCPA settlement ever made.  It was the best possible outcome, representing 100% of the

13  damages sought by Class Members, amounting to $6,614 per Class Member.  For this result, Class

14  Counsel seek the same percentage fee that Judge Eagleton awarded on the TCPA class action

15  judgment in *Krakauer*, 2018 WL 6305785, at *4–5 (awarding 33.33% of the judgment), and which

16  this Court awarded in the context of a TCPA class settlement in *West v. Cal. Service Bureau, Inc.*,

17  Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019) (awarding 33.33% of the common fund

18  settlement).

19    Class Counsel recognize that the benchmark for percentage fee awards in the Ninth Circuit

20  is 25%, but upward departures from that benchmark are commonplace. *See In re NCAA*, 2017 WL

21  6040065 at *2 ("[I]n most common fund cases, the award exceeds the [25%] benchmark.  And this

22  Court has referred to 'the many cases in this circuit that have granted fee awards of 30% or

23  more.'").  As discussed above, every factor weighs heavily in favor of such an upward departure in

24  this case.

25    For the foregoing reasons, Plaintiff and Class Counsel Plaintiff respectfully request an

26  Order:

(1) Awarding Class Counsel attorney's fees of one-third (33.33%) of the judgment, totaling $89,116,333.33;

(2) Awarding Class Counsel reimbursement for reasonable litigation costs and expenses, in the amount of $314,179.97;

(3) Awarding Mr. Perez a class representative service award of $50,000.

Dated:  September 23, 2019                  Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By:  _/s/ Scott A. Bursor_
                                                     Scott A. Bursor

                                            Scott A. Bursor (SBN 276006)
                                            2665 S. Bayshore Dr., Suite 220
                                            Miami, FL 33133
                                            Telephone:  (305) 330-5512
                                            Facsimile:  (305) 676-9006
                                            E-Mail:  scott@bursor.com

                                            **BURSOR & FISHER, P.A.**
                                            L. Timothy Fisher (SBN 191626)
                                            Yeremey O. Krivoshey (SBN 295032)
                                            Blair E. Reed (SBN 316791)
                                            1990 North California Blvd., Suite 940
                                            Walnut Creek, CA 94596
                                            Telephone: (925) 300-4455
                                            Facsimile: (925) 407-2700
                                            E-Mail:  ltfisher@bursor.com
                                                         ykrivoshey@bursor.com
                                                         breed@bursor.com

                                            _Class Counsel_

1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)

2
Yeremey O. Krivoshey (SBN 295032)
Blair E. Reed (SBN 316791)

3
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596

4
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

5
E-Mail: ltfisher@bursor.com
          breed@bursor.com

6
          ykrivoshey@bursor.com

7

**BURSOR & FISHER, P.A.**
Scott A. Bursor (SBN 276006)

8
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133

9
Telephone: (305) 330-5512
Facsimile: (305) 676-9006

10
E-Mail: scott@bursor.com

11
*Class Counsel*

12

13
UNITED STATES DISTRICT COURT

14
NORTHERN DISTRICT OF CALIFORNIA

15

16
IGNACIO PEREZ, on Behalf of Himself

17
and All Others Similarly Situated,

Case No. 4:16-cv-03396-YGR

18
                                   Plaintiff,

**DECLARATION OF SCOTT A. BURSOR
IN SUPPORT OF PLAINTIFF'S
MOTION FOR AN AWARD OF**

19
        v.

**ATTORNEY'S FEES, COSTS AND
EXPENSES, AND SERVICE AWARD**

20
RASH CURTIS & ASSOCIATES,

**FOR THE CLASS REPRESENTATIVE**

21
                                   Defendant.

Judge: Hon. Yvonne Gonzalez Rogers

22

23

24

25

26

27

28

DECLARATION OF SCOTT A. BURSOR
CASE NO. 4:16-cv-03396-YGR

I, Scott A. Bursor, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California.  I am a member of the bar of this Court, and I am a partner at Bursor & Fisher, P.A., which was appointed Class Counsel in this action. *See* ECF No. 81.  I make this declaration in support of Plaintiff's Motion for an Award of Attorney's Fees, Costs and Expenses, and Service Award for the Class Representative.

2.      I am sure this Court is familiar with the background and history of this litigation, so I will not repeat it here.  However, one of the factors supporting our fee motion is the expectation that Class Counsel will be required to perform substantial additional work to collect on the judgment.  So one purpose for this declaration is to provide the Court with some context for that statement.

3.      Defendant is insured under an errors and omissions liability insurance policy issued by XL America, Inc. (hereafter, "XL").  The policy gives the insurer, XL, the right and duty to defend all covered claims brought in the United States, and the right to select defense counsel.  XL selected and retained as defense counsel Mark Ellis of Ellis Law Group.  A representative of XL, Adam Williams, attended every day of the trial.

4.      On December 13, 2016, my partner, Yeremey O. Krivoshey, made an offer in writing to settle this case for an amount far below the policy limit.  XL rejected that offer.

5.      On December 19, 2016, Mr. Krivoshey made another offer in writing to settle this case for an amount far below the policy limit.  XL rejected that offer.

6.      On January 31, 2017, Mr. Krivoshey made another offer in writing to settle this case for an amount far below the policy limit.  XL rejected the offer that same day.  Mr. Krivoshey responded in writing stating that the potential liability in this case "could bankrupt" the Defendant, and urging that his settlement offer was "not meant to be a final offer.  We're happy to consider a counter once you've had a chance to discuss with your client."  XL did not counter.

7.      On August 16, 2017, the parties attended a mediation with Doug deVries of Judicate West serving as the mediator.  The mediation was scheduled for a full day.  Adam Williams attended the mediation as a representative of XL.  During the mediation, XL made no offer to settle

1  the case.  My partners, Mr. Fisher and Mr. Krivoshey, made an offer to settle the case for an

2  amount that was less than the policy limit.  XL rejected that offer and walked out of the mediation

3  without making a counter-offer, or any offer to settle the case on any terms.

4         8.     On August 31, 2017, Mr. Krivoshey wrote an email to defense counsel stating: "Re

5  settlement: we made an offer at the mediation and your client didn't counter and walked out.

6  We're still open to listening to a counter if you have one."  XL still did not make a counteroffer or

7  express any interest in settlement.

8         9.     On September 6, 2017, this Court granted Plaintiff's motion for class certification.

9  *See* ECF No. 81.

10        10.    On September 12, 2017, Mr. Fisher sent a copy of this Court's class certification

11  order to the mediator, Mr. deVries, to encourage further settlement negotiations or mediation.  Mr.

12  deVries responded that he would follow up with XL's counsel "to see whether or not there is any

13  interest on their part in re-engaging in settlement discussion."  Thereafter, on September 18, 2017,

14  Mr. deVries wrote that he had contacted XL's counsel, and "no further settlement negotiations will

15  occur at this time."

16        11.    On February 2, 2018, this Court granted Plaintiff's motion for summary judgment

17  on two key issues, finding Defendant's dialers were ATDSs, and that Defendant did not have

18  consent to call Mr. Perez.  ECF No. 167.

19        12.    On February 5, 2018, Mr. Fisher sent a copy of the summary judgment order to the

20  mediator, Mr. deVries, with an email stating: "I wanted to follow up with you about the Rash

21  Curtis class action that we mediated with you last year.  We received Judge Gonzalez Rogers'

22  order on the parties' motions for summary judgment on Friday.  Once again it was a resounding

23  victory for the plaintiffs.  A copy of the order is attached.  Can you follow up with defendant's

24  counsel Mark Ellis and see if he has any interest in mediating?"  XL did not respond.

25        13.    From February 5, 2018 through May 13, 2019, the date the jury returned its verdict,

26  XL persisted in refusing to negotiate any settlement of this action.

27        14.    California law requires insurance companies to act reasonably to settle claims.  "In

28  each policy of liability insurance, California law implies a covenant of good faith and fair dealing.

1   This implied covenant obligates the insurance company, among other things, to make reasonable

2   efforts to settle a third party's lawsuit against the insured. If the insurer breaches the implied

3   covenant by unreasonably refusing to settle the third party suit, the insured may sue the insurer in

4   tort to recover damages proximately caused by the insurer's breach." *PPG Industries, Inc. v.*

5   *Transamerica Ins. Co.*, 20 Cal.4th 310, 312 (1999).

6       15.    It is my view as Class Counsel that XL has breached the implied covenant of good

7   faith and fair dealing by unreasonably rejecting four written settlement offers that were at amounts

8   below the policy limit, and by refusing the negotiate settlement on any terms from the time the

9   Class was certified through the date the jury returned its verdict. Thus, in my view, Defendant has

10  a claim against XL for the full amount of the judgment, in excess of $267 million. *See, e.g.,*

11  *Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 725 (2002) ("Where the underlying action has

12  proceeded to trial and a judgment in excess of the policy limits has been entered against the

13  insured, the insurer is ordinarily liable to its insured for the entire amount of that judgment ....").

14      16.    Defendant's imminent bankruptcy filing should not affect XL's liability for bad

15  faith failure to settle. *See, e.g., Purdy v. Pacific Automobile Ins. Co.*, 157 Cal. App.3d 59, 74

16  (1984) (affirming trial court verdict against insurer for bad faith failure to settle within policy

17  limits, and holding the insurer liable for the entire judgment despite the insured's insolvency and

18  bankruptcy).

19      17.    After Plaintiff and the Class had prevailed at trial, on September 5, 2019, Mr. Ellis

20  sent me an email offering to settle this case for the remaining limits of the policy, which is less than

21  1% of the judgment. Mr. Ellis's email stated: "If the case does not settle and judgment is entered,

22  we will not only tie the case up in righteous appeals for years, but Rash will file for bk protection

23  and be protected from judgment enforcement by virtue of 11 USC sec 362."

24      18.    It is my view, as Class Counsel, that the best way to maximize Class Members'

25  recovery in this case is to obtain assignment of Defendant's claim against XL and pursue full

26  recovery of the judgment from XL.

27      19.    On September 11, 2019, I had a teleconference with Mr. Ellis to discuss settlement.

28  During that call I offered to settle with Defendant for <u>zero dollars</u> in exchange for an assignment of

1    Defendant's claim against XL and a promise of reasonable cooperation to assist Class Counsel in

2    prosecuting that claim.  I explained that this settlement would include a covenant by Plaintiff not to

3    execute the judgment against Defendant, which would obviate any need for Defendant to file for

4    bankruptcy protection.  *See* California Practice Guide:  Insurance Litigation Form 12:C (The Rutter

5    Group 2019) ("Assignment of Cause of Action in Exchange for Covenant Not to Execute").

6         20.    I had thought that settling a $267 million judgment for zero dollars would be an

7    easy decision for Defendant to make.  But I was wrong.  Defendant refused.

8         21.    Since I can't bid less than zero, it appears it will not be possible to settle.  Defendant

9    will file for bankruptcy.  And we will have to do everything the hard way.  Thus, I anticipate Class

10   Counsel will be required to do thousands of hours of additional work to defeat Defendant's

11   "righteous appeals," to navigate Defendant's likely bankruptcy filing, to obtain assignment of

12   Defendant's rights under the insurance policy either through settlement or through bankruptcy, and

13   to pursue full recovery from XL.

14        22.    To date Class Counsel has expended $314,179.97 in out-of-pocket expenses in

15   connection with the prosecution of this action.  Attached hereto as **Exhibit 1** is an itemized listing

16   of each out-of-pocket expense my firm incurred in this case.  These expenses are reflected in the

17   records of my firm, and were necessary to prosecute this litigation.  All expenses were carefully

18   and reasonably expended, and they reflect market rates for various categories of expenses incurred.

19   Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

20        23.    Plaintiff Ignacio Perez seeks a service award of $50,000.  Mr. Perez's cooperation

21   and assistance was very important to help us to secure a victory for Class Members at trial.

22   Moreover, the expected bankruptcy and insurance litigation will impose more burdens on Mr.

23   Perez.  Thus, in my view, $50,000 is a reasonable amount for a service award to Mr. Perez.

24

25

26

27

28

1       I declare under penalty of perjury under the laws of the United States and the State of

2    California that the foregoing is true and correct.  Executed on September 23, 2019 at Miami,

3    Florida.

4

5                         */s/ Scott A. Bursor*

6                         Scott A. Bursor

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

**Perez v. Rash Curtis & Associates Expenses**

| | |
|---:|:---|
| $666.00 | Court Fees |
| $13,904.22 | Deposition and Transcript Fees |
| $221,198.47 | Expert Fees |
| $2,945.00 | Mediation Fees |
| $24,430.17 | Notice Administration Fees |
| $8,386.16 | Third Party Litigation Support Fees |
| $3,123.48 | Catering & Meal Expenses |
| $1,864.12 | Postage & Delivery Expenses |
| $37,662.35 | Travel & Lodging Expenses |
| **$314,179.97** | **Total Perez v. Rash Curtis & Associates Expenses** |

**Court Fees**

| DATE | MATTER | AMOUNT | DESCRIPTION |
|---|---|---:|---|
| 2016.06.17 | Perez v. Rash Curtis & Associates | $400.00 | US District Court NDCA - Complaint Filing |
| 2017.10.27 | Perez v. Rash Curtis & Associates | $30.00 | Courtcall |
| 2017.11.03 | Perez v. Rash Curtis & Associates | $86.00 | Courtcall |
| 2017.11.16 | Perez v. Rash Curtis & Associates | $30.00 | Courtcall |
| 2017.11.28 | Perez v. Rash Curtis & Associates | $30.00 | Courtcall |
| 2018.09.25 | Perez v. Rash Curtis & Associates | $30.00 | Courtcall |
| 2018.09.27 | Perez v. Rash Curtis & Associates | $30.00 | Courtcall |
| 2018.09.28 | Perez v. Rash Curtis & Associates | $30.00 | Courtcall |
| | | **$666.00** | **Total Court Fees** |

**Deposition and Transcript Fees**

| DATE | MATTER | AMOUNT | DESCRIPTION |
|---|---|---:|---|
| 2017.05.01 | Perez v. Rash Curtis & Associates | $833.90 | Veritext - Kizer Transcript |
| 2017.05.09 | Perez v. Rash Curtis & Associates | $1,075.00 | Veritext - Kizer Video |
| 2017.11.06 | Perez v. Rash Curtis & Associates | $14.55 | Joan Marie Columbini - 8-17 Hearing Transcript |
| 2017.11.14 | Perez v. Rash Curtis & Associates | $737.00 | Veritext - Keith Video |
| 2017.11.14 | Perez v. Rash Curtis & Associates | $1,378.25 | Veritext - Correa Transcript & Video |
| 2017.11.30 | Perez v. Rash Curtis & Associates | $1,221.50 | Veritext - Paff & Keith Transcript and Video |
| 2018.02.01 | Perez v. Rash Curtis & Associates | $54.30 | Joan Columbini - Court Reporter |
| 2018.02.07 | Perez v. Rash Curtis & Associates | $206.00 | Sarah Goekler - Court Reporter |
| 2018.02.23 | Perez v. Rash Curtis & Associates | $299.37 | Aiken Welch - Court Reporter |
| 2019.01.11 | Perez v. Rash Curtis & Associates | $600.00 | Kempfer Court Reporting |
| 2019.03.08 | Perez v. Rash Curtis & Associates | $1,558.48 | Aiken Welch Court Reporters - 1/7 Depo |
| 2019.03.21 | Perez v. Rash Curtis & Associates | $398.75 | Diane Skillman - Court Reporter |
| 2019.04.01 | Perez v. Rash Curtis & Associates | $572.75 | Pamela Batalo - Court Reporter |
| 2019.04.02 | Perez v. Rash Curtis & Associates | $188.50 | Leo Mankiewicz - Court Reporter |
| 2019.04.10 | Perez v. Rash Curtis & Associates | $21.75 | Leo Mankiewicz - Court Reporter |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $4,338.00 | Diane Skillman - Court Reporter |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $406.12 | Diane Skillman - Court Reporter |
| | | **$13,904.22** | **Total Deposition and Transcript Fees** |

**Expert Fees**

| DATE | MATTER | AMOUNT | DESCRIPTION |
|---|---|---:|---|
| 2017.05.09 | Perez v. Rash Curtis & Associates | $450.00 | Economics and Technology, Inc. |
| 2017.06.06 | Perez v. Rash Curtis & Associates | $3,150.00 | Economics and Technology, Inc. |
| 2017.06.06 | Perez v. Rash Curtis & Associates | $4,692.50 | Wireless Research Services, LLC |
| 2017.09.07 | Perez v. Rash Curtis & Associates | $450.00 | Economics and Technology, Inc. |
| 2017.10.24 | Perez v. Rash Curtis & Associates | $3,942.50 | Wireless Research Services, LLC |

| | | | |
|---|---|---|---|
| 2017.12.05 | Perez v. Rash Curtis & Associates | $2,400.00 | Economics and Technology, Inc. |
| 2018.01.03 | Perez v. Rash Curtis & Associates | $4,650.00 | Economics and Technology, Inc. |
| 2018.01.03 | Perez v. Rash Curtis & Associates | $3,942.50 | Wireless Research Services, LLC |
| 2018.02.05 | Perez v. Rash Curtis & Associates | $5,000.00 | Economics and Technology, Inc. |
| 2018.03.05 | Perez v. Rash Curtis & Associates | $2,161.36 | Economics and Technology, Inc. |
| 2018.04.05 | Perez v. Rash Curtis & Associates | $3,961.36 | Economics and Technology, Inc. |
| 2018.04.05 | Perez v. Rash Curtis & Associates | $16,972.63 | Class Experts Group, LLC |
| 2018.08.13 | Perez v. Rash Curtis & Associates | $150.00 | Economics and Technology, Inc. |
| 2018.09.18 | Perez v. Rash Curtis & Associates | $9,750.00 | Economics and Technology, Inc. |
| 2018.10.09 | Perez v. Rash Curtis & Associates | $12,418.00 | Economics and Technology, Inc. |
| 2018.11.09 | Perez v. Rash Curtis & Associates | $11,700.00 | Economics and Technology, Inc. |
| 2018.11.28 | Perez v. Rash Curtis & Associates | $2,802.50 | Wireless Research Services, LLC |
| 2018.12.04 | Perez v. Rash Curtis & Associates | $42,407.84 | Class Experts Group, LLC |
| 2018.12.17 | Perez v. Rash Curtis & Associates | $3,750.00 | Economics and Technology, Inc. |
| 2018.12.19 | Perez v. Rash Curtis & Associates | $6,010.29 | Wireless Research Services, LLC |
| 2019.01.07 | Perez v. Rash Curtis & Associates | $4,946.50 | Class Experts Group, LLC |
| 2019.01.17 | Perez v. Rash Curtis & Associates | $11,358.49 | Economics and Technology, Inc. |
| 2019.02.11 | Perez v. Rash Curtis & Associates | $1,650.00 | Economics and Technology, Inc. |
| 2019.04.18 | Perez v. Rash Curtis & Associates | $2,550.00 | Economics and Technology, Inc. |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $8,982.70 | Wireless Research Services LLC |
| 2019.05.20 | Perez v. Rash Curtis & Associates | $450.00 | Economics and Technology, Inc. |
| 2019.06.19 | Perez v. Rash Curtis & Associates | $29,011.15 | Economics and Technology, Inc. |
| 2019.07.24 | Perez v. Rash Curtis & Associates | $21,488.15 | Class Experts Group, LLC |
| | | **$221,198.47** | **Total Expert Fees** |

## Mediation Fees

| DATE | MATTER | AMOUNT | DESCRIPTION |
|---|---|---|---|
| 2017.07.05 | Perez v. Rash Curtis & Associates | $2,945.00 | Judicate West - Mediation Fee |
| | | **$2,945.00** | **Total Mediation Fees** |

## Notice Administration Fees

| DATE | MATTER | AMOUNT | DESCRIPTION |
|---|---|---|---|
| 2019.06.05 | Perez v. Rash Curtis & Associates | $20,797.96 | KCC |
| 2019.07.24 | Perez v. Rash Curtis & Associates | $3,482.21 | KCC |
| 2019.09.05 | Perez v. Rash Curtis & Associates | $150.00 | KCC |
| | | **$24,430.17** | **Total Notice Administration Fees** |

## Third Party Litigation Support Fees

| DATE | MATTER | AMOUNT | DESCRIPTION |
|---|---|---|---|
| 2017.10.11 | Perez v. Rash Curtis & Associates | $41.27 | WinZip - Discovery tool |
| 2017.10.11 | Perez v. Rash Curtis & Associates | $69.00 | Systool Group - Discovery tool |
| 2018.02.12 | Perez v. Rash Curtis & Associates | $3,303.12 | DAKCS - Debt Collection Software |
| 2019.04.12 | Perez v. Rash Curtis & Associates | $670.92 | Quivx |
| 2019.04.12 | Perez v. Rash Curtis & Associates | $692.02 | Quivx |
| 2019.04.12 | Perez v. Rash Curtis & Associates | $748.44 | Quivx |
| 2019.06.14 | Perez v. Rash Curtis & Associates | $788.00 | Visualize Legal |
| 2019.06.14 | Perez v. Rash Curtis & Associates | $2,073.39 | Quivx |
| | | **$8,386.16** | **Total Third Party Litigation Support Fees** |

**Catering & Meal Expenses**

| DATE | MATTER | AMOUNT | DESCRIPTION |
|------|--------|--------|-------------|
| 2016.10.03 | Perez v. Rash Curtis & Associates | $4.90 | Starbucks |
| 2017.04.13 | Perez v. Rash Curtis & Associates | $17.00 | A Sweet Affair |
| 2017.07.11 | Perez v. Rash Curtis & Associates | $55.38 | A Sweet Affair |
| 2017.07.12 | Perez v. Rash Curtis & Associates | $35.23 | The Firehoue |
| 2017.07.13 | Perez v. Rash Curtis & Associates | $5.95 | Ranis Gift Shop |
| 2017.07.13 | Perez v. Rash Curtis & Associates | $52.72 | Roxy |
| 2017.08.17 | Perez v. Rash Curtis & Associates | $2.49 | Regent Café |
| 2017.09.26 | Perez v. Rash Curtis & Associates | $27.17 | Sammy's Restaurant |
| 2017.09.26 | Perez v. Rash Curtis & Associates | $28.41 | Quik Stop |
| 2017.10.17 | Perez v. Rash Curtis & Associates | $5.64 | Regent Café |
| 2017.10.17 | Perez v. Rash Curtis & Associates | $7.12 | Regent Café |
| 2017.10.19 | Perez v. Rash Curtis & Associates | $24.97 | PF Changs |
| 2018.01.30 | Perez v. Rash Curtis & Associates | $39.77 | FAZ Restaurant Oakland |
| 2018.08.27 | Perez v. Rash Curtis & Associates | $56.98 | FAZ Restaurant |
| 2018.09.05 | Perez v. Rash Curtis & Associates | $28.16 | Cracker Barrel |
| 2018.12.04 | Perez v. Rash Curtis & Associates | $12.60 | Woody Creek Bakery |
| 2018.12.04 | Perez v. Rash Curtis & Associates | $14.59 | Chilis Too Oak |
| 2018.12.05 | Perez v. Rash Curtis & Associates | $20.47 | St Paul Fish Co |
| 2018.12.05 | Perez v. Rash Curtis & Associates | $61.99 | Onesto |
| 2018.12.06 | Perez v. Rash Curtis & Associates | $16.21 | Mike Pizzeria |
| 2018.12.11 | Perez v. Rash Curtis & Associates | $3.11 | Eden Plaza |
| 2018.12.16 | Perez v. Rash Curtis & Associates | $6.00 | Pacific Renaissance |
| 2018.12.17 | Perez v. Rash Curtis & Associates | $1.29 | Eden Plaza |
| 2018.12.17 | Perez v. Rash Curtis & Associates | $3.11 | Eden Plaza |
| 2018.12.17 | Perez v. Rash Curtis & Associates | $11.14 | Courtyard Oakland |
| 2019.03.19 | Perez v. Rash Curtis & Associates | $15.14 | Sorabol Korean BBQ |
| 2019.03.28 | Perez v. Rash Curtis & Associates | $16.57 | Chili's |
| 2019.03.28 | Perez v. Rash Curtis & Associates | $18.12 | Sorabol Korean BBQ |
| 2019.03.29 | Perez v. Rash Curtis & Associates | $119.59 | Maria Maria |
| 2019.03.30 | Perez v. Rash Curtis & Associates | $25.63 | Lark Creek Grill |
| 2019.04.28 | Perez v. Rash Curtis & Associates | $12.00 | 5th & Mission GA |
| 2019.04.28 | Perez v. Rash Curtis & Associates | $38.21 | Restaurant - Pretrial prep |
| 2019.05.01 | Perez v. Rash Curtis & Associates | $190.19 | Doordash |
| 2019.05.02 | Perez v. Rash Curtis & Associates | $42.19 | Jaguar |
| 2019.05.02 | Perez v. Rash Curtis & Associates | $105.64 | Doordash |
| 2019.05.03 | Perez v. Rash Curtis & Associates | $55.44 | Yard House |
| 2019.05.03 | Perez v. Rash Curtis & Associates | $39.65 | Doordash |
| 2019.05.03 | Perez v. Rash Curtis & Associates | $149.29 | Doordash |
| 2019.05.04 | Perez v. Rash Curtis & Associates | $23.27 | Pasta Moto San Francisco |
| 2019.05.05 | Perez v. Rash Curtis & Associates | $55.19 | Saroms Southern Kitchen |
| 2019.05.05 | Perez v. Rash Curtis & Associates | $103.85 | Zacharys Chicago Pizza |
| 2019.05.05 | Perez v. Rash Curtis & Associates | $292.96 | Restaurant - Trial prep |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $7.13 | Super Duper |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $76.86 | Otaez Mex Res |
| 2019.05.08 | Perez v. Rash Curtis & Associates | $47.16 | Chipotle |
| 2019.05.09 | Perez v. Rash Curtis & Associates | $83.49 | Doordash |
| 2019.05.09 | Perez v. Rash Curtis & Associates | $145.43 | Kincaids Oakland |
| 2019.05.09 | Perez v. Rash Curtis & Associates | $32.64 | A Sweet Affair |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $100.58 | Scala's Bistro & Bar Drake |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $41.00 | Chipotle |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $83.28 | The Cooperage American Lafayette |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $27.40 | Bagel Street Café |
| 2019.05.12 | Perez v. Rash Curtis & Associates | $52.32 | Ippudo |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $46.60 | Ippudo |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $52.70 | Valencia Street |

| 2019.05.13 | Perez v. Rash Curtis & Associates | $206.29 | Kincaids Oakland |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $221.23 | Rooftop Restaurant |
| 2019.05.31 | Perez v. Rash Curtis & Associates | $36.04 | Saroms Southern Kitchen |
| 2019.06.12 | Perez v. Rash Curtis & Associates | $5.09 | Regent School Catering |
| 2019.06.12 | Perez v. Rash Curtis & Associates | $12.91 | Regent School Catering |
| | | **$3,123.48** | **Total Catering & Meal Expenses** |

**Postage & Delivery Expenses**

| DATE | MATTER | AMOUNT | DESCRIPTION |
| --- | --- | --- | --- |
| 2017.06.02 | Perez v. Rash Curtis & Associates | $54.28 | Golden State Overnight - Chamber Copies |
| 2017.09.19 | Perez v. Rash Curtis & Associates | $48.13 | Golden State Overnight - Chamber Copies |
| 2017.12.02 | Perez v. Rash Curtis & Associates | $57.87 | FedEx |
| 2017.12.06 | Perez v. Rash Curtis & Associates | $36.47 | FedEx |
| 2017.12.13 | Perez v. Rash Curtis & Associates | $76.06 | FedEx |
| 2017.12.23 | Perez v. Rash Curtis & Associates | $5.29 | USPS |
| 2018.02.02 | Perez v. Rash Curtis & Associates | $168.15 | First Legal - Chamber Delivery |
| 2018.02.14 | Perez v. Rash Curtis & Associates | $31.41 | FedEx |
| 2018.02.15 | Perez v. Rash Curtis & Associates | $71.55 | Golden State Overnight - Chamber Copies |
| 2018.02.24 | Perez v. Rash Curtis & Associates | $38.07 | FedEx |
| 2018.03.02 | Perez v. Rash Curtis & Associates | $23.85 | Golden State Overnight - Chamber Copies |
| 2018.03.15 | Perez v. Rash Curtis & Associates | $38.07 | Fedex |
| 2018.03.19 | Perez v. Rash Curtis & Associates | $17.94 | Golden State Overnight - Chamber Copies |
| 2018.05.02 | Perez v. Rash Curtis & Associates | $18.00 | Golden State Overnight - Chamber Copies |
| 2018.05.17 | Perez v. Rash Curtis & Associates | $24.17 | Golden State Overnight - Chamber Copies |
| 2018.06.04 | Perez v. Rash Curtis & Associates | $18.18 | Golden State Overnight - Chamber Copies |
| 2018.07.17 | Perez v. Rash Curtis & Associates | $25.59 | Golden State Overnight - Chamber Copies |
| 2018.08.02 | Perez v. Rash Curtis & Associates | $25.59 | Golden State Overnight - Chamber Copies |
| 2018.08.17 | Perez v. Rash Curtis & Associates | $53.35 | Golden State Overnight - Chamber Copies |
| 2018.09.05 | Perez v. Rash Curtis & Associates | $24.17 | Golden State Overnight - Chamber Copies |
| 2018.10.02 | Perez v. Rash Curtis & Associates | $71.53 | Golden State Overnight - Chamber Copies |
| 2018.10.17 | Perez v. Rash Curtis & Associates | $18.26 | Golden State Overnight - Chamber Copies |
| 2018.10.20 | Perez v. Rash Curtis & Associates | $30.03 | FedEx |
| 2018.11.02 | Perez v. Rash Curtis & Associates | $24.27 | Golden State Overnight - Chamber Copies |
| 2018.11.19 | Perez v. Rash Curtis & Associates | $44.04 | Golden State Overnight - Chamber Copies |
| 2019.02.19 | Perez v. Rash Curtis & Associates | $29.29 | Golden State Overnight - Chamber Copies |
| 2019.03.04 | Perez v. Rash Curtis & Associates | $34.22 | Golden State Overnight - Chamber Copies |
| 2019.03.19 | Perez v. Rash Curtis & Associates | $23.85 | Golden State Overnight - Chamber Copies |
| 2019.04.02 | Perez v. Rash Curtis & Associates | $17.94 | Golden State Overnight - Chamber Copies |
| 2019.04.17 | Perez v. Rash Curtis & Associates | $29.68 | Golden State Overnight - Chamber Copies |
| 2019.04.20 | Perez v. Rash Curtis & Associates | $90.15 | Fedex |
| 2019.04.26 | Perez v. Rash Curtis & Associates | $56.98 | Optional Delivery Systems - Chamber copy |
| 2019.05.03 | Perez v. Rash Curtis & Associates | $54.67 | Optional Delivery Systems |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $109.34 | Optional Delivery Systems - Chamber copy |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $24.00 | Golden State Overnight - Chamber Copies |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $48.43 | FedEx |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $51.16 | FedEx |
| 2019.05.09 | Perez v. Rash Curtis & Associates | $58.04 | FedEx |
| 2019.05.11 | Perez v. Rash Curtis & Associates | $22.93 | FedEx |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $125.84 | Optional Delivery Systems |
| 2019.05.17 | Perez v. Rash Curtis & Associates | $18.58 | Golden State Overnight - Chamber Copies |
| 2019.06.04 | Perez v. Rash Curtis & Associates | $24.70 | Golden State Overnight - Chamber Copies |
| | | **$1,864.12** | **Total Postage & Delivery Expenses** |

**Travel & Lodging Expenses**

| DATE | MATTER | AMOUNT | DESCRIPTION |
|------|--------|--------|-------------|
| 2016.10.03 | Perez v. Rash Curtis & Associates | $20.00 | BART |
| 2017.05.01 | Perez v. Rash Curtis & Associates | $8.00 | Lyft |
| 2017.05.02 | Perez v. Rash Curtis & Associates | $10.42 | Lyft |
| 2017.07.12 | Perez v. Rash Curtis & Associates | $1.75 | City of Sacramento Parking |
| 2017.07.14 | Perez v. Rash Curtis & Associates | $303.15 | Double Tree |
| 2017.08.16 | Perez v. Rash Curtis & Associates | $10.50 | BART |
| 2017.08.17 | Perez v. Rash Curtis & Associates | $12.32 | Lyft |
| 2017.08.18 | Perez v. Rash Curtis & Associates | $7.00 | Lyft |
| 2017.09.28 | Perez v. Rash Curtis & Associates | $6.00 | BART |
| 2017.09.29 | Perez v. Rash Curtis & Associates | $9.00 | Lyft |
| 2017.10.17 | Perez v. Rash Curtis & Associates | $10.50 | BART |
| 2017.10.17 | Perez v. Rash Curtis & Associates | $8.00 | Lyft |
| 2017.10.19 | Perez v. Rash Curtis & Associates | $2.00 | Bay Street Garage |
| 2017.10.20 | Perez v. Rash Curtis & Associates | $18.00 | ACE Parking |
| 2017.10.20 | Perez v. Rash Curtis & Associates | $18.00 | ACE Parking |
| 2017.11.06 | Perez v. Rash Curtis & Associates | $110.05 | Yeremey Krivoshey-Travel to Perez Meeting |
| 2017.11.06 | Perez v. Rash Curtis & Associates | $86.00 | L. Timothy Fisher - Mileage, Bridge Toll |
| 2017.11.06 | Perez v. Rash Curtis & Associates | $36.72 | L. Timothy Fisher - Mileage |
| 2018.01.10 | Perez v. Rash Curtis & Associates | $7.75 | Lyft |
| 2018.01.30 | Perez v. Rash Curtis & Associates | $14.00 | City Center West |
| 2018.02.23 | Perez v. Rash Curtis & Associates | $17.44 | L. Timothy Fisher- Expenses |
| 2018.03.16 | Perez v. Rash Curtis & Associates | $8.00 | Parking |
| 2018.08.27 | Perez v. Rash Curtis & Associates | $8.00 | Oakland Parking Meter |
| 2018.09.05 | Perez v. Rash Curtis & Associates | $40.67 | Chevron |
| 2018.09.28 | Perez v. Rash Curtis & Associates | $2.00 | Walnut Creek Parking |
| 2018.11.30 | Perez v. Rash Curtis & Associates | $1,051.16 | SouthWest |
| 2018.12.05 | Perez v. Rash Curtis & Associates | $40.45 | Lyft |
| 2018.12.06 | Perez v. Rash Curtis & Associates | $8.65 | Lyft |
| 2018.12.06 | Perez v. Rash Curtis & Associates | $19.54 | Lyft |
| 2018.12.06 | Perez v. Rash Curtis & Associates | $468.57 | Hilton Garden Inn |
| 2018.12.07 | Perez v. Rash Curtis & Associates | $8.65 | Lyft |
| 2018.12.08 | Perez v. Rash Curtis & Associates | $35.41 | Lyft |
| 2018.12.12 | Perez v. Rash Curtis & Associates | $9.12 | Lyft |
| 2018.12.12 | Perez v. Rash Curtis & Associates | $11.00 | Bart |
| 2018.12.12 | Perez v. Rash Curtis & Associates | $30.00 | Ace Parking |
| 2018.12.17 | Perez v. Rash Curtis & Associates | $4.00 | Oakland Park Meter |
| 2018.12.17 | Perez v. Rash Curtis & Associates | $8.99 | AA Inflight |
| 2018.12.18 | Perez v. Rash Curtis & Associates | $30.00 | Ace Parking |
| 2019.03.15 | Perez v. Rash Curtis & Associates | $1,348.30 | JetBlue - Hearing on Dauberts |
| 2019.03.15 | Perez v. Rash Curtis & Associates | $848.30 | Alaskan Air - Hearing on Dauberts |
| 2019.03.18 | Perez v. Rash Curtis & Associates | $2,319.10 | Hotel - Hearing on Dauberts |
| 2019.03.19 | Perez v. Rash Curtis & Associates | $18.00 | City Center West Garage |
| 2019.03.19 | Perez v. Rash Curtis & Associates | $8.80 | Lyft |
| 2019.03.19 | Perez v. Rash Curtis & Associates | $8.80 | Lyft |
| 2019.03.20 | Perez v. Rash Curtis & Associates | $49.23 | Uber - Hearing on Dauberts |
| 2019.03.22 | Perez v. Rash Curtis & Associates | $698.30 | Alaskan Air - 3/29 Pretrial Conference |
| 2019.03.22 | Perez v. Rash Curtis & Associates | $898.30 | Alaskan Air - 3/29 Pretrial Conference |
| 2019.03.23 | Perez v. Rash Curtis & Associates | $53.90 | Travel Guard - 3/29 Pretrial Conference |
| 2019.03.28 | Perez v. Rash Curtis & Associates | $75.63 | Uber - 3/29 Pretrial Conference |
| 2019.03.28 | Perez v. Rash Curtis & Associates | $39.32 | Uber - 3/29 Pretrial Conference |
| 2019.03.28 | Perez v. Rash Curtis & Associates | $58.50 | Car Service - 3/29 Pretrial Conference |
| 2019.03.29 | Perez v. Rash Curtis & Associates | $33.16 | Uber - 3/29 Pretrial Conference |
| 2019.03.29 | Perez v. Rash Curtis & Associates | $30.00 | City Center West Garage |
| 2019.03.30 | Perez v. Rash Curtis & Associates | $30.35 | Uber - 3/29 Pretrial Conference |
| 2019.03.30 | Perez v. Rash Curtis & Associates | $1,063.52 | Hotel - 3/29 Pretrial Conference |

| 2019.04.02 | Perez v. Rash Curtis & Associates | $1,355.75 | JetBlue - 4/29 Pretrial Conference |
|---|---|---|---|
| 2019.04.10 | Perez v. Rash Curtis & Associates | $8.00 | SWA Inflight |
| 2019.04.11 | Perez v. Rash Curtis & Associates | $19.14 | L. Timothy Fisher- Expenses |
| 2019.04.18 | Perez v. Rash Curtis & Associates | $645.19 | API Global Transportat |
| 2019.04.26 | Perez v. Rash Curtis & Associates | $1,555.75 | JetBlue - 4/29 Pretrial Conference |
| 2019.04.27 | Perez v. Rash Curtis & Associates | $185.99 | Travel Guard - 4/29 Pretrial Conference |
| 2019.04.28 | Perez v. Rash Curtis & Associates | $61.80 | Car Service - 4/29 Pretrial Conference |
| 2019.04.28 | Perez v. Rash Curtis & Associates | $15.00 | Impark |
| 2019.04.29 | Perez v. Rash Curtis & Associates | $5.00 | Bart Clipper |
| 2019.04.29 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garage |
| 2019.04.30 | Perez v. Rash Curtis & Associates | $33.86 | Uber - 4/29 Pretrial Conference |
| 2019.04.30 | Perez v. Rash Curtis & Associates | $13,463.98 | Hotel - Trial |
| 2019.04.30 | Perez v. Rash Curtis & Associates | $18.56 | Lyft |
| 2019.05.01 | Perez v. Rash Curtis & Associates | $955.75 | JetBlue - Trial |
| 2019.05.01 | Perez v. Rash Curtis & Associates | $5.00 | Bart Clipper |
| 2019.05.01 | Perez v. Rash Curtis & Associates | $6.80 | Lyft |
| 2019.05.01 | Perez v. Rash Curtis & Associates | $8.00 | Bart Clipper |
| 2019.05.03 | Perez v. Rash Curtis & Associates | $8.00 | Bart Clipper |
| 2019.05.04 | Perez v. Rash Curtis & Associates | $66.86 | Uber - Trial |
| 2019.05.04 | Perez v. Rash Curtis & Associates | $52.90 | Cab Service - Trial |
| 2019.05.04 | Perez v. Rash Curtis & Associates | $77.12 | Uber - Trial |
| 2019.05.04 | Perez v. Rash Curtis & Associates | $14.05 | Lyft |
| 2019.05.05 | Perez v. Rash Curtis & Associates | $57.75 | Guru Cab Serv |
| 2019.05.05 | Perez v. Rash Curtis & Associates | $22.02 | Oakland Marriot |
| 2019.05.05 | Perez v. Rash Curtis & Associates | $40.40 | Taxi Svc |
| 2019.05.05 | Perez v. Rash Curtis & Associates | $107.21 | Yeremey Krivoshey - Mileage and tolls |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $35.00 | Convention Center Oak |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $1.50 | City of Alamdeda IPS |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garage |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $21.39 | Oakland Marriot |
| 2019.05.06 | Perez v. Rash Curtis & Associates | $645.19 | API Global Transportat |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garage |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $55.00 | Parking Concepts |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $211.73 | API Global Transportat |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $950.00 | Parking Concepts |
| 2019.05.07 | Perez v. Rash Curtis & Associates | $111.96 | Oakland Marriot |
| 2019.05.08 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garage |
| 2019.05.08 | Perez v. Rash Curtis & Associates | $52.92 | API Global Transportat |
| 2019.05.09 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garage |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $16.00 | Bart-Walnut Creek |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garag Oak |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $3.00 | Parksmart |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garage |
| 2019.05.10 | Perez v. Rash Curtis & Associates | $322.57 | Hotel |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $38.23 | Uber - Trial |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $70.80 | Car Service - Trial |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $902.00 | JetBlue - Trial |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $1.00 | LAZ Parking |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garag Oak |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $2.75 | Port JLS Parking |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $3.00 | Parksmart |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $20.00 | City Center West Garage |
| 2019.05.13 | Perez v. Rash Curtis & Associates | $2.25 | Port JLS Parking |
| 2019.05.14 | Perez v. Rash Curtis & Associates | $215.69 | L. Timothy Fisher - Mileage for trial |
| 2019.05.15 | Perez v. Rash Curtis & Associates | $141.30 | Blair Reed - Uber travel for Trial |
| 2019.05.15 | Perez v. Rash Curtis & Associates | $652.15 | Yeremey Krivoshey - Trial related expenses |
| 2019.05.18 | Perez v. Rash Curtis & Associates | $95.00 | Parking Concepts |
| 2019.05.31 | Perez v. Rash Curtis & Associates | $27.41 | Chevron |

| | | | |
|---|---|---|---|
| 2019.05.31 | Perez v. Rash Curtis & Associates | $94.57 | Yeremey Krivoshey - Mileage and tolls |
| 2019.06.07 | Perez v. Rash Curtis & Associates | $1,355.75 | Jetblue - Settlement Conference |
| 2019.06.07 | Perez v. Rash Curtis & Associates | $1,048.25 | Jetblue - Settlement Conference |
| 2019.06.07 | Perez v. Rash Curtis & Associates | $1,317.31 | Hotel - Settlement Conference |
| 2019.06.08 | Perez v. Rash Curtis & Associates | $70.76 | Travel Guard - Settlement Conference |
| 2019.06.11 | Perez v. Rash Curtis & Associates | $78.47 | Uber - Settlement Conference |
| 2019.06.12 | Perez v. Rash Curtis & Associates | $21.00 | UC Hastings Parking |
| 2019.06.25 | Perez v. Rash Curtis & Associates | $33.90 | Lyft |
| 2019.06.25 | Perez v. Rash Curtis & Associates | $5.00 | Clipper Service |
| 2019.06.26 | Perez v. Rash Curtis & Associates | $7.30 | Lyft |
| | | **$37,662.35** | **Total Travel & Lodging Expenses** |

1  **BURSOR & FISHER, P.A.**
   L. Timothy Fisher (SBN 191626)
2  Yeremey O. Krivoshey (SBN 295032)
   Blair E. Reed (SBN 316791)
3  1990 North California Blvd., Suite 940
   Walnut Creek, CA 94596
4  Telephone: (925) 300-4455
   Facsimile: (925) 407-2700
5  E-Mail:  ltfisher@bursor.com
              breed@bursor.com
6              ykrivoshey@bursor.com

7  **BURSOR & FISHER, P.A.**
   Scott A. Bursor (SBN 276006)
8  2665 S. Bayshore Dr., Suite 220
   Miami, FL 33133
9  Telephone:  (305) 330-5512
   Facsimile:  (305) 676-9006
10 E-Mail:  scott@bursor.com

11 *Class Counsel*

12

13                     UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15

16 IGNACIO PEREZ, on Behalf of Himself    Case No. 4:16-cv-03396-YGR
17 and All Others Similarly Situated,
                                          **DECLARATION OF IGNACIO PEREZ**
18                          Plaintiff,    **IN SUPPORT OF PLAINTIFF'S NOTICE**
                                          **OF MOTION AND MOTION FOR AN**
19          v.                            **AWARD OF ATTORNEY'S FEES,**
                                          **COSTS AND EXPENSES, AND**
20 RASH CURTIS & ASSOCIATES,              **SERVICE AWARD FOR THE CLASS**
                                          **REPRESENTATIVE**
21                          Defendant.
                                          Judge:  Hon. Yvonne Gonzalez Rogers
22

23

24

25

26

27

28

# DECLARATION OF IGNACIO PEREZ

I, Ignacio Perez, declare as follows:

1.    I am the Class Representative in the lawsuit entitled *Perez v. Rash Curtis & Associates*, Case No. 4:16-cv-03396-YGR. I make this Declaration in Support of Plaintiff's Motion for an Award of Attorney's Fees, Costs and Expenses, and Service Award for the Class Representative.

2.    I assisted with my lawyers' investigation of this case and provided detailed information about the calls I received from the Defendant.

3.    During the course of the litigation, I kept in regular contact with my lawyers. Specifically, I conferred with them regularly by phone, in multiple in-person meetings, and e-mail to discuss the status of the case. We also discussed case strategy, pending and anticipated motions, the prospects of settlement, the likelihood of this case going through trial, and post-trial strategy.

4.    I spent significant time with my lawyers and on my own preparing to testify at my deposition and at the trial. I have had to sacrifice a tremendous amount of personal and professional time to prosecute this case. For instance, because I am a personal care-taker, I had to travel back and forth from Sacramento (where I live) to Oakland both of the days I appeared at trial.

5.    Based on my interactions and my relationship with my attorneys, I believe they have fairly and adequately represented me and the other class members and will continue to do so.

6.    Throughout this litigation, I understood that, as a Class Representative, I have an obligation to protect the interests of the other class members and not act just for my own personal benefit. I also understand that, although the trial has been won, the case is not over. Defendant will likely file an appeal and may file bankruptcy and, as a result, this case may proceed for a long time before I, my attorneys, and other class members are paid. Nonetheless, I am committed to seeing this case through the end. I have done my best to protect the interests of the other class members and will continue to fairly and adequately represent the class members to the best of my ability.

1      7.      The above statements are of my own personal knowledge, and I make such

2    statements under penalty of perjury under the laws of California and the United States of America.

3

4    Executed September 21, 2019.                    _____

5                                                    Ignacio Perez

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Yeremey O. Krivoshey (SBN 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
         ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (SBN 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO PEREZ, on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RASH CURTIS & ASSOCIATES, <br><br> Defendant. | Case No. 4:16-cv-03396-YGR <br><br> **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEY'S FEES, COSTS AND EXPENSES, AND SERVICE AWARD FOR THE CLASS REPRESENTATIVE** <br><br> Judge:  Yvonne Gonzalez Rogers |

1    On September 9, 2019, the Court entered judgment of $267,349,000 in favor of the Classes.

2   The Court ordered that any motion for attorney's fees, expenses, costs, and service awards shall be

3   filed no later than September 23, 2019 pursuant to Federal Rules of Civil Procedure 23(h)(1) and

4   54(d), and Local Rule 54.  The Court also ordered that notice of any such motion shall be directed

5   to Class Members pursuant to Fed. R. Civ. P. 23(h)(1) and ordered Plaintiff to file a motion for a

6   proposed notice plan in accordance with Fed. R. Civ. P. 23(h)(2).  Now pending before the Court is

7   Plaintiff's Motion for an Award of Attorney's Fees, Cost and Expenses, and Service Award for the

8   Class Representative.

9    The Court, having reviewed the papers filed in support of the Motion, heard arguments of

10   counsel, and good cause appearing therefore, hereby GRANTS Plaintiff's Motion for an Award of

11   Attorney's Fees, Cost and Expenses, and Service Award for the Class Representative and hereby

12   FINDS and Orders as follows:

13    1.    Class Notice was given substantially in the form approved by the Court, and in the

14   manner approved by the Court.  The Notice has been successfully implemented and satisfies the

15   requirements of Fed. R. Civ. P. 23(h)(1).

16    2.    The Court, having considered Class Counsel's request for an award of attorney's

17   fees, hereby GRANTS the request and awards Class Counsel attorney's fees of one-third (33.33%)

18   of the $267,349,000 judgment, in the total amount of $89,116,333.33.  This amount is reasonable

19   under a common fund analysis in light of the circumstances of this case, as addressed below:

20    a.   Class Counsel obtained an extraordinary result for the Class.  Class Counsel

21        obtained a judgment of 100% of the relief sought after a jury trial on the merits;

22    b.   Plaintiff's claims were novel and carried substantial litigation risks.  Defendant

23        vigorously litigated this case and raised numerous significant defenses.  Plaintiff

24        faced significant risk that the class would not be certified, that Defendant would

25        prevail at summary judgment, that his experts would be precluded from testifying at

26        trial under *Daubert*, that *ACA Int'l v. FCC* and *Marks v. Crunch San Diego* would

27

28

change the law with regard to the definitions of Automatic Telephone Dialing System and prior express consent, and other litigation risks;

   c. Class Counsel litigated the case on a contingent-fee basis for more than three years, and has advanced significant out-of-pocket expenses;

   d. It is appropriate to exceed the Ninth Circuit's benchmark award of 25 percent because of the substantial results achieved ($267,349,000 judgment), the risks of class litigation against an able defendant that represented itself vigorously, the significant risks posed at summary judgment and by *ACA Int'l v. FCC* and *Marks v. Crunch San Diego*, the fact that Class Counsel litigated this case for over three years entirely on a contingency fee basis (advancing hundreds of thousands of dollars doing so), and because of the novelty of the claims (believed to be first TCPA case against debt-collector or involving skip-tracing to go to trial).

3. The Court GRANTS Plaintiff's request for reimbursement for reasonable litigation costs and expenses in the amount of $314,179.97 and finds that the costs and expenses were reasonable and necessarily incurred for the benefit of the Class. The expenses and costs shall be paid out of the judgment.

4. The Court GRANTS Plaintiff's request for a service award in the amount of $50,000. Plaintiff's efforts in pursuing this litigation were vital in securing the $267,349,000 judgment for the benefit of the Class. Plaintiff spent significant time dedicated to this litigation, was deposed, and testified live (and was subject to cross-examination) at trial. The service award shall be paid out of the judgment.

**IT IS SO ORDERED.**

Dated: _____

                                    _____
                                    YVONNE GONZALEZ ROGERS
                                    United States District Judge

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEY'S FEES, COSTS AND EXPENSES, AND SERVICE AWARD FOR THE CLASS REPRESENTATIVE
CASE NO. 4:16-cv-03396-YGR

2

# EXHIBIT 11

1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)

2
Yeremey O. Krivoshey (SBN 295032)
1990 North California Blvd., Suite 940

3
Walnut Creek, CA 94596
Telephone: (925) 300-4455

4
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com

5
        ykrivoshey@bursor.com

6
*Attorneys for Plaintiffs*

7

8
UNITED STATES DISTRICT COURT

9
NORTHERN DISTRICT OF CALIFORNIA

10

11
SANDRA MCMILLION, JESSICA
ADEKOYA, and IGNACIO PEREZ, on

12
Behalf of Themselves and all Others
Similarly Situated,

13

14
                              Plaintiffs,

15
        v.

16
RASH CURTIS & ASSOCIATES,

17
                              Defendant.

Case No. 4:16-cv-03396-YGR

**DECLARATION OF YEREMEY
KRIVOSHEY IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO ENFORCE
SETTLEMENT AGREEMENT**

Judge:  Hon. Yvonne Gonzalez Rogers

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF YEREMEY KRIVOSHEY
CASE NO. 4:16-cv-03396-YGR

### DECLARATION OF YEREMEY KRIVOSHEY

I, Yeremey Krivoshey, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., counsel of record for Plaintiffs in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      Beginning in December of 2016, Andrew Steinheimer, Defendant's attorney, and I began preliminary settlement discussions on a class and individual basis.  At all times during these negotiations, I understood that before any agreement was reached, the settlement agreement would need to both (1) be expressly approved by the named Plaintiffs, and (2) reduced to writing and signed by all parties.

3.      Throughout the settlement discussions, neither I nor any other counsel for Plaintiffs has ever "confirmed" that Bursor & Fisher, P.A. does "not currently have another putative class member as a client that [it] intend[s] to re-file."

4.      One January 24, 2017, in an email to Mr. Steinheimer, I wrote, "Andrew, you have an update on the settlement? We need to get this done asap considering that the payment are already getting phased in monthly installments." *See* Ex. 1 at 7-8.  By saying "get this done," I was referring to Mr. Steinheimer's prior offer to "prepare an agreement," as I thought it was clear that the parties did not consider the settlement "done" before a written settlement agreement was executed.  On January 25, 2017, after not receiving a draft settlement agreement from Mr. Steinheimer for roughly two weeks, I again inquired by email whether the parties were still planning on executing a settlement agreement, as it appeared that Defendant continued calling Plaintiff McMillion's cellular telephone in violation of the TCPA even while the parties were negotiating a settlement.

5.      On January 25, 2017, Mr. Steinheimer responded that "[w]e have a deal and you will have the *signed agreement soon*" even though Mr. Steinheimer never even circulated a draft settlement agreement at that time.  On January 26, 2017, I received for the first time an email with an attached draft of a settlement agreement from Mr. Steinheimer.

6.      I have never approved the draft settlement agreement emailed to me by Mr. Steinheimer.  To my knowledge, no party has ever signed the draft settlement agreement that Mr. Steinheimer circulated on January 26, 2017.

7.      The draft settlement agreement contained multiple terms that were never discussed by the parties whatsoever and that I found objectionable.  Indeed, on January 31, 2017, I wrote to Defendant's counsel that Plaintiffs "never agreed on the material terms, and, further, Plaintiffs never even had a chance to provide revisions to the draft agreement."  The most glaring problem was that the draft settlement agreement did not provide for a mutual release of all claims.  Thus, even though Plaintiffs alleged that Defendant was calling them in an attempt to collect debts, the draft agreement circulated by Mr. Steinheimer would not have released any of Defendant's purported claims against the Plaintiffs.  Pursuant to Defendant's proposed release, Defendant would be free to continue its "effort to collect a debt [Ms. Adekoya] purportedly owes for an unpaid doctor's visit."  One of the main reason Plaintiffs brought this suit was to stop Defendant's debt collection practices.  Certainly, the release of Defendant's purported claims against the named Plaintiffs is a material term as to any potential settlement in this case.  The draft agreement likewise does not include a common disparagement clause, another material term.

8.      On February 24, 2017, Bursor & Fisher, P.A. received a check for $10,000 from Defendant purporting to be an installment payment due under a settlement agreement.  I ensured that the check was immediately sent it back to Defendant that same day, informing Defendant that no settlement had been reached.  To my knowledge, neither Bursor & Fisher, P.A. nor any named Plaintiff has received any other payments from Defendant.

9.      Attached hereto as **Exhibit 1** is a true and correct copy of an email thread (email exchanges) between myself and Andrew Steinheimer, spanning from December 12, 2016 to January 31, 2017.

10.      Attached hereto as **Exhibit 2** is a true and correct copy of an email thread (email exchanges) between myself and Andrew Steinheimer, spanning from January 26, 2017 to January 27, 2017.

1       I declare under the penalty of perjury under the laws of the State of California and the

2   United States that the foregoing is true and correct and that this declaration was executed in Walnut

3   Creek, California this 24th day of March, 2017.

4

5                                 _____*/s/ Yeremey Krivoshey*_____

                                 Yeremey Krivoshey

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**



Yeremey Krivoshey <ykrivoshey@bursor.com>

## McMillion v. RCA - confidential settlement communication
26 messages

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Mon, Dec 12, 2016 at 1:08 PM
To: "Yeremey Krivoshey (ykrivoshey@bursor.com)" <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

I have discussed potential settlement with Rash Curtis and at this time, we don't really see a realistic way to settle the case on a class basis. Identifying and providing notice to any putative class is simply not feasible (and a large part of why we do not believe this case will be certified) and I do not believe the Court will approve a notice by publication. However, Rash Curtis is willing to settle on an individual basis with the named plaintiffs on the condition that your office confirms that you do not represent any other putative class members and have no current intent to file a subsequent lawsuit on behalf of some other potential class member. Rash Curtis has authorized me to offer $30,000 to settle the claims globally. How that is divided among the plaintiffs or your firm is not material to RCA. In return for the payment RCA requests a release of all known and unknown claims including a Civil Code 1542 waiver. The case would be dismissed with prejudice as to the named plaintiffs and without prejudice as to any putative class.

Please let me know.


-Andrew Steinheimer


*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com


**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Mon, Dec 12, 2016 at 2:03 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Thanks Andrew. I'll take this to my clients and get back to you.
[Quoted text hidden]
--
Yeremey Krivoshey
Bursor & Fisher, P.A.

1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: ykrivoshey@bursor.com

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>          Tue, Dec 13, 2016 at 9:39 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew:

For the class aspect, I understand that the class as plead would call for a very expensive notice campaign. Before we scrap a class-wide deal altogether, I would propose considering whether we can define the class as those people who received calls from Rash Curtis for whom Rash Curtis obtained their cellphone number through skip tracing. The data you have provided makes clear that Rash Curtis does in fact obtain cellphone numbers for at least some of its accounts using skip tracing. I imagine this class would be significantly more narrow, and likely quite a bit more manageable.

If a class-wide deal is simply off the table, we are willing to lower our offer for an individual settlement to $85,000 for a dismissal with prejudice as to the named plaintiffs and without prejudice as to any putative class.

Please let me know if you want to discuss. Thanks.

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>          Tue, Dec 13, 2016 at 10:23 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

RCA's policy is not to call numbers obtained through skip-tracing with a dialer unless the number is not a cell phone.  There may be numbers that fall through the cracks on that, but I don't see a way of figuring it out with records alone.  I'll discuss that and the counter of $85,000 with Rash Curtis and get back to you soon.


-Andrew Steinheimer



*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com

**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Tuesday, December 13, 2016 9:40 AM
**To:** Andrew Steinheimer
**Cc:** Jennifer Mueller; Amanda Griffith
**Subject:** Re: McMillion v. RCA - confidential settlement communication

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>          Wed, Dec 14, 2016 at 1:27 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremy,

Rash Curtis ups it offer to $37,500 to settle with three named plaintiffs.  Let me know if we can get close.


-Andrew Steinheimer


*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com




**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Tuesday, December 13, 2016 9:40 AM
**To:** Andrew Steinheimer
**Cc:** Jennifer Mueller; Amanda Griffith
**Subject:** Re: McMillion v. RCA - confidential settlement communication


Andrew:

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Wed, Dec 14, 2016 at 1:46 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

At this rate, we'd have to meet in the middle of our offers before I recommended that my clients take the offer. We can cut through the back and forth and get there now if your client is amenable.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Wed, Dec 14, 2016 at 1:49 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

I'll talk to them.  I think it will be difficult to get them to $50k (and I know that's not the middle) but I will see what we can do.


**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Wednesday, December 14, 2016 1:47 PM

[Quoted text hidden]


[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Mon, Dec 19, 2016 at 10:18 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew, did you have a chance to talk to your client about this? I'm getting push back on my side for $50k, but I think we're close. I think $65k would get this done.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Mon, Dec 19, 2016 at 10:20 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

I am not sure which middle you were suggesting, but I have discussed further with RCA and I have convinced them to get to the bottom line and offer $50,000 to settle the case.   However, they will need to make payment towards the settlement and we proposed 10,000 January 15 and $10,000 on the 15th of each month until the $50,000 is paid.  Please let me know, if we can resolve on these terms.


-Andrew Steinheimer


*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com

**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Wednesday, December 14, 2016 1:47 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Mon, Dec 19, 2016 at 10:21 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>

I was just e-mailing you.  I have the $50k,  I don't think I can get more.  Certainly not $65,000.

**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Monday, December 19, 2016 10:19 AM

[Quoted text hidden]

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Mon, Dec 19, 2016 at 10:38 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>

Andrew, we don't normally agree to payment plans for settlements of this size. I'd agree to a payment plan here if it's
$60k though, with the last payment being June 15.
[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Tue, Dec 20, 2016 at 3:36 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>

FYI, I'm going to be out of the office all of next week. I'd like to get this resolved this week if possible so this doesn't
spill over into the next year.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Tue, Dec 20, 2016 at 3:39 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>

Thanks for following-up.  I am working on getting over $50,000 but don't have any more yet.  My client is in and
out this week so I am not sure if I will have any response this week.

**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Tuesday, December 20, 2016 3:37 PM
**To:** Andrew Steinheimer

[Quoted text hidden]

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>            Tue, Jan 3, 2017 at 10:30 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

Rash Curtis is willing to settle this matter for $55,000.  They can pay the $55,000 in payments ending June 15.  In return for release of all claims, dismissal of named plaintiff's claims with prejudice and dismissal of putative class claims without prejudice, with confirmation from your firm that you do not currently have another putative class member as a client that you intend to re-file.

Please let me  know if we have a deal.  Thanks.


-Andrew Steinheimer


*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com

---

**From:** Andrew Steinheimer
**Sent:** Tuesday, December 20, 2016 3:40 PM
**To:** 'Yeremey Krivoshey'
**Subject:** RE: McMillion v. RCA - confidential settlement communication

Thanks for following-up.  I am working on getting over $50,000 but don't have any more yet.  My client is in and out this week so I am not sure if I will have any response this week.


**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Tuesday, December 20, 2016 3:37 PM
**To:** Andrew Steinheimer

[Quoted text hidden]

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Tue, Jan 3, 2017 at 12:45 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew, the deal remains $60k with monthly payments. Please confer with your client and let me know if we have a deal. Thanks.
[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Fri, Jan 6, 2017 at 2:49 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew,

Any update on this?
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Fri, Jan 13, 2017 at 9:07 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Ok, we have a deal on the 60k with payments I'll prepare an agreement.


**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Friday, January 06, 2017 2:50 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Fri, Jan 13, 2017 at 5:46 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Thanks.
[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Tue, Jan 24, 2017 at 9:31 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew, you have an update on the settlement? We need to get this done asap considering that the payments are already getting phased in monthly installments.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                     Wed, Jan 25, 2017 at 2:37 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Just got a call from Plaintiff McMillion saying that she's still getting robodialed daily by Rash Curtis to this day! Not sure how messed up your client's dialer is, but this needs to stop. It's also strengthened her claims significantly. Further, based on our review of the documents, it now appears clear each of the Plaintiffs' phone numbers were obtained through skip tracing. Are we still doing this deal or should I start noticing depos for class cert?

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                             Wed, Jan 25, 2017 at 2:38 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Please let me know what number is being called.  We have a deal and you will have the signed agreement soon.


**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Wednesday, January 25, 2017 2:37 PM
**To:** Andrew Steinheimer

[Quoted text hidden]

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                     Wed, Jan 25, 2017 at 2:40 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

415 632 0589. She said the most recent calls came from 707 454 2010.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                             Wed, Jan 25, 2017 at 4:47 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

Can you give me a time/date of the recent calls?  I want to make sure they stop.  But it appears that the medical provider is continuing to send new accounts to Rash because McMillion is not paying her co-pays.


**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Wednesday, January 25, 2017 2:40 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                     Wed, Jan 25, 2017 at 5:09 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

I can't give you an exact time. I think she said she got one as recently as yesterday though.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>               Wed, Jan 25, 2017 at 5:09 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Ok, I'll look into it.


**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Wednesday, January 25, 2017 5:09 PM

[Quoted text hidden]


[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                      Tue, Jan 31, 2017 at 5:36 PM
To: Amanda Griffith <agriffith@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>

FRE 408 Confidential Settlement Communication

Amanda,

We've been in touch with Steven Kizer, Rash Curtis' former Compliance Director, who I am sure you know well.  He is a treasure trove of information, and obviously knows the ins and outs of Rash Curtis' practice better than any of us, you included. I have zero doubt that a class can be certified with his help.

The settlement draft that was circulated earlier by your firm is unacceptable. Our new settlement offer is $375,000, or, in the alternative, we need to sit down and get a class deal done with a mediator.

We have a class certification deadline quickly approaching, so we need to get a move on this quickly. We'll likely seek an extension to allow us to take discovery in light of all the newly discovered information and to get information that is now apparent has been improperly withheld.

[Quoted text hidden]

**EXHIBIT 2**



Yeremey Krivoshey <ykrivoshey@bursor.com>

## McMillion v. RCA

3 messages

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>       Thu, Jan 26, 2017 at 9:31 AM
To: "Yeremey Krivoshey (ykrivoshey@bursor.com)" <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

Attached is draft settlement agreement please let me know if it is approved and I will have it executed by Rash Curtis.

-Andrew Steinheimer

*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com

 **2017-01-25_Settlement Agt.pdf**
168K

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>       Fri, Jan 27, 2017 at 10:14 AM
To: "Yeremey Krivoshey (ykrivoshey@bursor.com)" <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

Today is my last day with Ellis Law Group. Please follow-up with Amanda Griffith on this case going forward.

-Andrew Steinheimer

---

**From:** Andrew Steinheimer
**Sent:** Thursday, January 26, 2017 9:32 AM

Case 4:16-cv-03396-YGR   Document 35-1   Filed 03/24/17   Page 17 of 17

**To:** Yeremey Krivoshey (ykrivoshey@bursor.com)
**Cc:** Jennifer Mueller; Amanda Griffith
**Subject:** McMillion v. RCA

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                        Fri, Jan 27, 2017 at 10:17 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Will do. Nice working with you.
[Quoted text hidden]
--
Yeremey Krivoshey
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: ykrivoshey@bursor.com

# EXHIBIT 12

VOLUME 5

PAGES 650 - 779

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE**

IGNACIO PEREZ, ON BEHALF )
OF HIMSELF AND ALL OTHERS )
SIMILARLY SITUATED, )
 )
   PLAINTIFFS, ) NO. C-16-3396 YGR
 )
 VS. ) FRIDAY, MAY 10, 2019
 )
RASH CURTIS & ASSOCIATES, ) OAKLAND, CALIFORNIA
 )
 ) JURY TRIAL
   DEFENDANT. )
_____)

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**   BURSOR FISHER, P.A.
      1990 N. CALIFORNIA BLVD., STE. 940
      WALNUT CREEK, CALIFORNIA 94596
     BY: TIMOTHY FISHER, ESQUIRE
      YEREMEY O. KRIVOSHEY, ESQUIRE
      BLAIR REED, ESQUIRE

      BURSOR & FISHER
      2665 S. BAYSHORE DR.
      MIAMI, FLORIDA 33133
     BY: SCOTT A. BURSOR, ESQUIRE

**FOR DEFENDANT:**    ELLIS LAW GROUP LLP
      1425 RIVER PARK DRIVE, STE. 400
      SACRAMENTO, CALIFORNIA 95815
     BY: MARK E. ELLIS, ESQUIRE
      ANTHONY P.J. VALENTI, ESQUIRE
      LARRY IGLESIAS, ESQUIRE

**REPORTED BY:**    DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
      OFFICIAL COURT REPORTER
  TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1    THE DEFENDANT PUT IT UP WITH EVERY WITNESS.  AND IT'S THE

2    ACCOUNT RECORDS FOR A MAN NAMED DANIEL REYNOSO.  THERE IS NO

3    PHONE NUMBER IN THE ACCOUNT RECORDS.  YOU SEE THE PHONE FIELD

4    IS BLANK.

5    AND SO WE GOT THIS A LONG TIME AGO.  WE SAW THIS RECORD.

6    BECAUSE, YOU KNOW, THE CASE HAS BEEN GOING ON FOR A WHILE.

7    THIS CASE DIDN'T START WHEN THE TRIAL STARTED.  IT STARTED

8    ALMOST TWO YEARS AGO -- ALMOST THREE YEARS AGO.

9    IF YOU LOOK AT THE ACCOUNT NOTES....

10    (DISPLAYED ON SCREEN.)

11    YOU'VE GOT NO PHONE NUMBER.  DEFENDANTS SAY THEY DELETED

12    IT.  BUT IF YOU LOOK AT THE -- IF YOU LOOK AT THE HISTORY, YOU

13    SEE THE VERY FIRST THING ON THE ACCOUNT IS REQUESTED ECA

14    ADVANCED TRACE, ASSETS, BANKRUPTCY, SCORE, BANK CARD.  AND

15    THEN AFTER THAT ECA ADVANCED TRACE, THAT'S WHEN THE PHONE

16    CALLS START.

17    NOW, ONE OF THE THINGS THAT HAPPENS IN CASES LIKE THIS IS

18    THE PARTIES ARE SUPPOSED TO EXCHANGE INFORMATION ABOUT THE

19    CASE BEFORE YOU HAVE THE TRIAL.  AND THE PARTIES GET TO ASK

20    EACH OTHER FOR IMPORTANT DOCUMENTS, FOR EXAMPLE.

21    IT'S HOW WE GOT THIS DOCUMENT.  AND WE SAW THIS REQUESTED

22    ECA ADVANCED TRACE.  AND WE SAID, OKAY, IT LOOKS TO US LIKE

23    YOU GOT MR. PEREZ'S NUMBER FROM SKIP-TRACING.  WE WANT TO SEE

24    THAT REPORT.  SHOW US THAT ECA ADVANCED TRACE REPORT.

25    AND THERE WERE AT LEAST THREE OF THE DEFENDANT'S FOUR

1    WITNESSES, AND IT MAY HAVE BEEN ALL FOUR, I JUST CAN'T

2    REMEMBER, THAT TESTIFIED YESTERDAY.  AND THEY CAME IN AND THEY

3    SAID THIS ECA ADVANCED TRACE REPORT, THAT DOESN'T MEAN WE

4    SKIP-TRACED THE PHONE NUMBER.  WHAT THAT REPORT IS, IS WE LOOK

5    UP YOUR MORTGAGE, YOUR ASSETS, YOUR CREDIT SCORE, YOUR BANK

6    CARD, BUT WE DON'T -- THEY GET YOUR MORTGAGE -- THEY GET YOUR

7    MORTGAGE INFORMATION BUT THEY DON'T GET YOUR PHONE NUMBER FROM

8    THAT REPORT.  THAT'S THEIR STORY.

9         NOW, THERE'S A WAY TO CHECK IF THAT'S TRUE OR IF THAT IS

10    FALSE.  THERE IS A WAY TO CHECK THAT.  THE WAY TO CHECK IT IS

11    TO LOOK AT THE ECA ADVANCED TRACE REPORT, BECAUSE THE RECORDS

12    ARE THE RECORDS AND THEY SHOW WHAT THEY SHOW.

13         SO WE ASKED FOR THAT REPORT MANY TIMES.  AND THEY WOULDN'T

14    GIVE IT TO US.  AND WE HAD TO COME TO COURT AND ASK --

15              **MR. ELLIS:**  OBJECTION.

16              **THE COURT:**  I THINK YOU CAN SAY WHAT'S BEEN PRESENTED

17    AT TRIAL AND WHAT HASN'T.

18              **MR. BURSOR:**  DID YOU SEE AN ECA ADVANCED TRACE REPORT

19    FOR MR. REYNOSO OR MR. PEREZ IN EVIDENCE DURING THIS TRIAL?

20    DID YOU SEE THAT?  WHAT EXHIBIT NUMBER WAS THAT?

21         NOW, LET ME ASK YOU THIS -- AND I'M GOING TO GET TO THE

22    CREDIBILITY OF WITNESSES SHORTLY BECAUSE THERE'S A CREDIBILITY

23    PROBLEM WITH SOME OF THE WITNESSES THAT CAME IN HERE AND I

24    THINK YOU SAW THAT.

25         BUT LET ME ASK YOU THIS:  IF YOU WANT TO KNOW IF THIS

1  PHONE NUMBER WAS OBTAINED BY SKIP-TRACING AND YOU HAVE

2  TWO-PLUS YEARS' NOTICE, YOU KNOW THAT QUESTION IS GOING TO BE

3  PRESENTED IN A FEDERAL COURTROOM BEFORE A JUDGE AND A JURY FOR

4  A WEEK, YOU KNOW THAT'S THE QUESTION.  IT'S YOUR REPORT, IT'S

5  YOUR FORM.  WOULDN'T YOU BRING THAT REPORT HERE AND SHOW IT TO

6  YOU?  AND SAY, LOOK, IT HAS HIS MORTGAGE, IT HAS HIS BANK CARD

7  INFORMATION, IT SHOWS WHAT ASSETS HE HAS, BUT IT DOESN'T SHOW

8  HIS PHONE NUMBER.  THAT'S NOT WHERE WE GOT IT.  WOULDN'T YOU

9  DO THAT?

10      SO YOU DIDN'T SEE THAT.  YOU DIDN'T SEE THAT REPORT.

11  INSTEAD YOU HAD FOUR WITNESSES SWEARING THEY GOT HIS MORTGAGE

12  INFORMATION BUT THEY DIDN'T GET HIS PHONE NUMBER.  AND YOU

13  HAVE A BLANK PHONE FIELD ON THE REPORT.

14      SO WE SAY THEY GOT -- WE SAY THEY GOT IT FROM SKIP-TRACING

15  AND HE WAS APPOINTED TO REPRESENT A CLASS OF PEOPLE WHOSE

16  NUMBERS WERE OBTAINED BY SKIP-TRACING.

17              (DISPLAYED ON SCREEN.)

18      SO NOW, I WANT TO COME BACK TO THE MOST IMPORTANT QUESTION

19  ON THE VERDICT FORM.

20      QUESTION 4:  DID RASH CURTIS MAKE CALLS WITH ITS GLOBAL

21  CONNECT DIALER TO CLASS MEMBERS' CELLULAR TELEPHONE NUMBERS

22  OBTAINED THROUGH SKIP-TRACING DURING THE CLASS PERIOD WITHOUT

23  THEIR PRIOR EXPRESS CONSENT?

24      THIS IS WHAT WE HIRED MR. WEIR AND MS. VERKHOVSKAYA AND

25  MR. SNYDER TO HELP US DETERMINE.  DID THAT HAPPEN AND HOW MANY

1    TIMES.

2        AND SO, AGAIN, THERE'S -- EVERY TIME THAT THING MAKES A

3    CALL, THERE'S A RECORD OF THE PHONE CALL AND IT GOES ON THE

4    CALL LOG.  AND IT TOOK A WHILE BUT WE GOT THE CALL LOGS.  AND

5    WHEN WE GOT THEM, WE GAVE THEM TO MR. WEIR.  WE GOT THE

6    ACCOUNT RECORDS.  WE GAVE THEM TO MR. WEIR.  AND HE FOUND THAT

7    RASH CURTIS CALLED NUMBERS IN PHONE FIELDS FIVE THROUGH TEN

8    WITH THE GLOBAL CONNECT DIALER.  THERE WERE 9.7 MILLION TIMES.

9        I WANT TO JUST WALK THROUGH THAT ONE MORE TIME.  I KNOW

10   YOU HAVE SEEN IT OVER AND OVER BUT IT'S IMPORTANT.

11                    (PAUSE IN THE PROCEEDINGS.)

12                    (DISPLAYED ON SCREEN.)

13       I SHOWED YOU THIS SLIDE DURING MY OPENING STATEMENT AND I

14   STICK WITH THE SAME SLIDES.  I DON'T CHANGE MY SLIDES.

15       SO, I TOLD YOU WHAT COLIN WEIR DID.  I TOLD YOU WHAT ANYA

16   VERKOVSKAYA DID.  AND WE HAD THIS OTHER FELLOW RANDY SNYDER

17   THAT WORKED TO HELP US.  AND I HAD TO MAKE A DECISION

18   YESTERDAY.  YOU HEARD THE STORY FROM ME IN OPENING STATEMENT.

19   YOU HEARD IT FROM MR. WEIR FOR THREE HOURS.  YOU HEARD IT FROM

20   MS. VERKHOVSKAYA FOR THREE HOURS.  DID YOU NEED TO HEAR IT

21   AGAIN FROM MR. SNYDER?  AND I DECIDED THAT YOU DIDN'T.  SO WE

22   SENT MR. SNYDER HOME AND HE DIDN'T TESTIFY.

23       SO, I JUST WANT TO ACKNOWLEDGE THAT.  WE DIDN'T PUT

24   MR. SNYDER ON THE STAND.  I DIDN'T THINK WE NEEDED TO, AND I

25   MADE THAT JUDGMENT CALL.

# EXHIBIT 13

# Another District Court Adopts Narrow Statutory Definition of ATDS

## Northern District of Illinois finds random or sequential number generation is required for device to be an autodialer as industry awaits decision in Seventh Circuit appeal on the matter.

9/13/2019 8:00 AMTwitter"FacebookLinkedIn

NewsTCPAAdvocacy



Precedent from the D.C. Circuit's ruling in *ACA International v. FCC* continues to surface as lower courts consider Telephone Consumer Protection Act cases and the definition of an automatic telephone dialing system (ATDS) or autodialer.

Most recently, funds from ACA International's Industry Advancement Program helped provide amicus support in a Seventh Circuit appeal—the outcome of which will likely reverberate around the country.

In *Gadelhak v. AT&T Services, Inc.*, the plaintiff, on behalf of a nationwide class, sued AT&T alleging that AT&T violated the TCPA by using an autodialer to request that customers respond to customer-service related surveys via text message, ACA previously reported.

The parties cross-moved for summary judgment disagreeing over the proper interpretation of the definition for the statutory term "automatic telephone dialing system."

The district court in *Gadelhak* granted AT&T's motion and denied Gadelhak's motion. In its memorandum and opinion, the district court rejected Gadelhak's broad interpretation of an "automatic telephone dialing system" concluding that predictive-dialing devices that lack the capacity to generate numbers either randomly or sequentially, and instead only dial numbers from a predetermined list, do not meet the statutory definition of ATDS.

If the Seventh Circuit affirms the district court's decision, there will be a true circuit split on what qualifies as an "automatic telephone dialing system" pursuant to the statutory definition and paving the way for a review by the U.S. Supreme Court.

Meanwhile, district courts across the country continue to grapple with the issue. Most recently, yet another district court in the Northern District of Illinois opined on this outstanding "what constitutes an ATDS" issue.

Nicole Su, associate at Womble Bond Dickinson, reports in a blog post that the Northern District of Illinois has again ruled "that random or sequential number generation is required for a device to meet the legal definition of an ATDS."

In the case, *Smith v. Premier Dermatology*, Su writes, "the Court held that "an ATDS is a device that (1) stores or produces telephone numbers that (2) were randomly or sequentially generated and (3) dials them automatically."

The court reviewed the decision in *ACA International v. FCC* and its impact on subsequent TCPA cases that focused on the definition of autodialer before concluding, according to the blog post, that an "ATDS requires random or sequential number generation" to fall within the ambit of the TCPA.

Like the *Gadelhak* case, the Northern District of Illinois strayed from the precedent in *Marks v. Crunch San Diego LLC*.

"The court found that the plain meaning of the statutory language defines 'an ATDS as a device that is capable of using randomly or sequentially generated numbers,'" Su reports. "The court also noted that it is the 'present capacity,' not the 'potential capacity' of the device that matters. As such, the court held that because the defendant's system did not have the present capacity to randomly or sequentially generate numbers to dial, it did not qualify as an ATDS."

Read more in Su's article here .

***Related Content from ACA International:***

Are We Getting Closer to Solving the Autodialer Disagreement? (This content is available for members only.)

---

*Follow ACA International on Twitter @ACAIntl and @acacollector, Facebook and request to join our LinkedIn group for news and event updates. ACA International members are welcome to submit news items for possible publication to comm@acainternational.org. Visit our publications page for news submission guidelines and subscriptions to ACA Daily, Collector magazine and Pulse.*

Advertising is available for companies wishing to promote their products or services. Be sure to visit the ACA Events Calendar on the Education and Training page to view our listing of upcoming CORE Curriculum and Hot Topic seminars featuring critical educational opportunities for your company.

---

Subscribe to ACA Daily NEWSROOM



Precedent from the D.C. Circuit's ruling in *ACA International v. FCC* continues to surface as lower courts consider Telephone Consumer Protection Act cases and the definition of an automatic telephone dialing system (ATDS) or autodialer.

Most recently, funds from ACA International's Industry Advancement Program helped provide amicus support in a Seventh Circuit appeal—the outcome of which will likely reverberate around the country.

In *Gadelhak v. AT&T Services, Inc.*, the plaintiff, on behalf of a nationwide class, sued AT&T alleging that AT&T violated the TCPA by using an autodialer to request that customers respond to customer-service related surveys via text message, ACA previously reported.

The parties cross-moved for summary judgment disagreeing over the proper interpretation of the definition for the statutory term "automatic telephone dialing system."

The district court in *Gadelhak* granted AT&T's motion and denied Gadelhak's motion. In its memorandum and opinion, the district court rejected Gadelhak's broad interpretation of an "automatic telephone dialing system" concluding that predictive-dialing devices that lack the capacity to generate numbers either randomly or sequentially, and instead only dial numbers from a predetermined list, do not meet the statutory definition of ATDS.

If the Seventh Circuit affirms the district court's decision, there will be a true circuit split on what qualifies as an "automatic telephone dialing system" pursuant to the statutory definition and paving the way for a review by the U.S. Supreme Court.

Meanwhile, district courts across the country continue to grapple with the issue. Most recently, yet another district court in the Northern District of Illinois opined on this outstanding "what constitutes an ATDS" issue.

Nicole Su, associate at Womble Bond Dickinson, reports in a blog post that the Northern District of Illinois has again ruled "that random or sequential number generation is required for a device to meet the legal definition of an ATDS."

In the case, *Smith v. Premier Dermatology*, Su writes, "the Court held that "an ATDS is a device that (1) stores or produces telephone numbers that (2) were randomly or sequentially generated and (3) dials them automatically."

The court reviewed the decision in *ACA International v. FCC* and its impact on subsequent TCPA cases that focused on the definition of autodialer before concluding, according to the blog post, that an "ATDS requires random or sequential number generation" to fall within the ambit of the TCPA.

Like the *Gadelhak* case, the Northern District of Illinois strayed from the precedent in *Marks v. Crunch San Diego LLC*.

"The court found that the plain meaning of the statutory language defines 'an ATDS as a device that is capable of using randomly or sequentially generated numbers,'" Su reports. "The court also noted that it is the 'present capacity,' not the 'potential capacity' of the device that matters. As such, the court held that because the defendant's system did not have the present capacity to randomly or sequentially generate numbers to dial, it did not qualify as an ATDS."

Read more in Su's article here .

***Related Content from ACA International:***

Are We Getting Closer to Solving the Autodialer Disagreement? (This content is available for members only.)

---

*Follow ACA International on Twitter @ACAIntl and @acacollector, Facebook and request to join our LinkedIn group for news and event updates. ACA International members are welcome to submit news items for possible publication to comm@acainternational.org. Visit our publications page for news submission guidelines and subscriptions to ACA Daily, Collector magazine and Pulse.*

Advertising is available for companies wishing to promote their products or services. Be sure to visit the ACA Events Calendar on the Education and Training page to view our listing of upcoming CORE Curriculum and Hot Topic seminars featuring critical educational opportunities for your company.

---

Subscribe to ACA Daily NEWSROOM

Advertisement



Starting a *Business* is hard.

Call us today and ask about our special programs for startup companies.

**DEBT NET**
800-552-8397 • www.debtnet.cc

Loading...

**EXHIBIT 14**

⚑ KeyCite Blue Flag – Appeal Notification

Appeal Filed by ALI GADELHAK v. AT&T SERVICES, INCORPORATED, 7th Cir., April 19, 2019

2019 WL 1429346
Only the Westlaw citation
is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Ali GADELHAK, on behalf
of himself and all others
similarly situated, Plaintiff,
v.
AT&T SERVICES, INC., Defendant.

No. 17-cv-01559
|
Signed 03/29/2019

## Attorneys and Law Firms

Michael S. Hilicki, Timothy J. Sostrin, Keith James Keogh, Keogh Law, Ltd., Chicago, IL, for Plaintiff.

Hans J. Germann, Mayer Brown LLP, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

Honorable Edmond E. Chang, United States District Judge

**\*1** Plaintiff Ali Gadelhak brought this proposed class action after he received automated text messages from Defendant AT&T Services, Inc. (AT&T), allegedly in violation of the Telephone Consumer Protection Act (TCPA). [1] Gadelhak and AT&T now cross-move for summary judgment. The motions present the parties' disagreement over the proper definition of the statutory term "automated telephone dialing system," and whether AT&T employed one when it sent text messages to Gadelhak and others. For the reasons explained below, the Court grants AT&T's motion and denies Gadelhak's motion.

[1] This Court has subject matter jurisdiction over the case under 28 U.S.C § 1331 and 29 U.S.C § 1132.

## I. Background

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So when the Court evaluates Gadelhak's summary judgment motion, AT&T gets the benefit of reasonable inferences; conversely, when evaluating AT&T's motion, the Court gives Gadelhak the benefit of the doubt.

AT&T is a major telecommunications corporation. R. 22, Answer ¶¶ 6, 7. Since around 2015, AT&T has engaged in a program called the AT&T Customer Rules Feedback Tool, also known (at least to the parties) as "TACRFT." R. 70.8, Lyon Dep. at 12:9-12; R. 52.2, Lyon Dec. ¶ 2. According to AT&T, the program sends surveys to customers of its corporate affiliates—DIRECTV, for example—via text message in order to assess customers' recent interactions with service representatives. Lyon Dec. ¶¶ 2-4. At the end of each survey, AT&T also includes an advertisement for its smartphone application, MyAT&T. R. 70.5, Abel Dep. at 69:21-25.

AT&T employs an automated process to select the numbers to which it sends the TACRFT surveys. First, a computer system for each AT&T affiliate identifies customer accounts that have engaged in qualifying transactions with a customer service representative. Lyon Dep at 35:7-13, 36:15-37:13; Lyon Dec. ¶ 5. Then, each of those computer systems sends a list of the phone numbers associated with each flagged account to AT&T's Market Research Organization for further processing. Lyon Dep. at 139:21-24. The list of these phone numbers is known as the Gross Sample List. *Id.* at 139:21-140:6. This list includes every phone number associated with a flagged account, rather than just the phone number that engaged in the qualifying transaction. Lyon Dep. at 21:6-22:2; R. 74, Def.'s Resp. PSOF ¶¶ 7, 8. Once the Gross Sample List is compiled, a computer system within the Market Research Organization narrows down the list to one number for each account by (1) removing any non-cellular numbers; and (2) selecting the first cellular number listed for each account. Lyon Dep. at 140:7-25; R. 74.3, Lyon Dec. II ¶¶ 3-6. This pared-down list is then sent to AT&T's outside vendor, Message Broadcast, who sends out pre-programmed text-message surveys previously drafted by AT&T. Lyon Dep. at 57:14-16, 130:13-20; R. 70.7, Joiner Dep. at 63:6-12. It is undisputed that a computer, not a human, compiles the list of telephone numbers to which these surveys are directed. Def.'s Resp. PSOF ¶¶ 9-11.

**\*2** Plaintiff Ali Gadelhak lives in Chicago, Illinois and is not a customer of AT&T or any AT&T affiliate. R. 70.9, Gadelhak Dep. at 81:7-82:4, 84:2-85:14; Def.'s Resp. PSOF ¶

38. Gadelhak registered his cell phone number with the Do Not Call list in May 2014. Gadelhak Dep. at 76:12-77:24. Nonetheless, in July 2016, Gadelhak received five text messages from AT&T asking survey questions in Spanish. Lyon Dec., Ex. A, Gadelhak Call Log; Gadelhak Dep., Ex. 33. AT&T insists that TARCRFT is designed to send text messages only to AT&T customers, so Gadelhak's number must have been erroneously listed on an AT&T account. Lyon Dec. ¶ 5; Def.'s Resp. PSOF ¶ 41.

In February 2017, Gadelhak brought this proposed class action against AT&T for violations of the Telephone Consumer Protection Act. Gadelhak alleges that AT&T "negligently, knowingly, and/or willfully contacted" him via text message using an automated telephone dialing system (ATDS) "without his prior consent." R. 20, Compl. ¶ 1. He also alleges that AT&T did the same to others, on whose behalf Gadelhak brings class allegations. *Id.* ¶¶ 34, 35, 39. Both parties now move for summary judgment, content to litigate class certification (if Gadelhak were to prevail) after a decision on summary judgment. In its motion, AT&T asserts that it did not use an ATDS to send a text message to Gadelhak and thus did not violate the TCPA. R. 51, Def.'s Br. at 1. For his part, Gadelhak asks the Court to declare as a matter of law that AT&T's TACRFT system employs an ATDS. R. 71, Pl.'s Br. at 1-2. Much of the parties' dispute boils down to whether the D.C. Circuit's opinion in *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) nullified previous FCC orders defining the term ATDS and, if so, what is the proper definition of that statutory term under the plain language of the TCPA.

*Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[2] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

[2]  This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up*

## III. Analysis

### A. Statutory and Regulatory History of the TCPA

To start, it is necessary to set forth the TCPA's framework. Enacted in 1991, the TCPA generally prohibits making calls using "any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). The statute defines ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." § 227(a)(1). This general prohibition has three exceptions: (1) calls made with "prior express consent;" (2) emergency calls; and (3) calls made to collect government debts. § 227(b)(1)(A).

**\*3** The FCC has the authority to promulgate regulations implementing the TCPA. *See ACA International*, 885 F.3d at 693. In 2003, the FCC promulgated regulations that interpreted the term ATDS to include "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* (2003 Order), 18 FCC Rcd. 14014, 14091-93 ¶¶ 131-133 (2003). The Commission referred to these types of devices as "predictive dialers" and explained that they have "the capacity to store or produce numbers and dial those numbers at random, in sequential

order, or from a database of numbers." *Id.* at 14091 ¶ 131. According to the 2003 Order, telemarketers may have primarily relied on dialing equipment "to create and dial 10-digit telephone numbers arbitrarily" in the past, but "to exclude ... equipment that use[s] predictive dialing software from the definition of [ATDS] simply because it relies on a *given* set of numbers would lead to an unintended result." *Id.* at 14092 ¶¶ 132, 133 (emphasis added). The Commission reasoned that it made little sense to permit calls to "wireless numbers ... when the dialing equipment is paired with predictive dialing software and a database of numbers," but prohibit calls "when the equipment operates independently of such lists and software packages." *Id.* ¶ 133.

The Commission affirmed this interpretation in 2008, explaining that the 2003 Order "found that, based on the statutory definition of [ATDS], the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress." *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2008 Declaratory Ruling"), 23 FCC Rcd. 559, 566 ¶ 13 (2008). Although a party to the 2008 proceeding urged the FCC to find that a "predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," *id.* at 566 ¶ 12 (emphasis added), the Commission disagreed, stating that nothing presented by the party "warrant[ed] reconsideration of [the 2003] findings." *Id.* at 567 ¶ 14.

Seven years later, the Commission revisited and again reaffirmed its earlier take: "predictive dialers, as previously described by the Commission, satisfy the TCPA's definition of 'autodialer.' " *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* (2015 Declaratory Ruling), 30 FCC Rcd. 7961, 7972 ¶ 10 (2015). The Commission compared predictive dialers to dialers that "utilize random or sequential numbers instead of a list of numbers" and stated that both "retain the capacity to dial thousands of numbers in a short period of time." *Id.* at 7973 ¶ 14. In the Commission's view, any device that "generally has the capacity to store or produce, and dial random or sequential numbers ... even if it is not presently used for that purpose, including when the caller is calling a set list of consumers," met the definition of "autodialer" under the TCPA. *Id.* at 7972 ¶ 10.

**\*4** Under the Hobbs Act, this Court, sitting as a district court, does not have the authority to invalidate the FCC's rulings, because "[t]he court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or to determine the validity of all final orders of the [FCC]." 28 U.S.C. § 2342(1); *see also* 47 U.S.C. § 402(a) (making § 2342(1) applicable to FCC regulations promulgated under the TCPA); *Blow v. Bijora*, 855 F.3d 793, 802 (7th Cir. 2017).[3] In *ACA International*, however, the D.C. Circuit consolidated several Hobbs Act petitions for review of the 2015 Declaratory Ruling and invalidated the Commission's interpretation of ATDS, because it "fail[ed] to satisfy the requirement of reasoned decisionmaking." 885 F.3d at 703. The D.C. Circuit explained that the 2015 Declaratory Ruling adopted two

irreconcilable definitions of the term ATDS: "A basic question raised by the statutory definition is whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed. Or is it enough if the device can call from database of telephone numbers generated elsewhere? The Commission's ruling appears to be of two minds on the issue." *Id.* at 701 (emphasis in original). Despite this holding, the D.C. Circuit declined to define ATDS in its own terms, but stated that it was permissible for the Commission to adopt either interpretation. "But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order." *Id.* at 703. So the D.C. Circuit invalidated the 2015 Declaratory Ruling.

3    The Supreme Court is considering this interpretation of the Hobbs Act in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, No. 17-1705 (oral argument heard on March 25, 2019). That particular dispute does not impact the Court's holding here.

## B. *ACA International*'s Scope

In this case, neither party disputes that the Commission's 2015 Declaratory Ruling was overturned and invalidated by *ACA International*. Def.'s Br. at 8; Pl.'s Br. at 15. AT&T, however, argues that the opinion also invalidated the Commission's prior rulings defining ATDS, Def,'s Br. at 8-11, while Gadelhak asserts that the case's holding is limited to the 2015 Declaratory Ruling, Pl.'s Br. at 15-20. A close read of *ACA International* and the 2015 Declaratory Ruling make clear that AT&T has the better argument.

It is true that the petitions in *ACA International* sought review only of the 2015 Declaratory Ruling, but the petitions zeroed-in on four specific aspects of the order. *ACA International*, 885 F.3d at 693-94. Most pertinent to this case was the Commission's interpretation of what functions a system needs to have in order to qualify as ATDS. On that question, the Commission argued "that the issue was resolved in prior agency orders— specifically, declaratory rulings in 2003 and 2008," and that it was too late to "raise a challenge [to those orders] by seeking review of a more recent declaratory ruling that essentially ratifies the previous ones." *Id.* at 701. The D.C. Circuit disagreed and proceeded to review all "pertinent pronouncements" from the Commission on the subject. *Id.* The court determined that "[t]he agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform," and then also set aside the Commission's "treatment" of the qualifying functions of an ATDS. *Id.* at 701, 703.

The Commission's own language in the 2015 Declaratory Ruling also bolsters the interpretation that *ACA International* nullified the FCC's previous pronouncements defining ATDS. The 2015 Declaratory Ruling states that the Commission "reaffirm[s]" previous statements, and refers specifically to the 2003 Declaratory Ruling. 2015 Declaratory Ruling, 30 FCC Rcd. at 7971 ¶ 10 & n. 39; *see also ACA International*, 885 F.3d at 694 ("The Commission reaffirmed prior orders deciding that 'predictive dialers'—equipment that can dial automatically from a given list of telephone numbers using algorithms to predict 'when

a sales agent will be available'—qualify as autodialers.").

Moreover, the D.C. Circuit's concern in *ACA International*—that the 2015 Declaratory Ruling, "in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking"—equally applies to the 2003 and 2008 orders. 885 F.3d at 703. The 2003 Order made clear that the Commission saw a difference between generating and dialing random or sequential numbers, on the one hand, and dialing from a list of numbers on the other. 2003 Order, 18 FCC Rcd. at 14092 ¶ 132; *see also ACA International*, 885 F.3d at 702. But it then went on to state that, "to exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result." *Id.* at 14092 ¶ 133. The 2008 Declaratory Ruling held the same, as it simply "affirm[ed]" the interpretation of ATDS promulgated in the 2003 Order. 2008 Declaratory Ruling, 23 FCC Rcd. at 566 ¶ 12. With the Commission's repeated affirmations of the prior orders, this Court holds, as other courts in this District have, that *ACA International* invalidated the Commission's understanding of the term ATDS as articulated in the 2015 Declaratory Ruling, as well as the 2008 Declaratory Ruling and the 2003 Order. *See Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 935 (N.D. Ill. 2018); *Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d 1159, 1161 (N.D. Ill 2018).

## C. Defining ATDS Under the TCPA

**\*5** Because *ACA International* invalidated the Commission's prior orders defining the term ATDS—and also declined to articulate their own definition of the term—the Court moves on to interpreting the TCPA unburdened by the Commission's definitions. Here, the pertinent question is really whether predictive-dialing devices that lack the capacity to generate numbers either randomly or sequentially, and instead only dial numbers from a predetermined list, meet the statutory definition of ATDS. AT&T argues that the statutory text dictates a "no" answer, Def.'s Br. at 11-13, while Gadelhak asserts that a device "that *stores* telephone numbers to be called and automatically dials those numbers falls within [the] statutory definition," Pl.'s Br. at 6 (emphasis in original).

The Court "must begin with [the TCPA's] text and assume that the ordinary meaning of that language accurately expresses the legislative purpose." *Our Country Home Enters., Inc. v. Comm'r*, 855 F.3d 773, 791 (7th Cir. 2017) (interpreting 28 U.S.C. § 6330(c)(4)(A) ) (cleaned up). In other words, the Court must give the TCPA its plain meaning. *Coleman v. Labor & Indus. Review Comm'n of Wis.*, 860 F.3d 461, 473 (7th Cir. 2017). To do so, the Court begins with "the language of the statute itself," attending to "the specific context in which that language is used." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077 (7th Cir. 2013) (cleaned up) (quoting *McNeill v. United States*, 563 U.S. 816, 819 (2011) ). And it must "accord words and phrases their ordinary and natural meanings and avoid rendering

them meaningless, redundant, or superfluous." *Scherr*, 703 F.3d at 1077 (cleaned up).

Under the TCPA, an ATDS has "the capacity to store or produce telephone numbers to be called, using a random or sequential number generator," and then call the numbers. 47 U.S.C. § 227(a)(1). Gadelhak asserts that the phrase "using a random or sequential number generator" modifies only the verb "produce," and has no effect on the verb "store." Pl.'s Br. at 7. Gadelhak cites to the Ninth Circuit opinion in *Marks v. Crunch San Diego, LLC* to support this argument. *Id. (*citing 904 F.3d 1041, 1051-52 (9th Cir. 2018) ). In *Marks*, the Ninth Circuit defined ATDS as "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers." 904 F.3d at 1053. The court came to this conclusion after examining § 227(a)(1), other provisions of the TCPA, and the legislative history of the statute. *Id.* at 1050-53. This Court respectfully disagrees with the Ninth Circuit's holding in *Marks* and Gadelhak's argument here.

At the outset, Gadelhak's reading of § 227(a)(1) is difficult to square with the plain language of that provision. Both "store" and "produce" are transitive verbs, meaning both require an object. *Pinkus*, 319 F. Supp. 3d at 937-38. Here, that object is "telephone numbers to be called." § 227(a)(1). And the phrase "using a random or sequential number generator" modifies neither "store" nor "produce," but instead actually modifies "telephone numbers to be called." *Id.* This is evidenced by the phrase's position immediately after "telephone numbers to be called." *Id.* Put another way, the most

sensible reading of the provision is that the phrase "using a random or sequential number generator" describes a required characteristic of the *numbers* to be dialed by an ATDS—that is, *what* generates the numbers.

To resist this interpretation, Gadelhak points to other provisions in the TCPA. As he discusses in his brief, there are two exceptions to the prohibition against automated calls that, it is true, do lead one to question whether calls dialed from a predetermined list are covered. Pl.'s Br. at 8-10. First, there is an exception for calls made with the prior consent of the called party. 47 U.S.C. § 227(b)(1)(A). Gadelhak, citing *Marks*, argues that there is no way to take advantage of this exception without dialing from a list of telephone numbers belonging to consenting individuals. Pl.'s Br. at 9 (citing *Marks*, 904 F.3d at 1051). Put another way, the exemption seems to imply that calling from a predetermined list of numbers qualifies a device as an ATDS, but that when the list is of those individuals who have given their consent, it is exempted from the prohibition. What Gadelhak overlooks though, is that the consent exception is drafted in such a way that it also applies to calls made using an artificial or prerecorded voice—not just those made using an ATDS. 47 U.S.C. § 227(b)(1)(A). So the consent exception still does have an effect—it does not suffer the embarrassment of being nugatory—even if ATDS does not cover systems that dial from preset lists. The consent exception does not undermine the non-preset-list interpretation of ATDS.

**\*6** The second exception on which Gadelhak relies is for calls "made solely to collect a debt owed to or guaranteed by the United

States." 47 U.S.C. § 227(b)(1)(A)(iii). But the same reasoning applies to undermine the persuasiveness of the inference to be drawn from this exception: it also applies to calls made with an artificial or prerecorded voice. 47 U.S.C. § 227(b)(1)(A). So, again, the federal-debt exception can co-exist with a definition of ATDS that does not cover calls to a preset list.[4]

[4]   It must also be said that, as time marches on and Congress adds to and amends a statutory framework in piecemeal provisions, at some point it is not surprising that provisions are added as fail-safe measures to broadly prevent the statute's application in a particular setting. This might be an instance where Congress simply wanted to guarantee that the TCPA, which set a statutory damages minimum for violations (and per violation), would never be applied to attempts to collect a debt owed to the federal government.

Similarly, Gadelhak's argument that Congress ratified the Commission's construction of the TCPA when it added the federal-debt exception in 2015, but left the definition of ATDS unchanged, is insufficient to overcome the plain meaning of the statutory definition of ATDS. The D.C. Circuit's review of the 2015 Declaratory Ruling was already pending at the time of Congress's amendment. *See ACA v. FCC*, Case No. 15-1211 (D.C. Cir.), Dkt. No. 1 (July 10, 2015) (Petition for Review); Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 588 (Nov. 2, 2015). As a result, there was no "consistent judicial construction" at the time of the amendment, precluding any conclusions about Congress's approval of the Commission's interpretation of the statute. *See Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 350-51 (2005).

Gadelhak's final argument is that the Court's reading of § 227(a)(1) renders the word "store"

superfluous, "because any number that is stored using a random or sequential number generator must logically also have been produced using a random or sequential number generator." Pl.'s Br. at 11. At the outset, even if this were true, it would not, by itself, justify disregarding the plain meaning of the provision. "The canon against surplusage is not an absolute rule." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). More important, the Court's interpretation does not actually render "store" superfluous. The word's presence in the provision ensures that systems that generate numbers randomly or sequentially, but then store the numbers for a period of time before dialing them later after a person has intervened to initiate the calls, are still covered by the statutory definition of ATDS. All in all, none of Gadelhak's arguments are persuasive; instead, the numbers stored by an ATDS must have been generated using a random or sequential number generator.

### D. Application to AT&T's TACRFT Program

Gadelhak concedes that the system employed by AT&T for its TACRFT program "generates a list of telephone numbers to be called via automated computer processes." Pl.'s Br. at 12. Based on this description, AT&T's system is not an ATDS as defined in the statute. Gadelhak makes the additional argument, though, that "AT&T's dialing system also uses a random number generator to produce telephone numbers to be called." *Id.* at 13. In support of this assertion, Gadelhak cites to deposition testimony from AT&T's Director-Market Research & Analysis, Kerry Lyon. *Id.*;

Lyon Dep. at 141:22-143:19; Lyon Dec. ¶ 1. Lyon stated that, when AT&T's system was confronted with an account that had more than one cellular phone number listed, he was not sure how the system chose which cellular number to call: "[I]t could be randomized, I'd have to look at the code." Lyon Dep. at 143:16-17. Gadelhak latched onto this comment as proof that AT&T's system was generating telephone numbers randomly. Lyon, however, later submitted a declaration in which he clarified that the AT&T system "selects the first eligible wireless number to send the survey system." Lyon Dec. II ¶ 5.

**\*7** Even so, Gadelhak continued to argue that Lyon's testimony was proof that AT&T's system at least had *the capacity* to generate numbers randomly, because it was able to "randomly" select numbers to dial from the compiled list of accounts. Pl.'s Br. at 13 ("Plaintiff pointed to the deposition testimony of Kerry Lyon, who testified that when the initial list of telephone numbers contains multiple telephone numbers for the same account, the computer randomly selects one of those numbers to receive the text message and thus randomly generates that number for dialing."). But the D.C. Circuit already explained that numbers must necessarily "be called in *some* order—either in a random or

some other sequence." *ACA International*, 885 F.3d at 702 (emphasis in original). Accordingly, the phrase "using a random or sequential number generator" would be meaningless if it simply referred to the order in which calls were made. Moreover, the organization of the provision does not support a reading where "using a random or sequential number generator" refers to the order numbers from a list are dialed. Otherwise, the provision would read "to store or produce telephone numbers to be called; and to dial such numbers, using a random or sequential number generator." Based on the record evidence, there is no genuine dispute that AT&T's system cannot *generate* telephone numbers randomly or sequentially— as those terms are used in the TCPA—and thus it is not an ATDS and is not prohibited.

### IV. Conclusion

For the reasons discussed, Gadelhak's motion for partial summary judgment is denied and AT&T's motion for summary judgment is granted. Final judgment shall be entered. The status hearing of April 4, 2019 is vacated.

### All Citations

Slip Copy, 2019 WL 1429346

---

# EXHIBIT 15

🏴 KeyCite Blue Flag – Appeal Notification

Appeal Filed by MARIAN SNOW v. GENERAL ELECTRIC COMPANY, 4th Cir., July 11, 2019

2019 WL 2500407
Only the Westlaw citation
is currently available.
United States District
Court, E.D. North Carolina,
Western Division.

Marian SNOW, Plaintiff,

v.

GENERAL ELECTRIC COMPANY,
Dell Technologies, Dell Inc.,
and Dell EMC, Defendants.

No. 5:18-CV-511-FL
|
Signed 06/14/2019

**Attorneys and Law Firms**

Marian Snow, Tuscaloosa, AL, pro se.

Jonathan A. Berkelhammer, Ellis & Winters LLP, Greensboro, NC, Wesley B. Gilchrist, Jeffrey P. Doss, Brooke G. Malcom, Lightfoot, Franklin & White, LLC, Birmingham, AL, for Defendant General Electric Company.

Adam P. Plant, Battle & Winn LLP, Birmingham, AL, Cassandra Kerkhoff Johnson, Pro Hac Vice, Derin B. Dickerson, Alston & Bird LLP, Atlanta, GA, Kendall Lee Stensvad, Ryan P. Ethridge, Alston & Bird LLP, Raleigh, NC, for Defendants Dell Technologies, Dell Inc., Dell EMC.

ORDER

LOUISE W. FLANAGAN, United States District Judge

**\*1** This matter is before the court on defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 65, 68). Plaintiff responded in opposition and defendants replied. In this posture, the issues raised are ripe for ruling. For the following reasons, defendants' motions are granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this action pro se on November 21, 2017, in the United States District Court for the Northern District of Alabama, and filed amended complaint on December 6, 2017, asserting claims arising out of unwanted text messages she received on her cell phone, for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii), and for conversion under state law. Plaintiff seeks statutory damages in the amount of $500.00 for each violation of the TCPA, trebled to $1,500.00 for each violation; compensatory damages and punitive damages for conversion; injunctive and declaratory relief; as well as fees, costs, and interest.

The United States District Court for the Northern District of Alabama dismissed plaintiff's action for lack of personal jurisdiction over defendants and transferred the action to this district for all further proceedings, on October 29, 2018. This court set a deadline for filing responsive pleading and set aside previous scheduling order entered by the

United States District Court for the Northern District of Alabama.

Defendant General Electric Company ("GE") filed its instant motion to dismiss for failure to state a claim on December 7, 2018, relying upon a May 14, 2018, public notice by the United States Federal Communications Commission ("FCC"), and an October 3, 2018, public notice by the FCC. Defendants Dell EMC, Dell Inc., and Dell Technologies (collectively, the "Dell defendants") filed their instant motion to dismiss for failure to state a claim on December 10, 2018. Plaintiff responded in opposition to each motion to dismiss on January 23, 2019. Defendant GE replied on February 6, 2019, and the Dell defendants replied on February 7, 2019.

### STATEMENT OF ALLEGED FACTS

The facts alleged in the complaint [1] may be summarized as follows.

[1] All references to the "complaint" or "Compl." in citations are to the amended complaint filed December 6, 2017 (DE 4), unless otherwise specified.

Plaintiff is a resident of Tuscaloosa, Alabama. Defendants GE and Dell EMC are corporations headquartered in Massachusetts, and defendants Dell Technologies, Inc. and Dell, Inc. are corporations headquartered in Texas. According to the complaint, defendant GE is "the world's largest digital industrial company," and the Dell defendants "provide[ ] essential [technological] infrastructure to 98 percent of the Fortune 500." (Compl. ¶¶ 62, 68).

"On March 29, 2014, [p]laintiff purchased a new cellular telephone provided by the service Tracfone, who assigned a telephone number ending in 4908 ('[p]laintiffs cell phone')." (Compl. ¶ 12). "Plaintiff activated her new cell phone, which had been purchased along with an airtime or prepaid minutes package from said service, Tracfone, within a short time thereafter." (Id. ¶ 13).

**\*2** "At some unknown time, prior to or around April 1,2014, [d]efendants caused or facilitated the composition, programming, system implementation, and automated or automatic transmission or sending through any of multiple technologies or business applications, including Internet-to-phone messaging technologies, text calls, or short message service ('SMS') calls ('[d]efendants' text messages') to the subject [p]laintiff's cell phone number ending in 4908." (Id. ¶ 14). "Defendants took the actions necessary to initiate a communication with [p]laintiff through use of her telephone number by an automated means that did not require direct human intervention and which resulted in the receipt of text messages by [p]laintiff's cell phone." (Id. ¶ 15).

Between April 1, 2014, and January 15, 2015, defendants sent in excess of 2900 text messages to plaintiff's cell phone. (Id. ¶ 43). "The content of [d]efendants' text messages contained technical information or alerts that were clearly intended for another recipient." (Id. ¶ 44). "It is [p]laintiff's good faith belief that she was, for [that] period[,] ... the unwitting recipient of a barrage of communications intended for the prior owner or holder of her reassigned number." (Id.

¶ 49). According to plaintiff, a "text message intended for an internal business or industrial communication, or as a remote alert to an employee[ ] or agent[ ], can be sent to a reassigned number" or "an incorrectly entered or generated number" and "potentially reach a member of the public." (Id. ¶¶ 51-52).

"The technical information or alerts contained in [d]efendants' text messages included, but were not limited to: 'FRM:EMC Control Center@e2ksmtpOLe2k.ad.ge.com'; 'SUBJ:ECC Alert: SRDF/A'; 'Session entered transmit idle state'; 'Alert ID: 1854732'; 'Severity: NORMAL'; 'Severity: WARNING'; 'Server Timestamp: Mon Aug 25 02:19:14 BST 2014'; 'Alert Name: PC Communications Error'; 'Canonical Managed Object Name: Symmetrix=00287890995'; 'stent.symmetrix.Symmetrix, 38380'; 'NAME: Storage Agent'; and 'gislonpeccsym.gis.corp.ge.com'." (Id. ¶ 48).

According to plaintiff, defendant GE is "the owner of the URL or web address: 'ge.com', which was referenced in [d]efendants' text messages." (Id. ¶ 58). Defendant Dell EMC allegedly produces and "owns the registered trademarks for 'EMC', 'Symmetrix', and 'SRDF,' " as also referenced in defendants' text messages. (Id. ¶¶ 59-61). According to plaintiff, based upon her research, the Dell defendants and GE had an ongoing technology or collaborative relationship during the period of time she received text messages from defendants. (See id. ¶¶ 62-67).

"The number that was displayed in the 'FROM' address in [d]efendants' text messages was 10-digits long. ('Sender ID')." (Id. ¶ 32).

"Defendants' text message sent on April 30, 2014 at 7:16am displayed a Sender ID of '1210100022' and another that was received that day at 9:37am display[ed] a Sender ID of '1210100025'." (Id. ¶ 33). Another received August 19, 2014, "displayed a Sender ID of '1210100270'." (Id. ¶ 34). "[T]he Sender IDs appeared to be sequential and to change or increase by one digit with each text message [p]laintiffs' cell phone received." (Id. ¶ 35).

According to plaintiff, "long SMS messages are sent using multiple messages, in which case each message will start with a User Data Header ("UDH") containing segmentation information." (Id. ¶ 37). "Defendants' text messages, as received by [p]laintiff's cell phone, were delivered as a batch of five ... text messages, the first holding the Sender ID followed by a UDH, in this manner: 'FROM 1210100265 — 1 of 5'." (Id. ¶ 38). "The four ... successive separate [d]efendants' text messages, sent in the batch of five ..., usually carried a UDH, such as '2 of 5', '3 of 5', '4 of 5', or '5 of 5'." (Id. ¶ 39).

**\*3** "On May 4, 2014 at 8:19pm, [p]laintiff's cell phone received seven ... unique and date-branded [d]efendants' text message batches within one single minute." (Id. ¶ 44). "Within said single minute at 8:19pm on May 4, 2014, Plaintiffs cell phone had, in fact, been deluged with [35] separate text messages[.]" (Id. ¶ 45). "On September 24, 2014, a day when [d]efendants' text message batches sent to [p]laintiff's cell phone numbered [39] or more within 24-hours, [d]efendants inflicted [p]laintiff's cell phone with no less than [195] text messages[.]" (Id. ¶ 46).

"Each batch of [d]efendants' text messages received by Plaintiff's cell phone deducted charges for five ... separate texts from her prepaid minutes." (Id. ¶ 40). For example, texts received on May 4, 2014, resulted in 35 text message charges, and texts received on September 24, 2014, resulted in 195 text message charges. (See id. ¶¶ 45-46).

"Defendants' text messages omitted, or failed to provide, an interactive 'opt-out' mechanism or any means for [p]laintiff to ask that they stop." (Id. ¶ 54). "Defendants' text messages were sent in such a manner as to block or disallow replies, leaving [p]laintiff powerless," through such means, "to reply, object, or ask that they stop." (Id. ¶ 55). "Defendants' text messages omitted, or failed to identify, a working telephone number of the sender, or to provide contact information to allow communication with the sender." (Id. ¶ 56).

"Defendants did not possess [p]laintiff's prior express consent to send any text messages to [p]laintiff." (Id. ¶ 19). "At no time did [p]laintiff expressly request any texts or solicit information from [d]efendants or from their agents, affiliates or subsidiaries to be sent to [p]laintiff's cell phone." (Id. ¶ 20). "Plaintiff's [cell phone] ... illuminates, hums and vibrates each time an incoming text message is received." (Id. ¶ 22). "Each unsolicited text message that [d]efendants transmitted to [p]laintiff's cell phone invaded [p]laintiff's privacy and intruded upon [p]laintiff's solitude and seclusion" and "distracted and aggravated [p]laintiff upon receipt." (Id. ¶¶ 23-24).

"Upon receiving each of [d]efendant's text messages, [p]laintiff wasted valuable time interacting with her cellular device in order to access the message, and then wasted more valuable time viewing the message and ultimately disposing of the text message." (Id. ¶ 25). Each such text message "detained, interfered with[,] and ... used available data storage on [p]laintiff's cell phone, and thus reduced the overall data storage capacity on [p]laintiff's cell phone." (Id. ¶ 26). "Defendants' text messages received were often so profuse so as to result in the production of alerts on [p]laintiff's cell phone advising that her mailbox was filled," thus interfering "with [p]laintiff's ability to receive other text messages," "diminish[ing] the available batter power (and shorten[ing] the battery life)," and "requir[ing] [p]laintiff to expend energy (i.e. electricity) to recoup the battery power lost." (Id. ¶¶ 28-31).

## COURT'S DISCUSSION

A. Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted

inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

## B. Analysis

### 1. TCPA

**\*4** "Congress enacted the ... TCPA to prevent abusive telephone marketing practices." Krakauer v. Dish Network, L.L.C., —— F.3d ——, —— 2019 WL 2292196, at \*1 (4th Cir. 2019). In pertinent part, the TCPA prohibits any person from making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b) (1)(A)(iii) (emphasis added). An "automatic telephone dialing system" ("ATDS") is defined as "equipment which has the capacity -- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added).

Plaintiff's TCPA claim fails as a matter of law because plaintiff does not allege that the text messages [2] she received were sent using equipment which has the capacity to store or produce numbers to be called using a random or sequential number generator. Plaintiff asserts in conclusory terms in the complaint that defendants "utilized one or more of the forms of hardware, software, or equipment that the FCC characterizes as an automatic telephone dialing system." (Compl. ¶ 52). She asserts that defendants communicated to plaintiff "by an automated means that did

not require human intervention." (Id. ¶ 54). However, such "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. A "formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

[2]     Defendants do not dispute that, although the statute refers only to "calls," the term encompasses text messages at issue here, as other courts also have presumed. See, e.g., Dominguez on Behalf of Himself v. Yahoo, Inc., 894 F.3d 116, 118 n.3 (3d Cir. 2018)

Critically missing from the complaint are any facts permitting an inference that the text messages plaintiff received were sent using equipment that stores or produces numbers to be called "using a random or sequential number generator." 47 U.S.C. § 227(a)(1) (emphasis added). Indeed, the facts alleged suggest the opposite. Plaintiff alleges that the text messages did not reach her randomly, but rather reached her because she was assigned a telephone number previously assigned to an individual who received technical alerts as a part of a job function. (See, e.g., Compl. ¶¶ 44-52).

For example, plaintiff alleges "[t]he content of [d]efendants' text messages contained technical information or alerts that were clearly intended for another recipient." (Id. ¶ 44) (emphasis added). She states she was "the unwitting recipient of a barrage of communications intended for the prior owner or holder of her reassigned number." (Id. ¶ 49) (emphasis added). According to plaintiff, a "text message intended for an internal business or industrial communication, or as a remote alert to an employee[ ] or agent[ ], can be sent to a reassigned number" or "an incorrectly entered or generated number" and "potentially

reach a member of the public." (Id. ¶¶ 51-52) (emphasis added). It is also notable that the messages comprised highly technical alerts and messages, with no intelligible marketing content and no "interactive 'opt-out' mechanism or any means for Plaintiff to ask that they stop." (Compl. ¶¶ 48, 54-55, 57). Because plaintiff alleges that the text messages she received were intended for the prior owner or holder of her reassigned number, a targeted recipient, and because of the alleged content of the messages, it is not reasonable to infer that the messages were sent with equipment "using a random or sequential number generator." 47 U.S.C. § 227(a)(1).

**\*5** Plaintiff argues that it is sufficient as a matter of law to allege that defendants used equipment that has the capacity "to store telephone numbers and dial such numbers," even where the dialing system "never had the capacity to produce or store telephone numbers using a random or sequential number generator." (Pl.'s Mem. (DE 75) at 8-9) (quotations omitted). According to plaintiff, the defining characteristic of an ATDS is "the capacity to dial numbers without human intervention." (Id. at 9) (quotations omitted). Plaintiff advances, however, a standard for defining an ATDS that does not take into account the "random or sequential number generator" element in the statute. 47 U.S.C. § 227(a)(1).

Plaintiff cites to prior decisions by this court where the court expressed the standard for defining an ATDS in the manner plaintiff asserts here. In Danehy v. Jaffe & Asher, LLP, No. 5:14-CV-60-FL, 2015 WL 1249879, at \*9 (E.D.N.C. Mar. 17, 2015), the court stated in dicta that an ATDS "means equipment that has the capacity to store telephone numbers and dial such numbers." Id. (emphasis added). In Cartrette v. Time Warner Cable, Inc., 157 F. Supp. 3d 448, 457 (E.D.N.C. 2016), the court rejected the argument that a "lack of a random or sequential number generator removes it from the definition of ATDS," relying instead upon "FCC Guidance" for the proposition "that the definition of ATDS includes dialing equipment that has the capacity to store and dial numbers from a preprogrammed list without human intervention." Id. (emphasis added).

Recently, however, in ACA International v. Federal Communications Commission, 885 F.3d 687, 691 (D.C. Cir. 2018) the D.C. Circuit invalidated a 2015 FCC order defining ATDS in the manner advanced by this court in Danehy and Cartrette. In so doing, the D.C. Circuit held that "numbers that are 'randomly or sequentially generated' differ from numbers that 'come from a calling list.'" Id. at 702. The D.C. Circuit rejected the FCCs interpretations that "a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers." Id. It further determined "unreasonab[le]," the FCC's "expansive understanding of when a device has the 'capacity' to perform the necessary functions." Id.

Accordingly, this court's reliance on FCC guidance in Cartrette and the court's similar interpretation in Danehy are no longer good law, because that guidance has been invalidated. Although the Fourth Circuit has not addressed the impact of ACA International on prior FCC interpretations of the definition of ATDS, other circuits uniformly have held

that ACA International set aside the FCC's interpretations of the definition of an ATDS, and that the court must return to interpreting the statutory definition of ATDS without that FCC guidance. See, e.g., Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1049 (9th Cir. 2018) ("Because the D.C. Circuit exercised its authority to set aside the FCC's interpretations of the definition of an ATDS in the 2015 order and any prior FCC rules that were reinstated by the 2015 order, we conclude that the FCC's prior orders on that issue are no longer binding on us."); King v. Time Warner Cable Inc., 894 F.3d 473, 477 (2d Cir. 2018) ("ACA International ... invalidated [the 2015 FCC Order] and thereby removed any deference we might owe to the views the FCC expressed in it."); Dominguez on Behalf of Himself v. Yahoo, Inc., 894 F.3d 116, 119 (3d Cir. 2018) (recognizing that ACA International "set aside" the 2015 FCC Order, and that "[i]n light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of" the 2015 FCC Order).

**\*6** Plaintiff suggests that ACA International does not alter a prior 2003 FCC interpretation of the ATDS definition under which it concluded that an ATDS need only have "the capacity to dial numbers without human intervention." (Pl.'s Resp. (DE 75) at 9) (quotations omitted). The D.C. Circuit, however, expressly drew a connection between the FCC's 2003 interpretation of ATDS and the FCC's 2015 interpretation:

> [I]n the 2003 order, the Commission had made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS. 2003 Order, 18 FCC Rcd. at 14,091 ¶ 131 n.432; id. at 14,093 ¶ 133. By reaffirming that conclusion in its 2015 ruling, the Commission supported the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers).

ACA Int'l, 885 F.3d at 702 (emphasis added). The D.C. Circuit also described the impact of its review on both the 2015 order and prior orders of the FCC, stating: "[T]he Commission's latest ruling purports to reaffirm the prior orders," and "that does not shield the agency's pertinent pronouncements from review," where "[t]he agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform." Id. at 701.

Plaintiff also suggests that, even without FCC guidance, this court should interpret the definition of ATDS to encompass any equipment that has the capacity to store and dial numbers from a preprogrammed list, even without the capacity to store or produce numbers to be called "using a

random or sequential number generator." 47 U.S.C. § 227(a)(1) (emphasis added). Plaintiff urges the court to follow the Ninth Circuit's interpretation in Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1050 (9th Cir. 2018). There, the court determined that the TCPA was "ambiguous on its face," and held that "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically." Id. at 1052.

A significant number of courts have rejected the reasoning of Marks, however, and the Third Circuit adopted a contrary approach in Dominguez on Behalf of Himself v. Yahoo, Inc., 894 F.3d 116, 121 (3d Cir. 2018), in requiring that a calling system "function[ ] as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers." Id.; see, e.g., Thompson-Harbach v. USAA Fed. Sav. Bank, 359 F. Supp. 3d 606, 626 (N.D. Iowa 2019) ("[T]his Court finds the Marks court's decision erroneous as a matter of statutory construction."); Johnson v. Yahoo!, Inc., 346 F. Supp. 3d 1159, 1162 (N.D. Ill. 2018) (rejecting Marks, and holding the statute is "not ambiguous"); Roark v. Credit One Bank, N.A., No. CV 16-173 (PAM/ECW), 2018 WL 5921652, at *3 (D. Minn. Nov. 13, 2018) (rejecting Marks and requiring a "present capability to generate random or sequential numbers to dial" to qualify as an ATDS).

Although the Fourth Circuit and courts within this circuit have not addressed the split between these courts and Marks, the court finds the Dominguez approach better comports with the plain language of the statue. The statute unambiguously incorporates a "random or sequential number generator" into the definition of an ATDS. 47 U.S.C. § 227(a)(1). Thus, plaintiff must allege facts permitting an inference that defendants called her with equipment that has the capacity to store or produce numbers using a random or sequential number generator.

**\*7** Finally, plaintiff argues that, even if she must allege equipment using a random or sequential number generator, she has alleged sufficient facts to meet this standard. However, as discussed above, plaintiff's own allegations foreclose a determination that defendants called her with equipment using a random or sequential number generator. (See, e.g., Compl. ¶¶ 47-57). The plain language and purpose of the TCPA does not support allowing claims to proceed under such alleged circumstances.

In sum, plaintiff's TCPA claim fails as a matter of law and must be dismissed. Because the court determines that plaintiff's claims must be dismissed due to failure to allege use of an ATDS, and this determination turns largely on a question of statutory interpretation, the court does not reach additional grounds for dismissal raised by defendants that turn on other deficiencies in plaintiff's pleadings.

2. Dismissal With Prejudice
"[T]he nature of dismissal is a matter for the discretion of the district court." Adbul-Mumit v. Alexandria Hyundai, LLC, 896 F.3d 278, 292 (4th Cir. 2018); see Carter v. Norfolk Cmty. Hosp. Ass'n, Inc., 761 F.2d 970, 974 (4th Cir. 1985) ("[D]ismissal under Rule 12(b)(6) is ... with prejudice unless [the

court] specifically orders dismissal without prejudice. That determination is within the district court's discretion."). In exercising this discretion, the court is not required to "resolve pleading deficiencies, regardless of previous opportunities to amend or other extenuating circumstances." Adbul-Mumit, 896 F.3d at 292.

In this case, dismissal of the TCPA claim with prejudice is warranted in light of the fact that plaintiff's TCPA claim turns largely upon an issue of statutory interpretation for which there is a split in the courts, and where the Fourth Circuit has not addressed the issue of law presented. In addition, plaintiff has alleged facts that foreclose proceeding under the interpretation of the statute advanced by defendants. Therefore, it is unlikely that amendment of the complaint consistent with the allegations already made could salvage plaintiff's claim in light of the law as interpreted herein. Accordingly, the court dismisses plaintiff's TCPA claim with prejudice.

3. State Law Claim

The court "may decline to exercise supplemental jurisdiction" over a state law claim included in an action on the basis of supplemental jurisdiction under 28 U.S.C. § 1367(a), if

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367(c). Here, plaintiff asserts a claim of conversion, citing Alabama law. (See Compl. ¶¶ 107-111). Where the court has dismissed with prejudice the only claim over which it has original jurisdiction, and where plaintiff's state law claim raises novel issues of law, including choice of law and the standard for pleading conversion in the context of intangible property interests, the court in its discretion declines to exercise supplemental jurisdiction over this claim.

Plaintiff's state law claim thus is dismissed without prejudice pursuant to 28 U.S.C. § 1367.

## CONCLUSION

Based on the foregoing, defendants' motions to dismiss (DE 65, 68) are GRANTED. Plaintiff's claim under the TCPA is DISMISSED WITH PREJUDICE. Plaintiff's state law claim of conversion is DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367. The clerk is DIRECTED to close this case.

**\*8** SO ORDERED, this the 14th day of June, 2019.

## All Citations

Slip Copy, 2019 WL 2500407

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 16

**2019 WL 4261245**
Only the Westlaw citation
is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Kimberly SMITH, Steven Smith
and Olwen Jaffe, individually
and on behalf of all others
similarly situated, Plaintiffs,
v.
PREMIER DERMATOLOGY,
Forefront Management, LLC, and
Erelevance Corporation, Defendants.

No. 17 C 3712
|
Signed 09/09/2019

**Attorneys and Law Firms**

Jeffrey Michael Salas, Salas Wang LLC, David
Louis Gerbie, Eugene Y. Turin, McGuire Law,
P.C., Chicago, IL, Alexis M. Wood, Pro Hac
Vice, Marron A. Ronald, Kas LaRene Gallucci,
Pro Hac Vice, Ronald Albert Marron, Pro Hac
Vice, Law Offices of Ronald A. Marron, APLC,
San Diego, CA, for Plaintiffs Kimberly Smith,
Steve Smith.

David Louis Gerbie, Eugene Y. Turin, McGuire
Law, P.C., Chicago, IL, Marron A. Ronald, Law
Offices of Ronald A. Marron, San Diego, CA,
for Plaintiff Olwen Jaffe.

Matthew D. Guletz, Thompson Coburn LLP,
St. Louis, MO, for Defendants Premier
Dermatology, Forefront Management LLC.

David Matthew Rownd, Emily Louise Peel,
Patrick Morales-Doyle, Thompson Coburn
LLP d/b/a Thompson Coburn Fagel Haber,
Chicago, IL, Matthew D. Guletz, Thompson
Coburn LLP, St. Louis, MO, for Defendant
Forefront Dermatology.

David Philip Whittlesey, Pro Hac Vice,
Shearman & Sterling LLP, Austin, TX, Jon
C. Weingart, Pro Hac Vice, Wilmer Cutler
Pickering Hale and Dorr LLP, Washington, DC,
Jonathan Booker Cifonelli, Walter Jones, Jr.,
Zeke Nathaniel Katz, Pugh, Jones & Johnson,
P.C., Chicago, IL, for Defendant ERelevance
Corporation.

## MEMORANDUM OPINION AND ORDER

HON. JORGE ALONSO, United States
District Judge

**\*1** Plaintiffs, Kimberly Smith, Steven Smith,
and Olwen Jaffe, bring this putative class action
under the Telephone Consumer Protection
Act ("TCPA"), 47 U.S.C. § 227, *et seq.*,
against defendants, Premier Dermatology,
Forefront Management, LLC, and eRelevance
Corporation. The case is before the Court on
defendants' motion for summary judgment. For
the following reasons, the motion is granted.

## BACKGROUND

Defendant eRelevance Corporation
("eRelevance") is in the business of providing
"mobile marketing services," especially for
"physician groups, surgery centers, or other
health care providers." (Pl.'s LR 56.1 Resp.
¶¶ 1, 8, ECF No. 119 (Sealed), ECF No.

116 (Redacted).) In particular, eRelevance maintains a "proprietary software system" that it uses "to send marketing communications ..., including text messages," to its clients' patients or customers. (*Id.* ¶ 11.) Generally, eRelevance's clients submit a list of customer or prospective customer contact information, which is uploaded to the eRelevance system, and they select " 'criteria' with what types of contacts they wish to reach." (Defs.' LR 56.1 Resp. ¶¶ 10, 13, ECF No. 137 (Sealed), ECF No. 132 (Redacted).) Based on the criteria clients select, the eRelevance system creates a list of contacts from its database, and eRelevance employees build a text-message marketing campaign by customizing template text messages to fit the clients' specifications. (*Id.* ¶¶ 15-16.) An eRelevance employee then presses a button to run the campaign, and the eRelevance system automatically sends text messages to each of the contacts in the list. (*Id.* ¶ 17.)

According to eRelevance, the system "does not currently have, and has never had, the capacity to generate random or sequential telephone numbers"; it relies entirely on client-provided contact information, which it filters to select phone numbers to which to send text messages. (Pl.'s LR 56.1 Resp. ¶ 15, *see id.* ¶¶ 14-21.) Plaintiffs do not directly dispute this fact, although they purport to dispute it by pointing out that eRelevance's "ruby virtual machine," the component of its system that actually sends the text messages, can be "programmed to do anything that is computationally possible." (*Id.* ¶ 15 (internal quotation marks and alterations omitted).)

After receiving a number of text messages from eRelevance sent on behalf of defendants Premier Dermatology and Forefront Management, LLC, plaintiffs brought this suit, alleging that defendants violated the Telephone Consumer Protection Act ("TCPA") by sending them text messages via an "automatic telephone dialing system" without their consent, *see* 47 U.S.C. § 227. Defendants now move for summary judgment.

## DISCUSSION

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the

nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

**\*2** In pertinent part, the TCPA provides as follows:

**(1) Prohibitions**

It shall be unlawful ...

> **(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any *automatic telephone dialing system* or an artificial or prerecorded voice--
>
> > **(iii)** to any telephone number assigned to a ... cellular telephone service, ... unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]

...

**(3) Private right of action**

...

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available....

47 U.S.C. § 227(b) (italicized emphasis added). The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity -- **(A)** to store or produce telephone numbers to be called, using a random or

sequential number generator; and **(B)** to dial such numbers." 47 U.S.C. § 227(a)(1).

For purposes of the present motion, the parties' dispute centers on the TCPA's definition of an automatic telephone dialing system (hereafter, "ATDS"). Defendants argue that they are entitled to summary judgment because the eRelevance system cannot generate "random or sequential" phone numbers, and it is therefore not an ATDS. Plaintiffs respond that defendants misread the statutory definition, which includes devices that lack the capacity to generate random or sequential numbers but can "dial stored numbers automatically." *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018).

**I. EFFECT OF *ACA INTERNATIONAL***
"The TCPA vests the [Federal Communications] Commission ["FCC"] with responsibility to promulgate regulations implementing the Act's requirements." *ACA Int'l v. FCC*, 885 F.3d 687, 693 (D.C. Cir. 2018). In 1992, the FCC promulgated regulations that adopted the statutory definition of an ATDS essentially verbatim, without elaborating. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8792 App'x B (1992) (amending 47 CFR § 64.1200) ("The terms 'automatic telephone dialing system' and 'autodialer' mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers."). In a series of regulatory rulings beginning in 2003, the FCC addressed the definition of an ATDS under the TCPA, and plaintiffs argue that these rulings are binding and controlling

for purposes of the present motion. Defendants argue, however, that this series of rulings is no longer good law under *ACA International v. FCC*, 885 F.3d at 703, which explicitly set aside the relevant portions of the FCC's 2015 ruling, the most recent in the series, and, according to defendants, necessarily invalidated the remainder of the series, to the extent they addressed the definition of an ATDS. As a result, defendants argue, the statutory language alone provides the applicable definition of an ATDS.

**\*3** In its 2003 ruling, the FCC interpreted the TCPA's ATDS definition to include "predictive dialers," equipment that was "not conceptually different" from a classic ATDS, which automatically dialed numbers randomly or sequentially, but that, "when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls" by calling stored numbers "in a manner that maximizes efficiencies for call centers" by "ensur[ing] that when a consumer answers the phone, a sales person is available to take the call." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14090-91 ¶¶ 130-31 (2003). "The principal feature of predictive dialing software is a timing function, not number storage or generation." *Id.* at 14091 ¶ 131. Generally, a predictive dialer's "hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," although some predictive dialers are not "capable of being programmed for random or sequential dialing." *Id.* at 14091 ¶ 131, 14091 n.432. The FCC explained that a

predictive dialer qualifies as an ATDS because the essence of the call activity that the TCPA sought to prohibit was automated dialing to certain kinds of phone numbers, which is what a predictive dialer does, regardless of whether it "create[s] and dial[s] 10-digit telephone numbers arbitrarily" or only dials a "given set of numbers." *Id.* at 14091-93 ¶¶ 131-33. In 2008, the FCC reaffirmed the ruling, declaring that nothing "warrant[ed] reconsideration of [the 2003] findings." *See Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 930-31 (N.D. Ill. 2018) (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 567 ¶ 14 (2008)) (internal quotation marks omitted).

In its 2015 declaratory ruling, the FCC again "reaffirm[ed]" this interpretation of the statute, but it also stated that an ATDS must have the "capacity"—*i.e.*, the "potential ability"—"to dial random or sequential numbers," even if it lacks the "present ability" to do so. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7972 ¶ 10, 7974 ¶ 15, 7975-76 ¶¶ 19-20 (2015) (internal quotation marks omitted).

Upon consolidated petitions for judicial review of this ruling under the Hobbs Act, 28 U.S.C. § 2342(1), *see also* 47 U.S.C. § 402(a), the D.C. Circuit held in *ACA International* that the FCC's approach could not be sustained. The court reasoned that (1) whatever one understands the essential functions of an ATDS to be, interpreting "capacity" to mean "potential ability" rather than "present ability" made the definition unreasonably broad—so broad, in fact, as to sweep within it any

common smartphone that could download an automatic dialing app, 885 F.3d at 695-700, and (2) it was incoherent and unreasonable to "reaffirm" the 2003 ruling while also insisting that an ATDS must have the "capacity to dial random or sequential numbers," a requirement that the 2003 ruling seemingly rejected, 885 F.3d at 701-03. Based on this reasoning, the D.C. Circuit "set aside" the portion of the 2015 ruling that sought to "expl[ain] ... which devices qualify as an ATDS." *Id.* at 695; *see id.* at 703.

Courts have differed in determining the scope and impact of *ACA International*. Some have concluded that it wiped away not only the FCC's 2015 ruling but its whole series of rulings on the definition of an ATDS beginning in 2003, *see, e.g., Marks*, 904 F.3d at 1047, 1049, while others have concluded that it merely set aside portions of the 2015 ruling, without affecting the validity of the FCC's prior rulings, *see, e.g., Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064, 1069 (W.D. Wis. 2018). On this issue, the Court agrees with the decisions in the former category.

In *ACA International*, the D.C. Circuit specifically rejected the FCC's argument that the court lacked jurisdiction "to entertain petitioners' challenge concerning the functions a[n] [ATDS] device must be able to perform" on the ground that "the issue was resolved in prior agency orders—specifically, declaratory rulings in 2003 and 2008," from which there had been no timely appeal. 885 F.3d at 701. The court explained that the fact that the FCC's latest ruling merely "purport[ed] to reaffirm the prior orders" did not suffice to "shield the agency's pertinent pronouncements

from review" because petitioners had "covered their bases by filing petitions for both [1] a declaratory ruling and [2] a rulemaking" concerning the functions that an ATDS must be able to perform, and the subsequent ruling was "reviewable on both grounds." *Id.* The court cited *Biggerstaff v. FCC*, 511 F.3d 178, 184-85 (D.C. Cir. 2007), which explained that a petition for rulemaking is "ordinarily the appropriate way in which to challenge a longstanding regulation on the ground that it is violative of statute," *id.* at 184 (internal quotation marks omitted) (citing *Pub. Citizen*, 901 F.2d at 152), and "an official reinterpretation of an old rule that creates a new opportunity to challenge the continuation of that rule triggers reopening," 511 F.3d at 185.

**\*4** In *Marks*, the Ninth Circuit characterized *ACA International* as having "concluded that the parties' 2015 rulemaking petition to the FCC reopened consideration of the definition of ATDS established in the FCC's 2003 order, as well as its subsequent rulings." 904 F.3d at 1047 (citing *Biggerstaff*, 511 F.3d at 185) ("An agency's reconsideration of a rule in a new rulemaking constitutes a reopening when the original rule is 'reinstated' so as to have renewed effect." (quoting *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152-53 (D.C. Cir. 1990))). Although the D.C. Circuit's reasoning was not explicit in this regard, the citation to *Biggerstaff* is telling, and this Court agrees with the Ninth Circuit's reading of it. *See Marks*, 904 F.3d at 1047; *Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d 1159, 1161 (N.D. Ill. 2018) (citing *Marks*) ("The 2015 FCC order 'reaffirmed' its earlier orders, and while that word choice is different than 'reopening' or 'reinstating,' its import is the

same—the FCC reviewed its past treatment of ATDS functionality, ... the agency understood its option to revisit its definitions when confronted with arguments about the statutory text[,] [and it] reaffirmed and reiterated its approach, which brought the entire agency definition of ATDS up for review in the D.C. Circuit."); *see also Pub. Citizen*, 901 F.2d at 152-53 ("We believe the law to be that where an agency reiterates a rule or policy in such a way as to render the rule or policy subject to renewed challenge on any substantive grounds, a coordinate challenge that the rule or policy is contrary to law will not be held untimely because of a limited statutory review period."). After *ACA International*, neither the 2015 ruling nor the FCC's prior orders addressing the definition of an ATDS are binding.

## II. INTERPRETING THE STATUTORY DEFINITION

Given that the definition of an ATDS in the FCC's 1992 regulation merely parrots the statutory language, and with the FCC's more recent interpretations of the definition pruned away by *ACA International*, "only the statutory definition as set forth by Congress in 1991 remains." *Marks*, 904 F.3d at 1049. Thus, the Court's task is to determine, "as an original matter," *Pinkus*, 319 F. Supp. 3d at 936, whether the eRelevance system qualifies as an ATDS under the definition set forth in the text of the TCPA, *see* 47 U.S.C. § 227(a)(1).

"[W]hen interpreting a statute, we must begin with its text and assume 'that the ordinary meaning of that language accurately expresses the legislative purpose.' " *Middleton v. City of Chi.*, 578 F.3d 655, 658 (7th Cir. 2009) (quoting *Engine*

*Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)). "When a statute is unambiguous, we must enforce the plain meaning of the language enacted by Congress." *Trs. of the Chi. Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996) (internal quotation marks omitted).

*Our Country Home Enterprises, Inc. v. Comm'r of Internal Revenue*, 855 F.3d 773, 791 (7th Cir. 2017) (internal citations altered).

As stated above, the TCPA defines an ATDS as follows:

**(1)** The term "automatic telephone dialing system" means equipment which has the capacity--

**(A)** to store or produce telephone numbers to be called, using a random or sequential number generator; and

**(B)** to dial such numbers.

47 U.S.C.A. § 227(a). The parties urge competing interpretations of this language, differing as to whether the ATDS must be able to generate "random or sequential" numbers. Defendants, relying heavily on *Pinkus*, argue that the "plain text" of the statutory definition, as well as the FCC's pre-2003 interpretations of it, show that "equipment qualifies as an ATDS only if it has the capacity to 'function ... by generating random or sequential telephone numbers and dialing those numbers.' " 319 F. Supp. 3d at 939 (quoting *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018)). Plaintiffs, relying heavily on *Marks*, argue that

the statute should be read as if it defined an ATDS as "equipment which has the capacity —(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically." 904 F.3d at 1053.

There is a certain allure to the conclusion in *Marks*, to the extent one agrees that a "particular problem" Congress sought to "alleviate" in the TCPA was, as the FCC put it in its 2003 order, "an increasing number of automated ... calls to certain categories of numbers," regardless of how the numbers were generated. *See* 18 F.C.C. Rcd. at 14092 ¶ 133. But the 2003 order is no longer binding or in force, and with only the bare statutory language for guidance, the Court cannot agree with plaintiffs that the plain text of the statutory definition can bear their proffered interpretation.

**\*5** While this Court might quibble with the grammatical analysis of *Pinkus* in some particulars, it agrees with its central insight that the phrase "using a random or sequential number generator," following the phrase "to store or produce telephone numbers to be called," is "best understood to describe the process by which those numbers are generated in the first place." 319 F. Supp. 3d at 938. As the court explained, it is "grammatically unlikely" that the phrase, "using a random or sequential number generator," "modifies only 'produce' and not 'store,' " because " 'a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one where the phrase is separated from the antecedents by a comma.' " *Id.* (quoting *Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996, 1000 (9th Cir. 2017)). Some courts have struggled to see "how a number generator could be used to 'store' telephone numbers," *see Pinkus*, 319 F. Supp. 3d at 938, but this Court finds nothing so strange about it. "The word 'store' ensures that a system that generated random numbers and did not dial them immediately, but instead stored them for later automatic dialing (after, for example, some human intervention in activating the stored list for dialing) is an ATDS." *Johnson*, 346 F. Supp. 3d at 1162 n.4. Thus, "the phrase 'using a random or sequential number generator' applies to the numbers to be called,"— specifically, it describes how they were generated for calling—"and an ATDS must either store or produce those numbers (and then dial them)." *Id.* at 1162.

In summary, then, the plain text of the statutory definition provides that an ATDS is a device that (1) stores or produces telephone numbers that (2) were randomly or sequentially generated and (3) dials them automatically.

Because the Court finds that the statutory definition is not ambiguous, it need not reach plaintiffs' arguments about "the context and the structure of the statutory scheme." *See Marks*, 904 F.3d at 1051. But even if the Court were to consider them, they are unpersuasive.

Plaintiffs argue that the statute's exemption for ATDS calls made with "prior express consent of the called party" is meaningless if an ATDS must generate numbers randomly or sequentially, because no one using an ATDS to make calls at random would have any opportunity to determine whether the called party had consented to the call. Similarly, the TCPA allows for treble damages for willful or

knowing violations, 47 U.S.C. § 227(b)(3), but this provision, too, according to plaintiffs, is meaningless if applied to ATDS calls made at random, for a similar reason: calling at random could never be a willful or knowing violation because the caller would never know in advance that the called party had not consented to the call. But the Court is not convinced. First, it does not follow from the fact that all ATDSs must have the capacity to use randomly or sequentially generated numbers that they *cannot but* call numbers at random or in sequence; rather, "it is possible to imagine a[n] [ATDS] device that both has the capacity to generate numbers randomly or sequentially and can be programmed to avoid dialing certain numbers, including numbers that belong to customers who have not consented to receive calls from a particular marketer." *Pinkus*, 319 F. Supp. 3d at 939. Second, even assuming no such device were possible and ATDS calls were necessarily to random or sequential numbers, it does not follow that the "prior express consent" and "willful or knowing violation" language in the statute is meaningless or superfluous because in neither case does the language apply only to ATDSs. In 47 U.S.C. § 227(a)(1)(A), "prior express consent" exempts a caller from liability for making any call to a cellular phone "using any [ATDS] *or an artificial or prerecorded voice." Id.* (emphasis added). The "willful or knowing violation" language applies not only to the prohibition on calls to cellular phones using an ATDS or artificial or prerecorded voice in § 227 (a)(1)(A) but also to the similar prohibition on such calls to residential phones in subsection (B), the prohibition on junk faxes in subsection (C), and so on. It might well have been Congress's intention for these particular provisions to do little or no work in relation to ATDS calls; the Court disagrees with plaintiffs that it would be absurd to so interpret the statute.

**\*6** Similarly, plaintiffs argue that the TCPA's exemption for calls made to collect government debt, *see* 47 U.S.C. § 227(b)(1)(A)(iii), would serve no purpose if an ATDS must be capable of generating numbers randomly or sequentially; any caller seeking to collect a debt would attempt to call the debtor's number, not a random number. But again, this argument ignores the "artificial or prerecorded voice" language in § 227(a)(1)(A), which provides an independent basis for the exemption.

More fundamentally, whatever slight persuasive value plaintiffs' structure-and-context arguments might have, they cannot overcome the plain meaning of the statutory language. The TCPA defines an ATDS as a device that is capable of using randomly or sequentially generated numbers. It is not genuinely disputed that the eRelevance system does not currently have, and at no point did have, the capacity to use randomly or sequentially generated numbers for its marketing campaigns; eRelevance only had the capacity to send text messages to client-provided phone numbers.

Plaintiffs purport to dispute this fact by citing an eRelevance executive's deposition testimony that the system can be "programmed to do anything that is computationally possible." (Pl.'s LR 56.1 Resp. ¶ 15.) But this is insufficient to create a genuine dispute of fact because, as *ACA International* explained, it is the system's "present capacity," not its "potential capacity," that matters. 885

F.3d at 695-96, 699-700. The Court agrees with the D.C. Circuit that interpreting the word "capacity" in the TCPA's definition of an ATDS to mean "potential capacity," *i.e.*, capacity a device lacks at present but might gain after a modification such as an app download, is "utterly unreasonable in the breadth of its regulatory inclusion." *Id.* at 699 (internal quotation marks and alteration omitted). But this unreasonable interpretation, soundly rejected in *ACA International*, is exactly what plaintiffs urge by suggesting that the eRelevance system is an ATDS because it can be "programmed" to generate random or sequential numbers. What matters is not what the device has the potential to do, depending on how it might be "programmed" in the future, but what it can actually do, and it must be able to use randomly or sequentially generated numbers. Plaintiffs have not shown that there is a genuine factual dispute as to whether the eRelevance system could use randomly or sequentially generated numbers when they received the offending text messages.

The proposed testimony of plaintiffs' expert witness, Randall Snyder, is of no help to them in this regard. Mr. Snyder proposes to testify that the eRelevance system is an ATDS under the TCPA because it automatically sends text messages to stored numbers. (*See* Snyder Report ¶¶ 69-75, ECF No. 109-1.) But, as the Court has explained, that is not the proper standard; an ATDS must have the capacity to use randomly and sequentially generated phone numbers. Plaintiffs do not dispute that

Mr. Snyder does not propose to testify that the eRelevance system had or has that capacity (Pls.' LR 56.1 Resp. ¶¶ 16, 20),[1] nor have plaintiffs pointed to other evidence creating a genuine factual dispute on that point.

[1] As a result of this deficiency in Mr. Snyder's testimony, and based on the Court's interpretation of the TCPA's definition of an ATDS, defendants are entitled to summary judgment irrespective of Mr. Snyder's testimony, and the Court need not reach defendants' *Daubert* motion to exclude it (ECF No. 104), which is denied as moot.

**\*7** Because the eRelevance system cannot use randomly and sequentially generated phone numbers, the system does not qualify as an ATDS. Defendants' text-message marketing campaigns therefore did not violate the TCPA, and defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [99] is granted. Defendants' motion to exclude Randall Snyder's expert testimony [104] is denied as moot. eRelevance's motion [158] to withdraw attorney Weingart's appearance is granted. Civil case terminated.

**SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 4261245

---

**End of Document**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 17

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

Name of U.S. District Court: Northern District of California

U.S. District Court case number: 4:16-cv-03396-YGR JSC

Date case was first filed in U.S. District Court: 06/20/2016

Date of judgment or order you are appealing: 09/09/2019

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes   ○ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

Rash Curtis & Associates

Is this a cross-appeal? ○ Yes   ◉ No

If Yes, what is the first appeal case number?

Was there a previous appeal in this case?   ○ Yes   ◉ No

If Yes, what is the prior appeal case number?

Your mailing address:

1425 River Park Drive, Suite 400

City: Sacramento   State: CA   Zip Code: 95815

Prisoner Inmate or A Number (if applicable):

**Signature** /s/ Mark E. Ellis   **Date** October 3, 2019

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 1**                                                                 *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

| |
|---|
| Rash Curtis & Associates |

Name(s) of counsel (if any):

| |
|---|
| Mark E. Ellis |

Address: | 1425 River Park Drive, Suite 400, Sacramento, CA 95815

Telephone number(s): | (916) 283-8820

Email(s): | mellis@ellislawgrp.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ⦿ Yes   ○ No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*
Name(s) of party/parties:

| |
|---|
| SANDRA McMILLION, JESSICA ADEKOYA, AND IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated |

Name(s) of counsel (if any):

| |
|---|
| Scott A. Bursor |

Address: | 2665 S. Bayshore Drive, Suite 220, Miami, FL 33133

Telephone number(s): | (212) 989-9113

Email(s): | scott@bursor.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                          *1*                              *Rev. 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Rash Curtis & Associates

Name(s) of counsel (if any):

Anthony P. J. Valenti

Address:  1425 River Park Drive, Suite 400, Sacramento, CA 95815

Telephone number(s):  (916) 283-8820

Email(s):  avalenti@ellislawgrp.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ⊙ No

**Appellees**

Name(s) of party/parties:

SANDRA McMILLION, JESSICA ADEKOYA, AND IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated

Name(s) of counsel (if any):

L. Timothy Fisher

Address:  1990 N. California Boulevard, Suite 940, Walnut Creek, CA 94596

Telephone number(s):  (925) 300-4455

Email(s):  ltfisher@bursor.com

Name(s) of party/parties:

SANDRA McMILLION, JESSICA ADEKOYA, AND IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated

Name(s) of counsel (if any):

Yeremey Krivoshey

Address:  1990 N. California Boulevard, Suite 940, Walnut Creek, CA 94596

Telephone number(s):  (925) 300-4455

Email(s):  ykrivoshey@bursor.com

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                    *2*                            *Rev. 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

| Rash Curtis & Associates |
| --- |

Name(s) of counsel (if any):

| Lawrence K. Iglesias |
| --- |

Address: | 1425 River Park Drive, Suite 400, Sacramento, CA 95815 |

Telephone number(s): | 916-283-8820 |

Email(s): | liglesias@ellislawgrp.com |

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ◉ No

**<u>Appellees</u>**

Name(s) of party/parties:

| |
| --- |

Name(s) of counsel (if any):

| |
| --- |

Address: | |

Telephone number(s): | |

Email(s): | |

Name(s) of party/parties:

| |
| --- |

Name(s) of counsel (if any):

| |
| --- |

Address: | |

Telephone number(s): | |

Email(s): | |

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                        *2*                                        *Rev. 12/01/2018*