Mark E. Ellis - 127159
Anthony P. J. Valenti – 284542
Lawrence K. Iglesias - 303700
ELLIS LAW GROUP, LLP
1425 River Park Drive, Suite 400
Sacramento, CA  95815
Tel: (916) 283-8820
Fax: (916) 283-8821
mellis@ellislawgrp.com
avalenti@ellislawgrp.com
liglesias@ellislawgrp.com

Attorneys for
DEFENDANT RASH CURTIS & ASSOCIATES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO PEREZ, on Behalf of Himself and all Others Similarly Situated,<br><br>            Plaintiffs,<br><br>v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>            Defendant. | Case No.:  4:16-cv-03396-YGR JSC<br><br>**SUPPLEMENTAL DECLARATION OF MARK E. ELLIS IN SUPPORT OF MOTION TO AMEND OR ALTER THE JUDGMENT IN FAVOR OF THE DEFENDANT (1) ON PLAINTIFF AND THE CLASSES' FIRST COUNT FOR WILLFUL AND KNOWING VIOLATIONS OF THE TCPA; (2) ON PLAINTIFF AND THE RULE 23(b)(2) CLASSES' CLAIM FOR INJUNCTIVE RELIEF; (3) ON PLAINTIFF'S CLAIMS UNDER THE FDCPA AND ROSENTHAL ACT; AND (4) TO CLARIFY THAT ANY RESIDUAL CLASS DAMAGES AWARD UNDISTRIBUTED TO A CLASS MEMBER RELEASES BACK TO DEFENDANT [FRCP 50, 52, 59, and 60]**<br><br>DATE:      November 18, 2019<br>TIME:      2:00 p.m.<br>DEPT:      Courtroom 1<br><br>JUDGE:   *Hon. Yvonne Gonzalez Rogers* |

- 1 -

SUPPLEMENTAL DECLARATION OF MARK E. ELLIS IN SUPPORT OF MOTION TO AMEND OR ALTER THE JUDGMENT

I, Mark E. Ellis, declare:

1.     I am an attorney at law duly licensed to practice before this Court, and I am a Partner in the law firm of Ellis Law Group LLP, attorneys of records for Defendant Rash Curtis & Associates in the above matter.  This declaration is based upon my own personal knowledge except as to those matters stated upon information and belief, and as to those things I believe them to be true.  If called as a witness to testify to the matters asserted herein I would do so competently.

2.     Attached to this declaration as **Exhibit S-1** is a true and correct copy of the Parties' Joint Pretrial Statement, ECF No. 260, filed on February 15, 2019.

3.     Attached to this declaration as **Exhibit S-2** is a true and correct copy of Plaintiff's Closing Argument Regarding Phase 2 (Knowing and Willfulness), ECF No. 361, filed on May 20, 2019.

4.     Attached to this declaration as **Exhibit S-3** is a true and correct copy of Rash Curtis' Trial Brief Re: Phase II, ECF No. 362, filed on May 20, 2019.

5.     Attached to this declaration as **Exhibit S-4** are true and correct copies of excerpts of the Trial Transcript from the trial in this action, which took place between May 6, 2019 and May 13, 2019

6.     Attached to this declaration as **Exhibit S-5** is a true and correct copy of the Final Judgment in this action, ECF No. 370, filed September 9, 2019.

7.     Attached to this declaration as **Exhibit S-6** is a true and correct copy of this Court's Standing Order Re: Pretrial Instructions in Civil Cases, Updated April 2, 2019.

8.     Attached to this declaration as **Exhibit S-7** is a true and correct copy of Plaintiff

9.     Attached to this declaration as **Exhibit S-8** is a true and correct copy of Defendant Rash Curtis & Associates' excerpted letter to class counsel, dated September 5, 2019.

10.     Attached to this declaration as **Exhibit S-9** is a true and correct copies of the Parties' proposed special verdict forms, ECF No.

SUPPLEMENTAL DECLARATION OF MARK E. ELLIS IN SUPPORT OF MOTION TO AMEND OR ALTER THE JUDGMENT

11.     Attached to this declaration as **Exhibit S-10** is a true and correct copy of Rash Curtis' transmission letter to the Court regarding the proposed forms of judgment based on the jury's verdict, ECF No. 353-1, filed on May 15, 2019.

12.     Attached to this declaration as **Exhibit S-11** is a true and correct copy of excerpts from the March 19, 2019 pretrial hearing transcript.

13.     Attached to this declaration as **Exhibit S-12** is a true and correct copy of an email to me from Victoria Fellner attaching KCC's "Weekly Case Status Report" showing statistics for class notice in this litigation, dated October 7, 2019.

14.     Attached to this declaration as **Exhibit S-13** is a true and correct copy of the "Weekly Case Status Report" showing statistics for class notice in this litigation which was emailed to me on October 7, 2019 from Victoria Fellner of KCC.

15.     On October 7, 2019, I spoke with Victoria Fellner of KCC about the status of class notice, among other things. Ms. Fellner explained the contents of the Weekly Case Status Report to me, which she had provided to me via email prior to our call that day. Ms. Fellner explained to me during our call that the table in **Exhibit S-13** to this declaration shows that, between two separate mailings on April 2, 2019 and April 18, 2019, a total of 17,703 class notices were mailed to addresses via USPS to addresses believed to belong to class members. Additionally, 34,823 notices were emailed to email addresses believed to belong to class members. Ms. Fellner explained to me that email notices were sent in lieu of USPS notices to class members who had no known address to send a notice via USPS mail. Based on what Ms. Fellner told me and what **Exhibit S-13** shows, approximately two-thirds of the 52,025 purported class members identified by Plaintiff's experts have no known physical address to receive mail.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

- 3 -

Dated: November 6, 2019

_/s/ Mark E. Ellis_____
Mark E. Ellis

SUPPLEMENTAL DECLARATION OF MARK E. ELLIS IN SUPPORT OF MOTION TO AMEND OR
ALTER THE JUDGMENT

# CERTIFICATE OF SERVICE

I, , declare:

I am a citizen of the United States, am over the age of eighteen years, and am not a party to or interested in the within entitled cause.  My business address is 1425 River Park Drive, Suite 400, Sacramento, CA 95815.

On November 6, 2019, I served the following document(s) on the parties in the within action:
**DECLARATION OF MARK E. ELLIS IN SUPPORT OF MOTION TO DECERTIFY CLASS**

|   |   |
|---|---|
|   | **VIA ELECTRONIC SERVICE:**  The above-described document(s) will be delivered electronically through the Court's ECF/PACER electronic filing system, as stipulated by all parties to constitute personal service, to the following: |
| **X** | **BY MAIL:** I am familiar with the business practice for collection and processing of mail.  The above-described document(s) will be enclosed in a sealed envelope, with first class postage thereon fully prepaid, and deposited with the United States Postal Service at Sacramento, CA on this date, addressed as follows: |
|   | **BY HAND:**  The above-described document(s) will be placed in a sealed envelope which will be hand-delivered on this same date by _____, addressed as follows: |
|   | **VIA FACSIMILE:**  The above-described document(s) was transmitted via facsimile from the fax number shown on the attached facsimile report, at the time shown on the attached facsimile report, and the attached facsimile report reported no error in transmission and was properly issued from the transmitting facsimile machine, and a copy of same was mailed, on this same date to the following: |
|   | **VIA OVERNIGHT SERVICE:**  The above-described document(s) will be delivered by overnight service, to the following: |

| | |
|---|---|
| L. Timothy Fisher<br>Bursor & Fisher, P.A.<br>1990 N. California Boulevard<br>Suite 940<br>Walnut Creek, CA 94596 | Attorneys for<br>Plaintiffs Sandra McMillion, Jessica Adekoya and Ignacio Perez |
| Yeremey Krivoshey<br>Bursor & Fisher, P.A.<br>1900 N. California Boulevard<br>Suite 490<br>Walnut Creek, CA 94596 | Attorneys for<br>Plaintiffs Sandra McMillion, Jessica Adekoya and Ignacio Perez |
| Blair E. Reed<br>Bursor & Fisher, P.A.<br>1990 N California Blvd<br>Suite 940<br>Walnut Creek, CA 94596 | Attorneys for<br>Plaintiffs Sandra McMillion, Jessica Adekoya and Ignacio Perez |

SUPPLEMENTAL DECLARATION OF MARK E. ELLIS IN SUPPORT OF MOTION TO AMEND OR ALTER THE JUDGMENT

| Scott A. Bursor<br>Bursor & Fisher, P.A.<br>2665 S. Bayshore Drive<br>220<br>Miami, FL 33133 | Attorneys for<br>Plaintiffs Sandra McMillion, Jessica Adekoya and Ignacio Perez |
|---|---|
| | Attorneys for |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is a true and correct statement and that this Certificate was executed on November 6, 2019.

By ._____

SUPPLEMENTAL DECLARATION OF MARK E. ELLIS IN SUPPORT OF MOTION TO AMEND OR ALTER THE JUDGMENT

# EXHIBIT S-1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey O. Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
          ykrivoshey@bursor.com
          breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone:  (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

**ELLIS LAW GROUP LLP**
Mark E. Ellis - 127159
Anthony P. J. Valenti - 284542
Lawrence K. Iglesias - 303700
1425 River Park Drive, Suite 400
Sacramento, CA  95815
Tel: (916) 283-8820
Fax: (916) 283-8821
mellis@ellislawgrp.com
avalenti@ellislawgrp.com
liglesias@ellislawgrp.com

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

SANDRA MCMILLION, JESSICA
ADEKOYA, and IGNACIO PEREZ, on Behalf
of Themselves and all Others Similarly Situated,

                              Plaintiffs,

        v.

RASH CURTIS & ASSOCIATES,

                              Defendant.

Case No.  4:16-cv-03396-YGR

Hon. Yvonne Gonzalez Rogers

**JOINT PRETRIAL CONFERENCE
STATEMENT**

Date: April 12, 2019
Time: 9:00 a.m.
Courtroom 1, 4th Floor

## I.      SUBSTANCE OF THE ACTION

### A.      Plaintiff's Statement Of Elements Of Proof

Plaintiff asserts a single claim against Rash Curtis for violation of the TCPA.  "The elements for a TCPA claim are that (1) a 'call' was made; (2) using an ATDS; (3) *or* an artificial or prerecorded voice; (4) the number called was assigned to a cellular telephone service; and (5) the 'call' was not made with the 'prior express consent' of the receiving party." *Pimental v. Google, Inc.* 2012 WL 1458179, at *2 n.2 (N.D. Cal. Apr. 26, 2012) (Gonzalez Rogers, J.) (citing 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)).  Although "prior express consent" is often referred to as an "element" of a TCPA claim, "express consent is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof." *Meyer v. Bebe Stores, Inc.*, 2015 WL 431148, at *3 n.3 (N.D. Cal. Feb. 2, 2015) (Gonzalez Rogers, J.) (quoting *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011)).  Plaintiffs will use the following evidence to prove each of these claims:

**A call was made:**  Rash Curtis produced logs of 534,698 calls it made using Global Connect, TCN, and DAKCS/VIC dialers (the "Dialers") during the class period (the "Call Logs"). Plaintiff will introduce summaries of these call logs into evidence with their expert witness, Colin Weir, and Anya Verkhovskaya, as the supporting witness.  Plaintiff will also introduce logs of calls Rash Curtis made to Mr. Perez using the Dialers during the class period.

**Using an ATDS:**  The Court has already determined that "[Rash Curtis'] Global Connect, TCN, and DAKCS/VIC dialers (the "Dialers") constitute Automatic Telephone Dialing Systems ("ATDSs") within the meaning of the TCPA."  Dkt. No. 167 at 2.

**Using a prerecorded or artificial voice:**  Plaintiff will introduce his own testimony that he heard a prerecorded or artificial voice when answering calls.  Plaintiff will also introduce the expert testimony of Randall A. Snyder who determined, through a review of Defendant's deposition testimony, dialer manuals, and Defendant's admissions, that Defendant used prerecorded or artificial voice when making calls with its Global Connect and VIC dialers.  Plaintiff will also introduce expert testimony from Colin B. Weir discussing the number of calls Defendant made to class members utilizing a prerecorded or artificial voice.

1  **The number called was assigned to a cellular telephone service:**  At Summary

2  Judgment, it was undisputed that Mr. Perez was called on his cellular telephone.  In fact, Rash

3  Curtis did not refute Mr. Perez was called on a cellular telephone.  Dkt. No. 152.  Plaintiff's expert

4  witness, Ms. Verkhovskaya, will testify that her searches using the LexisNexis database confirmed

5  that class members' phone numbers were assigned to cellular telephone services at the times the

6  calls were made.

7  **The call was made without the prior express consent of the receiving party:**  The Court

8  has already determined that "[Rash Curtis] lacked prior express consent to call [Plaintiff] Perez."

9  Dkt. No. 167 at 12.

10  **B.  Defendant's Defenses**

11  **Prior Express Consent**: No violation of the TCPA occurs when a phone call using an

12  automatic telephone dialing system, or an artificial or prerecorded voice, is initiated with the "prior

13  express consent" of the called party. 47 U.S.C. § 227(b)(1). "[P]rior express consent is a complete

14  defense" to a TCPA claim. *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1044 (9th

15  Cir. 2017). "Persons who knowingly release their phone numbers have in effect given their

16  invitation or permission to be called at the number which they have given, absent instructions to

17  the contrary." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of*

18  *1991*, 7 F.C.C. Rcd. 8752, 8769 (1992). A debt collector, such as Rash Curtis, who calls on behalf

19  of the party to whom consent has been provided, operates within that consent. *Hudson v. Sharp*

20  *Healthcare*, 2014 WL 2892290, at *3 (S.D. Cal. June 25, 2014).

21  Plaintiff has not proven that Rash Curtis lacked the prior express consent to place any of

22  the calls to any of the persons Plaintiff has identified as putative class members. Plaintiff Perez'

23  cell phone number does not appear on the list Plaintiff has described as class members. Rash Curtis

24  can prove through its records that some of the persons identified by Plaintiff's experts as class

25  members voluntarily provided their phone numbers to Rash Curtis or its creditor-clients with prior

26  express consent to be called. Rash Curtis' collection notes, ECA Advanced Trace reports, and Edit

27  Tracking reports may show whether a specific telephone number was obtained through skip

28  tracing, or by other methods.  Plaintiffs experts have erroneously assumed that all telephone

1  numbers in phone fields 5 through 10 were obtained by skip tracing and thus failed to reliably

2  separate phone numbers obtained by Rash Curtis through skip tracing from phone numbers

3  obtained through other methods, including those which were obtained with prior express consent.

4  Plaintiff has not established that any phone number stored in phone fields 5 through 10 was

5  obtained through skip tracing, or that Rash Curtis lacked prior express consent to dial any phone

6  number stored in those fields. *Snapp v. United Transportation Union,* 889 F.3d 1088, 1104 (9th

7  Cir. 2018).

8  **Good Faith**: TCPA liability does not extend to debt collectors where the phone number

9  provided to the debt collector by its creditor-client "gave Defendant a good-faith basis to believe

10  that it had prior express consent to contact Plaintiff at that number." *See, e.g., Chyba v. First*

11  *Financial Asset Management, Inc.*, 2014 WL 1744136, at *11 (S.D. Cal. 2014) *aff'd* 671

12  Fed.App'x 989 (9th Cir. 2016). The Ninth Circuit has confirmed that liability under the TCPA is

13  not appropriate where "[t]here appears to have been little that the Defendant could have done to

14  further ascertain whether there was consent except to call Plaintiff". *Id.*

15  Here, Rash Curtis obtained a cell phone number from its creditor client, Sutter General

16  Hospital ostensibly affiliated with a debt owed to Sutter by Daniel Reynoso. Rash Curtis

17  reasonably relied upon this information from Sutter; it did not know that the cell phone number in

18  question had been ported from Daniel Reynoso to Plaintiff Perez, until June 7, 2016, the first time

19  that Plaintiff Perez answered. On that date, upon notice, Rash Curtis deleted the cell number from

20  Mr. Reynoso's account, and never called Plaintiff Perez again.  The evidence, including testimony

21  from Rash Curtis' employees, as well as its business records, show that Rash Curtis reasonably and

22  in good faith believed that it possessed prior express consent to call the phone number in question

23  up until June 7, 2016. This defense is relevant to liability and the measure of damages.

24  **ATDS**: Rash Curtis raises, so as not to waive, the issue of whether Plaintiff has stated a

25  claim as to Rash Curtis' use of "automatic telephone dialing systems" within the meaning of 47

26  U.S.C. § 227(a)(1). Rash Curtis submits that the TCPA defines an "automatic telephone dialing

27  system" as "equipment which has the capacity (A) to store or produce telephone numbers to be

28  called, ***using a random or sequential number generator***; and (B) to dial such numbers." Although

1    the Ninth Circuit recently embraced a more expansive definition which includes all dialing

2    equipment that has the capacity to store phone numbers and dial them, there is a split among

3    Circuits, and the defendant in *Marks v. Crunch San Diego, LLC,* filed a petition for a writ of

4    certiorari to the Supreme Court of the United States on January 28, 2019, requesting the Supreme

5    Court resolve the circuit-split. The interpretation of the TCPA's definition of an "automatic

6    telephone dialing system" given by other circuits would obviate some or all of Plaintiff's class

7    claims because Rash Curtis' dialing equipment has never possessed the capacity to "generate"

8    telephone numbers "using a random or sequential number generator". *See, e.g., Dominguez v.*

9    *Yahoo, Inc.,* 894 F.3d 116, 120 (3rd Cir. 2018); *ACA Int'l v. Federal Commc'ns Comm'n,* 885 F.3d

10    687, 696-697 (D.C. Cir. 2018). Rash's dialers, like smartphones, are only used to dial phone

11    numbers off a list of specific phone numbers loaded and stored in Rash's dialers, and not numbers

12    which it "generated" randomly or sequentially.

13        **Safe Harbor**: Last year, the D.C. Circuit Court's decision in *ACA v. FCC, supra,* set aside

14    the FCC's "one-call safe harbor;" previously, the FCC had permitted "one liability-free call, rather

15    than impose a traditional strict liability standard, because it interpreted a caller's ability under the

16    statute to rely on a recipient's 'prior express consent' to mean reasonable reliance. And when a

17    caller has no knowledge of a reassignment, the [FCC] understandably viewed the caller's continued

18    reliance on the prior subscriber's consent to be reasonable." *ACA International, supra,* 894 F.3d at

19    706-707 (some internal quotation marks omitted). The D.C. Circuit discussed the purpose of the

20    FCC's reasonable reliance approach:

21          Elsewhere in the Declaratory Ruling, the Commission echoed the

22          same "reasonable reliance" understanding of the statute's approval of
            calls based on "prior express consent." The ruling accepts that a caller

23          can rely on consent given by a wireless number's "customary user"
            ("such as a close relative on a subscriber's family calling plan"), rather

24          than by the subscriber herself. [] That is because the "caller in this
            situation cannot reasonably be expected to divine that the consenting

25          person is not the subscriber." [] The [FCC] reiterated in that regard
            that, in "construing the term 'prior express consent' in section

26          227(b)(1)(A), we consider the caller's reasonableness in relying on
            consent. [][¶] The [FCC] thus consistently adopted a "reasonable

27          reliance" approach when interpreting the TCPA's approval of calls
            based on "prior express consent," including as the justification for

28

1
2
3
4
5
6

> allowing a one-call safe harbor when a consenting party's number is reassigned. The [FCC], though, gave no explanation of why reasonable-reliance considerations would support limiting the safe harbor to just one call or message. That is, why does a caller's reasonable reliance on a previous subscriber's consent necessarily cease to be reasonable once there has been a single, post-reassignment call? The first call or text message, after all, might give the caller no indication whatsoever of a possible reassignment (if, for instance, there is no response to a text message, as would often be the case with or without a reassignment).

7

*ACA International, supra,* 885 F.3d at 707 (internal citations omitted).

8
9
10
11
12
13
14
15

In setting aside the one-call safe harbor, the D.C. Circuit <u>did not</u> set aside the FCC's "reasonable reliance understanding of calls based on prior express consent." *Id.* (Internal quotation marks omitted.) Unlike some TCPA cases (e.g., junk fax cases) where there is no prior express consent from a previous subscriber upon which the defendant reasonably relied, the FCC has "consistently adopted a 'reasonable reliance' approach" in these circumstances. *Id. ACA* noted, "the [FCC] said that 'it could have interpreted the TCPA to impose a traditional strict liability standard,' i.e., 'a zero call' approach.' [] But the agency declined to 'require a result that severe'". *Id.* at 708. The *ACA* court went on to set aside the one-call safe harbor <u>only</u> because it was under the impression that the FCC does not treat reassigned number cases as strict-liability cases:

16
17
18
19
20
21
22
23

> When we invalidate a specific aspect of an agency's action, we leave related components of the agency's action standing only if "we can say without any 'substantial doubt' that the agency would have adopted the severed portion on its own." [][¶] Here, we have no such assurance. If we were to excise the Commission's one-call safe harbor alone, that would leave in place the Commission's interpretation that "called party" refers to the new subscriber. And that in turn would mean that a caller is strictly liable for *all* calls made to the reassigned number, even if she has no knowledge of the reassignment. [¶] We cannot be certain that the agency would have adopted that rule in the first instance. … We cannot say without substantial doubt that the agency would have embraced the "severe" implications of a pure, strict-liability regime in the absence of any safe harbor.

24

*ACA Int'l, supra,* 885 F.3d at 708 (internal citations omitted).

25
26
27
28

Thus, when the *ACA* court set aside the FCC's treatment of reassigned numbers, it did not contemplate leaving in place a strict-liability regime in reassigned number cases; rather, it left in place a "reasonable reliance" standard. *Id.* The TCPA imposes liability based upon negligence and

---

1    willfulness standards. *See, e.g.,* 47 U.S.C. § 227(b)(3). Here, Rash Curtis' conduct in calling

2    Plaintiff Perez does not rise to the level of "negligent" conduct, let alone "willful" or "knowing"

3    within the plain language of the TCPA. *See* 47 U.S.C. § 227(b)(3).

4        **No Proper Class**: Rash Curtis raises, so as not to waive, the issue that Federal Rule of Civil

5    Procedure 23 is not satisfied in this litigation. Rash intends to submit a motion to decertify in the

6    coming days explaining the basis for its defense in more detail. There are two primary issues here:

7    first, class certification was granted on the basis that individual issues would not predominate

8    because the classes only included skip traced phone numbers, and Rash could "easily identify"

9    which phone numbers were skip traced by searching for a unique status code. Now that expert

10   discovery has been conducted, it is clear that Plaintiff's experts do not intend to rely on any unique

11   status code, and instead, assert that calls placed to phone numbers obtained through "a variety of

12   sources", other than by skip tracing fall, within the scope of this litigation. Plaintiff's experts have

13   not conducted any adequate analysis of skip tracing by review of the relevant records and, as such,

14   have no non-speculative way of separating skip traced phone numbers from phone numbers

15   obtained with prior express consent.

16       Second, Plaintiff Perez is not designated as a member of the certified classes as framed by

17   Plaintiff and Plaintiff's experts' reports. The evidence demonstrates that his phone number was

18   given to Rash Curtis by its creditor-client, Sutter General, who was given the phone number by

19   Sutter's patient, Daniel Reynoso. Plaintiff defines the class merely by assuming that <u>all</u> phone

20   numbers stored in dialer fields five through ten (and which were not stored in fields one through

21   four) were skip traced; this assumption has no evidentiary support, and, conflicts with the

22   testimony of Rash's former Compliance Director, Steve Kizer, who Plaintiff deposed in April of

23   2017 and upon whose testimony his experts rely. Plaintiff Perez' phone number was not even

24   stored in one of those fields (5-10). As testified to by Kizer, Plaintiff Perez' phone number was

25   stored in phone field 1.

26       Plaintiff's experts' methodology for identifying class members whose phone numbers were

27   obtained through skip tracing, which begins with an analysis of which phone numbers were stored

28   in which phone fields in Rash Curtis' database, was a methodology invented solely for this

JOINT PRETRIAL CONFERENCE STATEMENT                                                              6
CASE NO. 4:16-cv-03396-YGR

1   litigation. Methodology which is "invented" for preparing an opinion for use in a particular case

2   and "likely never will be used again" is inherently unreliable. *In re SFPP Right-of Way Claims,*

3   2017 WL 2378363, at *7 (C.D. Cal. May 23, 2017) (citing *Clausen v. M/V NEW CARISSA*, 339

4   F.3d 1049, 1056 (9th Cir. 2003).

5        **Due Process**: This defense is both relevant to liability and damages. As to liability,

6   "Congress did not intend to depart from the common law understanding of consent because the

7   statute does not treat the term differently from its common law usage." *Gager v. Dell Financial*

8   *Services, LLC,* 727 F.3d 265, 271 (3rd Cir. 2013). Here, where Rash was validly given prior express

9   consent to call Mr. Reynoso at the cell number in question prior to the number being reassigned to

10  Plaintiff Perez, and no revocation of that consent was made until June 7, 2016, the first time

11  Plaintiff Perez spoke with anyone from Rash Curtis, due process requires revocation of consent be

12  made "clearly and expressly" before liability may be imposed. *See Van Patten, supra,* 847 F.3d at

13  1048. Imposing liability for calls placed after Rash had obtained prior express consent but before it

14  was notified that the consent was withdrawn, especially on a classwide basis, violates common law

15  principles of consent (under which the TCPA operates) and thus violates due process. *Id.*; *Gager,*

16  *supra,* 727 F.3d at 271. Additionally, class-wide liability would deprive Rash Curtis of an

17  opportunity to set forth its defenses to individual claims in violation of due process.

18        Due process is also relevant to the issue of damages, where the TCPA's "adding-machine"

19  damages were created to incentivize individual actions (for a nominal harm not otherwise likely to

20  be pursued by individual plaintiffs) but can quickly create ruinous liability on a class-wide basis.

21  While the TCPA's statutory damages are not facially unconstitutional, they "may become

22  unconstitutional as applied in an individual case." *Maryland v. Universal Electronics, Inc.*, 862

23  F.Supp.2d 457, 465 (D. Md. 2012) ("In such situations, a damages award may violate due process

24  or constitute an 'excessive file' under the Eighth Amendment"); *see also Forman v. Data Transfer,*

25  *Inc.,* 164 F.R.D. 400, 405 (E.D. Pa. 1995) (noting that the statutory damages allowed under the

26  TCPA were designed by Congress to be sufficient to incentivize individual actions and that class

27  actions posed the risk of "horrendous, possibly annihilating punishment, unrelated to any damage

28  to the purported class"); *see also Texas v. American Blastfax, Inc.,* 164 F.Supp.2d 892, 900-901

1   (W.D. Tex. 2001) (awarding 7 cents per TCPA violation, instead of $500 or more, for equitable,

2   reasonableness, and due process concerns).

3           **C.    Plaintiff's Response to Defendant's Listed Defenses**

4           The Court has already determined as a matter of law that "[D]efendant lacked prior express

5   consent to call [Plaintiff] Perez." Dkt. No. 167, at 12. The Court further denied Defendant's

6   arguments regarding a purported "good faith" or "reasonable reliance" defense to call Plaintiff, and

7   denied Defendant's motion for reconsideration on these issues. Accordingly, whether Defendant

8   had consent to call Plaintiff Perez (and whether Defendant had a good faith basis to believe it had

9   consent to call his number) will not be an issue to be proved at trial. *See* Dkt. No. 199, at 5-6

10  (Order denying Defendant's motion for reconsideration where Defendant made the same "good

11  faith" and "reasonable reliance" argument). And, as this Court has held, there is no such thing as a

12  good faith defense in the first place. *See Abrantes v. Northland Grp., Inc.*, 2015 WL 1738255, at

13  *1 (N.D. Cal. Apr. 13, 2015).

14          Defendant also states that it may prove through its records that some of the class members

15  identified in Plaintiff's expert reports provided prior express consent or that their phone numbers

16  were not obtained through skip tracing, including through the use of ECA Advanced Trace reports

17  and Edit Tracking reports. However, fact and expert discovery have long closed. Defendant has

18  not designated any rebuttal witnesses, and its deadline to do so has lapsed. Defendant also has not

19  disclosed or identified *a single* document that it may use to prove consent or absence of skip

20  tracing for the identified class members, and its deadline to disclose or exchange exhibits to be

21  used at trial passed on January 11, 2019. Dkt. No. 246, at 1. Accordingly, Defendant is foreclosed

22  from relying on any such undisclosed documents at trial. Dkt. No. 240, at 1 ("to the extent any

23  party intends to rely on any data in this lawsuit, be it in support of or in opposition to a motion or at

24  trial, the party shall first produce that data to the opposing party").

25          Plaintiff will address the other listed defenses in the relevant future pretrial filings.

26  **II.     RELIEF PRAYED**

27          Plaintiff seeks the following relief:

28

---

JOINT PRETRIAL CONFERENCE STATEMENT                                                              8
CASE NO. 4:16-cv-03396-YGR

1        1.      For Rash Curtis' violations of the TCPA, Plaintiff and class members seek at

2    minimum "statutory damages in the amount of $500 per violation." *See Meyer v. Bebe Stores, Inc.*,

3    2015 WL 431148, at *2 (N.D. Cal. Feb. 2, 2015) (Gonzalez Rogers, J.).  Plaintiff also intends to

4    present evidence that Rash Curtis' conduct was knowing and willful.  "In the case of knowing or

5    willful violations, statutory damages of up to $1,500 per violation may be awarded." *Id.*  Here,

6    Plaintiff will present testimony from Mr. Weir who has reported that his analysis of Rash Curtis'

7    Call Logs revealed 534,698 calls to class members using the Dialers during the class period.  At the

8    statutory floor of $500 per violation under the TCPA, damages total $267,349,000.  If Plaintiff

9    establishes that Rash Curtis' violations were knowing or willful, damages total $802,047,000.

10       2.      Plaintiffs also seek an injunction precluding Rash Curtis from calling class members

11   using an ATDS and/or artificial or prerecorded voice.

12   Defendant seeks the following relief:

13       1.      That Plaintiff Perez takes nothing from this action;

14       2.      An order decertifying the classes;

15       3.      That the putative class members take nothing from this action;

16       4.      An order that Defendant did not violate the TCPA; and

17       5.      An order denying Plaintiff's requested injunctive relief.

18   **III.    THE FACTUAL BASIS OF THE ACTION**

19       **A.      Undisputed Facts**

20   **Background**

21       1.      Plaintiff Perez filed the Class Action Complaint on June 17, 2016.

22       2.      The Court appointed Plaintiff Perez as class representative of the certified classes in

23   this case on September 6, 2017.  Dkt. No. 81.

24       3.      The Court appointed Bursor & Fisher, P.A. as class counsel to represent the certified

25   classes in this case on September 6, 2017.  Dkt. No. 81.

26       4.      Defendant Rash Curtis & Associates is a nationwide debt collection agency

27   specializing in the collection of healthcare debt.

28       5.      Rash Curtis' principal place of business in Vacaville, California.

6.      Rash Curtis obtains debtor accounts from healthcare providers for the purpose of collecting debts and may include one or more telephone numbers.

7.      As part of its efforts to collect debt, Rash Curtis regularly calls debtors and other people related to them.

**Rash Curtis' Use of Skip Tracing**

8.      Each of the certified classes requires, as a precondition to membership, that the class members' telephone numbers called by Rash Curtis were "obtained through skip tracing." Dkt. No. 81.

9.      Skip tracing is a method of obtaining demographic information about individuals. Skip tracing is used for a number of purposes including obtaining contact information such as home telephone numbers, current home addresses, last known addresses, places of employment, work phone numbers, fax numbers, spouse phone numbers (cellular or land line), family member phone numbers, additional addresses or phone numbers such as neighbors or friends, assets, credit scores, and searching for bankruptcy filings. Skip tracing may be performed via data analysis of personal information obtained from various public and private databases. Through skip tracing, a company like Rash Curtis may obtain new telephone numbers, addresses, and/or employment or asset information on a debtor or third-parties.

10.     Rash Curtis uses skip tracing to obtain various information about debtors, such as telephone numbers for the files it receives when it does not contain current telephone numbers for debtors, additional telephone numbers for accounts it receives that do contain telephone numbers, employment information, and, among other things, location information. Rash Curtis may also use skip tracing to obtain other information pertinent to its collection activity.

11.     Rash Curtis stores the telephone numbers it obtains from skip tracing in certain areas of its collection database.

12.     Rash Curtis maintains a database containing all of its collection accounts.  Each account record has ten telephone number "fields" used for storing phone numbers associated with the account.

13.     It is Rash Curtis' policy and procedure to place telephone numbers that it receives from its creditor-clients in phone fields one through four.

14.     It is Rash Curtis' policy and procedure to place the telephone numbers that it obtains from skip tracing in phone fields five through ten.

**Rash Curtis' Use of the Global Connect Dialer:**

15.     In the course of collecting debts, Rash Curtis regularly called consumers using Global Connect, a progressive dialer.

16.     A progressive dialer is a type of automatic telephone dialer whereby the equipment initiates outbound telephone calls by progressively dialing through a stored list of telephone numbers

17.     At the time Rash Curtis was using Global Connect, Global Connect could make 10 simultaneous calls per each of Rash Curtis' available debt collection agents.

18.     Global Connect could make thousands of calls within minutes.

19.     The Global Connect dialer allows for calling telephones using a prerecorded voice.

20.     Rash Curtis' employees would load lists of numbers for Global Connect to call prior to Global Connect placing calls.

21.     The Court has already determined that Rash Curtis' Global Connect dialer is an automatic telephone dialing system under the TCPA, 47 U.S.C. § 227(a)(1).  Dkt. No. 167.

22.     The Global Connect dialer is no longer in use by Rash Curtis.

**Rash Curtis' Use of the VIC Dialer**

23.     In the course of collecting debts, Rash Curtis regularly called consumers using VIC, a predictive dialer.

24.     A predictive dialer is a type of automatic telephone dialer that provides the capability to "predict" the availability of call center agents that can respond to the outbound calls that have been dialed by the predictive dialing system and answered by the called party.

25.     The VIC dialer utilizes debt collection business software sold by a company called DAKCS.

26.     At the time Rash Curtis was using VIC, VIC could make a minimum of three

JOINT PRETRIAL CONFERENCE STATEMENT
CASE NO. 4:16-cv-03396-YGR

11

1  simultaneous calls per each of Rash Curtis' available debt collection agents.

2        27.    The VIC dialer allows for calling telephones using a prerecorded voice.

3        28.    Rash Curtis' employees would load lists of numbers for VIC to call prior to VIC

4  placing calls.

5        29.    The Court has already determined that Rash Curtis' VIC dialer is an automatic

6  telephone dialing system under the TCPA, 47 U.S.C. § 227(a)(1).  Dkt. No. 167.

7        30.    The VIC dialer is no longer in use by Rash Curtis.

8  **Rash Curtis' Use of the TCN Dialer**

9        31.    In the course of collecting debts, Rash Curtis regularly calls consumers using TCN,

10  a predictive dialer.

11        32.    TCN can make 10 simultaneous calls per each of Rash Curtis' available debt

12  collection agents.

13        33.    Rash Curtis' employees load lists of numbers for TCN to call prior to TCN placing

14  calls.

15        34.    The Court has already determined that Rash Curtis' TCN dialer is an automatic

16  telephone dialing system under the TCPA, 47 U.S.C. § 227(a)(1).  Dkt. No. 167.

17  **Rash Curtis' Calls to the 5193 Phone Number**

18        35.    Rash Curtis called Plaintiff Perez's cellphone (ending in 5193) attempting to collect

19  a debt purportedly owed by a man named Daniel Reynoso.

20        36.    Rash Curtis' call logs show that it made 26 calls to Plaintiff Perez's cellphone, all of

21  which were placed through its dialing system "Global Connect" and none of which were placed

22  through the VIC or TCN dialers.  The calls were placed on the following dates: (1) June 3, 2015,

23  (2) February 24, 2016, (3) March 2, 2016, (4) March 9, 2016, (5) March 15, 2016, (6) March 28,

24  2016, (7) April 5, 2016, (8) April 6, 2016, (9) April 13, 2016, (10) April 18, 2016, (11) April 20,

25  2016, (12) April 22, 2016, (13) April 25, 2016, (14) April 27, 2016, (15) May 12, 2016, (16) May

26  16, 2016, (17) May 20, 2016, (18) May 24, 2016, (19) May 25, 2016, (20) May 26, 2016, (21) May

27  27, 2016, (22) May 28, 2016, (23) May 31, 2016, (24) June 1, 2016, (25) June 3, 2016, and (26)

28  June 7, 2016.

37.     Rash Curtis' call logs show that it made 14 calls to Plaintiff Perez where the call lasted six seconds or longer (indicating possible use of an artificial or prerecorded voice).

38.     Plaintiff Perez does not know Daniel Reynoso.

39.     Plaintiff Perez did not provide his cellphone number to Sutter General Hospital or to Rash Curtis in connection with Mr. Reynoso's purported debt.

40.     Plaintiff Perez provided his cellphone number to Sutter General Hospital at various times as part of his job as a caregiver.

41.     Plaintiff Perez also provided his cellphone number to Sutter General Hospital in connection with medical services both for himself and for his father.

42.     Rash Curtis has never had an account in Plaintiff Perez's name.

43.     Plaintiff Perez told Rash Curtis to stop calling his cellphone on June 7, 2016.

44.     Rash Curtis did not obtain the patient information sheet with Plaintiff Perez's cellphone number until after this case commenced.

45.     The Court has already determined that Rash Curtis lacked prior express consent to call Plaintiff Perez.  Dkt. No. 167.

**B.      Disputed Factual Issues**

      **1.      <ins>Plaintiff's List of Disputed Factual Issues</ins>**

1.     Whether Rash Curtis made 501,043 calls to class members through the Global Connect dialer that were answered and lasted six seconds or longer.

2.     Whether Rash Curtis made 31,064 calls to class members through the TCN dialer that were answered and lasted six seconds or longer.

3.     Whether Rash Curtis made 1679 calls to class members through the VIC dialer that resulted in the disposition code "Message – Hang Up."

4.     Whether Rash Curtis utilized a prerecorded or artificial voice on calls with the disposition code "Message – Hang Up."

5.     Whether Rash Curtis made 237 calls to class members through the VIC dialer that resulted in the disposition code "Message – VIC Voice Mail."

6. Whether Rash Curtis utilized a prerecorded or artificial voice on calls with the disposition code "Message – VIC Voice Mail."

7. Whether Rash Curtis made 675 calls to class members through the VIC dialer that resulted in the disposition code "Message – Party Connect."

8. Whether Rash Curtis utilized a prerecorded or artificial voice on calls with the disposition code "Message – Party Connect."

9. Whether Rash Curtis made 534,698 calls to class members' cellphones during the class period using an autodialer.

10. Whether Rash Curtis made calls to Plaintiff Perez using prerecorded voice.

11. Whether Rash Curtis made 503,634 calls to class members' cellphones using an artificial or prerecorded voice.

12. Whether Rash Curtis knowingly or willfully loaded cellphone numbers obtained through skip tracing into its dialers.

13. Whether Rash Curtis knowingly or willfully called cellphone numbers obtained through skip tracing using its dialers.

14. Whether Rash Curtis called phone numbers in phone fields 5-10 that were not also contained in phone fields 1-4 using its dialers.

15. Whether Rash Curtis had prior express consent to call class members' telephone numbers.

16. Whether Rash Curtis would run campaigns where its dialers were programmed to exclusively call third parties and telephone numbers obtained through skip tracing.

17. Whether Rash Curtis could determine if telephone numbers in its records were cellphone numbers or landline telephone numbers.

### 2. Rash Curtis' List of Additional Disputed Factual Issues:

1. On April 4, 2014, Sutter General Hospital provided medical treatment to a man named Daniel Reynoso.

2. Sutter General Hospital's records on Mr. Reynoso indicate that Mr. Reynoso gave Sutter his cell phone number ending in 5193 to Sutter to call him.

3.      Mr. Reynoso gave Sutter consent to dial the 5193 cell phone number.

4.      Mr. Reynoso's April 4, 2014 medical treatment had an outstanding balance which was assigned to Rash Curtis for collection.

5.      Sutter General Hospital transmitted Mr. Reynoso's account to Rash Curtis as a data file through its client portal with Rash Curtis on May 7, 2015.

6.      Sutter General Hospital transmitted demographic information to Rash Curtis when it assigned Mr. Reynoso's account for collection, including the 5193 phone number, as well as another phone number ending in 3071 belonging to Darlene Lopez, believed to be a relative of Mr. Reynoso.

7.      The 5193 phone number was stored in the "home" field, i.e., phone field 1 by Rash Curtis in its database.

8.      At some time between July of 2015 and July of 2016, the 5193 cell phone number was reassigned to Plaintiff Perez.

9.      Plaintiff Perez did not acquire the 5193 cell phone number until some point in time after Mr. Reynoso's debt account was assigned to Rash Curtis for collection on May 7, 2015.

10.     Rash Curtis typically obtains its debt accounts for collection from its creditor-clients such as Sutter General Hospital through a data file directly from the creditor, as opposed to obtaining the paper face sheets that the patients fill out at the hospital.

11.     Rash Curtis did not obtain the 5193 phone number through skip tracing, but rather, directly from Sutter General Hospital, Rash's creditor-client, when Mr. Reynoso's account was referred for collection.

12.     Rash Curtis did not obtain any phone numbers through skip tracing related to Mr. Reynoso's account, including the reassigned phone number ending in 5193 now belonging to Plaintiff Perez.

13.     The calls placed to Plaintiff Perez were "wrong number" calls placed after Mr. Reynoso's phone number was ported to Plaintiff Perez, unbeknownst to Rash Curtis.

14.     Skip tracing is a legal process. When Rash Curtis obtains a phone number through skip tracing, does not always autodial the skip-traced phone number immediately. In some cases,

1   Rash Curtis places manual calls, which are not regulated by the TCPA, to the skip traced phone

2   number to establish whether the phone number is accurate and to obtain prior express consent to

3   autodial it in the future.

4        15.    Plaintiff's experts have not performed any analysis of any manually dialed calls

5   placed by Rash Curtis to skip traced phone numbers.

6        16.    Plaintiff's experts have not performed any analysis of whether prior express consent

7   to dial any of the phone numbers Plaintiff's experts assert belong to class members was first

8   obtained during a manually dialed call prior to any autodialed calls.

9        17.    Plaintiff's experts have not performed any analysis of whether Rash Curtis obtained

10  prior express consent to dial any of the calls which they purport were in violation of the TCPA in

11  any other way, such as from Rash Curtis' creditor-clients, from a third-party, or directly from the

12  debtor.

13       18.    It is impossible to know whether a phone number stored in phone fields 5 through

14  10 was obtained by Rash Curtis through skip tracing without looking at the individual collection

15  notes for each account.

16       19.    Plaintiffs experts have not looked at the individual collection notes for any of the

17  class members to determine whether any phone numbers were skip traced.

18       20.    It is impossible to know whether Rash Curtis had prior express consent to dial any

19  phone number stored in fields 5 through 10 without looking at the individual collection notes for

20  each account.

21       21.    Plaintiffs experts have not looked at the individual collection notes for any of the

22  class members to determine whether any phone numbers were skip traced.

23       22.    Plaintiff's experts' have assumed that all phone numbers stored in phone fields 5

24  through 10 were obtained through skip tracing..

25       23.    Phone numbers stored in phone fields 5 through 10 are obtained by Rash Curtis

26  through a variety of sources, including when an account is assigned from its creditor-clients in a

27  data file, directly from debtors, directly from a debtors' family members or other related third-

28  parties, as well as through skip tracing

24.     Plaintiff's experts have not determined which phone numbers have been skip traced and which have not by looking at Rash Curtis' collection notes.

25.     Plaintiff's claim that all phone numbers stored in phone fields 5 through 10 are skip traced is not supported by the evidence.

26.     At least some, and potentially most or even all, of the third-party phone numbers Plaintiff's experts assert belong to putative class members were obtained by Rash Curtis with prior express consent.

27.     At least some, and potentially most or even all, of the third-party phone numbers Plaintiff's experts assert belong to the putative class members were not obtained by Rash Curtis through skip tracing

28.     Plaintiff has not established whether any of the persons asserted by Plaintiff's experts as belonging to the putative classes provided prior express consent to be called prior to one, several, or all of the calls placed by Rash Curtis using its dialers (i.e., whether a manual call was placed prior to any autodialed calls wherein the third-party gave Rash Curtis prior express consent to use autodialers and/or artificial or prerecorded voices to call him or her).

29.     Whether Rash Curtis obtained the phone numbers belonging to the pool of persons Plaintiff's experts identified as putative class members through any method other than skip tracing.

30.     Whether Rash Curtis obtained the phone numbers belonging to the pool of persons Plaintiff's experts identified as putative class members with prior express consent.

31.     Whether Rash Curtis knowingly or willingly, or even negligently, violated the TCPA as to Plaintiff Perez.

32.     Whether Rash Curtis knowingly or willingly, or even negligently, violated the TCPA as to any of the other persons identified by Plaintiff's experts as purportedly belonging to the classes.

33.     Whether Rash Curtis' dialers have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers.

34.     Whether Rash Curtis had a good-faith basis to dial the 5193 phone number up until the time Plaintiff Perez notified Rash that it was dialing a phone number that no longer belonged to Mr. Reynoso (on June 7, 2016).

**C.     Agreed Statement**

The parties have met and conferred and do not believe that all or part of this action may be presented upon an agreed statement of facts.

**D.     Stipulations**

1.     The parties stipulate to the authenticity of any document produced by a party in this case.  This stipulation shall not be deemed or interpreted to be a stipulation that any document is admissible in evidence.

2.     The parties stipulate that copies of documents may be used at trial in lieu of originals and shall not be deemed inadmissible solely on the basis that they are copies.

3.     The parties stipulate that venue is proper in this Court.

4.     The parties stipulate that this Court has personal jurisdiction over the parties for purposes of this action.

5.     The parties stipulate that they may call witnesses out of order (including Plaintiff calling witnesses during Rash Curtis' direct case and vice versa) if necessary, to accommodate third-party witness' schedules.

6.     The parties stipulate that they will identify the live witnesses they intend to call by 9:00 a.m. the calendar day before the day on which they intend to call that witness.

**IV.  DISPUTED LEGAL ISSUES**

Plaintiff does not believe that there are any disputed legal issues.

Defendant believes the following legal issues have not been resolved:

1.     If Rash Curtis had a good faith basis to believe that it was placing calls to Mr. Reynoso instead of Plaintiff Perez until Plaintiff Perez informed Rash Curtis that it was dialing the wrong number on June 7, 2016, whether that good faith believe should preclude TCPA liability.

2.      Whether Plaintiff Perez is an adequate class representative following expert discovery (especially in light of the fact that Plaintiff's expert's list of purported class members does not include Plaintiff Perez).

3.      What a reasonable safe harbor is for callers who place calls to a phone number that has been reassigned between the time that the phone number was provided with prior express consent and the time the time that the calls were placed but without notice of reassignment to the caller.

4.      Whether individualized issues of prior express consent predominate over any common issues.

5.      Whether the damages calculated proposed by Plaintiff's experts would violate due process.

6.      Whether any award of statutory damages predicated upon a "wrong number" call to a reassigned phone number would violate due process.

7.      Raised as not to waive the issue, whether Rash Curtis' dialers constitute an "automatic telephone dialing system" within the meaning of 47 U.S.C. § 227(a)(1).

8.      Whether a debt collector may reasonably rely on prior express consent transmitted to it by its creditor-client which was originally obtained by the debtor to the creditor directly.

9.      Whether statutory damages under the TCPA predicated on calls placed to a phone number that was obtained with prior express consent, but then subsequently reassigned to a different subscriber, and where the caller had no notice of the reassignment, would violate the caller's right to due process.

**10.**      Whether Rash Curtis may be held liable for calls placed without prior express consent via TCN in light of the certified class definitions.

## V. FURTHER DISCOVERY OR MOTIONS

All discovery has been completed. Defendant has indicated that it intends to file a motion for decertification of the classes. Plaintiff does not anticipate filing any additional motions at this time. However, Plaintiff notes that Plaintiff's unopposed Proposed Notice of Pendency of Class

1    Action, ECF Doc. No. 249, is still pending.  As discussed in the Notice, Plaintiff has proposed that

2    class members be given 60 days to request exclusion from the class from the date that notice is

3    disseminated.  Considering that trial is scheduled to begin on May 6, 2019, Plaintiff respectfully

4    requests that the Court rule on the proposed notice plan as soon as possible.

5        The parties are currently meet and conferring regarding the amount of costs that Defendant

6    will remit to Plaintiff for taking Plaintiff's experts' depositions.  Should the parties fail to agree on

7    a cost figure, Plaintiff may file a motion seeking an order for Defendant to pay the difference in

8    costs Defendant agrees to pay and the amount Plaintiff believes Defendant is obligated to pay.

9        **Defendant's Further Statement:** Defendant has not yet opposed the proposed notice

10   procedure but disputes that Plaintiff's proposed class notice plan is proper, which will be discussed

11   in greater detail in Defendant's upcoming motion to decertify classes. Defendant's position is that

12   an opt-in procedure, rather than an opt-out procedure, would be more suitable under the

13   circumstances. Defendant has identified at least one person on Plaintiff's proposed class list who

14   has already settled a TCPA case with Defendant (and, importantly, whose phone number was *not*

15   obtained by Defendant through skip tracing).

16   **VI.  ESTIMATE OF TRIAL TIME**

17       Plaintiff estimates that his direct case will take three to four trial days.  Rash Curtis

18   estimates the trial (both sides) will take 6 to 7 trial days, including opening statements, closing

19   arguments, and instructing the jury.

20   **VII.  LIST OF MOTIONS *IN LIMINE***

21       **Plaintiff's Motions in Limine:**

22       <u>No. 1</u>:  To Preclude Any Evidence Or Testimony Regarding Previously Stricken Evidence

23       <u>No. 2</u>:  Hearsay And Misleading Testimony Regarding Trial Exhibits 504 And 505

24       <u>No. 3</u>:  Preclude Cumulative Evidence

25       <u>No. 4</u>:  Preclude Evidence Regarding Non-Class Representative Plaintiffs

26       <u>No. 5</u>:  Preclude Deposition Transcript, Hearsay Declaration, Court Orders, Case Filings

27       <u>No. 6</u>:  Preclude Evidence Regarding The "Good Faith Defense" And Consent To Call

28   Plaintiff

---

JOINT PRETRIAL CONFERENCE STATEMENT                                                          20
CASE NO. 4:16-cv-03396-YGR

No. 7:  Preclude Defendant From Presenting Deposition Excerpts It Did Not Timely Disclose

No. 8:  Preclude Defendant And Its Counsel From Making Statements Regarding Defendant's Financial Condition Or Ability To Pay A Judgment In This Case

No. 9:  Exclude Defendant's Witnesses' Testimony That Defendant Purportedly Never Made Calls To Phone Numbers From Phone Fields 5 Through 10

**Defendant's Motion in Limine:**

No. 1:  To Use Documentary Screenshot Evidence From Rash Curtis' "Beyond ARM" Software Pertaining to Its Storage of the 5193 Phone Number in Phone Field No. 1, and Documentary Screenshot Evidence of Rash Curtis' ECA Advance Trace Report for Daniel Reynoso Showing That The 5193 Phone Number Was Not Obtained Through an ECA Advance Trace.

**VIII.  JUROR QUESTIONNAIRE**

The parties intend to file proposed additional questions for jury selection in accordance with Item 3.h of the Court's pretrial standing order.

**IX.  SETTLEMENT DISCUSSIONS**

On August 16, 2017, the parties attended a full-day mediation with Doug DeVries at Judicate West in San Francisco.  Both prior to and after the mediation, the parties have had several phone calls regarding settlement.  Those attempts to settle the case have failed.[1]  The parties do not believe a settlement is likely at this time and do not have any settlement discussions planned.

**X.  CONSENT TO TRIAL BEFORE A MAGISTRATE JUDGE**

The parties do not consent to trial before a magistrate judge.

**XI.  AMENDMENTS, DISMISSALS**

The parties intend to file stipulations of dismissal of the claims of Plaintiffs McMillion and Adekoya in the near future as required by the settlements with those plaintiffs.

---

[1] The parties did reach a settlement of the individual claims of Plaintiffs Adekoya and McMillion.

## XII.  BIFURCATION, SEPARATE TRIAL OF ISSUES

The parties agree that bifurcation is not appropriate in this case.

Dated: February 15, 2019                    Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By:   */s/ Yeremey Krivoshey*
                                                      Yeremey Krivoshey

                                            L. Timothy Fisher (State Bar No. 191626)
                                            Yeremey Krivoshey (State Bar No. 295032)
                                            Blair E. Reed (State Bar No. 316791)
                                            1990 North California Blvd., Suite 940
                                            Walnut Creek, CA  94596
                                            Telephone: (925) 300-4455
                                            Email: ltfisher@bursor.com
                                                      ykrivoshey@bursor.com
                                                      breed@bursor.com

                                            **BURSOR & FISHER, P.A.**
                                            Scott A. Bursor (State Bar No. 276006)
                                            888 Seventh Avenue
                                            New York, NY  10019
                                            Telephone: (212) 989-9113
                                            Facsimile:  (212) 989-9163
                                            E-Mail: scott@bursor.com

                                            *Attorneys for Plaintiffs*

Dated: February 15, 2019                    **ELLIS LAW GROUP LLP**

                                            By:   */s/ Mark E. Ellis*
                                                      Mark E. Ellis

                                            Mark E. Ellis (State Bar No. 127159)
                                            Anthony P.J. Valenti (State Bar No. 288164)
                                            Lawrence K. Iglesias (State Bar No. 303700)
                                            1425 River Park Drive, Suite 400
                                            Sacramento, CA 95815
                                            Tel: (916) 283-8820
                                            Fax: (916) 283-8821
                                            Email: mellis@ellislawgrp.com
                                            avalenti@ellislawgrp.com
                                            liglesias@ellislawgrp.com

                                            *Attorneys for Defendant*

# EXHIBIT S-2

1
2
3
4
5
6

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey O. Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
       ykrivoshey@bursor.com
       breed@bursor.com

7
8
9
10

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

11

*Class Counsel*

12

UNITED STATES DISTRICT COURT

13

NORTHERN DISTRICT OF CALIFORNIA

14
15
16
17
18
19
20

IGNACIO PEREZ, on Behalf of Himself
and all Others Similarly Situated,

               Plaintiff,

    v.

RASH CURTIS & ASSOCIATES,

               Defendant.

Case No. 4:16-cv-03396-YGR

**PLAINTIFF'S CLOSING ARGUMENT
REGARDING PHASE 2 (KNOWLEDGE
AND WILLFULNESS)**

Hon. Yvonne Gonzalez Rogers

21
22
23
24
25
26
27
28

PLAINTIFF'S CLOSING ARGUMENT REGARDING PHASE 2
CASE NO. 4:16-cv-03396-YGR

1

2

**TABLE OF CONTENTS**

**PAGE(S)**

I.      INTRODUCTION .................................................................................................. 1

II.     LEGAL STANDARD FOR KNOWLEDGE AND WILLFULNESS ................... 2

III.    DEFENDANT KNOWINGLY VIOLATED THE TCPA ..................................... 4

     A.      Defendant's Owners – Terrence and Natasha Paff – Personally
         Oversaw Defendant's Cellphone Compliance Program And
         Instructed Defendant's Employees To Call Cellphones Using
         Defendant's Autodialers .......................................................................... 4

     B.      Defendant Knew It Had No Consent To Call Phone Numbers In
         Phone Fields Five Through Ten ............................................................... 6

     C.      Each of Defendant's Trial Witnesses Lied About Not Calling Phone
         Numbers In Phone Fields Five Through Ten .......................................... 7

     D.      Defendant Knew That It Was Using An Artificial Or Prerecorded
         Voice ........................................................................................................ 9

     E.      Defendant Is A Repeat Offender ........................................................... 10

IV.     DEFENDANT'S DUE PROCESS ARGUMENTS ARE MERITLESS ............. 11

V.      CONCLUSION ................................................................................................... 15

1

# TABLE OF AUTHORITIES

2

**PAGE(S)**

3

**CASES**

4
*Bateman v. Am. Multi-Cinema, Inc.,*
 623 F.3d 708 (9th Cir. 2010) ................................................................. 11, 12

5
*Charvat v. Ryan,*
 879 N.E. 2d 765 (Ohio 2007) ....................................................................... 3

6

7
*Davis v. Diversified Consultants, Inc.,*
 36 F. Supp. 3d 217 (D. Mass. 2014).............................................................. 3

8
*Global-Tech Appliances, Inc. v. SEB S.A.,*
 563 U.S. 754 (2011) ........................................................................ 3, 4, 5, 8

9

10
*Golan v. Veritas Entm't, LLC,*
 2017 WL 3923162 (E.D. Mo. Sep. 7, 2017) ......................................... 13, 14, 15

11
*Italia Foods, Inc. v. Marinov Enters., Inc.,*
 2007 WL 4117626 (N.D. Ill. Nov. 16, 2007) ................................................. 13

12

13
*Kristensen v. Credit Payment Servs.,*
 12 F. Supp. 3d 1292 (D. Nev. 2014) ............................................................ 11

14

15
*Maryland v. Universal Elections, Inc.,*
 862 F. Supp. 2d 457 (D. Md. 2012) ............................................................. 14

16
*Meyer v. Portfolio Recovery Assocs., LLC,*
 707 F.3d 1036 (9th Cir. 2012) .................................................................... 11

17

18
*Murray v. GMAC Mortg. Corp.,*
 434 F.3d 948 (7th Cir. 2006) ...................................................................... 12

19
*Phillips Randolph Enters., LLC v. Rice Fields,*
 2007 WL 129052 (N.D. Ill. Jan 11, 2007)..................................................... 13

20

21
*Roylance v. ALG Real Estate Servs., Inc.,*
 2015 WL 1522244 (N.D. Cal. Mar. 16, 2015) .................................................. 2

22
*Safeco Ins. Co. of Am. v. Burr,*
 551 U.S. 47 (2007) ..................................................................................... 3

23

24
*Sengenberger v. Credit Control Servs., Inc.,*
 2010 WL 1791270 (N.D. Ill. May 5, 2010)...................................................... 3

25
*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
 559 U.S. 393 (2010) ............................................................................ 12, 13

26

27
*Texas v. Am. Blastfax, Inc.,*
 164 F. Supp. 2d 892 (W.D. Tex. 2001) ......................................................... 14

28

1

**STATUTES**

2

47 U.S.C. § 227(b)(3)(B) ................................................................................................. 15

3

47 U.S.C. § 227(c)(5) ..................................................................................................... 15

4

47 U.S.C. § 312(f)(1) ....................................................................................................... 3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.  INTRODUCTION

Defendant's owner and CEO, Terrence Paff, knew that he could "lose everything" by violating the TCPA, but chose to do it anyway. *See* Trial Exhibit 82.  The reason: to make more money.  Mr. Paff's company had been sued repeatedly for TCPA violations.  But rather than attempting to comply with the law, he decided it was more profitable to continue the illegal conduct.  As Defendant's compliance director, Steven Kizer explained: "So we're calling them knowing were not supposed to.  We are getting hit with maybe some very minor lawsuit, 1500, 3,000 [dollars].  …  After a couple of days, they'd go right back to the same thing."  Trial Tr. at 201:10 and 213:5 (Kizer Dep. at 76.17-77:23).

The evidence presented at trial, and the jury's verdict, leave no doubt that Rash Curtis used its autodialers to call skip-traced numbers without consent.  These numbers were stored in phone fields five through ten of Defendant's account database.  Plaintiff presented evidence, through the autodialer call logs and the testimony of Colin B. Weir, that Defendant's autodialers called numbers stored only in phone fields five through ten at least 14 million times during the Class Period.  *See* Trial Tr. at 253:16-18 (9.7 million calls by Global Connect autodialer); *id.* at 262:1-3 (3.7 million calls by the TCN autodialer); *id.* at 265:21-22 (665,181 calls by the VIC dialer).  The call logs show that this was a regular ongoing practice.  *See* Trial Tr. at 253:23-25 ("I found that calls were being placed to phone fields five through ten in every month of the call log data from Global Connect."); *id.* at 262:7-9 ("Again, every month for which I had call detail records [for the TCN autodialer], there were many calls placed to numbers contained in phone fields five through ten."); *id.* at 265:23-266:1 ("This was occurring on a month-by-month basis.").  Defendant made no effort to rebut Mr. Weir's testimony concerning these call log data.

Defendant's witnesses (Robert Keith, his son Nick Keith, Dan Correa, and Chris Paff (son of Terrence Paff)) claimed not to have looked at the call log data, but all swore under oath, repeatedly, that the autodialers did not call phone fields five through ten.  Trial Tr. at 552:1-5 ("Q. Mr. Keith, did Rash Curtis ever put any numbers in Phone Fields Five through Ten into Global Connect?  A. Not to my knowledge.  Q. That never happened?  A. Not to my knowledge.); *id.* at

592:9-15 (Dan Correa) ("Q. Does Rash Curtis on a regular basis load numbers from phone fields five through ten – A. No.  Q. – into the autodialers?  A. No.  Q. Never has?  A. No."); *id.* at 611:9-16 (Nick Keith) ("Q. So it's impossible for that to happen, the numbers cannot be loaded from fields five through ten into the Global Connect dialer?  A.  They cannot be called from there.  Q. That is your testimony? A. Correct.  Q. And you swear to that under oath?  A. Yes, sir.); *id.* at 634:12-23 ("Q. Good afternoon, Mr. Paff.  I want to ask you, does the Rash Curtis company load phone numbers from phone fields five though ten into the Global Connect dialer?  A. I don't believe so.  That wouldn't be … No, that is not our policy.").  That testimony was obviously false.  And it was brazen.  When four of four defense witnesses all give false testimony on the most important issue in the case, there can be little doubt that their testimony was part of a coordinated plan to attempt to defraud the court.  The defense presented at this trial was a mockery.  It was an affront to the dignity of the court.

To treble damages, the Court need only find by a preponderance of the evidence that Defendant knowingly or willfully called skip-traced cellphone numbers using its autodialers without consent.  The jury's verdict found that happened at least 534,712 times.  And the evidence showed quite clearly that the Defendant did know that it was autodialing skip-traced numbers without consent, and did so willfully.  The consequences of such a finding under the TCPA are severe.  But the Defendant's conduct here, including their conduct during the trial, was so outrageous, that the court should not hesitate to apply the full measure of justice available under the TCPA.

## II.  LEGAL STANDARD FOR KNOWLEDGE AND WILLFULNESS

In Defendant's Trial Brief on Standards Re: Treble Damages, ECF No. 344, Defendant identifies a number of different standards courts have looked to in determining whether TCPA violations were knowing or willful, but does not argue that one or more of them are correct or explain which standard the Court should adopt.  While there is some split of opinion, the majority of courts to rule on the issue have correctly held that a defendant need not have "intended" to violate the TCPA for the defendant's conduct to be "knowing" or "willful."  *Roylance v. ALG Real*

*Estate Servs., Inc.*, 2015 WL 1522244, at *11 (N.D. Cal. Mar. 16, 2015) (discussing case law regarding "knowledge" and "willfulness" under the TCPA); *Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 226 (D. Mass. 2014) ("While neither the TCPA nor FCC regulations provide a definition for willful and knowing, most courts have interpreted the willful or knowing standard to require only that a party's actions were intentional, not that it was aware that is was violating the statute."); *Charvat v. Ryan*, 879 N.E. 2d 765, 399 (Ohio 2007) ("We hold that to establish a knowing violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of law."). "While the TCPA does not define willful, the Communications Act of [1934], of which the TCPA is a part, defines willful as 'the conscious or deliberate commission or omission of such act, irrespective of any intent to violate any provision[], rule or regulation.'" *Sengenberger v. Credit Control Servs., Inc.*, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010) (quoting 47 U.S.C. § 312(f)(1)).

Accordingly, to prove willfulness or knowledge by a preponderance of the evidence, Plaintiff does not need to prove, *inter alia*, that Defendant knew its autodialers constituted ATDS within the meaning of the TCPA or that Defendant knew the definition of prior express consent under the TCPA. Rather, Plaintiff need only show that Defendant knew it was calling cellphone numbers using its autodialers which it did not obtain from its creditor-clients.

Plaintiff could also prove willfulness or knowledge by showing that Defendant was "willfully blind" to the fact that it was calling cellphones obtained through skip-tracing using its autodialers. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 48 (2007) ("Where willfulness is a statutory condition of civil liability, it is generally taken to cover not only knowing violations of a standard, but reckless ones as well."); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("[P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts.").

Whatever the standard, the evidence overwhelmingly shows that Defendant knew that the TCPA barred calling cellphones using its autodialers without prior express consent, but did so

anyway during every single month for which call records were produced.

### III.   DEFENDANT KNOWINGLY VIOLATED THE TCPA

**A.   Defendant's Owners – Terrence and Natasha Paff – Personally Oversaw Defendant's Cellphone Compliance Program And Instructed Defendant's Employees To Call Cellphones Using Defendant's Autodialers**

Defendant's two owners, Terry Paff and Natasha Paff personally oversaw Defendant's feigned TCPA "compliance" program. *See* Trial Exhibit 4, at 4 (listing Terry Paff as "President/CEO" and Natasha Paff as "Chief Administration Officer"). While Terry and Natasha Paff discussed trying to get "compliant" with the TCPA for <u>years</u>, they simultaneously directed Defendant's employees to call cellphones using autodialers in knowing violation of the TCPA.

As early as February of 2014, Terry and Natasha Paff discussed methods for identifying phone numbers as being wireless phone numbers so that such numbers would not be dialed. *See* Trial Exhibits 8, 9.[1] In August of 2015, Terry and Natasha Paff were consistently copied on emails discussing the need to get cell phone "compliant" and the fact that Defendant needs to call cellphones "manually unless our clients send us the admitting form that shows the debtor gave them this number to call." *See* Trial Exhibit 10, at 5. To be clear, Defendant's software allowed Defendant's employees to determine whether any given number was assigned to a cellphone with a click of a button. *See* Trial Exhibit 84, at 72:18-73:3.

Defendant's compliance program, however, was a sham. On November 19, 2015, after getting sued for violating the TCPA, Bob Keith, Defendant's Vice President in charge of Defendant's legal department, emailed Terry Paff stating that he was "under the impression that we stopped dialing cell phone." Trail Exhibit 82, at 3. Even though the email was prompted by a TCPA lawsuit, Bob Keith asked, "Do you want to continue to call them?" *Id.* In a subsequent email that same day, Chris Paff, Defendant's Executive Vice President of Collections and

---

[1] In discovery, Defendant produced emails from four custodians: Nick Keith, Dan Correa, Robert Keith, and Chris Paff. Defendant did not produce any emails directly from Terry or Natasha Paff. All Trial Exhibits cited herein referencing Terry and Natasha Paff were obtained because of Terry and Natasha Paff's direct involvement in Defendant's TCPA practices, as can be seen through their emails with the four custodians.

Operations and Terry Paff's son, reminded Terry Paff of the reason <u>Terry Paff</u> instructed his employees to restart dialing cellphones in violation of the TCPA:

> **When we were hurting you said to stop [doing cell phone scrubs] – it was too quite [sic] in here u didn't like it.**

*Id.*, at 1 (bolding added). Terry Paff responded with a joke: "Maybe it's time to [sell] this place and buy a fruit stand….. can we get sued for selling fruit?" *Id.* Based on the evidence presented during this trial, it is clear that Terry Paff really did treat TCPA compliance as a joke.

Steven Kizer corroborated Terry Paff's clear instructions to violate the TCPA, testifying that Defendant would call cellphones in knowing violation of the TCPA, stop for a few days upon receiving a lawsuit, and then start back up again:

Q.    Do you know why Rash Curtis made the decision at the times that it decided to place cell phone numbers into the dialers, why was that decision made?  Why were those – if you know?

A.    ... There was a time when it was made completely crystal clear to management that calling cell phones was violation of statute.  It was illegal.  You're not supposed to do that without consent.

Q.    The TCPA, is that what you're referring to?

A.    Correct.

…

Q.    So when you first started for those first couple of years, the decision was made to include cell phone numbers being inputted into the dialer?

A.    That is correct, knowing that it was not supposed to be happening.

…

Q.    Okay. So at some point did they stop then?

A.    When it was apparent it could potentially be too expensive.  So it's a cost factor ....  So we're calling them knowing we're not supposed to.  We are getting hit maybe with some very minor lawsuit, [$]1500, [$]3000.  Bob, Robert Keith, would come out of his office, vice president of the legal department, be all upset, because he's complaining he's having to cut checks for $3,000 ....  So he would come out and say, hey, we've been sued.  I want to stop making announcements to the entire floor.  Don't call cell phone numbers.  Make sure they're not in the header, and then that would go for about two or three days.

...

Q. Did management ever explain their decision to restart loading cell phones into the dialers?

A. Not the staff, but in meeting they did.

Q. Were you a part of those meetings?

A. I was present at them.

Q. So what were the reasons given?

A. We need money.

Q. ... So they figured by calling --- by loading cell phones into the dialer, they could make more money from their accounts. Is that –

A. That is correct, and unfortunately it's true. ...

Trial Tr. at 201:10 and 213:5 (Kizer Dep. at 74:11-80:2).

**B.      Defendant Knew It Had No Consent To Call Phone Numbers In Phone Fields Five Through Ten**

Defendant's Rule 30(b)(6) witness conceded that Defendant knew it did not have consent to call phone numbers in phone fields five through ten.  Trial Tr. at 219:2 (Daniel Correa Dep. at 52:17-19) ("Q. You don't have consent to call numbers in phone fields 5 through 10?  A. Correct.").  Defendant may argue that it had consent to call some of the phone numbers in phone fields five through ten, such as, e.g., numbers that were separately stored in phone fields one through four or came in from a client.  But there is no evidence in the record that a single phone number in phone fields five through ten came from a client.  Defendant has not produced or designated any exhibits showing a single instance of an account coming in from a creditor bearing more than four phone numbers, such that they would "spill over" into phone fields five through ten. All numbers that were separately stored in phone fields one through four were eliminated from Plaintiff's analysis at trial.[2]

---

[2] Defendant's cited cases where courts found willfulness only after a defendant was told they have reached the wrong person are inapposite.  See Trial Brief on Standards Re: Treble Damages, ECF No. 344, at 4-5.  Here, before placing a single call to phone numbers in phone fields five through ten, Defendant knew that it had no consent to call the phone numbers.  The entire purpose of putting phone numbers into those fields was, according to Defendant, so that Defendant would not call them due to lack of consent.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.   Each of Defendant's Trial Witnesses Lied About Not Calling Phone Numbers In Phone Fields Five Through Ten

On August 10, 2018, Plaintiff filed a motion for terminating sanctions because Defendant's three key witnesses – Robert Keith, Nick Keith, and Dan Correa – each committed perjury at their depositions by testifying that Defendant did not make a single call to any phone numbers in phone fields five through ten, and, further, that Defendant's dialers were not capable of making such calls. ECF No. 212. In fact, more than 14 million calls were made. *See* Trial Exhibit 56, at ¶ 11. At the time Plaintiff deposed Defendant's witnesses, Defendant had not yet produced any call log data (beyond one small sample) or any account records, and apparently assumed that Plaintiff would not be able to verify Defendant's statements.

In opposing Plaintiff's sanctions motion, Defendant made up a phony story that, to the extent any phone numbers were called from phone fields five through ten, it was because those numbers were separately contained in phone fields one through four. Defendant's Opposition to Plaintiffs' Motion for Sanctions, ECF No. 220. Each of Defendant's witnesses filed declarations in support of Defendant's opposition brief where they doubled-down on their false testimony. ECF No. 220-3, at ¶ 4 (Mr. Correa stating that "Phone numbers stored in phone fields 5 through 10 are not loaded from fields 5 through 10 into Rash Curtis' dialers"); ECF No. 220-2 (Robert Keith stating that "Phone numbers stored in phone fields 5 through 10 are not loaded from fields 5 through 10 into Rash Curtis' dialers"); ECF No. 220-4, at ¶ 5 (Nick Keith stating that Global Connect was "incapable of loading phone numbers which were only stored in phone fields 5 through 10") (underlining added). Defendant thought it could get away with this false narrative because it knew it did not produce phone field one through four data during discovery, and, accordingly, thought once again that Plaintiff would not be able to check whether Defendant was telling the truth. On September 27, 2018, however, Judge Coley ordered Defendant to produce data for phone fields one through four. ECF No. 228.

In his September 21, 2018 reply brief, Plaintiff was able to show that Defendant's narrative that phone numbers contained in phone fields five through ten were only called using its autodialers if they were also separately stored in phone fields one through four was unequivocally

false. ECF No. 225. Using a sample of about 180,000 accounts for which phone fields one through four and five through ten were available, Mr. Weir found that Defendant placed well over a <u>million</u> calls to phone numbers from phone fields five through ten that were not separately stored in phone fields one through four. *See id.*, at 1-2. Indeed, more than 99 percent of the phone numbers in phone fields five through ten in this 180,000 account sample did not have matching phone numbers in phone fields one through four. *Id.*

After having a chance to analyze Defendant's production of the full phone field one through four data, Plaintiff filed a Motion for Leave to Submit Newly Discovered Evidence in Support of Motion for Sanctions. ECF No. 247. Mr. Weir found that Defendant placed at least 14 million calls to phone numbers from phone fields five through ten that never appeared in phone fields one through four. *Id.*

On January 23, 2019, the Court denied Plaintiff's motion for sanctions. ECF No. 250. The Court agreed with Plaintiff that whether Defendant called phone numbers in phone fields five through ten "is certainly central to determining whether Rash Curtis violated the TCPA as to a member of the class." *Id.*, at 13. However, the Court denied the sanctions motion in large part because Defendant had not at that point attempted to use the false testimony in support of a motion or at trial. *See id.*, at 11-13 ("defendant has not attempted to 'use' the allegedly false statements during summary judgment, or at any other juncture").

Defendant apparently felt emboldened. Every single witness Defendant called at trial repeated the same false testimony – that Defendant's autodialers did not call a single phone number from phone fields five through ten. *See* Trial Tr. at 552:1-564:22 (Bob Keith); *id.*, at 591:9-593:24 (Daniel Correa); *id.*, at 610:20-618:2 (Nick Keith); *id.*, at 634:13-23 (Chris Paff).

Defendant's call logs and account records show more than 14 million calls to phone numbers from phone fields five through ten that were not separately stored in phone fields one through four. Trial Tr. at 253-266. The call logs show what they show. Defendant made no effort to rebut or even address this evidence. Instead, Defendant's IT Manager, Nick Keith, claimed not to have looked at the call log data. *See, e.g.*, Trial Tr. at 621:14-20 ("Q. And did you do one thing

to try to count how many phone calls there were on the auto dialer call logs since October of 2017, from the time you came to the federal courthouse today to testify in front of a judge and jury?  Did you do one thing?  A. Sir, when I know we didn't do anything wrong, I am not going to go chase a carrot that doesn't exist.").

Defendant's internal emails confirm that they knew the autodialers were calling these numbers illegally.  On May 5, 2016, Bob Keith emailed Chris Paff, Dan Correa, Terry Paff, and Natasha Paff stating that Global Connect was "clearly" calling a number in phone fields five through ten.  *See* Trial Exhibit 83; Trial Tr. at 555:19-559:5 (Bob Keith discussing Exhibit 83).  On May 12, 2016, Bob Keith emailed Nick Keith stating that Defendant's employees put phone fields five through ten into Global Connect.  *See* Trial Exhibit 11, at 2; Trial Tr. at 809:6-811:15 (Bob Keith discussing Exhibit 11).

Mr. Kizer's testimony also confirms that Defendant knew it was autodialing these numbers, knew it was illegal, but did it anyway to meet their financial goals:

> A.  … So at some point what they're doing is they're saying, we're short 175,000 this month.  We've got to make up some ground.  We have ten days left.  They'd hit it.  They'd hit every phone number.  Maybe they'd hit it on a Monday; wouldn't do it on a Tuesday; do it on a Thursday.  They just kind of bounced around.
>
> Q.  When … you say they hit every phone number, what do you mean?
>
> A.  Every number of Phone Fields 1 through 10.
>
> Q.  All accounts across the board in Rash Curtis's system?
>
> A.  That is correct, that were loaded to the dialer.

Trial Tr. at 201:10 and 213:5 (Kizer Dep. at 80:14-81:2).

### D.  Defendant Knew That It Was Using An Artificial Or Prerecorded Voice

It is undisputed that calls made to class members utilized a prerecorded voice.  Defendant's only argument at trial was that a prerecorded message was not left on class members' answering machines.  Defendant never argued or put on any evidence that an artificial or prerecorded voice did not play when Class Members picked up the phone.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's knowledge that calls made to Class Members utilized an artificial or prerecorded voice cannot reasonably be disputed.  Defendant's employees determine what kind of prerecorded voice is played before any given campaign is loaded into its dialers.  For instance, at his deposition, Defendant's Rule 30(b)(6) witness knew that Global Connect utilized prerecorded voice, otherwise known as Interactive Voice Response.  Trial Tr. at 219:2 (Correa Dep. at 22:20-23:2).

### E.      Defendant Is A Repeat Offender

As Mr. Kizer testified, Defendant is a repeat offender that has been sued for violating the TCPA many times.  A PACER search of case filings against Defendant reveals that it has been sued repeatedly for violating the TCPA.  Apparently, the only times Defendant stopped unlawfully calling cellphones with its autodialers were for short stints after getting served with a lawsuit.  Indeed, anticipating that it would keep getting sued for violating the TCPA, Defendant instituted a system where it stored "all files that have been sent to us electronically for any backup."  Trial Tr. at 219:12 (Nick Keith Dep. at 78:22-24).  The theory was that "in case of a [law]suit, [Defendant] [could] prove these phone numbers were provided on the clients' file."  *Id.* (Nick Keith Dep. at 78:24-79:1).  But, in the course of discovery and during trial, Defendant could not produce a <u>single</u> electronic file from a client showing that it obtained any of the 40,420 class member telephone numbers for its creditor clients.

Even after getting sued for violating the TCPA for calling cellphones with its autodialers, Bob Keith asked Defendant's CEO – Terry Paff – whether Terry Paff "want[ed] to continue to call them" even though Defendant "can't defend this."  Exhibit 82, at 3.  Although Terry Paff responded that "we could lose everything. This is not good," it was Terry Paff's decision to continue inputting cellphones into Defendant's autodialers as Defendant was "hurting" and Terry Paff "didn't like it."  *Id.*, at 1.  Exhibit 82 is dated November 19, 2015.  Knowing full well that Defendant could not "defend this" and that it could "lose everything," Terry Paff continued calling cellphone numbers contained in phone fields five through ten every single month for which call data was available.

## IV.   DEFENDANT'S DUE PROCESS ARGUMENTS ARE MERITLESS

In Plaintiff's Bench Memorandum Regarding Statutory Damages, ECF No. 345, Plaintiff explained that the Court does not have discretion to award any amount under $500 per call under the TCPA.  ECF No. 345.  Defendant appears to argue that the TCPA violates its due process rights because this case is a class action and the aggregated claims of all class members would impose "severe and oppressive" liability.  *See* Defendant's Trial Brief on Standards Re: Treble Damages, ECF No. 344, at 3, 6, 7.  This Court and the Ninth Circuit have already rejected that argument.  *See* Order Granting Plaintiffs' Motion for Class Certification, ECF No. 81, at 13, 14 n. 13 (citing *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 721 (9th Cir. 2010)).

Defendant further argues that the Court has "discretion to reduce a class action award to less than $500 per violation" to avoid such due process concerns.  *See id.*, at 3.  Plaintiff has already addressed this issue in part in his Memorandum Regarding Statutory Damages.  *See* ECF No. 345, at 1-2.  In any case, Defendant's argument is incorrect for several additional reasons.

In *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012), the Ninth Circuit denied a substantive, procedural, and "as-applied" due process challenge to the TCPA brought by a debt-collector accused of calling cellular telephones obtained through skip tracing.  The Ninth Circuit explained that, as here, a debt-collector's "interest in conducting a debt collection business" is an economic interest, and, accordingly, that a "fundamental right is not implicated."  *Id.*  Thus, Congress needed to have only a "rational basis" for barring the use of autodialers to call cellphones without prior express consent.  *Id.*  Congress also only needed to have a rational basis to set statutory damages at a minimum of $500 per violation.  "Here, Congress had several goals when it passed the TCPA, including prohibiting the use of automatic telephone dialing systems to communicate with others by telephone in a manner that invades privacy."  *Id.*  Prohibiting the use of autodialers in certain contexts and setting damages at $500 per violation are rational means to achieve those goals.  *See id. See also Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1308 (D. Nev. 2014) ("The $500 statutory damages amount for each violation, even if increased to $1,500 for willful violations, is insufficient to incentivize individual actions.  If a possible verdict reaches into the tens of millions of dollars, that is because Congress chose to set a

statutory damage amount for each violation and because the class is very large.  The damages amount grows in direct proportion to the class size.  The Court does not perceive any unfairness based on high damages.").

The Ninth Circuit rejected an identical argument as brought by Defendant in the context of a case brought under the Fair and Accurate Credit Transactions Act ("FACTA"), which imposes a minimum of $100 and up to $1000 for each willful violation of the statute and subjected the defendant in that case to between $29 million to $290 million in potential liability.  *Bateman*, 623 F. 3d at 710, 717.  The Ninth Circuit explained:

> Importantly, the statute does not place a cap on these damages in the case of class action, does not indicate any threshold at which courts are free to award less than the minimum statutory damages, and does not limit the number of individuals that can be certified in a class or the number of individual actions that can be brought against a single merchant.
>
> …
>
> There is no language in the statute, nor any indication in the legislative history, that Congress provided for judicial discretion to depart from the $100 to $1000 range where a district judge finds that damages are disproportionate to harm.  Further, we cannot surmise a principled basis for determining when damages are and are not "proportionate" to actual harm.  Indeed, one might plausibly argue that a $1000 award, or even a $100 award, for a single violation of FACTA, without any allegation of harm, is not proportionate.  But the plain text of the statute makes absolutely clear that, in Congress's judgment, the $100 to $1000 range is proportionate and appropriately compensates the consumer.  That proportionality does not change as more plaintiffs seek relief; indeed, the size of AMC's potential liability expands at exactly the same rate as the class size.  In the absence of any showing that courts have the discretion to modify this remedial scheme, we agree with the Seventh Circuit that "it is not appropriate to use procedural devices to undermine laws of which a judge disapproves."

*Bateman*, 623 F.3d at 718-719 (quoting *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006)).  And so it is here.  Congress made absolutely clear that awarding a minimum of $500 per violation is proportionate and appropriately compensates consumers for privacy rights that are inherently difficult to quantify.

The Court has no discretion to award any amount under $500 per violation based solely on the fact that this case has been brought as a class action.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (holding that class actions "neither change

plaintiffs' separate entitlements to relief nor abridge defendants' rights; they alter only how the claims are processed"). As the Supreme Court has held, a class action "merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Id.* "And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged." The Court cannot treat this case any differently than had 40,420 people filed individual actions in courts all across the country seeking redress for an average of 12 to 13 calls per person at $500 to $1,500 per each call. Otherwise, defendants could bring due process challenges to the TCPA's statutory damages provision even if only one violation (or 13 violations) was at issue.

Defendant's argument is effectively that violating the TCPA is too expensive and that a jury's finding that Defendant violated the law over 500,000 times, during every single month for which call data was available, may put it out of business. As Judge Kocoras of the Northern District of Illinois stated, the argument is a "nonstarter":

> [The defendant] states that $500 would be a financially feasible amount if it were imposed, but the potential damages that could result from a class action involving many separate violations would result in crippling numbers. This argument is a nonstarter. Though the amount of damages could become very high if the statute is violated numerous times, as in the context of a class action, the purpose of the statute is to combat transmissions of unsolicited fax advertisements. The statute accomplishes that purpose by making the practice prohibitively expensive, which is an acceptable means of accomplishing the statute's goal of deterrence. Contrary to [the defendant's] implicit position, the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple violations.

*Phillips Randolph Enters., LLC v. Rice Fields*, 2007 WL 129052, at *3 (N.D. Ill. Jan 11, 2007). *See also Italia Foods, Inc. v. Marinov Enters., Inc.*, 2007 WL 4117626, at *4 (N.D. Ill. Nov. 16, 2007) (holding that the TCPA's statutory damages provisions are not "so severe and oppressive" as to violate due process).

In Defendant's Trial Brief on Standards Re: Treble Damages, ECF No. 344, at 3, 6, 7, Defendant cited three cases for its argument that the Court has "discretion to reduce a class action award to less than $500 per violation if it is so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable." *Id.*, at 3 (citing *Golan v. Veritas*

*Entm't, LLC*, 2017 WL 3923162 (E.D. Mo. Sep. 7, 2017) (quotations omitted), *Maryland v.*
*Universal Elections, Inc.*, 862 F. Supp. 2d 457 (D. Md. 2012), and *Texas v. Am. Blastfax, Inc.*, 164
F. Supp. 2d 892 (W.D. Tex. 2001)). Each of these cases is easily distinguishable. None are
binding. Further, the cases directly conflict with the Ninth Circuit and Supreme Court precedent
discussed above.

In *Golan*, at $500 per violation, damages would have been more than $1.6 billion. *Golan*,
2017 WL 3923162, at *1. The court noted that it "was unable to find any district courts who
determined a specific TCPA damages award was unconstitutional." *Id.*, at *2. It found only one
case where a court reduced a TCPA damages award to comport with due process. *Id.*, at *3. The
court reduced the damages award to $32 million to "reflect[] the severity of the offense, a six-day
telemarketing campaign which placed 3.2 million telephone calls." *Id.*, at *4. As an initial matter,
*Golan* is incorrect for the reasons discussed above, as the district court there had no discretion to
adjust the statutory damages award. Further, the circumstances in *Golan* are far afield of this case,
where the jury found that Rash Curtis violated the TCPA every single month for which call data
was available in a multi-year class period. In *Golan*, the court appears to have taken pity on the
defendant because its violations stemmed from a one-off six-day campaign.

In *Maryland*, as explained by the court in *Golan*, the district court reduced the TCPA award
but "specifically explained it was not suggesting a $10 million award was necessarily
unconstitutional." *Id.*, at 3 (citing *Maryland*, 862 F. Supp. 2d at 466). Critically, in *Maryland*, the
<u>plaintiff</u> – the State of Maryland – asked that the court reduce the TCPA damages award from over
a hundred million dollars to just over $10 million. *Maryland*, 862 F. Supp. 2d at 462. The court
obliged, but decided to decrease the award to $1 million, instead of the $10 million requested by
the plaintiff, in its own discretion. *Id.* at 466. Accordingly, *Maryland* has no bearing on this case.

Finally, the court in *Am. Blastfax* clearly had an erroneous reading of the plain language of
the TCPA. The court interpreted the TCPA's mandatory floor of $500 per violation as "providing
for 'up to' $500 per violation." *Am. Blastfax*, 164 F. Supp. 2d at 900. Even the court in *Golan*
found this reasoning unpersuasive:

PLAINTIFF'S CLOSING ARGUMENT REGARDING PHASE 2                                                        14
CASE NO. 4:16-cv-03396-YGR

> The Court will not apply the reasoning of *American Blastfax* to this case. The TCPA statute clearly states the damages are $500 per violation for violations using automated telephone equipment. 47 U.S.C. § 227(b)(3)(B). Another provision in the TCPA, which applies to violations of the do-not-call list, does allow for damages *up to* $500 per violation. 47 U.S.C. § 227(c)(5). If Congress intended damages for an automated telephone equipment violation to be up to $500, instead of $500, it could easily have done so as it did for do-not-call list violations. Thus, the Court does not find the reasoning of *American Blastfax* persuasive.

*Golan*, 2017 WL 3923162, at *2 (emphasis in original).[3]

Accordingly, while the Court has discretion to treble damages up to $1,500 per call if it finds that Defendant's conduct was knowing or willful, it does not have discretion to award any amount under $500 per each call that the jury found violated the TCPA.

## V.  CONCLUSION

The jury found that Defendant made 534,712 unlawful calls to Class Members, including 14 calls to Plaintiff Ignacio Perez. Because Defendant's conduct was knowing and willful, the Court should treble damages and award $1,500 for each call. Accordingly, the Court should enter judgment for $802,068,000 on the Class Claim, which would include $21,000 for Plaintiff Ignacio Perez's individual claim.

Dated:  May 20, 2019

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Yeremey Krivoshey*
        Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email: ltfisher@bursor.com
            ykrivoshey@bursor.com
            breed@bursor.com

---

[3] In *Krakauer v. Dish Network, L.L.C.*, Case No. 1:14-cv-333, ECF No. 439 (M.D.N.C. Apr. 5, 2018), the court trebled damages at a rate of $1,200 per call for an aggregate award of $61,342,800. In *Krakauer*, the TCPA claims were brought under 47 U.S.C. § 227(c)(5) which contains the "up to $500" language, and not 47 U.S.C. § 227(b)(3)(B), which does not. Even with the "up to" language, the jury determined that an award of $400 per call was appropriate. The court then trebled the award to $1,200 per call.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Class Counsel*

# EXHIBIT S-3

Mark E. Ellis - 127159
Anthony P. J. Valenti - 284542
Lawrence K. Iglesias - 303700
ELLIS LAW GROUP LLP
1425 River Park Drive, Suite 400
Sacramento, CA  95815
Tel: (916) 283-8820
Fax: (916) 283-8821
mellis@ellislawgrp.com

Attorneys for
DEFENDANT RASH CURTIS & ASSOCIATES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>        Defendant. | Case No.:  4:16-cv-03396-YGR JSC<br><br>**RASH CURTIS' TRIAL BRIEF RE: PHASE II - TREBLE DAMAGES**<br><br>TRIAL DATE: May 6, 2019<br>TIME:  8:00 a.m.<br>DEPT:  1, 4th Floor |

## I.   **INTRODUCTION**

On Monday, May 13, 2019, the Court ordered the parties to provide closing briefing on Phase II of the trial – whether treble damages should be assessed.  As discussed below, Defendant Rash Curtis requests that the Court exercise its discretion and award no treble damages as to either Mr. Perez, individually, or the class generally.

As outlined below, _all_ of the evidence demonstrated that Rash Curtis obtained Perez' cell phone number ending in 5196 electronically from its client, Sutter, believing it was [the debtor's] Daniel Reynoso's telephone number.  (**Exh. 78**.)  The number had, in turn been given to Sutter with consent to call.  (*See, e.g.,* Trial Testimony ("TT") at 529:17, 533:13-23, 581:10-23, 607:4-10, 630:1-16, 792:25-793:18.)  As such, the number was put in phone field 1 by Rash Curtis (as a so-called "qualified," "primary" or "resident" number).  (TT at 601-1-2, 584:1-3.)  Rash Curtis called the number 26 times over one year, with a connection and hang up occurring 13 times and one live call. (**Exh. 78**.)

On June 7, 2016, Perez picked up Rash Curtis' call and told Rash Curtis he was not Mr. Reynoso; Rash Curtis purged the number ending in 5196 from its files and admittedly never called it again.  (TT 518:1-6, 578:8-23, 584:15-23, 608:1-4.)  Under these circumstances, Defendant submits its conduct as to Mr. Perez should not be deemed willful and knowing. *See, e.g., Harris v. World Fin. Network National Bank,* 807 F.Supp.2d 888, 895 (E.D. Mich. 2012); *Echevaria v. Diversified Consultants, Inc.,* 2014 WL 929275 at *11 (S.D.N.Y. Feb 28, 2014; *see also Warnick v. Dish Network, LLC,* 2014 WL 12537066 (D. Colo. Sept. 30, 2014); *cf. Davis v. Diversified Consultants, Inc.,* 36 F.Supp.3d 217, 227 (D. Mass. 2014).

Even if the calls are deemed willful based upon a mere volitional standard (*i.e.* Rash Curtis had the intent to dial), Defendant Rash Curtis nevertheless submits the Court should not treble damages as to Mr. Perez, as, among other things, it was acting in good faith. Rash Curtis was clearly attempting to comply with the TCPA when it called.  It

- 1 -

1   autodialed the number believing it had prior express consent.  Moreover, it stopped

2   calling that number, and never called Perez again after the June 7, 2016 call when Perez

3   notified Rash Curtis it had the wrong number, as he was not the debtor Mr. Reynoso.

4        As to the class, Defendant submits the Court should not treble damages, even if it

5   finds simply making the calls alone is sufficient to establish willfulness.  The evidence

6   demonstrates that Rash Curtis began developing a policy and procedure from as early as

7   2014 onward to become TCPA Compliant – meaning "Robo" calling to only cell phone

8   numbers it obtained _with_ prior express consent from its clients, or from debtors directly.[1]

9   Other so-called "non-qualified" telephone numbers, including, but not limited to, cell

10  phone numbers obtained by skip tracing were placed in phone fields 5 through 10.  These

11  phone numbers were _not_ to be Robo-dialed.[2]

12       Certainly, there was no credible evidence of a regular, systemic failure of the

13  policy in process.  Although emails showed Vice President Robert Keith's concerns that

14  the policies were being followed, only one incident was recalled by Messrs. Keith and

15  Correa about a breakdown where numbers in phone fields 5 through 10 (including

16  potential cell phone numbers) obtained without consent may have been called.

17       However, as shown in **Exhs. 8, 9, 10, 11** and **78**, pp. 1-2, the Rash Curtis policy,

18  after being developed, was consistently applied.  (B. Keith TT, at 793-794, 810-811, 819-

19  810, 820-822;  Nick Keith TT, at 608-609; C. Paff TT, at 626-628; D. Correa TT, at 588-

20  590.)  Even Steve Kizer, a disgruntled former employee of Rash Curtis, agreed with Rash

21  Curtis witnesses on this point.  (Kizer Deposition Clips from May 13, 2019, passim.)

22       Plaintiffs produced absolutely no evidence that Rash Curtis has been successfully

---

[1] The Court itself suggested it was skeptical of why it took so long for the company to develop a policy.
But, as the Court itself knows, the intricacies of TCPA liability, consent, good faith and so forth were in
flux in those days, and indeed remain in flux up to today.  The _ACA v. FCC_ decision demonstrates this,
as does the split in the U.S. Circuits as to such fundamental issues of what constitutes an "ATDS" under
the TCPA.  All of these issues have been raised in this litigation.

[2] Plaintiffs presented no direct evidence to the contrary.  The testimony and statistics presented by Mr.
Weir (_see_ **Exhs. 56-60**, inclusive) do _not_ reflect whether the calls were Robo-dialed or manually dialed –
only that they were made on one of Rash Curtis' three dialing platforms.  The fact the Court has
determined they are "auto dialers" does not mean phone numbers were not manually dialed.

- 2 -

1   sued with an adverse verdict or judgment for TCPA non-compliance.  It is true that Rash

2   Curtis, like all collection agencies, is repeatedly sued by disgruntled debtors under the

3   TCPA, FDCPA, RFDCPA, FCRA and other consumer statutes, but that is simply the

4   product of doing business in today's litigious climate.  The Court may take judicial notice

5   of the hundreds of such cases are filed in the Northern District of California.

6        Finally, trebling the damages here would impose annihilating liability, putting

7   Rash Curtis, a family business, out of business.  A treble damage award would be far in

8   excess of its ability to pay, and the regular $500 damage under the circumstance, where

9   they could exceed $250,000,000, would be, therefore, monopoly money – to use Berson's

10   phrase.  Whatever the constitutionality of such damages without a cap[3] in the abstract,

11   imposing such damage liability would violate the Constitution's due process clause as

12   applied.  *See Maryland v. Universal Elections, Inc.*, 729 F.3d 370 (4th Cir. 2013,

13   affirming 962 F.Supp.2d 457, 465 (D. Md. 2012); *accord Texas v. Am. Blastfax, Inc.,* 164

14   F.Supp.2d 852, 900-901 (W.D. Texas 2001); *BMW v. Gore,* 517 U.S. 559 (1996); *State*

15   *Farm Mutual v. Campbell,* 538 U.S. 408 (2003); *Hale v. Morgan,* 22 Cal.3d 338, 398-405

16   (1978); *Starbucks v. Superior Court*, 168 Cal.App.4th 1436, 1450-1453.

## II.   STANDARD OF REVIEW

18        The Telephone Communication Protection Act (TCPA) is found at 47 U.S.C. §§

19   227(a), *et seq.*  Section 227(b)(3)(A) provides:

21        *If the court finds that the defendant willfully or knowingly violated this*
        *subsection*, or the regulations prescribed under this subsection, *the*
22        *court may, at its discretion,* increase the amount of the award to an
        amount equal to not more than 3 times the amount available under
23        subparagraph (B) of this paragraph.

24   / / /

25   / / /

26   / / /

27
   _____
28   [3] *Cf. FDCPA,* 15 U.S.C. § 1692k (class action award capped at $500,000, or 1 percent of collector's net worth, whichever is *less*).

- 3 -

**RASH CURTIS' TRIAL BRIEF RE: PHASE II - TREBLE DAMAGES**

The _court_ determines whether any violation is "willful or knowing" within the meaning of the TCPA.  _See_ 47 U.S.C. § 227(b)(3).  It has the discretion to award these additional damages, but it is not required to do so by the plain language of the statute.[4] As noted in Rash Curtis' earlier briefing, the terms "willful" and "knowing" are not defined under the statute.  _Pieterson v. Wells Fargo Bank, N.A.,_ 2018 WL 4039972 at *4 (N.D. Cal. August 8, 2018).  There is a split of authority as to what constitutes a willful/knowing violation of the TCPA.  _Ibid._

In _Charvat v. Ryan,_ 879 NE.2d 765 (Iowa 2007), unauthorized pre-recorded voice messages were being used to solicit business.  The Ohio Supreme Court analyzed "knowing" and "willing" separately. The court determined that even when a violation is found to be "knowing or willful," a court has discretion not to award treble damages. The court remanded so the trial court could apply the correct two-part test:

> "_[A] two-part test is presented for the trial court_ to employ when ascertaining _whether treble damages are appropriate_ in a particular case. _First, the court must decide whether a violation_

---

[4] A District Court further appears to have discretion to reduce a class action award to less than $500 per violation where the imposition of that award is "so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable." _Golan v. Veritas Ent., LLC,_ 2017 WL 3923162, at *3 (E.D. Mo. Sept. 7, 2017) (quoting _Capital Records, Inc. v. Thomas-Rasset,_ 692 F.3d 899, 907 (8th Cir. 2012); _see also St. Louis, I.M. & S. Ry. Co. v. Williams,_ 251 U.S. 63, 66-67, 40 S.Ct. 71 (1919) (Congress possesses wide discretion to impose statutory damages, and only damages that are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable" are prohibited).  In this regard, the _Golan_ court awarded only $10 per violative call, finding that amount was sufficient to vindicate the policies underlying the TCPA.  _Golan, supra,_ 2017 WL3923162, at *4.  In _Texas v. Am. Blastfax, Inc.,_ 164 F. Supp. 2d 892 (W.D. Tex. 2001), the State of Texas sued defendant mass fax advertiser for TCPA violations. Defendants built their database of phone numbers by taking fax numbers from phone books, computer programs, public sources, and buying lists of fax numbers from third parties.  The Court held: "Although the TCPA provides for liquidated damages of $500 for each violation, the Court finds _it would be inequitable and unreasonable to award $500 for each of these violations._[8] The Court therefore will interpret the provision as providing for "up to" $500 per violation…_Because the defendants' conduct was willful and knowing for the final month, from February 9, 2001 to March 15, 2001, the Court exercises its discretion under the TCPA and trebles these damages,_ to $196,875. The defendants' total TCPA damages, therefore, are $459,375." _Id._ at 900-901 (emphasis added). In fn. 8, the court noted if it awarded damages strictly as prescribed by the TCPA, it would amount to an award of about $2.34 billion against two individuals and a fifteen-employee company.

- 4 -

was 'knowing' or 'willful.' Then the court may, but need not, award treble damages."

*Id.* (original italics, other emphasis added); *accord Heidorn v. BDD Marketing & Management Co., LLCV,* 2013 WL 6571168 at *3 (N.D. Cal. 2013); *Bridgeview Health Care Ctr. Ltd. v. Clark,* 2013 WL 1154206 (N.D. Ill. Mar. 19, 2013) ("A Court may treble the damage for a willful violation of the statute. 47 U.S.C. § 227(b)(3)(C). However, in this case the Court determines that no enhanced damages are appropriate. Defendant is a small business with the normal desire to increase its business.").

### III.   ANALYSIS

**A.   Calls to Mr. Perez (Reynoso)**

Clearly, until June 7, 2016, Rash Curtis understood it was calling the cell phone number of one Daniel Reynoso.  (**Exh. 78;** TT at pp. 526:2-10.)  It had been provided this number by its creditor client Sutter, which had, in turn, received it from Mr. Reynoso when treatment was rendered.  (TT 533, 607, 630.)

Because this number was received from Sutter, it was a "qualified" primary number, also referred to as a "residence" number, or home number.  As such, the number was placed in phone field 1 by Rash Curtis.  (TT, pp. 584, 601, 630.)  Phone field 1 was made up of numbers for which Rash Curtis possessed prior express consent to call, and it "robo" called this number using the automatic dialing functions of its three dialing platforms.  (*Id.*)

At some point after treatment, Mr. Reynoso's cell phone number was apparently transferred to Mr. Perez.  This was not discovered by Rash Curtis despite using cell phone scrub technology.

Rash Curtis attempted unsuccessfully to talk to Mr. Reynoso from May of 2015, up through June of 2016.  (**Exh. 78.**) Although Mr. Perez initially claimed he talked to Rash Curtis on May 28, 2015, on cross-examination, he conceded he really did not remember, and he instead agreed with his earlier deposition testimony that his first and last

- 5 -

1   conversation with Rash Curtis was on June 7, 2016.  (TT, pp. 192, 195-196, 199.)  On

2   that date, he told the collector he was not Mr. Reynoso.  The 5196 number was then

3   removed from that account by Rash Curtis, and Perez was never called again.  (**Exh. 78**;

4   TT, pp. 584-585, 607-608.)

5        Under these circumstances, Rash Curtis submits its collection attempts were not

6   knowing or willful; there is no evidence that as to Mr. Perez (Reynoso) it intended to

7   violate the statute or continued making phone calls knowing it did _not_ have prior express

8   consent.  Under similar circumstances, courts have found trebling damages is

9   inappropriate.  *See, e.g. Harris, supra*; and *Echevaria, supra.*

10        The Ninth Circuit appears to have obliquely approved such a result where, as here,

11   the collector was operating under the good-faith belief that it possessed prior express

12   consent to call the cell phone number:  TCPA liability does not extend to debt collectors

13   where the phone number provided to the debt collector by its creditor-client "gave

14   Defendant a good-faith basis to believe that it had prior express consent to contact

15   Plaintiff at that number." *See, e.g., Chyba v. First Financial Asset Management, Inc.*,

16   2014 WL 1744136, at *11 (S.D. Cal. 2014) *aff'd* 671 Fed.App'x 989 (9th Cir. 2016).

17        Here, Rash Curtis obtained a cell phone number from its creditor client, Sutter

18   General Hospital ostensibly affiliated with a debt owed to Sutter by Daniel Reynoso.

19   Rash Curtis reasonably relied upon this information from Sutter; it did not know that the

20   cell phone number in question had been ported from Daniel Reynoso to Plaintiff Perez,

21   until June 7, 2016, the first time that Plaintiff Perez answered. On that date, upon notice,

22   Rash Curtis deleted the cell number from Mr. Reynoso's account, and never called

23   Plaintiff Perez again.  The evidence, including testimony from Rash Curtis' employees,

24   as well as its business records, show that Rash Curtis reasonably and in good faith

25   believed that it possessed prior express consent to call the phone number in question up

26   until June 7, 2016. This defense is relevant to liability and the measure of damages.

27

28

**RASH CURTIS' TRIAL BRIEF RE: PHASE II - TREBLE DAMAGES**

**B.     Calls to the Class**

The true battleground here is as to the calls allegedly made to numbers stored in phone fields 5 through 10.  Class counsel argued that every number in those fields was skip traced, and every number belonged to a non-debtor.  With due respect to the jury's verdict, these arguments were clearly shown to be erroneous.[5]

The Court made a comment at some point in the trial questioning why it had not heard of Rash Curtis' compliance program and manual dialing previously (or words to this effect).  The simple answer is that these issues have been raised.  However, once the Court ruled Rash Curtis' three dialers were auto dialers – which it did as early as its class certification order – how the calls were made (automatically or manually) should have been irrelevant.  All the calls under this ruling were dialed using an ATDS.  As the Court knows, Rash Curtis disagrees with this ruling given the plain language of the TCPA (capacity to automatically generate and dial numbers ) and the authority of *ACA v. FCC*.

But, at trial, how the calls were actually dialed, and Rash Curtis' policies and procedures became a huge issue of credibility, if not liability.  Not being satisfied that it had won the issue of the dialing platforms being ATDS's for TCPA purposes, class counsel attempted to give the impression that all phone calls to phone fields 5-10 were "robo" dialed.  But this is just not true, and to do so would have violated the policy and procedure that all of Rash Curtis' witnesses, and even Mr. Kizer, testified to.  *See also* Exhibits 8, 9, 10, 11 and 77, all of which support Rash Curtis' TCPA policy to only "robo" dial cell phone numbers in fields 1-4 which it had consent to call, and to manually dial, or dial with "human intervention" the numbers which were not qualified in phone fields 5-10.

The confusion stems from the fact that the three dialing platforms have been referred to repeatedly as "automatic dialing systems" or ATDS's.  But that does not mean that all calls made from these platforms were in fact auto or robo dialed.  It is clear they were not.

---

[5] These issues, with numerous others, will be the subject of appeal if the case does not settle.

**RASH CURTIS' TRIAL BRIEF RE: PHASE II - TREBLE DAMAGES**

1   Moreover, a careful reading of Mr. Weir's trial testimony demonstrates that he

2   never claimed the numbers he reviewed were "robo" dialed.  Instead, he testified that

3   *because the numbers were phoned from an auto dialer*, they were robo or auto dialed.

4   Again, he presented no testimony as to whether he determined which numbers were robo

5   dialed versus which numbers were manually dialed (both through the same dialing

6   platform).  Robert Keith, Vice President at Rash Curtis of Operations and Compliance,

7   testified on May 13, 2019 during Phase II as follows:

8   Q.  When did Rash Curtis begin to – attempt to implement policies and
9       procedures that would be TCPA compliant?

10  A.  You know, I would say 2014 . . .

11  Q.  And in terms of the three platforms that we heard about over the
12      course of the trial, the VIC and the TCN and Global Connect,
13      whether or not the phone call was manually made or with a click, or
        with a press of the F6 button that we heard about, or where the
14      phone numbers were batched and. . .telephoned in bulk, were those
15      . . .were those the dialing platforms that were used.

16  A.  VIC, TC, and global, yes – TCN.

17  Q.  All right.  And so let me just. . .see if I can summarize this.  Was
18      the policy and procedure that ultimately Rash Curtis came up with
        during this time period and implemented, was that if numbers came
19      in from clients, such as we saw with Sutter here, those numbers
20      came in with prior express consent.

21  A.  Correct.

22  Q.  And then those were numbers that could be auto dialed?

23  A.  Correct.

24  Q.  And the reason they could be auto dialed, as you understood it, was
25      that because you would have prior express consent that would be
26      TCPA compliant?

27  A.  Correct.

28  Q.  And then phone fields five through ten, where you weren't sure that

- 8 -

**RASH CURTIS' TRIAL BRIEF RE: PHASE II - TREBLE DAMAGES**

1   you had – the numbers were qualified, or skip-traced numbers
2   could or could not be put in – what was the policy and procedure as
    to those numbers?

3   A. To either dial with the pop-all campaign or call manually.

4   Q. Now, I'm not sure that anyone has defined what a pop-all campaign
5   is. Can you explain that to the court?

6   A. Just where the dialable calls, one of the numbers it's allowed to call
7   through express permission, and then the list of numbers will come
8   up for the collector to click on to call the next number.

9   Q. And the reason that the clicking of the number is important is why?

10  A. Human intervention.

11  Q. And can you explain to the court why human intervention is
12  important as you understand it for TCPA compliance?

13  A. Because it was like a manual call. It's done so by having the
14  collector initiate the phone call.

15  (TT, at pp. 819:19-821:13.)

16  Mr. Keith's testimony continued at 833 to 834 of the trial transcript:

17  Q. . . .Was there a time period where you believed that you couldn't
18  call a cellphone even if it had been what you now call a qualified,
19  that is, coming from the client?

20  A. Yes.

21  Q. So I don't want you to reveal attorney-client privilege between my
22  assisting the company in that regard, but is it fair to say at some
    point in time you began to understand that there's this defense
23  called prior express consent?

24  A. Correct.

25  Q. Is that what you and the company began to build it's TCPA
26  compliance program around?

27  A. Yes.

28

**RASH CURTIS' TRIAL BRIEF RE: PHASE II - TREBLE DAMAGES**

Q. So to the extent that there were numbers that came in qualified by the client as having prior express consent, you built a compliance program where those numbers were put in certain phone fields, correct?

A. Correct.

Q. And it was those phone fields that you would auto dial?

A. Right.

Q. Because you understood that was TCPA compliant?

A. Correct.

Q. And then you had other fields where numbers may have come in from skip-tracing or may have come in from the clients, or something, these are phone fields five through ten, true?

A. True.

Q. Those were the numbers that even though loaded into auto dialers, were manually called in some sense or called with human intervention?

A. Yes, to my knowledge.

Q. . . .The dialing platforms that you used, VIC, TCN, Global Connect, your attempts at TCPA compliance, those were all workarounds that you folks had to do to use the existing technology, correct?

A. Correct.

Q. And that's why you have now moved on to the live VOX System so that you are hopefully a hundred percent TCPA compliant, true?

A. Correct.

Confirmation that this was Rash Curtis' TCPA compliance program and its policy and procedure from at least 2014, forward, is found in Exhibit 8, at pp. 9-10, a February 2014 email trail wherein Bob Keith writes:

To get started on this I believe we need phone number fields in the header that are labeled specifically for cell phones. I believe we should

- 10 -

have 3, one that shows we got the number from the client (which is ok for us to robo dial), one that the debtor gives us directly (implied expressed consent that allows us to robo dial it) and a 3rd field that would be for the numbers we get from our skip tracing efforts like ECA and or Accurint, etc. The 3rd number would need to call manually until we get contact with the debtor and they tell us it's a good contact number for them.

In Exhibit 9, also from February of 2015, Nick Keith writes:

I was talking to Chris and Bob and Chris's theory is if we have all ECA and Accurint skip tracing phone numbers placed in fields 5-10, we can make the dialer and global not call these phone numbers and only the first four fields which are ALWAYS reserved for client given phone numbers or approved phone numbers by the debtor.

(*Accord* **Exh. 10**, p. 3 ("Collectors are to only use the first four sequences for verified phone numbers and/or phone numbers that have been provided by the client."); **Exh. 11**, p. 3 and **Exh. 77**.) In Exhibit 77, Rash Curtis' "skip tracing quick reference" guide emphatically states that skip traced phone numbers should be placed in phone fields 5-10 because they are considered "unverified."

In bold, underlined and red font on the first page of Exhibit 77, the guide says: "All phone numbers found using TLO should be placed in fields's [sic] #5-#10 only, these fields are considered unverified." The same is repeated verbatim on page 2. Page 4 of Exhibit 77, which discusses ECA Advance Traces, says the same: "[these reports] may have additional information like phone numbers (All phone numbers found in ECA should be placed in field's [sic] #5-#10 only, these fields are considered unverified.").

The following testimony also supports Rash Curtis' TCPA compliance policies and procedures: TT at pp 160, 163, 164, 171-172, 172-173, 173-174, 174-175, 589:5-590:14, 592:15-24, 625:1-17, 625:18-626:8, 626:9-15, 626:16-627:2; 627:16-628:12, 634:21-23, 608:1-16, 609:3-6, 809:24-810:1, 810, 815:11-18, 818:20-22, 819:23-820:5, 820-821, 825:5-7, 828-829, 833:2-13, 834:12, 835-836, 837-838; *see also* Kizer Clips from his deposition, pp. 31:2-9, 121:1-6, 121:14-20, 123:21-124:5, 127:4-10.

Not only did Rash Curtis implement what it believed was a compliant TCPA

1   policy and procedure program, since this lawsuit, it has implemented the Live Vox HCI

2   software which eliminates any "capacity" for the dialing platform to be configured so as

3   to meet the TCPA's definition of an ATDS.  (TT at pp. 821:14-822:9.)

4           Numerous courts throughout the country have repeatedly ruled that the same

5   equipment now used by Rash Curtis lacks the capacity to constitute an ATDS under the

6   TCPA, *as a matter of law*.  *See, e.g., Pozo v. Stellar Recovery Collection Agency, Inc.,*

7   2016 WL 7851415, at *3-5 and *passim* (M.D. Fla. Sept. 2, 2016) (TCPA claim predicated

8   upon use of Live Vox HCI dismissed at summary judgment, finding that plaintiff's

9   expert's affidavit "does not controvert the simple fact that HCI required human

10  intervention to place all calls"); *Smith v. Stellar Recovery, Inc.*, 2017 WL 1336075, at *5-

11  7 (E.D. Mich. Feb. 7, 2017) ("Plaintiff has failed to create a genuine material dispute of

12  fact over whether the HCI dialing system constitutes an autodialer"); *Schlusselberg v.*

13  *Receivables Performance Mgmt., LLC,* 2017 WL 2812884, at *4 (D. N.J. Jun. 29, 2017)

14  ("Defendant's HCI system is not an autodialer for the purposes of TCPA"); *Fleming v.*

15  *Associated Credit Services, Inc.,* 342 F.Supp.3d 563, 578 (D. N.J. 2018) (same); *Arora v.*

16  *Transworld Systems, Inc.,* 2017 WL 3620742, at *3 (N.D. Ill. Aug. 23, 2017 (same);

17  *Hatuey v. IC Systems, Inc.,* 2018 WL 5982020, at *7 (D. Mass. Nov. 14, 2018) (same);

18  *Collins v. National Student Loan Program,* 2018 WL 6696168, at *4-5 (D. N.J. Dec. 20,

19  2018 (same); *see also Marshall v. CBE Group, Inc.,* 2018 WL 1567852, at *4-8 (D. Nev.

20  Mar. 30, 2018) ("the Live Vox system used in this case does not have the capacity to

21  operate as an ATDS"); *Maddox v. CBE Group, Inc.,* 2018 WL 2327037, at *5 (N.D. Ga.

22  May 22, 2018) ("[t]he focus is on whether the system can *automatically* dial a phone

23  number, not whether the system makes it easier for a person to dial the number

24  . . .Defendant's system requires human intervention. . . .the system does not use any kind

25  of predictive or statistical algorithm to engage in predictive dialing. . .[f]or these reasons,

26  it does not qualify as an ATDS").

27          Next, although the Court noted during Phase II that Rash Curtis seemed slow to

28  implement its TCPA compliance program, it is clear that such is not easy or mechanical.

1  The legal issues as to what constitutes an ATDS, when is a safe harbor appropriate, prior

2  express consent, and the like, continue to bedevil the courts.  In assessing the FCC's 2015

3  Order, the *ACA v. FCC* court held, "[t]he order's lack of clarity about which functions

4  qualify a device as an autodialer compounds the unreasonableness of the Commission's

5  expansive understanding of when a device has the 'capacity' to perform the necessary

6  functions. We must therefore set aside the Commission's treatment of those matters."

7  *ACA v. FCC*, 885 F.3d 687, 703 (D.C Cir. 2018).

8         Following the *ACA* decision, courts across the country do not agree on whether

9  *ACA v. FCC* only set aside the 2015 Order, or all previous FCC orders with respect to its

10  treatment of the ATDS issue, let alone whether *ACA* was even binding. *See McMillion v.*

11  *Rash Curtis & Associates*, 2018 WL 3023449, at *3 (N.D. Cal. Jun. 18, 2018) ("The D.C.

12  Circuit Court's decision in *ACA International* may influence a future ruling by the Ninth

13  Circuit regarding the TCPA, but it does not itself constitute a change in controlling law.

14  First *ACA International* invalidated only the 2015 FCC Order"); *cf. Marks v. Crunch San*

15  *Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018) ("we conclude that the FCC's prior

16  orders on that issue are no longer binding on us").

17         Along with the scope of the *ACA* decision, the Circuits are now split with respect

18  to the definition of an ATDS. *See Marks, supra,* 904 F.3d at 1051 ("After struggling with

19  the statutory language ourselves, we conclude that it is not susceptible to a

20  straightforward interpretation based on the plain language alone. Rather, the statutory text

21  is ambiguous on its face"); *cf. Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3rd Cir.

22  2018) ("[plaintiff] cannot point to any evidence that creates a genuine dispute of fact as to

23  whether the Email SMS Service had the present capacity to function as an autodialer by

24  generating random or sequential telephone numbers and dialing those numbers"); *King v.*

25  *Time Warner Cable, Inc.*, 894 F.3d 473, 479 (2nd Cir. 2018) ("We view the D.C. Circuit's

26  discussion as correctly drawing a distinction between a device that currently has features

27  that enable it to perform the functions of an autodialer – whether those features are

28  actually in use during the offending call – and a device that can perform those functions

1  only if additional features are added. We find that distinction persuasive; accordingly, we

2  would conclude that the former category falls within the definition of an ATDS, and the

3  latter does not.")

4          Due process is also relevant to the issue of treble damages here, where the TCPA's

5  "adding-machine" damages were created to incentivize individual actions (for a nominal

6  harm not otherwise likely to be pursued by individual plaintiffs) but can quickly create

7  ruinous liability on a class-wide basis. While the TCPA's statutory damages are not

8  facially unconstitutional, they "may become unconstitutional as applied in an individual

9  case." *Maryland v. Universal Electronics, Inc.*, 862 F.Supp.2d 457, 465 (D. Md. 2012)

10 ("In such situations, a damages award may violate due process or constitute an 'excessive

11 file' under the Eighth Amendment"); *see also Forman v. Data Transfer, Inc.,* 164 F.R.D.

12 400, 405 (E.D. Pa. 1995) (noting that the statutory damages allowed under the TCPA

13 were designed by Congress to be sufficient to incentivize individual actions and that class

14 actions posed the risk of "horrendous, possibly annihilating punishment, unrelated to any

15 damage to the purported class"); *see also Texas v. American Blastfax, Inc.,* 164

16 F.Supp.2d 892, 900-901 (W.D. Tex. 2001) (awarding 7 cents per TCPA violation, instead

17 of $500 or more, for equitable, reasonableness, and due process concerns); *Hale v.*

18 *Morgan, supra,* 22 Cal.3d at 402 ("adding machine" liability).

## IV.   **CONCLUSION**

19

20         For the reasons given above, Defendant Rash Curtis respectfully requests the Court

21 find its conduct as to Mr. Perez was not willful, and further that it not treble damages as

22 to Mr. Perez.  Likewise, Defendant requests the Court not find its conduct as to the class

23 is willful and knowing, and otherwise that it exercise its discretion to not treble damages

24 as to the class.

25         / / /

26         / / /

27

28

- 14 -

1    Dated: May 20, 2019                    ELLIS LAW GROUP LLP

2
                                            By   /s/ Mark E. Ellis
3                                              Mark E. Ellis
                                               Attorney for
4                                              DEFENDANT RASH CURTIS &
                                               ASSOCIATES
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  STANDARD OF REVIEW ............................................................................ 3

III. ANALYSIS ................................................................................................... 5

   A.  Calls to Mr. Perez (Reynoso) ................................................................ 5

   B.  Calls to the Class .................................................................................. 7

IV.  CONCLUSION ............................................................................................ 14

# EXHIBIT S-4

WEIR - DIRECT / BURSOR

1    A.   ACCORDING TO THE CALL DETAIL RECORD, YES.

2    Q.   AND NONE OF THOSE PHONE CALLS WERE MADE TO PEOPLE WHO OWED

3    MONEY ON A RASH CURTIS ACCOUNT; IS THAT TRUE?

4    A.   AS I UNDERSTAND IT, THEY ARE NON-DEBTORS.

5    Q.   SO, THERE ARE NONE IN HERE?

6    A.   RIGHT.  THEY WOULD NOT OWE ANY MONEY TO RASH CURTIS.

7    Q.   ALL RIGHT.  NOW, SAME QUESTION FOR THE TCN AUTO DIALER.

8    IF WE NEED TO DETERMINE HOW MANY CALLS THE TCN AUTO DIALER

9    MADE TO CLASS MEMBERS, IS THE ANSWER TO THAT QUESTION ON

10   TABLE 4 OF YOUR REPORT?

11   A.   YES, IT IS.

12   Q.   AND IS IT RIGHT HERE, THIS NUMBER RIGHT HERE (INDICATING)?

13   A.   YES.  31,064 CALLS WERE PLACED TO CLASS MEMBERS.

14   Q.   SO IS IT YOUR UNDERSTANDING EVERY ONE OF THOSE PHONE

15   NUMBERS WAS OBTAINED BY SKIP-TRACING?

16   A.   YES.

17   Q.   EVERY ONE WAS CALLED WITH AN AUTO DIALER?

18   A.   YES.

19   Q.   EVERY ONE OF THEM WAS A CELLPHONE NUMBER?

20   A.   YES.

21   Q.   EVERY ONE OF THEM WAS A NON-DEBTOR?

22   A.   YES.

23   Q.   MEANING THESE PEOPLE DIDN'T OWE -- THEY WERE NOT NAMED ON

24   AN ACCOUNT AT RASH CURTIS FOR OWING MONEY?

25   A.   THEY ARE NOT NAMED ON THE ACCOUNT FOR WHICH THESE CALLS

WEIR - DIRECT / BURSOR

```
 1    WERE PLACED.
 2    Q.  NOW, I WANT TO ASK THE SAME QUESTION FOR THE VIC DIALER.
 3    A.  OKAY.
 4    Q.  BECAUSE THAT ONE IS HARDER BECAUSE I THINK WE HAVE TO ADD
 5    THREE NUMBERS TOGETHER.  WELL, LET ME TRY.
 6        IF WE WANT TO KNOW HOW MANY PHONE CALLS THE VIC DIALER
 7    MADE TO CLASS MEMBERS, CAN WE GET THAT NUMBER FROM TABLE 4 OF
 8    YOUR REPORT?
 9    A.  I APOLOGIZE THAT YOU HAVE TO DO A SMALL AMOUNT OF MATH,
10    BUT YOU WOULD ADD UP THE LAST THREE NUMBERS IN THE LAST COLUMN
11    TO GET THAT.
12        SO 1,679 PLUS 237 PLUS 675 WOULD BE THE NUMBER OF CALLS
13    PLACED TO CLASS MEMBERS BY THE VIC AUTO DIALER.
14    Q.  YESTERDAY I DID IT IN OPENING STATEMENT AND I GOT IT
15    RIGHT.  BUT IS IT 2,591?
16    A.  YES, THAT SOUNDS RIGHT.
17    Q.  SO DID YOU FIND THAT THE VIC AUTO DIALER MADE 2,591 CALLS
18    TO CLASS MEMBERS?
19    A.  YES, I DID.
20    Q.  YOU DID THAT BY ADDING THESE THREE NUMBERS?
21    A.  THAT'S CORRECT.
22    Q.  AND EVERY ONE OF THOSE PHONE CALLS WAS TO A PHONE NUMBER
23    OBTAINED BY SKIP-TRACING AND NO OTHER SOURCE?
24    A.  YES.
25    Q.  EVERY ONE OF THOSE PHONE CALLS IS MADE BY AN AUTO DIALER?
```

R. KEITH – DIRECT / ELLIS

1      AND I THINK THAT YOU WERE SITTING IN THE COURTROOM WHEN

2   THIS EXHIBIT WAS PUT UP AND I TALKED WITH MS. VERKHOVSKAYA

3   ABOUT THAT.  DO YOU RECALL THAT?

4   **A.**  MR. WHO?

5   **Q.**  MS. VERKHOVSKAYA.

6   **A.**  YES, YES.

7   **Q.**  LET'S GO TO THE NEXT PAGE.  LET'S GO TO THE NEXT PAGE.

8          **MR. ELLIS:**  OKAY.  LET'S BLOW THAT UP.

9   **BY MR. ELLIS:**

10  **Q.**  SO, MS. VERKHOVSKAYA INDICATED THAT DIANE STEELE WAS A

11  NON-DEBTOR.  DO YOU REMEMBER THAT TESTIMONY?

12  **A.**  I DO.

13  **Q.**  IS THAT CORRECT?

14  **A.**  NO.

15  **Q.**  HOW DO YOU KNOW THAT THAT WAS INCORRECT TESTIMONY?

16  **A.**  I, MYSELF, PERSONALLY WORKED ON THIS ACCOUNT.

17  **Q.**  ON MS. STEELE'S ACCOUNT?

18  **A.**  YES.

19  **Q.**  AND SO SHE WAS A DEBTOR?

20  **A.**  YES.

21  **Q.**  ALL RIGHT.  IN RASH CURTIS, WHEN -- FIRST OF ALL, STEVE

22  KIZER, DO YOU KNOW WHO HE IS?

23  **A.**  YES.

24  **Q.**  DID MR. KIZER USED TO WORK AT RASH CURTIS?

25  **A.**  YES.

R. KEITH - CROSS / BURSOR

1    FLOOR WE'RE BEING SUED OR WORDS TO THAT EFFECT BECAUSE WE'RE

2    NOT TCPA COMPLIANT?

3    **A.**   NO.  I WOULD NEVER COME OUT AND SCREAM AT MY STAFF LIKE

4    THAT.

5    **Q.**   WELL, ALL RIGHT.

6        THAT'S ALL I HAVE, THANK YOU.

7            **THE COURT:**  CROSS?

8                    **CROSS-EXAMINATION**

9    **BY MR. BURSOR:**

10   **Q.**   GOOD MORNING, MR. KEITH.

11   **A.**   GOOD MORNING.

12   **Q.**   WAS DIANE STEELE THE DEBTOR ON THAT ACCOUNT?

13   **A.**   YES.

14   **Q.**   ON THE ACCOUNT THAT YOU JUST SAW ON EXHIBIT 523?

15   **A.**   YES.

16   **Q.**   MR. KEITH, ISN'T IT TRUE THAT A MAN NAMED STEPHEN MILLIGAN

17   IS THE NAME OF THE DEBTOR ON THAT ACCOUNT?

18   **A.**   I BELIEVE HE WAS ALSO A DEBTOR ON THAT ACCOUNT, YES.

19   **Q.**   DID DIANE STEELE SUE YOUR COMPANY?

20   **A.**   YES.

21   **Q.**   WHY?

22   **A.**   I BELIEVE IT WAS TCPA AND ROSENTHAL, IF I REMEMBER

23   CORRECTLY.

24   **Q.**   SHE SUED YOU FOR VIOLATING THE TCPA, RIGHT?

25   **A.**   SHE CLAIMED THAT WE VIOLATED.

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

PAFF - DIRECT ELLIS

1    **BY MR. ELLIS:**

2    **Q.**  CAN YOU TELL ME, DO YOU SEE THE THIRD LINE DOWN MAY 28,

3    2015?

4    **A.**  YES, I DO.

5    **Q.**  CAN YOU TELL ME FROM YOUR INTERPRETATION OF THESE NOTES

6    WHETHER A LIVE CONVERSATION OCCURRED THAT DAY?

7    **A.**  THERE WAS NO -- THERE WAS NO -- SAYS NO LINK BACK.  THERE

8    WAS NO CONVERSATION AT ALL.

9             **MR. ELLIS:**  AND, MR. VALENTI, IF YOU CAN SCROLL DOWN

10   SLOWLY.

11   **BY MR. ELLIS**

12   **Q.**  STOP ME, MR. PAFF, IF THERE WAS A LIVE CONVERSATION BEFORE

13   THAT JUNE 67TH ENTRY.

14   **A.**  THE ONE YOU HIGHLIGHTED IS THE ONLY CONVERSATION WE'VE HAD

15   WITH THIS DEBTOR.

16            **MR. ELLIS:**  YOUR HONOR, I HAVE MARKED AS 608B A NEW

17   EXHIBIT.  MAY I APPROACH MS. STONE?

18            **THE COURT:**  A NEW EXHIBIT?

19            **MR. ELLIS:**  IT'S AN EXHIBIT THAT GOES WITH 608A THAT

20   WE... THAT WE -- THAT WAS ENTERED YESTERDAY.

21            **THE COURT:**  MR. ELLIS, I DON'T UNDERSTAND.  THAT WAS

22   FOR IMPEACHMENT?

23            **MR. ELLIS:**  CORRECT.

24            **THE COURT:**  SO IF IT IS NOT ON YOUR LIST --

25            **MR. ELLIS:**  OKAY.  FAIR ENOUGH.

PAFF – DIRECT ELLIS

1    **BY MR. ELLIS:**

2    **Q.**  MR. PAFF, LET ME JUST ASK YOU:  A DEBTOR BY THE NAME OF

3    ROY MACABEE (PHONETIC), HAVE YOU EVER HEARD OF THAT?

4    **A.**  I BELIEVE SO, YES.

5    **Q.**  AND WAS THAT SOMEONE THAT RASH CURTIS COLLECTED A DEBT

6    AGAINST?

7    **A.**  I BELIEVE SO, BUT I WOULD NEED TO SEE THE DOCUMENTATION.

8    I MEAN, I'M PRETTY SURE.

9    **Q.**  OKAY.

10            **MR. ELLIS:**  YOUR HONOR, MAY I SHOW HIM A DOCUMENT?

11            **THE COURT:**  NO.  IT'S NOT OKAY.  NOT TO HAVE AN

12   EXHIBIT NOT ON THE LIST.

13            **MR. ELLIS:**  OKAY.

14   **BY MR. ELLIS:**

15   **Q.**  LET ME ASK YOU, MR. PAFF, HAVE YOU EVER HEARD OF A DEBTOR

16   BY THE NAME OF JUAN ROSAS?

17   **A.**  OH, YEAH.

18   **Q.**  AND YOU HAVE HEARD THAT?

19   **A.**  YES.

20   **Q.**  AND WAS THAT A DEBTOR THAT RASH CURTIS COLLECTED AGAINST?

21   **A.**  CORRECT.

22   **Q.**  AND HAVE YOU HEARD OF A DEBTOR BY THE NAME OF KATHLEEN

23   HURLEY?

24   **A.**  I HAVE.

25   **Q.**  AND WAS THAT SOMEONE THAT RASH CURTIS COLLECTED AGAINST?

PAFF — CROSS / BURSOR

1    A.   YES, IT WAS.

2    Q.   AND HAVE YOU HEARD OF SOMEONE BY THE NAME OF ANTHONY

3    BANCHERO?

4    A.   YES, I HAVE.

5    Q.   AND WHO IS THAT?

6    A.   A DEBTOR.

7            MR. ELLIS:   THANK YOU.   I HAVE NO FURTHER QUESTIONS.

8            MR. BURSOR:   CAN WE SWITCH THIS OFF?   WE ARE NOT

9    USING THIS ANYMORE.   I'M GOING TO USE THE ELMO.

10                      **CROSS-EXAMINATION**

11   BY MR. BURSOR:

12   Q.   GOOD AFTERNOON, MR. PAFF.

13       I WANT TO ASK YOU, DOES THE RASH CURTIS COMPANY LOAD PHONE

14   NUMBERS FROM PHONE FIELDS FIVE THROUGH TEN INTO THE GLOBAL

15   CONNECT DIALER?

16   A.   I DON'T BELIEVE SO.   THAT WOULDN'T BE... NO, THAT IS NOT

17   OUR POLICY.

18   Q.   SO, IF WE LOOK AN AT THE CALL LOGS FOR THE GLOBAL CONNECT

19   DIALER, WE ARE NOT GOING TO FIND ANY CALLS TO NUMBERS IN PHONE

20   FIELDS FIVE THROUGH TEN, RIGHT?

21   A.   I DON'T BELIEVE SO.

22   Q.   THERE WOULDN'T BE ANY?

23   A.   I DON'T BELIEVE SO.

24   Q.   AND --

25            MR. BURSOR:   NO FURTHER QUESTIONS.

1    AND THEY ALL SAT DOWN.  WE TALKED FOR A LONG TIME.  WE WILL

2    SEE WHAT THEY HAVE TO SAY.

3             **MR. BURSOR:**  OKAY.

4        (RECESS TAKEN AT 10:26 A.M.; RESUMED AT 11:19 A.M.)

5             **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

6    COME TO ORDER.

7             **THE COURT:**  LET'S GO BACK ON THE RECORD.

8        THE RECORD WILL REFLECT THAT WE HAVE THE PARTIES PRESENT

9    AND THAT EVERYONE HAS HAD AN OPPORTUNITY, I GUESS, TO SPEAK TO

10   SOME OF THE JURORS AND ENJOY SOME PIE.

11       FROM WHAT I UNDERSTAND, THE FOREPERSON SAID HE WAS

12   INSPIRED BY MY SUGGESTION THAT WHEN I WAS A STATE COURT JUDGE

13   MY YOUNG SON, AT THAT TIME YOUNG AND MUCH SMALLER THAN I, USED

14   TO BAKE THINGS AND I WOULD BRING THEM IN FOR JURORS.  SO HE

15   BROUGHT IN TWO PIES HOMEMADE TODAY THAT EVERYBODY GOT A CHANCE

16   TO EAT.  BUT I GUESS THEY MUST HAVE BEEN FULL ON BREAKFAST

17   BECAUSE THERE WAS A LOT LEFT SO HE GAVE IT TO FOLKS OUT IN THE

18   HALLWAY.  DIDN'T WANT TO TAKE HOME ALL THE CALORIES.

19       SO A GOOD GROUP OF PEOPLE.  THEY WERE VERY EXCITED ABOUT

20   HAVING BEEN JURORS, WHICH I THINK IS OUR JOB TO DO.  SO IT'S

21   ALL GOOD.

22       IF I CAN GET THE LAWYERS AT THE MICS, I WANT TO ASK A

23   COUPLE OF QUESTIONS IN TERMS OF WHERE WE GO FROM HERE.

24       AND AS YOU ALL KNOW, WE WERE IN THE MIDDLE OF -- OR JUST

25   GETTING STARTED ON TAKING ADDITIONAL EVIDENCE ON PHASE II FOR

```
1    WILLFULNESS.

2         THIS MAY BE ABOVE YOUR PAY GRADE, MY QUESTION, BUT MY

3    QUESTION TO THE PLAINTIFFS IS:  IS THIS REALLY NECESSARY AT

4    THIS POINT?  THAT IS, THE NUMBERS THAT WE ARE TALKING ABOUT

5    EXCEED $250 MILLION.  SO IS THERE -- ARE THE PLAINTIFFS

6    PURSUING AN AWARD IN ADDITION UPON WHICH THEY ARE LOOKING FOR

7    A WILLFULNESS FINDING?

8              MR. BURSOR:  YOUR HONOR, THE ANSWER IS YES.  AND I'LL

9    TELL YOU THAT WE -- IT'S NOT IMPORTANT TO US TO GET A LARGER

10   DOLLAR AMOUNT ON THE AWARD.  THAT IS NOT IMPORTANT TO US.

11        I EXPECT THAT THERE ARE GOING TO BE FURTHER PROCEEDINGS IN

12   THIS CASE, POSSIBLY IN COURTS OTHER THAN THIS ONE, AND I WANT

13   TO ENSURE THAT -- WHAT WE WANT IS A RULING FROM YOUR HONOR ON

14   WILLFULNESS.

15        I THINK IT'S IMPORTANT THAT THERE'S A RECORD OF WHAT

16   HAPPENED HERE BOTH IN TERMS OF THE CASE AND WHAT HAPPENED AT

17   THIS TRIAL, AND WE THINK IT'S IMPORTANT THAT SOME RECORD BE

18   MADE OF WHAT THE COURT'S FINDING IS AS TO WILLFULNESS AND

19   FINDING IS AS TO THE CONDUCT OF THIS TRIAL.

20        I EXPECT THERE'S GOING TO BE PROCEEDINGS IN OTHER COURTS

21   THAT ARE GOING TO FOLLOW THIS ONE, AND THAT'S WHY WE WANT

22   THAT.

23        SO WE UNDERSTAND THAT WE ARE TALKING -- WE ARE PROBABLY

24   TALKING ABOUT MONOPOLY MONEY AT THIS POINT, AND I DON'T WANT

25   TO IMPOSE ANY MORE OF A BURDEN ON THE COURT THAN NEED BE.  SO
```

```
 1    IF THERE IS AN EFFICIENT WAY TO DO THAT, WE ARE ALL FOR

 2    EFFICIENCY, BUT I WOULD LIKE A FINDING FROM THE COURT ON

 3    WILLFULNESS.

 4           THE COURT:  MR. ELLIS, THERE WAS ONLY TWO RESULTS

 5    COMING OUT OF LAST WEEK'S EVIDENCE, AS YOU ARTFULLY ARGUED,

 6    ZERO OR UPWARDS OF $250 MILLION.

 7           MR. ELLIS:  RIGHT.

 8           THE COURT:  ARE YOUR CLIENTS INTERESTED IN TRYING

 9    TO -- INTERESTED IN TRYING TO SETTLE THIS CASE OR, AS I TELL

10    MY LAW CLERKS, YOU KNOW, TRIALS ARE THE GIFT THAT KEEPS ON

11    GIVING.  THEY JUST NEVER SEEM TO STOP.

12        SO WHAT ARE WE GOING TO BE DOING HERE?  YOU HAVE A

13    JUDGMENT FROM THE -- A VERDICT.  YOU MUST HAVE TALKED TO YOUR

14    CLIENTS ABOUT THIS POSSIBILITY.

15           MR. ELLIS:  SURE.

16           THE COURT:  ARE THEY INTERESTED IN GOING NOW IN A

17    DIFFERENT POSTURE TO A SETTLEMENT CONFERENCE OR ARE WE

18    PROCEEDING TO THE NINTH CIRCUIT?

19           MR. ELLIS:  WELL, PROBABLY BOTH, I MEAN, HONESTLY.

20    SO -- YEAH.  SURE, WE'RE INTERESTED IN SETTLEMENT NEGOTIATIONS

21    AND GETTING IN FRONT PERHAPS OF A MAGISTRATE OR

22    COURT-APPOINTED MEDIATOR.  AND THE ANSWER IS YES.

23           THE COURT:  ALL RIGHT.  HAVE I SENT YOU TO A

24    MAGISTRATE JUDGE --

25           MR. ELLIS:  I DON'T THINK --
```

R. KEITH - FURTHER REDIRECT / ELLIS

1   NUMBERS GO OUT THROUGH ALL OF THOSE DIALING PLATFORMS?

2   **A.**   YES.  IF WE DID A POP-ALL CAMPAIGN, THEY WOULD COME UP AND

3   HAVE THE HUMAN CLICK THE BUTTON.

4   **Q.**   THAT'S THE --

5   **A.**   A DIFFERENT NUMBER.

6   **Q.**   THAT'S THE HUMAN INTERVENTION THAT YOU WERE TALKING ABOUT?

7   **A.**   CORRECT.

8   **Q.**   THAT WOULD BE IN PHONE FIELDS FIVE THROUGH TEN?

9   **A.**   YES.

10  **Q.**   OKAY.

11  **A.**   I MEAN THEY CAN CLICK ANY OF THEM, BUT YEAH.

12  **Q.**   IT COULD BE ALL TEN; IS THAT WHAT YOU ARE SAYING?

13  **A.**   YES.

14          **MR. ELLIS:**  THANK YOU, YOUR HONOR.  THAT'S IT.

15          **THE COURT:**  CROSS ON MY QUESTIONS PLAINTIFFS' (SIC)

16  QUESTIONS, ANY?

17          **MR. KRIVOSHEY:**  WE HAVE NOTHING FURTHER.

18          **THE COURT:**  ALL RIGHT.  MR. KEITH, YOU MAY STEP DOWN.

19  YOU ARE EXCUSED.

20          **THE WITNESS:**  DO YOU WANT ME TO LEAVE ALL THESE HERE?

21          **THE COURT:**  YES.

22     OKAY.  I NEED THE FOLLOWING:  I WOULD LIKE TO SEE FROM

23  EACH SIDE A PROPOSED FORM OF JUDGMENT FROM -- BASED UPON THE

24  JURY'S VERDICT.  AND I'LL GIVE YOU UNTIL WEDNESDAY CLOSE OF

25  BUSINESS TO FILE YOUR PROPOSAL.

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

1      I STILL HAVE TO DEAL WITH PHASE II, BUT I DO NEED TO KNOW

2   AND WANT TO KNOW WHAT YOUR PROPOSED FORM OF JUDGMENTS WOULD

3   LOOK LIKE BASED UPON THAT VERDICT.

4      I AM ASSUMING YOU CAN'T AGREE, SO I'M NOT ASKING YOU TO

5   MEET AND CONFER.

6      NEXT, WITH RESPECT TO PHASE II AND WITH RESPECT TO THE

7   PARTIES' SUBMISSIONS, DOCKETS 344 AND 345, DO YOU WANT TO

8   BRIEF THE ISSUES OR DO YOU JUST WANT TO ARGUE?

9      IF YOU ARE GOING TO ARGUE, WE ARE GOING TO DO IT AFTER

10  LUNCH.

11          MR. KRIVOSHEY:  YOUR HONOR, I'M HAPPY TO ARGUE IT.

12          MR. ELLIS:  I PREFER TO HAVE ARGUMENTATIVE BRIEFING

13  WHERE WE TAKE THE LAW THAT WE HAVE PROVIDED TO YOU AND THEN

14  USE THE EVIDENCE THAT'S COME IN.

15          THE COURT:  OKAY.

16      GIVEN THAT DEFENDANTS HAVE LOST IN PHASE I, I'M GOING TO

17  GIVE THEM THE OPPORTUNITY TO DO IT IN WRITING GIVEN THAT THAT

18  IS THEIR PREFERENCE.

19      OKAY.  ONE WEEK FOR BRIEFS.

20          MR. ELLIS:  THAT WOULD BE FINE, YOUR HONOR.

21  SIMULTANEOUSLY SUBMITTED?

22          THE COURT:  CORRECT.  BY THE CLOSE OF BUSINESS NEXT

23  MONDAY, 5/20.

24      HOW MANY PAGES DO YOU WANT?

25          MR. ELLIS:  15?

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

# EXHIBIT S-5

1 **BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
2 Yeremey O. Krivoshey (SBN 295032)
1990 North California Blvd., Suite 940
3 Walnut Creek, CA 94596
Telephone: (925) 300-4455
4 Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
5         ykrivoshey@bursor.com

6 **BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
7 2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
8 Telephone: (305) 330-5512
Facsimile: (305) 676-9006
9 E-Mail: scott@bursor.com

10 *Attorneys for Plaintiff and the Classes*

11

12                 UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14

15 SANDRA MCMILLION, JESSICA              Case No. 4:16-cv-03396-YGR
   ADEKOYA, and IGNACIO PEREZ, on
16 Behalf of Themselves and all Others     ~~[PROPOSED]~~ FINAL JUDGMENT
   Similarly Situated,
17                                          Judge:  Yvonne Gonzalez Rogers
                        Plaintiffs,
18         v.

19 RASH CURTIS & ASSOCIATES,

20                        Defendant.

21

22

23

24

25

26

27

28

~~[PROPOSED]~~ FINAL JUDGMENT
CASE NO. 4:16-cv-03396-YGR

1

# **FINAL JUDGMENT**

Pursuant to Federal Rules of Civil Procedure 23, 54, and 58, the Court now enters Final

Judgment on behalf of the certified Classes, defined as follows:

(a) **Skip-Trace Class 1:** All persons who received a call on their cellular telephones from June 17, 2012 through April 2, 2019 from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose cellular telephone was obtained by Rash Curtis through skip tracing.

(b) **Skip-Trace Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones from June 17, 2012 through April 2, 2019 from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

(c) **Non-Debtor Class 1:** All persons who received a call on their cellular telephones from June 17, 2012 through April 2, 2019 from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis never had a debt-collection account in their name.

(d) **Non-Debtor Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones from June 17, 2012 through April 2, 2019 from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis has never had a debt-collection account in their name.

Excluded from the Classes are persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with Rash Curtis in such debtor's name prior to Rash Curtis first placing a call using an automatic telephone dialing system and/or prerecorded voice.

The dissemination of the Class Notice, ECF Nos. 249, 293: (a) constituted the best

practicable notice to Class Members under the circumstances, (b) constituted notice that was

reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the

Action, their right to exclude themselves, and the binding effect of the Final Judgment, (c) and met

all applicable requirements of law, including, but not limited to, the Federal Rules of Civil

Procedure, the United States Constitution (including the Due Process Clause), and the Rules of this

Court, as well as complied with the Federal Judicial Center's illustrative class action notices.  No

Class Members requested exclusion.

Consistent with the jury's verdict on May 13, 2019, ECF No. 347, each member of the

Classes shall recover from the Defendant, Rash Curtis & Associates, the amount of $500 per call

[PROPOSED] FINAL JUDGMENT
CASE NO. 4:16-cv-03396-YGR

1

made in violation of the Telephone Consumer Protection Act, for an aggregate award in favor of the Classes of $267,349,000.

With regard to Plaintiff Ignacio Perez's individual claim under the Telephone Consumer Protection Act, Plaintiff Perez shall recover from Defendant, Rash Curtis & Associates, the amount of $500 per call made in violation of the Telephone Consumer Protection Act, for an aggregate award in favor of Plaintiff Perez of $7,000.

The Classes and Plaintiff Perez are entitled to post-judgment interest on the jury's award at a rate of 2.36% per annum.

Pursuant to Federal Rules of Civil Procedure 23(h)(1) and 54(d), and Local Rule 54, any motion for attorneys' fees, expenses, costs, and incentive awards shall be filed no later than 14 days after entry of this Judgment.  Notice of the motion shall be directed to Class Members pursuant to Fed. R. Civ. P. 23(h)(1).  Class Members may object to the motion pursuant to Fed. R. Civ. P. 23(h)(2).  Plaintiff shall file a motion for a proposed notice plan in accordance with Fed. R. Civ. P. 23(h)(2) within 28 days of the entry of Final Judgment.

**IT IS SO ORDERED.**

Dated:   September 9, 2019

YVONNE GONZALEZ ROGERS
United States District Judge

# EXHIBIT S-6

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**STANDING ORDER RE: PRETRIAL INSTRUCTIONS IN CIVIL CASES
Judge Yvonne Gonzalez Rogers
(Updated April 2, 2019)**

1. **PRETRIAL CONFERENCE:** Trials are scheduled to begin Monday mornings. The trial day is from 8:00 a.m. through 1:30 p.m. with two 15-minute breaks. Fridays are generally dark. Pretrial Conferences generally are scheduled on the third Friday preceding the trial at 9:00 a.m. Parties shall comply in all respects with Fed. R. Civ. P. 16.

2. **PRETRIAL CONFERENCE STATEMENT:** The parties shall file a joint Pretrial Conference Statement containing the information listed below. To comply with this requirement, trial counsel shall meet and confer at least twenty-one (21) days in advance of the Pretrial Conference. More complicated cases may require the meet and confer process to occur even earlier. The Statement is due **fourteen (14) days** prior to the Pretrial Conference.

   A compliance calendar hearing will be set by the Court to confirm that counsel have met and conferred timely, as required by these Pretrial Instructions. **Five (5) business days** prior to the date of the compliance hearing, the parties shall file a Joint Statement confirming they have complied with this requirement or explaining their failure to comply. If compliance is complete, the Court will vacate the compliance hearing and the parties need not appear. Telephonic appearances may be allowed if the parties have submitted a Joint Statement in a timely fashion. Failure to do so many result in sanctions.

   a. **The Action.**

      i. *Substance of the Action.* A brief description of the substance of claims and defenses which remain to be decided, including a list of the claims and defenses to be tried. In addition, each party shall attach to the Statement the elements of proof for any claim and/or defense which they assert and a summary of the evidence anticipated to prove the same.

      ii. *Relief Prayed.* A detailed statement of all the relief claimed, particularly itemizing all elements of damages claimed as well as witnesses, documents or other evidentiary material to be presented concerning the amount of those damages.

   b. **The Factual Basis of the Action.**

      i. *Undisputed Facts.* A plain and concise statement of all relevant facts not in dispute, as well as all facts the parties will stipulate for admission into the trial record without the necessity of supporting testimony or exhibits.

      ii. *Disputed Factual Issues.* A plain and concise statement of all disputed factual elements of a claim which remain to be decided.

      iii. *Agreed Statement.* A statement assessing whether all or part of the action may be presented upon an agreed statement of facts.

    iv. *Stipulations.* A statement of stipulations requested or proposed for pretrial or trial purposes.

**c. Disputed Legal Issues.**

    i. *Points of Law*. Without extended legal argument, a concise statement of each disputed point of law concerning liability or relief, citing supporting statutes and decisions setting forth the nature of each party's contentions concerning each disputed point of law, including procedural and evidentiary issues. Supporting statutes and decisions and the parties' contentions regarding the same shall be brief and provided in an outline or bullet-point format.

    ii. *Proposed Conclusions of Law*. If the case is to be tried without a jury, unless otherwise ordered, parties should briefly indicate objections to Proposed Conclusions of Law. *See* Paragraph 7, below.

**d. Further Discovery or Motions.** A statement of any remaining discovery and why the same was not completed by the cutoff dates and pending motions.

**e. Estimate of Trial Time.** An estimate of the number of court days requested for the presentation of each party's case, indicating possible reductions in time through proposed stipulations, agreed statements of facts, or expedited means of presenting testimony and exhibits.

**f. List of Motions in Limine.** *See* Item 4 below. The list shall include only contested, non-duplicative motions.

**g. Juror Questionnaire.** Whether the parties intend to file proposed additional questions for jury selection. *See* Item 3.h below.

**h. Trial Alternatives and Options.**

    i. *Settlement Discussions*. A statement summarizing the status of settlement negotiations and indicating whether further negotiations are likely to be productive.

    ii. *Consent to Trial Before a Magistrate Judge*. A statement of whether reference of all or part of the action to a master or magistrate judge is feasible, including whether the parties consent to a court or jury trial before a magistrate judge, with appeal directly to the Ninth Circuit. The Court will entertain requests for reference to a specific magistrate.

    iii. *Amendments, Dismissals*. A statement of requested or proposed amendments to pleadings or dismissals of parties, claims or defenses and any objections thereto.

    iv. *Bifurcation, Separate Trial of Issues*. A statement of whether bifurcation or a separate trial of specific issues is feasible and desired.

**3.**    **TRIAL READINESS FILINGS AND BINDER and PROPOSED ORDER THEREON:** The parties shall file each of the documents listed below and deliver to chambers <u>two</u> copies of a JOINT TRIAL READINESS BINDER. To provide the Court with sufficient time to prepare, the binder of documents is due by noon no less than **seven (7) days** prior to the Pretrial Conference. The Joint Trial Readiness Binders shall contain

copies of filed documents **with the ECF header** reflecting the item's docket number and filing date.

It is the responsibility of the parties to provide two copies of revised or updated trial documents to insert into the Court's Trial Readiness Binders.  The parties shall provide a labeled tab to identify the document(s) being added to the binder.  The parties may also provide updated indexes for the Court, if an index was provided with the original binders.

a.  **Proposed Order Re: Trial Stipulations.**  During the meet and confer process, the Court expects that the parties will agree to a variety of stipulations regarding the conduct of the trial.  A Proposed Order outlining all such stipulations shall be presented to the Court.

b.  **Witness List.**  A list of all witnesses likely to be called at trial (other than solely for impeachment or rebuttal), with a brief statement following each name that describes the substance of the testimony to be given and provides a time estimate of the direct and cross examinations.  This information shall be presented in chart format and organized by party.  Witnesses not included on the list will be excluded from testifying unless the Court orders otherwise.  The list shall identify by an asterisk or other notation whether the witness listed is viewed as a primary witness or only included as a precautionary measure.  Such identification tends to be useful during pretrial discussions.

c.  **Expert Witness List.**  A list of all expert witnesses with a summary plainly stating the expert's theories and conclusions and the basis therefore, accompanied by a curriculum vitae.  If the expert has prepared a report in preparation for the testimony, a copy thereof shall be furnished to opposing counsel and included in the Trial Readiness Binder.  Witnesses not included on the list will be excluded from testifying unless the Court orders otherwise.

d.  **Exhibit Lists Annotated with Stipulations/Objections.**

    i.  The parties shall comply with Item 6 below regarding the meet and confer process for exhibits.

    ii.  As part of the Trial Readiness Binder, the parties shall include a list of all documents and other items to be offered as exhibits at the trial (other than solely for impeachment or rebuttal).  Each entry shall include a brief description of the contents, and the identity of each sponsoring witness.  The Exhibit List shall specify for each exhibit: (1) if it is being marked for identification only, not for admission; (2) whether the parties stipulate to its admission; and (3) the grounds for any objection to its admission.  The Exhibit List shall also include an additional column so that the Court can track the date on which each exhibit is admitted.  Prior to submitting the list, the parties shall meet and confer and attempt to stipulate as to the admissibility of each exhibit.  This information shall be presented in chart format and organized numerically.  The parties should consult the Appendix for a suggested format of the Exhibit List.

    iii.  Parties shall meet and confer and agree on numeric designations for exhibits, such as plaintiffs shall have numbers 1-99, defendant one: numbers 100-199, defendant two: numbers 200-299, etc.  The agreed-upon designations shall be noted for the Court.

iv. The parties shall also provide the Court with a copy of any exhibit or representative samples of any exhibits which require discussion at the Pretrial Conference.

e. **List of Discovery Excerpts, Audios, and Videos.**  The parties shall list (i) those excerpts from depositions, from interrogatory answers, or from responses to requests for admission (other than those solely for impeachment or rebuttal) and (ii) any other audio or video likely to be used at trial.

Prior to submitting the list, the parties shall meet and confer and attempt to resolve any disagreements regarding designations or counter-designations.  The parties shall (i) identify any remaining legal objections to the excerpts on the list itself, and (ii) attach in a separate appendix copies of the disputed excerpts/ transcripts so that the Court can review the disputed materials.  The parties should consult the Appendix for a suggested format of the List of Discovery/Audio/ Video Excerpts.  EACH disputed designation shall be separately numbered and shall correspond to the materials provided to the Court for resolution of the dispute.  Further, they shall be highlighted, underlined or otherwise marked for ease of the Court's reference and contain sufficient contextual information.

The parties shall provide a single proposed order with each disputed designation which will allow the Court to rule whether permission to use each is granted, granted with modification, or denied.  The parties should consult the Appendix for a suggested format of a chart to be contained within the Proposed Order Re: Discovery Excerpts.

Parties are advised that the Court will not resolve more than six pages of disputed excerpts.  However, the parties can provide a representative sample to obtain guidance from the Court so that the parties can resolve their disputes independently.

f. **_Jury Instructions._**

i. **_Joint Set of Jury Instructions._**

(A) The parties shall meet and confer and prepare one Joint Set of Jury Instructions provided to the Court in the logical sequence to be read to the jury.  Authority shall be provided for all instructions.

(B) The parties shall prepare an index which identifies: (i) whether the parties stipulate or object to each instruction; and (ii) the competing instruction(s) preferred on a given topic such that the Court can readily compare and contrast the same.

(C) Disputed instructions must be annotated with: (i) the proponent's authority for seeking the instruction and a brief explanation of how the authority supports the instruction; and (ii) the opponent's reason for opposition with any applicable authority and a brief explanation why the instruction should not be given.  It shall clearly identify which party is proposing each disputed instruction, the nature of the dispute, and any competing instruction.

(D) Every instruction submitted (whether disputed or stipulated) must include "Date Submitted: [insert date]" or "Date Revised: [insert date]" (as applicable).

ii.  If the parties resolve any disputes prior to the Pretrial Conference, the parties must immediately inform the Court which proposed instructions are withdrawn, and submit the stipulated instruction to the Court.

iii. If the parties wish to revise any proposed instructions, they must be identified as a "revised" instructions, such that the Court can easily identify and remove the previously proposed instruction, and insert the revised instruction into the Trial Readiness Binders.

iv.  If the parties wish to propose additional instructions, they must be clearly identified as "supplemental" instructions. Competing supplemental instructions must be filed jointly such that the Court can readily compare and contrast the same. The parties must identify where in the sequence of previously submitted instructions the supplemental instructions should be added.

v.   The parties will be required to re-organize and re-submit a complete set of instructions once the Court has resolved all disputes. Clean sets of all jury instructions (without the parties' arguments and authorities) must be provided to the Court in electronic format (MS Word) upon request.

vi.  ***Substance and Format of Instructions***. The instructions shall cover all substantive issues and other points not covered by the Ninth Circuit Manual of Model Jury Instructions. All instructions submitted to the Court, whether stipulated or disputed, shall contain a table of contents. Each requested instruction shall be typed in full on a separate page with annotations or citations to the authorities upon which the instruction is based included below the instruction. Instructions shall be <u>brief, clear, written in plain English,</u> and free of argument. Model Instructions shall be revised to address the particular facts and issues of this case. The parties shall give a <u>brief</u> explanation of their authorities and any revisions to Model Instructions.

vii. ***Routine Instructions***. Absent objection, and as appropriate, the Court will give the Model Instructions in Chapter 1 (Instructions on the Trial Process) and 3.1-3.3 (concerning deliberations) from the most recent version of the Manual of Model Civil Jury Instructions for the Ninth Circuit. If any party seeks to alter the above-referenced Model Instructions, that party (or parties, if stipulated) shall provide the Court with a redline in MS Word reflecting the proposed changes to the Model Instructions. The parties should not file the redline document, but should send an electronic copy to ygrchambers@cand.uscourts.gov and ygrpo@cand.uscourts.gov.

g.  **Preliminary Statement of the Case and Instructions.** The parties shall propose a joint statement of the case to be read to the jury. The parties may also propose additional preliminary instructions where appropriate.

h.  **Jury Selection.**

i.   Parties are advised that jury selection may occur on the Wednesday or Friday preceding the Monday trial date to allow for a full day of voir dire.

ii. The Court will conduct most of the voir dire and will provide limited time for attorney follow-up.  Parties may file proposed additional questions for jury voir dire.

iii. Parties are advised that juror questionnaires are not mailed in advance to any prospective jurors unless the trial is scheduled to proceed three weeks or more.  In those cases, the parties must submit a proposed joint questionnaire, not to exceed two pages, at least **seven weeks** prior to jury selection.  The standard form used is attached in the Appendix.

iv. For shorter trials, jurors will be provided a basic one-page questionnaire.  (*See* Appendix.)  Parties may jointly request one additional page of questions.

v. To determine whether prospective jurors know any of the parties, attorneys or potential trial witnesses, the parties shall provide the Court with one alphabetical list of all names for distribution to the prospective jurors.

vi. Generally, in civil cases, the jury commissioner will summon 20 to 25 prospective jurors.  The Court will seat 8 jurors and no alternates.

i. **Proposed Verdict Forms.**  The parties shall meet and confer and prepare a joint proposed Verdict Form.  If an agreement cannot be reached, each may file their own proposed verdict form.

4. **MOTIONS *IN LIMINE*.**

a. Any party wishing to have motions *in limine* heard prior to the commencement of trial must **exchange** (but not file) the same no later than twenty-eight (28) days prior to the date set for the Pretrial Conference.  Each motion may not exceed more than four (4) pages.  No more than fifteen (15) motions may be exchanged, and each motion shall be numbered.  The parties shall then meet and confer and attempt to resolve the issues raised in the motions prior to the filing of the Pretrial Statement.  Parties frequently misuse motions *in limine* in an attempt to exclude broad categories of possible evidence.  Such motions are routinely denied.  Any motion *in limine* must specify the precise exhibits or proffered testimony the party seeks to exclude.

b. Any motions *in limine* not resolved shall be filed at the same time as the Pretrial Conference Statement.  To the extent the motion *in limine* refers to exhibits, the moving party must provide a copy of the exhibit(s) along with the motion.  Any party opposing such a motion *in limine* shall file and serve its opposition papers no later than **nine (9) days prior** to the Pretrial Conference.  Each opposition shall reference the moving party's motion *in limine* number.  Reply papers are not permitted.

c. Chambers copies shall be provided in a separate binder entitled MOTIONS *IN LIMINE* and collated with the opposition papers following the motion papers.  Said binder shall be delivered no later than **noon, seven (7) days** prior to the Pretrial Conference.  The binder shall include copies of the motions and oppositions *with* the ECF header reflecting the item's docket number and filing date.

d. One Proposed Order on Motions *in Limine* per side shall be provided, briefly identifying the requested relief and the legal basis therefor.  The proposed order shall be formatted to

allow the Court state a ruling of granted, granted with modification, or denied for each motion *in limine*.

5. **ELECTRONIC COPIES OF TRIAL DOCUMENTS.**

Parties shall send an electronic copy in MS **Word** format to ygrchambers@cand.uscourts.gov and ygrpo@cand.uscourts.gov of the following documents listed above: (i) Proposed Order Re: Trial Stipulations; (ii) Proposed Order Re: Discovery Excerpts; (iii) Joint Set of Jury Instructions; (iv) any revised or supplemental jury instructions; (v) Proposed Juror Questionnaire (if any); (vi) Proposed Verdict Forms; and (vii) Proposed Order(s) on Motions *in limine*.

6. **EXHIBITS**

a. **Delivery of Exhibits to Other Parties.**  At least twenty-eight (28) days before the Pretrial Conference, the parties shall exchange with every other party one set of all proposed exhibits, charts, schedules, summaries, diagrams, recordings, and other similar documentary materials *in the form to be used at trial*, together with a complete list of all such proposed exhibits.  By joint agreement only, the parties may exchange the above-referenced documents by providing only a complete list of proposed exhibits through reference to bates labels or other identification.

b. **Voluminous or lengthy exhibits** shall be reduced by the elimination of irrelevant portions and/or through the use of summaries, if possible.  For particularly lengthy exhibits, the offering party should indicate why a summary is not being offered.

c. **Audio/Video Evidence.**  A written transcript of all audio or video recordings to be used at trial must be delivered to opposing counsel twenty-eight (28) days in advance, and discussed during the meet and confer process.  The exhibit list must identify the specific portions of the recording the party intends to offer in its case in chief by reference to transcript pages.  The parties shall meet and confer and attempt to resolve any disagreements regarding designations or counter-designations.  The Court recommends that the parties confer in advance of the 28 days to discuss the issue and avoid duplicative costs.  Parties are reminded to designate those portions of deposition transcripts which introduce the deponent to the jury.

d. **Subparts.** All groups of exhibits containing multiple parts (including photographs) shall be marked separately for each part (*e.g.*, 1-A, 1-B, and 1-C).

e. **Stipulations re: Admissibility.**  The parties shall make a good faith effort to stipulate to admissibility of exhibits.  If stipulation is not possible, the parties shall make every effort to stipulate to authenticity and foundation absent a legitimate (not tactical) objection.  To reduce the number of disputes, if a potential exhibit is identified by a party "in an abundance of caution," it shall be identified as such.

f. Until it is admitted, NO EXHIBIT may be shown to the jury, including during Opening Statements, without the express approval of the Court.

g. All exhibits which have not been exchanged as required are subject to exclusion.

h. **Copies of Exhibits to Court**.

    i. Unless otherwise ordered, a final set of exhibits shall be provided to the Court on the **Friday prior to the trial date** as follows:

        (A) One original set is for use in the trial and to be provided to the jurors.

        (B) The second set is for the Court and shall be provided in binders, marked, tabbed, and indexed. However, if a party uses witness binders, a copy of the witness binder for the Court is sufficient.

        (C) If a bench trial, a third set for Court staff which shall also be in binders, marked, tabbed, and indexed.

    ii. Exhibits sets shall be delivered to Chambers in coordination with the Courtroom Deputy.

    iii. Each exhibit shall be pre-marked with an exhibit tag placed in the top right corner of the first page of a document. Parties are to use different colors than white for the exhibit tags. A page of blank trial exhibit tags can be found on the Court's website.

    iv. If an exhibit is a physical object (rather than a document), a picture should be taken and placed in the respective binders.

    v. Updated Exhibit Lists shall be included in the binders.

i. No later than the start of closing arguments, the parties shall provide the Courtroom Deputy with a list of Admitted Exhibits for use by the jury in its deliberations.

j. **Disposition of Exhibits after Trial**. Upon the conclusion of the trial, the Court will retain the original of all exhibits in accordance with Local Rule 79-4.

7. **NON-JURY TRIALS.**

In non-jury cases, each party shall serve and lodge with the Court **fourteen (14) days** prior to the Pretrial Conference, proposed Findings of Fact and Conclusions of Law on all material issues. Proposed Findings shall be brief, written in plain English and free of pejorative language, conclusions, and argument. In addition to the copy in the binder, parties shall send an electronic copy in Word format to ygrchambers@cand.uscourts.gov and ygrpo@cand.uscourts.gov.

8. **MISCELLANEOUS.**

a. The parties shall take and provide a photograph of each witness who testifies on the day of their testimony to assist the trier of fact with recalling the testimony. Sufficient copies for the Court and all jurors shall be provided by the end of the day of testimony.

b. If a party wishes to use electronic equipment or other large items (such as bookshelves), the party must file a request and proposed order with the Court by the second Friday preceding the trial. Equipment not provided by the Court must be tested in the courtroom prior to the day when it will be used. Arrangements may be made with the Courtroom Deputy, Frances Stone, at (510) 637-3540 as to an appropriate time for doing so.

    c.  Please **DO NOT** call Chambers.  If you need to contact the Courtroom Deputy, please call (510) 637-3540 and leave a message if the Deputy is not available.

**9.    PROFESSIONAL RESPONSIBILITY.**

    a.  The Court expects all parties to meet and confer in good faith, which will have the effect of reducing the costs of trial for all involved.  This requires that all parties comply independently, and simultaneously, then jointly.  Any breakdown in the meet and confer process should be reported so that the Court may take action well in advance of the Pretrial Conference.

    b.  **No party is relieved of any of the requirements of this Standing Order without a prior written order of this Court.**

      **IT IS SO ORDERED.**

Dated: April 2, 2019

YVONNE GONZALEZ ROGERS
United States District Judge

9

**STANDING ORDER RE: PRETRIAL INSTRUCTIONS IN CIVIL CASES**
**Judge Yvonne Gonzalez Rogers**

**APPENDIX**

*When printing and providing these documents to the Court, please use the "portrait"*
*orientation only.  (Do not use "landscape" orientation.)*

**(SAMPLE EXHIBIT LIST)**

| Ex. No. | Description | Sponsoring Witness | Stipulation to Admit | Objection | Date Admitted |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**(SAMPLE LIST OF DISCOVERY/AUDIO/VIDEO EXCERPTS)**

| No. | Form of Excerpt | Designation in Dispute | Legal Objection |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**(SAMPLE PROPOSED ORDER RE: DISCOVERY/AUDIO/VIDEO EXCERPTS)**

| No. | Form of Excerpt | Designation in Dispute | Court's Ruling |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

# EXHIBIT S-7



# BURSOR & FISHER
### P.A.

2665 S. BAYSHORE DR.                                        SCOTT A. BURSOR
SUITE 220                                                   Tel: 305.330.5512
MIAMI, FL 33133                                             Fax: 305.676.9006
www.bursor.com                                              scott@bursor.com

September 9, 2019

*Via ECF*

Honorable Yvonne Gonzalez Rogers
U.S. District Court, Northern District of California
Oakland Courthouse, Courtroom 1 – 4th Floor
1301 Clay Street
Oakland, CA 94612

Re:   *Ignacio Perez, et al. v. Rash Curtis & Associates*; Case No. 4:16-cv-03396-YGR JSC

Dear Judge Gonzalez Rogers:

Plaintiff, on behalf of himself and the Class, hereby withdraws the claim that Defendant violated the TCPA "willfully or knowingly."

The issue of whether Defendant violated the TCPA "willfully or knowingly" was presented to the Court during a brief "Phase 2" of the trial of this matter, which began while the jury was deliberating. When the jury returned its verdict, your Honor asked "is this [Phase 2] really necessary at this point?" Trial Tr. at 803. I responded that it was, and the presentation of evidence for Phase 2 was completed that day. The parties submitted closing arguments concerning Phase 2 on May 20, 2019. Docs. 361 & 362. Thereafter the parties had two settlement conferences, but no settlement has been reached.

Class Counsel recognize that our decision to withdraw the claim is a reversal of the position we took during Phase 2 of the trial. We also understand that our failure to withdraw the claim earlier, when your Honor suggested it, may have caused the Court to do extra work that could have been avoided. Nevertheless, we now believe that withdrawing the claim will best serve the interests of the Class.

Class Counsel respectfully requests that the Court simply enter final judgment in the form that we previously submitted, Doc. 359.

Very truly yours,

Scott A. Bursor

# EXHIBIT S-8

**Lawrence Iglesias**

| | |
|---|---|
| **From:** | Mark Ellis |
| **Sent:** | Thursday, September 05, 2019 9:40 AM |
| **To:** | Scott A. Bursor |
| **Cc:** | Mark Ellis; Paula Crary; Anthony Paul John Valenti; Lawrence Iglesias; Crystal Strong |
| **Subject:** | PEREZ v. Rash Curtis-- Protected confidential settlement- communication |

Scott:

I hope you had a good summer and have survived the tropical storm.

I am reaching out to you in light of the fact that the court has still not issued any order, much less judgment. I believe that this signals that the legal and factual issues are in fact very complex here with issues of first impression under the TCPA.

You and I are not only attorneys, but we run/administer our firms. Because of this I strongly urge you to consider this offer because this money may be off the table soon.

While threats of putting Rash out of business are well and good that will not get some recovery to the class or get you paid for your work in the case.

If the case does not settle and judgment is entered, we will not only tie the case up in righteous appeals for years, but Rash will file for bk protection and be protected from judgment enforcement by virtue of 11 USC sec 362.

This offer is open until close of business (5:00pm PST) on September 12, 2019 or upon entry of judgment—whichever occurs first.

Thanks Scott; If you want to chat about this more please call or email me.

Mark


Mark E. Ellis
Certified Specialist, Legal Malpractice
Managing Partner
**ELLIS LAW GROUP, LLP**
1425 River Park Drive, Suite 400
Sacramento, CA  95815

Tel:  (916) 283-8820
Fax: (916) 283-8821
Web: ellislawgrp.com

*This e-mail transmission and any document, file or previous message attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient (or a person responsible for delivering it to the intended recipient), you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in, or attached to, this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please: (1) immediately notify me by*

*reply e-mail, or by telephone call to 916-283-8820; and (2) destroy the original transmission and its attachments without reading or saving in any manner.*

# EXHIBIT S-9

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey O. Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
          ykrivoshey@bursor.com
          breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiff*

**ELLIS LAW GROUP LLP**
Mark E. Ellis - 127159
Anthony P. J. Valenti - 284542
Lawrence K. Iglesias - 303700
1425 River Park Drive, Suite 400
Sacramento, CA  95815
Tel: (916) 283-8820
Fax: (916) 283-8821
mellis@ellislawgrp.com
avalenti@ellislawgrp.com
liglesias@ellislawgrp.com

*Attorneys for Defendant*
RASH CURTIS & ASSOCIATES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SANDRA MCMILLION, JESSICA ADEKOYA, and IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>Defendant. | Case No.  4:16-cv-03396-YGR<br><br>**THE PARTIES' PROPOSED VERDICT FORMS**<br><br>Date: April 12, 2019<br>Time: 9:00 a.m.<br>Courtroom 1, 4th Floor<br><br>Hon. Yvonne Gonzalez Rogers |

### Plaintiff's Proposed Verdict Form

We, the jury in the above-entitled action, find as follows:

**On Class Members' claims under the <u>Telephone Consumer Protection Act</u>:**

1.  Did Rash Curtis make calls with its Global Connect dialer to Class Members' cellular telephone numbers during the class period without their prior express consent?

    _____        _____
    Yes                    No

    **If you answered "no" to Question No. 1, skip to Question No. 4.  If you answered "yes" to Question No. 1, answer Question Nos. 2 and 3.**

2.  State the number of calls Rash Curtis made with its Global Connect dialer to Class Members' cellular telephone numbers during the class period without their prior express consent:

    _____

3.  How many of the calls in your answer to Question No. 2 were made using an artificial or prerecorded voice?

    _____

4.  Did Rash Curtis make calls with its VIC dialer to Class Members' cellular telephone numbers during the class period without their prior express consent?

    _____        _____
    Yes                    No

    **If you answered "no" to Question No. 4, skip to Question No. 7.  If you answered "yes" to Question No. 4, answer Question Nos. 5 and 6.**

5.  State the number of calls Rash Curtis made with its VIC dialer to Class Members' cellular telephone numbers during the class period without their prior express consent:

_____

6.  How many of the calls in your answer to Question No. 5 were made using an artificial or prerecorded voice?

_____

7.  Did Rash Curtis make calls with its TCN dialer to Class Members' cellular telephone numbers during the class period without their prior express consent?

_____          _____
Yes                      No

**If you answered "no" to Question No. 7, skip to Question No. 9.  If you answered "yes" to Question No. 7, answer Question No. 8.**

8.  State the number of calls Rash Curtis made with its TCN dialer to Class Members' cellular telephone numbers during the class period without their prior express consent:

_____

9.  Did Rash Curtis call Plaintiff Ignacio Perez on his cellular telephone during the class period with the Global Connect dialer?

_____          _____
Yes                      No

**If you answered "no" to Question No. 9, skip Question Nos. 10 and 11.  If you answered "yes" to Question No. 9, answer Question Nos. 10 and 11.**

**On Plaintiff Perez's individual claims under the <u>Telephone Consumer Protection Act</u>:**

10. How many times did Rash Curtis call Plaintiff Ignacio Perez on his cellular telephone during the class period with the Global Connect dialer?

_____

11. How many of the calls in your answer to Question No. 10 were made using an artificial or prerecorded voice?

_____

Date: _____        _____
                                                      Presiding Juror

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Defendant's Proposed Verdict Form

Pursuant to the Court's Local Rules and Standing Orders, Defendant Rash Curtis & Associates hereby submits the following verdict form:

We, the jury in the above-entitled action, find as follows:

### As to the Plaintiff's Individual TCPA Claim:

1.      Did Defendant place calls to Plaintiff using an "automatic telephone dialing system?"


_____        _____
        Yes                        No


**If you answered "yes" to Question No. 1, answer Question No. 2.  If you answered "no" to Question No. 2, skip to Question No. 3.**


2.      How many calls did Defendant place to Plaintiff's cellular telephone using an "automatic telephone dialing system?"


_____


3.      Did Defendant place calls to Plaintiff using a prerecorded or artificial voice?


_____        _____
        Yes                        No


**If you answered "yes" to Question No. 3, answer Question No. 4.  If you answered "no" to Question No. 3, skip to Question No. 5.**


4.      How many calls did Defendant place to Plaintiff's cellular telephone using a prerecorded or artificial voice?

THE PARTIES' PROPOSED VERDICT FORMS                                           4
CASE NO. 4:16-cv-03396-YGR

_____

5.      Did Defendant possess Plaintiff's prior express consent to call Plaintiff's cellular telephone?

_____          _____
        Yes                       No

**If you answered "no" to Question No. 5, answer Question No. 6.  If you answered "yes" to Question No. 5, skip to Question No. 10.**

6.      Did Defendant have a good faith belief that Plaintiff provided his prior express consent to be called on his cellular telephone?

_____          _____
        Yes                       No

7.      Did Defendant reasonably rely on the telephone number provided by its creditor-client, Sutter General Hospital, such that its calls fell within the "safe harbor" defense?

_____          _____
        Yes                       No

8.      Did Plaintiff suffer any actual monetary loss as a result of Defendant's conduct?

_____          _____
        Yes                       No

If you answered "yes" to Question No. 8, answer Question No. 9.  If you answered "no" to Question No. 8, skip to Question No. 10.

9.      What was Plaintiff's actual monetary loss as a result of Defendant's conduct?

$_____

**As to the Class Members' TCPA Claims:**

10.     Did Plaintiff establish that Defendant used an "automatic telephone dialing system" to place telephone calls to cellular telephone numbers obtained through skip-tracing?

_____            _____
        Yes                     No

If you answered "yes" to Question No. 10, answer Question No. 11.  If you answered "no" to Question No. 10, skip to Question No. 12.

11.     How many calls did Defendant place to the Class Members' skip-traced cellular telephones using an "automatic telephone dialing system?"

_____

12.     Did Plaintiff establish that Defendant used a prerecorded or artificial voice during telephone calls placed to Class Members' cellular telephone numbers obtained through skip-tracing?

_____            _____
        Yes                     No

1      **If you answered "yes" to Question No. 12, answer Question No. 13.  If you answered**

2   **"no" to Question No. 12, skip to Question No. 14.**

3

4      14.     How many calls did Defendant place to the Class Members' skip-traced cellular

5   telephones using a prerecorded or artificial voice?

6

7      _____

8

9      15.     Did the Class Members suffer any actual monetary loss as a result of Defendant's

10  conduct?

11

12     _____        _____

13            Yes                          No

14

15     **If you answered "yes" to Question No. 15, answer Question No. 16.  If you answered**

16  **"no" to Question No. 15, have the presiding juror sign this Verdict Form and return it to the**

17  **clerk.**

18

19     16.     What was the Class Members' actual monetary loss as a result of Defendant's

20  conduct?

21

22     $_____

23

24  **Once you have completed this Verdict Form, have the presiding juror sign it and return it to**

25  **the clerk.**

26  Dated: _____

27                                          _____
                                            Presiding Juror
28

1    Dated: March 4, 2019                  Respectfully submitted,

2                                          **BURSOR & FISHER, P.A.**

3                                          By:   */s/ Yeremey Krivoshey*
4                                                  Yeremey Krivoshey

5                                          L. Timothy Fisher (State Bar No. 191626)
                                           Yeremey Krivoshey (State Bar No.295032)
6                                          1990 North California Blvd., Suite 940
                                           Walnut Creek, CA  94596
7                                          Telephone: (925) 300-4455
                                           Email:  ltfisher@bursor.com
8                                                    ykrivoshey@bursor.com

9                                          **BURSOR & FISHER, P.A.**
                                           Scott A. Bursor (State Bar No. 276006)
10                                         888 Seventh Avenue
                                           New York, NY  10019
11                                         Telephone: (212) 989-9113
                                           Facsimile:  (212) 989-9163
12                                         E-Mail: scott@bursor.com

13                                         *Attorneys for Plaintiff*

14   Dated:  March 4, 2019                 **ELLIS LAW GROUP LLP**

15                                         By: */s/ Mark E. Ellis*
16                                                Mark E. Ellis

17                                         Mark E. Ellis (State Bar No. 127159)
                                           Anthony P.J. Valenti (State Bar No. 288164)
18                                         Lawrence K. Iglesias (State Bar No. 303700)
                                           1425 River Park Drive, Suite 400
19                                         Sacramento, CA  95815
                                           Tel: (916) 283-8820
20                                         Fax: (916) 283-8821
                                           mellis@ellislawgrp.com
21                                         avalenti@ellislawgrp.com
                                           liglesias@ellislawgrp.com

22                                         *Attorneys for Defendant*

23

24

25

26

27

28

# EXHIBIT S-10

# ELLIS LAW GROUP, LLP

1425 River Park Drive, Suite 400, Sacramento, California  95815
Phone: 916-283-8820    Fax: 916-283-8821    Web: www.ellislawgrp.com
e-mail:  mellis@ellislawgrp.com

May 15, 2019

Honorable Yvonne Gonzalez Rogers
U.S.D.C. Northern District of California
1301 Clay Street
Courtroom 1-4th Floor
Oakland, CA  95612

      Case Name:    **PEREZ v. RASH CURTIS**
      Case No.:      *4:16-cv-03396-YGR JSC*
      Our File Number:  *16-0057*

Dear Judge Gonzalez Rogers:

Pursuant to the Court's order from the bench on May 13, 2019, Defendant Rash Curtis respectfully submits its proposed judgment.

From its research, Rash Curtis submits that any judgment that could be entered at this point in time would only be partial, not disposing of all claims, and thus not final. *See, e.g., Riley v. Kennedy,* 553 U.S. 406, 419, 128 S.Ct. 1970, 1981 (2008); *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631 (1945) (A final judgment is "one which ends the litigation on the merits and leaves nothing for the Court to do but execute the judgment."); *HSBC Bank USA v. Townsend,* 793 F.3d 771, 775 (7th Cir. 2015).

Defendant submits any "final" judgment must await the court's separate determination as to whether the purported violations as to (a) Perez, individually, and/or (b) the class he represents were willful and knowing within the meaning of 47 U.S.C. § 227(b)(3)(C), and/or whether the Court exercises its discretion not to increase the amount of the award. Even a $500 award under § 227(b)(3)(B) appears to be subject to reduction where the statutory $500 damages as applied would constitute an unconstitutional violation of due process because of the imposition of annihilating damages. *See Maryland v. Universal Elections, Inc.*, 729 F.3d 370 (4th Cir. 2013), *affirming* 862 F.Supp.2d 457, 465; *Texas v. American Blastfax, Inc.*, 164 F.Supp.2d 892, 900-901 (W.D. Tex. 2001) (application of $500 per violation excessive and "inequitable and unreasonable"); *Golan v. Veritas Ent., LLC,* 2017 WL 3923162 at *2 (E.D. Mo. Sept. 7, 2017) (awarding less than $500 per violation).

Honorable Yvonne Gonzalez Rogers
*Perez v. Rash Curtis*
*Case No. 4:16-cv-03396-YGR JSC*
May 15, 2019
Page 2


     Defendant submits entering judgment piecemeal will be confusing as to the time to appeal, which the federal rules seek to avoid.  *See, e.g.,* Fed. R. Civ. Proc. 54(b).  No party will be prejudiced and, indeed, Defendant submits that final judgment on all claims should be held in abeyance while the parties negotiate settlement before Magistrate Hixson.

               Respectfully submitted,

               */s/ Mark E. Ellis*

               Mark E. Ellis
               Attorney for Defendant Rash Curtis & Associates


cc:  All counsel through CM/ECF

# EXHIBIT S-11

```
1    ECONOMIST FROM MIT.  AND I WENT TO AN ANTITRUST CONFERENCE OF
2    JUDGES RECENTLY, AND THE JOKE WAS THAT THERE ARE TWO LAWS IN
3    ECONOMICS.  THE FIRST LAW IS THAT FOR EVERY ECONOMIST, THERE
4    IS AN EQUAL AND OPPOSITE ECONOMIST.  THE SECOND LAW IS THAT
5    THEY ARE BOTH WRONG.
6        SO, YOU HAVE ISSUES.  THEY ARE VALID THINGS, BUT YOU WILL
7    RAISE THEM AT TRIAL.  TO THE EXTENT THAT YOU NEEDED TO DO THIS
8    IN THE CONTEXT OF A DAUBERT, THE ISSUES ARE PRESERVED, BUT I'M
9    NOT GRANTING THE MOTIONS.
10           MR. ELLIS:  THANK YOU, YOUR HONOR.
11           THE COURT:  WITH RESPECT TO THE ADMIN MOTIONS.  I WAS
12   VERY SURPRISED WHEN I SAW THE MOTION TO SHORTEN TIME AND THERE
13   WAS A NOTE IN THE BRIEFING THAT I HAD BEEN REMISS IN MY
14   DUTIES.  AND SO I WENT BACK TO THE DOCKET AND REALIZED THAT
15   YOU ALL DID NOT FILE YOUR MOTION PROPERLY.
16       SO YOU FILED SOME NOTICE.  WELL, YOU DIDN'T ASK ME TO DO
17   ANYTHING.  AND BECAUSE THERE WAS, IN OUR PARLANCE, WE HAVE
18   GAVELS FOR MOTIONS, ADMIN MOTIONS, REGULAR MOTIONS, BUT WE
19   KNOW WE HAVE TO DO SOMETHING WHEN THE PARTY FILES THEIR
20   DOCUMENTS PROPERLY.  PUTTING SOME NOTICE ON THE DOCKET TELLS
21   ME NOTHING UNLESS I READ EACH AND EVERY PAGE, WHICH I DON'T.
22   I DON'T READ THINGS ON THE DOCKET UNLESS THERE'S SOMETHING FOR
23   ME TO DO.  SO, I WAS SURPRISED, AND THEN I LEARNED IT WAS
24   BECAUSE IT WAS FILED -- OR FILED NOT PROPERLY.
25       BUT I THINK THAT I'M GOING TO GRANT THE RELIEF IN ANY
```

1   EVENT.  WE ARE GOING TO TRY THIS CASE.  THIS CASE HAS BEEN OUT

2   THERE FOR A LONG TIME.  I'M NOT GRANTING YOU LEAVE TO FILE A

3   MOTION TO DECERTIFY.  AND, YOU KNOW, THIS HAS BEEN A

4   HARD-FOUGHT CASE, AND IT HAS TO COME TO A RELATIVE END.  I USE

5   THE WORD "RELATIVE" BECAUSE AS I TELL MY LAW CLERKS, TRIALS

6   ARE THE GIFT THAT KEEPS ON GIVING.  EVERYONE THINKS THAT IT'S

7   THE END BUT IT IS ACTUALLY NOT.  WE GET SOME ANSWER AND THEN I

8   GET POST-TRIAL BRIEFS AND APPEALS AND EVERYTHING ELSE.  BUT,

9   IN EFFECT, WE DO HAVE TO BRING THIS TO A CLOSE.

10       AND SO IF THAT MEANS I HAVE TO SHORTEN THE CLASS NOTICE

11   PERIOD, SO BE IT.  IN THESE KINDS OF CASES, YOU KNOW, YOU'RE

12   LOOKING AT A 2 PERCENT RETURN IN ANY EVENT PERHAPS, 2 TO

13   5 PERCENT.  SO THE FACT THAT WE'RE DECREASING THE NOTICE

14   PERIOD, I THINK, GIVEN ALL OF THE CONSIDERATIONS IS FINE.

15       THE REASON THAT I ASKED YOU TO BRING YOUR TRIAL BINDERS IS

16   THAT ONCE I DECIDED I WAS GOING TO DENY THE MOTIONS, I THOUGHT

17   THAT HAVING -- I TOOK A QUICK LOOK AT YOUR BINDERS.  IT LOOKS

18   LIKE THERE'S ACTUALLY -- WE COULD PROBABLY MOVE THROUGH THIS

19   PRETTY QUICKLY.  AND IF I CAN AVOID HAVING YOU COME BACK AND

20   SPEND MORE TIME HERE, WE CAN PROBABLY DO THAT.

21       WE CAN TALK BRIEFLY -- WE STILL HAVE TO DEAL WITH THE

22   MOTIONS BECAUSE I HAD NOT BEEN GIVEN COURTESY COPY OF THE

23   MOTIONS.  THEY WEREN'T ACTUALLY DUE, BUT IT LOOKED LIKE YOU

24   WERE ALL DONE.

25       SO I THOUGHT I WOULD RUN THROUGH THIS QUICKLY WITH YOU IN

# EXHIBIT S-12

## Lawrence Iglesias

| | |
|---|---|
| **From:** | Victoria Fellner <Victoria.Fellner@computershare.com> |
| **Sent:** | Monday, October 07, 2019 11:33 AM |
| **To:** | Lawrence Iglesias; Mark Ellis; Shawn Gilhula |
| **Cc:** | Anthony Paul John Valenti; Paula Crary; Crystal Strong; Rosanne Estrella; Jennifer Mueller; Jennifer Mueller |
| **Subject:** | RE: McMillion, et al. v. Rash Curtis & Associates, Case No. 16-cv-03396-YRG |
| **Attachments:** | v6_RRM_PC_032919_FINAL.pdf; v7_RRM_WebNotice_032819_FINAL.pdf; McMillion v Rash Curtis & Associates Statistical Report.pdf |

Hi Lawrence and Mark,

As discussed over the phone, attached is the Post Card Notice, Long Form Notice and updated report.

Kind regards,

Victoria

**Victoria Fellner**
KCC
Project Manager > Class Action Services
M + 1 519 709 4512
www.kccllc.com

| CERTAINTY | INGENUITY | ADVANTAGE |

---

**From:** Lawrence Iglesias [mailto:liglesias@ellislawgrp.com]
**Sent:** Monday, October 07, 2019 1:53 PM
**To:** Victoria Fellner; Mark Ellis; Shawn Gilhula
**Cc:** Anthony Paul John Valenti; Paula Crary; Crystal Strong; Rosanne Estrella; Jennifer Mueller; Jennifer Mueller
**Subject:** RE: McMillion, et al. v. Rash Curtis & Associates, Case No. 16-cv-03396-YRG

Thank you Victoria.

Lawrence Iglesias, Esq.
Associate Attorney
Ellis Law Group, LLP
1425 River Park Drive, Suite 400
Sacramento, CA 95815

Tel: (916) 283-8820
Fax: (916) 283-8821
Web: ellislawgroup.com

*WARNING:  The information contained in this e-mail is intended for the use of the individual or entity to which it is addressed, and may be privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this e-mail in error, please notify us immediately at the telephone number listed above, or by return e-mail to liglesias@ellislawgrp.com and delete this communication in a manner that permanently removes it from any computer drive in your possession.  This document was not intended or written to be used and it cannot be used for the purpose of avoiding tax penalties that may be imposed on the taxpayer.*

**From:** Victoria Fellner <Victoria.Fellner@computershare.com>
**Sent:** Monday, October 07, 2019 10:51 AM
**To:** Mark Ellis <mellis@ellislawgrp.com>; Lawrence Iglesias <liglesias@ellislawgrp.com>; Shawn Gilhula <sgilhula@ricepoint.com>
**Cc:** Anthony Paul John Valenti <AValenti@ellislawgrp.com>; Paula Crary <pcrary@ellislawgrp.com>; Crystal Strong <cstrong@ellislawgrp.com>; Rosanne Estrella <restrella@ellislawgrp.com>; Jennifer Mueller <jmueller@ellislawgrp.com>; Jennifer Mueller <jmueller@ellislawgrp.com>
**Subject:** RE: McMillion, et al. v. Rash Curtis & Associates, Case No. 16-cv-03396-YRG

Hi all,

Here is a stat report I made to show the statistics of the Direct Notice Campaign to help during the meeting.

Kind regards,

Victoria

**Victoria Fellner**
KCC
Project Manager > Class Action Services
M + 1 519 709 4512
www.kccllc.com

| CERTAINTY | INGENUITY | ADVANTAGE |

---

**From:** Mark Ellis [mailto:mellis@ellislawgrp.com]
**Sent:** Monday, October 07, 2019 1:11 PM
**To:** Victoria Fellner; Lawrence Iglesias; Shawn Gilhula
**Cc:** Mark Ellis; Anthony Paul John Valenti; Paula Crary; Crystal Strong; Rosanne Estrella; Jennifer Mueller; Jennifer Mueller
**Subject:** RE: McMillion, et al. v. Rash Curtis & Associates, Case No. 16-cv-03396-YRG

thanx

Mark E. Ellis
Certified Specialist, Legal Malpractice
Managing Partner
**ELLIS LAW GROUP, LLP**
1425 River Park Drive, Suite 400
Sacramento, CA  95815

Tel:  (916) 283-8820
Fax: (916) 283-8821
Web: ellislawgrp.com

*This e-mail transmission and any document, file or previous message attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient (or a person responsible for delivering it to the intended recipient), you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in, or attached to, this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please: (1) immediately notify me by reply e-mail, or by telephone call to 916-283-8820; and (2) destroy the original transmission and its attachments without reading or saving in any manner.*

-----Original Appointment-----
**From:** Victoria Fellner <Victoria.Fellner@computershare.com>
**Sent:** Monday, October 07, 2019 10:07 AM
**To:** Lawrence Iglesias; Mark Ellis; Shawn Gilhula
**Subject:** McMillion, et al. v. Rash Curtis & Associates, Case No. 16-cv-03396-YRG
**When:** Monday, October 07, 2019 2:00 PM-2:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Skype Meeting

Hi all,

Here is the meeting invite for our scheduled call.

Kind regards,

Victoria

# → Join Skype Meeting

Trouble Joining? Try Skype Web App

## Join by phone

| | |
|---|---|
| 1 781 298 2909 (US) | English (United States) |
| 1 855 258 0369 (US) | French (Canada) |
| 1 855 321 4789 (US) | English (United States) |
| 1 781 298 2908 (US) | French (Canada) |
| 1 781 298 2909 (US) | English (United States) |

Find a local number

Conference ID: 48981895
Forgot your dial-in PIN? | Help



*************************************************************************
Please visit the following website to read the Computershare legal notice:
http://www.computershare.com/disclaimer/americas/en

Veuillez visiter le site Web suivant afin de prendre connaissance de l'avis juridique de Computershare:
http://www.computershare.com/disclaimer/americas/fr

*************************************************************************

# EXHIBIT S-13

462 S. Fourth St
Louisville, KY 40202

**KCC**

10/7/2019
**Weekly Case Status Report**

**PROJECT MANAGER**
Direct Telephone:
Email:

Victoria Fellner
(519) 709-4512
victoria.fellner@computershare.com

Mailing Date: 4/2/2019
Opt-out Deadline: 5/3/2019
Trial: 5/6/2019

## McMillion v Rash Curtis & Associates Class Statistics

| | |
|---|---|
| Total class members: | 52,025 |
| Total opt-outs: | 0 |
| % opt-outs: | 0.00% |

### Notification Mailings

| Date | Notices Mailed | Notices Emailed | Email Bouncebacks | RUM[1] | RUM Remailed | Correspondence Timely Opt-Outs Received | Late Opt-Outs Received |
|---|---|---|---|---|---|---|---|
| 4/2/2019 | 17,202 | 34,823 | - | - | - | - | - |
| 4/18/2019 | 501 | 0 | 1,261 | | | 0 | 0 |
| 5/21/2019 | 0 | 0 | 0 | 2,875 | 125 | 0 | 0 |
| 5/28/2019 | 0 | 0 | 0 | 0 | 456 | 0 | 0 |
| 6/3/2019 | 0 | 0 | 0 | 74 | 0 | 0 | 0 |
| 6/10/2019 | 0 | 0 | 0 | | | 0 | 0 |
| **Total:** | **17,703** | **34,823** | **1,261** | **2,949** | **581** | **0** | **0** |

**NOTES**

[1]RUM is an acronym for Returned Undeliverable Mail, indicating mail returned by the United States Postal Service (USPS).

[2]The numbers and statistics on this report are for your reference only and will change throughout the administration process. Final numbers and statistics shall be provided by the Senior Project Manager once response deadlines have passed and all responses have been properly validated.